**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
Tracy L. Klestadt
Brendan M. Scott
Stephanie R. Sweeney
200 West 41st Street, 17th Floor
New York, NY 10036
Tel. (212) 972-3000
Fax. (212) 972-2245

*Proposed Attorneys for the Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
In re                                         :
                                              :        Chapter 11
HBL SNF, LLC, d/b/a EPIC REHABILITATION       :
AND NURSING AT WHITE PLAINS,[1]               :
                                              :        Case No. 21-22623 (SHL)
                    Debtor.                    :
----------------------------------------------------------------x

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 AND 507 AND F. R. BANKR. P. 4001 AND 9014, (I) AUTHORIZING THE DEBTOR TO BORROW PURSUANT TO A POST-PETITION SENIOR SECURED FINANCING FACILITY; AND (II) TO THE EXTENT NECESSARY, AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL**

**TO THE HONORABLE SEAN H. LANE,**
**UNITED STATES BANKRUPTCY JUDGE:**

HBL SNF, LLC, d/b/a Epic Rehabilitation and Nursing at White Plains (the "Debtor"), as

debtor and debtor in possession, hereby moves (the "DIP Motion") pursuant to sections 105, 361,

362, 363, 364, 503, and 507 of Title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and Rules 2002-1 and 4001-2 of the Local Rules of Bankruptcy Procedure for the

Southern District of New York ("Local Rules"), seeking (a) entry of an interim order (the

---

[1] The Debtor's principal office is located at 120 Church Street, White Plains, New York 10601. The last four digits of its taxpayer identification number are 6045.

"Interim Order"), in substantially the same form as that annexed hereto as Exhibit A, inter alia, on an interim basis: (i) authorizing the Debtor to obtain a post-petition senior secured revolving credit facility in an aggregate amount of up to $4,000,000 (the "DIP Facility") from CNH Finance Fund I, L.P. (the "DIP Lender") on the terms set forth in the Term Sheet attached hereto as Exhibit B (the "DIP Term Sheet")[2], and the definitive documentation therefor to be filed with the Court (the "DIP Credit Agreement"), for use in accordance with the approved budget attached hereto as Exhibit C (the "DIP Budget"); (ii) authorizing the Debtor to borrow up to $750,000 under the DIP Facility on an interim basis; (iii) to the extent necessary, authorizing the Debtor's use of cash collateral of White Plains Healthcare Properties I, LLC ("WPHCP"), Security Benefit Life Insurance Company and Security Benefit Corporation (collectively, "Security Benefit"); (iii) modifying the automatic stay to the extent necessary to give effect to the relief requested herein, and (iv) scheduling a final hearing for approval of the DIP Motion on a final basis (the "Final Hearing"); and (b) following the Final Hearing, entry of an order granting the relief requested herein on a final basis (the "Final Order," and together with the Interim Order, the "DIP Orders").   In support of the DIP Motion, the Debtor relies upon the Declaration of Lizer Jozefovic Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Chapter 11 Subchapter V Petition and First Day Motions (the "First Day Declaration") [Docket No. 3] filed concurrently herewith and respectfully states as follows:

## PRELIMINARY STATEMENT

The Debtor is a 160-bed skilled nursing facility operating in Westchester, New York. The Debtor employs over 250 people, currently serves approximately 120 patients, and has annual revenues of in excess of $10 million. The Debtor filed this case as a result of pending

---

[2] Terms capitalized but not defined herein shall have the meanings ascribed to them in the DIP Term Sheet or the DIP Credit Agreement, as applicable.

litigation with WPHCP, the owner and landlord of the real property from which the Debtor operates its business premises (the "Real Property"), seeking a judgment of over $84 million and threatening to terminate the Debtor's lease and ability to operate.

Although the Debtor is generally financially and operationally sound, the timing of collections of the Debtor's accounts receivable has resulted in a need for immediately available cash as of the Petition Date to allow the Debtor to continue to meet its obligations, including funding payroll within the first few days of the Case. Without immediate financing, the Debtor will likely be unable to pay its vendors and employees, ultimately resulting in potential loss of jobs and cessation of services to its patients. After diligent efforts to obtain financing, the proposed DIP Facility on the terms described in the DIP Term Sheet was the most cost-effective and otherwise favorable facility available to the Debtor.

Pursuant to the DIP Term Sheet, the Debtor seeks immediate entry of the Interim Order permitting it to borrow up to $750,000 to be used to fund business expenses and costs of the bankruptcy case pursuant to the approved DIP Budget. Thereafter, the Debtor seeks the scheduling of a Final Hearing and entry of a Final Order authorizing the Debtor to draw the remainder of the DIP Facility, in an aggregate amount of up to $4,000,000, and otherwise approving the relief sought herein on a final basis.

Although the Debtor believes it does not have secured debt outstanding as of the Petition Date, it is requesting authority to obtain the DIP Facility on a senior secured priming basis and authority to use cash collateral as a result of the potential arguments by WPHPC and WPHPC's lender, Security Benefit, that they hold a lien on substantially all of the Debtor's assets. As further described herein and in the First Day Declaration, although the Debtor granted security interests to each of WPHPC and Security Benefit, WPHPC's security interest is unperfected and avoidable, and the Debtor is not a party to WPHPC's loan agreement with, and has no

obligations thereunder to, Security Benefit. Further, in light of the appraised value of the Real Property and related business assets, WPHPC and Security Benefit are more than adequately protected by equity in the property securing their interests. As additional adequate protection, the Debtor intends to pay post-petition rent and other charges in the ordinary course of business, in accordance with the terms of the Lease while this Case is pending, as set forth in the Budget.  As such, the Debtor will remain current on all of its obligations under the Lease.  Approval of the proposed DIP Facility and use of cash collateral is necessary to allow the Debtor to meet its obligations, including continue to make all payments due under its Lease, for the benefit of all stakeholders, including WPHCP and Security Benefit. As a result, the Debtor respectfully submits that obtaining the DIP Facility and utilizing cash collateral on the terms set forth herein is appropriate in the reasonable exercise of the Debtor's business judgment and should be approved.

## JURISDICTION

1.      This Court has jurisdiction to consider this DIP Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503(b), and 507 of the Bankruptcy Code, Bankruptcy Rules 4001, 6003 and 9014, and Local Rules 2002-1 and 4001-2.

## BACKGROUND

### A.  The Bankruptcy Case

3.      On November 1, 2021 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under Subchapter V of Chapter 11 of the Bankruptcy Code commencing the instant bankruptcy case (the "Case").

4.      The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

5.      No trustee, with the exception of the Subchapter V trustee, or examiner has been appointed in the Case.  As of the date of this DIP Motion, the United States Trustee has not appointed an official committee of unsecured creditors in the Case.

6.      The Court and interested parties are respectfully referred to the First Day Declaration for background on the Debtor, its operations, the events leading to the filing of the Case, and other relevant facts in further support of the relief sought in the DIP Motion.

**B.  The Debtor's Development and Lease Agreements with WPHCP**

7.      In or around November 2015, the Debtor entered into certain agreements with WPHCP for the construction and finance of the Debtor's care facility. The Debtor executed that certain Development Agreement (as amended or modified from time to time, the "Development Agreement"), dated as of November 19, 2015, between the Debtor, as operator/tenant, and WPHCP, as developer, and that certain Amended and Restated Operating Lease (as amended or modified from time to time, the "Lease" and, together with the Development Agreement, the "Development and Lease Agreements"), dated November 19, 2015, by and between the Debtor, as tenant, and WPHCP, as Landlord.[3]

8.      Pursuant to the Development and Lease Agreements, WPHCP agreed to provide the necessary financing and construction management, and to obtain the necessary NYSDOH authorizations and approvals, in order to deliver to the Debtor a "turn-key" facility for operation by the Debtor as a skilled nursing and rehabilitation facility. The Debtor, as tenant and operator of the completed facility, agreed to pay, among other things, monthly fixed rent in the amount of

---

[3] The Debtor reserves all rights with respect to characterization of the Lease as a leasehold interest or a disguised financing transaction.

$506,096.50 for an annual amount of fixed rent of $6,073,158, to WPHCP, as landlord, over the thirty-year term of the Lease.

9.      The Lease provides that the Debtor's obligations to WPHCP under the Lease are secured by, among other things, a first priority security interest and lien granted to WPHCP upon all of the Debtor's assets (but not expressly including after-acquired property), including personal property, equipment and accounts receivable, and certificates of need and other authorizations of the Debtor with respect to operation of the facility as a skilled nursing facility. The Lease provides that WPHCP agrees to subordinate its lien on accounts receivable in favor of an accounts receivable lender to the Debtor upon certain conditions set forth therein.

10.      As of the Petition Date, there is no enforceable UCC-1 Financing Statement of record filed against the Debtor by or on behalf of WPHCP. As a result, WPHCP's liens on the Debtor's assets are unperfected and avoidable. Further, the Debtor has made all rent payments of over $506,000, commencing on October 30, 2019 (even before the opening of the facility and commencement of the Lease), totaling over $10,500,000, such that no amounts are due and owing to WPHCP, and the Debtor intends to continue to remain current on its obligations under the Lease after the Petition Date.

C.  **Financing Obtained by WPHCP from Security Benefit**

11.      In furtherance of its obligation to secure financing for the project, WPHCP entered into that certain Construction Loan Agreement (as amended or modified from time to time, the "Loan Agreement"), dated as of August 18, 2017, by and among WPHCP, as borrower, Security Benefit Life Insurance Company, as lender ("Security Benefit Lender"), and Security Benefit Corporation (together with Security Benefit Lender, "Security Benefit"), as agent, whereby Security Benefit Lender would make loans to WPHCP in an aggregate principal amount of up to $38,500,000.

12.     WPHCP's obligations under the Loan Agreement are secured by, among other things, that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "Mortgage"), recorded August 31, 2017, granted by WPHCP to Security Benefit, and an Assignment of Leases and Rents (the "Assignment of Rents"), dated as of August 18, 2017, assigning all rents in and under all leases with respect to the Real Property. The Mortgage provides that WPHCP's obligations are secured by all rights and interests of WPHCP in the Real Property. However, property of the Debtor is expressly excluded from Security Benefit's Mortgage, which provides that "all property of tenants under any Lease…is excluded from the scope of this Security Instrument."

13.     In connection with the financing, WPHCP, Security Benefit and the Debtor, as operator, entered into that certain Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of July 2017 (the "Security Agreement"), which provides for the Debtor's grant of a security interest in favor of Security Benefit in all of its assets constituting Collateral Property (as defined therein) as security for the payment and performance of, among other things, WPHCP's obligations under the Loan Agreement.[4]  With respect to the Debtor's accounts receivable, Security Benefit's liens were granted "to the extent, but only to the extent, they are used in connection with or arise from the operation of the Collateral Property that are or will be subject to an Intercreditor Agreement with the [Debtor's] AR Lender."

14.     Security Benefit filed a UCC-1 Financing Statement perfecting this security interest against the Debtor on September 19, 2017. The Debtor is not a party to the Loan Agreement and does not owe any amounts thereunder to Security Benefit.  To the best of the Debtor's knowledge, the balance owed by WPHCP to Security Benefit under the Loan

---

[4] The Debtor is not in possession of a copy of the Security Agreement executed by the Debtor and reserves all rights with respect to the Security Agreement.

Agreement was approximately $41,742,537.06 as of May 1, 2021. According to an appraisal provided by JLL dated as of April 24, 2020, the value of the Real Property and related assets is estimated to be between $56,800,000 and $74,900,000. A copy of the appraisal is annexed to the First Day Declaration as Exhibit 6.

### D. **Events Leading to the Filing**

15.     Despite the fact that the Debtor did not default under the Lease, WPHCP defaulted under its Loan Agreement with Security Benefit. Indeed, Security Benefit issued multiple notices of default to WPHCP, commencing on October 16, 2019, and commenced litigation against WPHCP attempting to foreclose against the Real Property. These actions were discontinued as a result of a New York State moratoriums on such actions.

