**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
Tracy L. Klestadt
Christopher Reilly
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245

*Proposed Counsel to the Debtor and Debtor in*
*Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| HBL SNF, LLC, d/b/a EPIC REHABILITATION AND NURSING AT WHITE PLAINS, | : | (Subchapter V) |
| | : | |
| | : | Case No. 21-22623 (SHL) |
| Debtor. | : | |

-----------------------------------------------------------------x

## NOTICE OF FILING OF PROPOSED SUPER PRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

**PLEASE TAKE NOTICE** that the above-captioned debtor and debtor-in-possession (the "Debtor"), through its undersigned proposed counsel, hereby files the Proposed *Super Priority Debtor-in-Possession Credit and Security Agreement* attached hereto as Exhibit A.

Dated:  New York, New York
        November 3, 2021

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP

By:    */s/ Tracy L. Klestadt*
Tracy L. Klestadt
Christopher Reilly
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: tklestadt@klestadt.com
       creilly@klestadt.com

**SUPER PRIORITY DEBTOR-IN-POSSESSION**
**CREDIT AND SECURITY AGREEMENT**


**between**


**HBL SNF, LLC**

**as the Borrower**


**and**


**CNH FINANCE FUND I, L.P.**


**as the Lender**


**Dated as of**
**November 3, 2021**

# SUPER PRIORITY DEBTOR-IN-POSSESSION
# CREDIT AND SECURITY AGREEMENT

## Table of Contents

Page

I.   DEFINITIONS ............................................................................................................ 1

    1.1   General Terms ............................................................................................ 1
    1.2   Specific Terms ........................................................................................... 2
    1.3   Other Definitional and Interpretative Provisions .............................. 20
    1.4   Time is of the Essence ............................................................................ 21

II.  ADVANCES, PAYMENT AND INTEREST .......................................................... 21

    2.1   Advances ................................................................................................... 21
    2.2   Evidence of Obligations; Maturity ....................................................... 21
    2.3   Interest ...................................................................................................... 22
    2.4   Revolving Facility Disbursements; Requirement to Deliver Borrowing
          Certificate .................................................................................... 22
    2.5   Revolving Facility Collections; Repayment; Borrowing Availability  and
          Lockbox ........................................................................................ 23
    2.6   Promise to Pay; Manner of Payment .................................................... 24
    2.7   Repayment of Excess Advances ............................................................ 25
    2.8   Payments by Lender ................................................................................ 25
    2.9   Grant of Security Interest; Collateral ................................................... 26
    2.10  Collateral Administration ...................................................................... 27
    2.11  Power of Attorney ................................................................................... 29
    2.12  Setoff Rights ............................................................................................ 29

III. FEES AND OTHER CHARGES ............................................................................. 30

    3.1   Facility Fee ............................................................................................... 30
    3.2   Unused Line Fee ...................................................................................... 30
    3.3   Collateral Management Fee .................................................................... 30
    3.4   Deferred Origination Fee ....................................................................... 30
    3.5   Computation of Fees; Lawful Limits .................................................... 30
    3.6   Default Rate of Interest .......................................................................... 31

IV.  CONDITIONS PRECEDENT .................................................................................. 31

    4.1   Conditions to Closing and Advances .................................................... 31
    4.2   Waivers of Conditions to Advances ...................................................... 32

V.   REPRESENTATIONS AND WARRANTIES ........................................................ 32

    5.1   Organization and Authority .................................................................... 32
    5.2   Loan Documents ...................................................................................... 33

i

|      |      |      |      |
|------|------|------|------|
| 5.3 | Subsidiaries, Capitalization and Ownership Interests | | 33 |
| 5.4 | Properties | | 33 |
| 5.5 | Other Agreements | | 34 |
| 5.6 | Litigation | | 34 |
| 5.7 | Labor Matters | | 34 |
| 5.8 | Tax Returns, Governmental Reports | | 34 |
| 5.9 | Financial Statements and Reports | | 35 |
| 5.10 | Compliance with Law | | 35 |
| 5.11 | Intellectual Property | | 35 |
| 5.12 | Licenses and Permits | | 35 |
| 5.13 | Disclosure | | 36 |
| 5.14 | Existing Indebtedness; Investments, Guarantees and Certain Contracts | | 36 |
| 5.15 | Agreements with Affiliates | | 36 |
| 5.16 | Insurance | | 36 |
| 5.17 | Names, Location of Offices, Records and Collateral | | 37 |
| 5.18 | Non-Subordination | | 37 |
| 5.19 | Accounts | | 37 |
| 5.20 | Healthcare Law Compliance Representations | | 38 |
| 5.21 | Reliance on Representations; Survival | | 40 |
| 5.22 | Compliance with Environmental Requirements; No Hazardous Substances | | 40 |
| 5.23 | Material Contracts | | 40 |
| **5.24** | **Third-Party Payor Billing Numbers** | | 41 |
| **5.25** | **Financing Orders** | | 41 |
| **5.26** | **DIP Order Notices** | | 41 |
| **5.27** | **Super Priority Administrative Expense Claims** | | 41 |
| **5.28** | **DIP Liens** | | 42 |
| **VI.** | **AFFIRMATIVE COVENANTS** | | 42 |
| 6.1 | Financial Statements, Reports and Other Information | | 42 |
| 6.2 | Payment of Obligation | | 45 |
| 6.3 | Conduct of Business and Maintenance of Existence and Assets | | 45 |
| 6.4 | Compliance with Legal, Tax and Other Obligations | | 46 |
| 6.5 | Insurance | | 46 |
| 6.6 | True Books | | 47 |
| 6.7 | Inspection; Period Audits | | 47 |
| 6.8 | Further Assurances; Post Closing | | 47 |
| 6.9 | Payment of Indebtedness | | 48 |
| 6.10 | Lien Terminations | | 48 |
| 6.11 | Use of Proceeds | | 48 |
| 6.12 | Collateral Documents; Security Interest in Collateral | | 48 |
| 6.13 | Taxes and Other Charges | | 48 |
| 6.14 | Reserved | | 49 |
| 6.15 | Hazardous Substances | | 49 |
| 6.16 | Licensed Facilities | | 50 |
| 6.17 | Healthcare Operations | | 50 |

VII.  NEGATIVE COVENANTS ............................................................................. 51

    7.1  Financial Covenants .................................................................................. 51
    7.2  No Indebtedness Other Than Permitted Indebtedness ............................. 51
    7.3  No Liens Other Than Permitted Liens ...................................................... 52
    7.4  Investments, New Facilities or Collateral; Subsidiaries ........................... 52
    7.5  Prohibited Payments ................................................................................. 52
    7.6  Transactions with Affiliates ..................................................................... 52
    7.7  Organizational Documents; Fiscal Year; Dissolution; Use of Proceeds ... 52
    7.8  Asset Sales ................................................................................................ 53
    7.9  Management ............................................................................................... 53
    7.10  Restrictive Agreements ............................................................................. 53
    7.11  Modifications of Certain Agreements ....................................................... 53
    7.12  Reserved .................................................................................................... 54
    7.13  Deposit Accounts ...................................................................................... 54
    7.14  Truth of Statements ................................................................................... 54
    7.15  IRS Form 8821 .......................................................................................... 54
    7.16  Third Party Payor Programs ...................................................................... 54
    7.17  Filing of Motions and Applications .......................................................... 54
    7.18  Interim and Final Financing Orders ......................................................... 54

VIII.  EVENTS OF DEFAULT ................................................................................. 55

    8.1  Events of Default ....................................................................................... 55
    8.2  Acceleration and Suspension or Termination of Commitments ............... 57

IX.  RIGHTS AND REMEDIES AFTER DEFAULT ............................................. 57

    9.1  Rights and Remedies ................................................................................. 57
    9.2  Application of Proceeds ............................................................................ 58
    9.3  Reserved .................................................................................................... 59
    9.4  Application of Payments Following Default .............................................. 59
    9.5  Reserved .................................................................................................... 59
    9.6  Rights and Remedies not Exclusive .......................................................... 59

X.  WAIVERS AND JUDICIAL PROCEEDINGS ................................................. 60

    10.1  Waivers ..................................................................................................... 60
    10.2  Delay; No Waiver or Defaults ................................................................... 60
    10.3  Jury Waiver ............................................................................................... 60
    10.4  Cooperation in Discovery and Litigation .................................................. 61

XI.  EFFECTIVE DATE AND TERMINATION ..................................................... 61

    11.1  Effectiveness and Termination .................................................................. 61
    11.2  Survival ..................................................................................................... 62

XII.  ASSIGNMENTS AND PARTICIPATIONS ..................................................... 62

12.1    Assignments .................................................................................................. 62

XIII.    MISCELLANEOUS .................................................................................................. 62

13.1    Governing Law; Jurisdiction; Service of Process; Venue ................................ 62
13.2    Binding Effect of Loan Documents .................................................................. 63
13.3    Revival of Obligations ..................................................................................... 63
13.4    Indemnity ......................................................................................................... 63
13.5    Notice ............................................................................................................... 64
13.6    Severability; Captions; Counterparts; Facsimile Signatures ............................ 64
13.7    Expenses ........................................................................................................... 65
13.8    Entire Agreement ............................................................................................. 65
13.9    Lender Approvals ............................................................................................. 66
13.10   USA Patriot Act ............................................................................................... 66

ANNEX I

Financial and Loan Covenants

## **EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Borrowing Certificate |
| Exhibit B | - | Compliance Certificate |
| Exhibit C | - | Budget |

## **SCHEDULES**

| | | |
|---|---|---|
| Schedule 2.4 | - | Borrower's Account for Funding Wires |
| Schedule 2.5 | - | Borrower's Deposit Accounts |
| Schedule 5.3 | - | Organizational Information |
| Schedule 5.4 | - | Real Property Owned or Leased |
| Schedule 5.16 | - | Insurance |
| Schedule 5.17A | - | Corporate Names |
| Schedule 5.17B | - | Business and Collateral Locations |
| Schedule 5.20 | - | Exceptions to Healthcare Law Compliance Representations |
| Schedule 5.23 | - | Material Contracts |
| Schedule 5.24 | - | Third-Party Payor Billing Numbers |
| Schedule 7.3 | - | Liens |

## SUPER PRIORITY DEBTOR-IN-POSSESSION
## CREDIT AND SECURITY AGREEMENT

THIS SUPER PRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT (this "**Agreement**") dated as of November 3, 2021, is entered into between HBL SNF, LLC, a New York limited liability company (the "**Borrower**"), Borrower being a debtor and debtor-in-possession in a case pending under Subchapter V of Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Case**"), and CNH FINANCE FUND I, L.P., a Delaware limited partnership (the "**Lender**").

## RECITALS

**WHEREAS**, on November 1, 2021 (the "**Petition Date**"), Borrower filed a voluntary petition with the Bankruptcy Court commencing the Bankruptcy Case and subsequent to such filing, Borrower has continued to be in possession of its assets and in the management of its business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Borrower has requested and Lender has agreed to make available to Borrower a secured debtor-in-possession revolving credit facility in the maximum principal amount of $4,000,000.00 (the "**Revolving Facility**") to provide Borrower with the funds necessary for it to meet its working capital needs and other expenses set forth in the Budget upon the terms set forth herein and subject to the approval of the Bankruptcy Court;

**WHEREAS**, to secure Borrower's obligations hereunder, Borrower will grant to Lender, valid, perfected and enforceable superpriority Liens, senior to all other security interests in the Collateral, approved pursuant to Bankruptcy Code § 364(c)(1) and (d)(1), which Liens are a material and necessary condition of Lender's willingness to provide the credit contemplated herein; and

**WHEREAS**, Lender is willing to make the Revolving Loan available to Borrower upon the terms and subject to the conditions set forth herein.

## AGREEMENT

In consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which hereby are acknowledged, Borrower and Lender hereby agree as follows:

## I.  DEFINITIONS

### 1.1    General Terms

For purposes of this Agreement, in addition to the definitions above and elsewhere in this Agreement, the terms listed below shall have the meanings set forth. All capitalized terms used which are not specifically defined shall have meanings provided in Article 9 of the UCC to the extent the same are used or defined therein. Unless otherwise specified herein, any agreement or contract referred to herein shall mean such agreement as modified, amended or supplemented from time to time. Unless otherwise specified, as used in the Loan Documents or in any certificate, report, instrument or other document made or delivered pursuant to any of the Loan Documents,

all accounting terms not defined elsewhere in this Agreement shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of Borrower and its consolidated Subsidiaries delivered to Lender on or prior to the Closing Date.

## 1.2    Specific Terms

**"Account Debtor"** shall mean "account debtor", as defined in Article 9 of the UCC, and any other obligor in respect of an Account.

**"Accounts"** shall mean all of Borrower's (i) accounts (as that term is defined in the UCC), (ii) payment intangibles (as that term is defined in the UCC), and (iii) all other rights of payment, collection or reimbursement (whether owed directly to Borrower or assigned to Borrower by a patient or other third party), whenever due, that arose out of, or will arise out of, the rendering of services, the provision of room, board or other daily living assistance, or the sale, assignment, lease or license of Equipment, prosthetics, pharmaceutical or other goods, whether before or after the date of this Agreement and including, without limitation, all of Borrower's rights of payment, collection or reimbursement with respect to such services from any insurer, federal or state government agency or other third party; whether billed on a fee for service, monthly per patient capitation charge or any other basis, whether or not the accounts, payment intangibles, or rights of payment, collection or reimbursement have been invoiced or billed, written off, partially paid, currently assigned to collection agencies or other third party service vendors. Without limiting the foregoing, Accounts shall also include all monies due or to become due to Borrower and obligations to Borrower in any form (whether arising in connection with contracts, contract rights, instruments, or chattel paper), in each case whether or not earned by performance, now or hereafter in existence, and all documents of title or other documents representing any of the foregoing, and all collateral security and guaranties of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

**"Accrediting Organization"** shall mean any Person from which Borrower has received an accreditation as of the Closing Date or thereafter.

**"Advance"** shall mean a borrowing under the Revolving Facility. Any amounts paid by Lender on behalf of Borrower under any Loan Document shall also be an Advance for purposes of this Agreement. Each Advance shall increase the principal amount outstanding hereunder.

**"Affiliate"** shall mean, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of ten percent (10%) or more of any class of the outstanding voting stock, securities or other equity or ownership interests of such Person and (d) any spouses, parents, descendants and siblings of any of the Persons described in clauses (a), (b) and (c) above. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to

direct or cause the direction of the administrative management or policies (even without the power to direct or cause the direction of the clinical/medical management or policies), whether through ownership of securities or other interests, by contract or otherwise.

**"Applicable Margin"** shall mean two percent (2.0%).

**"Applicable Rate"** shall mean the sum of (i) the Applicable Margin, (ii) the Prime Rate, and (iii) if applicable, the Default Rate, expressed as a percentage.

**"Availability"** shall mean the Revolving Loan Limit less all Revolving Loans outstanding, minus any reserves against Availability imposed by the Lender in its Permitted Discretion.

**"Bankruptcy Case"** shall have the meaning assigned to that term in the preamble of this Agreement.

**"Bankruptcy Code"** shall mean Title 11 of the United States Code entitled "Bankruptcy", as the same may be amended, modified or supplemented from time to time, and any successor statute thereto.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York, or such other bankruptcy court having jurisdiction over the Bankruptcy Case from time to time.

**"Books and Records"** shall mean Borrower's books and records specifically relating to Accounts, including, but not limited to, ledgers, records indicating, summarizing, or evidencing Borrower's Accounts and all computer programs, disc or tape files, printouts, runs, and other computer prepared information with respect to the foregoing and any software necessary to operate the same.

**"Borrower"** shall mean the entity described in the first paragraph of this Agreement and its successors and permitted assigns.

**"Borrowing Base"** shall mean, as of any date of determination:

(a)      the Net Collectible Value of Eligible Receivables, as such Net Collectible Value is determined by Lender with reference to the most recent Borrowing Certificate, other factors deemed relevant by Lender and otherwise in accordance with the Agreement; provided, however, that if as of such date of determination the most recent Borrowing Certificate is of a date more than four (4) Business Days before such date, the Borrowing Base shall be determined by Lender in its Permitted Discretion; *minus*

(b)      the amount of any Carve-Outs, reserves or adjustments against the Borrowing Base provided for in this Agreement or determined by Lender from time to time, in its Permitted Discretion.

**"Borrowing Certificate"** shall mean a Borrowing Certificate substantially in the form of Exhibit A.

**"Borrowing Date"** shall have the meaning assigned to that term in Section 2.4.

**"Budget"** shall mean the Budget attached hereto as Exhibit C to this Agreement, in form and substance satisfactory to Lender and approved by the Bankruptcy Court.  It is understood that the Budget attached hereto as Exhibit C will be updated in accordance with Section 6.1(d)(vi). Any amended or restated Budget shall be in form and substance satisfactory to Lender; however, for purposes of calculating compliance with the Budget and providing a Budget-to-actual presentation, the initial expenses and revenues for the relevant time periods as set forth in the earliest Budget shall be used and not the expenses and revenues for such time period as may be set forth in any subsequently amended or restated Budget.

**"Business Day"** shall mean any day other than a Saturday, Sunday, Good Friday or other day on which the Federal Reserve or Lender is closed.

**"Capital Lease"** shall mean, as to any Person, a lease or any interest in any kind of property or asset by that Person as lessee that is, should be or should have been recorded as a "capital lease" of such person in accordance with GAAP.

**"Capitalized Lease Obligations"** shall mean all obligations of any Person under Capital Leases, in each case, taken at the amount thereof accounted for as a liability in accordance with GAAP.

**"Carve-Outs"** shall mean, to the extent allowed by the Bankruptcy Court: (i) all invoiced and payable attorneys' fees under Sections 330 and 331 of the Bankruptcy Code, and (ii) all fees payable by Borrower to a patient ombudsman appointed under Section 333(a) of the Bankruptcy Code.

**"CERCLA"** shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. § 9601 *et seq*., as the same may be amended from time to time.

**"Change of Control"** shall mean any of the following: (a) the occurrence of a merger, consolidation, reorganization, recapitalization or share or interest exchange, sale or transfer or any other transaction or series of transactions as a result of which the owners, directly or indirectly, of a majority of any Borrower's voting stock or voting power as of the date hereof cease to be entitled to control the company, or (b) the resignation, termination, replacement, death, disability or any other event the result of which is the failure of the existing senior management of Borrower to function in its current capacity, unless, (i) in the case of a replacement, the replacement is reasonably acceptable to Lender, or (ii) in all other cases a replacement reasonably satisfactory to Lender is identified and engaged within 30 days following such event, or (c) the sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of Borrower's assets to, or a consolidation or merger with or into, any other Person, other than any such transaction where immediately thereafter the surviving Person is a direct or indirect subsidiary of Borrower.

**"Closing"** shall mean the date of the initial Advance under the Revolving Facility.

**"Closing Date"** shall mean the date the Closing occurs.

"**Collateral**" shall mean, collectively and each individually, all collateral or security identified in Section 2.9, together with any additional collateral or security now or hereafter granted to Lender by Borrower pursuant to a Loan Document.

"**Collateral Management Fee**" shall have the meaning assigned to the term in Section 3.3.

"**Collection Bank**" shall mean a depository bank identified on the United States trustee's list of authorized depositories, and otherwise acceptable to Lender in its Permitted Discretion.

"**Commercial Deposit Account**" shall mean a deposit account established and maintained in Borrower's name, which is used solely to collect payments with respect to Borrower's Accounts and other Collateral, other than payments with respect to Governmental Receivables.

"**Compliance Certificate**" shall have the meaning assigned to the term in Section 6.1(a).

"**CON**" shall mean any certificate of need or similar license which determines that there is a need for a healthcare facility at a particular location or within a certain geographic region.

"**Concentration Account**" shall have the meaning assigned to the term in Section 2.5.

"**Contingent Obligation**" shall mean, with respect to any Person, any direct or indirect liability of such Person:  (a) with respect to any Indebtedness of another Person (a "**Third Party Obligation**") if the purpose or intent of such Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such Third Party Obligation that such Third Party Obligation will be paid or discharged, or that any agreement relating thereto will be complied with, or that any holder of such Third Party Obligation will be protected, in whole or in part, against loss with respect thereto; (b) with respect to any undrawn portion of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for the reimbursement of any drawing; or (c) for any obligations of another Person pursuant to any guaranty (other than a guaranty of the Obligations or any part thereof) or pursuant to any agreement to purchase, repurchase or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to preserve the solvency, financial condition or level of income of another Person.  The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determinable amount, the maximum amount so guaranteed or otherwise supported.

"**Controlled Deposit Accounts**" shall mean each Governmental Deposit Account, Commercial Deposit Account, Operating Account, and if applicable, the master collections account established by Borrower in accordance with Section 2.5(b).

"**Control Agreements**" shall mean each deposit account control agreement, deposit account instructions and service agreement or similar agreements on each Governmental Deposit Account, Commercial Deposit Account, Operating Account, and if applicable, the master collections account established by Borrower in accordance with Section 2.5(b).

"**Date of Service**" of an Account shall mean the earliest date the service for which the Account is payable was rendered, the Equipment, prosthetics, pharmaceuticals or other goods for

which the Account is payable were delivered, or the room, board or other daily living assistance for which the Account is payable was provided.

"**Debtor Relief Law**" shall mean, collectively, the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally, as amended from time to time.

"**Default Rate**" shall have the meaning assigned to the term in Section 3.6.

"**Distribution**" shall mean (a) any dividend or other distribution (whether in cash, securities or other property) on any equity interest in the Borrower (except those payable solely in its equity interests of the same class), (b) any payment by the Borrower on account of (i) the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any equity interests in the Borrower or any claim respecting the purchase or sale of any equity interest in the Borrower, or (ii) any option, warrant or other right to acquire any equity interests in the Borrower, and (c) any loan or advance to an Affiliate of the Borrower.

"**Dollars**" or "**$**" shall mean the lawful and freely-transferrable currency of the United States of America.

"**EBITDA**" shall have the meaning assigned to that term in Annex I.

"**Eligible Billed Receivables**" shall mean each Account (other than Eligible Unbilled Receivables) arising in the ordinary course of Borrower's business, which meets the following criteria:

a.      it is subject to a valid perfected first priority security interest in favor of Lender, subject to no other Lien (other than Permitted Liens);

b.      it is evidenced by an invoice, statement, electronic submission or other documentary evidence satisfactory to Lender which has been submitted to the Account Debtor for payment in accordance with applicable Law;

c.      it is in substantial compliance and conformance with any requisite procedures, requirements and regulations governing payment by such Account Debtor with respect to such Account, and, if due from a Medicaid/Medicare Account Debtor, is properly payable directly to Borrower;

d.      any portion thereof that is payable by a beneficiary, recipient or subscriber individually and not directly by a third-party obligor acceptable to Lender shall not be included as an Eligible Billed Receivable;

e.      it does not arise out of services rendered to, room, board or other daily living assistance provided to, a sale made to, or out of any other transactions between Borrower or any of its Subsidiaries and, one or more Affiliates of Borrower or any of its Subsidiaries;

f.      it is outstanding for less than 150 days after the Date of Service with respect to such Account; provided that if more than fifty percent (50%) in Net Collectible Value of the Accounts payable by any one Third-Party Payor are outstanding for more than 150 days after such Accounts' Date of Service, no Accounts payable by such Third-Party Payor shall be Eligible Billed Receivables;

g.      no covenant, agreement, representation or warranty with respect to such Accounts contained in any Loan Document has been breached and remains uncured;

h.      to the extent the Account Debtor for such Account is solvent and has a claims-paying ability rating by A.M. Best Company, such rating shall be "A" or better; or to the extent the Account Debtor for such Account does not have a claims-paying ability rating by A.M. Best Company or its claims-paying ability is not rated "A" or better, such Account Debtor is otherwise creditworthy as determined by the Lender in its sole discretion, and there are no proceedings or actions which are threatened or pending against any Account Debtor thereunder which might result in any Material Adverse Change in such Account Debtor's financial condition or the collectability of Accounts with respect to such Account Debtor;

i.      arises out of a completed, bona fide sale, assignment, lease, license and related delivery of goods, provision of room, board or other daily living assistance, or rendering of services by Borrower in the ordinary course of business, in accordance with applicable Law, and in accordance with the terms and conditions of all purchase orders, contracts, certifications, participations, certificates of need and other agreements and documents relating thereto or forming a part of the contract between Borrower and the Account Debtor;

j.      it does not represent the sale of goods or rendering of services to an Account Debtor with respect to which the obligation of payment by the Account Debtor is or may be conditional for any reason whatsoever, including, without limitation, accounts arising with respect to goods that were (i) not sold on an absolute basis, (ii) sold on a bill-and-hold sale basis, (iii) sold on a consignment sale basis, (iv) sold on a guaranteed sale basis, (v) sold on a sale or return basis, or (vi) sold on the basis of any other similar understanding, and is not evidenced by Chattel Paper or an Instrument of any kind and has not been reduced to judgment;

k.      it does not represent amounts payable to Borrower for the use (whether through leasing or otherwise) of Borrower's employees by third parties;

l.      it is not payable under worker's compensation laws or insurance, automobile insurance whether a no-fault law or otherwise, does not represent a census capitation payment or a claim for a personal injury and is not a Self-Pay Account;

m.      the applicable Account Debtor for such Account is not a Governmental Authority, unless all applicable statutes, ordinances or regulations respecting the assignment of such Account have been complied with; provided, however, neither Borrower or Lender will be

required to comply with any filing or notice requirements under the Assignment of Claims Act (31 U.S.C. § 3727);

n.      any portion of an Account that is subject to any offset, credit (including any resource or other income credit or offset), lien, deduction, defense, discount, chargeback, freight claim, allowance, adjustment, dispute or counterclaim, is not for a liquidated amount or is contingent in any respect or for any reason (except to the extent that the same is taken into consideration in determining Net Collectible Value) shall not be included as an Eligible Billed Receivable;

o.      except for deductions taken into consideration in determining Net Collectible Value, there is no agreement with an Account Debtor for any deduction from such Accounts, except for discounts or allowances made in the ordinary course of business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each invoice related thereto, such that only the discounted amount of such Accounts after giving effect to such discounts and allowances shall be considered an Eligible Billed Receivable;

p.      no return, rejection or repossession of goods or services related to it has occurred;

q.      the Account Debtor with respect thereto has its principal place of business or chief executive offices within the continental United States and the Account is payable to Borrower in US dollars;

r.      Borrower has not agreed to accept and has not accepted any non-cash payment for such Account;

s.      if the Account Debtor is the Medicaid Program, the Account is not in a "Medicaid Pending" status; and

t.      such Account meets such specifications and requirements other than as set forth above, which may from time to time be established by Lender, in Lender's sole discretion, by written notice to the Borrower.