16.     On January 7, 2020, attorneys for WPHCP sent the Debtor a letter purporting to terminate the Lease effective January 13, 2020, and on September 18, 2020, WPHCP filed a complaint against the Debtor and certain of its officers in the Supreme Court of the State of New York, County of Westchester (the "Complaint"), captioned as *White Plains Healthcare Properties I, LLC v. HBL SNF, LLC, et al.*, Index No. 60278-20 (N.Y. Sup. Ct. 2020) (the "State Court Action"), containing various frivolous allegations regarding purported defaults by the Debtor under the Lease, seeking termination of the Lease and seeking recovery of over $84 million in alleged damages.

17.     The Debtor and co-defendants filed an answer to the Complaint and asserted counterclaims and third-party claims against WPHCP, among others, as discussed in the First Day Declaration.

18.     The Debtor is generally financially and operationally sound but has been forced to file this Case because of WPHCP's lawsuit and the resulting distraction caused by the risk that

the Lease could be deemed to be terminated based upon WPHCP's frivolous allegations regarding purported defaults under the Lease.

## THE DIP FACILITY

19.    As set forth above and in the First Day Declaration, given the timing of collections of substantial accounts receivable of the Debtor, the Debtor requires immediately available cash to continue to meet its obligations in the ordinary course of its business as they come due, including its payroll obligations coming due in the first week of the Case. Following a diligent search for debtor in possession financing and good faith, arm's-length negotiations with the DIP Lender, the DIP Facility was the most cost effective and favorable financing available to the Debtor.

20.    Under the DIP Facility, the Debtor will have access to a revolving line of credit in an amount of up to $750,000 upon entry of the Interim Order and, after entry of the Final Order, in an amount of up to $4,000,000. Pursuant to Bankruptcy Rules 4001(c)(1)(B)(i)-(xi) and 4001(b)(1)(B)(i)-(iv) and Local Rule 4001-2(a)(i), a summary of the key terms of the DIP Facility is as follows:[5]

| CONCISE STATEMENT OF MATERIAL TERMS OF THE DIP FACILITY PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2 | |
|---|---|
| **TERM** | **DESCRIPTION** |
| **Borrower** <br> *Bankruptcy Rule 4001(c)(1)(B)* | HBL SNF, LLC, a New York limited liability company, in its capacity as borrower and debtor in possession |
| **Guarantors** <br> *Bankruptcy Rule 4001(c)(1)(B)* | Not applicable. |
| **DIP Lender** <br> *Bankruptcy Rule* | CNH Finance Fund I, L.P., a Delaware limited partnership |

---

[5] The following is intended to be a summary for convenience of the Court and parties in interest. In the event of any inconsistency between the following or the DIP Term Sheet and the DIP Credit Agreement, the DIP Credit Agreement shall control.

| | |
|---|---|
| *4001(c)(1)(B)* | |
| **Use of Proceeds**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The Debtor covenants and agrees that it shall incur advances and use the proceeds thereof solely (i) to the extent required to pay those working capital and other expenses enumerated in the Budget as and when such expenses become due and payable, subject to a variance of no more than ten percent (10%) between a projected line-item expense in the Budget and such actual expense; (ii) to pay fees and DIP Lender's expenses, and (iii) to pay the Carve Out. |
| **Amount and**<br>**Structure of DIP**<br>**Credit Facility**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B);Local Rule*<br>*4001-2(a)(1)* | The aggregate amount of all advances at any time outstanding under the revolving credit DIP Facility shall not exceed $4,000,000, provided that advances shall be made available in the amount of up to $750,000 upon entry of the Interim Order.<br><br>Borrowings under the DIP Facility shall be based upon DIP Lender's approval of a 16-week budget (updated weekly), in form and substance acceptable to DIP Lender in its sole discretion, and shall not exceed 85% of the net collectable value of the Eligible Receivables (which is based on historical collection rates using a static pool analysis, and adjusted to reflect factors that may not be accounted for by historical collection rates) less Court-approved Carve-Outs and reserves. Advances that are repaid or prepaid may be re-borrowed.<br><br>Eligible accounts receivable include billed accounts receivable no more than 150 days from the date of service, and unbilled accounts receivable no more than 30 days from the date of service, that are due from insurance companies with an AM Best rating equal to or greater than A, governmental agencies, and other creditworthy debtors. DIP Lender does not consider personal injury, workers compensation, or private pay receivables eligible receivable. |
| **Maturity and**<br>**Termination Date**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The Maturity Date occurs the earliest of (a) the effective date of a plan of reorganization confirmed by the Bankruptcy Court, (b) consummation of a sale or other disposition of substantially all of the Debtor's assets pursuant to 11 U.S.C. 363 or otherwise, (c) the Debtor's filing of a motion or other pleading seeking, or shall consent to, conversion to a Chapter 7 proceeding, (d) conversion to a Chapter 7 proceeding, (e) a dismissal by the Bankruptcy Court of the Debtor's bankruptcy proceeding, (f) the Debtor's filing of a motion or other pleading seeking the dismissal of the bankruptcy case under Section 1112 of the Bankruptcy Code or otherwise, (g) 24 months from closing, or (h) any date on which the loans are accelerated upon an event of default under the DIP Credit Agreement. |
| **Fees**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B);*<br>*Local Rule 4001-*<br>*2(a)(3)* | Facility Fee - 1.0% of the Facility Amount, which shall be earned and payable upon entry of the Interim Order and which shall be paid to the DIP Lender on the Closing Date from the proceeds of the Facility.<br><br>Collateral Management Fee − 0.15% per month of the average outstanding loan balance to monitor and service the DIP Facility.<br><br>Unused Line Fee – 0.042% per month of the average unused portion of the Facility Amount.<br><br>Deferred Origination Fee – 1.0% of the Facility Amount upon the earlier of the Maturity date, exit from bankruptcy or the repayment of the DIP Facility in full, as a deferred origination fee.<br><br>Fees & Expenses – the Debtor shall pay all fees and expenses related to the underwriting, documentation, bankruptcy court approval, closing process, |

| | administration and enforcement of the DIP Facility, including without limitation the reasonable fees of loan documentation and legal counsel. |
|---|---|
| **Interest Rates**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Interest Rate. All outstanding advances shall bear interest at a rate of interest equal to the rate quoted from time to time by Wells Fargo Bank as its prime rate or a comparable reference rate designated by the DIP Lender plus 2.00%. Collections of cash by the DIP Lender under the DIP Facility shall be credited to the Debtor's obligations thereunder on a daily basis, subject to three business clearance days.<br><br>Default Rate. Upon the occurrence and during the continuation of an Event of Default, all outstanding obligations shall bear interest at a per annum rate equal to three percent (3.00%) above the per annum rate otherwise applicable hereunder. |
| **Prepayments**<br>*Local Rule 4001-2(a)(13)* | Not applicable. |
| **Collateral and Priority**<br>*Bankruptcy Rule 4001(c)(1)(B)(ii); Local Rule 4001-2(a)(4)* | All obligations of the Debtor to the DIP Lender, including all principal and interest, costs, fees and expenses (the "DIP Obligations"), shall be secured by a valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected first-priority security interest and lien in substantially all of the assets of the Debtor. DIP Lender requires a first-priority lien, pursuant to 11 U.S.C. § 364(c)(2), on all unencumbered assets of the Debtor; and a first-priority priming lien, pursuant to 11 U.S.C. § 364(d), on all encumbered assets of the Debtor, including, to the extent encumbered, all accounts receivable, books and records, billing software, chattel paper, bank accounts, and acquisition deposits. This first-priority security interest and lien shall not be subject to "carve outs" other than the Carve Out.<br><br>The DIP Obligations shall constitute claims entitled to the benefits of 11 U.S.C. § 364(c)(1) (the "Super-Priority Claim"), having a super-priority over any and all administrative expenses and claims, including administrative expenses of the kind specified in or ordered pursuant to 11 U.S.C. §§ 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 and 1114. |
| **Indemnification of any Entity**<br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | Indemnification. The Debtor will indemnify and hold harmless the DIP Lender, its respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Debtor or any of its affiliates) that relates to the DIP Facility, the final order approving the DIP Facility, or the transactions contemplated thereby; provided that, no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence or willful misconduct. No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtor or any of its affiliates, subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct. In no event, however, shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages |
| **Carve-Out** | Carve-Out - (i) costs of any patient ombudsman appointed under Section 333(a) of |

| | |
|---|---|
| *Local Rule 4001-2(a)(5)* | the Bankruptcy Code, and (ii) Debtor's and DIP Lender's reasonable and documented attorneys' fees. The Carve-Out shall be reserved against the borrowing base and reduce availability. |
| **Conditions to Closing** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2),2(h)* | DIP Lender shall not be required to make any advances unless and until all of the conditions specified below, among others, shall have been satisfied with respect to such advance at the time set forth below: (a) DIP Lender shall have received and approved the Budget and the Debtor and DIP Lender shall have executed and delivered the DIP Credit Agreement; (b) The Bankruptcy Court shall have entered the Interim Order or the Final Order, as applicable, which shall be in full force and effect; (c) Debtor shall have established Controlled Deposit Accounts and DIP Lender shall have received fully executed Control Agreements prior to entry of the Final Order; (d) DIP Lender shall have received copies of all insurance policies, endorsements, certificates of insurance and such other insurance information specified in the DIP Credit Agreement prior to entry of the Final Order; (e) No Event of Default shall have occurred and be continuing, or no Event of Default would exist after DIP Lender's disbursement of each advance; (f) Each of the representations and warranties made by Debtor shall be accurate in all material respects; (g) Other than the filing of the Bankruptcy Case, no event shall have occurred which has had or could reasonably be expected to have a Material Adverse Effect, excluding any event disclosed to DIP Lender in the Bankruptcy Case; (h) DIP Lender shall have received such other documents, certificates, information or legal opinions as DIP Lender may reasonably request, all in form and substance reasonably satisfactory to DIP Lender; (i) DIP Lender shall have received all fees, charges and expenses payable to DIP Lender on or prior to the date of the advance pursuant to the Loan Documents and the Interim Order; and (j) The Bankruptcy Case is and shall remain at all times a case under Subchapter V of Chapter 11 of the Bankruptcy Code. The Interim Order and Final Order shall be in form and substance satisfactory to the DIP Lender and shall include provisions, among other things, granting the DIP Lender protections under Section 364(e) of the Bankruptcy Code, requiring all government payments owing to the Debtor to be paid to lockbox accounts in favor of DIP Lender (but in the name of the Debtor), prohibiting any governmental authority or other party from exercising rights of set-off or recoupment against any account arising on or after the Petition Date. |
| **Covenants** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(8)* | The DIP Credit Agreement contains the following general affirmative covenants: 1. Compliance with the Budget Subject to Variance 2. Financial Statements and Reports 3. Payment of Obligations 4. Conduct of Business and Maintenance of Existence and Assets |

|  | |
|---|---|
|  | 5.   Compliance with Legal, Tax and Other Obligations<br>6.   Insurance<br>7.   True Books<br>8.   Inspections<br>9.   Further Assurances<br>10.  Payment of Indebtedness<br>11.  Lien Terminations<br>12.  Use of Proceeds<br>13.  Collateral Documents; Security Interest in Collateral<br>14.  Taxes and Other Charges<br>15.  Hazardous Substances<br>16.  Licensed Facilities<br>17.  Healthcare Operations<br>18.  Bankruptcy Matters<br>And the following general negative covenants:<br>1.   Financial Covenants<br>2.   No Indebtedness Other Than Permitted Indebtedness<br>3.   No Liens Other Than Permitted Liens<br>4.   Investments, New Facilities or Collateral; Subsidiaries<br>5.   Prohibited Payments<br>6.   Transactions with Affiliates<br>7.   Organizational Documents; Fiscal Year; Dissolution; Use of Proceeds<br>8.   Asset Sales<br>9.   Management<br>10.  Restrictive Agreements<br>11.  Modifications of Certain Agreements<br>12.  Deposit Accounts<br>13.  Truth of Statements<br>14.  IRS Form 881<br>15.  Third Party Payor Programs<br>16.  Filing of Motions and Applications<br>17.  Interim and Final Financing Orders<br>And the following financial covenants:<br>1.   Current Ratio<br>2.   Loan Turnover |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001- 2(a)(10)* | Events of Default include:<br><br>(a)     Failure to pay Obligations, subject to 5 day cure period;<br><br>(b)     Any representation, statement or warranty made or deemed made by Debtor in any Loan Document or in any other certificate, document, report or opinion delivered in conjunction with any Loan Document to which it is a party, (i) shall not be true and correct in all material respects, or (ii) shall have been false or misleading in any material respect on the date when made or deemed to have been made (except to the extent already qualified by materiality, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect);<br><br>(c)     Debtor or any other party thereto other than DIP Lender shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in any Loan Document and such violation, breach, default or failure shall not be cured within the applicable period set forth in the applicable Loan Documents; provided that a cure period shall apply to specific covenants to be set forth in the DIP Credit Agreement;;<br><br>(d)     Any of the Loan Documents ceases to be in full force and effect, or any |