"**Eligible Receivables**" shall mean Eligible Billed Receivables and Eligible Unbilled Receivables and shall include such additional Accounts as may be permitted from time to time by Lender at the request of Borrower pursuant to Section 2.1(e).

"**Eligible Unbilled Receivables**" shall mean each Account meeting all of the criteria of Eligible Billed Receivable (and otherwise acceptable to Lender in Lender's sole discretion), except:

a.      clause (b) of the definition of "Eligible Billed Receivables" shall be restated as follows: "it does not remain unbilled for longer than the thirtieth (30th) day of the month following the month in which the Date of Service occurred;"

b.      clause (f) of the definition of "Eligible Billed Receivables" shall be restated as follows: "it is outstanding for no more than 150 days after the Date of Service with respect

to such Account; provided that if more than fifty percent (50%) in Net Collectible Value of the Accounts payable by any one Third-Party Payor are outstanding for more than 150 days after such Accounts' Date of Service, no Accounts payable by such Third-Party Payor shall be Eligible Unbilled Receivables;"

c.    the eligible unbilled portion of any such Accounts shall include amounts earned on each day prior to issuance of any invoice in an amount equal to the rate per patient per day established under the applicable Government Contract; provided that (i) Lender in its Permitted Discretion may from time to time determine the liquidity factors and reserves applicable to Advances made on any such Accounts and (ii) the aggregate amount of Eligible Unbilled Receivables included in the Borrowing Base shall be adjusted monthly based on the amounts actually billed with respect to such Accounts.

**"Environmental Laws"** shall mean all federal, state, local, and foreign laws now or hereafter in effect relating to pollution or protection of the environment, including laws relating to emissions, discharges, releases, or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or wastes or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, removal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or wastes, and any and all regulations, notices, or demand letters issued, entered, promulgated, or approved thereunder.

**"Equipment"** shall mean "equipment" as defined in Article 9 of the UCC.

**"ERISA"** shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

**"ERISA Plan"** shall mean any "employee benefit plan," as such term is defined in Section 3(3) of ERISA (other than a Multiemployer Plan), which Borrower maintains, sponsors or contributes to, or, in the case of an employee benefit plan which is subject to Section 412 of the Code or Title IV of ERISA, to which Borrower or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five (5) years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.  For purposes of this definition, a "Controlled Group" shall mean all members of any group of corporations and all members of a group of trades or businesses (whether or not incorporated) under common control which, together with Borrower, are treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

**"Event of Default"** shall mean the occurrence of any event set forth in Article VIII.

**"Facility Cap"** shall mean the maximum principal amount that may be outstanding hereunder, which amount shall initially be $750,000.00, and which will be automatically increased to $4,000,000.00 upon the entry of the Final Financing Order (or such lesser amount as may be set forth in the Final Financing Order).

**"Facility Fee"** shall have the meaning set forth in Section 3.1.

**"Financing Orders"** shall mean the Interim Financing Order, the Final Financing Order, and any amendments or modifications thereto entered by the Bankruptcy Court in the Bankruptcy Case.

**"Final Financing Order"** shall mean an order that is entered by the Bankruptcy Court in the Bankruptcy Case pursuant to Sections 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), in form and substance that are satisfactory to the Lender, approving the Loan Documents, and which order shall, among other things (i) have been entered on such prior notice as is required by applicable Law and any applicable orders of the Bankruptcy Court, (ii) authorize the extensions of credit in respect of the Revolving Facility in the amounts and on the terms and conditions set forth herein, (iii) grant the Super Priority Claim and other Liens on Collateral referred to herein and in the other Loan Documents (subject to the Carve-Outs), and (iv) approve the payment by the Borrower of the Obligations.

**"GAAP"** shall mean generally accepted accounting principles in the United States of America in effect from time to time as applied by nationally recognized accounting firms.

**"Government Contract"** shall mean all contracts (including all amendments thereto) relating to the payment of Government Receivables (a) with the United States government or with any agency or instrumentality thereof, or (b) with any State or Territory of the United States or the District of Columbia or with any agency or instrumentality thereof.

**"Governmental Authority"** shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

**"Governmental Deposit Account"** shall mean a deposit account established and maintained in Borrower's name, which is used to collect payments with respect to Borrower's Governmental Receivables.

**"Governmental Receivable"** shall mean any Account which is the obligation of the United States of America, or any State or Territory of the United States of America, and the District of Columbia, or any of their respective agencies, whether under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including, without limitation, TRICARE (formerly known as CHAMPUS) and CHAMPVA and whether or not the Account is the primary obligation of such government or agency.

**"Hazardous Substances"** shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which is prohibited by any Environmental Laws; any contaminant, pollutant, waste or substance that is likely to cause immediately or at some future time harm or degradation to the surrounding

environment or risk to human health; toxic mold, any substance that requires special handling; and any other material or substance now or in the future defined, classified or listed as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant", "radioactive", "dangerous" or other words of similar import within the meaning of any Environmental Law, including:  (a) any "hazardous substance" defined as such in (or for purposes of) CERCLA, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (b) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (c) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (d) any petroleum or petroleum by-products, including crude oil or any fraction thereof; (e) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (f) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (g) any toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls ("**PCB's**"), flammable explosives, radioactive materials, infectious substances, materials containing lead-based paint or raw materials which include hazardous constituents); and (h) any other toxic substance or contaminant that is subject to any Environmental Laws or other past or present requirement of any Governmental Authority.  Notwithstanding the foregoing, Hazardous Substances shall not include substances in kinds and amounts commonly used in the operation of businesses of similar kind and nature to the business engaged in by Borrower in accordance with all applicable Laws (including, but not limited to, Environmental Laws) and prudent business management practices and in a manner that does not result in any contamination of all or any portion of properties utilized by Borrower.

"**Hazardous Substances Contamination**" shall mean contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personalty, soil, groundwater, air or other elements on or of the relevant property by Hazardous Substances, or any derivatives thereof, or on or of any other property as a result of Hazardous Substances, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

"**Healthcare Laws**" shall mean all applicable Laws relating to the possession, control, warehousing, marketing, sale and distribution of pharmaceuticals, the operation of medical or senior housing facilities (such as, but not limited to, nursing homes, skilled nursing facilities, rehabilitation hospitals, intermediate care facilities and adult care facilities), patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of medical care, rate setting, Equipment, personnel, operating policies, fee splitting, including, without limitation, (a) all federal and state fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(6)), the Stark Law (42 U.S.C. §1395nn), the civil False Claims Act (31 U.S.C. §3729 et seq.), (b) TRICARE, (c) HIPAA, (d) Medicare, (e) Medicaid, (f) the Patient Protection and Affordable Care Act (P.L. 111-1468), (g) The Health Care and Education Reconciliation Act of 2010 (P.L. 111-152), (h) quality, safety and accreditation standards and requirements of all applicable state laws or regulatory bodies, (i) all laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued, and (j) any and all other applicable health care laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (j) as may be amended from time to time.

"**Healthcare Permit**" shall mean a Permit (a) issued or required under Healthcare Laws applicable to the business of Borrower or any of its Subsidiaries or necessary in the possession,

ownership, warehousing, marketing, promoting, sale, labeling, furnishing, distribution or delivery of goods or services under Healthcare Laws applicable to the business of Borrower or any of its Subsidiaries, (b) issued by any Person from which Borrower has, as of the Closing Date, received an accreditation, and/or (c) issued or required under Healthcare Laws applicable to the ownership or operation of any business location of Borrower.

"**HIPAA**" shall mean the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**HIPAA Compliant**" shall mean that the applicable Person is in compliance with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA, and is not and could not reasonably be expected to become the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could result in any of the foregoing or that could reasonably be expected to adversely affect such Person's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual or potential violation by such Person of the provisions of HIPAA.

"**Indebtedness**" of a Person shall mean at any date, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid on a timely basis and in the ordinary course of business, (d) all Capital Leases of such Person, (e) all non-Contingent Obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (f) all equity securities of such Person subject to repurchase or redemption other than at the sole option of such Person, (g) all obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (h) "earnouts," purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts, (i) all Indebtedness of others guaranteed by such Person, (j) off-balance sheet liabilities and/or Pension Plan or Multiemployer Plan liabilities of such Person, and (k) obligations arising under non-compete agreements.

"**Indemnified Persons**" shall have the meaning assigned to the term in Section 13.4.

"**Intellectual Property**" shall mean, with respect to any Person, all patents, patent applications and like protections, including improvements divisions, continuation, renewals, reissues, extensions and continuations in part of the same, trademarks, trade names, trade styles, trade dress, service marks, logos and other business identifiers and, to the extent permitted under applicable Law, any applications therefor, whether registered or not, and the goodwill of the business of such Person connected with and symbolized thereby, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative works, whether published or unpublished, technology, know-how and processes, operating manuals, trade secrets, computer hardware and software, rights to unpatented inventions and all

applications and licenses therefor, used in or necessary for the conduct of business by such Person and all claims for damages by way of any past, present or future infringement of any of the foregoing.

**"Interim Financing Order"** shall mean the interim order by the Bankruptcy Court in the Bankruptcy Case under Sections 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), in form and substance satisfactory in all respects to Lender: (i) authorizing Borrower to enter into this Agreement and the transactions contemplated hereunder, (ii) approving the terms and conditions of this Agreement, (iii) granting to Lender super-priority over any and all administrative expenses, secured claims, and unsecured claims, now existing or hereafter arising, including administrative expenses of the kind specified in or ordered pursuant to 11 U.S.C. §§ 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise (the "**Super Priority Claim**"), unless such claims are Carve-Outs, (iv) granting to Lender a first priority lien and security interest in all assets of the Borrower, (v) including a prohibition applicable to any governmental authority or other party from exercising rights of set-off or recoupment against any account that arises from and after the filing of the bankruptcy petition, (vi) including a prohibition against using the proceeds of the loan to initiate or prosecute any claims, causes of action, adversary proceedings or other litigation against Lender or any of its officers, directors, equity holders, employees or affiliates, (vii) including a prohibition against using the proceeds of the loan to object, contest, or raise in any proceeding any defense to the validity, perfection, priority, extent or enforceability of this Agreement or the liens contemplated thereby or taking any action that would be injurious to Lender's interests, (viii) ordering that all government payments owing to Borrower be paid to a Controlled Account, (ix) granting relief from the automatic stay to permit Lender to take any action permitted under this Agreement, (x) ordering that Borrower pay Lender at the initial Closing all Lender's due diligence and legal counsel fees related to the financing and all fees required by this Agreement, and (xi) including such other provisions as Lender or Lender's counsel may require or approve.

**"Laws"** shall mean any and all federal, state, provincial, territorial, municipal, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, codes, injunctions, permits, governmental agreements and governmental restrictions, whether now or hereafter in effect, which are applicable to Borrower in any particular circumstance. "**Laws**" includes, without limitation, Environmental Laws.

**"Lease"** shall have the meaning assigned to the term in Section 6.1(i).

**"Liability Event"** shall mean any event, fact, condition or circumstance or series thereof (i) in or for which Borrower becomes liable or otherwise responsible for any amount owed or owing to any Medicaid or Medicare program by a provider under common ownership with Borrower or any provider owned by Borrower pursuant to any applicable Law after the failure of any such provider to pay any such amount when owed or owing, (ii) in which Medicaid or Medicare payments to Borrower are lawfully set-off against payments to Borrower to satisfy any liability of or for any amounts owed or owing to any Medicaid or Medicare program by Borrower, a provider under common ownership with Borrower, or any provider owned by Borrower pursuant to any applicable Law, or (iii) any of the foregoing under clauses (i) or (ii) in each case pursuant to statutory or regulatory provisions that are similar to any applicable Law. Notwithstanding the

foregoing, a "Liability Event" shall not exist unless it could reasonably be expected to have a Material Adverse Effect.

"**Lien**" shall mean any mortgage, pledge, security interest, encumbrance, restriction, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof), or any other arrangement pursuant to which title to the property is retained by or vested in some other Person for security purposes.  For the purposes of this Agreement and the other Loan Documents, any Borrower or any Subsidiary shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, Capital Lease or other title retention agreement relating to such asset.

"**Loan**" or "**Loans**" shall mean, individually and collectively, all Advances under the Revolving Facility.

"**Loan Documents**" shall mean, collectively and each individually, this Agreement, any documents that provide, as security for all or any portion of the Obligations, a Lien on any assets in favor of Lender, the Controlled Deposit Agreements, the Uniform Commercial Code Financing Statements and all other documents or instruments necessary to create or perfect the Liens in the Collateral, the Borrowing Certificates, the Compliance Certificates, the Financing Orders, and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to Lender in connection with any of the foregoing or the Loans, as the same may be amended, modified or supplemented from time to time; all of which shall be in form and substance acceptable to Lender in its sole discretion.

"**Management Agreement**" shall mean any agreement between Borrower and a Manager pursuant to which such Person is compensated for providing any management services of any nature to Borrower in the ordinary course of its business consistent with past practices.

"**Manager**" shall have the meaning assigned to the term in Section 6.16(c).

"**Material Adverse Effect**" or "**Material Adverse Change**" shall mean any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, which results, directly or indirectly in (a) a material adverse change in, or a material adverse effect upon, any of (i) the Borrower's condition (financial or otherwise), operations, business, properties or prospects, (ii) the rights and remedies of Lender under any Loan Document, or the ability of Borrower to perform any of its obligations under any Loan Document to which it is a party, (iii) the legality, validity or enforceability of any Loan Document, (iv) the existence, perfection or priority of any security interest granted in any Loan Document, (v) the value of any material Collateral; or (vi) the use or scope of any Healthcare Permits; (b) a material impairment to the likelihood that Eligible Receivables in general will be collected and paid in the ordinary course of business of Borrower and upon the same schedule and with the same frequency as Borrower's recent collections history; or (c) the imposition of a fine against or the creation of any liability of Borrower to any Governmental Authority that is not subject to a Permitted Contest.

"**Material Contracts**" shall have the meaning set forth in Section 5.23.

"**Medicaid**" shall mean that certain program of medical assistance, funded jointly by the federal government and the states, for impoverished individuals who are aged, blind and/or disabled, and/or members of families with dependent children, which program is more fully described in Title XIX of the Social Security Act (42 U.S.C. §§ 1396 *et seq*.) and the regulations promulgated thereunder, or any successor program.

"**Medicaid/Medicare Account Debtor**" shall mean any Account Debtor which is (i) the United States of America acting under the Medicaid or Medicare program established pursuant to the Social Security Act or any other federal healthcare program, including, without limitation, TRICARE and CHAMPVA, (ii) any state or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Social Security Act or any other state healthcare program, or (iii) any agent, carrier, administrator or intermediary for any of the foregoing.

"**Medicaid Pending**" shall mean that an application for Medicaid payment on behalf of a patient has not yet been approved by Medicaid.

"**Medicaid Program**" shall mean a medical assistance program administered by a state agency and approved by the Federal Centers for Medicare and Medicaid Services (formerly the federal Health Care Financing Administration) pursuant to the terms of Title XIX of the Social Security Act, codified at 42 U.S.C. 1396 et seq.

"**Medicare**" shall mean that certain federal program providing health insurance for eligible elderly and other individuals, under which physicians, hospitals, skilled nursing homes, home health care and other providers are paid for certain covered services they provide to the beneficiaries of such program, which program is more fully described in Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 *et seq*.) and the regulations promulgated thereunder, or any successor program.

"**Net Collectible Value**" shall mean the amount that Lender reasonably expects from time to time to be collected with respect to Eligible Receivables from third-party payors within 150 days of the Date of Service taking into account historical and recent collection rates for each payor class (e.g., Medicare, Medicaid, commercial, etc.), entitled to reimbursement pursuant to any contract or arrangement between Borrower and the applicable Account Debtor(s), offsets, historical returns, rebates, discounts, credits and allowances, and other factors that affect the collectability of Eligible Receivables.

"**Notice Period**" shall have the meaning set forth in Section 9.1(a).

"**Obligations**" shall mean all present and future obligations, Indebtedness and liabilities of Borrower to Lender at any time and from time to time of every kind, nature and description, direct or indirect, secured or unsecured, joint and several, absolute and contingent, due or to become due, matured or unmatured, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, under any of the Loan Documents or under applicable Law including, without limitation, all applicable fees, charges and expenses and/or all amounts paid or advanced by Lender on behalf of or for the benefit of Borrower for any reason at any time, including obligations that accrue after the commencement of the Bankruptcy Case.

"**Operating Account**" shall mean a deposit account established and maintained in Borrower's name, which is used to receive Advances or for Borrower's operating disbursements.

"**Organizational Documents**" shall mean, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement), including any and all shareholder agreements or voting agreements relating to the capital stock or other equity interests of such Person.

"**Payroll Account**" shall mean a deposit account established and maintained in Borrower's name, which is used solely to hold any and all amounts to be used by Borrower for payroll, payroll taxes and other employee wage and benefit payments, and which does not contain monies allocated for any other purpose.

"**Permit**" shall mean all Borrower's governmental licenses, authorizations, provider numbers, supplier numbers, registrations, permits, drug or device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents and approvals required under applicable Law and required for Borrower to carry on its business as now conducted, including, without limitation, Healthcare Permits.

"**Permitted Contest**" shall mean, with respect to any tax obligation or other obligation allegedly or potentially owing from Borrower or its Subsidiary to any governmental tax authority or other third party, a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made on Borrower's books and records and financial statements; provided, however, that (a) compliance with the obligation that is the subject of such contest is effectively stayed during such challenge; (b) Borrower's and its Subsidiaries' title to, and its right to use, the Collateral is not adversely affected thereby and Lender's Lien and priority on the Collateral are not adversely affected, altered or impaired thereby; (c) Borrower has given prior written notice to Lender of Borrower's or its Subsidiary's intent to so contest the obligation; (d) the Collateral or any part thereof or any interest therein shall not be in any danger of being sold, forfeited or lost by reason of such contest by Borrower or its Subsidiaries; (e) Borrower has given Lender notice of the commencement of such contest and upon request by Lender, from time to time, notice of the status of such contest by Borrower and/or confirmation of the continuing satisfaction of this definition; (f) a final determination of such contest could not result in Lender's Lien and its priority on the Collateral being adversely affected, altered or impaired; and (g) upon a final determination of such contest, Borrower and its Subsidiaries shall promptly comply with the requirements thereof. "**Permitted Contest**" includes without limitation, the State Court Action.

"**Permitted Discretion**" shall mean a determination or judgment made by Lender in good faith in the exercise of its reasonable business judgment.

"**Permitted Indebtedness**" shall mean: (i) Indebtedness under the Loan Documents, (ii) any Indebtedness existing on the Petition Date, (iii) Capitalized Lease Obligations incurred after the Closing Date and secured only by the Equipment being leased pursuant to such Capitalized Lease Obligations; (iv) a purchase-money obligation, as defined in Section 9-103(a) of the UCC, provided that the aggregate amount thereof outstanding at any time shall not exceed $50,000, (v) Indebtedness in connection with advances made by an equity holder in order to cure any Event of Default of the financial and loan covenants set forth on Annex I; provided, however, that such Indebtedness shall be on an unsecured basis, subordinated in right of repayment and remedies to all of the Obligations and to all of Lender's rights and in form and substance satisfactory to Lender; (vi) accounts payable to trade creditors and current operating expenses incurred in the ordinary course of business and paid on a timely basis; (vii) borrowings incurred in the ordinary course of business and not exceeding $50,000 individually or in the aggregate outstanding at any one time; provided, however, that such Indebtedness shall be on an unsecured basis, subordinated in right of repayment and remedies to all of the Obligations and to all of the Lender's rights and in form and substance satisfactory to Lender; (viii) Indebtedness in the form of insurance premiums financed through the applicable insurance company; and (ix) any other Indebtedness to which Lender may expressly consent in writing prior to its incurrence, which consent shall be in the sole discretion of Lender.

"**Permitted Liens**" shall mean: (a) deposits or pledges of cash to secure obligations under worker's compensation, social security or similar Laws, or under unemployment insurance (but excluding Liens arising under ERISA, or, with respect to any Pension Plan or Multiemployer Plan, the Code) pertaining to Borrower's or its Subsidiary's employees, if any; (b) deposits or pledges of cash to secure bids, tenders, contracts (other than contracts for the payment of money or the deferred purchase price of property or services), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the ordinary course of business; (c) carrier's, warehousemen's, mechanic's, workmen's, materialmen's or other like Liens on Collateral, other than any Collateral which is part of the Borrowing Base, arising in the ordinary course of business with respect to obligations which are not due, or which are being contested pursuant to a Permitted Contest; (d) Liens on Collateral, other than Accounts, for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or the subject of a Permitted Contest; (e) attachments, appeal bonds, judgments and other similar Liens on Collateral other than Accounts, for sums not exceeding $25,000 in the aggregate arising in connection with court proceedings; provided, however, that the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are the subject of a Permitted Contest; (f) Liens and encumbrances in favor of Lender under the Loan Documents; (g) Liens on Collateral, other than Collateral which is part of the Borrowing Base, existing on the date hereof and set forth on Schedule 7.3; (h) any Lien on any Equipment securing Indebtedness permitted under subpart (iii) of the definition of Permitted Indebtedness, provided, however, that such Lien attaches concurrently with or within twenty (20) days after the acquisition thereof, (i) any Liens that are expressly subordinated to Lender under a Financing Order and are subject to the Bankruptcy Case's automatic stay, and (j) any other Liens to which Lender may expressly consent in writing, which consent shall be in the sole discretion of Lender.

"**Permitted Modifications**" shall mean (a) such amendments or other modifications to Borrower's or Subsidiary's Organizational Documents as are required under this Agreement or by applicable Law and fully disclosed to Lender within thirty (30) days after such amendments or

modifications have become effective, and (b) such amendments or modifications to Borrower's or Subsidiary's Organizational Documents (other than those involving a change in the name of Borrower or Subsidiary or involving a reorganization of Borrower or Subsidiary under the laws of a different jurisdiction) that would not adversely affect the rights and interests of the Lender and fully disclosed to Lender within thirty (30) days after such amendments or modifications have become effective.

"**Permitted Variance**" shall mean a variance of no more than ten percent (10%) between a projected line-item expense set forth in an approved Budget and the actual expense.

"**Person**" shall mean any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority or any other entity of whatever nature.