Lien created thereunder ceases to constitute a valid perfected first priority Lien on the Collateral, or DIP Lender ceases to have a valid perfected first priority security interest in any material portion of the Collateral;

(e)     DIP Lender's administrative expense claim in the Bankruptcy Case becomes subject (or subordinate) to another administrative expense claim;

(f)     One or more judgments or decrees is rendered against Debtor in an amount in excess of $25,000 individually or $50,000 in the aggregate at one time outstanding, which is/are not satisfied, stayed, bonded, vacated or discharged of record within thirty (30) calendar days of being rendered;

(g)     Any Change of Control occurs or any agreement or commitment to cause or that may result in any such Change of Control is entered into, (ii) any Material Adverse Effect, Material Adverse Change occurs, (iii) any Liability Event occurs, or (iv) Debtor ceases any material portion of its business operations as currently conducted;

(h)     Any Indebtedness of Debtor is declared to be due and payable or is required to be prepaid (other than by a regularly scheduled payment) prior to the stated maturity thereof;

(i)     DIP Lender receives any indication or evidence that Debtor may have directly or indirectly been engaged in any type of activity which, in DIP Lender's judgment, might result in forfeiture of any property to a Governmental Authority which shall have continued unremedied for a period of ten (10) calendar days after written notice from DIP Lender;

(j)     Debtor or any of its respective members or senior officers is criminally indicted or convicted under any law that could lead to a forfeiture of any material portion of their respective assets;

(k)     The Bankruptcy Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed by Debtor;

(l)     Debtor files or supports or the Bankruptcy Court enters an order confirming a proposed plan of reorganization or liquidation that does not provide for the indefeasible payment in full and in cash of the Obligations, unless otherwise agreed in writing by DIP Lender in its sole discretion;

(m)     Any attempt by Debtor to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to (i) invalidate, reduce or otherwise impair DIP Lender's claims, or (ii) amend, supplement, stay, vacate or otherwise modify the Revolving Facility, or the Financing Orders without the consent of Lender;

(n)     Debtor requests approval of any post-petition financing, other than pursuant to the Revolving Facility, that would not immediately repay all Obligations, in full, in cash, on the date of the closing of such post-petition financing, unless otherwise agreed by DIP Lender;

(o)     The entry of an order granting liens or claims that are senior or *pari passu* to the Liens granted in favor of DIP Lender;

(p)     The Debtor shall assert that any of the Liens securing the Obligations are

|  | invalid, or any such Liens granted to the DIP Lender shall be determined to be invalid; |
|  | (q)      Any report is filed by a patient care ombudsman or state long-term care ombudsman in the Bankruptcy Case indicating that patient care has significantly declined or has been materially compromised; |
|  | (r)      Any creditor or party in interest shall be granted relief from the automatic stay with respect to any material portion of the assets used in operation of the Debtor's business; |
|  | (s)      Debtor shall default in the due performance or observance by it of any term, covenant or agreement contained in the Interim Financing Order or the Final Financing Order; |
|  | (t)      From and after the date of entry thereof, the Interim Financing Order or the Final Financing Order approving this Agreement and the Revolving Facility shall cease to be in full force and effect; |
|  | (u)      A Final Financing Order approving this Agreement and the Revolving Facility has not been entered by the Bankruptcy Court within forty-five (45) days of the Petition Date, unless otherwise agreed by DIP Lender; |
|  | (v)      Debtor applies for an order substituting any assets for all or any portion of the Collateral; or |
|  | (w)      The Lease is determined to be terminated or otherwise invalid by a court of competent jurisdiction. |
|  | Upon the occurrence of an Event of Default and after expiration of any applicable cure period, DIP Lender may, among other things: |
|  | (i) terminate DIP Lender's obligations and/or, (ii) declare all or any portion of the Obligations to be due and payable immediately, (iii) apply any property of Debtor to reduce the Obligations, (iv) foreclose the Liens created under the Loan Documents, (v) exercise all rights and powers with respect to the Collateral as Debtor might exercise (other than with respect to Collateral consisting of Accounts owed or owing by Medicaid/Medicare Account Debtors absent a court order or compliance with applicable Law), (vi) reduce or otherwise change the Facility Cap; (a) exercise any and all of the rights and remedies of Debtor under the Permits, without any interference from Debtor, and Debtor shall cooperate in causing the Governmental Authorities, contractors, or purchasers and lessees to comply with all the terms and conditions of the Licenses, and, (b) if and to the extent permitted by law and the terms of the Permits, DIP Lender may, at its option, take over and enjoy the benefits of the Permits, exercise Debtor's rights under the Permits, and perform all acts in the same manner and to the same extent as Debtor might do. |
| **Change of Control**<br>*Local Rule 4001-2(a)(11)* | The following is deemed a Change of Control resulting in an Event of Default: |
|  | (a) the occurrence of a merger, consolidation, reorganization, recapitalization or share or interest exchange, sale or transfer or any other transaction or series of transactions as a result of which the owners, directly or indirectly, of a majority of any Debtor's voting stock or voting power as of the date hereof cease to be entitled to control the company, or (b) the resignation, termination, replacement, death, |

| | disability or any other event the result of which is the failure of the existing senior management of Debtor to function in its current capacity, unless, (i) in the case of a replacement, the replacement is reasonably acceptable to DIP Lender, or (ii) in all other cases a replacement reasonably satisfactory to DIP Lender is identified and engaged within 30 days following such event, or (c) the sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of Debtor's assets to, or a consolidation or merger with or into, any other Person, other than any such transaction where immediately thereafter the surviving Person is a direct or indirect subsidiary of Debtor. |
|---|---|
| **Deadline or Requirement for Sale of Property** *Local Rule 4001-2(a)(12)* | Not applicable. |
| **Restrictions on Funding Certain Activities** *Local Rule 4001-2(a)(9)* | The Debtor may not use the proceeds of the DIP facility to initiate or prosecute any claims, causes of action, adversary proceedings or other litigation against the DIP Lender or any of its officers, directors, equity holders, employees or affiliates, or to object, contest, or raise in any proceeding any defense to the validity, perfection, priority, extent or enforceability of the DIP Credit Agreement or the liens contemplated thereby or take any action that would be injurious to DIP Lender's interests. |
| **Funding of Non-Debtor Affiliates with Cash Collateral or Loan** *Local Rule 4001-2(a)(15)* | Not applicable. |
| **Automatic Stay** *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | Pursuant to the proposed Interim Order, the automatic stay imposed under section 362(a) of the Bankruptcy Code is modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of the Interim Order and the Loan Documents, including without limitation, to permit the DIP Lender to exercise all rights and remedies provided for in the Loan Documents and take any and all actions provided therein, in each case, without further notice, application to, order of or hearing before the Court. |

## **RELIEF REQUESTED**

21.     By this DIP Motion, the Debtor requests: (a) entry of the Interim Order (i) approving the DIP Facility on a first priority senior secured basis, (ii) modifying the automatic stay to the extent necessary to grant the relief requested herein, and (ii) scheduling the Final Hearing; and (b) following the Final Hearing, entry of a Final Order.

**BASIS FOR RELIEF**

22.     The Court should approve the senior secured DIP Facility on the terms set forth herein and in the DIP Term Sheet because (a) the Debtor is unable to obtain financing on an unsecured, administrative priority, or junior secured basis; and (b) approval of the DIP Facility is in the best interests of the Debtor's estate and all stakeholders in the Debtor's Case.

### A.  The DIP Facility Should be Approved

23.     Approval of the DIP Facility is necessary to provide the Debtor with immediate and ongoing access to liquidity to pay its current and ongoing operating expenses, including wages, taxes, vendor obligations, professional fees, costs pertaining to the duly appointed patient ombudsman, and other operational costs such as utilities and rent under the Lease. The inability to access additional liquidity would result in an inability to meet payroll obligations, bringing the Debtor's operations to an immediate halt, to the severe and irreparable detriment of the Debtor's patients, creditors, employees, and all other stakeholders, including WPHCP and Security Benefit. The funding to be provided by the DIP Facility will enable the Debtor to continue to service patients, pay employees and vendors, and otherwise continue to operate its business in the ordinary course during the Case, thereby preserving and enhancing the value of its estate for the benefit of all stakeholders.

24.     Most significantly, the liquidity and flexibility provided by the DIP Facility will provide the Debtor with breathing room to seek to resolve its pending disputes with WPHCP, without the threat of imminent abrupt termination of its Lease and ability to operate. Accordingly, the Debtor submits that the DIP Facility is essential to allow the Debtor to continue as a going concern and preserve estate value for the benefit of all stakeholders.

### B.  The Proposed Liens and Superpriority Administrative Claims are Appropriate

25.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a

debtor is unable to obtain unsecured credit allowable as an administrative expense under section

503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur

debt (a) with priority over any and all administrative expenses as specified in section 503(b) or

507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not

otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject

to a lien. 11 U.S.C. § 364(c).  Section 364(d) of the Bankruptcy Code allows a debtor to obtain

credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided

that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection

of the interest of the holder of the lien on the property of the estate on which such senior or equal

lien is proposed to be granted. 11 U.S.C. § 364(d). The Debtor proposes to obtain financing

under the DIP Facility by providing the DIP Lender with superpriority claims and security

interests pursuant to sections 364(c)(1)–(3) and 364(d) of the Bankruptcy Code.

26.     The Debtor's liquidity needs can be satisfied only if the Debtor is immediately

authorized to obtain postpetition financing on an interim basis under the DIP Facility to fund its

operations.  As set forth in the First Day Declaration, the Debtor has been unable to procure

sufficient financing in the form of unsecured credit allowable under section 503(b)(1) or as an

administrative expense under sections 364(a) or (b) of the Bankruptcy Code. See 11 U.S.C. §§

503(b)(1), 364(a)-(b). The Debtor has not been able to obtain postpetition financing or other

financial accommodations from any alternative prospective lender or group of lenders on more

favorable terms and conditions than those for which approval is sought herein.

27.     Having determined that financing is available only under sections 364(c) and (d)

of the Bankruptcy Code, the Debtor approached several parties, including the DIP Lender, in

good faith and at arms'-length to seek interest in lending to the Debtor.  Provided that a debtor's

judgment in choosing its postpetition financing does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  See, e.g., In re Barbara K. Enters., Inc., Case No. 08-11474, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y., June 16, 2008); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest"); see also Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Berry Good, LLC, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008).