"**Petition Date**" shall have the meaning assigned to that term in the Recitals.

"**Prime Rate**" shall mean a fluctuating interest rate per annum equal at all times to the rate of interest announced, from time to time, within Wells Fargo Bank at its principal office in San Francisco as its "prime rate," with the understanding that the "prime rate" is one of Wells Fargo Bank's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo Bank may designate; <u>provided</u> <u>that</u> Lender may, upon prior written notice to Borrower, choose a reasonably comparable index or source to use as the basis for the Prime Rate, and further <u>provided</u>, <u>that</u> in no event shall the Prime Rate be lower than the Prime Rate on the Closing Date, and further <u>provided</u>, <u>that</u> each change in the fluctuating interest rate shall take effect simultaneously with the corresponding change in the Prime Rate.

"**Project**" shall mean any healthcare facility (including any assisted living facility, skilled nursing facility or short- or long-term rehabilitation facility) operated or owned or leased by Borrower or any of its Subsidiaries.

"**Related Property**" shall mean, with respect to each Account, the following: (i) all records of any nature evidencing or related to the Account, including contracts, invoices, charges slips, credit memoranda, notes and other instruments and other documents, books, records and other information (including, without limitation, computer data) (ii) all security interests or liens and property subject thereto from time to time purporting to secure payment of such Account, whether pursuant to the contract related to such Account or otherwise, including all rights of stoppage in transit, replevin, reclamation, supporting obligations and letter of credit rights (as such terms are defined in the Uniform Commercial Code), and all claims of lien filed or held by the Borrower on personal property; (iii) all rights to any goods whose sale gave rise to such Account, including returned or repossessed goods; (iv) all instruments, documents, chattel paper and general intangibles (each as defined in the Uniform Commercial Code) arising from, related to or evidencing such Account; (v) all UCC financing statements covering any collateral securing payment of such Account; (vi) all guaranties and other agreements or arrangements of whatever

character from time to time supporting or securing payment of such Account whether pursuant to the contract related to such Account or otherwise; and (vii) all proceeds and amounts received or receivable arising from any of the foregoing.

**"Resident Agreements"** shall mean the singular or collective reference to all patient and resident care agreements, admission agreements and service agreements which include an occupancy agreement and all amendments, modifications or supplements thereto.

**"Revolving Loan"** shall mean the aggregate of the loans made pursuant to Section 2.1(a).

**"Revolving Loan Limit"** shall mean, at any time, the lesser of (a) the Facility Cap and (b) eighty-five percent (85%) the Borrowing Base.

**"Self-Pay Account"** shall mean an Account payable by the individual receiving medical goods or services or by an individual (as opposed to a third party insurance company, Medicare, Medicaid or similar entity) responsible for such payment on behalf of the individual receiving medical goods or services. Self-Pay Accounts shall also include any co-pays and deductibles payable by such individual.

**"State Court Action"** shall mean the civil action commenced in the Supreme Court of the State of New York, County of Westchester, captioned as *White Plains Healthcare Properties I, LLC v. HBL SNF, LLC, et al.*, Index No. 60278-20 (N.Y. Sup. Ct. 2020).

**"Subsidiary"** shall mean (i) as to Borrower, any Person in which more than fifty percent (50%) of all equity, membership, partnership or other ownership interests is owned directly or indirectly by Borrower through one or more of its Subsidiaries, and (ii) as to any other Person, any Person in which more than fifty percent (50%) of all equity, membership, partnership or other ownership interests is owned directly or indirectly by such Person through one or more of such Person's Subsidiaries. Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of Borrower.

**"Test Period"** shall have the meaning assigned to that term in Annex I.

**"Term"** shall mean the period commencing on the date set forth on the first page hereof and ending on the earlier to occur of (i) the effective date of a plan of reorganization of the Borrower confirmed by the Bankruptcy Court, (ii) consummation of a sale or other disposition of a material portion of the Borrower's assets pursuant to 11 U.S.C. 363 or otherwise, (iii) the Borrower's filing of a motion or other pleading seeking, or consenting to, conversion to a proceeding under Chapter 7 of the Bankruptcy Code, (iv) conversion to a proceeding under Chapter 7 of the Bankruptcy Code, (v) a dismissal by the Bankruptcy Court of Borrower's Bankruptcy Case, (vi) the Borrower's filing of a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise, (vii) twenty-four (24) months from Closing, or (viii) any date on which the Loans are accelerated during the continuance of an Event of Default.

**"Termination Date"** shall mean the earlier to occur of (a) the end of the Term, (b) any date on which Lender accelerates the maturity of the Loans pursuant to Article VIII, or (c) the

termination date stated in any notice of termination of this Agreement provided by Borrower in accordance with Section 11.1.

"**Third Party Payor**" shall mean Medicare, Medicaid, TRICARE, and other state or federal health care program, Blue Cross and/or Blue Shield, private insurers, managed care plans and any other Person or entity which presently or in the future maintains Third Party Payor Programs.

"**Third Party Payor Programs**" shall mean all payment and reimbursement programs, sponsored by a Third Party Payor, in which Borrower participates.

"**TRICARE**" shall mean the program administered pursuant to 10 U.S.C. Section 1071 et. seq), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

"**UCC**" and "**Uniform Commercial Code**" shall mean the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**United States**" and "**U.S.**" shall mean the United States of America.

"**Unused Line Fee**" shall have the meaning assigned to the term in Section 3.2.

### 1.3      Other Definitional and Interpretative Provisions

References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits", or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided. Any term defined herein may be used in the singular or plural. "Include", "includes" and "including" shall be deemed to be followed by "without limitation". Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person. References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively. Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds. Unless otherwise specified herein, all amounts (including, for the avoidance of doubt, for purposes of calculating the Borrowing Base) shall be calculated in Dollars. References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations. All amounts used for purposes of financial calculations required to be made herein shall be without duplication. References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States. References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto. As used in this Agreement, the meaning of the term "material" or the phrase "in all material respects" is intended to refer to an act, omission, violation or condition which reflects or could reasonably be expected to result in a Material Adverse Effect. References to capitalized terms that are not defined herein, but are defined in the UCC, shall have the meanings given them in the UCC. All references herein to times of day shall be references to daylight or standard time, as applicable, in New York City.

### 1.4    Time is of the Essence

Time is of the essence in Borrower's performance under this Agreement and all other Loan Documents.

## II.  ADVANCES, PAYMENT AND INTEREST

### 2.1    Advances

(a)    Subject to the provisions of this Agreement, Lender shall make Advances to the Borrower under the Revolving Facility from time to time during the Term, and not more than once per each week unless agreed to by Lender and subject to the processing fees set forth in Section 2.4; provided that, notwithstanding any other provision of this Agreement (but subject to the provisions of this Section 2.1(a)), the aggregate amount of all Advances at any one time outstanding under the Revolving Facility shall not exceed the Revolving Loan Limit.  The Revolving Facility is a revolving credit facility, which may be drawn, repaid and redrawn, from time to time as permitted under this Agreement.  Any determination as to whether there is availability within the Borrowing Base for Advances shall be made by Lender in its Permitted Discretion and is final and binding upon Borrower absent manifest and demonstrable error.  Unless otherwise permitted by Lender, each Advance requested by Borrower shall be in an amount of at least $25,000.00.  Subject to the provisions of this Agreement, Borrower may request Advances under the Revolving Facility up to and including the Availability.  Advances under the Revolving Facility automatically may, in the discretion of the Lender, be made for the payment of interest on the Revolving Facility and other Obligations on the date when due to the extent of Availability and as provided for herein.

(b)    Lender shall have the right to establish and readjust from time to time, in its Permitted Discretion, reserves (without duplication of other reserves) against the Borrowing Base, which reserves shall have the effect of reducing the amounts otherwise eligible to be disbursed to Borrower under the Revolving Facility pursuant to this Agreement.

(c)    Borrower may, from time to time, repay all or part of the outstanding Advances under the Revolving Facility, with such repaid amounts eligible to be redrawn under the terms of the Agreement.

### 2.2    Evidence of Obligations; Maturity

(a)    Lender shall maintain, in accordance with its usual practice, electronic or written records evidencing the outstanding Obligations to Lender, including, without limitation, the amounts of principal, interest, fees and other amounts payable and paid to Lender from time to time under this Agreement.

(b)    The entries made in the electronic or written records maintained pursuant to subsection (a) above shall be prima facie evidence of the existence and amounts of the Obligations therein recorded absent manifest and demonstrable error; provided, however, that the failure of the Lender to maintain such records or any error therein shall not in any manner affect the obligations of the Borrower to repay the Obligations in accordance with their terms.  Subject to the foregoing, Advances under the Revolving Facility may also be evidenced by a promissory note, payable to

the order of Lender, duly executed and delivered by Borrower and dated as of the date hereof, evidencing the aggregate indebtedness of Borrower to Lender resulting from Advances under the Revolving Facility, from time to time.  Lender hereby is authorized, but is not obligated, to enter the amount of each Advance under the Revolving Facility and the amount of each payment or prepayment principal or interest thereon in the appropriate spaces on the reverse of or on an attachment to the promissory note.  Lender may account to Borrower from time to time with a statement of Advances under the Revolving Facility, the amounts outstanding hereunder, and charges and payments made pursuant to this Agreement, and in the absence of manifest and demonstrable error, such accounting rendered by Lender shall be deemed final, binding and conclusive unless Lender is notified by Borrower in writing to the contrary within 30 days of receipt of each accounting, which notice shall be deemed an objection only to items specifically objected to therein.

(c)     All amounts outstanding hereunder and other Obligations shall be due and payable in full, if not earlier in accordance with this Agreement or the Financing Orders, on the Termination Date.

### 2.3     Interest

Interest shall accrue on the principal amount outstanding from time to time hereunder at a rate per annum equal to the Prime Rate plus the Applicable Margin calculated on the basis of a 360-day year and adjusted for the actual number of days elapsed in each interest calculation period.  Interest shall be payable by Borrower monthly in arrears but in no event later than the first day of each calendar month commencing with December 1, 2021.  Interest shall continue to accrue on the principal amount outstanding from time to time until the irrevocable payment in full in cash of the Obligations and termination of this Agreement.  Any accrued but unpaid interest shall be added to the Obligations and increase the principal amount outstanding hereunder on the first Business Day of each month.

### 2.4     Revolving Facility Disbursements; Requirement to Deliver Borrowing Certificate

So long as no Event of Default shall have occurred and be continuing, Borrower may give Lender written notice requesting an Advance under the Revolving Facility by delivering to Lender not later than 11:00 a.m. (New York City time) at least two but not more than four Business Days before the proposed borrowing date of such requested Advance (the "**Borrowing Date**"), a completed Borrowing Certificate and relevant supporting documentation satisfactory to Lender in its Permitted Discretion, which shall (i) specify the proposed Borrowing Date of such Advance which shall be a Business Day, (ii) specify the principal amount of such requested Advance, (iii) certify the matters specified therein, and (iv) specify the amount of any Medicare or Medicaid recoupments and/or recoupments of any third party being sought, requested or claimed, or, to Borrower's knowledge, threatened against Borrower or Borrower's Affiliates.  In the event that Borrower does not request an Advance during any two consecutive calendar weeks, Borrower shall, on the last Business Day of the second such week (and more frequently if Lender shall so request) until the Obligations are indefeasibly paid in cash in full and this Agreement is terminated, deliver to Lender a completed Borrowing Certificate.  On each Borrowing Date, Borrower authorizes Lender to disburse the proceeds of the requested Advance to the account(s) as set forth

on Schedule 2.4 (or to such other account as to which the Borrower shall expressly instruct Lender in writing), in all cases for credit by the recipient of such proceeds to the Borrower, via Federal funds wire transfer no later than 4:00 p.m. (New York City time); provided, however, if any amounts are then due to Lender on account of any interest, fees or expense reimbursements pursuant to the Loan Documents at the time such Advance is requested, Lender is authorized (but not required) to reduce the proceeds to Borrower with respect to such Advance by the amount of such interest, fees or expense reimbursements and to retain such amounts as payment of such interest, fees or expense reimbursements.  It is understood and agreed that Lender shall have no responsibility for the application of proceeds disbursed pursuant to Schedule 2.4.  Lender shall charge a processing fee of $100.00 for the first three Advances of each calendar week and $200.00 for each additional Advance during such calendar week.

**2.5    Revolving Facility Collections; Repayment; Borrowing Availability and Lockbox**

(a)    Borrower shall establish and maintain at a Collection Bank and at Borrower's expense:

(i)    a Governmental Deposit Account, which shall be subject to a deposit account instructions agreement or similar agreement between Borrower, Lender and a Collection Bank;

(ii)    a Commercial Deposit Account, which shall be subject to a blocked deposit account control agreement between Borrower, Lender and a Collection Bank;

(iii)    an Operating Account, which shall be subject to a springing deposit account control agreement between Borrower, Lender and a Collection Bank; and

(iv)    a Payroll Account, which shall not be subject to a deposit account control agreement.

(b)    The Control Agreements on the Governmental Deposit Account and Commercial Deposit Account shall instruct the Collection Bank to transfer, on each Business Day, all funds on deposit therein to (i) a deposit account established and maintained by Lender or an Affiliate of Lender at such bank as Lender may communicate to the Collection Bank from time to time (the "**Concentration Account**"), or (ii) a master collections account established and maintained in the name of Borrower, which is subject to a blocked deposit account control agreement between Borrower, Lender and a Collection Bank, which causes all funds on deposit in such master collections account to be transferred to the Concentration Account on each Business Day.

(c)    Borrower hereby agrees to (i) identify its Governmental Deposit Account as the "pay to" address on all invoices sent to each payor of Borrower's Governmental Receivables, and (ii) identify its Commercial Deposit Account as the "pay to" address on all invoices sent to each payor of Borrower's other Accounts and Collateral not constituting Governmental Receivables. Borrower further agrees not to (A) change such directives to payors without the prior written consent of Lender, (B) terminate any Controlled Deposit Account or Control Agreement, or (C) terminate or modify, or attempt to terminate or modify, the standing transfer order in any Controlled Deposit Agreement.

(d)      Borrower hereby acknowledges and agrees that any violation of this Section 2.5 would be an Event of Default hereunder, would cause irreparable harm to the Lender for which there would be no adequate remedy at law, and agrees and consents to entry of an order by a court of competent jurisdiction granting the Lender specific performance of the terms and provisions of this Agreement as to Borrower. At the request of Lender, Borrower shall also enter into a lockbox agreement with the Collection Bank providing for the receipt of deposits at an address specified in such lockbox agreement and the deposit of funds received at such address to the applicable Controlled Deposit Account.

(e)      To the extent that any Account collections or any other cash payments received by Borrower are not sent directly to the appropriate Controlled Deposit Account, such collections and proceeds shall be held in trust for the benefit of the Lender and once at least $1,000.00 has been so collected, it will be  remitted (and in any event within one (1) Business Day), in the form received (or, with respect to cash, by check or wire transfer), to the appropriate Controlled Deposit Account for immediate transfer to the Concentration Account.

(f)      For purposes of calculating interest, all funds transferred to the Lender's Concentration Account shall be subject to a three (3) Business Day clearance period and all interest accruing on such funds during such clearance period shall accrue for the benefit of Lender. All funds transferred to the Concentration Account shall be applied to reduce the Obligations hereunder in the following order of priority: (i) payment of any fees and expense reimbursements due to Lender under the Loan Documents, (ii) any of Borrower's Obligations not included in items (iii) and (iv) below, (iii) to any interest then due and owing hereunder, and (iv) to the principal amount outstanding hereunder. For purposes of determining Availability, all funds transferred to the Concentration Account in accordance with this Section shall be applied in accordance with the foregoing sentence as of the date of the transfer.

(g)      If there is a positive balance in favor of Borrower in the Concentration Account, such positive balance shall not accrue interest in favor of Borrower, but shall be available to Borrower in accordance with the terms of this Agreement.

(h)      At all times, Borrower and its Affiliates shall direct all collections or proceeds it receives on Accounts or from other Collateral to the account(s) and in the manner specified by Lender in its Permitted Discretion so long as any amounts are outstanding under the Revolving Facility.

(i)      Borrower shall provide Lender with all information (including user identifications and passwords) necessary for Lender to have online view-only access to all information regarding Borrower's deposit accounts.

(j)      Schedule 2.5 identifies each of Borrower's deposit accounts, the depository bank at which such accounts are maintained, the type of Control Agreements on such accounts (if any), and the second lien secured party to such Control Agreements (if any).

**2.6      Promise to Pay; Manner of Payment**

Borrower promises to pay principal, interest and all other amounts payable hereunder, or under any other Loan Document, without any right of rescission and without any

deduction whatsoever, including any deduction for any setoff, counterclaim or recoupments, and notwithstanding any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any property or improvements. All payments in respect of interest, principal, fees or other Obligations shall be made by Borrower, at Lender's sole discretion: (i) by application of available funds in the Concentration Account pursuant to Section 2.5, (ii) by application of Advances under the Revolving Facility pursuant to Section 2.1, or (iii) upon two Business Days' notice, directly by Borrower. If Lender requests payment in accordance with clause (iii) of the immediately preceding sentence, Borrower shall make such payment by wire transfer on the date when due, without offset or deduction for counterclaim, in Dollars, in immediately available funds to such account as may be indicated in writing by Lender to Borrower. Any payment received after 4:00 p.m. on the date when due shall be deemed received on the following Business Day.  Whenever any payment hereunder shall be stated to be due or shall become due and payable on a day other than a Business Day, the due date thereof shall be extended to, and such payment shall be made on, the next succeeding Business Day, and such extension of time in such case shall be included in the computation of payment of any interest (at the interest rate then in effect during such extension) and/or fees, as the case may be.

### 2.7    Repayment of Excess Advances

Subject to the following sentence, any balance of Advances under the Revolving Facility outstanding at any time in excess of the Revolving Loan Limit shall be immediately due and payable by Borrower upon demand (or, if such over-advance was created as a result of Lender's adjustment of the advance rates for Availability or eligibility criteria, then within five (5) Business Days, unless such adjustment by Lender was the result of any misrepresentation or fraud of Borrower, in which case there shall be no grace period and any such over-advance shall be immediately due and payable), whether or not an Event of Default has occurred or is continuing and shall be paid in the manner specified in Section 2.6.  Notwithstanding the foregoing, if Lender intentionally makes an Advance that is in excess of Availability, such Advance shall be repaid within five (5) Business Days of a demand for repayment or when it is otherwise required to be repaid pursuant to other Sections of this Agreement.

### 2.8    Payments by Lender

Should any amount, interest or other Obligation required to be paid under any Loan Document remain unpaid after it is due and payable and after the expiration of any cure period, if applicable, such amount may be paid by Lender, which payment shall be deemed a request for an Advance under the Revolving Facility as of the date such payment is due, and Borrower irrevocably authorizes disbursements of any such funds to Lender by way of direct payment of the relevant amount, interest or other Obligations.  No payment or prepayment of any amount by Lender or any other Person shall entitle any Person to be subrogated to the rights of Lender under any Loan Document unless and until the Obligations have been fully performed and paid irrevocably in cash and this Agreement has been terminated.  Any sums expended by Lender as a result of Borrower's failure to pay, perform or comply with any Loan Document or any of the Obligations may be charged to Borrower's account as an Advance under the Revolving Facility and added to the Obligations and thereby increase the principal amount outstanding hereunder.

### 2.9    Grant of Security Interest; Collateral

(a)    To secure the payment and performance of the Obligations, and without limiting any grant of any Lien and security interest in any other Loan Document, Borrower, upon entry of the Interim Financing Order or the Final Financing Order, as applicable, hereby grants to Lender a continuing security interest in and Lien upon, and pledges to Lender, all of its right, title and interest in and to the following, whether now owned or hereafter created, acquired or arising, wherever located, and subject to Section 2.9(b), whether acquired before (collectively and each individually, the "**Collateral**"):

     (i)    All Accounts (including health-care insurance receivables) and Related Property;

     (ii)    all of Borrower's deposit accounts, including the Governmental Deposit Account;

     (iii)    all Books and Records, whether or not related to any Collateral;

     (iv)    all other personal property and fixtures of Borrower, including all goods, Inventory, Equipment, furniture, fixtures, General Intangibles (including, without limitation, payment intangibles and software), chattel paper (whether tangible or electronic), supporting obligations, investment property, financial assets, documents, instruments (including any promissory notes), securities, securities accounts, contract rights or rights to payment of money, leases, Permits, license agreements, franchise agreements, commercial tort claims, stock in direct and indirect subsidiaries, machinery, cash, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), Intellectual Property, copyrights, trademarks, patents, and tradestyles; and

     (v)    any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

(b)    The Liens and security interests granted to Lender above or under the Financing Orders shall be valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected first-priority security interests and Liens. Under Section 364(c)(2) of the Bankruptcy Code, Lender has been granted a first-priority Lien on all Collateral not encumbered as of the Petition Date. Under Section 364(d) of the Bankruptcy Code, Lender has been granted a first-priority priming Lien on all Collateral encumbered as of the Petition Date.

(c)    Pursuant to the Financing Orders, the Liens granted in favor of Lender in all of the Collateral shall be perfected without the recordation of any UCC financing statements, notices of Liens or other instruments of assignment. Notwithstanding the foregoing, Borrower further agrees that Lender is authorized to file or record financing statements with respect to the Collateral without the signature of Borrower in such form and in such offices as Lender reasonably determines appropriate to further evidence the perfection of the security interests of Lender under this Agreement and to use the collateral description "all assets of the Debtor" in any such financing statements.

(d)    The Liens, lien priority, administrative priorities and other rights and remedies granted to Lender in the Financing Orders and the other Loan Documents shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any other act or omission whatsoever until the full performance and irrevocable payment in full in cash of the Obligations and termination of this Agreement.

### 2.10    Collateral Administration

(a)    All Collateral (except funds required to be deposited in the Controlled Deposit Accounts) will at all times be kept by Borrower at the locations set forth on Schedule 5.17B hereto and shall not, without concurrent written notice to Lender, be moved therefrom and in any case shall not be located (as that term is used in Section 9-301(2) of the UCC) outside the continental United States.

(b)    Borrower shall keep accurate and complete records of its Accounts and all payments and collections thereon and shall submit such records to Lender on such periodic basis as Lender may request.  After the occurrence and during the continuance of an Event of Default, and upon Lender's request, Borrower shall execute and deliver to Lender formal written assignments of all of its Accounts weekly or daily as Lender may request, including all Accounts created since the date of the last assignment, together with copies of claims, invoices and/or other information related thereto.  To the extent that collections from such assigned Accounts exceed the amount of the Obligations, such excess amount shall not accrue interest in favor of Borrower, but shall be available to Borrower upon Borrower's written request.

(c)    Reserved.

(d)    Lender shall have the right at all times after the occurrence and during the continuance of an Event of Default after expiration of all applicable cure periods to notify (i) Account Debtors owing Accounts to Borrower other than Medicaid/Medicare Account Debtors that their Accounts have been assigned to Lender and to collect such Accounts directly in its own name and to charge collection costs and expenses, including reasonable attorneys' fees, to Borrower, and (ii) Medicaid/Medicare Account Debtors that Borrower has waived any and all defenses and counterclaims it may have or could interpose in any action or procedure brought by Lender to obtain a court order recognizing the collateral assignment or security interest and lien of Lender in and to any Account or other Collateral and that Lender is seeking or may seek to obtain a court order recognizing the collateral assignment or security interest and lien of Lender in and to any Account or Collateral and that Lender is seeking or may seek to obtain a court order recognizing the collateral assignment or security interest and lien of Lender in and to all Accounts and other Collateral payable by Medicaid/Medicare Account Debtors.

(e)    As and when determined by Lender in its Permitted Discretion, Lender shall have the right to perform the searches described in clauses (i) and (ii) below against Borrower (the results of which are to be consistent with Borrower's representations and warranties under this Agreement), at Borrower's reasonable expense:  (i) UCC searches with the Secretary of State and local filing offices of each jurisdiction where Borrower maintains its respective executive offices, a place of business or assets or in which it is organized; and (ii) bankruptcy, judgment, federal,

state and local tax lien and litigation searches, in each jurisdiction in which such actions, or Liens may be recorded.

(f)     Reserved.