28.    Section 364(d) of the Bankruptcy Code does not require a debtor to seek alternative financing from every possible lender; rather, the debtor need only demonstrate that it undertook sufficient efforts to obtain financing without the need to grant a senior lien.  In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 n. 44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a showing of "reasonable effort" to obtain alternative credit with lesser security); In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); see also Snowshoe Co., 789 F.2d at 1088 (unsuccessful contact with other financial institutions in the geographic area was sufficient to demonstrate that credit was unavailable absent senior lien).

29.    Although the Debtor's assets are technically encumbered by Security Benefit's security interest under the Security Agreement, WPHCP holds no enforceable liens, and the Debtor does not have any secured debt owing to Security Benefit, as the Debtor is not a party to the Loan Agreement or guarantor of WPHCP's obligations thereunder. Further, neither WPHCP

nor Security Benefit has control of the Debtor's bank accounts under a deposit control agreement or otherwise, such that they could argue that they have an enforceable lien on the Debtor's cash. In addition, at least with respect to the Debtor's accounts receivable, the language of the Lease and Security Agreement contemplate carve outs from such security interests in favor of an accounts receivable lender to the Debtor, such as the DIP Lender here. However, given the complexity of the Debtor's pre-petition lease and development transactions and disputes, the DIP Lender requires, and the Debtor is therefore seeking, liens to be granted on a priming basis under section 364(d) of the Bankruptcy Code to ensure the DIP Lender's senior secured priority, and the Debtor has been unable after reasonable effort to procure alternative post-petition financing absent such provision.  The Debtor respectfully submits that because the circumstances of the Case require the Debtor to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, its entry into the DIP Facility reflects an exercise of its sound business judgment and should be approved.

## C.  The Debtor Should be Permitted to Use Cash Collateral of WPHCP and Security Benefit

### (i)      The Debtor Requires the Use of Cash Collateral

30.    A debtor in possession may be authorized pursuant to court order to use cash collateral in the ordinary course of its business operations under Bankruptcy Code sections 363(c) and 1107.  The Court may condition such use, pursuant to Bankruptcy Code section 363(e), as is necessary to provide adequate protection of any interest held therein by any entity other than the debtor in possession. A chapter 11 debtor may not use cash collateral unless "(A) each entity that has an interest in such collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

31.     Courts repeatedly have recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. See In re Realty Southwest Assoc., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); H.R. Rep. No. 595, 95th Cong., 1st Sess. 344 (1977); 3 Collier on Bankruptcy 363.03 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006); see also In re Dynaco, 162 B.R. 389, 396; In re Stein, 19 B.R. 458 (Bankr. E.D. Pa. 1982).  Bankruptcy Rule 4001(b) governs authorization for utilizing cash collateral and provides that the court may permit the debtor in possession to use cash collateral prior to a final hearing to the extent necessary to avoid immediate and irreparable harm.  After a final hearing held on at least fourteen days' notice, the court may grant the authority to use cash collateral on a permanent basis.

32.     The Debtor requires the use of its accounts receivable and other assets in order to continue to meet its obligations and to secure the proposed debtor in possession financing.  To the extent such assets are subject to the liens and security interests of WPHCP and/or Security Benefit, the Debtor is requesting authority to utilize such assets pursuant to the terms of the DIP Facility and in accordance with the proposed Budget, on an interim basis subject to entry of the Final Order. The Debtor submits that such relief is in the best interest of all parties in interest, including WPHCP and Security Benefit. In the absence of such relief, the Debtor's ability to make payments under its Lease to or for the benefit of WPHCP or Security Benefit, pay employees and suppliers, ensure the care of its patients and generally operate it business will be jeopardized, causing immediate and irreparable harm to the Debtor's estate and all stakeholders. Thus, the Debtor's use of cash collateral is essential in order to enable the Debtor to preserve its value, and thus the value of any security interests of WPHCP and Security Benefit.

**(ii)     WPHCP and Security Benefit are Adequately Protected**

33.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  The purpose of adequate protection is to protect a secured creditor from a decrease in the value of its property interest in its collateral during the period of use, sale, or lease. In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); see also Delbridge v. Production Credit Assoc. and Fed. Land Bank, 104 B.R. 824, 827-28 (E.D. Mich. 1989); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).  The appropriate form of adequate protection must be determined on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985).

34.     The Debtor submits that the value of WPHCP's and Security Benefit's property interests is and will remain adequately protected against the Debtor's use thereof upon the terms proposed herein. First, given that the appraisal received by the Debtor estimates the value of the Real Property and related assets at between $56,800,000 and $74,900,000, there is substantial equity in the Real Property over and above the amounts owed to Security Benefit by WPHCP, which totaled less than $42 million six months before the Petition Date.[6] Putting aside the infirmities in WPHCP's liens, there is also substantial equity above any amounts owed to WPHCP as of the Petition Date. Second, the Debtor's proposed use of cash collateral will only enable the Debtor to preserve and enhance the value of any such party's property interests by enabling the Debtor to continue to generate and collect accounts receivable, obtain the proposed debtor in possession financing, and continue its contracts and relationships. Third, even if adequate protection were required, the Debtor submits that its intent and commitment in the

[6] As alleged by Security Benefit in its state court foreclosure action against WPHCP.

Budget to continue to remain current on its obligations under its Lease after the Petition Date will adequately protect any interest that WPHCP and Security Benefit may have in the Debtor's property.

35.    The Debtor respectfully submits that any interests of WPHCP and Security Benefit are adequately protected against any decrease in value that may result from the Debtor's use of cash collateral on the terms set forth herein, and the Debtor's request to use any such cash collateral should therefore be approved.

**D.    <u>The Automatic Stay Should be Modified on a Limited Basis.</u>**

36.    A limited modification of the automatic stay imposed by Section 362(a) of the Bankruptcy Code is necessary to effectuate the relief sought herein.  Specifically, the Interim Order should modify the automatic stay to (i) permit the Debtor to grant the liens and claims described herein; (ii) permit the Debtor and DIP Lender to take such actions as may be necessary to ensure the perfection and priority thereof; (iii) permit the DIP Lender to exercise remedies pursuant to the Interim Order and, following entry of a Final Order, the Final Order and the DIP Credit Agreement (subject, in each instance, to the applicable notice periods); and (iv) implement the terms of the proposed DIP Orders immediately.  Stay modifications of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtor's business judgment, are appropriate under the present circumstances.  Accordingly, in conjunction with approval of the DIP Facility, the Debtor respectfully requests that the Court modify the automatic stay as set forth herein.

## <u>REQUEST FOR INTERIM APPROVAL</u>

37.    Bankruptcy Rule 4001 provides that final hearings on motions to use cash collateral or obtain post-petition financing may not be commenced earlier than 14 days after the service of such motions. Upon request, however, the Court is empowered to conduct a

preliminary expedited hearing on such motions and authorize the use of cash collateral and the

obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's

estate pending a final hearing.

38.     Pursuant to Bankruptcy Rule 4001, the Debtor requests that the Court conduct an

expedited preliminary hearing on the Motion and on an interim basis (i) approve the DIP Facility

and (ii) to the extent necessary, authorize the Debtor to use the cash collateral of WPHCP and

Security Benefit, in order to (a) maintain and finance the ongoing operations of the Debtor in the

ordinary course of business during the pendency of the Chapter 11 Case and (b) avoid immediate

and irreparable harm and prejudice to the Debtor's employees, patients, estate, and all other

parties in interest, including WPHCP and Security Benefit.  Furthermore, the Debtor requests

that the Court schedule the Final Hearing on the relief requested herein.

39.     Absent authorization from the Court to borrow under the DIP Facility on an

interim basis pending a Final Hearing, the Debtor will be immediately and irreparably harmed as

a result of an inability to operate its business in the ordinary course. Without the liquidity

provided by the DIP Facility, the Debtor's business will be brought to an immediate halt leading

to the loss of significant value, and the Debtor's ability to maintain business relationships with its

vendors and suppliers, meet payroll and other operating expenses, and ensure a high quality of

care to its patients will be compromised.  The DIP Facility will enable the Debtor to explore its

strategic options to resolve its disputes and formulate its plan of reorganization, while

simultaneously relieving the Debtor of the threat of potential impending termination and the

recurring crises created by the timing of collection of its accounts receivable.

## **REQUEST FOR FINAL HEARING**

40.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor requests that the Court set a

date for the Final Hearing that is as soon as practicable but within approximately thirty (30) days

of entry of an Interim Order approving the DIP Facility and fix the time and date prior to the Final Hearing for parties to file objections to the DIP Motion.

### REQUEST FOR WAIVER OF BANKRUPTCY FULES 6004(a) AND 6004(h)

41.     To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the proposed granting of liens and superpriotiy claims and use of cash collateral is essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

### NOTICE

42.     Notice of this DIP Motion was given by email, facsimile or overnight delivery of a copy to:  (i) the Office of the United States Trustee for the Southern District of New York, Attn: Andrea Schwartz, Esq.; (ii) the New York State Department of Health; (iii) counsel to the DIP Lender; (iv) New York State Office of the State Long Term Care Ombudsman, county of Westchester; (v) the duly appointed patient care ombudsman in this Case; (vi) the United States Attorney's Office for the Southern District of New York; (vii) the Internal Revenue Service; (viii) the parties included on the Debtor's consolidated list of thirty (30) largest unsecured creditors; (ix) counsel to WPHCP; (x) counsel to Security Benefit; (xi) the Subchapter V trustee, and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002.

43.     Pursuant to Bankruptcy Rule 4001, the Debtor respectfully requests that it be authorized to serve notice of the Final Hearing and a proposed Final Cash Collateral Order upon:

(a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for any Creditors' Committee, if appointed by such date; and (d) any other party to whom notice is required to be given pursuant to Bankruptcy Rules 2002 and 4001 and the Local Rules. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

## **NO PRIOR REQUEST**

44.    No previous request for the relief sought in this DIP Motion has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests entry of the Interim Order and, following the Final Hearing, entry of a Final Order, and for such other and further relief as is just and proper.

Dated:   New York, New York
         November 1, 2021

                                    **KLESTADT WINTERS JURELLER**
                                    **SOUTHARD & STEVENS, LLP**


                           By:   *Tracy L. Klestadt*
                                 Tracy L. Klestadt
                                 Brendan M. Scott
                                 Stephanie R. Sweeney
                                 200 West 41st Street, 17th Floor
                                 New York, New York 10036-7203
                                 Tel: (212) 972-3000
                                 Fax: (212) 972-2245
                                 Email: tklestadt@klestadt.com
                                        bscott@klestadt.com
                                        ssweeney@klestadt.com


                                 *Proposed Attorneys for Debtor and Debtor in*
                                    *possession*

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re                                                              :

                                                     :           Chapter 11

HBL SNF, LLC, d/b/a EPIC REHABILITATION        :
AND NURSING AT WHITE PLAINS,[1]                :

                                                     :           Case No. 21-22623 (SHL)

                      Debtor.                                :

------------------------------------------------------------------x

## INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING AND GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS WITH RESPECT TO THE DIP COLLATERAL; (II) TO THE EXTENT NECESSARY, AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL; (III) MODIFYING THE AUTOMATIC STAY; AND (IV) SCHEDULING A FINAL HEARING

This matter having come before the Court upon the motion (the "DIP Motion")[2] of the above-captioned debtor (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), pursuant to sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rules 2002-1 and 4001-2, seeking entry of an interim order (this "Interim Order") granting *inter alia*:

i. authority, pursuant to sections 105, 363, 364(c) and 364(d)(1) of the Bankruptcy Code, for the Debtor to obtain senior secured post-petition financing in an aggregate principal amount of up to $4 million (the "DIP Facility"), inclusive of $750,000 available for funding upon entry of this Interim Order, pursuant to the Loan Documents (as defined below) and this Interim Order;

ii. authority for the Debtor to enter into that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, among the Debtor, as Borrower, and CNH Finance Fund I, L.P. (the "DIP Lender"), in substantially the same form as attached hereto as Exhibit 1 (as amended,