(g)     As of the Closing Date, Borrower has no ownership interest in any Chattel Paper (as defined in Article 9 of the UCC), letter of credit rights, commercial tort claims (except for the claims asserted by Borrower in the State Court Action), Instruments, documents or investment property (other than equity interests in any Subsidiaries of Borrower disclosed on Schedule 5.3) and Borrower shall give notice to Lender promptly (but in any event not later than the delivery by Borrower of the next Borrowing Certificate required pursuant to Section 2.4 above) upon the acquisition by Borrower of any such Chattel Paper, letter of credit rights, commercial tort claims, Instruments, documents, investment property.  No Person other than any Lender has "control" (as defined in Article 9 of the UCC) over any deposit account, investment property (including Securities Accounts and commodities account), letter of credit rights or electronic chattel paper in which Borrower has any interest (except for such control arising by operation of law in favor of any bank or securities intermediary or commodities intermediary with whom any deposit account, securities account or commodities account of Borrower is maintained).

(h)     Borrower shall deliver to Lender all tangible Chattel Paper and all Instruments and Documents owned by Borrower and constituting part of the Collateral duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to Lender.  Borrower shall provide Lender with "control" (as defined in Article 9 of the UCC) of all electronic Chattel Paper owned by Borrower and constituting part of the Collateral by having Lender identified as the assignee on the records pertaining to the single authoritative copy thereof and otherwise complying with the applicable elements of control set forth in the UCC. Borrower also shall deliver to Lender all security agreements securing any such Chattel Paper and securing any such Instruments.  Borrower will mark conspicuously all such Chattel Paper and all such Instruments and documents with a legend, in form and substance satisfactory to Lender, indicating that such Chattel Paper and such instruments and documents are subject to the security interests and Liens in favor of Lender created pursuant to this Agreement and the Loan Documents.

(i)     Borrower shall deliver to Lender all letters of credit on which Borrower is the beneficiary and which give rise to letter of credit rights owned by Borrower which constitute part of the Collateral in each case duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to Lender.  Borrower shall take any and all actions as may be necessary or desirable, or that Lender may reasonably request, from time to time, to cause Lender to obtain exclusive "control" (as defined in Article 9 of the UCC) of any such letter of credit rights in a manner acceptable to Lender.

(j)     Borrower shall promptly advise Lender upon Borrower becoming aware that it has any interests in any commercial tort claim that constitutes part of the Collateral, which such notice shall include descriptions of the events and circumstances giving rise to such commercial tort claim and the dates such events and circumstances occurred, the potential defendants with respect such commercial tort claim and any court proceedings that have been instituted with respect to such commercial tort claims, and Borrower shall, with respect to any such commercial tort claim, execute and deliver to Lender such documents as Lender shall request to perfect, preserve or

protect the Liens, rights and remedies of Lender with respect to any such commercial tort claim. Notwithstanding the foregoing, Lender acknowledges that it has actual knowledge of and that no further notice of the claims asserted by Borrower in the State Court Action is required hereunder.

(k)    After the occurrence and during the continuance of an Event of Default, after all applicable cure periods and compliance with the Notice Period and related procedures set forth in the Interim Financing Order, (a) Lender may elect to exercise any and all of the rights and remedies of Borrower under the Permits, without any interference from Borrower, and Borrower shall cooperate in causing the Governmental Authorities, contractors, or purchasers and lessees to comply with all the terms and conditions of the Licenses, and, (b) if and to the extent permitted by law and the terms of the Permits, Lender may, at its option, take over and enjoy the benefits of the Permits, exercise Borrower's rights under the Permits, and perform all acts in the same manner and to the same extent as Borrower might do.

(l)    Reserved.

(m)    Borrower shall furnish to Lender from time to time any statements and schedules further identifying or describing the Collateral and any other information, reports or evidence concerning the Collateral as Lender may reasonably request from time to time.

## 2.11    Power of Attorney

Borrower hereby appoints Lender as its attorney, with power (a) to endorse the name of Borrower on any checks, notes, acceptances, money orders, drafts, or other forms of payment or security that may come into Lender's possession, (b) to sign the name of Borrower on any invoice or bill of lading relating to any Accounts, inventory, or other Collateral, (c) to perfect Lender's security interest or lien in any Collateral, including filing financing statements, without Borrower's signature, covering part or all of the Collateral in such jurisdictions as Lender shall determine to be advisable (d) verify the validity, amount or any other matter relating to the Collateral by mail, telephone, telecopy or otherwise; and (e) do such other and further acts and deeds in the name of such Borrower that Lender may reasonably deem necessary or desirable to enforce its right with respect to any Collateral. The appointment of Lender as attorney-in-fact for a Borrower is coupled with an interest and is irrevocable prior to full payment in cash of all Obligations.

## 2.12    Setoff Rights

During the continuance of any Event of Default, Lender is hereby authorized by Borrower at any time or from time to time, with reasonably prompt subsequent notice to Borrower (any prior or contemporaneous notice being hereby expressly waived) to set off, appropriate and apply, any and all (a) balances held by Lender or any of Lender's Affiliates for the account of Borrower or any of its Subsidiaries (regardless of whether such balances are then due to Borrower or its Subsidiaries), and (b) other property at any time held or owing by Lender to or for the credit or for the account of Borrower or any of its Subsidiaries, against and on account of any of the Obligations.

## III. FEES AND OTHER CHARGES

### 3.1   Facility Fee

On the Closing Date, Borrower shall pay to Lender one percent (1.0%) of the Facility Cap as a nonrefundable fee (the "**Facility Fee**").

### 3.2   Unused Line Fee

Borrower shall pay to Lender monthly an unused line fee (the "**Unused Line Fee**") in an amount equal to four and one-fifth basis points (i.e., 0.042%) per month of the difference derived by subtracting (i) the average daily balance under the Revolving Facility outstanding during the preceding month, from (ii) the Facility Cap.  The Unused Line Fee shall be payable monthly in arrears but in no event later than the first day of each successive calendar month (starting with December 1, 2021). The final payment shall be prorated to the date of payment in full and shall be paid on that date as part of the Obligations.

### 3.3   Collateral Management Fee

Borrower shall pay Lender as additional interest a monthly collateral management fee (the "**Collateral Management Fee**") for monitoring and servicing the Revolving Facility, equal to fifteen basis points (i.e., 0.15%) per month, calculated on the basis of the average daily balance under the Revolving Facility outstanding during the preceding month.  The Collateral Management Fee shall be payable monthly in arrears but in no event later than the first calendar day of each successive calendar month (starting with December 1, 2021).  The final payment shall be prorated to the date of payment in full and shall be paid on that date as part of the Obligations.

### 3.4   Deferred Origination Fee

Borrower shall pay Lender a fee in an amount equal to one percent (1.0%) of the Facility Cap on the Termination Date as a deferred origination fee.

### 3.5   Computation of Fees; Lawful Limits

All fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed in each calculation period, as applicable.  In no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the interest and other charges paid or agreed to be paid to Lender for the use, forbearance or detention of money hereunder exceed the maximum rate permissible under applicable Law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.  If, due to any circumstance whatsoever, fulfillment of any provision hereof, at the time performance of such provision shall be due, shall exceed any such limit, then, the obligation to be so fulfilled shall be reduced to such lawful limit, and, if Lender shall have received interest or any other charges of any kind which might be deemed to be interest under applicable Law in excess of the maximum lawful rate, then such excess shall be applied first to any unpaid fees and charges hereunder, then to unpaid principal balance owed by Borrower hereunder, and if the then remaining excess interest is greater than the previously unpaid principal balance, Lender shall promptly refund such excess amount to Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate.

The terms and provisions of this Section shall control to the extent any other provision of any Loan Document is inconsistent herewith.

### 3.6     Default Rate of Interest

Upon the occurrence and during the continuation of an Event of Default, the Applicable Rate of interest in effect at such time with respect to the Obligations shall be increased by three percent (3%) per annum (the "**Default Rate**").  Such increase shall be in addition to any other specific charges provided for herein for noncompliance with specific provisions of this Agreement.

## IV. CONDITIONS PRECEDENT

### 4.1     Conditions to Closing and Advances

The obligations of Lender to consummate the transactions contemplated herein and to make any Advance under the Revolving Facility are subject to the satisfaction, in the Permitted Discretion of Lender, of the following:

(a)     The Bankruptcy Court shall have entered the Interim Financing Order in the Bankruptcy Case and such order shall be in full force and effect and shall not have been vacated, reversed, modified or stayed in any respect (and, if such order is the subject of a pending appeal, motion for reconsideration, rehearing, etc., no further performance of any obligation of any party shall have been stayed pending appeal or motion);

(b)     Lender shall have received, reviewed and approved the Budget and any amendments and restatements thereof;

(c)     Borrower and Lender shall have executed and delivered this Agreement;

(d)     Borrower shall have established Controlled Deposit Accounts and Lender shall have received fully executed Control Agreements in accordance with Section 2.5 prior to entry of the Final Financing Order;

(e)     Borrower shall have provided Lender with all information (including, without limitation, user identifications and password) necessary for Lender to have online access to view all information regarding all of Borrower's bank accounts prior to entry of the Final Financing Order;

(f)     Borrower shall have executed and delivered to Lender an IRS Form 8821 in form acceptable to Lender naming Tax Guard as appointee;

(g)     Lender shall have received (i) copies of all insurance policies required by Section 6.5, (ii) a copy of the declarations page for such insurance policies and (iii) certificates of insurance confirming that the Lender has been named as sole beneficiary, loss payee or additional insured, as appropriate, in each case prior to entry of the Final Financing Order;

(h)      Borrower shall have delivered to Lender a Borrowing Certificate in the form of Exhibit A executed by an authorized officer of Borrower;

(i)      No Event of Default shall have occurred and be continuing, or no Event of Default would exist after Lender's disbursement of the Advance;

(j)      Each of the representations and warranties made by Borrower under this Agreement shall be accurate in all material respects on and as of the date the Advance is requested as if made on and as of such date, before and after giving effect to such Advance;

(k)      Other than the filing of the Bankruptcy Case, and the pending State Court Action, including the allegations therein regarding a possible termination of the Lease, no event shall have occurred which has had or could reasonably be expected to have a Material Adverse Effect;

(l)      Immediately after giving effect to the requested Advance, the aggregate outstanding principal amount of Advances under the Revolving Facility shall not exceed the Revolving Loan Limit;

(m)     Lender shall have received such other documents, certificates, information as Lender may reasonably request, all in form and substance reasonably satisfactory to Lender;

(n)      Lender shall have received all fees, charges and expenses payable to Lender on or prior to the date of the Advance pursuant to the Loan Documents and the Interim Financing Order; and

(o)      The Bankruptcy Case is and shall remain at all times a case under Subchapter V of Chapter 11 of the Bankruptcy Code.

### 4.2      Waivers of Conditions to Advances

No waiver of any of the foregoing conditions to an Advance or the making of an Advance by Lender notwithstanding the failure of any of the foregoing conditions to be met as of the date of such Advance, shall not be deemed to constitute a waiver by Lender of any such conditions with respect to any future requested Advance.

## V.  REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and to advance funds to Borrower, Borrower represents and warrants as of the date hereof, the Closing Date, and each Borrowing Date as follows:

### 5.1      Organization and Authority

Borrower is an entity of the type specified on Schedule 5.3, is duly organized, validly existing and in good standing under the laws of the jurisdiction specified on Schedule 5.3 and no other jurisdiction, and Borrower (i) has all requisite corporate or other organizational power and authority to own its properties and assets and to carry on its business as now being conducted and as contemplated in the Loan Documents, (ii) is duly qualified to do business in every

jurisdiction in which failure so to qualify could reasonably be expected to have a Material Adverse Effect, and (iii) has requisite power and authority, subject to entry of the Financing Orders, (A) to execute, deliver and perform the Loan Documents to which it is a party and all amendments thereto, (B) to borrow hereunder, (C) to consummate the transactions contemplated under the Loan Documents, and (D) to grant the Liens with regard to the Collateral pursuant to the Loan Documents to which it is a party.

### 5.2    Loan Documents

The execution, delivery and performance by Borrower of the Loan Documents to which it is a party, and the consummation of the transactions contemplated thereby, including the grants of Liens and security interests in the Collateral, subject to entry of the Financing Orders, (i) have been duly authorized by all requisite action of the Bankruptcy Court or the Borrower and have been duly executed and delivered by or on behalf of Borrower; and (ii) do not violate any provisions of (A) applicable Law, (B) any order of any Governmental Authority binding on Borrower or any of Borrower's properties the effect of which could reasonably be expected to have a Material Adverse Effect, or (C) the certificate of incorporation or bylaws (or any other equivalent governing agreement or document) of Borrower, or any agreement between Borrower and its shareholders, members, partners or equity owners or among any such shareholders, members, partners or equity owners. When executed and delivered, each of the Loan Documents to which each Borrower is a party will constitute the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms.

### 5.3    Subsidiaries, Capitalization and Ownership Interests

Borrower has no Subsidiaries. Schedule 5.3 also states the authorized and issued capitalization of Borrower, the number and class of equity securities and/or ownership, voting or partnership interests issued and outstanding of Borrower and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing). The outstanding equity securities and/or ownership, voting or partnership interests of Borrower have been duly authorized and validly issued and are fully paid and nonassessable, and each Person listed on Schedule 5.3 owns beneficially and of record all of the equity securities and/or ownership, voting or membership interests it is listed as owning free and clear of any Liens other than Permitted Liens. Except as listed on Schedule 5.3, Borrower doesn't own an interest in or participates or engages in any joint venture, partnership or similar arrangements with any Persons.

### 5.4    Properties

Borrower (i) is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its material properties and assets, including the Collateral, whether personal or real, subject to no transfer restrictions or Liens of any kind except for Permitted Liens, and (ii) is in compliance in all material respects with each lease to which it is a party or otherwise bound except for such noncompliance as would not reasonably be expected to have a Material Adverse Effect. Schedule 5.4 lists all real properties (and their locations) owned or leased by or to the Borrower. Borrower enjoys peaceful and undisturbed possession under all such leases and such leases are all the leases necessary for the operation of such properties and assets, are valid and subsisting and are in full force and effect.

### 5.5    Other Agreements

Other than with respect to the Bankruptcy Case and claims stayed thereunder, Borrower is not (i) a party to any judgment, order or decree or any agreement, document or instrument, or subject to any restriction, which would materially adversely affect its ability to execute and deliver, or perform under, any Loan Document or to pay the Obligations, or (ii) in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any agreement, document or instrument to which it is a party or to which any of its properties or assets are subject, which default, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both; would constitute or result in a conflict, breach, default or event of default under, any of the foregoing which, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect.

### 5.6    Litigation

Except for the State Court Action, there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against Borrower that (i) could reasonably be expected to affect the validity of any of the Loan Documents or the right of Borrower to enter into any Loan Document or to consummate the transactions contemplated thereby or (ii) could reasonably be expected to be or have, either individually or in the aggregate, any Material Adverse Change or Material Adverse Effect.  Borrower is not a party or subject to any order, writ, injunction, judgment or decree of any Governmental Authority that could reasonably be expected to have a Material Adverse Effect, except for the State Court Action.

### 5.7    Labor Matters

There are no strikes, slowdowns, work stoppages, lockouts, grievances, other collective bargaining or labor related disputes pending or, to Borrower's knowledge, threatened against Borrower.  All payments due from Borrower, or for which any claim may be made against any of them, on account of wages and employee and retiree health and welfare insurance and other benefits have been paid or accrued as a liability on its books, as the case may be. The provisions of any collective agreement are consistent with applicable industry standards respecting wage rates, benefits and working rules.  Borrower is not in breach of any provision of any collective agreement to which it is a party.  The consummation of the transactions contemplated by the Loan Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which it is a party or by which it is bound.

### 5.8    Tax Returns, Governmental Reports

Borrower (i) has filed all material federal, state, foreign (if applicable) and local tax returns and other reports which are required by law to be filed by Borrower, and (ii) has paid all taxes, assessments, fees and other governmental charges, including, without limitation, payroll and other employment related taxes, in each case that are due and payable.

5.9     **Financial Statements and Reports**

All financial information and statements relating to Borrower that has been or may hereafter be delivered to Lender by Borrower are accurate and complete in all material respects and have been prepared in accordance with GAAP consistently applied with prior periods. Borrower does not have any material obligations or liabilities of any kind not disclosed in such financial information or statements or the Bankruptcy Case, and since the date of the most recent financial statements submitted to Lender, there has not occurred any Material Adverse Change, Material Adverse Effect, Liability Event or, to Borrower's knowledge, any other event or condition that could reasonably be expected to have a Material Adverse Effect or Liability Event, excluding the Bankruptcy Case.

5.10    **Compliance with Law**

Borrower (i) is in substantial compliance with all Laws applicable to Borrower and its business, assets or operations, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except where noncompliance or violation would not reasonably be expected to have a Material Adverse Effect.  There is no event, fact, condition or circumstance which, with notice or passage of time, or both, would constitute or result in any noncompliance with, or any violation of, any of the foregoing, in each case except where noncompliance or violation would not reasonably be expected to have a Material Adverse Effect. Borrower has not received any notice that Borrower is not in compliance in any respect with any of the requirements of any of the foregoing.

5.11    **Intellectual Property**

Borrower owns, is licensed to use or otherwise has the right to use, all Intellectual Property that is material to the condition (financial or other), business or operations of Borrower, except as would not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect, Borrower is the sole and exclusive owner of the entire and unencumbered right, title and interest in and to each such registered Intellectual Property (or application therefor) purported to be owned by Borrower, free and clear of any Liens (except for Permitted Liens) or licenses in favor of third parties or agreements or covenants not to sue such third parties for infringement. All registered Intellectual Property of Borrower is duly and properly registered, filed or issued in the appropriate office and jurisdictions for such registrations, filings or issuances, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. To Borrower's knowledge, it conducts its business without infringement or claim of infringement of any Intellectual Property rights of others and there is no infringement or claim of infringement by others of any Intellectual Property rights of Borrower, which infringement or claim of infringement could reasonably be expected to have a Material Adverse Effect.

5.12    **Licenses and Permits**

Without limitation of anything contained in Section 5.20: Borrower is in substantial compliance with and has all Permits necessary or required by applicable Law or Governmental Authority for the operation of its businesses except where the failure to be in compliance would

not reasonably be expected to have a Material Adverse Effect.  All of the foregoing are in full force and effect and not in known conflict with the rights of others except where the failure to be in compliance would not reasonably be expected to have a Material Adverse Effect.  Borrower is not (i) in breach of or default under the provisions of any of the foregoing, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a conflict, breach, Default or Event of Default under, any of the foregoing which, if not remedied within any applicable grace or cure period could reasonably be expected to have a Material Adverse Effect, (ii) a party to or subject to any agreement, instrument or restriction that is so unusual or burdensome that it might have a Material Adverse Effect.

### 5.13    Disclosure

No Loan Document nor any other agreement, document, certificate, or statement furnished to Lender by or on behalf of Borrower in connection with the transactions contemplated by the Loan Documents, when taken as a whole contains any untrue statement of material fact or omits to state any fact necessary to make the statements therein not materially misleading in light of current circumstances.  All financial projections delivered to Lender by Borrower have been prepared on the basis of the assumptions stated therein.  Such projections represent Borrower's best estimate of Borrower's future financial performance and such assumptions are believed by Borrower to be fair and reasonable in light of current business conditions.

### 5.14    Existing Indebtedness; Investments, Guarantees and Certain Contracts

Except as permitted by the Loan Documents, Borrower (i) has no outstanding Indebtedness other than Permitted Indebtedness, (ii) is not subject or party to any mortgage, note, indenture, indemnity or guarantee of, with respect to or evidencing any Indebtedness of any other Person other than in connection with a Permitted Lien, or (iii) does not own or hold any equity or long-term debt investments in, and does not have any outstanding advances to or any outstanding guarantees for the obligations of, or any outstanding borrowings from, any Person.  Borrower has performed all material obligations required to be performed by Borrower pursuant to or in connection with its outstanding Indebtedness and the items permitted by the Loan Documents and there has occurred no breach, default or event of default under any document evidencing any such items or any fact, circumstance, condition or event which, with the giving of notice or passage of time or both, would constitute or result in a breach, default or event of default thereunder.

### 5.15    Agreements with Affiliates

Except for transactions permitted under Section 7.6, there are no existing or proposed material agreements, arrangements, understandings or transactions between Borrower and any of its officers, members, managers, Managers, directors, stockholders, partners, other interest holders, employees or Affiliates or any members of their respective immediate families, other than the Management Agreements.

### 5.16    Insurance

Borrower has in full force and effect such insurance policies as are customary in its industry and as may be required pursuant to Section 6.5.  All such insurance policies as in force on the date of this Agreement are listed and described on Schedule 5.16.

### 5.17   Names, Location of Offices, Records and Collateral

During the preceding five years, Borrower has not conducted business under or used any name (whether corporate, partnership or assumed) other than as shown on Schedule 5.17A. Borrower is the sole owner of all of its names listed on Schedule 5.17A, and any and all business done and invoices issued in such names are Borrower's sales, business and invoices. Borrower maintains its places of business and chief executive offices only at the locations set forth on Schedule 5.17B. Schedule 5.17B also identifies all of the addresses (including warehouses) at which any of the Collateral is located or Books and Records of Borrower regarding any Collateral are kept and identifying which Collateral and which Books and Records are kept at each location, the nature of such location (e.g., leased business location operated by Borrower, third party warehouse, consignment location, processor location, etc.) and the name and address of the third party owning and/or operating such location. No Collateral and no Books and Records in connection therewith or in any way relating thereto or that evidence the Collateral are located at any other location. All of the Collateral is and shall remain located (as that term is used in Section 9-301(2) of the UCC) only in the continental United States.

### 5.18   Non-Subordination

(a)      The Obligations are not subordinated in any way to any other obligations of the Borrower or to the rights of any other Person.

(b)      Upon the entry of each Financing Order by the Bankruptcy Court, the Obligations of the Borrower will constitute allowed Super Priority Claims (subject only to the Carve-Outs), having priority in payment over all other administrative expenses and unsecured claims against the Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.

(c)      The security interests granted in this Agreement will, upon the entry of each Financing Order by the Bankruptcy Court, be prior to all other interests and Liens with respect to the Collateral.

### 5.19   Accounts

In determining which Accounts are Eligible Receivables, Lender may rely on all statements and representations made by Borrower with respect to any Account. Unless otherwise indicated in writing to Lender, each Account of Borrower that is included on a Borrowing Certificate as an Eligible Receivable (i) is genuine and in all respects what it purports to be and is not evidenced by a judgment, (ii) meets the criteria for an Eligible Receivable as set forth in the definition of that term, (iii) there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or materially reduce the amount payable thereunder from the face amount of the claim or invoice and statements delivered to Lender with respect thereto, except to the extent the same is reflected in the calculation of Net Collectible Value, and (iv) Borrower has disclosed to Lender on each Borrowing Certificate the amount of all Accounts of Borrower for which Medicare is the Account Debtor and for which payment has been denied and subsequently appealed, and Borrower is properly pursuing all available appeals in respects of such Accounts.

**5.20** **Healthcare Law Compliance Representations**

To induce Lender to enter into this Agreement and to make credit accommodations contemplated hereby, Borrower hereby represents and warrants that all of the information regarding the Borrower and the Project set forth in Schedule 5.20 is true, complete and correct, and that, except as disclosed in Schedule 5.20, the following statements are true, complete and correct:

(a)     <u>Healthcare Permits</u>.  Borrower has (i) each Healthcare Permit and other rights from, and has made all declarations and filings with, all applicable Governmental Authorities, all self-regulatory authorities and all courts and other tribunals necessary to engage in the ownership, management and operation of the Project or the assets of Borrower, and (ii) no knowledge that any Governmental Authority is considering limiting, suspending or revoking any such Healthcare Permit.  All such Healthcare Permits are valid and in full force and effect and Borrower is in compliance with the terms and conditions of all such Healthcare Permits.

(b)     <u>Specific Licensing</u>.  The Project is duly licensed under the applicable Laws of the state where the facility is located.  The licensed bed or unit capacity of each such facility is shown on Schedule 5.20.  Borrower has not granted to any third party the right to reduce the number of licensed beds, persons served or units in any of the health care facilities operated by Borrower or the right to apply for approval to move any and all of the licensed beds, persons served or units in the Project to any other location and there are no proceedings or contemplated to reduce the number of licensed beds, persons served or units in the Project.

(c)     <u>Operating Leases</u>.  The Lease has been approved by all necessary Governmental Authorities.  Under applicable Healthcare Laws in the state in which the Project is located, the reimbursement rate of the Borrower under applicable Third Party Payor participation agreements is not affected by the rental rates under the Lease.  The rentals provided for under the Lease comply with all applicable Healthcare Laws and do not exceed the sums permitted to be paid under applicable Healthcare Laws.