---

[1] The Debtor's principal office is located at 120 Church Street, White Plains, New York 10601. The last four digits of its taxpayer identification number are 6045.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion or the DIP Term Sheet (as defined below), as applicable.

restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with the any ancillary, collateral or related documents and agreements, the "Loan Documents");

iii. authority for the Debtor to use the DIP Facility and the proceeds thereof solely in accordance with the Budget attached hereto as Exhibit 2 (the "Budget") to (a) fund the working capital needs and certain administrative costs of the Debtor during the pendency of the Chapter 11 Case, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the Loan Documents, and (c) pay other amounts as specified in the Budget;

iv. authority for the Debtor to grant valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and, solely as set forth herein, priming liens pursuant to section 364(d)(1) of the Bankruptcy Code, to the DIP Lender, in the DIP Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, to secure all DIP Obligations, as more fully set forth in this Interim Order, subject only to the Carve-Out (each as defined below);

v. subject to and only effective upon entry of the Final Order (as defined below) granting such relief, waiver by the Debtor of all rights to surcharge against the collateral of the DIP Lender pursuant to section 506(c) of the Bankruptcy Code;

vi. subject to and only effective upon entry of the Final Order granting such relief, waiver of the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lender;

vii. modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h);

viii. the scheduling of a final hearing (the "Final Hearing") on the Motion for __, 2021 to consider entry of a final order (the "Final Order"), *inter alia*, authorizing the borrowings under the DIP Facility on a final basis and approval of notice procedures with respect thereto; and

ix. related relief; and

The Court having considered the First Day Declaration, the DIP Motion and the exhibits attached thereto, the evidence submitted or adduced and the arguments of counsel made at the interim hearing held and concluded on November 3, 2021 (the "Interim Hearing"); and having found that due and proper notice (the "Notice") of the DIP Motion and the Interim Hearing having been served by the Debtor in accordance with Bankruptcy Rules 4001 and 9006 and Local Rule 2002-1; and it appearing that no other or further notice need be provided; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtor, its estates, and its creditors and equity holders, and is essential for the continued operation of the Debtor's business; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND EVIDENCE SUBMITTED DURING THE INTERIM HEARING**:[3]

---

[3] To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant to Fed. R. Bankr. P. 7052.

A.    _Petition Date_.  On November 1, 2021 (the "Petition Date"), the Debtor filed a voluntary petition under Subchapter V of Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court") commencing this Chapter 11 Case.

B.    _Debtor in Possession_.  The Debtor is continuing in the management and operation of its business and properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee, with the exception of the Subchapter V Trustee, or examiner has been appointed in this Chapter 11 Case.

C.    _Notice_.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtor in compliance with Bankruptcy Rule 4001(c), whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including:  (i) the Office of the United States Trustee for the Southern District of New York, Attn: Andrea Schwartz, Esq.; (ii) the New York State Department of Health; (iii) counsel to the DIP Lender; (iv) New York State Office of the State Long Term Care Ombudsman, county of Westchester; (v) the duly appointed patient care ombudsman in this Chapter 11 Case; (vi) the United States Attorney's Office for the Southern District of New York; (vii) the Internal Revenue Service; (viii) the parties included on the Debtor's consolidated list of twenty (20) largest unsecured creditors; (ix) counsel to WPHCP; (x) counsel to Security Benefit; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002.

D.    _Jurisdiction and Venue_.  This Court has core jurisdiction over the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Case and proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

E.    _No Committee Formed_.  No official committee of unsecured creditors has been appointed in this Subchapter V Chapter 11 Case.

F.    _No Credit Available on More Favorable Terms_.  The Debtor is unable to procure financing

in the form of unsecured credit allowable as an administrative expense under §§ 364(a), 364(b), or

503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative

expense, junior liens on encumbered property of the Debtor's estate, or liens on property of the

Debtor's estate not subject to a lien pursuant to § 364(c)(1), 364(c)(2) or 364(c)(3) of the

Bankruptcy Code. The Debtor has been unable to procure the necessary financing on terms more

favorable, taken as a whole, than the financing offered by the DIP Lender pursuant to the Loan

Documents.

G.    _Best Interests of Estate_.  It is in the best interest of the Debtor's estate and creditors that

the Debtor be allowed to enter into the DIP Facility to obtain postpetition secured financing from

the DIP Lender under the terms and conditions set forth herein and in the Loan Documents, as

such financing is necessary to avoid immediate and irreparable harm to the Debtor's estate and for

the continued operation of the Debtor's business.

H.    _Good Faith_.  The extension of credit and financial accommodations under the Loan

Documents are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtor's

exercise of prudent business judgment, and are supported by reasonably equivalent value and fair

consideration and the DIP Lender is entitled to the protections of section 364(e) of the Bankruptcy

Code.

I.    _Good Cause_. The relief requested in the Motion is necessary, essential and appropriate,

and is in the best interest of and will benefit the Debtor, its creditors and its estate, as its

implementation will, among other things, provide the Debtor with the necessary liquidity to (1)

minimize disruption to the Debtor's business and ongoing operation, (2) preserve and maximize

the value of the Debtor's estate for the benefit of the Debtor's patients and creditors, and (3) avoid

immediate and irreparable harm to the Debtor, its creditors, its business, its patients, its employees, and its assets.

J.      _Necessity of DIP Facility Terms_.  The terms of the Loan Documents and this Interim Order assuring that the liens and the various claims, superpriority claims, and other protections granted in this Interim Order will not be affected by any subsequent reversal or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated in the Loan Documents, are necessary in order to induce the DIP Lender to provide postpetition financing to the Debtor.

K.      _Need for Post-Petition Financing_.  The Debtor does not have sufficient available sources of working capital, including cash collateral, to continue to operate its business in the ordinary course of business without the financing requested in the DIP Motion.  The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise fund its operation is essential to the Debtor's continued viability as the Debtor seeks to maximize the value of the asset of its estate for the benefit of all creditors of the Debtor through a reorganization process.  The ability of the Debtor to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangement with the DIP Lender as set forth in this Interim Order and the Loan Documents, is vital to the preservation and maintenance of the going concern value of each Debtor.  Accordingly, the Debtor has an immediate need to obtain the postpetition financing in order to, among other things, permit the orderly continuation of the operation of its business, minimize the disruption of its business operation, and preserve and maximize the value of the assets of the Debtor's bankruptcy estate in order to maximize the recovery to all creditors of the estate.

L.     _Cash Collateral_.  Certain of the Debtor's cash and cash equivalents, including cash in its deposit accounts, security deposits, wherever located and whenever acquired, whether in the form of cash, profits, accounts receivable, now in the possession, custody or control of the Debtor or persons in privity with the Debtor, or on which the Debtor will obtain an interest during the pendency of this Chapter 11 Case, may constitute cash collateral in which WPHCP and Security Benefit have asserted a first priority security interest in and lien on to the extent set forth in, among other things, (i) with respect to WPHCP, that certain Amended and Restated Operating Lease, dated November 19, 2015 (as amended or modified from time to time, the "Lease") by and between the Debtor, as tenant, and WPHCP, as landlord, and (ii) with respect to Security Benefit, that certain Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of July 2017 (the "Security Agreement"), by and among WPHCP, the Debtor and Security Benefit, in each case for purposes of and within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"). This Court has exclusive jurisdiction over the Cash Collateral pursuant to 28 U.S.C. § 1334(e)(1).

M.     _Need to Use Cash Collateral_.  The Debtor requires the use of Cash Collateral in order to, among other things, preserve, maintain and maximize the value of its assets and business.  The ability of the Debtor to maintain liquidity through the use of the Cash Collateral is vital to the Debtor and its efforts to maximize the value of its assets. Accordingly, the Debtor has demonstrated good and sufficient cause for the relief granted herein.

N.     _Immediate Entry_.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

        Based upon the foregoing,

        **IT IS HEREBY ORDERED** that:

1.      <u>Recitals Incorporated</u>.  The above recitals and findings of this Interim Order are incorporated herein by referenced as if fully set forth herein.

2.      <u>Disposition</u>.  The DIP Motion is granted on an interim basis to the extent set forth herein, effective as of the date hereof.  Any objections to the interim relief requested in the DIP Motion that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

3.      <u>DIP Facility Approval</u>.  Subject to the terms and conditions contained in this Interim Order, the Debtor is hereby expressly authorized, pursuant to section 364 of the Bankruptcy Code, to enter into and borrow under the DIP Facility, execute and deliver to the Lender the Loan Documents, and such additional documents, instruments, and agreements as may be reasonably required by the Lender to implement the terms, and effectuate the purposes, of this Interim Order.  The terms and conditions of the Loan Documents are hereby approved and ratified, and the Debtor is authorized and directed to comply with and perform all of the terms and conditions contained therein.  The failure to reference or discuss any particular provision of the Loan Documents in this Interim Order shall not affect the validity or enforceability of any such provision.  In the event of a conflict between this Interim Order and the Loan Documents, the terms and conditions of this Interim Order shall govern.

4.      <u>Authorization to Borrow</u>.  The Debtor hereby is authorized, pursuant to sections 364(c) and (d) of the Bankruptcy Code, to obtain post-petition financing from the Lender through the DIP Facility, in accordance with the terms of this Interim Order, the Loan Documents and the Budget in an aggregate principal amount of up to $750,000 on an interim basis, pending the Final Hearing.

5.      Conditions Precedent.   The obligations of the Lender under the DIP Loan
Documents, including but not limited to the obligation(s) of the Lender to provide any advance of
funds, shall not become effective until the date on which each condition to effectiveness set forth
in the DIP Loan Documents has been satisfied or waived by the Lender.   The obligations of the
Lender from and after the date of the Final Hearing are subject to entry of a final order on the
Motion in a form acceptable to the Lender in its sole discretion.

6.      DIP Facility Obligations.   The Loan Documents shall constitute and evidence the
valid and binding effect of the Debtor's obligations under the DIP Facility which shall be legal,
valid, and binding obligations of the Debtor and enforceable against the Debtor, its estate, any
successors thereto. The Debtor and its successors shall be jointly and severally liable for repayment
of any funds advanced pursuant to the Loan Documents, together with interest thereon, at the times
and in the amounts set forth in the Loan Documents and all Obligations as defined and provided
for in the DIP Credit Agreement (collectively, the "DIP Obligations").

7.      Use of Proceeds.   Except as otherwise provided herein or further order of this Court
or approved by the DIP Lender, from and after the entry of this Interim Order, the Debtor shall use
advances of credit under the DIP Facility (the "DIP Loans") for working capital and other
permitted purposes only in compliance with the Budget, subject only to permitted variances as set
forth in the Loan Documents, including for payment of the Carve Out amounts, including for the
costs and fees of the patient care ombudsman duly appointed in this Chapter 11 Case pursuant to
section 333(a) of the Bankruptcy Code.   The proceeds of the DIP Loans shall not be used to initiate
or prosecute any claims, causes of action, adversary proceedings, contested matters or other
litigation against DIP Lender or any of its officers, directors, equity holders, employees or
affiliates, or object, contest or raise in any proceeding any defense to the validity, perfection,

priority, extent or enforceability of the Loan Documents or the DIP Liens or taking any action that would be injurious to Lender's interests.

8.      Payment of DIP Fees and Expenses.    The fees set forth in the DIP Term Sheet are each hereby approved as set forth on the record at the Interim Hearing, and the Debtor is hereby authorized and directed to pay such fees if and to the extent due under the terms set forth in the DIP Term Sheet upon entry of this Interim Order.