(d)     <u>Resident Agreements</u>.  The Resident Agreements comply with all applicable Laws.  Without Lender's consent, which consent shall not be unreasonably withheld delayed or conditioned, Borrower shall not: (i) modify the form of Resident Agreement previously approved by Lender; (ii) accept any payment under any Resident Agreement more than one month in advance of its due date or in violation of the cash management or lockbox provisions of this Agreement; (iii) enter into any subleases with respect to the Project; (iv) modify, amend, renew, surrender, terminate, consent to a sublease of, consent to a transfer of, abate rent or other payments due under or otherwise grant any financial or other concession under any sublease with respect to the Project; or (v) enter into any Resident Agreement for a term of more than one (1) year, or upon rates other than market rates or upon a form that fails to comply with applicable Laws.

(e)     <u>Accreditation</u>.  Borrower has received and maintains accreditation in good standing and without impairment by all applicable Accrediting Organizations, to the extent required by law (including any equivalent regulation) or the terms of the Lease pertaining to the Project.  Neither Borrower nor Manager has received any notice or communication from any Accrediting Organization that the Project is (i) subject to or is required to file a plan of correction with respect

to any accreditation survey, or (ii) in danger of losing its accreditation due to a failure to comply with a plan of correction.

(f)    <u>Participation Agreements/Provider Status/Cost Reports</u>.  There is no investigation, audit, claim review, or other action pending or, to the knowledge of Borrower, threatened which could result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Third Party Payor participation agreement or provider number or other Healthcare Permit or result in Borrower's exclusion from any Third Party Payor Program, nor has Borrower or any Third Party Payor Program made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit related to the Project, nor has the Borrower made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit, nor is there any action pending or threatened to impose material intermediate or alternative sanctions with respect to the Project.  The Borrower, and, to the knowledge of the Borrower, its contractors, have properly and legally billed all intermediaries and Third Party Payors for services rendered with respect to the Project and have maintained their records to reflect such billing practices.  No funds relating to Borrower are now, or, to the knowledge of Borrower will be, withheld by any Third Party Payor.  Borrower has the requisite participation agreement or provider number or other Healthcare Permit to bill the Medicare program and the respective Medicaid programs in the state or states in which Borrower operates (to the extent Borrower participates in the Medicare or Medicaid program in such state or states) and all other Third Party Payor Programs (including, without limitation, Medicare) which have historically accounted for any portion of the revenues of the Project.  All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by the Borrower are and will be materially accurate and complete and have not been and will not be misleading in any material respects.  No cost reports for the Project remain "open" or unsettled and there are no current, pending or outstanding Medicare, Medicaid or other Third Party Payor Program reimbursement audits or appeals pending with respect to the Project or the Borrower.

(g)    <u>No Violation of Healthcare Laws</u>.  None of the Project, the Borrower or any Manager are in violation of any Healthcare Laws, except where any such violation would not have a Material Adverse Effect.  Borrower is HIPAA Compliant.  The Project has not received a statement of deficiencies or survey violation of a "Level A" (or equivalent) or worse (with respect to assisted living facilities), or a tag level of "G" or higher with respect to any skilled nursing facility, within the past three years for which a plan of correction has not been filed with the applicable state authority.  The Project is not currently subject to any plan of correction that has not been accepted by or is currently the subject of a review by the applicable state authority.  Borrower has not received notice of any charges of patient abuse.

(h)    <u>Proceedings</u>.  Neither Borrower nor the Project is subject to any proceeding, suit or, to Borrower's knowledge, investigation by any federal, state or local government or quasi-governmental body, agency, board or authority or any other administrative or investigative body (including the Office of the Inspector General of the United States Department of Health and Human Services):  (i) which may result in the imposition of a fine, alternative, interim or final sanction, a lower reimbursement rate for services rendered to eligible patients which has not been provided for on its financial statements, or which would have a Material Adverse Effect on Borrower or the operation of the Project; (ii) which could result in the revocation, transfer, surrender, suspension or other impairment of the operating certificate, provider agreement or

Healthcare Permits of the Project; (iii) which pertains to or requests any voluntary disclosure pertaining to a potential overpayment matter involving the submission of claims to such payor by Borrower; or (iv) which pertains to any state or federal Medicare or Medicaid cost reports or claims filed by Borrower (including, without limitation, any reimbursement audits), or any disallowance by any commission, board or agency in connection with any audit of such cost reports.

(i)     Hill Burton.  Except for Governmental Receivables, Borrower is not or will be a participant in any federal program whereby any federal, state or local government or quasi-governmental body, agency, board or other authority may have the right to recover funds by reason of the withholding from federal funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.).

### 5.21   Reliance on Representations; Survival

Borrower makes the representations and warranties contained herein with the knowledge and intention that Lender is relying and will rely thereon.  All such representations and warranties will survive the execution and delivery of this Agreement and the making of the Advances under the Revolving Facility.  No investigation or inquiry made by or on behalf of Lender nor knowledge by Lender which is in any fashion inconsistent with the representations and warranties contained herein, shall in any way (i) affect or lessen the representations and warranties made and entered into by the Borrower hereunder, or (ii) reduce or in any way affect Lender's rights with respect to a breach of such representations and warranties.

### 5.22   Compliance with Environmental Requirements; No Hazardous Substances

(a)     Borrower has no knowledge of (i) the presence of any Hazardous Substance on any of the real property where Borrower conducts operations or has its personal property, (ii) any on site spills, releases, discharges, disposal or storage of Hazardous Substances that have occurred or are presently occurring on any of such real property or where any Collateral is located, or (iii)  any spills, releases, discharges or disposal of Hazardous Substances that have occurred or are presently occurring on any other real property as a result of the conduct, action or activities of Borrower.

(b)     No property now owned or leased by Borrower is on the National Priorities List promulgated pursuant to CERCLA, or CERCLIS (as defined in CERCLA) or any similar state list or is the subject of federal, state or local enforcement actions or, to the knowledge of Borrower, other investigations which may lead to claims against Borrower for clean-up costs, remedial work, damage to natural resources or personal injury claims, including, without limitation, claims under CERCLA;

For purposes of this Section 5.22, Borrower shall be deemed to include any business or business entity (including a corporation) that is, in whole or in part, a predecessor of Borrower.

### 5.23   Material Contracts

Except for the Organizational Documents and the other agreements set forth on Schedule 5.23 (collectively with the Organizational Documents, the "**Material Contracts**"), there are no (a) employment agreements covering the management of any Borrower, (b) collective bargaining agreements or other similar labor agreements covering any employees of Borrower,

(c) agreements for managerial, consulting or similar services to which Borrower is a party or by which it is bound, (d) agreements regarding Borrower, its assets or operations or any investment therein to which any of its equity holders is a party or by which it is bound, (e) real estate leases, Intellectual Property licenses or other lease or license agreements to which Borrower is a party, either as lessor or lessee, or as licensor or licensee (other than licenses arising from the purchase of "off the shelf" products), (f) customer, distribution, marketing or supply agreements to which Borrower is a party, in each case with respect to the preceding clauses (a) through (f) requiring payment of more than $25,000 in any year, (g) partnership agreements to which Borrower is a general partner or joint venture agreements to which Borrower is a party, or (h) any other agreements or instruments to which Borrower is a party, and the breach, nonperformance or cancellation of which, or the failure of which to renew, could reasonably be expected to have a Material Adverse Effect.  Schedule 5.23 sets forth, with respect to each real estate lease agreement to which Borrower is a party (as a lessee), the address of the subject property and the annual rental (or, where applicable, a general description of the method of computing the annual rental).  The consummation of the transactions contemplated by the Loan Documents will not give rise to a right of termination in favor of any party to any Material Contract (other than Borrower), except for such Material Contracts the noncompliance with which would not reasonably be expected to have a Material Adverse Effect.

### 5.24    Third-Party Payor Billing Numbers

The numbers under which the Borrower bills Third-Party Payors are listed on Schedule 5.24 and all such billing numbers have been issued to Borrower and not to any Affiliate of Borrower and not to any unaffiliated third party; and Borrower has not allowed any Person that is not a borrower hereunder to use such billing numbers for any purpose.

### 5.25    Financing Orders

The Financing Orders are in full force and effect and are not subject to a pending appeal, motion for leave to appeal, or other proceeding to set aside such orders, and such Financing Orders have not been reversed, modified, stayed or vacated absent Lender's written consent.

### 5.26    DIP Order Notices

The Bankruptcy Case was commenced on the Petition Date in accordance with applicable law and proper and all legally required notice thereof and the proper notice for (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and Final Financing Order, (ii) the hearing for the approval of the Interim Financing Order, and (iii) the hearing for the approval of the Final Financing Order, have been or will be timely given.

### 5.27    Super Priority Administrative Expense Claims

After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed Super Priority Claims, except as provided by the Financing Orders.

### 5.28    DIP Liens

After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Final Financing Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, subject only to the Liens and priorities of other claims (if any) as provided by the Financing Orders.

## VI.    AFFIRMATIVE COVENANTS

The Borrower covenants and agrees that, until full performance and satisfaction, and payment in full in cash, of all the Obligations (other than indemnity obligations with respect to which no claim has been made) and termination of this Agreement:

### 6.1    Financial Statements, Reports and Other Information

(a)    <u>Financial Reports</u>.  Borrower shall furnish to Lender (i) as soon as available and in any event within one hundred fifty (150) calendar days after the end of each fiscal year of Borrower, annual consolidated and consolidating financial statements of Borrower, including the notes thereto, consisting of a consolidated and consolidating balance sheet at the end of such completed fiscal year and the related consolidated and consolidating statements of income, retained earnings, cash flows and owners' equity for such completed fiscal year, reviewed by an accounting firm acceptable to Lender, and, if Borrower's annual revenues exceed $20,000,000, such financial statements shall be audited and certified without qualification by an independent certified public accounting firm satisfactory to Lender and accompanied by related management letters, if available, and (ii) within thirty (30) calendar days after the end of each calendar month, unaudited consolidated and consolidating financial statements of Borrower consisting of a balance sheet and statements of income, retained earnings, cash flows and owners' equity as of the end of such calendar month.  All such financial statements shall be prepared in accordance with GAAP consistently applied with prior periods.  With each such financial statement, Borrower shall also deliver a compliance certificate of its chief executive officer or chief financial officer in the form set forth in Exhibit B (a "**Compliance Certificate**") showing compliance with all financial and loan covenants set forth in Annex I.  In addition to the above financial reports, Borrower shall furnish to Lender as soon as available and in any event within ten (10) calendar days after the end of each calendar month, statements from Borrower's bank showing all account activity for the preceding calendar month.

(b)    <u>Accounts Receivable Aging Schedules</u>.  Borrower shall furnish to Lender as soon as available, and in any event within ten (10) calendar days after the end of each calendar month, detailed accounts receivable and accounts payable aging schedules as of the end of such month, in a form satisfactory to Lender.

(c)    <u>Forms 941</u>.  Within thirty (30) days following the end of each calendar quarter, Borrower shall furnish Lender with a copy of all IRS Forms 941 required to be filed by Borrower with respect to the quarter then ended.

(d)    <u>Other Materials</u>.  Borrower shall furnish to Lender as soon as available, and in any event within fifteen (15) calendar days after the preparation or issuance thereof or at such other time as set forth below:

(i)      *Cost Reports*.  All Medicare and Medicaid cost reports and other document and materials filed by or on behalf of Borrower and any other reports, materials or other information regarding or otherwise relating to Medicaid or Medicare prepared by, for or on behalf of Borrower;

(ii)     *Medicare/Medicaid Documents*.   Any other reports, materials or other information regarding or otherwise relating to Medicaid or Medicare prepared by, for, or on behalf of, Borrower or any of its Subsidiaries, including, without limitation, (A) copies of licenses and permits required by any applicable federal, state, foreign or local law, statute ordinance or regulation or Governmental Authority for the operation of its business, (B) Medicaid or Medicare provider numbers and agreements, (C) state surveys pertaining to the Project, (D) participating agreements relating to medical plans and (E) copies of all Medicare or Medicaid surveys, or other surveys or reviews conducted by any government health plan or other accreditation entity;

(iii)    *Monthly Reports*.  Within ten (10) calendar days after the end of each calendar month for such month, (A) a report of the status of all payments, denials and appeals of all Medicaid and/or Medicare Accounts, (B) a sales and collection report (including credits issued) in a form satisfactory to Lender, all such reports showing a reconciliation to the amounts reported in the monthly financial statements, and (C) a report of census and occupancy percentage;

(iv)     *Insurance Renewals*.  Prior to the expiration date of each of the insurance policies required to be maintained pursuant to Section 6.5, proof of the renewal of each such insurance policy together with copies of the declarations page for each such renewed policy;

(v)      *Accountants Communications*.  Promptly upon receipt thereof, copies of any reports submitted to Borrower by its independent accountants in connection with any interim audit of the books of Borrower and copies of each management control letter provided by such independent accountants;

(vi)     *Budget*.  On or before 12:00 pm EST on the first Business Day of each week, commencing with the first week following the Petition Date, Borrower shall deliver to Lender (i) a report comparing, on a line-item basis, actual cash receipts and disbursements against cash receipts and disbursements set forth in the previously delivered Budget, and (ii) an updated Budget for the proceeding sixteen-week period. Such updated Budget(s), in each case in form and substance satisfactory to Lender, once approved by Lender, shall become the Budget for all purposes going forward hereunder until a subsequent Budget is submitted and approved by Lender.

(vii)    *Documents Requested by Lender*.  Such additional information, documents, statements, reports and other materials as Lender may reasonably request from a credit or security perspective or otherwise from time to time, including, but not limited to, periodic

receivable and payable aging reports, payroll tax information, dilution analyses, origination reports and default/charge off reports.

(e)     Notices.  Borrower shall promptly, and in any event within five (5) Business Days after Borrower or any officer of Borrower obtains knowledge thereof, notify Lender in writing of (i) any pending litigation, suit, investigation, arbitration, formal dispute resolution proceeding or administrative proceeding brought against or initiated by Borrower or otherwise affecting or involving or relating to Borrower or any of its property or assets, (ii) any Event of Default, which notice shall specify the nature and status thereof, the period of existence thereof and what action is proposed to be taken with respect thereto, (iii) any other development, event, fact, circumstance or condition that could reasonably be expected to have a Material Adverse Effect, in each case describing the nature and status thereof and the action proposed to be taken with respect thereto, (iv) any matter(s) affecting the value, enforceability or collectability of any of the Collateral, including without limitation, post-petition claims or disputes in the amount of $25,000 or more, singly or in the aggregate, in existence at any one time, (v) receipt of any notice or request from any Governmental Authority or governmental payor regarding any liability or claim of liability outside the ordinary course of business, or (vi) termination of any executive manager of any facility owned, operated or leased by Borrower.

(f)     Consents.  Borrower shall obtain and deliver from time to time all required consents, approvals and agreements from such third parties as Lender shall determine are necessary or desirable in its Permitted Discretion (as communicated to Borrower by written notice) for the protection of its Collateral and that are reasonably satisfactory to Lender with respect to the Loan Documents and the transactions contemplated thereby or any of the Collateral, including, without limitation, landlord waivers with respect to leases entered into after the Closing Date.

(g)     [Reserved].

(h)     Healthcare Notices.  Borrower shall notify Lender within three (3) Business Days (but in any event prior to Borrower submitting any requests for advances of reserves or escrows or fundings of credit facility proceeds under this Agreement) following the occurrence of any facts, events or circumstances known to Borrower, whether threatened, existing or pending, that would make any of the representations and warranties contained in Section 5.20 untrue, incomplete or incorrect (together with such supporting data and information as shall be necessary to fully explain to Lender the scope and nature of the fact, event or circumstance), and shall provide to Lender within 2 Business Days of Lender's request, such additional information as Lender shall request regarding such disclosure.

(i)     Notices with Respect to Lease.  In connection with that certain Amended and Restated Operating Lease by and between White Plains Healthcare Properties I, LLC, and Borrower, dated as of November 19, 2015 (such agreement, and any amendments, modifications or replacements thereof with respect to the Project are referred to herein as the "**Lease**"), Borrower shall:

(i)  notify Lender within one (1) Business Day of any default, event of default, or, except as disclosed in the Bankruptcy Case, alleged default or event of default in connection with the Lease. Notwithstanding the foregoing, Lender acknowledges that it

has actual knowledge, and no further notice if required, that Borrower's landlord has alleged that Borrower is in default under the Lease, and that such allegations are the subject of a pending Permitted Contest;

(ii)  notify Lender within one (1) Business Day of any termination of the Lease; and

(iii)  at Lender's request, provide Lender with evidence satisfactory to Lender of Borrower's payment of all rent due under the Lease on a monthly basis within one (1) business day of such payment.

## 6.2    Payment of Obligation

Borrower (a) will pay and discharge, on a timely basis as and when due, all of its postpetition obligations and liabilities, except for such obligations and/or liabilities (i) that may be the subject of a Permitted Contest, and (ii) the nonpayment or nondischarge of which could not reasonably be expected to have a Material Adverse Effect or result in a Lien against any Collateral, except for Permitted Liens, (b) without limiting anything contained in the foregoing clause (a), pay all postpetition amounts due and owing in respect of taxes (including without limitation, payroll and withholdings tax liabilities) on a timely basis as and when due, and in any case prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for nonpayment thereof, (c) will maintain, and cause each Subsidiary to maintain, in accordance with GAAP, appropriate reserves for the accrual of all of their respective obligations and liabilities, and (d) will not breach or permit any Subsidiary to breach, or permit to exist any default under, postpetition the terms of any lease, commitment, contract, instrument or obligation to which it is a party, or by which its properties or assets are bound in any material respect.  Notwithstanding the foregoing, Borrower shall make full and timely payment in cash of the principal of and interest on the Loans, Advances and all other Obligations when due and payable.

## 6.3    Conduct of Business and Maintenance of Existence and Assets

Borrower shall (i) engage principally in the same or similar lines of business substantially as heretofore conducted, (ii) collect its Accounts in the ordinary course of business, (iii) maintain all of its material properties, assets and Equipment used or useful in its business in good repair, working order and condition (normal wear and tear excepted and except as may be disposed of in the ordinary course of business and in accordance with the terms of the Loan Documents and otherwise as determined by Borrower using commercially reasonable business judgment), (iv) from time to time make all necessary or desirable repairs, renewals and replacements thereof, as determined by Borrower using commercially reasonable business judgment, (v) maintain and keep in full force and effect its existence, (vi) maintain and keep in full force and effect, in good standing, and free from restrictions, probations, conditions or known conflicts which would materially impair the Borrower's business, all qualifications to do business in each jurisdiction in which the ownership or lease of property or the nature of its business makes such qualification necessary, and (vii) maintain and keep in full force and effect all Healthcare Permits necessary under Healthcare Laws to continue to receive reimbursement under all Third Party Payor Programs in which Borrower participates as of the date of this Agreement.

### 6.4    Compliance with Legal, Tax and Other Obligations

Borrower shall (i) substantially comply with Laws applicable to it or its business, assets or operations, (ii) pay all postpetition taxes, assessments, fees, governmental charges, claims for labor, supplies, rent and all other obligations or liabilities of any kind, as and when due and payable, except liabilities being contested in a Permitted Contest; however, all payroll taxes payable in connection with each payroll shall be paid or funds shall set aside in a reserve in an amount adequate to pay all such payroll taxes contemporaneously with the payment of such payroll, and (iii) perform in accordance with its terms each contract, agreement or other arrangement to which it is a party or by which it or any of the Collateral is bound, except where the failure to comply with any of the foregoing provisions of this Section 6.4 could reasonably be expected not to have a Material Adverse Effect.

### 6.5    Insurance

(a)    Borrower shall (i) keep all of its insurable properties and assets adequately insured in all material respects against losses, damages and hazards as are customarily insured against by businesses engaging in similar activities or owning similar assets or properties and at least the minimum amount required by applicable Law, including, without limitation, medical malpractice and professional liability insurance, as applicable; (ii) maintain business interruption insurance, (iii) maintain general public liability insurance at all times against liability on account of damage to persons and property having such limits, deductibles, exclusions and co-insurance and other provisions as are customary for a business engaged in activities similar to those of Borrower; and (iv) maintain insurance under all applicable workers' compensation laws.  All of the insurance policies referenced above shall be (x) satisfactory in form and substance to Lender in its Permitted Discretion and (y) placed with insurers having an A.M. Best policyholder rating acceptable to Lender in its Permitted Discretion.  Borrower agrees that it shall not alter, amend, modify or cancel its insurance policies without thirty (30) Business Days prior written notice to Lender unless such alteration, amendment, modification or cancellation, shall be in compliance with the requirements set forth above.  The insurance policies referenced in clauses (i) and (ii) shall name Lender as a loss payee thereunder.  The insurance policies referenced in clause (iii) shall name Lender as an additional insured thereunder.

(b)    **Warning.  In the event Borrower fails to provide Lender with evidence of the insurance coverage required by this Agreement, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the Collateral.  This insurance may, but need not, protect Borrower's interests.**  The coverage purchased by Lender may not pay any claim made by Borrower or any claim that is made against Borrower in connection with the Collateral.  Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by this Agreement.  If Lender purchases insurance for the Collateral in accordance with this 6.5(b), Borrower will be responsible for the costs of that insurance to the fullest extent provided by law, including interest and other charges imposed by Lender in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance may be added to the Obligations.  The costs of the insurance may be more than the cost of insurance Borrower is able to obtain on its own.

### 6.6    True Books

Borrower shall (i) keep true, complete and accurate books of record and accounts in accordance with commercially reasonable business practices in which true and correct entries are made of all of its dealings and transactions in all material respects; and (ii) set up and maintain on its books such reserves as may be required by GAAP with respect to doubtful accounts and all taxes, assessments, charges, levies and claims and with respect to its business, and include such reserves in its quarterly as well as year-end financial statements.

### 6.7    Inspection; Period Audits

Borrower shall permit the representatives of Lender, from time to time during normal business hours, upon reasonable notice but not more than once in any twelve-month period, to (i) visit and inspect any of its offices or properties or any other place where Collateral is located to inspect the Collateral and/or to examine or audit all of Borrower's books of account, records, reports and other papers, (ii) make copies and extracts therefrom, and (iii) discuss Borrower's business, operations, prospects, properties, assets, liabilities, condition and/or Accounts with Borrower's officers, managers, and independent public accountants (the performance of the foregoing activities is referred to herein as a "site audit").  In addition, Lender may conduct "desk audits" of Borrower at Lender's offices no more frequently than monthly by (i) reviewing and inspecting such books and records of Borrower as Lender may require Borrower to transmit to Lender, and (ii) discussing Borrower's business, operations, prospects, properties, assets, liabilities, condition and/or Accounts with Borrower's officers, managers and independent public accountants. Each of Borrower's officers, managers and accountants are authorized to discuss any matter relating to the foregoing with Lender at any time.  At the completion of each site audit, Borrower shall pay Lender an audit fee of $1,200.00 per auditor per day (provided, however, Lender shall utilize the services of only one auditor per day for its site audits) and Borrower shall reimburse Lender for all reasonable site audit-related out-of-pocket expenses.  At the completion of each desk audit, Borrower shall pay Lender an audit fee of $1,240.00 and Borrower shall reimburse Lender for all reasonable desk audit-related out-of-pocket expenses.  Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, there shall be no restrictions on the number of auditors that Lender may use or number of times that Lender may perform the activities described in this Section 6.7 nor shall Lender be required to give prior notice to Borrower of any visit to inspect the Borrower's books and records or to discuss any matter with Borrower's officers, managers or independent public accountants, provided that such visit shall not materially impair with the Borrower's ability to operate its business.

### 6.8    Further Assurances; Post Closing

At Borrower's cost and expense, Borrower shall (i) within five (5) Business Days after Lender's reasonable request, take such further actions, and duly execute and deliver such further agreements, assignments, instructions or documents and do such further acts and things as may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purposes of this Agreement and the Loan Documents, and (ii) upon the exercise by Lender or any of its Affiliates of any power, right, privilege or remedy pursuant to any Loan Documents or under applicable Law or at equity which requires any consent, approval, registration, qualification or authorization of any Person, including without limitation a

Governmental Authority, execute and deliver, or cause the execution and delivery of, all applications, certificates, instruments and other documents that Lender or its Affiliate may be required to obtain for such consent, approval, registration, qualification or authorization.

### 6.9    Payment of Indebtedness

Except as otherwise prescribed in the Loan Documents, Borrower shall pay, discharge or otherwise satisfy at or before maturity (subject to applicable grace periods and, in the case of trade payables, to ordinary course payment practices) all of its material postpetition Indebtedness, except when the amount or validity thereof is being contested in a Permitted Contest.