9.      Use of Cash Collateral.    The Debtor is authorized to use Cash Collateral in accordance with and pursuant to this Interim Order.  The Debtor's request in the DIP Motion, and the authorization granted herein, to use Cash Collateral of WPHCP and Security Benefit is without prejudice to any and all rights and defenses of the Debtor and other parties in interest with appropriate standing, including, without limitation, the right of any party in interest to challenge the validity, extent, priority or nature of any security interest or document relating thereto, all of which rights and defenses are expressly preserved.

10.     DIP Superpriority Claims.  In accordance with section 364(c)(1) and 507(b) of the Bankruptcy Code, the DIP Obligations shall constitute superpriority administrative expense claims against the Debtor and its estate (the "DIP Superpriority Claims") (and without the need for the DIP Lender to file a proof of claim or take any further action) with priority in payment over any and all other obligations, liabilities, and indebtedness against the Debtor and its bankruptcy estate, now existing or hereafter arising, of any kind whatsoever, including any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting

from the conversion of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, whether now in existence or hereafter incurred by the Debtor, and shall at all times be senior to the rights of the Debtor, the Debtor's estate and any successor trustee, estate representative, or any creditor, in the Chapter 11 Case or any subsequent cases or proceedings under the Bankruptcy Code; provided, however, that the DIP Superpriority Claims shall be subject to and subordinate to only the Carve-Out.  The DIP Superpriority Claims shall have recourse to and be payable from all prepetition and post-petition assets of the Debtor and the bankruptcy estate, including, but not limited to, the DIP Collateral (as defined below and in the DIP Credit Agreement).

11.     DIP Liens.  Effective as of the entry of the Interim Order, as security for the DIP Obligations, the DIP Lender is granted first priority,continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens pursuant to section 364(d)(1) of the Bankruptcy Code (collectively, the "DIP Liens") on all assets of the Debtor, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtor, and regardless of where held, before or after the Petition Date, as collateral security for the prompt and complete performance and payment when due (whether at the Maturity Date, by acceleration, or otherwise) of the DIP Obligations (as such collateral is further set forth and defined as "Collateral" in the Credit Agreement, the "DIP Collateral").  For the avoidance of doubt, the DIP Collateral shall include, without limitation and as further described in the DIP Credit Agreement, all of the Debtor's cash and cash equivalents, all deposit accounts and all funds, cash and other property deposited therein or credited thereto from time to time, all accounts and other receivables including government accounts and receivables, all contracts and contract rights, all

real property and leasehold interests, any causes of action under the Bankruptcy Code or applicable

non-bankruptcy law, including causes of action and recoveries for claims asserted under chapter 5

of the Bankruptcy Code, and all general intangibles, including all payment intangibles, all of

Debtor's books and records relating to the DIP Collateral, and all products, offspring, profits, and

proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and

rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance,

indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the

foregoing.

12.     <u>Priority of DIP Liens</u>.

(a)     To secure the DIP Obligations, immediately upon and effective as entry of

this Interim Order, the DIP Lender, is hereby granted continuing, valid, binding, enforceable, non-

avoidable, and automatically and properly perfected DIP Liens in the DIP Collateral as follows, in

each case subject to the Carve-Out:

> (i)     pursuant to section 364(d)(1) of the Bankruptcy Code, valid,
> enforceable, non-avoidable automatically and fully perfected first priority
> senior priming liens on and security interests in, all DIP Collateral wherever
> located, which senior priming liens and security interests in favor of the DIP
> Lender shall be senior to any and all prepetition liens and for the avoidance
> of doubt, the security interests granted to WPHCP and Security Benefit,
> whether under the Lease, the Security Agreement or otherwise, and any
> other judgment creditor claims; and

> (ii)     pursuant to section 364(c)(2) of the Bankruptcy Code, valid,
> binding, continuing, enforceable, non-avoidable automatically and fully
> perfected first priority liens on and security interests in all DIP Collateral
> that is not otherwise subject to a valid, perfected and non-avoidable security
> interest or lien as of the Petition Date (or perfected after the Petition Date
> to the extent permitted by section 546(b) of the Bankruptcy Code).

(b)     Except as expressly set forth herein, the DIP Liens and the DIP

Superpriority Claims: (i) shall not be made junior to or *pari passu* with any lien, security interest

or claim heretofore or hereinafter granted in the Chapter 11 Case, and shall be valid and

enforceable against the Debtor, its estate, any trustee or any other estate representative appointed

or elected in the Chapter 11 Case or any successor case and/or upon the dismissal of the Chapter

11 Case or any successor case.

13.     Carve-Out. As used in this Interim Order, the term "Carve-Out" means, to the

extent allowed by the Bankruptcy Court, and as set forth in the Budget: (i) all invoiced and payable

attorneys' fees under sections 330 and 331 of the Bankruptcy Code, and (ii) all fees payable by

Borrower to a patient ombudsman appointed under section 333(a) of the Bankruptcy Code.

14.     Waivers of "Marshaling" and Bankruptcy Code Section 506(c). Subject to the entry

of the Final Order, and in light of the Lender's agreement to subordinate its DIP Superpriority

Claims to the Carve-Out and to make post-petition loan advances under the Loan Documents,

without limiting the Carve-Out, the Debtor irrevocably waives and shall be prohibited from

asserting (i) a surcharge on the DIP Collateral under section 506(c) of the Bankruptcy Code,and/or

(ii)the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP

Collateral, and all proceeds thereof shall be received and used in accordance with this Interim

Order.

15.     Automatic Effectiveness of Liens. The DIP Liens shall not be subject to a challenge

and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by

operation of law as of the date of the entry of this Interim Order without any further action by the

Debtor or the DIP Lender and without the necessity of execution by the Debtor, or the filing or

recordation, of any financing statements, security agreements, vehicle lien applications,

mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and

Trademark Office or the Library of Congress), or other documents or the taking of any other

actions; provided; however, that at the request of the DIP Lender, the Debtor shall execute any and

all documents as may be reasonably requested to evidence, perfect, and provide public notice of such liens.  All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the Loan Documents and this Interim Order.  The DIP Lender is authorized to file or record such financing statements, security agreements, pledge agreements, control agreements, mortgages, collateral assignments, instruments, and documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of the entry of this Interim Order; provided; however, no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The DIP Lender may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of liens or similar statements.

16.    Budget.  Use of funds advanced under the DIP Facility shall be used solely for the purposes expressly provided in the Loan Documents, and only as set forth in the Budget.  The Debtor shall provide the DIP Lender with a new proposed Budget and Budget variance and financial reporting as provided in the DIP Credit Agreement.  Each Budget and all expenses proposed to be incurred and the payments proposed to be made by and through any such Budget shall be subject to the express written approval of the DIP Lender.

17.    Termination Event. The occurrence of any of the following shall constitute a "Termination Event": (a) the occurrence of an Event of Default (as defined in section 8.1 of the DIP Credit Agreement); (b) the Debtor's failure to comply in any material respect with any provision of this Interim Order unless waived by the DIP Lender; or (c) the occurrence of the Maturity Date.

18.     <u>Remedies Upon Termination Event</u>.  Upon the occurrence of a Termination Event and following the giving of not less than five (5) calendar days' advance written notice (which may be by email) (the "Notice Period") by the DIP Lender to counsel to the Debtor, the U.S. Trustee and Subchapter V Trustee, the DIP Lender may exercise all default-related rights and remedies (as set forth in the DIP Credit Agreement and that exist in law or equity) against the DIP Collateral, without further order of the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 of the Bankruptcy Code or otherwise; <u>provided</u>; <u>however</u>, that during the Notice Period, the Debtor has the right to seek an order from this Court determining that the Termination Event has not occurred; <u>provided</u>; <u>however</u>, that upon a Termination Event triggered by an Event of Default as set forth in section 8.1(g) of the DIP Credit Agreement, the DIP Lender can immediately exercise all rights and remedies as set forth in section 8.2 of the DIP Credit Agreement, including termination of the DIP Facility and acceleration of the DIP Obligations, without notice to Debtor or any other party.

19.     <u>Limitation on Use of Proceeds</u>.  Neither the Advances (as defined in the DIP Credit Agreement) made to Debtor under the DIP Facility nor the Carve-Out shall be utilized (i) to attack the validity, priority or enforceability of any of the liens or security interests of the DIP Lender, (ii) to research, review, analyze or investigate with respect to or in connection with any litigation, claim, objection or cause of action of any kind or nature whatsoever against the DIP Lender, or (iii) to file, prosecute or otherwise pursue any litigation, claim, objection or cause of action of any kind or nature whatsoever against the DIP Lender.

20.     <u>Modification of Stay</u>.  Subject to the terms set forth herein, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to

effectuate all of the terms, rights, benefits, privileges, remedies and provisions of this Interim

Order and the Loan Documents including without limitation, to permit the DIP Lender to exercise

all rights and remedies provided for in the Loan Documents and take any and all actions provided

therein, in each case, without further notice, application to, order of or hearing before this Court.

21.    <u>Protection Under Section 364(e) of the Bankruptcy Code</u>.  The DIP Lender has

acted in good faith in connection with this Interim Order and its reliance on this Interim Order is

in good faith.    The failure of this Interim Order to become a final order or the reversal or

modification on appeal of the authorizations under section 364 of the Bankruptcy Code contained

in this Interim Order does not affect the validity of any DIP Obligation or DIP Liens, or the validity

and enforceability of the DIP Loan, whether or not the DIP Lender knew of the pendency of the

appeal, unless such authorization and incurrence of DIP Obligations and DIP Lien and advance of

the DIP Loan under 364 of the Bankruptcy Code in this Interim Order, were stayed pending appeal.

22.    <u>Government Account and Cash Management</u>. The Debtor and DIP Lender are

authorized to establish or continue the segregated government account established in the name of

the Debtor, subject to a deposit account instructions and service agreement, or similar agreement,

in favor of the DIP Lender and in form and substance satisfactory to the DIP Lender, for the deposit

of all government accounts receivable, including without limitation Medicare and Medicaid

payments owing to the Debtor. The Debtor and DIP Lender are authorized to establish or continue

the segregated commercial and private pay account established in the name of the Debtor, subject

to a blocked deposit account control agreement in favor of the DIP Lender and in form and

substance satisfactory to the DIP Lender, for the deposit of all commercial, private pay and other

non-governmental accounts receivables owing to the Debtor. The Debtor and DIP Lender are

authorized to establish or continue the segregated operating accounting account established in the

name of the Debtor, subject to a springing deposit account control agreement in favor of the DIP

Lender and in form and substance satisfactory to the DIP Lender, which will be used to receive

advances under the DIP Facility and to pay the Debtor's accounts payable. No party shall be

authorized to exercise any other set-off or recoupment rights against such account without further

order of this Court.

23.     <u>Fees and Expenses</u>.  The Debtor shall reimburse the DIP Lender for all costs and

expenses as set forth in Article III of the DIP Credit Agreement, pursuant to the terms of the DIP

Credit Agreement, without the need for any further approval or order of the Bankruptcy Court.

24.     <u>Preservation of Rights</u>.  If any or all of the provisions of this Interim Order are, at

any time, modified, vacated or stayed, such stay, modification, or vacation shall not affect the

validity, extent, priority, and enforceability of any lien, priority, or other benefit conferred under

this Interim Order prior to such stay, modification, or vacation.

25.     <u>Binding Effect</u>.  This Interim Order shall be binding on all creditors and parties in

interest in the Chapter 11 Case, including, but not limited to, the Debtor and any successors thereto.

This Order shall be binding upon, and inure to the benefit of, any and all successors, designees,

transferees, endorsees and/or assignees of the DIP Lender.  Subject to entry of the Final Order, the

security interests and liens provided for in this Interim Order shall be and remain valid and

perfected, and the claims of the DIP Lender hereunder valid and enforceable in accordance with

the terms hereof, notwithstanding any discharge that the Debtor may receive pursuant to section

1141 of the Bankruptcy Code, the conversion of the Chapter 11 Case to a case under chapter 7 of

the Bankruptcy Code, the dismissal of the Chapter 11 Case or any subsequent chapter 7 case or

the release or transfer of any DIP Collateral from the bankruptcy estate.  No claim or cause of

action of any kind or nature may be asserted against the DIP Lender in its capacity as lender under

the DIP Facility, or related to the liens and claims hereunder granted to the DIP Lender under or in connection with the DIP Facility.  All waivers by the Debtor of any rights or notices that are expressly provided in the DIP Loan Documents are hereby approved and are effective without further order of this Court.