### 6.10    Lien Terminations

If Liens other than Permitted Liens exist, Borrower immediately shall take, execute and deliver all actions, documents and instruments necessary to release and terminate such Liens.

### 6.11    Use of Proceeds

Borrower shall use the proceeds of Loans solely for (a) transaction fees incurred in connection with the Loan Documents, (b) for working capital needs of Borrower through the Bankruptcy Case in accordance with the Approved Budget, and (c) to pay the Carve-Outs. No portion of the proceeds of the Loans will be used for family, personal, agricultural or household use, or for any purpose prohibited by the Financing Orders or the Bankruptcy Code or any other order of the Bankruptcy Court.

### 6.12    Collateral Documents; Security Interest in Collateral

Borrower hereby acknowledges that subject to the entry of the Financing Orders, Lender is authorized to file UCC-1 Financing Statements with respect to the Collateral, and any amendments or continuations relating thereto, without the signature of Borrower in such jurisdictions as Lender, from time to time determines appropriate.  Borrower hereby ratifies, confirms and consents to any such filings made by Lender prior to the date hereof.  Borrower hereby agrees to take any actions reasonably requested by Lender that are necessary to evidence Lender's security interest in the Collateral, including, without limitation, executing additional documents or financing statements.  Borrower shall not allow any financing statement (other than that filed by or on behalf of Lender and other than Permitted Liens) to be on file in any public office covering any Collateral or the proceeds thereof. At the request of Lender, Borrower shall defend the Collateral and Lender's perfected first priority Lien thereon against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Lender, and pay all reasonable costs and expenses (including, without limitation, reasonable in-house documentation and diligence fees and reasonable legal expenses and reasonable attorneys' fees and expenses) in connection with such defense, which may at Lender's discretion be added to the Obligations and increase the principal amount outstanding hereunder.

### 6.13    Taxes and Other Charges

All payments and reimbursements to Lender made under any Loan Document shall be free and clear of and without deduction for all taxes, levies, imposts, deductions, assessments,

charges or withholdings, and all liabilities with respect thereto of any nature whatsoever, excluding taxes to the extent imposed on Lender's net income.  If Borrower shall be required by law to deduct any such amounts from or in respect of any sum payable under any Loan Document to Lender, then the sum payable to Lender shall be increased as may be necessary so that, after making all required deductions, Lender receives an amount equal to the sum it would have received had no such deductions been made.  Notwithstanding any other provision of any Loan Document, if at any time after the Closing (i) any change in any existing law, regulation, treaty or directive or in the interpretation or application thereof, (ii) any new law, regulation, treaty or directive (whether or not having the force of law) from any Governmental Authority (A) subjects Lender to any tax, levy, impost, deduction, assessment, charge or withholding of any kind whatsoever with respect to any Loan Document, or changes the basis of taxation of payments to Lender of any amount payable thereunder (except for net income taxes, or franchise taxes imposed in lieu of net income taxes, imposed generally by federal, state or local taxing authorities with respect to interest or facility fees or other fees payable hereunder or changes in the rate of tax on the overall net income of Lender), or (B) imposes on Lender any other condition or increased cost in connection with the transactions contemplated thereby or participations therein; and the result of any of the foregoing is to increase the cost to Lender of making or continuing any Loan hereunder or to reduce any amount receivable hereunder, then, in any such case, Borrower shall promptly pay to Lender any additional amounts necessary to compensate Lender, on an after-tax basis, for such additional cost or reduced amount as determined by Lender.  If Lender becomes entitled to claim any additional amounts pursuant to this Section 6.13 it shall promptly notify Borrower of the event by reason of which Lender has become so entitled, and each such notice of additional amounts payable pursuant to this Section 6.13 submitted by Lender to Borrower shall, absent manifest error, be final, conclusive and binding for all purposes.  For purposes of this Section, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in any applicable Law", regardless of the date enacted, adopted or issued.

**6.14   Reserved**

**6.15   Hazardous Substances**

(a)     If any release or disposal of Hazardous Substances shall occur or shall have occurred on any real property or any other assets of Borrower, Borrower will cause the prompt containment and removal of such Hazardous Substances and the remediation of such real property or other assets as is necessary to comply with all Environmental Laws and to preserve the value of such real property or other assets.

(b)     Borrower will provide Lender within thirty (30) days after written  demand therefor with a bond, letter of credit or similar financial assurance evidencing to the reasonable satisfaction of Lender that sufficient funds are available to pay the cost of removing, treating and disposing of any Hazardous Substances or Hazardous Substances Contamination and discharging any assessment which may be established on any property as a result thereof, such demand to be made, if at all, upon Lender's reasonable business determination that the failure to remove, treat or

dispose of any Hazardous Substances or Hazardous Substances Contamination, or the failure to discharge any such assessment could reasonably be expected to have a Material Adverse Effect.

**6.16    Licensed Facilities**

(a)    <u>Reserved</u>.

(b)    <u>Resident Deposits and Resident Agreements</u>.  No Resident Agreements conflict with any Laws.

(c)    <u>Manager</u>.   To the extent the Project is subject to a Management Agreement, Borrower shall cause the Project at all times to be managed by one or more managers (collectively in the singular, the "**Manager**") pursuant to Management Agreements approved by Lender and that complies with all applicable Healthcare Laws.  Borrower shall not modify, terminate, or assign the Management Agreement in effect on the Closing Date without the written consent of Lender.

**6.17    Healthcare Operations**

(a)    Borrower will:

(i)    timely file or caused to be timely filed (after giving effect to any extension duly obtained), all notifications, reports, submissions, Permit renewals and reports (other than cost reports as provided in Section 6.17(a)(ii) below) of every kind whatsoever required by Healthcare Laws (which reports will be materially accurate and complete in all respects and not misleading in any respect and shall not remain open or unsettled); and

(ii)    timely file or caused to be timely filed (after giving effect to any extension duly obtained), all cost reports required by Healthcare Laws, which reports shall be materially accurate and complete in all respects and not misleading in any material respect and which shall not remain open or unsettled, except in accordance with applicable settlement appeals procedures that are timely and diligently pursued and except for any processing delays of any Governmental Authority.

(b)    Borrower will maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of the Project for its current use, all Healthcare Permits necessary under Healthcare Laws to carry on the business of Borrower as it is conducted on the Closing Date.

(c)    Borrower will not suffer or permit to occur any of the following:

(i)    any transfer of a Healthcare Permit or rights thereunder to any Person (other than Borrower or Lender) or to any location other than a location approved by Lender in advance in writing;

(ii)    any pledge or hypothecation of any Healthcare Permit as collateral security for any indebtedness other than indebtedness to Lender;

(iii)    any rescission, withdrawal, revocation, amendment or modification of or other alteration to the nature, tenor or scope of any Healthcare Permit without Lender's prior written consent, including, without limitation, (A) any change to the authorized units/beds and persons served capacity of the Project and/or the number of units/beds and persons served approved by the applicable Governmental Authority, and (B) any transfer all or any part of the Project's authorized units or beds to another site or location;

(iv)    any voluntary transfer of any resident of the Project to any other facility, unless such transfer is at the request of the resident (without economic incentives being given to the resident by an Affiliate of Borrower) or its payor or is for reasons relating to non-payment or the health, required level of medical care or safety of the resident to be transferred; or

(v)    any fact, event or circumstance for which notice to Lender is required under Sections 5.20 and 6.1(h).

(d)    Borrower will maintain a corporate health care regulatory compliance program.

(e)    Borrower will at all times be, and cause all Managers to be, HIPAA Compliant.

(f)    If the Project is currently accredited by an Accrediting Organization, Borrower will (i) maintain such accreditation in good standing and without limitation or impairment, (ii) promptly submit to the Accrediting Organization a plan of correction for any deficiencies listed on any accreditation survey report, and (iii) cure all such deficiencies within such time frame as is necessary to preserve and maintain in good standing and without limitation or impairment such accreditation.

## VII.    NEGATIVE COVENANTS

The Borrower covenants and agrees that, until full performance and satisfaction, and payment in full in cash, of all the Obligations (other than indemnity obligations with respect to which no claim has been made) and termination of this Agreement:

### 7.1    Financial Covenants

Borrower shall not violate the financial and loan covenants set forth on Annex I to this Agreement, which is incorporated herein and made a part hereof. Borrower shall comply with the Approved Budget, subject to the Permitted Variance and as set forth in the Financing Orders.

### 7.2    No Indebtedness Other Than Permitted Indebtedness

Borrower will not, and will not permit any Subsidiary to, directly or indirectly, create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except for Permitted Indebtedness.  Borrower will not, and will not permit any Subsidiary to, directly or indirectly, create, assume, incur or suffer to exist any Contingent Obligations.

**7.3     No Liens Other Than Permitted Liens**

Borrower shall not create, incur, assume or suffer to exist any Lien upon, in or against, or pledge of, any of the Collateral or any of its properties or assets or any of its shares, securities or other equity or ownership or partnership interests, whether now owned or hereafter acquired, except Permitted Liens.

**7.4     Investments, New Facilities or Collateral; Subsidiaries**

Borrower, directly or indirectly, shall not purchase, own, hold, invest in or otherwise acquire obligations or stock or securities of, or any other interest in, or all or substantially all of the assets of, any Person or any joint venture whether by merger, consolidation, outright purchase or otherwise. Borrower, directly or indirectly, shall not purchase, own, operate, hold, invest in or otherwise acquire any facility, property or assets or any Collateral that is not located at the locations set forth on Schedule 5.17B.  Borrower shall have no Subsidiaries other than such Subsidiaries existing at Closing.

**7.5     Prohibited Payments**

Borrower shall not make any Distributions.  Borrower shall not pay any Management Fees during the continuance of an Event of Default, or if such payment would cause an Event of Default.

**7.6     Transactions with Affiliates**

Borrower shall not enter into or consummate any transactions of any kind with any of its Affiliates other than:  (i) salary, bonus, employee stock option and other compensation to and employment arrangements with directors, officers or employees in the ordinary course of business, underlined, that no payment of any bonus shall be permitted if an Event of Default has occurred and is continuing or would be caused by or result from such payment, (ii) transactions with Lender or any Affiliate of Lender, and (iii) payments (other than those referenced in cause (i) above) permitted under and pursuant to written agreements entered into by and between Borrower and one or more of its Affiliates that (A) both reflect and constitute transactions on overall terms at least as favorable to Borrower as would be the case in an arm's-length transaction between unrelated parties of equal bargaining power, (B) do not grant a security interest in the Collateral to any Affiliate of Borrower, and (C) contain payment obligations, if any, that are subordinate to the Obligations, underlined, that notwithstanding the foregoing Borrower shall not enter into, consummate, or perform with respect to any transactions or agreement pursuant to which it becomes a party to any mortgage, note, indenture or guarantee evidencing any Indebtedness of any of its Affiliates or otherwise to become responsible or liable, as a guarantor, surety or otherwise, pursuant to an agreement for any Indebtedness of any such Affiliate other than Permitted Indebtedness.

**7.7     Organizational Documents; Fiscal Year; Dissolution; Use of Proceeds**

Borrower shall not (i) change its name, state of formation, or amend, modify, restate or change its certificate of incorporation or formation or bylaws or similar charter documents in a manner that would be materially adverse to Lender and, in any event, without five (5) days' notice

to Lender, (ii) change its fiscal year, (iii) amend, alter or suspend or terminate or make provisional in any material way, any Permit without the prior written consent of Lender, (iv) wind up, liquidate or dissolve (voluntarily or involuntarily) or commence or suffer any proceedings seeking to wind up, liquidate or dissolve or that would result in any of the foregoing, it being understood and agreed that the Bankruptcy Case is not such a proceeding, or (v) use any proceeds of any Advance for "purchasing" or "carrying" "margin stock" as defined in Regulations U, T or X of the Board of Governors of the Federal Reserve System.

### 7.8     Asset Sales

Borrower shall not, without the prior written approval of Lender and the Bankruptcy Court, directly or indirectly sell, convey, transfer, assign, license, lease (that has the effect of a disposition) or otherwise dispose of (including, without limitation, any merger or consolidation or upon any condemnation, eminent domain or similar proceedings) to any Person, in one transaction or a series of related transactions, any assets of Borrower which constitute substantially all of an operating unit of Borrower or any other assets (including without limitation intellectual property) of Borrower outside of the ordinary course of business.  Borrower shall not, directly or indirectly, transfer or assign any contract, patient relationship, or other business relationship, or right to provide services, goods, room or board to any Affiliate of Borrower. Borrower shall not let any contract, patient relationship, or other business relationship be terminated or expire if at any time following such termination or expiration, such contract, patient relationship or other business relationship is reinstated with any Affiliate of Borrower.

### 7.9     Management

Borrower shall not pay any compensation or other amounts to senior management of Borrower in excess of such amounts as are usual and customary for companies in similar businesses and of a similar size.

### 7.10     Restrictive Agreements

Borrower will not, and will not permit any Subsidiary to, directly or indirectly (a) enter into or assume any agreement (other than the Loan Documents and any agreements for purchase money debt permitted under clause (iii) of the definition of Permitted Indebtedness) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired.

### 7.11     Modifications of Certain Agreements

Other than with respect to Permitted Modifications, Borrower will not, and will not permit any Subsidiary to, directly or indirectly, amend, terminate or otherwise modify any Material Contract, any Management Agreement or the Lease, without Lender's prior written consent (which Lender may give or withhold in Lender's sole discretion), it being understood and agreed that the Borrower may seek to exercise its purchase option under the Lease.

**7.12    Reserved**

**7.13    Deposit Accounts**

Borrower shall not make any changes to its deposit accounts, Controlled Deposit Accounts or establish new deposit accounts or change the passwords or user identification information with respect thereto in such a fashion as would result in Lender not having on-line access to view all information regarding all of Borrower's deposit accounts and Controlled Deposit Accounts or having control of all of Borrower's deposit accounts through deposit account control agreements.

**7.14    Truth of Statements**

Borrower shall not furnish to Lender any certificate or other document that contains any untrue statement of a material fact or that omits to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

**7.15    IRS Form 8821**

Borrower shall not materially alter, amend, restate, or otherwise modify, or withdraw, terminate or re-file any IRS Form 8821 required to be delivered pursuant to the Conditions Precedent in Section 4.1.

**7.16    Third Party Payor Programs**

Neither the Project, nor Borrower, shall, other than in the ordinary course of Borrower's business, change the terms of any Third Party Payor Programs or its normal billing payment and reimbursement policies and procedures with respect thereto (including, without limitation, the amount and timing of finance charges, fees and write-offs) without prior written notice of such change to Lender.  Borrower shall provide to Lender, upon request, an accurate, complete and current list of all participation agreements with Third Party Payors with respect to the business of Borrower.  Borrower shall not fail to comply with all requirements, contracts, conditions and stipulations applicable to Borrower in order to maintain in good standing and without default or limitation all such participation agreements.

**7.17    Filing of Motions and Applications**

The Borrower shall not, without the prior written consent of the Lender, apply to the Bankruptcy Court for authority to (i) take any action that is prohibited by the terms of any of the Loan Documents, or (ii) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Financing Orders.

**7.18    Interim and Final Financing Orders**

Borrower shall not:

(a)    Seek, create or consent to at any time any modification, stay, vacation or amendment of the Interim Financing Order (until such time as the Final Financing Order is entered)

and the Final Financing Order, except for modifications and amendments joined in or agreed to in writing by Lender;

(b)    seek the use of "Cash Collateral" (as defined in the Financing Orders) in a manner inconsistent with the terms of the Financing Orders without the prior written consent of Lender;

(c)    suffer to exist at any time a priority for any administrative expense or unsecured claim against Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 503((b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code) or any super priority claim which is equal or superior to the priority of the Lender in respect of the Obligations, except as expressly permitted by the Financing Orders; or

(d)    prior to the date on which the Obligations have been paid in full, pay any administrative expenses, except administrative expenses incurred in accordance with the Carve-Out, the Budget or the Financing Orders.

## VIII.    EVENTS OF DEFAULT

### 8.1    Events of Default

The occurrence of any one or more of the following shall constitute an "Event of Default:"

(a)    Borrower shall fail to pay any amount on the Obligations or provided for in any Loan Document when due and such failure shall not be cured within five (5) calendar days of when due (whether on any payment date, at maturity, by reason or acceleration, by notice of intention to prepay, by required prepayment or otherwise);

(b)    Any representation, statement or warranty made or deemed made by Borrower in any Loan Document or in any other certificate, document, report or opinion delivered in conjunction with any Loan Document to which it is a party, (i) shall not be true and correct in all material respects, or (ii) shall have been false or misleading in any material respect on the date when made or deemed to have been made (except to the extent already qualified by materiality, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect);

(c)    Borrower or any other party thereto other than Lender shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in any Loan Document and such violation, breach, default or failure shall not be cured within the applicable period set forth in the applicable Loan Documents; provided that, with respect to the affirmative covenants set forth in Article VI (other than Sections 6.2, 6.3 (i) and (ii), 6.9, 6.11, 6.16 and 6.17 for which there shall be no cure period, unless otherwise set forth herein), there shall be a fifteen (15) calendar day cure period commencing from the earlier of (i) receipt by such Person of written notice of such breach, default, violation or failure, and (ii) the time at which such Person or any officer thereof knew or became aware, or should have known or been aware, of such failure, violation, breach or default;

(d)      Any of the Loan Documents ceases to be in full force and effect, or any Lien created thereunder ceases to constitute a valid perfected first priority Lien on the Collateral, or Lender ceases to have a valid perfected first priority security interest in any material portion of the Collateral;

(e)      Lender's administrative expense claim in the Bankruptcy Case becomes subject (or subordinate) to another administrative expense claim;

(f)      One or more judgments or decrees is rendered against Borrower in an amount in excess of $50,000 individually or $100,000 in the aggregate at one time outstanding, which is/are not satisfied, stayed, bonded, vacated or discharged of record within thirty (30) calendar days of being rendered;

(g)      (i) Any Change of Control occurs or any agreement or commitment to cause or that may result in any such Change of Control is entered into without the written consent of Lender, (ii) any Material Adverse Effect or Material Adverse Change occurs, (iii) any Liability Event occurs, or (iv) Borrower ceases any material portion of its business operations as currently conducted;

(h)      Any Indebtedness of Borrower is declared to be due and payable or is required to be prepaid (other than by a regularly scheduled payment) prior to the stated maturity thereof;

(i)      Lender receives any indication or evidence that Borrower may have directly or indirectly been engaged in any type of activity which, in Lender's judgment, might result in forfeiture of any property to a Governmental Authority which shall have continued unremedied for a period of ten (10) calendar days after written notice from Lender;

(j)      Borrower or any of its respective members or senior officers is criminally indicted or convicted under any law that could lead to a forfeiture of any material portion of their respective assets;

(k)      The Bankruptcy Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed by Borrower;

(l)      Borrower files or supports or the Bankruptcy Court enters an order confirming a proposed plan of reorganization or liquidation that does not provide for the indefeasible payment in full and in cash of the Obligations, unless otherwise agreed in writing by Lender in its sole discretion;

(m)      Any attempt by Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, (i) invalidate, reduce or otherwise impair Lender's claims, or (ii) amend, supplement, stay, vacate or otherwise modify the Revolving Facility or the Financing Orders without consent of Lender;

(n)      Borrower requests approval of any post-petition financing, other than pursuant to the Revolving Facility, that would not immediately repay all Obligations, in full, in cash, on the date of the closing of such post-petition financing, unless otherwise agreed by Lender;

(o)      The entry of an order granting liens or claims that are senior or *pari passu* to the Liens granted in favor of Lender under the Loan Documents;

(p)      The Borrower shall assert that any of the Liens securing the Obligations are invalid, or any such Liens granted to the Lender shall be determined to be invalid;

(q)      Any report is filed by a patient care ombudsman or state long-term care ombudsman in the Bankruptcy Case indicating that patient care has significantly declined or has been materially compromised;

(r)      Any creditor or party in interest shall be granted relief from the automatic stay with respect to any material portion of the assets used in operation of the Borrower's business;

(s)      Borrower shall default in the due performance or observance by it of any term, covenant or agreement contained in the Interim Financing Order or the Final Financing Order;

(t)      From and after the date of entry thereof, the Interim Financing Order or the Final Financing Order approving this Agreement and the Revolving Facility shall cease to be in full force and effect;

(u)      A Final Financing Order approving this Agreement and the Revolving Facility has not been entered by the Bankruptcy Court within forty-five (45) days of the Petition Date, unless otherwise agreed to by Lender;

(v)      Borrower applies for an order substituting any assets for all or any portion of the Collateral; or

(w)      The Lease is determined to be terminated or otherwise invalid by a court of competent jurisdiction.

### 8.2      Acceleration and Suspension or Termination of Commitments

Upon the occurrence of an Event of Default and after expiration of any applicable cure period, notwithstanding any other provision of any Loan Documents, Lender may by notice to Borrower (i) terminate the Lender's obligations under this Agreement and/or (ii) by notice to Borrower declare all or any portion of the Obligations to be due and payable immediately (except in the case of an Event of Default under Section 8.1(g), in which event all of the foregoing shall automatically and without further act by Lender be due and payable). If the Revolving Facility is accelerated for any reason, Lender may, at its sole discretion, elect to exclude all or a portion of the Eligible Unbilled Receivables from the definition of Eligible Receivables. If Lender so elects, such Eligible Unbilled Receivables shall not be included in the calculation of the Borrowing Base.

## IX. RIGHTS AND REMEDIES AFTER DEFAULT

### 9.1      Rights and Remedies

(a)      In addition to the acceleration provisions set forth in Article VIII above, upon the occurrence and continuation of an Event of Default, following the giving of not less than

five (5) calendar days' advance written notice by Lender to such parties and in the manner set forth in the Interim Financing Order (the "**Notice Period**") and subject to the procedures set forth in such Interim Financing Order (and after any applicable cure period set forth herein, which shall be coterminous with and not incremental to the Notice Period), Lender shall have the right to exercise any and all rights, options and remedies provided for in any Loan Document, under the UCC or at law or in equity, including, without limitation, the right to (i) apply any property of Borrower received or held by Lender to reduce the Obligations in such manner as Lender may deem advisable, (ii) foreclose the Liens created under the Loan Documents, (iii) realize upon, take possession of and/or sell any Collateral or securities pledged with or without judicial process, (iv) exercise all rights and powers with respect to the Collateral as Borrower might exercise (other than with respect to Collateral consisting of Accounts owed or owing by Medicaid/Medicare Account Debtors absent a court order or compliance with applicable Law), (v) collect and send notices regarding the Collateral with or without judicial process, (vi) at Borrower's expense, require that all or any part of the Collateral be assembled and made available to Lender at any reasonable place designated by Lender, (vii) reduce or otherwise change the Facility Cap, (viii) engage, on behalf of Borrower, a third party to service and collect Borrower's receivables, including billing and rebilling Third Party Payors as well as the patients to the extent of their obligations thereunder, and/or (ix) relinquish or abandon any Collateral or securities pledged or any Lien thereon. Notwithstanding any provision of any Loan Document, Lender, in its Permitted Discretion, shall have the right, at any time that Borrower fails to do so, and from time to time, without prior notice, to: (i) obtain insurance covering any of the Collateral to the extent required hereunder; (ii) pay for the performance of any Obligations; (iii) discharge taxes or liens on any of the Collateral that are in violation of any Loan Document unless such taxes or liens are the subject of a Permitted Contest,; and (iv) pay for the maintenance and preservation of the Collateral. Such expenses and advances shall be added to the Obligations and increase the principal amount outstanding hereunder, until reimbursed to Lender and shall be secured by the Collateral, and such payments by Lender shall not be construed as a waiver by Lender of any Event of Default or any other rights or remedies of Lender.

(b)      Borrower agrees that notice received by it at least ten (10) calendar days before the time of any intended public sale, or the time after which any private sale or other disposition of Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable Law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Lender without prior notice to Borrower. At any sale or disposition of Collateral or securities pledged, Lender may (to the extent permitted by applicable Law) purchase all or any part thereof free from any right of redemption by Borrower which right is hereby waived and released. Borrower covenants and agrees not to, and not to permit or cause any of its Subsidiaries to, interfere with or impose any obstacle to Lender's exercise of its rights and remedies with respect to the Collateral. Lender, in dealing with or disposing of the Collateral or any part thereof, shall not be required to give priority or preference to any item of Collateral or otherwise to marshal assets or to take possession or sell any Collateral with judicial process.