26.    <u>Modifications of Loan Documents</u>.  The Debtor and the DIP Lender are hereby authorized, to implement, in accordance with the terms of the Loan Documents, any non-material modifications of the Loan Documents without further notice, motion or application to, order of or hearing before, this Court.  Any modifications to the Budget that are provided to the DIP Lender shall also be provided to the U.S. Trustee.  In the event of any inconsistency between this Interim Order and the DIP Credit Agreement, this Interim Order shall control.

27.    <u>Proofs of Claim</u>.  Notwithstanding any order entered by the Bankruptcy Court, the DIP Lender shall not be required to file proofs of claim in the Chapter 11 Case for any claim allowed herein.

28.    <u>No Competing Liens</u>. Except as set forth herein, the Debtor shall not grant liens on, or security interests in, the DIP Collateral to any other party, pursuant to section 364 of the Bankruptcy Code or otherwise, without the consent of the DIP Lender.

29.    <u>Right to Credit Bid</u>.  In connection with the sale or other disposition of all or any portion of the Debtor's assets, whether under Bankruptcy Code section 363, 1129 or otherwise, the DIP Lender shall be entitled to credit bid up to the full amount of DIP Obligations then due and owing to the DIP Lender by Debtor, including pursuant to Bankruptcy Code section 363(k), without limitation, set-off or other reduction.

30.    <u>Further Relief</u>.  Nothing in this Interim Order shall preclude the DIP Lender from seeking any other relief that it may deem appropriate, including relief from the automatic stay.

31.    <u>No Control</u>. Nothing in this Interim Order shall cause the DIP Lender to be deemed to be in control of the operations of the Debtor, or to be acting as a "responsible person," "managing agent," or "owner or operator" (as such terms or any similar terms are used in any Federal or state statute) with respect to the operation or management of the Debtor, notwithstanding its consent to this Interim Order, its approval of the Budget or involvement in the Budget process, or its extension of financial accommodations of any type, kind, or nature under this Interim Order and the Loan Documents.

32.    <u>No Third-Party Beneficiaries</u>. Unless expressly provided herein or in the Loan Documents, no rights are created hereunder or by the Loan Documents for the benefit of any third party, any creditor, or any direct, indirect or incidental beneficiary.

33.    <u>Immediate Effect of Order</u>.    The terms and conditions of this Order shall be effective and immediately enforceable upon its entry by the Clerk of the Court notwithstanding any potential application of Bankruptcy Rule 6004(h) or otherwise.    To the extent applicable, the notice requirements and/or stays imposed by Bankruptcy Rules 4001(a)(3), 6003(b), and 6004(a) are hereby waived for good and sufficient cause. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

34.    <u>Final Hearing; Objections</u>.    The Final Hearing on the Motion shall be held before the Bankruptcy Court on _____ __, 2021 at __:__ _.m.  (EST). Any objections shall be filed and served on proposed counsel for the Debtor, Klestadt Winters Jureller Southard & Stevens LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, Attn: Tracy L. Klestadt and Stephanie R. Sweeney, tklestadt@klestadt.com and ssweeney@klestadt.com, and counsel for the DIP Lender, Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016, Attn: Alissa M. Nann, anann@foley.com, no later than _____ __, 2021, at 11:59 p.m.

35.    <u>Notice of Final Hearing</u>.  The Debtors shall, within two (2) business days after entry of this Interim Order, provide a notice of the entry of this Interim Order, together with a notice of the Final Hearing, by electronic mail or overnight courier to:  (i) the Office of the United States Trustee for the Southern District of New York, Attn: Andrea Schwartz, Esq.; (ii) the New York State Department of Health; (iii) counsel to the DIP Lender; (iv) New York State Office of the State Long Term Care Ombudsman, county of Westchester; (v) the duly appointed patient care ombudsman in this Chapter 11 Case; (vi) the United States Attorney's Office for the Southern District of New York; (vii) the Internal Revenue Service; (viii) the parties included on the Debtor's consolidated list of twenty (20) largest unsecured creditors; (ix) counsel to WPHCP; (x) counsel to Security Benefit; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002. Such notice shall be sufficient notice of the Final Hearing.

36.    <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction to decide all disputes arising under or related to this Order and the Loan Documents.

Dated: _____, 2021
   New York, New York     _____
                  HONORABLE SEAN H. LANE
                  UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**



CNH Finance Fund I, L.P.
c/o CNH Finance, L.P.
24 East Ave PMB 1285
New Canaan, CT 06840
Attention: Timothy Peters

October 27, 2021

HBL SNF, LLC
1280 Albany Post Road
Croton-on-Hudson, New York 10520
Attn: Lizer Jozefovic

Dear Lizer:

CNH Finance Fund I, L.P., a Delaware limited liability company ("Lender") is pleased to confirm in this letter its interest in working on a potential debtor in possession revolving line of credit for HBL SNF, LLC, a New York limited liability company ("Borrower"), which would be secured by a first-priority security interest and lien in, among other property, the pre- and post-petition accounts receivable of Borrower.  The terms set forth below are based on our discussions with the Borrower to date and remain subject to confirmation through our due diligence.  We have limited this letter to an identification of the material terms of the financing we have discussed.  There will be additional terms, conditions, covenants, representations, warranties, default clauses and other provisions in the definitive documents for the transaction.  This letter represents an expression of interest only and is intended to be used as a basis for continued discussions.  This letter does not constitute a commitment of Lender to provide the financing described herein or an obligation by Lender to continue discussing such financing, to conduct any due diligence with respect to such financing or to initiate credit approval proceedings for any such financing.  The execution of definitive documents will supersede the provisions of the terms set forth in this letter.

| | |
|---|---|
| **Borrower:** | HBL SNF, LLC, a New York limited liability company ("Borrower") |
| **Lender:** | CNH Finance Fund I, L.P., a Delaware limited liability company ("Lender") |
| **Facility:** | Debtor-in-possession revolving credit facility |
| **Initial Facility Amount:** | A super-priority revolving credit facility in the maximum amount of $750,000 upon the entry of an Interim DIP Financing Order, which will be increased to $4,000,000 upon the entry of a Final DIP Financing Order (the "Facility Amount") |
| **Purpose:** | To provide working capital to the Borrower throughout its Chapter 11 Bankruptcy and any related proceedings, which proceeds will be used solely (i) to the extent required to pay those working capital and other expenses enumerated in the Budget as and when such expenses become due and payable, subject to a variance of no more than ten percent (10%) between a projected line-item expense in the Budget and such actual expense, (ii) to pay fees and Lender's expenses, and (iii) to pay the Carve-Out. |
| **Maturity Date:** | The earlier to occur of (a) the effective date of a plan of reorganization of the Borrower confirmed by the Bankruptcy Court, (b) consummation of a |

Please initial upon approval_____

sale or other disposition of substantially all of the Borrower's assets pursuant to 11 U.S.C. 363 or otherwise, (c) the Borrower's filing of a motion or other pleading seeking, or shall consent to, conversion to a Chapter 7 proceeding, (d) conversion to a Chapter 7 proceeding, (e) a dismissal by the Bankruptcy Court of Borrower's Bankruptcy Proceeding, (f) the Borrower's filing of a motion or other pleading seeking the dismissal of the Bankruptcy Proceeding under Section 1112 of the Bankruptcy Code or otherwise, (g) 24 months from Closing, or (h) any date on which the loans are accelerated upon an event of default under definitive loan documentation.

**Repayment:**

Interest, fees and expenses are capitalized to the principal balance monthly in arrears. Principal payments are made as accounts receivable are collected and transferred to Lender through the controlled deposit accounts each business day; however, no principal payments are due until the Maturity Date. Principal amounts repaid or prepaid may be reborrowed.

**Priority and Security:**

All obligations of the Borrower to the Lender, including all principal and interest, costs, fees and expenses (the "DIP Obligations"), shall be secured by a valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected first-priority security interest and lien in substantially all of the assets of the Borrower.  Lender requires a first-priority lien, pursuant to 11 U.S.C. § 364(c)(2), on all unencumbered assets of the Borrower; and a first-priority priming lien, pursuant to 11 U.S.C. § 364(d), on all encumbered assets of the Borrower, including, to the extent encumbered, all accounts receivable, billing software chattel paper, bank accounts, and acquisition deposits. This first-priority security interest and lien shall not be subject to "Carve Outs" to anyone other than (i) any patient ombudsman appointed under Section 333(a) of the Bankruptcy Code, and (ii) Borrower's and Lender's reasonable and documented attorneys' fees. Any such Carve-Outs shall be reserved against the borrowing base and reduce availability.

**Super-Priority Claim:**

The DIP Obligations shall constitute claims entitled to the benefits of 11 U.S.C. § 364(c)(1) (the "Super-Priority Claim"), having a super-priority over any and all administrative expenses and claims, including administrative expenses of the kind specified in or ordered pursuant to 11 U.S.C. §§ 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 and 1114.

**Interim DIP Financing Order:**

Prior to providing any funding, Lender will require that the Bankruptcy Court approve an Interim DIP Financing Order, following notice to the US Trustee, top 20 creditors, all holders of liens in the borrower's assets, all taxing authorities and all parties requesting notice, that contains all appropriate findings (including a finding that Lender is entitled to the protections of Sections 364(e)) and the following on an interim basis: (i) authorization of Borrower to enter into the Lender's Credit Agreement and the transactions contemplated hereby, (ii) approval of the terms and conditions of the Credit Agreement, (iii) a grant to Lender of a Super-

Please initial upon approval_____

Priority Claim, (iv) a grant to Lender of a first priority lien and security interest in all assets of the Borrower, (iv) a prohibition applicable to any governmental authority or other party from exercising rights of set-off or recoupment against any account that arises from and after the filing of the bankruptcy petition, (v) a prohibition against using the proceeds of the loan to initiate or prosecute any claims, causes

of action, adversary proceedings or other litigation against Lender or any of its officers, directors, equity holders, employees or affiliates, (vi) a prohibition against using the proceeds of the loan to object, contest, or raise in any proceeding any defense to the validity, perfection, priority, extent or enforceability of the Credit Agreement or the liens contemplated thereby or taking any action that would be injurious to Lender's interests, (vii) an order that all government payments owing to Borrower be paid to the Lender's lockbox accounts, (viii) relief from the automatic stay to permit Lender to take any action permitted under the Credit Agreement, (ix) an order directing that Debtor pay Lender at the initial closing all Lender's due diligence and legal counsel fees related to the financing and all fees required by the Credit Agreement, (x) a determination that the "equities of the case" exception in 11 U.S.C. § 552(b) will not apply to or limit the Lender's security interest in the proceeds, product, offspring or profits of the collateral, and (xi) such other provisions as Lender or Lender's counsel may require.

**Final DIP Financing Order:**

The final order approving the DIP loan facility, which shall be in form and substance acceptable to Lender in its sole discretion, shall, among other things, authorize, approve and direct the Borrower to enter into definitive loan documentation, the granting of the Super-Priority Claim and first-priority security interests and liens, including any priming liens, in the assets of the Borrower, the making of the DIP loans, and the payment of the Lender's fees and expenses.

Lender will require that the bankruptcy court approve a final DIP financing order, following proper notice to all affected parties and as otherwise required under the Bankruptcy Code, that reaffirms all provisions of the Interim DIP Financing Order. The period for appeal of the Final DIP Financing Order shall have expired with no appeals being filed or if appeals are filed, such appeals have been denied and no provision of the Final DIP Financing Order shall have been reversed or modified.