## 9.2    Application of Proceeds

In addition to any other rights, options and remedies Lender has under the Loan Documents, the UCC, at law or in equity, all dividends, interest, rents, issues, profits, fees,

revenues, income and other proceeds collected or received from collecting, holding, managing, renting, selling, or otherwise disposing of all or any part of the Collateral or any proceeds thereof upon exercise of its remedies hereunder shall be applied in the following order of priority, after payment of the Carve Out then due:  (i) <u>first</u>, to the payment of all reasonable out-of-pocket costs and expenses of such collection, storage, lease, holding, operation, management, sale, disposition or delivery and of conducting Borrower's business and of maintenance, repairs, replacements, alterations, additions and improvements of or to the Collateral, and to the payment of all sums which Lender may be required or may elect to pay, if any, for taxes, assessments, insurance and other charges upon the Collateral or part thereof, and all other payments that Lender may be required or authorized to make under any provision of this Agreement (including, without limitation, in each such case, reasonable in-house documentation and diligence fees and legal expenses, search, audit, recording, professional and filing fees and expenses and reasonable attorneys' fees and all expenses, reasonable expert witness fees, liabilities and advances made or incurred in connection therewith, whether litigation is commenced or not); (ii) <u>second</u>, to the payment of all Obligations as provided herein, (iii) <u>third</u>, to the satisfaction of Indebtedness secured by any subordinate security interest of record in the Collateral if written notification of demand therefor is received before distribution of the proceeds is completed, <u>provided</u>, <u>that</u>, if requested by Lender, the holder of a subordinate security interest shall furnish reasonable proof of its interest, and unless it does so, Lender need not address its claims; and (iv) <u>fourth</u>, to the payment of any surplus then remaining to Borrower, unless otherwise provided by law or directed by a court of competent jurisdiction, <u>provided that</u> Borrower shall be liable for any deficiency if such proceeds are insufficient to satisfy the Obligations or any of the other items referred to in this Section.

**9.3    Reserved**

**9.4    Application of Payments Following Default**

Following the occurrence and continuance of an Event of Default, Lender may, notwithstanding Section 9.2, apply any and all payments received by Lender in respect of the Obligations, and any and all proceeds of Collateral received by Lender, in such order as Lender may from time to time elect, subject to the Carve Out.

**9.5    Reserved**

**9.6    Rights and Remedies not Exclusive**

Lender shall have the right in accordance with the terms hereof, in its Permitted Discretion to determine which rights, Liens and/or remedies Lender may at any time pursue, relinquish, subordinate or modify, and such determination will not in any way modify or affect any of Lender's rights, Liens or remedies under any Loan Document, applicable Law or equity. The enumeration of any rights and remedies in any Loan Document is not intended to be exhaustive, and all rights and remedies of Lender described in any Loan Document are cumulative and are not alternative to or exclusive of any other rights or remedies which Lender otherwise may have.  The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

## X.  WAIVERS AND JUDICIAL PROCEEDINGS

### 10.1   Waivers

Except as expressly provided for herein, Borrower hereby waives setoff, counterclaim, demand, presentment, protest, all defenses with respect to any and all instruments and all notices and demands of any description, and the pleading of any statute of limitations as a defense to any demand under any Loan Document.  Borrower hereby waives any and all defenses and counterclaims it may have or could interpose in any action or procedure brought by Lender to obtain an order of court recognizing the assignment of, or Lien of Lender in and to, any Collateral, whether or not payable by a Medicaid/Medicare Account Debtor.  With respect to any action hereunder, Lender conclusively may rely upon, and shall incur no liability to Borrower in acting upon, any request or other communication that Lender reasonably believes to have been given or made by a person authorized on Borrower's behalf, whether or not such person is listed on the incumbency certificate delivered pursuant to Section 4.1.  In each such case, Borrower hereby waives the right to dispute Lender's action based upon such request or other communication, absent manifest error.

### 10.2   Delay; No Waiver or Defaults

No course of action or dealing, renewal, release or extension of any provisions of any Loan Document, or single or partial exercise of any such provision, or delay, failure or omission on Lender's part in enforcing any such provision shall affect the liability of Borrower or operate as a waiver of such provision or affect the liability of Borrower or preclude any other or further exercise of such provision.  No waiver by any party to any Loan Document of any one or more defaults by any other party in the performance of any of the provisions of any Loan Document shall operate or be construed as a waiver of any future default, whether of a like or different nature, and each such waiver shall be limited solely to the express terms and provisions of such waiver.  Notwithstanding any other provision of any Loan Document, by completing the Closing under this Agreement and/or by making Advances, Lender does not waive any breach of any representation or warranty of under any Loan Document, and all of Lender's claims and rights resulting from any such breach or misrepresentation are specifically reserved.

### 10.3   Jury Waiver

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THE LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

### 10.4    Cooperation in Discovery and Litigation

In any litigation, arbitration or other dispute resolution proceeding relating to any Loan Document, Borrower waives any and all defenses, objections and counterclaims it may have or could interpose with respect to (i) any of its directors, officers, employees or agents being deemed to be employees or managing agents of Borrower for purposes of all applicable Law or court rules regarding the production of witnesses by notice for testimony (whether in a deposition, at trial or otherwise), (ii) Lender's counsel examining any such individuals as if under cross-examination and using any discovery deposition of any of them as if it were an evidence deposition, and/or (iii) using all commercially reasonable efforts to produce in any such dispute resolution proceeding, at the time and in the manner requested by Lender, all Persons, documents (whether in tangible, electronic or other form) and/or other things under its control and relating to the dispute.

## XI. EFFECTIVE DATE AND TERMINATION

### 11.1    Effectiveness and Termination

(a)    <u>Termination by Lender</u>.  Subject to Lender's right to terminate and cease making Advances upon the occurrence and during the continuance of an Event of Default, this Agreement shall continue in full force and effect until the full performance and indefeasible payment in cash of all Obligations (other than indemnity obligations with respect to which no claim has been made), unless terminated sooner as provided in this Section 11.1.

(b)    <u>Termination by Borrower</u>.  Borrower may terminate this Agreement at any time upon not less than thirty (30) calendar days' prior written notice to Lender and upon full performance and indefeasible payment in full in cash of all Obligations (other than indemnity obligations with respect to which no claim has been made) on or prior to such 30th calendar day after receipt by Lender of such written notice.  Borrower may elect to terminate this Agreement in its entirety only.  No section of this Agreement or type of Loan available hereunder may be terminated singly.

(c)    <u>Effectiveness of Termination</u>.  All of the Obligations (other than indemnity obligations with respect to which no claim has been made) shall be immediately due and payable upon the Termination Date.  All undertakings, agreements, covenants, warranties and representations of Borrower contained in the Loan Documents shall survive any such termination and Lender shall retain its Liens in the Collateral and Lender shall retain all of its rights and remedies under the Loan Documents notwithstanding such termination until all Obligations have been irrevocably discharged or paid, in full, in immediately available funds, including, without limitation, all Obligations under Section 3.4 and the terms of any fee letter resulting from such termination.  Notwithstanding the foregoing or the payment in full of the Obligations, Lender shall not be required to terminate its Liens in the Collateral unless, with respect to any loss or damage Lender may incur as a result of dishonored checks or other items of payment received by Lender from Borrower or any Account Debtor and applied to the Obligations, Lender shall, at its option, (i) have received a written agreement satisfactory to Lender, executed by Borrower and, if Borrower's financial condition at that time is weaker than it is as of the date hereof, by any Person whose loans or other advances to Borrower are used in whole or in part to satisfy the Obligations,

indemnifying Lender from any such loss or damage or (ii) have retained cash Collateral or other Collateral for such period of time as Lender, in its discretion, may deem necessary to protect Lender from any such loss or damage.

### 11.2    Survival

All obligations, covenants, agreements, representations, warranties, waivers and indemnities made by Borrower in any Loan Document shall survive the execution and delivery of the Loan Documents, the Closing, the making of the Advances and any termination of this Agreement until all Obligations (other than indemnity obligations with respect to which no claim has been made) are fully performed and indefeasibly paid in full in cash.  Notwithstanding the foregoing sentence of this Section 11.2, the obligations and provisions of Sections 3.7, 10.1, 10.4, 13.1, 13.3, 13.4, 13.7 and 13.12 shall survive termination of the Loan Documents and any payment, in full or in part, of the then-outstanding Obligations.

## XII.    ASSIGNMENTS AND PARTICIPATIONS

### 12.1    Assignments

Lender may at any time assign its rights and obligations hereunder and under all other Loan Documents to an assignee approved by the Bankruptcy Court.

## XIII.    MISCELLANEOUS

### 13.1    Governing Law; Jurisdiction; Service of Process; Venue

The Loan Documents shall be governed by and construed in accordance with the internal substantive laws of the State of New York without giving effect to its choice of law provisions.  So long as the Bankruptcy Case is pending, any judicial proceeding against Borrower with respect to the Obligations, any Loan Documents or any related agreement shall be brought in the Bankruptcy Court, and thereafter, any judicial proceeding shall be brought in any federal or state court of competent jurisdiction located in the State of New York. By execution and delivery of each Loan Document to which it is a party, each of the Borrower and Lender (i) accepts the non-exclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any judgment rendered thereby, (ii) waives personal service of process, (iii) agrees that service of process upon it may be made by certified or registered mail, return receipt requested, pursuant to Section 13.5, (iv) waives any objection to jurisdiction and venue of any action instituted hereunder and agrees not to assert any defense based on lack of jurisdiction, venue or convenience, and (v) agrees that this loan was made in New York, that Lender has accepted in New York the Loan Documents executed by Borrower and has disbursed Advances under the Loan Documents in New York.  Nothing shall affect the right of Lender to serve process in any manner permitted by law. All parties acknowledge that they participated in the negotiation and drafting of this Agreement and that, accordingly, no party shall move or petition a court construing this Agreement to construe it more stringently against one party than against any other.

### 13.2    Binding Effect of Loan Documents

The Loan Documents shall inure to the benefit of Lender, its assignees, Participants and all future holders of the Obligations and/or any of the Collateral, and each of their respective successors and assigns.  Each Loan Document shall be binding upon the Persons other than Lender that are parties thereto and their respective successors and assigns, and no such Person may assign, delegate or transfer any Loan Document or any of its rights or obligations thereunder without the prior written consent of Lender.  No rights are intended to be created under any Loan Document for the benefit of any Person who is not a party to such Loan Document.  Nothing contained in any Loan Document shall be construed as a delegation to Lender of any other Person's duty of performance.  BORROWER ACKNOWLEDGES AND AGREES THAT LENDER AT ANY TIME AND FROM TIME TO TIME MAY (I) DIVIDE AND RESTATE ANY NOTE, AND/OR (II) SELL, ASSIGN OR GRANT PARTICIPATING INTERESTS IN OR TRANSFER ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER ANY LOAN DOCUMENT, THE OBLIGATIONS AND/OR THE COLLATERAL TO OTHER PERSONS (EACH SUCH TRANSFEREE, ASSIGNEE OR PURCHASER, A "TRANSFEREE"), subject to Bankruptcy Court approval, if applicable.

### 13.3    Revival of Obligations

To the extent that any payment made or received with respect to the Obligations is subsequently invalidated, determined to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other Person under any Debtor Relief Law, common law or equitable cause or any other law, then the Obligations intended to be satisfied by such payment (whether or not previously terminated) shall be revived and shall continue as if such payment had not been received by Lender.  Any payments received with respect to such revived Obligations shall be credited and applied in such manner and order, as Lender shall decide in its Permitted Discretion.

### 13.4    Indemnity

Borrower shall indemnify Lender, its Affiliates and its and their respective managers, members, officers, employee, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "**Indemnified Persons**") from and against any and all liability, obligations, losses, damages, penalties, actions, judgments, suits, reasonable out-of-pocket costs, expenses and disbursements of any kind of nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel, expert witness fees, and reasonable in-house documentation and diligence fees and reasonable legal expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any way relating to any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, any Loan Document or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing (i) arises out of the gross negligence or willful misconduct of any Indemnified Person or (ii) arises out of a dispute between or among any Indemnified Persons. No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Borrower or any of its affiliates, subsidiaries or any shareholders or creditors of the foregoing for or in

connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct. In no event, however, shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages. If any Indemnified Person uses in-house counsel for any purpose for which Borrower is responsible to pay or indemnify, Borrower expressly agrees that its indemnification obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by Indemnified Person in its Permitted Discretion for the work performed.  Lender agrees to give Borrower reasonable notice of any event of which Lender becomes aware for which indemnification may be required under this Section 13.4, and Lender may elect (but is not obligated) to direct the defense thereof, provided that the selection of counsel shall be subject to Borrower's consent which consent shall not be unreasonably withheld or delayed.  Any Indemnified Person may in its reasonable discretion, take such actions, as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral.  Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "**Insured Event**"), Lender agrees not to exercise its right to select counsel to defend the event if that would cause Borrower's insurer to deny coverage; provided, however, that Lender reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense.  To the extent that Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that Borrower has paid to Lender pursuant to the indemnity set forth in this Section 13.4, then Lender shall promptly pay to Borrower the amount of such recovery.

### 13.5    Notice

Any notice or request under any Loan Document shall be given to any party to this Agreement at such party's address set forth beneath its signature on the signature page to this Agreement, or at such other address as such party may hereafter specify in a notice given in the manner required under this Section 13.5.  Any notice or request hereunder shall be given only by, and shall be deemed to have been received upon:  (i) registered or certified mail, return receipt requested, on the date on which such received as indicated in such return receipt, (ii) delivery by a nationally recognized overnight courier, one (1) Business Day after deposit with such courier, or (iii) pdf or other electronic transmission, in each case upon telephone or further electronic communication from the recipient acknowledging receipt (whether automatic or manual from recipient), as applicable.

### 13.6    Severability; Captions; Counterparts; Facsimile Signatures

If any provision of any Loan Document is adjudicated to be invalid under applicable Laws, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of the Loan Documents which shall be given effect so far as possible.  The captions in the Loan Documents are intended for convenience and reference only and shall not affect the meaning or interpretation of the Loan Documents.  The Loan Documents may be executed in one or more counterparts (which taken together, as applicable, shall constitute one and the same instrument) and by facsimile, pdf or other transmission, and such facsimile signatures shall be considered original executed counterparts.  Each party to this

Agreement agrees that it will be bound by its own electronic signature and that it accepts the electronic signature of each other party.

### 13.7    Expenses

Borrower shall pay, whether or not the Closing occurs, all reasonable usual and customary costs and expenses incurred by Lender and/or its Affiliates, including, without limitation reasonable, documentation and diligence fees and expenses, all search, audit, appraisal, recording reasonable professional and filing fees and expenses and all other actual out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-Closing UCC and judgment and tax lien searches and audit expenses), and reasonable attorneys' fees and expenses, incurred (i) in any effort to enforce, protect or collect payment of any Obligation or to enforce any Loan Document or any related agreement, document or instruments (ii) in connection with entering into, negotiating, preparing, reviewing and executing the Loan Documents and/or any related agreements, documents or instruments, (iii) arising in any way out of administration of the Obligations, (iv) in connection with instituting, maintaining, preserving, enforcing and/or foreclosing on Lender's Liens in any of the Collateral or securities pledged under the Loan Documents, whether through judicial proceedings or otherwise, (v) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Lender's transactions with Borrower, (vi) in seeking, obtaining or receiving any advice with respect to its rights and obligations under any Loan Document and any related agreement, document or instrument, (vii) in connection with any modification, restatement, supplement, amendment, waiver or extension of any Loan Document and/or any related agreement, document or instrument and/or (viii) in connection with all actions, visits, audits and inspections undertaken by Lender or its Affiliates pursuant to the Loan Documents, subject to the provisions of Section 6.7.  In addition, Borrower shall pay Lender a wire fee of $25.00 with respect to each domestic wire transfer of funds by Lender to or for the benefit of Borrower.  All of the foregoing shall be charged to Borrower's account and shall be part of the Obligations.  If Lender or any of its Affiliates uses in-house counsel for any purpose under any Loan Document for which Borrower is responsible to pay or indemnify, Borrower expressly agrees that its Obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by Lender or such Affiliate in its Permitted Discretion for the work performed.  Without limiting the foregoing, Borrower shall pay all taxes (other than taxes based upon or measured by Lender's income or revenues or any personal property tax), if any, in connection with the transactions contemplated by this Agreement and the Loan Documents and the filing and/or recording of any documents and/or financing statements.

### 13.8    Entire Agreement

This Agreement and the other Loan Documents to which Borrower is a party constitute the entire agreement between Borrower and Lender with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, if any, relating to the subject matter hereof or thereof.  Any promises, representations, warranties or guarantees not herein contained and hereafter made shall have no force and effect unless in writing signed by Borrower and Lender, provided, however, additional covenants, representations, warranties and guarantees will be enforceable if executed by the party against whom enforcement is sought.  No provision of this Agreement may be changed, modified, amended, restated, waived, supplemented,

discharged, canceled or terminated orally or by any course of dealing or in any other manner other than by an agreement in writing signed by Lender and Borrower.  Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation and execution of this Agreement and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof.  Any schedule may be amended from time to time by the Borrower with the consent of the Lender, which consent shall not be unreasonably withheld if the revised schedule does not evidence any violation of the covenants in Articles VI or VII.

### 13.9    Lender Approvals

Any approval, consent, waiver or satisfaction of Lender with respect to any matter that is subject of any Loan Document (i) shall not be effective unless it is in writing and (ii) unless expressly provided herein to the contrary, may be granted or withheld by Lender in its sole discretion.

### 13.10   USA Patriot Act

Borrower shall not (a) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Lender from making any advance or extension of credit to Borrower or from otherwise conducting business with Borrower, or (b) fail to provide documentary and other evidence of Borrower's or its corporate officers' identities as may be requested by Lender at any time to enable Lender to verify Borrower's identity or to comply with any applicable Laws, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. §5318.  Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record certain information and documentation that identifies Borrower, which information includes the name and address of Borrower and such other information that will allow Lender to identify Borrower in accordance with the USA Patriot Act.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGES]**

IN WITNESS WHEREOF, each of the parties has duly executed this Super Priority Debtor-in-Possession Credit and Security Agreement as of the date first written above.

BORROWER:

HBL SNF, LLC
a New York limited liability company


By: _____
Name: Lizer Jozefovic
Title:  Manager

<u>Address for Notice:</u>
1280 Albany Post Road
Croton-on-Hudson, New York 10520
Attention: Lizer Jozefovic

Telephone:  (914) 829-5114 Ext. 704
Email:  lizerj@epicmgt.com

With a copy to (which shall not constitute notice):
Michelman & Robinson, LLP
800 3rd Avenue, 24th Floor
New York, New York 10022
Attention: Eric Simonson, Esq.

Telephone: (212) 730-7700
Email: esimonson@mrllp.comesimonson@mrllp.com

-and-

Klestadt Winters Jureller
Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, NY 10036
Attention: Tracy L. Klestadt, Esq.

Telephone: (212) 972-3000
Email: tklestadt@klestadt.com


[Lender's Signature Page Follows]



Super Priority Debtor-in-Possession Credit and Security Agreement, Signature Page

LENDER:

CNH FINANCE FUND I, L.P.
a Delaware limited partnership


By:  _____
Name:  Timothy Peters
Title:    Authorized Signatory

<u>Address for Notice:</u>
CNH Finance Fund I, L.P.
c/o CNH Finance, L.P.
24 East Ave PMB 1285
New Canaan, CT 06840
Attention: Timothy Peters

Telephone: (203) 266-3210
Email: Legal@cnhfinance.com

With a copy to (which shall not constitute notice):

Kincaid, Frame & Associates Co., LPA
6151 Wilson Mills Road, Suite 310
Highland Heights, OH 44143
Attention: Alexander Frame, Esq.

Telephone: (440) 352-1010
Email: aframe@tjklaw.com

-and-

Foley & Lardner LLP
90 Park Avenue
New York, New York 10016
Attention: Alissa M. Nann, Esq.

ANNEX I

Financial and Loan Covenants

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Borrowing Certificate |
| Exhibit B | - | Compliance Certificate |
| Exhibit C | - | Budget |

## SCHEDULES

| | | |
|---|---|---|
| Schedule 2.4 | - | Borrower's Account for Funding Wires |
| Schedule 2.5 | - | Borrower's Deposit Accounts |
| Schedule 5.3 | - | Organizational Information |
| Schedule 5.4 | - | Real Property Owned or Leased |
| Schedule 5.16 | - | Insurance |
| Schedule 5.17A | - | Corporate Names |
| Schedule 5.17B | - | Business and Collateral Locations |
| Schedule 5.20 | - | Exceptions to Healthcare Law Compliance Representations |
| Schedule 5.23 | - | Material Contracts |
| Schedule 5.24 | - | Third-Party Payor Billing Numbers |
| Schedule 7.3 | - | Liens |

## ANNEX I

## FINANCIAL AND LOAN COVENANTS

1)      **Current Ratio**

At the end of each calendar month, Borrower's ratio of current assets (determined in accordance with GAAP) to current liabilities (also determined in accordance with GAAP) shall not be less than 1.0 to 1.0; provided that, (A) Accounts receivable by Borrower from any Affiliate of Borrower shall not be included in the calculation of current assets, (B) Accounts payable by Borrower to any Affiliate of Borrower shall not be included in the calculation of current liabilities, and (C) the Revolving Facility shall be included in the calculation of current liabilities.

2)      **Loan Turnover Rate**

At the end of each calendar month, the amount calculated by dividing (a) the average outstanding principal balance of the Revolving Facility for the applicable Test Period by (b) the result achieved by dividing (i) the sum of all collections received in the Controlled Deposit Account during the applicable Test Period with respect to all of Borrower's Accounts by (ii) the number of days in such Test Period, shall not be greater than 45.

For purposes of the covenants set forth in this Annex I, capitalized terms shall have the following meanings set forth below, or if not set forth below, the meanings set forth in Article I.

"Test Period" shall mean the three most recent calendar months then ended (taken as one accounting period).

EXHIBIT A

BORROWING CERTIFICATE
Dated as of _____, 20___

The undersigned hereby certifies to CNH Finance Fund I, L.P. ("Lender") that:

1. I am certifying the following facts and making and delivering this Borrowing Base Certificate pursuant to that certain Super Priority Debtor-in-Possession Credit and Security Agreement, dated as of November 3, 2021 (as the same may be, amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement") between HBL SNF, LLC, a New York limited liability company ("Borrower") and Lender. Capitalized terms used in this certificate have the same meaning as set forth in the Credit Agreement.

2. All information contained in this Borrowing Base Certificate is true, correct, and complete as of the date hereof. All representations and warranties made by Borrower in the Credit Agreement are true and correct on and as of the date hereof as if such representations and warranties had been made as of the date hereof.

3. No Event of Default has occurred and is continuing or will exist after giving effect to the Advance requested hereby.

4. Borrower has performed and complied with all agreements and conditions required under Article IV of the Credit Agreement to be performed or complied with by it on or prior to the funding of the Advance requested hereby.

5. There have been no modifications to reimbursement rates or other contractual arrangements that would adversely affect the valuation or collectability of the Accounts. There are no offsets, setoffs, counterclaims, disputes or defenses of any kind from any Account Debtor against any Account classified as an Eligible Receivable. All Accounts classified as Eligible Receivables and Ineligible Receivables in this Borrowing Base Certificate are properly so classified.

6. The Borrower has directed all Account Debtors to deliver all payments on the Accounts to the proper Controlled Deposit Account (including any Lockbox Account) as specified in the Credit Agreement and has identified such Controlled Deposit Account as the account to which all payments are to be sent on all invoices for Accounts with Dates of Service after the date of the Credit Agreement. All Accounts reflected in the Borrower's most recently submitted Accounts Receivable Aging Report are the subject of properly and validly billed invoices for services provided and goods sold by the applicable Borrower in the ordinary course of business. The aging buckets in this Borrowing Base Certificate reflect the number of days the Accounts have been outstanding subsequent to their

respective Dates of Service.  All collections on Accounts have been applied to the proper invoices resulting in accurate aging totals for each aging bucket.  There are no known duplicate or fictitious claims or invoices included in the Accounts.  The Borrower has not diverted or permitted to be diverted any such payments on Accounts to a deposit account other than the proper Controlled Deposit Account as required by Section 2.5 of the Credit Agreement.  No collections on Accounts have been received that have not been applied to reduce the Accounts.

7. All Accounts are owned by the undersigned, free and clear of all liens, security interests, claims, charges, or trusts, legal or equitable, now existing or which might arise with the passage of time, other than Permitted Liens.