**Interest Rate:**

The Prime Rate plus 2% of the Outstanding Loan Balance. "Prime Rate" means the rate of interest quoted from time to time by Wells Fargo Bank as its prime rate or a comparable reference rate designated by Lender. Collections of cash by Lenders under the Revolver shall be credited to Borrower's obligations thereunder on a daily basis, subject to three business clearance days. The default interest rate will be three percent (3.0%) in addition to the then applicable interest rate.

**Eligible Receivables:**

All billed accounts receivable no more than 150 days from the date of

Please initial upon approval_____

service, and all unbilled accounts receivable that are no more than 30 days from the date of service, that are due from insurance companies with an AM Best rating equal to or greater than A, governmental agencies, and other creditworthy debtors. Lender does not consider personal injury, workers compensation, or private pay receivables eligible receivable.

**Availability Formula:**    Borrowings under the Facility shall be based upon Lender's approval of a 16-week budget (updated weekly), in form and substance acceptable to Lender in its sole discretion, and shall not exceed 85% of the net collectable value of the Eligible Receivables (which is based on historical collection rates using a static pool analysis, and adjusted to reflect factors that may not be accounted for by historical collection rates) less Court-approved Carve-Outs and reserves.

**Fees:**    The following are the fees associated with the revolving line of credit.

1. **Facility Fee:** Borrower shall be obligated to pay Lender a Facility Fee in an amount equal to one percent 1% of the Facility Amount payable from the proceeds at closing.

2. **Collateral Management Fee:**  0.15% per month of the average outstanding loan balance to monitor and to service this loan.

3. **Unused Line Fee:** Borrower shall pay Lenders an unused line fee of zero point zero eight three percent 0.042% per month of the average unused portion of the Revolver.

4. **Deferred Origination Fee:** Borrower shall pay 1% of the Facility Amount upon the earlier of Maturity Date, exit from bankruptcy or the repayment of the loan, as a deferred origination fee.

5. **Fees & Expenses:** Borrower shall pay all fees and expenses related to the underwriting, documentation, bankruptcy court approval, closing process, administration and enforcement of the loan, including without limitation the reasonable fees of loan documentation and legal counsel.

**Financial Covenants:**    Covenants regarding current ratio of 1.0 to 1.0 and loan turnover rate of 45 days will be established, subject to Lenders completion of due diligence.

**Financial, Legal, and Process Review:**    Approval of the financing is premised on a satisfactory review of Borrower's financial records including balance sheets, profit and loss statements, cash flow statements, tax returns, and other documents that Lender, in its sole discretion, deems necessary.  Lender will also require information pertaining to Borrower's organizational structure, and policy and procedures.  A good faith deposit of $25,000 will be due at the execution of this document.

**Governing Law:**    Law of the State of New York and as applicable the Bankruptcy Code.

**Indemnification**

Please initial upon approval_____

**and Exculpation:**   The Borrower will indemnify and hold harmless the Lender, its respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel but subject to the limitations set forth two paragraphs below) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates) that relates to the DIP facility, the final order approving the DIP facility, or the transactions contemplated thereby; provided that, no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its gross negligence or willful misconduct.    No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Borrower or any of its affiliates, subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct. In no event, however, shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages.

The terms of the Facility as set forth herein are for discussion purposes only and this term sheet does not imply in any way a commitment by Lender to enter into the Facility or to submit the Facility to  Lender's credit committee for approval.   Lender may terminate its review of the Facility at any time in its sole discretion.  Lender will make the loans summarized above only upon further due diligence and underwriting of the transaction, approval through Lender's credit approval process,  Lender's continuing satisfaction with the financial and business conditions of the Borrower and its principals, and receipt of documentation and assurances satisfactory to Lender and its legal counsel. This term sheet does not purport to specify all of the terms, conditions, representations and warranties, covenants and other provisions that will be contained in the final financing documents for the Facility, if approved by Lender.  The Facility shall be subject to such other terms, covenants and conditions as Lender deems appropriate in its sole discretion.

This term sheet is being delivered in reliance that all information provided to Lenders is and will be accurate and complete.  The contents of this term sheet may not be shared with any third party without  Lender's prior written consent, except for management and regulatory bodies on a need-to-know basis.  All persons who are informed of the contents of this term sheet also need to be informed that such contents are confidential and cannot be disclosed without  Lender's prior written consent.

Notwithstanding anything else contained herein, Borrower hereby expressly agrees to be bound by the provisions of this term sheet relating to confidentiality, exclusivity and expense reimbursement.

This term sheet supersedes all previous discussions, communications and proposals relating in any way to the Facility and shall expire if not executed by Borrower and returned to Lender by 5:00 p.m. EDT on November 1, 2021.

Please initial upon approval_____

Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act") and Lender's policies and practices, Lender is required to obtain, verify and record certain information and documentation that identifies Borrower, which information includes the name and address of Borrower and such other information that will allow Lender to identify Borrower in accordance with the Act.

We appreciate the opportunity to furnish this proposal to you.  If you have any questions, please do not hesitate to call.

Sincerely,                                    Accepted & agreed,

CNH Finance Fund I, L.P.                      HBL SNF, LLC


By: _____          By: _____
Name: Timothy Peters                          Name:_____
Title: Authorized Signatory                   Title:_____
                                              Date:_____

Please initial upon approval_____

**EXHIBIT C**

**HBL SNF, LLC d/b/a Epic Nursing and Rehab at White Plains**
**DIP Budget**

| | | |
|---|---|---|
| Week 1 Begins on | 11/1/2021 |
| Week 16 Ends on | 2/21/2022 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medicaid | 395 | 398 | 401 | 401 | 405 | 405 | 408 | 408 | 411 | 411 | 415 | 415 | 418 | 418 | 421 | 421 |
| Medicare | 302 | 305 | 307 | 307 | 310 | 310 | 312 | 312 | 315 | 315 | 318 | 318 | 320 | 320 | 323 | 323 |
| Private Pay | 76 | 76 | 77 | 77 | 77 | 77 | 78 | 78 | 79 | 79 | 79 | 79 | 80 | 80 | 81 | 81 |
| Commercial Insurance | 67 | 68 | 69 | 69 | 69 | 69 | 70 | 70 | 70 | 70 | 70 | 70 | 71 | 71 | 71 | 71 |
| Resident Days | 840 | 847 | 854 | 854 | 861 | 861 | 868 | 868 | 875 | 875 | 882 | 882 | 889 | 889 | 896 | 896 |
| ADC | 120 | 121 | 122 | 122 | 123 | 123 | 124 | 124 | 125 | 125 | 126 | 126 | 127 | 127 | 128 | 128 |

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medicaid | 110,000 | 110,000 | 110,000 | 110,000 | 117,278 | 118,168 | 119,059 | 119,059 | 120,247 | 120,247 | 121,137 | 121,137 | 124,299 | 124,299 | 125,508 | 125,508 |
| Medicare | - | 145,000 | - | 826,464 | - | 825,744 | - | 145,720 | - | 841,299 | - | 148,465 | - | 856,178 | - | 151,090 |
| Private Pay | 50,000 | - | 50,537 | - | 50,537 | - | 50,537 | - | 50,537 | - | 51,198 | - | 51,198 | - | 52,189 | - |
| Commercial Insurance | 54,635 | - | - | 54,635 | - | 54,635 | - | 54,635 | - | 54,635 | - | 55,636 | - | 55,636 | - | 56,036 |
| Medicare Part B | 45,000 | - | - | 49,499 | - | 42,074 | - | 7,425 | - | 42,855 | - | 7,563 | - | 43,549 | - | 7,685 |
| **Total Cash Receipts** | 259,635 | 255,000 | 160,537 | 1,040,598 | 167,815 | 1,040,621 | 169,596 | 326,839 | 170,784 | 1,059,036 | 172,335 | 332,801 | 175,497 | 1,079,662 | 177,697 | 340,319 |
| Salaries- Management | 50,000 | | 50,000 | | 50,000 | | 50,000 | | 50,000 | | 50,000 | | 50,000 | | 50,000 | |
| Salaries- Staff | 337,500 | | 340,000 | | 342,500 | | 342,500 | | 342,500 | | 345,000 | | 345,000 | | 345,000 | |
| Payroll Taxes & Fees | 35,000 | | 35,000 | | 35,000 | | 35,000 | | 35,000 | | 36,000 | | 36,000 | | 36,000 | |
| Employee Benefits | | | | 105,000 | | | | 105,000 | | | | 105,000 | | | | 105,000 |
| Contracted Staff | | | | 30,000 | | | | 32,500 | | | | 35,000 | | | | 37,500 |
| **Total Labor Costs** | 422,500 | - | 425,000 | 135,000 | 427,500 | - | 427,500 | 137,500 | 427,500 | - | 431,000 | 140,000 | 431,000 | - | 431,000 | 142,500 |
| Professional Fees- CPA | 10,000 | | | | 5,000 | | | | 5,000 | | | | 5,000 | | | |
| Professional Fees- Legal | 60,000 | | | | 60,000 | | | | 60,000 | | | | 60,000 | | | |
| Patient Care Ombudsman Fees | 10,000 | | | | 10,000 | | | | 10,000 | | | | 10,000 | | | |
| Subchapter V Trustee | 2,500 | | | | 2,500 | | | | 2,500 | | | | 2,500 | | | |
| Professional Fees - Omni | 2,500 | | | | 2,500 | | | | 2,500 | | | | 2,500 | | | |
| DIP Lender Fees | 100,000 | | | | 25,000 | | | | 25,000 | | | | | | | |
| Cash Receipts Assessment | | | | 44,187 | | | | 46,506 | | | | 47,245 | | | | 48,598 |
| COD Payment Allowance | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| Rent | 506,097 | | | | 506,097 | | | | 506,097 | | | | 506,097 | | | |
| Total No-Lag Expenses | 766,097 | 75,000 | 75,000 | 119,187 | 686,097 | 75,000 | 75,000 | 121,506 | 686,097 | 75,000 | 75,000 | 122,245 | 661,097 | 75,000 | 75,000 | 123,598 |
| "New" A/P Vendor Payments | - | - | - | - | 50,000 | 50,000 | 50,000 | - | 50,000 | 50,000 | 50,000 | - | 50,000 | 50,000 | 50,000 | - |
| "Old" A/P Vendor Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash Disbursements** | 1,188,597 | 75,000 | 500,000 | 254,187 | 1,163,597 | 125,000 | 552,500 | 259,006 | 1,163,597 | 125,000 | 556,000 | 262,245 | 1,142,097 | 125,000 | 556,000 | 266,098 |
| **Net Cash Flow** | (928,962) | 180,000 | (339,463) | 786,411 | (995,782) | 915,621 | (382,904) | 67,833 | (992,813) | 934,036 | (383,665) | 70,556 | (966,600) | 954,662 | (378,303) | 74,221 |
| Plus: Opening Cash Balance | 400,639 | 221,678 | - | - | 98,626 | - | 18,465 | - | - | - | - | - | - | - | - | - |
| Plus: Draw from Credit Line | 750,000 | - | 339,463 | - | 897,156 | - | 364,439 | - | 992,813 | - | 383,665 | - | 966,600 | - | 378,303 | - |
| Less: Repayment to Credit Line | - | (401,678) | - | (687,786) | - | (897,156) | - | (67,833) | - | (934,036) | - | (70,556) | - | (954,662) | - | (74,221) |
| **Ending Cash Balanc** | 221,678 | - | - | 98,626 | - | 18,465 | - | - | - | - | - | - | - | - | - | - |
| Net Credit Draw Dow | 750,000 | 348,323 | 687,786 | - | 897,156 | - | 364,439 | 296,606 | 1,289,419 | 355,383 | 739,048 | 668,492 | 1,635,091 | 680,429 | 1,058,732 | 984,511 |