8. The Borrower has deposited all state and federal payroll withholding taxes required with respect to each payroll period through the most recent payroll period.

9. After Lender makes the Advance requested hereby, the aggregate amount of the Loan will not exceed the Revolving Loan Limit.

**BORROWER:**

HBL SNF, LLC
a New York limited liability company

By: _____
Name: Lizer Jozefovic
Title:  Manager

EXHIBIT B

COMPLIANCE CERTIFICATE
Dated as of _____, 20____

This Compliance Certificate is delivered by HBL SNF, LLC (the "Borrower"), in accordance with the Super Priority Debtor-in-Possession Credit and Security Agreement dated as of November 3, 2021, between Borrower and CNH Finance Fund I, L.P. ("Lender") (as amended, supplemented or modified from time to time, the "Credit Agreement").  All capitalized terms not defined herein have the meanings given them in the Credit Agreement and other Loan Documents.

The undersigned hereby certifies that:

(a)     The financial statements delivered with this certificate in accordance with Section 6.1 of the Credit Agreement fairly present in all material respects the results of operations and financial condition of Borrower as of the dates and the accounting periods covered by such financial statements;

(b)     I have reviewed the terms of the Credit Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and financial condition of Borrower during the accounting period covered by such financial statements;

(c)     Such review has not disclosed the existence during or at the end of such accounting period, and I have no knowledge of the existence as of the date hereof, of any condition or event that constitutes an Event of Default, except as set forth in Schedule 1 attached hereto, which includes a description of the nature and period of existence of such Event of Default and what action Borrower has taken, is undertaking and proposes to take with respect thereto;

(e)     Except as noted on Schedule 2 attached hereto, the undersigned has no knowledge of any federal or state tax liens having been filed against Borrower or any Collateral;

(f)     Except as noted on Schedule 3 attached hereto, the undersigned has no knowledge of any failure of Borrower to make required payments of withholding or other tax obligations during the accounting period to which the attached statements pertain or any subsequent period.

(g)     Except as described in the Credit Agreement or the schedules thereto, or on Schedule 4 attached hereto, and the Bankruptcy Case and the disputed matters concerning the Lease as disclosed in the Bankruptcy Case, the undersigned has no knowledge of any current, pending or threatened:

(i)     litigation against Borrower;

(ii)     inquiries, investigations or proceedings concerning the business affairs, practices, licensing or reimbursement entitlements of Borrower;

(iii)     default by Borrower under any material contract to which it is a party, including, without limitation, any leases.

(h)     Borrower is in compliance with the financial and loan covenants contained in Annex I of the Credit Agreement, as demonstrated by the calculation of such covenants below, except as set forth below; in determining such compliance, the following calculations have been made:  [See attached worksheets].  Such calculations and the certifications contained therein are true, correct and complete.

**BORROWER:**

HBL SNF, LLC
a New York limited liability company


By: _____
Name: Lizer Jozefovic
Title:  Manager

**Schedules to Compliance Certificate**

Schedule 1 – Non-Compliance with Covenants

Schedule 2 – Federal or State Tax Liens

Schedule 3 – Unpaid Tax or Withholding Obligations

Schedule 4 –Pending Litigation, Inquiries or Investigations; Defaults under Material Contracts

Worksheet(s) for Financial or Other Covenant Calculations

**Current Ratio Worksheet (Attachment to Compliance Certificate)**

1. Current Assets as of the end of the most recent month:     $_____

2. Current Liabilities as of the end of the most recent month:     $_____

3. Ratio of Line 1 to Line 2:     _____

4. Minimum Current Ratio:     1.0 to 1.0

5. In compliance:     YES  -  NO

**Loan Turnover Rate Worksheet (Attachment to Compliance Certificate)**

1.  Average outstanding principal balance of Revolving Facility for the
Test Period:                                                           $_____

2.  Total collections received in the Controlled Deposit Accounts during
most recently ended Test Period:                                       $_____

3.  Number of days during most recently ended Test Period:             _____ days

4.  Line 2 divided by Line 3:                                          _____ days

5.  Line 1 divided by Line 4:                                          _____ days

6.  Maximum Loan Turnover Rate:                                        45 days

7.  In compliance:                                                     YES  -  NO

EXHIBIT C

Budget

**HBL SNF, LLC d/b/a Epic Nursing and Rehab at White Plains**
**DIP Budget**

| | | |
|---|---|---|
| Week 1 Begins on | 11/1/2021 |
| Week 16 Ends on | 2/21/2022 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medicaid | 395 | 398 | 401 | 401 | 405 | 405 | 408 | 408 | 411 | 411 | 415 | 415 | 418 | 418 | 421 | 421 |
| Medicare | 302 | 305 | 307 | 307 | 310 | 310 | 312 | 312 | 315 | 315 | 318 | 318 | 320 | 320 | 323 | 323 |
| Private Pay | 76 | 76 | 77 | 77 | 77 | 77 | 78 | 78 | 79 | 79 | 79 | 79 | 80 | 80 | 81 | 81 |
| Commercial Insurance | 67 | 68 | 69 | 69 | 69 | 69 | 70 | 70 | 70 | 70 | 70 | 70 | 71 | 71 | 71 | 71 |
| Resident Days | 840 | 847 | 854 | 854 | 861 | 861 | 868 | 868 | 875 | 875 | 882 | 882 | 889 | 889 | 896 | 896 |
| ADC | 120 | 121 | 122 | 122 | 123 | 123 | 124 | 124 | 125 | 125 | 126 | 126 | 127 | 127 | 128 | 128 |

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medicaid | 110,000 | 110,000 | 110,000 | 110,000 | 117,278 | 118,168 | 119,059 | 119,059 | 120,247 | 120,247 | 121,137 | 121,137 | 124,299 | 124,299 | 125,508 | 125,508 |
| Medicare | - | 145,000 | - | 826,464 | - | 825,744 | - | 145,720 | - | 841,299 | - | 148,465 | - | 856,178 | - | 151,090 |
| Private Pay | 50,000 | - | 50,537 | - | 50,537 | - | 50,537 | - | 50,537 | - | 51,198 | - | 51,198 | - | 52,189 | - |
| Commercial Insurance | 54,635 | - | - | 54,635 | - | 54,635 | - | 54,635 | - | 54,635 | - | 55,636 | - | 55,636 | - | 56,036 |
| Medicare Part B | 45,000 | - | - | 49,499 | - | 42,074 | - | 7,425 | - | 42,855 | - | 7,563 | - | 43,549 | - | 7,685 |
| **Total Cash Receipts** | 259,635 | 255,000 | 160,537 | 1,040,598 | 167,815 | 1,040,621 | 169,596 | 326,839 | 170,784 | 1,059,036 | 172,335 | 332,801 | 175,497 | 1,079,662 | 177,697 | 340,319 |
| Salaries- Management | 50,000 | | 50,000 | | 50,000 | | 50,000 | | 50,000 | | 50,000 | | 50,000 | | 50,000 | |
| Salaries- Staff | 337,500 | 340,000 | | 342,500 | | 342,500 | | 342,500 | | 345,000 | | 345,000 | | 345,000 | | |
| Payroll Taxes & Fees | 35,000 | | 35,000 | | 35,000 | | 35,000 | | 35,000 | | 36,000 | | 36,000 | | 36,000 | |
| Employee Benefits | | | | 105,000 | | | | 105,000 | | | | 105,000 | | | | 105,000 |
| Contracted Staff | | | | 30,000 | | | | 32,500 | | | | 35,000 | | | | 37,500 |
| **Total Labor Costs** | 422,500 | - | 425,000 | 135,000 | 427,500 | - | 427,500 | 137,500 | 427,500 | - | 431,000 | 140,000 | 431,000 | - | 431,000 | 142,500 |
| Professional Fees- CPA | 10,000 | | | | 5,000 | | | | 5,000 | | | | 5,000 | | | |
| Professional Fees- Legal | 60,000 | | | | 60,000 | | | | 60,000 | | | | 60,000 | | | |
| Patient Care Ombudsman Fees | 10,000 | | | | 10,000 | | | | 10,000 | | | | 10,000 | | | |
| Subchapter V Trustee | 2,500 | | | | 2,500 | | | | 2,500 | | | | 2,500 | | | |
| Professional Fees - Omni | 2,500 | | | | 2,500 | | | | 2,500 | | | | 2,500 | | | |
| DIP Lender Fees | 100,000 | | | | 25,000 | | | | 25,000 | | | | | | | |
| Cash Receipts Assessment | | | | 44,187 | | | | 46,506 | | | | 47,245 | | | | 48,598 |
| COD Payment Allowance | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| Rent | 506,097 | | | | 506,097 | | | | 506,097 | | | | 506,097 | | | |
| Total No-Lag Expenses | 766,097 | 75,000 | 75,000 | 119,187 | 686,097 | 75,000 | 75,000 | 121,506 | 686,097 | 75,000 | 75,000 | 122,245 | 661,097 | 75,000 | 75,000 | 123,598 |
| "New" A/P Vendor Payments | - | - | - | - | 50,000 | 50,000 | 50,000 | - | 50,000 | 50,000 | 50,000 | - | 50,000 | 50,000 | 50,000 | - |
| "Old" A/P Vendor Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash Disbursements** | 1,188,597 | 75,000 | 500,000 | 254,187 | 1,163,597 | 125,000 | 552,500 | 259,006 | 1,163,597 | 125,000 | 556,000 | 262,245 | 1,142,097 | 125,000 | 556,000 | 266,098 |
| **Net Cash Flow** | (928,962) | 180,000 | (339,463) | 786,411 | (995,782) | 915,621 | (382,904) | 67,833 | (992,813) | 934,036 | (383,665) | 70,556 | (966,600) | 954,662 | (378,303) | 74,221 |
| Plus: Opening Cash Balance | 400,639 | 221,678 | - | - | 98,626 | - | 18,465 | - | - | - | - | - | - | - | - | - |
| Plus: Draw from Credit Line | 750,000 | - | 339,463 | - | 897,156 | - | 364,439 | - | 992,813 | - | 383,665 | - | 966,600 | - | 378,303 | - |
| Less: Repayment to Credit Line | - | (401,678) | - | (687,786) | - | (897,156) | - | (67,833) | - | (934,036) | - | (70,556) | - | (954,662) | - | (74,221) |
| **Ending Cash Balance** | 221,678 | - | - | 98,626 | - | 18,465 | - | - | - | - | - | - | - | - | - | - |
| Net Credit Draw Down | 750,000 | 348,323 | 687,786 | - | 897,156 | - | 364,439 | 296,606 | 1,289,419 | 355,383 | 739,048 | 668,492 | 1,635,091 | 680,429 | 1,058,732 | 984,511 |

SCHEDULE 2.4

Borrower's Account for Funding Wires

Bank:                Metropolitan Commercial Bank
Account Name:        HBL SNF, LLC
Account Number:      xxxxxx1389

SCHEDULE 2.5

Borrower's Deposit Accounts

See attached account chart.

| Name | **JP Morgan Chase Bank** | **JP Morgan Chase Bank** | **JP Morgan Chase Bank** |
|---|---|---|---|
| Title | HBL SNF, LLC | HBL SNF, LLC | HBL SNF, LLC |
| Address: | 171 S Riverside Ave., Croton-on-Hudons, NY 10520 | 171 S Riverside Ave., Croton-on-Hudons, NY 10520 | 171 S Riverside Ave., Croton-on-Hudons, NY 10520 |
| Acct # | xxxxxx1769 | xxxxxx7272 | xxxxxx9639 |
| | | | |
| Purpose | Payroll | Savings | Resident Funds Savings Account |
| | | | |
| | | | |

| Name | **JP Morgan Chase Bank** | **JP Morgan Chase Bank** | **JP Morgan Chase Bank** |
|---|---|---|---|
| Title | HBL SNF, LLC | HBL SNF, LLC | HBL SNF, LLC |
| Address: | 171 S Riverside Ave., Croton-on-Hudons, NY 10520 | 171 S Riverside Ave., Croton-on-Hudons, NY 10520 | 171 S Riverside Ave., Croton-on-Hudons, NY 10520 |
| Acct # | xxxxxx2635 | xxxxxx2908 | xxxxxx5537 |
| | | | |
| Purpose | Petty Cash | Resident Funds Checking | Resident Security Account for Private Pay |
| | | | |
| | | | |

| Name | **Regions Bank** | **Metropolitan Commercial Bank** | **Metropolitan Commercial Bank** |
|---|---|---|---|
| Title | HBL SNF, LLC | HBL SNF, LLC | HBL SNF, LLC |
| Address | 100 N. Tampa St., Suite 3100,Tampa, FL 33602 | 99 Park Ave., 12th Fl., New York, NY 10016 | 99 Park Ave., 12th Fl., New York, NY 10016 |
| Acct # | xxxxxx5238 | xxxxxx1389 | xxxxxx1397 |
| | | | |
| Purpose | Commercial Account | Checking/Operating | Medicare/Medicaid Deposit Account |
| | | | |
| | | | |

| Name | **Regions Bank** | **Regions Bank** |
|---|---|---|
| Title | HBL SNF, LLC | HBL SNF, LLC |
| Address: | 100 N. Tampa St., Suite 3100,Tampa, FL 33602 | 100 N. Tampa St., Suite 3100,Tampa, FL 33602 |
| Acct # | xxxxxx5246 | xxxxxx5254 |
| | | |
| Purpose | Non Government Receivables | Government Receivables |
| | | |
| | | |

SCHEDULE 5.3

Organizational Information

The Borrower is a limited liability company organized under the laws of New York.

The Borrower has no subsidiaries.

The number and class of equity securities issued and outstanding of Borrower and the record and beneficial owners thereof (including options, warrants and other rights to acquire any of the foregoing) are as follows:

| HBL SNF, LLC | |
| --- | --- |
| Beneficial Owner | Membership Interests |
| Westchester Health Care Properties I, LLC | 51% |
| The Bethel Nursing Home Company, Inc. | 10% |
| HHHW Liquidation Trust | 39% |

SCHEDULE 5.4

Real Property Owned or Leased

Amended and Restated Operating Lease by and between White Plains Healthcare Properties I, LLC, as Landlord, and HBL SNF, LLC, as Tenant, dated as of November 19, 2015, for the premises located at:

116-120 Church Street, White Plains, New York 10601

SCHEDULE 5.16

Insurance

See attached certificates of insurance and endorsements

**ACORD®**

EPICHEA-02          D2GBLEDSOE

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
**3/20/2020**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER  License # L077730 | CONTACT NAME: Georgeanne Bledsoe | | |
|---|---|---|---|
| AssuredPartners, Lake Mary 300 Colonial Center Parkway, Suite 270 Lake Mary, FL 32746 | PHONE (A/C, No, Ext): (407) 203-9227 | | FAX (A/C, No): |
| | E-MAIL ADDRESS: georgie.bledsoe@assuredpartners.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : National Fire & Marine Insurance Company | | 20079 |
| INSURED                     HBL SNF LLC | INSURER B : | | |
| dba EPIC Rehabilitation and Nursing at White Plains | INSURER C : | | |
| 120 Church Street | INSURER D : | | |
| White Plains, NY 10601 | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X  COMMERCIAL GENERAL LIABILITY | X | | NSC100812 | 11/15/2019 | 11/15/2020 | EACH OCCURRENCE | $ 1,000,000 |
| | X  CLAIMS-MADE   OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 200,000 |
| | X  Professional-$1M/$3M | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 3,000,000 |
| | X  POLICY   PRO-JECT   LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 3,000,000 |
| | OTHER: | | | | | | EBL-Claims Made | $ 1,000,000 |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY   NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB   OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED   RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY             Y / N | | | | | | PER STATUTE   OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N / A | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
CNH FINANCE FUND I IS INCLUDED AS AN ADDTIIONAL INSURED WHEN REQUIRED BY WRITTEN CONTRACT

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CNH Finance Fund I, ISAOA c/o CNH Finance, L.P. 330 Railroad Avenue, Suite 101 Greenwich, CT 06830 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.  AUTHORIZED REPRESENTATIVE |

ACORD 25 (2016/03)

© 1988-2015 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: **EPICHEA-02**

LOC #: 1

# ACORD®

## ADDITIONAL REMARKS SCHEDULE

Page 1 of 1

| AGENCY | License # L077730 | NAMED INSURED |
|---|---|---|
| **AssuredPartners, Lake Mary** | | **HBL SNF LLC**<br>**dba EPIC Rehabilitation and Nursing at White Plains**<br>**120 Church Street**<br>**White Plains, NY 10601** |
| POLICY NUMBER | | |
| **SEE PAGE 1** | | |
| CARRIER | NAIC CODE | |
| **SEE PAGE 1** | **SEE P 1** | EFFECTIVE DATE: **SEE PAGE 1** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:   ACORD 25   FORM TITLE: Certificate of Liability Insurance

**NAMED INSURED SCHEDULE**
**HBL SNF, LLC DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS**
**EPIC HEALTH CARE MANAGEMENT, LLC**
**WHITE PLAINS HEALTHCARE PROPERTIES I, LLC**

**PLGL RETRO DATE - 11/15/2019**

© 2008 ACORD CORPORATION.  All rights reserved.
The ACORD name and logo are registered marks of ACORD

**ACORD**

# EVIDENCE OF COMMERCIAL PROPERTY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 3/20/2020 |

THIS EVIDENCE OF COMMERCIAL PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS EVIDENCE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE ADDITIONAL INTEREST.

| PRODUCER NAME, CONTACT PERSON AND ADDRESS | PHONE (A/C, No, Ext): **(407) 203-9227** | COMPANY NAME AND ADDRESS | NAIC NO: **10677** |
|---|---|---|---|
| AssuredPartners, Lake Mary<br>300 Colonial Center Parkway, Suite 270<br>Lake Mary, FL 32746<br><br>Contact name: Georgeanne Bledsoe | | Cincinnati Insurance Company<br>P.O. Box 145496<br>Cincinnati, OH 45250-5496 | |
| FAX (A/C, No): | E-MAIL ADDRESS: georgie.bledsoe@assuredpartners.com | IF MULTIPLE COMPANIES, COMPLETE SEPARATE FORM FOR EACH | |
| CODE: | SUB CODE: | POLICY TYPE | |
| AGENCY CUSTOMER ID #: **EPICHEA-02**   License # L077730 | | **Property** | |

| NAMED INSURED AND ADDRESS | LOAN NUMBER | | POLICY NUMBER |
|---|---|---|---|
| Epic Health Care Management<br>1278 Albany Post Road<br>Croton On Hudson, NY 10520 | | | **HFN0009557** |
| | EFFECTIVE DATE | EXPIRATION DATE | |
| | 9/30/2019 | 9/30/2020 | ☐ CONTINUED UNTIL TERMINATED IF CHECKED |
| ADDITIONAL NAMED INSURED(S) | THIS REPLACES PRIOR EVIDENCE DATED: | | |

**PROPERTY INFORMATION**   (ACORD 101 may be attached if more space is required)   ☒ BUILDING   OR ☒ BUSINESS PERSONAL PROPERTY

LOCATION / DESCRIPTION
Loc # 1, Bldg # 1, 120 Church Street, White Plains, NY 10601, Skilled Nursing Facility

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| COVERAGE | PERILS INSURED | BASIC | | BROAD | ☒ SPECIAL | | | |
|---|---|---|---|---|---|---|---|---|
| COMMERCIAL PROPERTY COVERAGE AMOUNT OF INSURANCE: $ 49,500,000 | | | | | | DED: **10,000** | | |

| | YES | NO | N/A | | | | |
|---|---|---|---|---|---|---|---|
| ☒ BUSINESS INCOME   ☐ RENTAL VALUE | X | | | If YES, LIMIT: | **2,500,000** | Actual Loss Sustained; # of months: | |
| BLANKET COVERAGE | | X | | If YES, indicate value(s) reported on property identified above: $ | | | |
| TERRORISM COVERAGE | X | | | Attach Disclosure Notice / DEC | | | |
|    IS THERE A TERRORISM-SPECIFIC EXCLUSION? | | X | | | | | |
|    IS DOMESTIC TERRORISM EXCLUDED? | | X | | | | | |
| LIMITED FUNGUS COVERAGE | X | | | If YES, LIMIT: | **15,000** | DED: | **10,000** |
| FUNGUS EXCLUSION (If "YES", specify organization's form used) | | X | | | | | |
| REPLACEMENT COST | X | | | | | | |
| AGREED VALUE | X | | | | | | |
| COINSURANCE | X | | | If YES, | **80** % | | |
| EQUIPMENT BREAKDOWN (If Applicable) | X | | | If YES, LIMIT: | **49,500,000** | DED: | **10,000** |
| ORDINANCE OR LAW - Coverage for loss to undamaged portion of bldg | X | | | If YES, LIMIT: | **45,000,000** | DED: | **10,000** |
|    - Demolition Costs | X | | | If YES, LIMIT: | **1,000,000** | DED: | **10,000** |
|    - Incr. Cost of Construction | X | | | If YES, LIMIT: | **1,000,000** | DED: | **10,000** |
| EARTH MOVEMENT (If Applicable) | X | | | If YES, LIMIT: | **1,000,000** | DED: | **50,000** |
| FLOOD (If Applicable) | X | | | If YES, LIMIT: | **2,000,000** | DED: | **25,000** |
| WIND / HAIL INCL   ☒ YES   ☐ NO  Subject to Different Provisions: | | X | | If YES, LIMIT: | | DED: | |
| NAMED STORM INCL   ☒ YES   ☐ NO  Subject to Different Provisions: | | X | | If YES, LIMIT: | | DED: | |
| PERMISSION TO WAIVE SUBROGATION IN FAVOR OF MORTGAGE HOLDER PRIOR TO LOSS | | | X | | | | |

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

**ADDITIONAL INTEREST**

| ☐ CONTRACT OF SALE | ☐ LENDER'S LOSS PAYABLE | ☐ LOSS PAYEE | LENDER SERVICING AGENT NAME AND ADDRESS |
|---|---|---|---|
| ☒ MORTGAGEE | | | |
| NAME AND ADDRESS | | | |
| CNH Finance Fund I, ISAOA<br>c/o CNH Finance, L.P.<br>330 Railroad Avenue, Suite 101<br>Greenwich, CT 06830 | | | AUTHORIZED REPRESENTATIVE |

ACORD 28 (2016/03)

© 2003-2015 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD



AGENCY CUSTOMER ID: **EPICHEA-02**                                    **D2GBLEDSOE**

LOC #: _____

## ADDITIONAL REMARKS SCHEDULE                    Page  1  of  1

| AGENCY | License # L077730 | NAMED INSURED |
|---|---|---|
| **AssuredPartners, Lake Mary** | | **Epic Health Care Management**<br>**1278 Albany Post Road**<br>**Croton On Hudson, NY 10520** |

| POLICY NUMBER | | |
|---|---|---|
| **HFN0009557** | | |

| CARRIER | NAIC CODE | |
|---|---|---|
| **Cincinnati Insurance Company** | **10677** | EFFECTIVE DATE: **09/30/2019** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:   ACORD 28   FORM TITLE: EVIDENCE OF COMMERCIAL PROPERTY INSURANCE

**Remarks:**
**NAMED INSURED SCHEDULE**
**HBL SNF, LLC DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS**
**EPIC HEALTH CARE MANAGEMENT, LLC**
**WHITE PLAINS HEALTHCARE PROPERTIES I, LLC**

## SCHEDULE 5.17A

### Corporate Names

HBL SNF, LLC
Epic Rehabilitation and Nursing at White Plains

SCHEDULE 5.17B

Business and Collateral Locations

116-120 Church Street, White Plains, New York 10601
1278 Albany Post Road, Croton on the Hudson, New York 10520

SCHEDULE 5.20

Exceptions to Healthcare Law Compliance Representations

None. 160-Bed Skilled Nursing Facility.

SCHEDULE 5.23

Material Contracts

Amended and Restated Operating Lease by and between White Plains Healthcare Properties I, LLC, as Landlord, and HBL SNF, LLC, as Tenant, dated as of November 19, 2015, for the premises located at:

116-120 Church Street, White Plains, New York 10601

SCHEDULE 5.24

Third-Party Payor Billing Numbers

[To be added post-closing]

SCHEDULE 7.3

Liens

Liens on Borrower's personal property, including, without limitation, accounts receivable, in favor of Security Benefit Corporation, a Kansas corporation.

Liens on Borrower's personal property, including, without limitation, accounts receivable, in favor of White Plains Healthcare Properties I, LLC, a Massachusetts limited liability company.

Liens on equipment in favor of Ascentium Capital LLC