NYSCEF - New York State Courts Electronic Filing (Live System)

<< Return to **Search Results**

**60278/2020 -** Westchester County Supreme Court

Short Caption: **White Plains Healthcare Properties I, LLC v. HBL SNF, LLC et al**
Case Type: **Commercial Division**
Case Status: **Active**
eFiling Status: **Full Participation Recorded**
Assigned Judge: **Gretchen Walsh**

E-mail Participating Parties

## Narrow By Options

| | | |
|---|---|---|
| Document Type: | Please select... ⌄ | Filed By: |
| | Please select... ⌄ | |
| Motion Info: | Please select... ⌄ | Filed Date: |
| | [ ] 🗓 thru [ ] 🗓 | |
| Document Number: | [ ] | |

**Display Document List with Motion Folders** 📁

**Sort By:** Doc # ⌄

| # | Document | Filed By | Status |
|---|---|---|---|
| 1 | SUMMONS + COMPLAINT | Donnellan, A. Filed: 09/18/2020 *Received: 09/18/2020* | **Processed** Confirmation Notice |
| 2 | EXHIBIT(S) - 1 *Operating Lease* **Redacted** *per 22 NYCRR §202.5(e)* | Donnellan, A. Filed: 09/18/2020 *Received: 09/18/2020* | **Processed** Confirmation Notice |
| 3 | EXHIBIT(S) - 2 *Guaranty of Lease* **Redacted** *per 22 NYCRR §202.5(e)* | Donnellan, A. Filed: 09/18/2020 *Received: 09/18/2020* | **Processed** Confirmation Notice |
| 4 | EXHIBIT(S) - 3 *Guaranty of Lease* **Redacted** *per 22 NYCRR §202.5(e)* | Donnellan, A. Filed: 09/18/2020 *Received: 09/18/2020* | **Processed** Confirmation Notice |
| 5 | EXHIBIT(S) - 4 *Letter of Intent* **Redacted** *per 22 NYCRR §202.5(e)* | Donnellan, A. Filed: 09/18/2020 *Received: 09/18/2020* | **Processed** Confirmation Notice |
| 6 | EXHIBIT(S) - 5 *Notice of Default* | Donnellan, A. Filed: 09/18/2020 *Received: 09/18/2020* | **Processed** Confirmation Notice |
| 7 | AFFIRMATION/AFFIDAVIT OF SERVICE *affidavit of service upon defendant, HBL SNF, Inc.* | Coleman, W. Filed: 09/28/2020 | **Processed** Confirmation Notice |

| | | | |
|---|---|---|---|
| | *affidavit of service upon defendant, RBL SNF, Inc.* | Filed: 09/28/2020<br>*Received: 09/28/2020* | |
| 8 | AFFIRMATION/AFFIDAVIT OF SERVICE<br>*affidavits of service of summons and complaint - all defendants* | Coleman, W.<br>Filed: 10/07/2020<br>*Received: 10/07/2020* | **Processed**<br>Confirmation Notice |
| 9 | NOTICE OF MOTION  (Motion #1) | Donnellan, A.<br>Filed: 10/28/2020<br>*Received: 10/28/2020* | **Processed**<br>Confirmation Notice<br>Payment Receipt |
| 10 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF MOTION  (Motion #1)<br>*Affirmation of Default of Alfred E. Donnellan* | Donnellan, A.<br>Filed: 10/28/2020<br>*Received: 10/28/2020* | **Processed**<br>Confirmation Notice |
| 11 | EXHIBIT(S)  - 1  (Motion #1)<br>*Complaint*<br>**Redacted**  *per 22 NYCRR §202.5(e)* | Donnellan, A.<br>Filed: 10/28/2020<br>*Received: 10/28/2020* | **Processed**<br>Confirmation Notice |
| 12 | EXHIBIT(S)  - 2  (Motion #1)<br>*Affidvt of Service* | Donnellan, A.<br>Filed: 10/28/2020<br>*Received: 10/28/2020* | **Processed**<br>Confirmation Notice |
| 13 | EXHIBIT(S)  - 3  (Motion #1)<br>*Confirmation Notices* | Donnellan, A.<br>Filed: 10/28/2020<br>*Received: 10/28/2020* | **Processed**<br>Confirmation Notice |
| 14 | EXHIBIT(S)  - 4  (Motion #1)<br>*Additional Notice* | Donnellan, A.<br>Filed: 10/28/2020<br>*Received: 10/28/2020* | **Processed**<br>Confirmation Notice |
| 15 | ORDER ( PROPOSED )  (Motion #1) | Donnellan, A.<br>Filed: 10/28/2020<br>*Received: 10/28/2020* | **Processed**<br>Confirmation Notice |
| 16 | BILL OF COSTS  (Motion #1) | Donnellan, A.<br>Filed: 10/28/2020<br>*Received: 10/28/2020* | **Processed**<br>Confirmation Notice |
| 17 | AFFIRMATION/AFFIDAVIT OF SERVICE  (Motion #1) | Donnellan, A.<br>Filed: 10/28/2020<br>*Received: 10/28/2020* | **Processed**<br>Confirmation Notice |
| 18 | RJI -RE: NOTICE OF MOTION  (Motion #1) | Donnellan, A.<br>Filed: 10/28/2020<br>*Received: 10/28/2020* | **Processed**<br>Confirmation Notice<br>Payment Receipt |
| 19 | ADDENDUM - COMMERCIAL DIVISION (840C)<br>(Motion #1) | Donnellan, A.<br>Filed: 10/28/2020<br>*Received: 10/28/2020* | **Processed**<br>Confirmation Notice |
| 20 | COURT NOTICE | Court User<br>Filed: 10/29/2020<br>*Received: 10/29/2020* | **Processed**<br>Confirmation Notice |
| 21 | ANSWER WITH COUNTER-CLAIM(S) | Giardino, J.<br>Filed: 11/05/2020<br>*Received: 11/05/2020* | **Processed**<br>Confirmation Notice |
| 22 | NOTICE OF CROSS-MOTION  (Motion #2) | Giardino, J.<br>Filed: 11/05/2020 | **Processed**<br>Confirmation Notice |

|    |                                                                                 |                                                        |                                    |
|----|---------------------------------------------------------------------------------|--------------------------------------------------------|------------------------------------|
|    |                                                                                 | Filed: 11/05/2020<br>*Received: 11/05/2020*            | Payment Receipt                    |
| 23 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO MOTION AND IN SUPPORT OF CROSS-MOTION<br>(Motion #2) | Giardino, J.<br>Filed: 11/05/2020<br>*Received: 11/05/2020* | **Processed**<br>Confirmation Notice |
| 24 | EXHIBIT(S) - A  (Motion #2)<br>*Email Correspondence*                            | Giardino, J.<br>Filed: 11/05/2020<br>*Received: 11/05/2020* | **Processed**<br>Confirmation Notice |
| 25 | EXHIBIT(S) - B  (Motion #2)<br>*Proof of November Rent Payment*                  | Giardino, J.<br>Filed: 11/05/2020<br>*Received: 11/05/2020* | **Processed**<br>Confirmation Notice |
| 26 | EXHIBIT(S) - C  (Motion #2)<br>*Filed Answer*                                    | Giardino, J.<br>Filed: 11/05/2020<br>*Received: 11/05/2020* | **Processed**<br>Confirmation Notice |
| 27 | MEMORANDUM IN OPPOSITION TO MOTION AND IN SUPPORT OF CROSS-MOTION  (Motion #2)   | Giardino, J.<br>Filed: 11/05/2020<br>*Received: 11/05/2020* | **Processed**<br>Confirmation Notice |
| 28 | ORDER ( PROPOSED )  (Motion #2)                                                  | Giardino, J.<br>Filed: 11/05/2020<br>*Received: 11/05/2020* | **Processed**<br>Confirmation Notice |
| 29 | STIPULATION - WITHDRAWING MOTION/ORDER TO SHOW CAUSE  (Motion #1)                | Donnellan, A.<br>Filed: 11/09/2020<br>*Received: 11/09/2020* | **Processed**<br>Confirmation Notice |
| 30 | DECISION + ORDER ON MOTION  (Motion #1)<br>*Motion withdrawn*                    | Court User<br>Filed: 11/13/2020<br>*Received: 11/10/2020* | **Processed**<br>Confirmation Notice |
| 31 | DECISION + ORDER ON MOTION  (Motion #2)<br>*Motion withdrawn*                    | Court User<br>Filed: 11/13/2020<br>*Received: 11/10/2020* | **Processed**<br>Confirmation Notice |
| 32 | JOINT ONE PAGE STATEMENT OF FACTS & PARTIES CONTENTIONS                          | Donnellan, A.<br>Filed: 11/12/2020<br>*Received: 11/12/2020* | **Processed**<br>Confirmation Notice |
| 33 | EXHIBIT(S) - 1<br>*Copy of Pleadings*<br>**Redacted** *per 22 NYCRR §202.5(e)*  | Donnellan, A.<br>Filed: 11/12/2020<br>*Received: 11/12/2020* | **Processed**<br>Confirmation Notice |
| 34 | PRELIMINARY CONFERENCE ORDER (PROPOSED)                                          | Donnellan, A.<br>Filed: 11/12/2020<br>*Received: 11/12/2020* | *** Pending ***<br>Confirmation Notice |
| 35 | EXHIBIT(S) - 1<br>*ADR Attorney Certification for Alfred Donnellan*             | Donnellan, A.<br>Filed: 11/12/2020<br>*Received: 11/12/2020* | **Processed**<br>Confirmation Notice |
| 36 | ORDER - PRELIMINARY CONFERENCE                                                   | Court User<br>Filed: 11/13/2020<br>*Received: 11/13/2020* | **Processed**<br>Confirmation Notice |
| 37 | COMPLAINT (AMENDED)                                                              | Donnellan, A.                                          | **Processed**                      |

|    | *Amended Verified Complaint* | Filed: 11/30/2020<br>*Received: 11/30/2020* | Confirmation Notice |
|----|------------------------------|---------------------------------------------|---------------------|
| 38 | EXHIBIT(S)  - 1<br>*Amended and Restated Operating Lease*<br>**Redacted** *per 22 NYCRR §202.5(e)* | Donnellan, A.<br>Filed: 11/30/2020<br>*Received: 11/30/2020* | **Processed**<br>Confirmation Notice |
| 39 | EXHIBIT(S)  - 2<br>*Jozefovic Guaranty of Lease*<br>**Redacted** *per 22 NYCRR §202.5(e)* | Donnellan, A.<br>Filed: 11/30/2020<br>*Received: 11/30/2020* | **Processed**<br>Confirmation Notice |
| 40 | EXHIBIT(S)  - 3<br>*Neuman Guaranty of Lease*<br>**Redacted** *per 22 NYCRR §202.5(e)* | Donnellan, A.<br>Filed: 11/30/2020<br>*Received: 11/30/2020* | **Processed**<br>Confirmation Notice |
| 41 | EXHIBIT(S)  - 4<br>*Jozefovic Security Agreement*<br>**Redacted** *per 22 NYCRR §202.5(e)* | Donnellan, A.<br>Filed: 11/30/2020<br>*Received: 11/30/2020* | **Processed**<br>Confirmation Notice |
| 42 | EXHIBIT(S)  - 5<br>*Letter of Intent*<br>**Redacted** *per 22 NYCRR §202.5(e)* | Donnellan, A.<br>Filed: 11/30/2020<br>*Received: 11/30/2020* | **Processed**<br>Confirmation Notice |
| 43 | EXHIBIT(S)  - 6<br>*Notice of Deafult*<br>**Redacted** *per 22 NYCRR §202.5(e)* | Donnellan, A.<br>Filed: 11/30/2020<br>*Received: 11/30/2020* | **Processed**<br>Confirmation Notice |
| 44 | LETTER / CORRESPONDENCE TO JUDGE<br>*Letter to Judge Walsh requesting pre motion conference* | Donnellan, A.<br>Filed: 12/04/2020<br>*Received: 12/04/2020* | **Processed**<br>Confirmation Notice |
| 45 | EXHIBIT(S)  - 1<br>*Amended complaint* | Donnellan, A.<br>Filed: 12/04/2020<br>*Received: 12/04/2020* | **Processed**<br>Confirmation Notice |
| 46 | EXHIBIT(S)  - 2<br>*December 2, 2020 letter* | Donnellan, A.<br>Filed: 12/04/2020<br>*Received: 12/04/2020* | **Processed**<br>Confirmation Notice |
| 47 | EXHIBIT(S)  - 3<br>*Compared version of amended complaint* | Donnellan, A.<br>Filed: 12/04/2020<br>*Received: 12/04/2020* | **Processed**<br>Confirmation Notice |
| 48 | ANSWER TO THIRD PARTY COMPLAINT<br>*Verified Answer to Third Party Complaint* | Donnellan, A.<br>Filed: 12/11/2020<br>*Received: 12/11/2020* | **Processed**<br>Confirmation Notice |
| 49 | REPLY TO COUNTERCLAIM(S)<br>*Verified Reply to Counterclaims* | Donnellan, A.<br>Filed: 12/11/2020<br>*Received: 12/11/2020* | **Processed**<br>Confirmation Notice |
| 50 | LETTER / CORRESPONDENCE TO JUDGE | Donnellan, A.<br>Filed: 01/11/2021<br>*Received: 01/11/2021* | **Processed**<br>Confirmation Notice |
| 51 | NOTICE OF MOTION  (Motion #3)<br>*to file Amended Complaint* | Donnellan, A.<br>Filed: 01/26/2021<br>*Received: 01/26/2021* | **Processed**<br>Confirmation Notice<br>Payment Receipt |
| 52 | AFFIDAVIT OR AFFIRMATION IN SUPPORT OF | Donnellan, A. | **Processed** |

MOTION  (Motion #3)
*Affirmation of Alfred E. Donnellan in Support of Motion to file Amended Complaint*
Filed: 01/26/2021
Received: 01/26/2021
Confirmation Notice

53  EXHIBIT(S)  - A  (Motion #3)
*Complaint with exhibits*
**Redacted**  *per 22 NYCRR §202.5(e)*
Donnellan, A.
Filed: 01/26/2021
Received: 01/26/2021
**Processed**
Confirmation Notice

54  EXHIBIT(S)  - B  (Motion #3)
*Verified Answer*
Donnellan, A.
Filed: 01/26/2021
Received: 01/26/2021
**Processed**
Confirmation Notice

55  EXHIBIT(S)  - C  (Motion #3)
*Amended Compliant with exhibits*
**Redacted**  *per 22 NYCRR §202.5(e)*
Donnellan, A.
Filed: 01/26/2021
Received: 01/26/2021
**Processed**
Confirmation Notice

56  EXHIBIT(S)  - D  (Motion #3)
*Redline version of Amended Complaint*
Donnellan, A.
Filed: 01/26/2021
Received: 01/26/2021
**Processed**
Confirmation Notice

57  EXHIBIT(S)  - E  (Motion #3)
*December 2, 2020 letter*
Donnellan, A.
Filed: 01/26/2021
Received: 01/26/2021
**Processed**
Confirmation Notice

58  EXHIBIT(S)  - F  (Motion #3)
*Security Agreement*
**Redacted**  *per 22 NYCRR §202.5(e)*
Donnellan, A.
Filed: 01/26/2021
Received: 01/26/2021
**Processed**
Confirmation Notice

59  EXHIBIT(S)  - G  (Motion #3)
*Lease*
**Redacted**  *per 22 NYCRR §202.5(e)*
Donnellan, A.
Filed: 01/26/2021
Received: 01/26/2021
**Processed**
Confirmation Notice

60  EXHIBIT(S)  - H  (Motion #3)
*NY County Action Answer*
Donnellan, A.
Filed: 01/26/2021
Received: 01/26/2021
**Processed**
Confirmation Notice

61  MEMORANDUM OF LAW IN SUPPORT  (Motion #3)
Donnellan, A.
Filed: 01/26/2021
Received: 01/26/2021
**Processed**
Confirmation Notice

62  NOTICE OF MOTION  (Motion #4) *Corrected*
Donnellan, A.
Filed: 02/03/2021
Received: 02/04/2021
**Processed**
Confirmation Notice
Payment Receipt

63  AFFIDAVIT OR AFFIRMATION IN SUPPORT OF MOTION  (Motion #4)
*Affirmation of Alfred E. Donnellan*
Donnellan, A.
Filed: 02/03/2021
Received: 02/03/2021
**Processed**
Confirmation Notice

64  EXHIBIT(S)  - A  (Motion #4)
*Complaint*
**Redacted**  *per 22 NYCRR §202.5(e)*
Donnellan, A.
Filed: 02/03/2021
Received: 02/03/2021
**Processed**
Confirmation Notice

65  EXHIBIT(S)  - B  (Motion #4)
*Answer*
Donnellan, A.
Filed: 02/03/2021
Received: 02/03/2021
**Processed**
Confirmation Notice

66  EXHIBIT(S)  - C  (Motion #4)
*Development Agreement*
Donnellan, A.
Filed: 02/03/2021
Received: 02/03/2021
**Processed**
Confirmation Notice

#    Document                          Filed By                Status

| 67 | EXHIBIT(S) - D (Motion #4)<br>*Lease*<br>**Redacted** *per 22 NYCRR §202.5(e)* | Donnellan, A.<br>Filed: 02/03/2021<br>*Received: 02/03/2021* | **Processed**<br>Confirmation Notice |
| 68 | EXHIBIT(S) - E (Motion #4)<br>*Temporary Certificate of Occupancy* | Donnellan, A.<br>Filed: 02/03/2021<br>*Received: 02/03/2021* | **Processed**<br>Confirmation Notice |
| 69 | EXHIBIT(S) - F (Motion #4)<br>*AJA Form 0704* | Donnellan, A.<br>Filed: 02/03/2021<br>*Received: 02/03/2021* | **Processed**<br>Confirmation Notice |
| 70 | EXHIBIT(S) - G (Motion #4)<br>*NYSDOH Communication* | Donnellan, A.<br>Filed: 02/03/2021<br>*Received: 02/03/2021* | **Processed**<br>Confirmation Notice |
| 71 | MEMORANDUM OF LAW IN SUPPORT (Motion #4) | Donnellan, A.<br>Filed: 02/03/2021<br>*Received: 02/03/2021* | **Processed**<br>Confirmation Notice |
| 72 | LETTER / CORRESPONDENCE TO JUDGE | Donnellan, A.<br>Filed: 02/04/2021<br>*Received: 02/04/2021* | **Processed**<br>Confirmation Notice |
| 73 | MEMORANDUM OF LAW IN OPPOSITION (Motion #3) | Giardino, J.<br>Filed: 02/05/2021<br>*Received: 02/05/2021* | **Processed**<br>Confirmation Notice |
| 74 | AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO MOTION (Motion #3) | Giardino, J.<br>Filed: 02/05/2021<br>*Received: 02/05/2021* | **Processed**<br>Confirmation Notice |
| 75 | EXHIBIT(S) - A (Motion #3)<br>*Collateral Assignment* | Giardino, J.<br>Filed: 02/05/2021<br>*Received: 02/05/2021* | **Processed**<br>Confirmation Notice |

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 60278/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 7 of 150

RECEIVED NYSCEF: 09/18/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,

Plaintiff,

– against –

HBL SNF, LLC, LIZER JOZEFOVIC A/K/A LIZER
JOZOFOVIC and MARK NEUMAN,

Defendants.

Index No. _____

Date Purchased: _____

**SUMMONS**

**YOU ARE HEREBY SUMMONED** and required to serve upon plaintiff's attorney an answer to the Verified Complaint in this action within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after service if this summons is not personally delivered to you within the State of New York). In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Westchester County is designated as the place of trial. The venue designated is based upon Defendant's residence.

Dated: White Plains, New York
September 16, 2020

DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Lead Counsel for Plaintiff White Plains Healthcare
Properties I, LLC*

By: _____
Alfred E. Donnellan, Esq.
Peter S. Dawson, Esq.
One North Lexington Avenue
White Plains, New York 10601
(914) 681-0200

1

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 1

INDEX NO. 60278/2020

RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 8 of 150

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN,
FORMATO, FERRARA, WOLF & CARONE, LLP
*Co-Counsel for Plaintiff White Plains Healthcare
Properties I, LLC*
Robert A. Spolzino, Esq.
81 Main Street, Suite 306
White Plains, New York 10601
(914) 607-7010

TO:

HBL SNF, LLC
537 Route 22
Purdys, New York 10578

Lizer Jozefovic a/k/a Lizer Jozofovic
53 Mariner Way
Monsey, New York 10952

Mark Neuman
22 Lyncrest Drive
Monsey, New York 10952

2

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 1
INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020
21-22623-shl   Doc 29-2   Filed 11/08/21   Entered 11/08/21 16:50:03   Doc 3 Notice
part 1   Pg 9 of 150

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,

Plaintiff,

– against –

HBL SNF, LLC, LIZER JOZEFOVIC A/K/A LIZER
JOZOFOVIC and MARK NEUMAN,

Defendants.

Index No. _____

**VERIFIED COMPLAINT**

Plaintiff, White Plains Healthcare Properties I, LLC ("WPH Properties"), by its attorneys,

DelBello, Donnellan, Weingarten, Wise & Wiederkehr, LLP and Abrams, Fensterman,

Fensterman, Eisman, Formato, Ferrara, Wolf & Carone, LLP, for its complaint against defendants,

HBL SNF, LLC ("HBL"), Lizer Jozefovic a/k/a Lizer Jozofovic ("Jozefovic") and Mark Neuman

("Neuman"), alleges:

### NATURE OF THE CASE

1.      This action concerns HBL's material default of its obligations under an amended

and restated operating lease dated as of November 19, 2015 (the "Lease"), by which WPH

Properties leased to HBL a brand new, state-of-the-art, 160-bed skilled nursing facility that WPH

Properties constructed at 116-120 Church Street, White Plains, New York.

2.      WPH Properties had constructed the nursing facility and entered into the Lease with

HBL dated November 19, 2015. The Lease was amended and restated in 2017. It provided that

HBL would operate the facility for 30 years, commencing September 30, 2019. HBL took

possession of the facility on September 30, 2019. By the end of October 2019, HBL had defaulted.

1

3.      On January 7, 2020, WPH Properties served notice of default and elected to terminate the Lease and accelerate all rents due. This action seeks to recover from HBL the Rent it owes and the other damages its defaults have caused and to enforce the unconditional guaranties of HBL's performance under the Lease given by Neuman and Jozefovic.

### PARTIES AND VENUE

4.      WPH Properties is a limited liability company duly organized and existing under the laws of the State of Massachusetts, with its principal place of business at 2 Bourbon Street, Suite 200, Peabody, Massachusetts. WPH Properties is duly authorized to do business in the State of New York.

5.      HBL was and is a limited liability company duly organized and existing under the laws of the State of New York with an address and place of business at 537 Route 22, Purdys, New York.

6.      Jozefovic is an individual residing at 53 Mariner Way, Monsey, New York, with a business address and place of business at HBL, 537 Route 22, Purdys, New York.

7.      Neuman is an individual residing at 22 Lyncrest Drive, Monsey, New York, with a business address and place of business at HBL, 537 Route 22, Purdys, New York.

8.      Pursuant to CPLR § 503(a), venue is properly designated in Westchester County based on the residences of WPH Properties and HBL, because a substantial part of the events giving rise to the claim occurred in Westchester County and because HBL agreed in the Lease that any action or proceeding arising out of the Lease be brought in Westchester County. Lease § 20.1(b).

2

## FACTS

9.       WPH Properties is and was at all relevant times the owner of the real property known as 116-120 Church Street, White Plains, New York (the "Real Property").

10.      WPH Properties constructed a brand new, state-of-the-art, 160-bed skilled nursing facility on the Real Property.

### The Lease

11.      In 2017, WPH Properties, as landlord, and HBL, as tenant, entered into the amended and restated Lease, dated as of November 19, 2015, under which WPH Properties leased to HBL the Real Property and the improvements to be constructed on the Real Property, together with other assets, all as defined in Section 2.1 of the Lease (the "Facility"). A true and accurate copy of the Lease is annexed to this complaint as Exhibit 1 and is incorporated into this complaint by reference.

12.      WPH Properties obtained a certificate of occupancy for the Facility on August 22, 2019.

13.      HBL entered into possession of the Facility on September 30, 2019.

14.      The lease provided for a term of 30 years, with three 10 year options to the tenant, unless sooner terminated. Exhibit 1, Lease, § 3.1.

15.      The Lease obligated HBL to pay WPH Properties annual fixed rent of $6,073,158 in monthly installments of $506,096.50 (the "Fixed Rent"). Exhibit 1, Lease, § 3.2.

16.      The Lease also obligated HBL to pay WPH Properties other amounts which are defined as "Additional Rent." Fixed Rent and Additional Rent are referred to collectively as "Rent."

3

17.     The Lease obligated HBL to pay all charges for electricity, steam, telephone, cable, gas, oil, water, sewer and all other services or utilities used on or related to the Premises during the Term. Exhibit 1, Lease, § 4.1.

18.     The Lease obligated HBL to pay, before penalties are incurred, all real estate taxes, assessments, utility charges and other taxes. Exhibit 1, Lease, § 4.2.

19.     The Lease obligated HBL to keep the Premises in good condition and repair including, at HBL's sole cost and expense, payment of all utility service and maintenance deposits and expenses relating to the Premises. Exhibit 1, Lease, § 5.2.

20.     The Lease obligated HBL to deliver a guarantee of all obligations owed by HBL under the Lease from Jozefovic (the "Jozefovic Guaranty") and from Neuman (the "Neuman Guaranty"). Exhibit 1, Lease, § 7.1.

21.     A true and accurate copy of the Jozefovic Guaranty is annexed to this complaint as Exhibit 2.

22.     A true and accurate copy of the Neuman Guaranty is annexed to this complaint as Exhibit 3.

23.     Pursuant to the Jozefovic Guaranty, Jozefovic absolutely, unconditionally and irrevocably guaranteed the full and prompt payment of all rent, sums and charges of every type and nature payable by HBL under the Lease, whether due by acceleration or otherwise, and the full, timely and complete performance of all obligations to be performed by HBL under the Lease, including obligations that survive termination of the Lease.

24.     The Jozefovic Guaranty is an absolute and unconditional guaranty of payment and of performance and is enforceable against Jozefovic without the necessity of any notice of

4

nonpayment, nonperformance or nonobservance, or any notice or demand, all of which Jozefovic
expressly waived.

25.    Pursuant to the Neuman Guaranty, Neuman absolutely, unconditionally and
irrevocably guaranteed the full and prompt payment of all rent, sums and charges of every type
and nature payable by HBL under the Lease, whether due by acceleration or otherwise, and the
full, timely and complete performance of all obligations to be performed by HBL under the Lease,
including obligations that survive termination of the Lease.

26.    The Neuman Guaranty is an absolute and unconditional guaranty of payment and
of performance and is enforceable against Neuman without the necessity of any notice of
nonpayment, nonperformance or nonobservance, or any notice or demand, all of which Neuman
expressly waived.

27.    The Lease obligated HBL to deliver to WPH Properties, before the commencement
date of the Lease, an agreement by Capital Funding Group by which Capital Funding Group agreed
to allow HBL to draw down on its credit line each month so as to enable Capital Funding Group
to pay the Fixed Rent each month directly to WPH Properties on the commencement date and for
the following 11 months. Exhibit 1, Lease, § 7.1.

28.    The Lease obligated HBL to deliver to WPH Properties, before the commencement
date of the Lease, an unconditional letter of credit or cash in the amount of $3,700,000 to secure
the full and timely performance of its obligations under the Lease. Exhibit 1, Lease, § 7.1.

29.    The Lease obligated HBL to deliver to WPH Properties, before the commencement
date of the Lease, $1,600,000 as an additional security deposit. Exhibit 1, Lease, § 7.1.

30.    The Lease obligated HBL to provide WPH Properties all reports, statements and

5

inspections as defined in the Lease, including all Medicare, Medicaid and other provider agreements and reimbursement rates for the Facility, updated reimbursement rates, financial reporting and written reports providing an operational overview of significant events and circumstances on a monthly basis. Exhibit 1, Lease, § 7.4.

31.    The Lease obligated HBL to maintain working capital accounts in specified amounts. Exhibit 1, Lease, § 7.7.

32.    The Lease provides that HBL will be in default of the Lease if, among other things, (i) HBL fails to pay any installment of Rent within five days of the date when Rent was due; (ii) HBL defaults in the prompt and full performance of any other of its obligations and fails to correct that failure within 30 days of receipt of written notice from WPH Properties of the default; (iii) HBL fails to give WPH Properties timely notice or timely deliver copies of documents as required by section 7.4 of the Lease; (iv) HBL defaults or breaches the provisions of section 7.4(b); (v) a Guarantor defaults beyond expiration of any applicable cure period; or (vi) any governmental authority assesses a fine or penalty against HBL in an amount in excess of $75,000. Exhibit 1, Lease, § 16.1.

33.    WPH Properties performed all of the conditions on its part required by the Lease.

34.    The Lease provides in section 16.1 that upon the occurrence of a default by HBL, WPH Properties may, upon five days written notice, terminate the Lease, accelerate the payment of all Rent for the balance of the Term and declare the Rent presently due and payable in full, requiring HBL to pay to WPH Properties the present value of the accelerated Rent.

35.    Section 16.1 of the Lease also provides that upon the occurrence of a default, and in addition to all of the other remedies provided for in the Lease, WPH Properties is immediately

6

entitled to retain the security deposit required by section 7.1 of the Lease and HBL has no further

claim, right, title or interest therein to the extent of WPH Properties' claims.

36.    Section 16.1 of the Lease also provides that upon the occurrence of a default and

the commencement of an action for Rent or for any other amount due under the Lease, HBL must

pay to WPH Properties all of the expenses, including reasonable attorneys' fees, incurred by WPH

Properties to enforce the Lease.

37.    In addition, under the terms of the Lease, HBL's continuation in occupancy after

termination does not constitute a renewal of the Lease, but HBL becomes a tenant month-to-month

for a rental of 300% of the most recent Rent payable by HBL under the Lease. Exhibit 1, Lease, §

201.13.

### HBL breached its obligations under the Lease

38.    HBL failed to perform its obligations, materially defaulting under the Lease, almost

immediately after taking possession of the Premises.

39.    HBL failed to pay Rent as required by the Lease.

40.    HBL failed to pay real estate taxes as required by the Lease.

41.    HBL failed to pay utility deposits as required by the Lease.

42.    HBL failed to pay municipal maintenance escrows as required by the Lease.

43.    HBL failed to pay utility charges as required by the Lease.

44.    HBL failed or refused to deliver certificates of insurance as required by the Lease.

45.    HBL failed to deliver to WPH Properties all Medicare, Medicaid and other provider

agreements and reimbursement rate sheets for the Facility, as required by the Lease.

46.    HBL failed to deliver to WPH Properties all Medicare, Medicaid and other provider

7

updated rate sheets, as required by the Lease.

47.     HBL failed to deliver to WPH Properties the required financial reporting, as required by the Lease.

48.     HBL failed to deliver to WPH Properties the required written reporting providing an operational overview of significant events and circumstances at the Facility during each prior month of the term of the Lease, as required by the Lease.

49.     HBL failed or refused to deliver to WPH Properties the security deposits, as required by the Lease.

50.     HBL failed to deliver and maintain the required credit line in an amount equal to 12 months rent, as required by the Lease.

51.     HBL failed to have and maintain the working capital account required by the Lease.

52.     HBL failed to pay late fees and costs, as required by the Lease.

### The Letter of Intent

53.     After HBL defaulted, WPH Properties negotiated in good faith with HBL in an attempt to avoid termination of the Lease, despite HBL's default.

54.     On November 20, 2019, WPH Properties and HBL entered into a Letter of Intent (the "LOI") in which WPH Properties and HBL agreed that WPH Properties would sell the Facility for $73,000,000 to a Delaware Statutory Trust in which Jozefovic and Neuman would have a 77.5 percent interest and WPH Properties or its designees would have a 22.5 percent interest.

55.     A true and accurate copy of the LOI is annexed to this complaint as exhibit 4.

56.     The LOI provides for the Lease to be amended to require that HBL pay the November 2019 rent by November 18, 2019, the December rent by December 5, 2019 and all real

8

estate taxes and utility payments by December 1, 2019, that by December 5, 2019 HBL reimburse

WPH Properties for $65,856 in municipal and utility deposits, that HBL enter into a Deposit

Account Control Agreement with MNB requiring MNB to draw on the account first to pay the

rent.

57.    The LOI further provides for the Lease to be amended so that the $3,700,000

security deposit required by section 7.1(a)(ii) is reduced to $2,000,000, $1,000,000 of which was

required to be paid by HBL on or before December 1, 2019 or the date on which WPH Properties

obtained a certificate of occupancy for the Facility, whichever was later, and the balance of which

was required to be paid upon the closing of title on April 1, 2020.

58.    In addition, the LOI provides for the Lease to be amended so that in lieu of

providing the additional $1,600,000 in security required by section 7.1(a)(iii) of the Lease, HBL

would be required to enter into an agreement with JP Morgan Chase Bank prohibiting liquidation

of that account until the second $1,000,000 in security required by the LOI had been paid.

59.    The LOI also provides for the Lease to be amended to require HBL to obtain a

single working capital line of credit in the amount of $8,000,000 by December 1, 2019.

60.    HBL defaulted and breached its obligations under the LOI by failing to pay rent,

failing to pay the municipal and utility payments to WPH Properties, failing to pay the real estate

taxes and utility payments, failing to enter into the Deposit Account Control Agreement, failing to

enter into the agreement with JP Morgan Chase Bank, by failing to pay the first $1,000,000 security

deposit as required by the LOI and by failing to obtain the $8,000,000 working capital credit line.

61.    WPH Properties performed all conditions on its part required by the LOI.

62.    Solely as a result of HBL's breach of the LOI, WPH Properties did not sell the

9

property to the Delaware Statutory Trust, causing damage to WPH Properties, and WPH Properties

incurred interest and late charges on its loans, all of which are the direct result of HBL's breach of

the LOI.

### Notice of default, termination of the Lease and acceleration of Rent

63.    On January 7, 2020, while the LOI was in effect, WPH Properties served a "Notice

of Default And Landlord's Election To Terminate Lease And Accelerate All Rents Due For The

Balance of the Lease Term" upon HBL (the "Notice of Default").

64.    A true and accurate copy of the Notice of Default is annexed to this complaint as

Exhibit 5 and incorporated into this complaint by reference.

65.    The Notice of Default contains a true and accurate accounting of the amounts then

due and owing under the Lease and LOI.

66.    The Notice of Default gave HBL notice that by reason of HBL's defaults under the

Lease, WPH Properties had exercised its right under section 16.1 of the Lease to terminate the

Lease, effective January 13, 2020.

67.    The Notice of Default further gave HBL notice that pursuant to section 16.1 of the

Lease all Rent for the balance of the Term was accelerated and HBL became obligated to pay WPH

Properties the present value of the accelerated rent, discounted at a rate of 6% per annum.

68.    HBL continued, and still continues, to occupy the Premises, despite WPH

Properties' termination of the Lease.

69.    Because HBL has held over after its default resulted in termination of the Lease,

HBL is a tenant month-to-month at a rent equal to 300% of the most recent Rent payable by HBL

under the Lease. Exhibit 1, Lease, § 20.13.

10

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM INDEX NO. 60278/2020
NYSCEF DOC. NO. 1    21-22623-shl   Doc 29-2   Filed 11/08/21   Entered 11/08/21 16:50:03 RECEIVED NYSCEF: 09/18/2020   Doc 3 Notice
part 1   Pg 19 of 150

70.    HBL has failed to perform its obligations as a tenant month-to-month by failing to pay rent in the amount of 300% of the most recent Rent payable by HBL under the Lease, remitting only the base rent which had been payable before WPH Properties terminated the Lease.

71.    HBL is in default with respect to its obligations under the Lease and its obligations as a month-to-month tenant following termination of the Lease effective January 13, 2020.

### Amounts Due

72.    As a result of HBL's defaults, HBL is obligated to pay to WPH Properties, as of August 25, 2020, the sum of $113,832,987.54 (the "Amounts Due"), as follows: (i) holdover rent and rent, $7,096,182.79; (ii) municipal and utility deposits, $26,725.35; (iii) security and working capital deposits, $9,800,000.00; (iv) late fees, default fees, costs and professional fees, $1,948,753.00; and (v) accelerated rent, $94,961,326.40.

73.    HBL is obligated to pay to WPH Properties the Amounts Due in full, plus any amounts that have accrued since August 25, 2020.

74.    HBL has failed or refused to pay the Amounts Due.

75.    WPH Properties has fully performed all obligations required to be performed on its part with respect to the Lease, the LOI, HBL's month-to-month tenancy after the termination of the Lease, the Jozefovic Guaranty, the Neuman Guaranty, the HBL Security Agreement, the Jozefovic HBL Security Agreement and the Neuman HBL Security Agreement.

### FIRST CAUSE OF ACTION AGAINST HBL
### (BREACH OF CONTRACT)

76.    WPH Properties repeats and re-alleges each and every allegation set forth in paragraphs "1" through "75" with the same force and effect as if fully set forth here.

77.    By reason of HBL's material default and breach of its obligations pursuant to the

11

Lease and its obligations as a month-to month tenant after termination of the lease, WPH Properties is entitled to judgment against HBL for the Amounts Due, together with the other and further amounts that may come due between the date of this complaint and the entry of judgment, plus interest from the date of the default as provided by law.

### SECOND CAUSE OF ACTION AGAINST HBL
### (BREACH OF CONTRACT)

78.     WPH Properties repeats and re-alleges each and every allegation set forth in paragraphs "1" through "77" with the same force and effect as if fully set forth here.

79.     By reason of HBL's material default and breach of its obligations pursuant to the LOI, WPH Properties is entitled to judgment against HBL in an amount to be determined at trial.

### THIRD CAUSE OF ACTION AGAINST JOZEFOVIC
### (ENFORCING GUARANTY)

80.     WPH Properties repeats and re-alleges each and every allegation set forth in paragraphs "1" through "79" with the same force and effect as if fully set forth here.

81.     By reason of HBL's default in the performance of its obligations under the Lease, WPH Properties is entitled to judgment against Jozefovic for the Amounts Due pursuant to the terms of the Jozefovic Guaranty.

### FOURTH CAUSE OF ACTION AGAINST NEUMAN
### (ENFORCING GUARANTY)

82.     WPH Properties repeats and re-alleges each and every allegation set forth in paragraphs "1" through "81" with the same force and effect as if fully set forth here.

83.     By reason of HBL's default in the performance of its obligations under the Lease, WPH Properties is entitled to judgment against Neuman for the Amounts Due pursuant to the terms of the Neuman Guaranty.

12

**WHEREFORE**, WPH Properties demands judgment as follows:

1.     On its first cause of action, against HBL in the amount of $113,832,987.54, together with the other and further amounts that may come due between the date of this complaint and the entry of judgment, plus interest from the date of the default as provided by law; and

2.     On its Second Cause of Action, against HBL, in an amount to be determined at trial; and

3.     On its Third Cause of Action, against Jozefovic in the amount of $113,832,987.54, together with the other and further amounts that have come due since August 25, 2020 and may come due between the date of this complaint and the entry of judgment, plus interest from the date of the default as provided by law; and

4.     On its Fourth Cause of Action, against Neuman in the amount of $113,832,987.54, together with the other and further amounts that have come due since August 25, 2020 and may come due between the date of this complaint and the entry of judgment, plus interest from the date of the default as provided by law; and

5.     On all causes of action, awarding costs, disbursements and attorneys' fees against HBL pursuant to the provisions of the Lease and against Jozefovic and Neuman pursuant to the provisions of the Jozefovic Guaranty and the Neuman Guaranty; and

6.     Awarding such other and further relief as the Court may deem just and proper.

13

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 1
INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020
21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 22 of 150

Dated: White Plains, New York
       September 16, 2020

DELBELLO DONNELLAN WEINGARTEN WISE & WIEDERKEHR, LLP
*Lead Counsel for Plaintiff White Plains Healthcare Properties I, LLC*

By: _____
       Alfred E. Donnellan, Esq.
       Peter S. Dawson, Esq.
       One North Lexington Avenue
       White Plains, New York 10601
       (914) 681-0200

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO,
FERRARA, WOLF & CARONE, LLP
*Co-Counsel for Plaintiff White Plains Healthcare Properties I, LLC*
Robert A. Spolzino, Esq.
81 Main Street, Suite 306
White Plains, New York 10601
(914) 607-7010

14

## VERIFICATION

STATE OF MASSACHUSETTS )
                                ) ss:
COUNTY OF ESSEX          )

William A. Nicholson, being duly sworn, deposes and says:

I am the Manager of plaintiff, White Plains Healthcare Properties I, LLC. I have read the annexed Verified Complaint, know the contents thereof and the same are true to my own knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.

William A. Nicholson

Sworn to before me this
16th day of September 2020

Notary Public

EXP: 11·26·2021

15

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM        INDEX NO. 60278/2020

NYSCEF DOC. NO. 2        21-22623-shl   Doc 29-2   Filed 11/08/21   Entered 11/08/21 16:50:03   Doc 3 Notice   RECEIVED NYSCEF: 09/18/2020
                                                part 1    Pg 24 of 150

# Exhibit 1 to

# Verified Complaint

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM INDEX NO. 60278/2020

NYSCEF DOC. NO. 2    21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice    RECEIVED NYSCEF: 09/18/2020

part 1    Pg 25 of 150

AMENDED AND RESTATED OPERATING LEASE

By and Between

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company
("Landlord")

and

HBL SNF, LLC,
a New York limited liability company ("Tenant")

Dated as of November 19, 2015

2305449v5/17057-6

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2

INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 26 of 150

TABLE OF CONTENTS

Page

ARTICLE I

INCORPORATION OF RECITALS; PRINCIPLES OF CONSTRUCTION,
DEFINITIONS

Section 1.1    Incorporation of Recitals..................................................................1
Section 1.2    Principles of Construction...............................................................1
Section 1.3    Definitions......................................................................................2

ARTICLE II

LEASED PREMISES

Section 2.1    Leased Premises..............................................................................5

ARTICLE III

TERM AND RENT

Section 3.1    Term of Lease..................................................................................6
Section 3.2    Rent..................................................................................................7
Section 3.3    Net Lease Provisions...................................Error! Bookmark not defined.
Section 3.4    Rent Tax...........................................................................................8
Section 3.5    Assignment of Lease to Mortgagee.................................................9
Section 3.6    True Lease........................................................................................9
Section 3.7    Option to Purchase..........................................................................9

ARTICLE IV

UTILITIES AND TAXES

Section 4.1    Utilities..........................................................................................11
Section 4.2    Taxes.............................................................................................11
Section 4.3    Escrow Deposits............................................................................12

ARTICLE V

LANDLORD'S WORK, MAINTENANCE AND REPAIR; IMPROVEMENTS

Section 5.1    Landlord's Work............................................................................10
Section 5.2    Maintenance and Repair................................................................14

Section 5.3     Improvements, Renovation, Alterations and Additions..........................16
Section 5.4     Signage...........................................................................16
Section 5.5     Surrender.........................................................................17
Section 5.6     Condition of Leased Premises......................................................19

## ARTICLE VI

### INSURANCE

Section 6.1     Insurance.........................................................................20
Section 6.2     Certificates of Insurance.........................................................24
Section 6.3     Waiver of Subrogation.............................................................24

## ARTICLE VII

### SECURITY, ACCESS AND REPORTING OBLIGATIONS

Section 7.1     Security Deposit/Guaranty.........................................................25
Section 7.2     Access to Leased Premises.........................................................27
Section 7.3     Changes in Licensure and Certification Status.....................................28
Section 7.4     Reporting and Other Obligations...................................................28
Section 7.6     Security Agreement................................................................34

## ARTICLE VIII

### PERSONAL PROPERTY

Section 8.1     Landlord's Personal Property......................................................36
Section 8.2     Tenant's Personal Property........................................................37

## ARTICLE IX

### INDEMNIFICATION

Section 9.1     Tenant's Indemnification..........................................................37

## ARTICLE X

### USE OF LEASED PREMISES

Section 10.1    Compliance with Laws and Regulations..............................................38
Section 10.2    No Waste..........................................................................39
Section 10.3    Hazardous Materials and Hazardous Waste...........................................39



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2
21-22623-shl   Doc 29-2   Filed 11/08/21   Entered 11/08/21 16:50:03   Doc 3 Notice
part 1   Pg 28 of 150
INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020

# ARTICLE XI

## DAMAGE OR DESTRUCTION

Section 11.1   Damage or Destruction. ...................................................................41
Section 11.2   Precedence of Rights of Mortgagee. .................................................42

# ARTICLE XII

## EMINENT DOMAIN

Section 12.1   Eminent Domain. ..............................................................................42

# ARTICLE XIII

## NOTICES

Section 13.1   Notices. ............................................................................................43
Section 13.2   Notices to Mortgagee. ......................................................................44

# ARTICLE XIV

## QUIET ENJOYMENT

Section 14.1   Quiet Enjoyment. ..............................................................................45

# ARTICLE XV

## SUBLETTING AND ASSIGNMENT

Section 15.1   Subletting and Assignment ...............................................................45
Section 15.2   Attornment and Related Matters. ......................................................46
Section 15.3   Assignment of Subleases. .................................................................47
Section 15.4   Additional Sublease Requirements. ..................................................48
Section 15.5   Transfers In Bankruptcy. ..................................................................48
Section 15.6   Management Agreement. ...................................................................50
Section 15.7   Memorandum of Lease. .....................................................................50

# ARTICLE XVI

## DEFAULT

Section 16.1   Default by Tenant and Remedies of Landlord. ..................................50
Section 16.2   Facility Operating Deficiencies. .......................................................57

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2

INDEX NO. 60278/2020

RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 29 of 150

## ARTICLE XVII

### ENTRY AND REIMBURSEMENT RIGHTS OF LANDLORD

Section 17.1   Entry and Reimbursement Rights of Landlord. .................................................58

## ARTICLE XVIII

### REPRESENTATIONS AND WARRANTIES

Section 18.1   Tenant's Representations, Warranties and Covenants.............................58
Section 18.2   Representation and Warranties. ................................................................61

## ARTICLE XIX

### OPERATION, MERGER AND CONSOLIDATION RESTRICTIONS

Section 19.2   SPE Provisions.............................................................................62
Section 19.3   Injunctive Relief...........................................................................62
Section 19.4   Equity Interests............................................................................62
Section 19.5   No Merger or Consolidation.................................................................62

## ARTICLE XX

### MISCELLANEOUS

Section 20.1    GOVERNING LAW. .......................................................................63
Section 20.2    Waiver of Breach. .......................................................................64
Section 20.3    Delay Not a Waiver. ....................................................................64
Section 20.4    Force Majeure............................................................................64
Section 20.5    Severability. ...........................................................................64
Section 20.6    Entire Agreement; Amendments.............................................................64
Section 20.7    Counterpart Execution; Facsimile Execution. .............................................65
Section 20.8    Survival of Representations and Warranties...............................................65
Section 20.9    Use of Brokers. .........................................................................65
Section 20.10   Owner for Federal Tax Purposes. .........................................................65
Section 20.11   Estoppel Certificates....................................................................65
Section 20.12   Confidentiality. ........................................................................66
Section 20.13   Holdover. ...............................................................................67
Section 20.14   Tenant's Waiver of Claim for Physical Injury.............................................67
Section 20.15   Binding Effect...........................................................................67
Section 20.16   Default by Landlord......................................................................67
Section 20.17   Liens....................................................................................68
Section 20.18   Publicity................................................................................68
Section 20.19   Trial by Jury............................................................................68
Section 20.20   Construction and Interpretation..........................................................68



Section 20.21   Accord and Satisfaction. ..................................................................68
Section 20.22   Captions and Headings. ...............................................................69
Section 20.23   Time is of the Essence. ................................................................69
Section 20.24   Successors and Assigns...............................................................69
Section 20.25   No Third Party Beneficiaries ........................................................69
Section 20.26   Licenses and Transfer of Operations, ....................Error! Bookmark not defined.
Section 20.27   Subdivision. ................................................................................70
Section 20.28   Landlord Not in Control; No Partnership. ....................................70

## ARTICLE XXI

### REMEDIES CUMULATIVE

Section 21.1   Cumulative Remedies. ...........................................Error! Bookmark not defined.

## ARTICLE XXII

### LIMITATION OF LIABILITY

Section 22.1   Liability...........................................................................................71
Section 22.2   Consequential Damages.................................................................72

## ARTICLE XXIII

### REGULATORY ACTIONS

Section 23.1   Notice of Litigation.........................................................................72

## ARTICLE XXIV

### ANTI-TERRORISM AND ANTI-MONEY LAUNDERING COMPLIANCE

Section 24.1   Compliance with Anti-Terrorism Laws ..........................................73
Section 24.2   Funds Invested in Tenant...............................................................73
Section 24.3   No Violation of Anti-Money Laundering Laws. ..............................73
Section 24.4   Tenant Compliance with Anti-Money Laundering Laws. ...............74



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 2
21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
RECEIVED NYSCEF: 09/18/2020
part 1    Pg 31 of 150

## LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| EXHIBIT "A" | Legal Description |
| EXHIBIT "B" | Guaranty |
| EXHIBIT 7.1(a) | Capital Funding Group Agreement |
| EXHIBIT 7.1(b) | Letter of Credit Agreement |
| EXHIBIT 7.1(c) | Letter to Bank |
| SCHEDULE 3.1 | Definition of Material Default |
| SCHEDULE 4.3(b) | Permitted Investments |
| SCHEDULE 7.4 | EBITDAR |
| SCHEDULE 18.1(d) | Litigation/Adverse Events |
| SCHEDULE 18(k) | Health Care Warranties and Representations |
| SCHEDULE 19.2 | Special Purpose Entity Provisions |

2303449v5/17057-6

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2

INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 32 of 150

## EXHIBIT "A"

### Legal Description

ALL that certain plot, piece or parcel of land, situate, lying and being in the City of White Plains, County of Westchester and State of New York.  Said parcel being more particularly described as follows:

BEGINNING at a point in the easterly line of Church Street where the same is intersected by the southerly line of Barker Avenue;

THENCE from said point North 70 degrees 40 minutes 10 seconds East a distance of 173.57 feet along the southerly line of Barker Avenue to a point where the same is intersected by the division line herein described parcel on the West and lands now or formerly of Koeppel & Mohr Equities on the East;

THENCE from said point and along said division line South 17 degrees 59 minutes 50 seconds East a distance of 200.51 feet to a point in the division line between the herein described parcel on the north and lands now or formerly of Hamilton Plaza Company, Inc. on the south;

THENCE from said point and along said line South 71 degrees 01 minutes 50 seconds West a distance of 173.24 feet to the easterly line of Church Street; and

THENCE from said point and along said line North 18 degrees 05 minutes 04 seconds West a distance of 199.41 feet to the point and place of BEGINNING.

EXHIBIT A

2305449v5/17057-6

EXHIBIT "B"

<u>GUARANTY</u>

See Attached

EXHIBIT B

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 2
21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
RECEIVED NYSCEF: 09/18/2020
part 1    Pg 34 of 150

## SCHEDULE 3.1

### Definition of Material Default

Material Default shall mean the occurrence of any of the following:

      (a)    Any Lease Default except 16.1 (a) (xxv) and (xxxx), provided that the following Lease Defaults shall not be deemed a Material Default unless they occur two or more times within such period: 16.1 (a) (ix), (xvii), (xxx), (xxxxi), and the following Lease Defaults shall not be deemed a Material Default unless they occur three or more times within such period: 16.1 (a) (i), (ii), (xvii).

      (b)    Any Lease Default during such period constitutes an "Event of Default" by Landlord under any Loan Document between Landlord and its Mortgagee(s) evidencing or documenting a loan secured by the Facility;

                           **EXHIBIT 7.1(a)**
                           See Attached

                           **EXHIBIT 7.1(b)**
                           See Attached

                           **EXHIBIT 7.1(c)**
                           See Attached



## SCHEDULE 7.4

| PERIOD | EBITDAR TARGET |
|---|---|
| Quarter 1 (_____, 201__ through _____, 201___) | $_____ |
| Quarter 2 | $_____ |
| Quarter 3 | $_____ |
| Quarter 4 | $_____ |
| Quarter 5 | $_____ |
| Quarter 6 and thereafter | $_____ |

**"EBITDAR"** means with respect to any quarterly period for the Facility an amount determined on a consolidated basis equal to the sum of the following amounts for the Facility for a trailing twelve month period: (a) earnings/(net income or net loss) (including, as an expense an actual or theoretical management expense of five percent (5%) of gross receipts) from operations before (b) interest expense, (c) income tax expense, (d) depreciation expense, (e) amortization expense, and (f) Fixed Rent, defined in accordance with GAAP for such quarterly period. EBITDAR is not considered a measure of financial performance under GAAP. In calculating earnings for the trailing twelve months that encompasses any month prior to the Commencement Date, for the months prior to the Commencement Date, revenue shall be calculated using current rates of reimbursement, meaning reimbursement rates in effect as of the start of the applicable quarterly period.

## OPERATING LEASE

THIS AMENDED AND RESTATED OPERATING LEASE ("Lease") is entered into as of November 19, 2015 (the "Effective Date"), by and between WHITE PLAINS HEALTHCARE PROPERTIES I, LLC a Massachusetts limited liability company with its principal place of business located at 2 Bourbon Street, Suite 200, Peabody, MA 01960 ("WPHCP") or (the "Landlord") and HBL SNF, LLC a New York Limited Liability Company having an office at 537 Route 22, Purdys, New York 10578 (the "Tenant"), and amends and restates in its entirety the lease between the Parties dated as of November 19, 2015.

### RECITALS

A.    WHEREAS, Landlord is the owner of the real property, improvements, and personal property constituting the long-term care facility commonly known as 116-120 Church Street, White Plains, New York and more particularly described on Exhibit A, attached hereto and made a part hereof, (the "Real Property"), and following execution of this Lease, upon which certain buildings and improvements shall be erected (the "Facility"); and

B.    WHEREAS, Landlord desires to lease the entire Leased Premises (defined herein) to Tenant and Tenant desires to lease the Leased Premises from Landlord pursuant to the terms, conditions and covenants set forth herein; and

NOW, THEREFORE, in consideration of the mutual covenants, agreements, promises, representations and warranties set forth herein and for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by the Parties, the Parties hereby agree as follows:

## ARTICLE I

## INCORPORATION OF RECITALS; PRINCIPLES OF CONSTRUCTION, DEFINITIONS

Section 1.1    Incorporation of Recitals. The aforesaid Recitals A through B are hereby incorporated into this Lease as if fully set forth herein. Landlord and Tenant are hereinafter sometimes individually referred to as a "Party" and collectively referred to as "Parties".

Section 1.2    Principles of Construction. All references to articles, sections, schedules and exhibits are to articles, sections, schedules and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, the word "Landlord" shall mean

1

2305449v5/17057-6



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2
INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 37 of 150

"Landlord and its successors and assigns"; the words "Leased Premises" shall include any portion of the Leased Premises and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all reasonable attorneys', paralegal, legal assistant and law clerk fees and disbursements, whether retained firms, the reimbursement for the expenses of in-house staff or otherwise, and, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Landlord in protecting its interest in the Leased Premises and its rights hereunder. Wherever pursuant to this Lease it is provided that Landlord shall pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees as defined above. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa. The words "includes", "including" and similar terms shall be construed as if followed by the words "without limitation". Whenever in this Lease any consent, approval, determination or decision of Landlord is to be made by Landlord, or any matter is to be satisfactory to Landlord, then unless expressly provided to the contrary, such provision shall be deemed to mean that such consent, approval, determination or decision of Landlord or determination whether a matter is satisfactory shall be made by Landlord in its sole and absolute discretion for any or no reason and shall be final and conclusive. Any reference in this Lease shall be deemed to include references to such documents as the same may hereafter be amended, modified, supplemented, extended, consolidated, replaced and/or restated from time to time. Any reference in this Lease shall be deemed to be a reference to this Lease (as defined herein), as the same may hereafter be amended, modified, supplemented, extended, consolidated, replaced and/or restated from time to time. Any reference in this Lease or in the Guaranty shall be deemed to be a reference to the Guaranty (as defined herein), as the same may hereafter be amended, modified, supplemented, extended, consolidated, replaced and/or restated from time to time.

Section 1.3    Definitions.

"Additional Rent" as defined in Section 3.2

"Affiliate" as defined in Section 20.31.

"Change of Ownership" means

"Commencement Date" as defined in Section 3.1.

"Commissioner" means the Federal Housing Commissioner also called the Assistant Secretary for Housing in the United States Department of Housing and Urban Development.

"DOH" means New York State Department of Health.

"Effective Date" as defined in introductory paragraph.

"Eligible Institution" as defined in Section 4.3.

"Extension Term" as defined in Section 3.1(b).

2

2305449v5/17057-6

"**Facility**" as defined in Recital A.

"**First Refinance**" means the replacement or refinance of the Original Mortgage and/or original Junior Debt, in whole or part, in an amount not less than $42,200,000.

"**First Refinance Date**" means the date of the First Refinance.

"**Fixed Rent**" as defined in Section 3.2.

"**Governmental Authority**" as defined in Section 5.2.

"**Guarantors**" mean  Lizer Josefovic and Mark Neuman.

"**Hazardous Materials**" as defined in Section 10.3

"**Hazardous Waste**" as defined in Section 10.3.

"**Health Care Authority or Authorities**" means any Governmental Authority (including HUD) having responsibility for the approval, licensing, certification, payment, issuance of guaranties and insurance for, and/or otherwise setting standards for the operation and occupancy of skilled nursing facilities.

"**Health Care Licenses**" means all Medicare and Medicaid certifications and provider agreements, all public third party payor certifications and provider agreements, and all certifications, permits, regulatory agreements or other agreements and approvals, including certificates of operation, completion and occupancy, and state nursing facility licenses or other licenses and certificates of need required by Health Care Authorities for the legal use, occupancy and operation of the Facility.

"**HUD**" means the United States Department of Housing and Urban Development.

"**Junior Debt**" means a mortgage on the Premises junior to the first Mortgage, and/or debt relating to the development and construction of the Premises.

"**Landlord**" as defined in introductory paragraph, and Section 1.2.

"**Landlord's Indemnitees**" as defined in Section 9.1.

"**Landlord's Work**" as defined in Section 5.1.

"**Laws**" as defined in Section 5.1.

"**Lease Default**" as defined in Section 16.1.

"**Leased Premises**" as defined in Section 2.1.

"**Lease Year**" as defined in Section 3.1.

2305449v5/17057-6

"Letter of Credit" as defined I Section 7.1.

"Material Default" as defined in Schedule 3.1.

"Mortgagee" shall refer to the first and second priority mortgages secured by fee simple interest in the Real Property as amended, restated, extended or replaced from time to time in Landlord's discretion.

"Original Mortgage" means the original Mortgage placed on the Premises by Landlord.

"Overdue Rate" as defined in Section 9.1(b).

"Primary Market of the Facility" means a fifteen mile radius of the Leased Premises.

"Prime Rate" as defined in Section 9.1.

"Prospective Mortgagee" means any Person chosen by Landlord as a Mortgage prior to a closing of a Mortgage to be held by such Person.

"Real Property" as defined in Recital A.

"Refinance" means the replacement or refinance of the Mortgage, or Junior Debt, or any debt in replacement thereof, in whole or part, including the First Refinance.

"Refinance Date" means the date of any Refinance including the First Refinance.

"Rent" as defined in Section 3.2.

"Security Deposit" as defined in Section 7.1.

"Special Purpose Entity" as defined in Schedule 19.2.

"Substantial Completion Date" means the date which is the later of: (i) the date specified in the AIA Form G704, duly executed and certified by the Landlord's architect, that the Facility was substantially completed and in substantial compliance with the plans and specifications for the Facility, and (ii) the date Landlord delivers a Temporary Certificate of Occupancy (the "TCO") for the Facility, provided, however, if the Landlord is unable to obtain the TCO or Permanent CO because of the actions or inactions of the Tenant, its employees or agents including, but not limited to, a delay in obtaining the necessary DOH approvals then delivery of the TCO shall not be a condition under this clause (ii).

"Tenant's Lease Coverage Ratio" means EBITDAR divided by Fixed Rent.

"Term" as defined in Section 3.1 (including all exercised Extension Terms).

4



"**Total Project Cost or "TPC"**  is the actual cost of purchasing, developing, constructing, and equipping the Facility, including without limitation, the cost of the Real Property and improvements, development costs, financing costs, and the cost of Landlord's Work and all equipment.

"**Utilities**" as defined in Section 4.1.

## ARTICLE II

## LEASED PREMISES

Section 2.1    <u>Leased Premises.</u>  Landlord hereby leases and demises to Tenant, and Tenant hereby leases from Landlord, on the terms and conditions set forth in this Lease, the following assets:

(a)    all of Landlord's right, title, and interest in and to the Real Property, including, without limitation, all buildings, structures, erections, improvements, appurtenances, easements and fixtures, including fixed machinery and fixed equipment situated thereon or forming a part thereof; and

(b)    all of Landlord's right, title and interest  in and to all machinery, trade equipment, trade fixtures, furniture, furnishings, beds, and accessories of all kinds used in connection with the Facility located on the Real Property.

All of the items described in <u>Sections 2.1(a)</u> and <u>2.1(b)</u> herein are collectively referred to as the "<u>Leased Premises.</u>"  Landlord and Tenant acknowledge and understand that all of the items which comprise the Leased Premises, as repaired, rebuilt, replaced, restored, altered or added to as permitted or required by provisions of this Lease, shall be transferred back to Landlord in accordance with the terms and conditions set forth herein upon the expiration or earlier termination of this Lease.

Section 2.2    In connection with any assignment of Landlord's interest under this Lease and the assumption of this Lease by a new landlord, the original Landlord named herein, and each successor in interest, shall have the right to transfer all amounts deposited pursuant to <u>Section 4.3</u> with respect to the Facility, less any amount used pursuant to <u>Section 4.3</u>, to such assignee (as the subsequent holder of Landlord's interest in this Lease) and upon such transfer, Landlord or the applicable successor in interest transferring the deposits shall thereupon be completely released from all liability with respect to such deposits so transferred and Tenant shall look solely to said assignee, as the subsequent holder of Landlord's interest under this Lease, in reference thereto.  If Landlord's interest in the Leased Premises is sold or conveyed as provided above or otherwise or by operation of law:  (i) at the new owner's option, Tenant shall attorn to and recognize the new owner as Tenant's Landlord under this Lease and Tenant shall take such actions to confirm the foregoing within ten (10) days after request.

2305449v5/17057-6



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2
INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 41 of 150

## ARTICLE III

## TERM AND RENT

Section 3.1    Term of Lease.

(a)    The term (the "Term") of this Lease shall be for a period of thirty (30) years commencing on the later to occur of (i) the date of issuance of a permanent or temporary Certificate of Occupancy for the Facility and (ii) the date that New York State Department of Health (hereinafter sometimes, "DOH") determines that the Landlord's Work is sufficiently complete as constructed (but not necessarily the Tenant's operations) to accept patients, provided, however, if the Landlord is unable to obtain a permanent or temporary Certificate of Occupancy because of the actions or inactions of the Tenant, its employees or agents including, but not limited to, a delay in obtaining the necessary DOH approvals then delivery of a permanent or temporary Certificate of Occupancy shall not be a condition under clause (i) (the "Commencement Date"), and ending at 11:59:59 P.M. on the day preceding the thirtieth (30th) anniversary of the Commencement Date (the "Expiration Date").    Under any and all circumstances, Landlord shall not be liable to Tenant, in damages or otherwise, for any delay in delivering the Leased Premises to Tenant and Tenant shall have no right to terminate or rescind this Lease on account thereof.    Notwithstanding the Commencement Date, certain of the rights and obligations of the parties shall commence on the Effective Date, but not including Tenant's obligations to pay Fixed Rent and Impositions prior to the Commencement Date, or to maintain the Leased Premises, insure the Leased Premises or restore the Leased Premises after a casualty or condemnation prior to the Commencement Date, or any other rights and obligations, which by their terms are intended to commence as of the Commencement Date, which rights and obligations shall commence on the Commencement Date.

As used herein with respect to the Term and the periods for payment of Rent (unless the context otherwise requires) the term "Lease Year" shall mean a 365 day period (or 366 day period in the case of a leap year), first commencing on the Commencement Date and thereafter on successive anniversaries thereof, and ending on the day prior to the next succeeding anniversary of the Commencement Date.

Landlord and Tenant hereby acknowledge that the Commencement Date is presently indeterminate and shall occur only as hereinabove provided in this Section. Except for the rights of Tenant expressly stated herein, Tenant hereby waives any right to rescind this Lease under the provisions of Section 223-a of the Real Property Law of the State of New York, and agrees that the provisions of this Article are intended to constitute "an express provision to the contrary" within the meaning of said Section 223-a. Landlord and Tenant shall execute a memo specifying the Commencement Date immediately following its occurrence.

(b)    Provided a Lease Default has not occurred and is then continuing either at the time of the exercise of the options provided below or at the end of the Term or Extension Term, or there has not been any Lease Default listed in Schedule 3.1 attached hereto (a "Material Default"), whether or not cured, within two years of the end of the Term or Extension Term, Tenant shall have the option to extend the Term of this Lease for three (3) additional periods of ten (10) years each (each an "Extension Term"), by giving written notice to Landlord

6



not less than five forty-five (545) days nor more than seven hundred (700) days prior to the expiration of the Term (or Extension Term as the case may be) of this Lease, TIME BEING OF THE ESSENCE to these time periods. These options may be exercised by Tenant serving written notice upon Landlord stating that Tenant is exercising the option to extend. If Tenant fails to give such notice in writing to Landlord within the time period specified herein, all rights and privileges granted to Tenant to extend this Lease shall lapse and become null and void. No later option may be exercised if Tenant has failed to exercise a prior option. If Tenant has validly exercised its option(s) to extend the Term, references herein to the "Term" shall be deemed to include an Extension Term.

Section 3.2    Rent.

(a)    Beginning in the first (1st) Lease Year of the Term and for each succeeding Lease Year thereafter, including during any and all Extension Terms, until the First Refinance Date, Tenant shall pay Landlord an annual amount of Six Million Seventy Three Thousand One Hundred Fifty Eight ($6,073,158) Dollars ("Fixed Rent") in monthly installments of $506,096.50.

(b)    Tenant shall pay the Rent to Landlord during the term without deduction or setoff and without demand.

(c)    The terms "Additional Rent" or "additional rent" means all sums, amounts, fees, expenses and costs (including, without limitation, legal fees and disbursements) payable or reimbursable to Landlord under this Lease other than Fixed Rent, and all of same shall be and constitute Additional Rent hereunder. The terms "Fixed Rent" and "Additional Rent" shall be collectively referred to as "Rent." Landlord shall have the same rights and remedies hereunder consequent upon a failure of Tenant to pay any item of Additional Rent as upon a failure of Tenant to pay any item of Fixed Rent.

(d)    Rent shall be due and payable in advance in equal monthly installments during each year on the first (1st) day of each calendar month thereof (or in the event the first day of the calendar month is not a business day, on the first business day following the first day of each calendar month) throughout the Term. Rent for any period which is less than a full calendar month or full year, as the case may be, during the Term, shall be prorated on a daily basis. Rent shall not be paid more than one (1) month in advance. Rent shall be paid to Landlord at Landlord's address set forth in Section 13.1 or at such other place as Landlord designates from time to time by written notice to Tenant. Tenant agrees to pay Rent, at Landlord's direction, by electronic transfer or wire, as directed by Mortgagee in writing.

(e)    TENANT HEREBY ACKNOWLEDGES THAT LATE PAYMENT BY TENANT TO LANDLORD OF RENT WILL CAUSE LANDLORD TO INCUR COSTS NOT CONTEMPLATED HEREUNDER, THE EXACT AMOUNT OF WHICH IS PRESENTLY ANTICIPATED TO BE EXTREMELY DIFFICULT TO ASCERTAIN. SUCH COSTS MAY INCLUDE PROCESSING AND ACCOUNTING CHARGES AND LATE CHARGES WHICH MAY BE IMPOSED ON LANDLORD BY THE TERMS OF ANY LOAN AGREEMENT AND OTHER EXPENSES OF A SIMILAR OR DISSIMILAR NATURE. ACCORDINGLY, IF ANY INSTALLMENT OF RENT THAT IS PAYABLE TO LANDLORD

2305449v5/17057-6



OR ITS DESIGNEE SHALL NOT BE PAID WITHIN FIVE (5) DAYS OF THE DATE WHEN DUE, TENANT WILL PAY LANDLORD ON DEMAND A LATE CHARGE EQUAL TO FIVE PERCENT (5%) OF THE UNPAID PORTION OF THE AMOUNT OF SUCH INSTALLMENT. THE PARTIES AGREE THAT THIS LATE CHARGE REPRESENTS A FAIR AND REASONABLE ESTIMATE OF THE COSTS THAT LANDLORD WILL INCUR BY REASON OF LATE PAYMENT BY TENANT. THE PARTIES FURTHER AGREE THAT SUCH LATE CHARGE IS RENT AND NOT INTEREST AND SUCH ASSESSMENT DOES NOT CONSTITUTE A LENDER OR BORROWER/CREDITOR RELATIONSHIP BETWEEN LANDLORD AND TENANT. IN ADDITION, THE AMOUNT UNPAID, INCLUDING ANY LATE CHARGES, SHALL BEAR INTEREST AT THE OVERDUE RATE FROM THE DUE DATE OF SUCH INSTALLMENT TO THE DATE OF PAYMENT THEREOF, AND TENANT SHALL PAY SUCH INTEREST TO LANDLORD ON DEMAND. THE PAYMENT OF SUCH LATE CHARGE AND/OR SUCH INTEREST SHALL NOT CONSTITUTE A WAIVER OF, NOR EXCUSE OR CURE, ANY DEFAULT UNDER THIS LEASE, NOR PREVENT LANDLORD FROM EXERCISING ANY OTHER RIGHTS AND/OR REMEDIES AVAILABLE TO LANDLORD.

(f)   If a default is declared by the Commissioner under the provisions of the Regulatory Agreement, provided a copy of Notice of Default is given to Tenant, Tenant shall thereafter make all future payments under this Lease to the Commissioner.

Section 3.3   Net Lease Provisions. Landlord and Tenant intend that the Rent herein specified shall be net to Landlord in each year during the Term, and that all costs, expenses and obligations of every kind and nature, (known or unknown, general or special, ordinary or extraordinary, foreseen or unforeseen, direct or indirect, contingent or otherwise) relating to the operation, repair and maintenance of the Leased Premises (except Landlord's income taxes) which may arise or become due during the Term shall be timely paid by Tenant and that Landlord shall be indemnified by Tenant against such costs, expenses and obligations. Tenant's obligation to pay Rent is independent of all, and is in no manner conditioned upon any, other covenants, conditions and obligations of Landlord or Tenant under this Lease. There shall be no abatement of Rent payments for any reason nor shall Tenant be entitled to any offsets or deductions from Rent payments due hereunder.

Section 3.4   Rent Tax. If any governmental taxing authority levies, assesses, or imposes any tax, sales or use tax, privilege tax, excise or assessment (other than income or franchise taxes) upon or against the Rent payable by Tenant to Landlord, either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, then Tenant shall be responsible for and shall pay such tax, excise or assessment, or, if Landlord pays same, Tenant shall reimburse Landlord for the amount thereof within ten (10) days after written demand by Landlord.

It is the intent of this Section 3.4 and all other provisions of this Lease to insure that the Rent (including Additional Rent) paid to Landlord by Tenant will be received by Landlord without diminution by any tax, assessment, charge or levy of any nature whatsoever, except United States, State of New York and local net income taxes, and the terms and conditions of this Lease shall be liberally construed to effect such purpose. Without limiting the generality of the foregoing, if any tax is assessed or based on gross income actually or

8



constructively received by Landlord pursuant to this Lease, Tenant shall pay such amount which, when added to said gross income, shall yield to Landlord, after deduction of all such tax payable by Landlord with respect thereto, a net amount equal to that which Landlord would have realized therefrom had no such tax been imposed.

Section 3.5    Assignment of Lease to Mortgagee. Tenant acknowledges that all of the interest of Landlord in and to this Lease has been or will be assigned to Mortgagee pursuant to the Loan Documents.

Tenant agrees to promptly execute and deliver to Landlord from time to time any and all documents required by a Mortgagee, Prospective Mortgagee, HUD and/or HUD's Approved Lender, or any successor, commercial, agency or private lender, including, without limitation, a lease addendum, regulatory agreement, subordination agreement, non-disturbance and attornment agreement, and/or estoppel certificate, in order to finance or refinance the Facility or otherwise.

Tenant will on request at any time or from time to time by Landlord or any Mortgagee or Prospective Mortgagee subordinate this lease and all of Tenant's rights and estate hereunder to such Person's Mortgage and to any renewals, extensions, substitutions, refinancings, modifications or amendments thereof, or declare such Mortgage to be prior to this lease and to any renewals, extensions, substitutions, refinancings, modifications or amendments thereof, and agree with such holder that Tenant will attorn thereto in the event of foreclosure. Landlord agrees to use reasonable efforts (except that Landlord shall not be obligated to expend money for any such agreement) to obtain a written agreement from any such holder in the form typically used by such holder which consents to this lease and provides that, notwithstanding such mortgage or any default, expiration, termination, foreclosure, sale, entry or other act or omission under, pursuant to or affecting said Mortgage, Tenant shall not be disturbed in peaceful enjoyment of the Leased Premises or this lease terminated or canceled at any time, except in the event Landlord shall have the right to terminate this lease under the terms and provisions set forth herein.

Section 3.6    True Lease. It is the intent of Landlord and Tenant and the parties agree that this Lease is a true lease and that this Lease does not represent a financing agreement. Each party shall reflect the transaction represented hereby in all applicable books, records and reports (including income tax filings) in a manner consistent with "true lease" treatment rather than "financing" treatment.

Section 3.7    Right of First Refusal; Buyout. (a) Landlord shall not sell, transfer or convey the Leased Premises to a third person or entity unless Tenant first is given the opportunity to purchase the Leased Premises pursuant to the terms and conditions set forth in this Section 3.7(a). If at any time during the first eleven years of Term Landlord receives from any third person or entity an Offer (as hereinafter defined) to purchase the Leased Premises which Landlord desires to accept, Landlord shall notify Tenant of such Offer by delivering written notice to Tenant, which notification (the "Offer Notice") shall contain a copy of the written Offer or, at Landlord's election, a written summary of the terms of the Offer. For purposes of this Lease, an "Offer" shall mean any bona fide written instrument or verbal communication setting forth the terms pursuant to which Landlord will convey the Leased Premises. Tenant shall have ten (10) Business Days after receipt of the Offer Notice in which to elect by written

9

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2

INDEX NO. 60278/2020

RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 45 of 150

notice delivered to Landlord (the "**Acceptance Notice**") to enter into a formal agreement on the same terms and conditions as those contained in the Offer ("**Tenant's Purchase Right**"). Such election shall be effective only if within ten (10) Business Days after delivery of the Acceptance Notice the parties enter into a written purchase agreement on terms reasonably acceptable to Landlord in good faith for the sale of the Leased Premises to Tenant containing all terms of the Offer. If Tenant fails to timely deliver the Acceptance Notice, or if Tenant fails to timely enter into said purchase agreement as provided herein, Landlord shall have the right to accept the Offer or any modification thereof on terms substantially similar as those set forth in the Offer. Tenant's right to purchase the Leased Premises identified in the Offer Notice shall not apply to (i) transfers of less than one hundred percent of the ownership interests in Landlord, (ii) a public offering of ownership interests in Landlord, (iii) a recapitalization transaction of any kind involving Landlord, (iv) condemnation, eminent domain or similar proceedings, or (v), rights exercised by Mortgagees in foreclosure or in lieu thereof pursuant to Mortgages or other documents executed by Landlord in connection therewith, including the subsequent disposition of the Premises by Mortgagee or its affiliate or designee that acquires the Leased Premises in connection therewith.

(b)     Notwithstanding anything to the contrary, if Landlord's Offer Notice states that it is purchasing from Tenant Tenant's Purchase Right, then (i) Tenant shall have no further rights under Section 3.7(a), and Section 3.7(a) shall be null and void without further effect, and (ii) upon the closing of the purchase and sale of the Leased Premises pursuant to the Offer, Landlord shall pay Tenant ten percent (10%) of the excess of the sales price agreed to pursuant to the Offer (less costs and fees, including broker's fees) over the TPC, the "**Offer Fee**"), and (iii) the Rent shall be the greater of the amount as determined by Section 3.2(a) or fair market value, as shall be determined by an independent third party appraiser jointly appointed by Landlord or and Tenant, and absent their agreement appointed by the then chairman or similar officer of the Westchester County Society of Real Estate Appraisers. For purposes of clarification, Tenant shall not be entitled to the receipt of the Offer Fee if Tenant exercises Tenant's Purchase Right as set forth in Section 3.7(a) above.

(c)     Upon expiration of the eleventh Lease Year, Tenant's Right of First Refusal as set forth in in Section 3.7(a) shall lapse and become null and void.

Section 3.8.    Option to Purchase.  Commencing on the latter of (i) the first day after the Commencement Date and (ii) 24 months from the date of the closing of the Original Mortgage, and ending on the last day of the fifteenth Lease Year of the Lease, Tenant shall have the option to purchase the Leased Premises from Landlord for a purchase price of $65,055,000 by giving written notice of its exercise of the Option to Purchase including a proposed closing date, provided if Tenant does not exercise the Option to Purchase prior to receiving an Offer Notice pursuant to Section 3.7, Tenant's Option to Purchase under this Section 3.8 shall lapse unless and until the conveyance of the Leased Premises contemplated under Section 3.7 does not occur.  Upon expiration of the fifteenth Lease Year, Tenant's the right to purchase the Leased Premises from Landlord, all as set forth above, shall lapse, become null and void, and Tenant shall have deemed to waived all such rights hereunder.

## ARTICLE IV

10

## UTILITIES AND TAXES

Section 4.1    **Utilities.** From and after the Commencement Date, Tenant shall pay or cause to be paid all charges next coming due and payable for electricity, steam, telephone, cable, gas, oil, water, sewer and all other services or utilities used on or related to the Leased Premises (the "Utilities") during the Term. Tenant covenants to place all Utilities in Tenant's name as of the Commencement Date. Adjustment shall be made for Utilities applicable to any period prior to the Commencement Date. In the event Landlord is billed directly by any service provider or utility company for any Utilities or services supplied to Tenant during the Term, Landlord shall send Tenant the bill and Tenant shall promptly pay the same. Landlord shall have no obligation or liability with respect to any interruption or failure in the supply of any such Utilities. If Landlord elects to or shall be required to pay for any Utilities to preserve and/or protect the Leased Premises, Tenant shall reimburse Landlord for the cost and expense thereof plus interest at the Prime Rate.

Section 4.2    **Taxes.** Tenant shall be solely responsible for the payment, prior to the date when penalties would attach, of all general and special real estate taxes and assessments (together with any excise taxes on such real estate taxes and assessments levied or imposed by any governmental taxing authority), fire district taxes, liens, impositions, including capital stock, franchise, ad valorem, sales, use, single business, gross receipts, transaction privilege, rent or similar taxes; personal property taxes, assessments including assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Term; ground rents; water, sewer and other utility levies and charges; excise tax levies; fees including license, permit, inspection, authorization and similar fees; and all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Leased Premises, and all interest and penalties thereon attributable to any failure in payment by Lessee which at any time prior to, during or in respect of the Term hereof may be assessed or imposed on or in respect of or be a lien upon the Leased Premises (collectively, the "Impositions") that accrue from the Commencement Date through the Term. Adjustment shall be made for Impositions applicable to any period prior to the Commencement Date. Tenant shall pay all of the Impositions directly to the applicable taxing authorities and Tenant shall promptly forward proof of payment to Landlord in such form as shall be reasonably acceptable to Landlord unless Landlord elects to require escrow deposits in accordance with Section 4.3 hereof. Landlord shall promptly forward any tax bills which it may receive to Tenant. Landlord shall only bill Tenant for any of the Impositions if Tenant does not pay any of the Impositions before delinquency and Landlord is obligated or elects (in Landlord's sole and absolute discretion) to pay any of the Impositions directly to remain current with all taxing authorities. Tenant shall pay the full amount of any increases in any of the Impositions resulting from alterations or improvements made by or for the benefit of Tenant. After the expiration or termination of this Lease, Tenant shall pay all bills for any of the Impositions which become due and payable after the expiration or termination of the Lease covering any period through the expiration or earlier termination of the Lease. If any governmental taxing authority acting under any present or future ordinance or regulation, shall levy, assess or impose a tax, excise and/or assessment (other than any net income or franchise tax) upon Landlord or Tenant for rental payable by Tenant to Landlord, either by way of substitution for or in addition to any existing tax on land, buildings or otherwise, then Tenant shall be responsible for and shall pay such tax, excise and/or assessment

11

2305449v5/17057-6



or shall reimburse Landlord for the cost and expense thereof, as the case may be. Provided that Tenant shall have deposited a sufficient amount of funds to pay the Impositions pursuant to <u>Section 4.3</u> and Tenant has done nothing to prevent payment by Landlord or its lender of the Impositions, then Tenant shall not be responsible for any and all late payment fees and/or penalties, including interest, imposed by any applicable taxing authorities with respect to the untimely payment of Impositions.

Section 4.3    <u>Escrow Deposits.</u>

(a)    <u>Escrow.</u> At the option of Landlord, which may be exercised at any time by Landlord in its sole and absolute discretion Tenant shall, on the first day of the first calendar month commencing after notice from Landlord, and on the first day of each calendar month thereafter during the Term (each of which dates is referred to as a "<u>Monthly Deposit Date</u>"), pay to and deposit with Landlord a sum equal to one-twelfth (1/12th) of the Impositions to be levied, charged, filed, assessed or imposed upon or against the Leased Premises within one (1) year after said Monthly Deposit Date and a sum equal to one-twelfth (1/12th) of the premiums for the property insurance policies required pursuant to Article VI which are payable within one (1) year after said Monthly Deposit Date. If the amount of the Impositions to be levied, charged, assessed or imposed or insurance premiums to be paid within the ensuing one (1) year period shall not be fixed upon any Monthly Deposit Date, such amount for the purpose of computing the deposit to be made by Tenant hereunder shall be reasonably estimated by Landlord with an appropriate adjustment to be promptly made between Landlord and Tenant as soon as such amount becomes determinable. In addition, Landlord may, at its option, from time to time require that any particular deposit be greater than one-twelfth (1/12th) of the estimated amount payable within one (1) year after said Monthly Deposit Date, if such additional deposit is required in order to provide to Landlord sufficient funds from which to make payment of all Impositions on or before the next due date of any installment thereof, or to make payment of any required insurance premiums not later than the due date thereof. If any Mortgagee or the Commissioner requires Landlord to impound insurance premiums on a periodic basis during the term, Tenant, on notice from Landlord indicating this requirement, shall pay a sum of money towards its liability under this Lease to Landlord on a periodic basis in accordance with Landlord's requirements. Landlord shall impound the premium payments received from Tenant in accordance with the requirements of Mortgagee and shall utilize such funds to timely pay insurance premiums.

(b)    <u>Use of Deposits.</u> The sums deposited by Tenant under this <u>Section 4.3</u> shall be held by Landlord or Mortgagee and shall be applied in payment of the Impositions or insurance premiums, as the case may be, when due. Any such deposits may be commingled with other assets of Landlord or such Mortgagee, and shall be deposited by Landlord or such Mortgagee in an Eligible Institution in such account or accounts as Landlord or the Mortgagee may, from time to time select, and Landlord shall not be liable to Tenant or any other person (i) based on Landlord's or the Mortgagee's (or any bank's) choice of investment vehicles, (ii) for any consequent loss of principal or interest or (iii) for any unavailability of funds based on such choice of investment. Furthermore, subject to the foregoing regarding the use of depositories and accounts, Landlord and its Mortgagee shall bear no responsibility for the financial condition of, nor any act or omission by the depository bank. No income, if any, from such investment or interest on such deposits shall be paid to Tenant. To the extent that Landlord does not have an

12



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 48 of 150

invoice or bill specifying the due date for payment, Tenant shall give not less than thirty (30) days prior written notice to Landlord in each instance when an Imposition or insurance premium is due, specifying the Imposition or premium to be paid and the amount thereof, the place of payment, and the last day on which the same may be paid in order to comply with the requirements of this Lease. If Landlord, in violation of its obligations under this Lease, does not pay any Imposition or insurance premium when due, for which a sufficient deposit exists, Tenant shall not be in default hereunder by virtue of the failure to pay such Imposition or such insurance premium and Tenant shall not be liable for any late payment fees and/or penalties, including interest imposed as a result of such failure to pay. The term "Eligible Institution" shall mean a depository institution or trust company, the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P, "P-1" by Moody's and "F-1+" by Fitch in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's).

(c)    Deficits.    If for any reason any deposit made by Tenant or held by Landlord under this Section 4.3 shall not be sufficient to pay any Imposition or insurance premium within the time specified therefor in this Lease, then, within ten (10) days after demand by Landlord, Tenant shall deposit an additional amount with Landlord, increasing the deposit held by Landlord so that Landlord holds sufficient funds to pay such Imposition or premium in full (or in installments as otherwise provided for herein), together with any penalty or interest thereon. Landlord may change its estimate of any Imposition or insurance premium for any period on the basis of a change in an assessment or tax rate or on the basis of a prior miscalculation or for any other good faith reason; in which event, within ten (10) days after demand by Landlord, Tenant shall deposit with Landlord the amount in excess of the sums previously deposited with Landlord for the applicable period which would theretofore have been payable under the revised estimate.

(d)    Transfers.    Consistent with Section 2.2, in connection with any assignment of Landlord's interest under this Lease and the assumption of this Lease by a new landlord, the original Landlord named herein and each successor in interest shall have the right to transfer all amounts deposited pursuant to the provisions of this Section 4.3 and not used pursuant to this Section 4.3 to such assignee (as the subsequent holder of Landlord's interest in this Lease) and upon such transfer, the original Landlord named herein or the applicable successor in interest transferring the deposits shall thereupon be completely released from all liability with respect to such deposits so transferred and Tenant shall look solely to said assignee, as the subsequent holder of Landlord's interest under this Lease, in reference thereto.

(e)    Security.    All amounts deposited with Landlord pursuant to the provisions of this Section 4.3 shall be held by Landlord as additional security for the payment and performance of Tenant's obligations under this Lease and, upon the occurrence and during the continuance of any Lease Default, Landlord may, in its sole and absolute discretion, apply such amounts towards payment or performance of such obligations.

(f)    Return.    Upon the expiration or earlier termination of this Lease, as long as all of the Rent and any and all other obligations due under this Lease have been fully paid and performed, any sums then held by Landlord under this Section 4.3 shall be refunded to Tenant,

2305449v5/17057-6



and subject to the rights of a Mortgagee, together with all interest, if any, earned thereon and all income, if any, earned therefrom; provided, however, that if a Lease Default has occurred and is continuing, all of such sums may be applied by Landlord towards any amounts owed to Landlord pursuant to this Lease.

(g)    Receipts. Tenant shall deliver to Landlord copies of all claims and bills in relation to the Impositions and insurance premiums promptly upon receipt thereof by Tenant.

This Article and the obligations herein shall survive expiration or earlier termination of this Lease.

## ARTICLE V

## LANDLORD'S WORK, MAINTENANCE AND REPAIR; IMPROVEMENTS

Section 5.1    Landlord's Work.    (a)    Landlord shall cause the Facility to be constructed ("Landlord's Work").

(b)    Landlord will give Tenant thirty (30) days' notice of the date Landlord expects to be the Substantial Completion Date. On or prior to the Substantial Completion Date, Landlord and Tenant shall jointly prepare a list of the items for the Facility that remain to be completed or corrected, set a dollar value for the cost to complete the work, and fix time for their completion or correction (collectively the "Punchlist").

(c)    Notwithstanding anything in this lease to the contrary, on and after the Substantial Completion Date Tenant shall be deemed to have agreed Landlord has completed Landlord's Work to Tenant's complete satisfaction, except for (i) the Punchlist, (ii) such items of decoration or mechanical adjustment of which Tenant gives Landlord written notice within thirty (30) days after the Substantial Completion Date (the "Initial Correction Items") or (iii) any defects in the Facility which were not known or reasonably discoverable by Tenant in the time period specified in the immediately prior clause (ii) ("Latent Defects"); provided that, as to Latent Defects, Landlord will have no responsibility or liability therefor, or for the correction thereof, unless (A) Tenant conducts at least one inspection of the Facility with a qualified engineer or other expert, within one year from the Substantial Completion Date, and (B) Tenant gives Landlord notice of such Latent Defects within thirty( 30) days after discovery thereof and in any event not later than one year after the Substantial Completion Date, which notice will be accompanied by the certification of such engineer or other experts, specifying, in detail, such Latent Defects in the Facility.

(d)    At its sole expense, Landlord shall complete the Punchlist, and remedy the Initial Correction Items, and the Latent Defects provided with respect to Latent Defects that the conditions set out in clause (c) of section (c) are satisfied.

(e)    To the extent assignable at no cost to Landlord, Landlord assigns to Tenant all manufacturer warranties on materials and equipment. Tenant shall have the benefit and right to enforce such warranties at its sole cost and expense.

14

2305449v5/17057-6



Section 5.2     Maintenance and Repair.     Except as provided in Section 5.1, Tenant, at Tenant's sole cost and expense, shall keep the Leased Premises, including all buildings, fixtures, trade equipment, trade fixtures, furniture, beds and other personal property leased to Tenant pursuant to this Lease, including, without limitation, all structural and non-structural components, the roof, foundation, all outer walls, plumbing, sprinklers, electrical, mechanical, heating, ventilation, utility service, air conditioning, vertical transport, telephone, communications, cable, computer, fire-life-safety, nursing call, and all other systems of the Leased Premises in good condition and repair and in compliance with all Laws. Landlord shall not be responsible to make any improvements, repairs, maintenance or replacements whether occasioned by the act, omission, active negligence, or passive negligence of Landlord or Tenant and/or its agents, employees, invitees or licensees or otherwise, and Tenant shall pay for all improvements, repairs, replacements, maintenance and expenditures relating to the Leased Premises, whether interior or exterior, structural or non-structural, ordinary or extraordinary, foreseen or unforeseen or arising by reason of a condition existing prior to the commencement of the Lease, by Tenant's use or by a change in applicable Laws. The Leased Premises and its appurtenances shall at all times be kept clean, safe and sanitary and in good order, condition, replacement and repair by Tenant, at Tenant's sole cost and expense, except for ordinary wear and tear (provided, however, that, without limiting the generality of this Section 5.2, Tenant shall be obligated to replace any portion of the Leased Premises upon any obsolescence thereof or if proper repair is impractical). Tenant shall provide (if not currently a part of the Leased Premises) and maintain, repair and replace, as necessary, all furniture, fixtures, equipment and/or other personal property required by any Governmental Authority (other than furniture, fixtures, equipment and/or other personal property owned by contractors providing ancillary services at the Facility) necessary for the operation of the Facility and to comply with all Laws. All such property provided by Tenant shall immediately become the property of Landlord and Tenant shall execute such documentation as Landlord may reasonably require vesting title in such property in Landlord. Landlord shall have no liability or obligation with respect to such property or any of Tenant's operations relating thereto. All replacements made by Tenant hereunder shall be made in a good and workmanlike manner in accordance with Laws using the same, similar or better quality of materials as being replaced and shall immediately become the property of Landlord. Tenant acknowledges that title and ownership of all repaired and replaced furniture, fixtures, equipment and/or other personal property made hereunder shall belong to and is for the benefit of Landlord. Tenant shall not enter into any equipment leases or conditional sales contracts for any furniture, fixtures, equipment and/or other personal property relating to the Facility without Landlord's consent which it may grant or withhold in its sole discretion. The term "Laws" means, all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting any Leased Premises or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Tenant, at any time in force affecting the Leased Premises or any part thereof. The term "Governmental Authority" means any court, board, agency, arbitrator, commission, office or other authority of any nature whatsoever for any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

15



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2
21-22623-shl   Doc 29-2   Filed 11/08/21   Entered 11/08/21 16:50:03   Doc 3 Notice
part 1   Pg 51 of 150

INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020

Section 5.3    <u>Improvements, Renovation, Alterations and Additions.</u>  Tenant shall have the right during the Term to make such non-structural interior alterations, changes and improvements to the Leased Premises as may be proper and necessary for the conduct of Tenant's business, to cause the Leased Premises to conform to all Laws, for patient comfort and safety, or for the full beneficial use of the Leased Premises, so long as such improvements do not (i) exceed Three Hundred Fifty Thousand Dollars ($350,000.00) in any given calendar year, (ii) interfere with any of the purposes for which the Facility was leased or affect the roof or structure, (iii) decrease the value of the Leased Premises, (iv) affect any building system, including, heating, ventilation, air conditioning, mechanical, electrical, plumbing or vertical transport systems, or (v) affect the exterior appearance of the Leased Premises. Tenant shall not make any other alterations, changes, or improvements without the express written approval in each instance by Landlord, which consent shall not be unreasonably withheld; <u>provided, however,</u> that the granting or withholding of consent shall not result in any liability to Landlord. Furthermore, Tenant may make all repairs or replacements required by a Governmental Authority without obtaining Landlord's consent, provided, however, Tenant shall give Landlord no less than ten (10) days prior written notice of such government mandated repairs or replacements prior to making or implementing same, unless emergency factors necessitate the making of such repairs before Tenant can reasonable give notice to Landlord, in which event Tenant shall give notice to Landlord as soon as reasonably possible. Tenant shall pay for all costs, fees and penalties imposed by the applicable state agencies or the Center for Medicare and Medicaid Services ("<u>CMS</u>") or other Governmental Authority in connection with any survey or the Change of Ownership.   Tenant shall notify Landlord of any alterations, changes or improvements required and/or permitted by the applicable state agencies or the CMS or other Governmental Authority prior to the commencement thereof.  Tenant shall pay all costs and expenses of any required and/or permitted alterations, changes, and improvements, shall make the same in a good and workmanlike manner, and in accordance with all Laws, having obtained all necessary permits and approvals from Governmental Authorities having jurisdiction over the Facility and work performed thereon or therein, and shall assure Landlord, in form reasonably satisfactory to Landlord, all necessary permits and authorizations have been received and that payment for the work and materials will be made by Tenant.  Tenant hereby completely and fully indemnifies Landlord against any mechanic's liens or other liens or claims in connection with the making of any alterations, changes, and/or improvements.  Any liens arising out of any required and/or permitted alterations, changes, and/or improvements shall be discharged of record by Tenant within the earlier of thirty (30) days after the same have been filed by payment, bonding or otherwise, as permitted by law, or five (5) days after commencement of a foreclosure or enforcement action.  Notwithstanding any provision of this Lease to the contrary, Tenant shall not undertake any alterations, renovations, or improvements to the Facility or otherwise commence any project or activity with respect to the Facility, which may result in any bed being taken out of service for more than seven (7) days without Landlord's and/or Mortgagee's prior written consent, which Landlord's consent shall not be unreasonably withheld. Tenant shall give Landlord written notice ten (10) days prior to commencing repairs, construction, or alterations whose costs exceed One Hundred Thousand Dollars ($100,000.00).

Section 5.4    <u>Signage.</u>   All signs installed by Tenant at the Facility shall comply with all Laws, and all necessary permits or licenses shall be obtained by Tenant. Tenant shall maintain all signs in good condition and repair, and/or replace as may be required by applicable law, at all times at Tenant's sole cost and expense.  Upon vacating the Leased

16



Premises, Tenant shall remove all signs and supporting material or installations so installed by Tenant, but only if Landlord shall request such removal, and Tenant shall repair all damage caused by such removal. Landlord acknowledges and agrees that neither Landlord nor any subsequent tenant of Landlord shall be authorized to use any company or registered trade name of Tenant or any of Tenant's affiliates or subtenants.

Section 5.5 <u>Surrender.</u> (a) Subject to applicable law and to receipt of any necessary DOH approval, Tenant shall deliver up and surrender to Landlord possession of the Leased Premises and all improvements and replacements thereof, including all of Tenant's alterations, improvements work (and all replacements thereof) and all fixtures permanently attached to the Leased Premises by Tenant during the Term, upon the expiration of this Lease or its termination in any manner whatsoever, in as good condition and repair and in substantially similar form, character and manner as the same shall be on the Commencement Date, reasonable wear and tear excepted (without compensation to Tenant), with permitted changes, improvements and additions made during the Term as authorized herein, subject to no liens, encumbrances, charges, restrictions, conditions, limitations or claims whatsoever to the extent not encumbering the Leased Premises as of the Commencement Date, and deliver the keys and/or operational security cards to the Leased Premises to Landlord or Landlord's designated agent.

(b) <u>Licenses and Transfer of Operations</u>. Upon the expiration of the Term or earlier termination of the Lease, Tenant shall and shall cause its subtenants to, (i) transfer to Landlord or Landlord's nominee a fully operational, licensed and certified, and staffed facility and shall cooperate with Landlord or Landlord's designee or nominee in connection with the processing by Landlord or Landlord's designee or nominee of any applications for all licenses, operating permits and other governmental authorization, all contracts, including contracts with all Governmental Authorities or quasi governmental entities (provided that except following a Lease Default, the reasonable costs and expenses of the processing of any such application shall be paid by Landlord or Landlord's designee or nominee), (ii) transfer to Landlord or Landlord's nominee all tangible personal property of Tenant, including financial and accounting records, business records, data, employee and/or personnel records, patient and resident records, and all records held in electronic form, (all subject to the Laws requiring confidentiality), all equipment and small ware and all inventory used in connection with the Facility, (iii) transfer to Landlord or Landlord's nominee all intangible property except accounts receivable of Tenant, and (iv) transfer to Landlord or Landlord's nominee all residents in the Facility. With respect to resident funds, Tenant shall transfer to Landlord or its designee, all patient and resident trust accounts, and shall cause its subtenant to prepare and submit to Landlord or its designee a true, correct, and complete accounting and inventory (properly reconciled) of any patient trust funds and resident property to be transferred to Landlord, or its designee. Tenant shall, and shall cause its subtenant, not to commit any act or be remiss in the undertaking of any act that would jeopardize the licensure or certification of the Facility, and Tenant shall and shall cause its subtenant to comply with all requests for an orderly transfer of the same upon the expiration or early termination of the Term, including, but not limited to, upon the request of Landlord or its designee, the transitioning of employees in compliance with applicable laws. Without limiting the generality of the foregoing, if requested by Landlord or a proposed replacement operator for the Facility, Tenant hereby agrees to enter into a reasonable operations transfer agreement with such replacement operator. Tenant shall not unreasonably withhold, condition or delay its

17



consent to entering into any interim subleases or management agreements as may be necessary to effectuate an early transfer of the operations of the Facility prior to the time that such replacement operator holds all licenses and permits from all applicable Governmental Authorities with jurisdiction necessary to operate the Facility for its intended use. In addition, upon request, Tenant shall and shall cause subtenants, to promptly deliver copies to Landlord or Landlord's designee of all books and records relating to the Leased Premises and operations thereon (including inventories, employee lists and personnel records, and policies and procedures manuals). Tenant shall allow Landlord or a proposed replacement operator for the Facility to utilize Tenant's, subtenants' computer hardware and software for a minimum of ninety (90) days to facilitate the transfer of operations, the collection of accounts receivables, the billing of providers, and the provision of patient care. Tenant shall indemnify, defend, protect and hold harmless Landlord from and against any loss, damage, cost or expense incurred by Landlord or Landlord's designee or nominee in connection with the correction of any and all deficiencies of a physical nature identified by any Governmental Authority responsible for licensing the Leased Premises in the course of any change of ownership inspection and audit. Tenant shall be responsible for any alterations or renovations necessitated by, or imposed in connection with, a change of ownership inspection survey for the transfer of operation of the Leased Premises to Landlord or its designee. Tenant shall not commence to wind up and terminate the operations of the Facility or relocate the patients or occupants of the Facility to any other health care facility. In addition, Tenant shall not terminate the employees of the Facility except in connection with and upon the transfer of operations of the Facility to Landlord or its designee.

(c)    If Landlord notifies Tenant in writing that it intends to transfer the operations of the Facility, to a new operator and desires to have Tenant continue to operate the Facility after the Expiration Date or earlier termination of the Lease, then Tenant shall continue to operate the Facility until the earliest to occur of (i) the date on which such successor operator shall assume operation of the Facility, or (ii) the date that is 180 days after the applicable Expiration Date or termination date (the "**Reimbursement Period**"). During the Reimbursement Period (x) Landlord shall provide Tenant with an operating budget, (y) Landlord shall include in the aforesaid operating budget, and Tenant shall continue to pay during the Reimbursement Period, all Rent that would have been owing under this Lease as to the Leased Premises if this Lease had not expired or terminated as to; and/or Tenant had not been dispossessed from, such Leased Premises, and (z) provided that this Lease was not terminated with respect to, and Tenant was not dispossessed from, such the Lease Premises due to a Lease Default, Landlord shall reimburse Tenant for any operating deficits with respect to the Facility that Tenant may be required to fund out-of-pocket on account of operating losses and expenses incurred by Tenant by reason of, or arising out of compliance with, such budget with respect to the Reimbursement Period. Any such reimbursement shall be due from Landlord to Tenant within 60 days after request by Tenant, provided that Tenant shall furnish such documentation of any operating deficits, losses and expenses as Landlord may reasonably request. The terms of this Section 5.5(c) shall survive the expiration or earlier termination of this Lease and/or any dispossession of Tenant from the Lease Premises.

(d).    Use of Legacy Tradename. Without limitation of the other provisions of this Section 5.5 and notwithstanding anything to the contrary contained in this Lease, Tenant agrees to allow Landlord or its designee operator, at its option and at no cost to Landlord or any such designee, to continue to use, in its signage, marketing and advertising materials, operations

18



and otherwise, any or all name(s) (including tradenames) associated with the operation of the Facility as a going concern for up to 180 days following (i) the expiration or termination of this Lease and (ii) the vacation from, and surrender of, the Leased Premises and Facility by Tenant. At the end of such 180 day period, or upon sooner written notice from Landlord to Tenant, Tenant shall, promptly and at its expense, remove its aforesaid name(s) from all signs on the Facility and repair any damage to such signs caused by such removal. Landlord acknowledges and agrees that Tenant, not Landlord, owns the aforesaid names and that neither Landlord nor any designee of Landlord may use the same except as described in this Section 5.5(d) or as otherwise agreed in writing by Tenant.

(e)     Management of Terminated/Dispossessed Premises. Commencing on the applicable Termination/Dispossession Date as to any Terminated/Dispossessed Premises, Landlord or its designee, upon notice to Tenant, may elect to assume the responsibilities and obligations for the management and operation of the Business at such Terminated/Dispossessed Premises, and Tenant agrees to cooperate fully to accomplish the transfer of such management and operation without interrupting the operation of such Business to the extent allowable by Laws. Tenant shall permit Landlord or its designee to operate the Facility under Tenant's licenses, certifications and other authorizations pending the issuance of new licenses, certifications and other authorizations Landlord or its designee. Tenant shall not commit any act or be remiss in the undertaking of any act that would jeopardize any licenses, certifications and other authorizations related to the Facility, and Tenant shall comply with all requests for an orderly transfer of all licenses, certifications and other authorizations related to the Facility and any payor's certifications.

(f)     In addition, upon any expiration or termination of this Lease, Tenant covenants and agrees to do such things and to take such action as may, from time to time, be necessary or appropriate to permanently surrender and withdraw from possession and operation (including but not limited to licensure and certification) of the Leased Premises, and shall thereafter be fully and permanently relieved of all powers, duties, responsibilities and obligations that are conferred or imposed upon Tenant under this Lease (except those continuing obligations, including but not limited to the obligation to pay all Rent due and owing under this Lease, and the obligation to pay all amounts owed by Tenant to the Medicare, Medicaid, third party payor programs and residents for the period of the Term, which survive the termination hereof as provided herein) and to restore and place Landlord or its designee in possession and operation of the Leased Premises, or any portion thereof, and Tenant covenants and agrees to execute and deliver to Landlord or Landlord's designee (each subject to the approval of DOH) all assignments, operation transfer agreements, consents, consents to assignments (including Medicare and Medicaid provider agreements, if requested by Landlord) documents and other instruments, to the reasonable satisfaction of Landlord in order to effectuate the provisions hereof.

Section 5.6   Condition of Leased Premises.   (a)   Subject to Section 5.1, Tenant shall accept and take possession of the Leased Premises in its "AS IS," "WHERE IS" "WITH ALL FAULTS" condition, and acceptance of possession of the Leased Premises on the Commencement Date shall be deemed an acknowledgment by Tenant of Tenant's acceptance of the condition of the Leased Premises. Tenant acknowledges and agrees that Landlord is not making any representation, warranty or covenant whatsoever with respect to the condition of the

19



Leased Premises, or any portion thereof, or its suitability for any particular purpose, and Tenant shall be relying solely on its inspection of the Leased Premises and due diligence investigations with respect thereto.

(b)    LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, IN RESPECT OF THE LEASED PREMISES OR ANY PART THEREOF, EITHER AS TO ITS FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE OR OTHERWISE, OR AS TO THE NATURE OR QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, OR THE EXISTENCE OF ANY HAZARDOUS SUBSTANCE, IT BEING AGREED THAT ALL SUCH RISKS, LATENT OR PATENT, ARE TO BE BORNE SOLELY BY TENANT, INCLUDING ALL RESPONSIBILITY AND LIABILITY FOR ANY ENVIRONMENTAL REMEDIATION AND FOR COMPLIANCE WITH ALL ENVIRONMENTAL LAWS. EFFECTIVE AS OF THE DATE OF THIS LEASE, TENANT SHALL RELEASE LANDLORD FROM ALL CLAIMS WHICH TENANT OR ANY AGENT, REPRESENTATIVE, AFFILIATE, EMPLOYEE, DIRECTOR, OFFICER, PARTNER, MANAGER, MEMBER, SERVANT, SHAREHOLDER, TRUSTEE OR OTHER PERSON OR ENTITY ACTING ON TENANT'S BEHALF OR OTHERWISE RELATED TO OR AFFILIATED WITH TENANT ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO OR IN CONNECTION WITH THE LEASED PREMISES, INCLUDING THE INFORMATION AND ANY PHYSICAL OR ENVIRONMENTAL CONDITIONS, AND TENANT SHALL NOT LOOK TO LANDLORD IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF. THIS RELEASE SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH OF ITS EXPRESSED TERMS AND PROVISIONS, INCLUDING THOSE RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, DAMAGES AND CAUSES OF ACTION. EXCEPT AS TO MATTERS SPECIFICALLY SET FORTH IN THIS LEASE: (A) TENANT WILL ACQUIRE THE LEASED PREMISES SOLELY ON THE BASIS OF ITS OWN PHYSICAL AND FINANCIAL EXAMINATIONS, REVIEWS AND INSPECTIONS, AND (B) WITHOUT LIMITING THE FOREGOING, WAIVES ANY RIGHT IT OTHERWISE MAY HAVE AT LAW OR IN EQUITY AGAINST LANDLORD WITH RESPECT TO ANY ASPECT OF LEASED PREMISES.

## ARTICLE VI

### INSURANCE

Section 6.1    Insurance.    (a) Tenant shall obtain and maintain, or cause to be maintained, insurance for Tenant and the Facility providing at least the following coverages or as required from time to time by any Mortgagee:

(i)    comprehensive "all risk" insurance on the Facility and the Personal Property, including Building Ordinance Coverage from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Lease shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation (except with respect to the insurance pursuant to clauses (D), (x), (y) and (z) below); (B) containing an agreed amount

20



endorsement with respect to the Facility and Personal Property waiving all co-insurance provisions; (C) providing for no deductible in excess of Ten Thousand Dollars ($10,000.00) for all such insurance coverage (except as stated in the penultimate sentence of this subsection); and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if the Facility or the use of the Facility shall at any time constitute legal non-conforming structures or uses and covering the increased cost of construction, demolition cost, value of the undamaged portion of the structure and any increased expenses to rebuild due to the enforcement of building or zoning laws or requirements following a covered loss of the Leased Premises. In addition, Tenant shall obtain: (x) if any portion of any of the Leased Premises is currently or at any time in the future located in a federally designated "special flood hazard area," flood hazard insurance in an amount equal to the lesser of (1) the outstanding principal balance of any loan encumbering the Leased Premises or (2) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or successor legislation, or such greater amount as Landlord and/or Mortgagee shall require; (y) earthquake insurance in amounts and in form and substance satisfactory to Landlord and Mortgagee in the event the Facility is located in an area with a high degree of seismic activity and (z) coastal windstorm insurance in amounts and in form and substance satisfactory to Landlord and Mortgagee in the event the Facility is located in a coastal region; provided that the insurance pursuant to clauses (x), (y) and (z) hereof shall be on terms consistent with the comprehensive insurance policy required under this Subsection (i); and further provided that the earthquake insurance pursuant to clause (y) may provide for a deductible of up to the greater of One Hundred Thousand Dollars ($100,000.00) and two percent (2%) of the amount of such coverage, (III) the flood insurance pursuant to clause (x) may provide for a deductible of up to One Hundred Thousand Dollars ($100,000.00), and (IV) the ordinance and law coverage pursuant to clause (D) may have a sub-limit of Two Million Five Hundred Thousand Dollars ($2,500,000.00).

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Facility, such insurance (A) with a combined limit of not less than Five Million Dollars ($5,000,000.00) in the aggregate and Two Million Dollars ($2,000,000.00) per claim (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (B) to continue at not less than the aforesaid limit until required to be changed by Landlord and Mortgagee in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability; and (5) contractual liability covering the indemnities contained in Section 9.1 of the Lease to the extent the same is available;

(iii)    business income with extra expense insurance (A) with loss payable to Landlord and Mortgagee; (B) covering all risks required to be covered by the insurance provided for in Subsection (i) above; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Facility and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Facility is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred

21

percent (100%) of the projected net profit and extra expense with respect to the Facility for a period of twelve (12) months from the date of such Casualty (assuming such Casualty had not occurred) and notwithstanding that the policy may expire at the end of such period. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Tenant's reasonable estimate of the gross income from the Facility for the succeeding twelve (12) month period. Nothing herein contained shall be deemed to relieve Tenant of its obligations to pay the Rent when due except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv) at all times during which structural construction, repairs or alterations are being made with respect to the Facility, and only if the Facility coverage form does not otherwise apply, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above and (3) with an agreed amount endorsement waiving co-insurance provisions;

(v) worker's compensation insurance with respect to any employees of Tenant, as required by any Governmental Authority, Health Care Authority, Legal Requirement or Health Care Requirement;

(vi) boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Landlord and Mortgagee on terms consistent with the commercial property insurance policy required under Subsection (i) above;

(vii) intentionally omitted;

(viii) motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million Dollars ($1,000,000.00);

(ix) if the Facility is or becomes a legal "non-conforming" use, ordinance or law coverage and insurance coverage to compensate for the cost of (upon a Casualty) demolition or rebuilding of the undamaged portion of the Facility along with any reduced value and the increased cost of construction in amounts as requested by Landlord and Mortgagee;

(x) the commercial property and business income insurance required under Sections 6.1(a)(i) and (iii) above shall cover perils of terrorism and acts of terrorism and Tenant shall maintain commercial property and business income insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required under Sections 6.1(a)(i) and (iii) above at all times during the Term;

(xi) professional liability and malpractice insurance with limits of at least Two Million Dollars ($2,000,000.00) per claim / Five Million Dollars ($5,000,000.00) in the aggregate. Tenant shall also require each medical director for the Facility and the associated nurse practitioner at the Facility to carry professional liability and malpractice insurance with

2305449v5/17057-6



limits of not less than Two Million Dollars ($2,000,000.00) per claim / Five Million Dollars ($5,000,000.00) in the aggregate; and

(xii)  notwithstanding anything to the contrary in the foregoing, all insurance coverage required by any mortgagee of Landlord shall be met by Tenant, from time to time as necessary;

(xiii)  upon sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Landlord and/or Mortgagee from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Facility located in or around the region in which the Facility is located.

(b)    All insurance provided for in Section 6.1(a) shall be obtained under valid and enforceable policies (collectively, the "Policies" or, in the singular, the "Policy"), and shall be subject to the approval of Landlord and Mortgagee as to insurance companies, amounts, deductibles, loss payees and insureds.  The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State of New York and having a claims paying ability rating of "A" or better (and the equivalent thereof) by at least two (2) of the Rating Agencies rating the companies (one of which shall be S&P if they are rating the securities and one of which will be Moody's if they are rating the companies), or if only one Rating Agency is rating the companies, then only by such Rating Agency and shall specifically name Landlord and Mortgagee as loss payees and additional insureds, as applicable.  Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Landlord and Mortgagee, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Landlord and Mortgagee of payment of the premiums due thereunder (the "Insurance Premiums"), shall be delivered by Tenant to Landlord and Mortgagee.

(c)    Any blanket insurance Policy shall specifically allocate to the Facility the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Facility in compliance with the provisions of Section 6.1(a).

(d)    All Policies provided for or contemplated by Section 6.1(a), except for the Policy referenced in Section 6.1(a)(v), shall name Tenant as the insured and Landlord and Mortgagee as the additional insured, as their interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called lender's loss payee endorsement in favor of Mortgagee providing that the loss thereunder shall be payable to Mortgagee.

(e)    All Policies provided for in Section 6.1 shall contain clauses or endorsements to the effect that:

(i)  no act or negligence of Tenant, or anyone acting for Tenant, or of any tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Landlord and Mortgagee are concerned;

23

2305449v5/17057-6

(ii)   the Policies shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' written notice to Landlord and Mortgagee and any other party named therein as an additional insured;

(iii)   the issuers thereof shall give notice to Landlord and Mortgagee if the Policies have not been renewed fifteen (15) days prior to its expiration; and

(iv)   Neither Landlord nor Mortgagee shall be liable for any insurance premiums thereon or subject to any assessments due thereunder.

(f)   If at any time Landlord and Mortgagee is not in receipt of written evidence that all Policies are in full force and effect, either shall have the right, without notice to Tenant, to take such action as either deems necessary to protect its interest in the Leased Premises, including, without limitation, the obtaining of such insurance coverage as either in its sole discretion deems appropriate.   All premiums incurred by Landlord and/or Mortgagee in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Tenant to Landlord and/or Mortgagee, as the case may be, upon demand and, until paid, shall be secured by the Mortgages and shall bear interest at the Overdue Rate.

(g)   Tail Insurance.   If Tenant has claims made insurance coverage of any type, upon expiration or earlier termination of this Lease, Tenant shall purchase so-called "tail" insurance for a period of three years in an amount not less than its existing coverages in order to assure Tenant is covered by insurance after the expiration or earlier termination of this Lease for all claims arising or relating to the period prior to the expiration or earlier termination of this Lease, and Landlord and Mortgagee shall be named as additional insured thereunder.

Section 6.2   Certificates of Insurance.   Upon the Commencement Date of this Lease, Tenant shall furnish Landlord, Mortgagee and other third parties which Landlord shall designate with appropriate certificates of insurance on acceptable Acord forms, together with an additional insurance endorsement showing that each type of insurance required under this Article VI is in full force and effect and not cancelable or modifiable without thirty (30) days prior written notice to Landlord, and upon request of Landlord or one or more of such additional insureds, deliver copies of such insurance policies.   Tenant will provide Landlord with acceptable certificates of insurance pursuant to this Section 6.2 evidencing the renewal of such Policies ten (10) Business Days prior to the Policies' expiration date.   Tenant acknowledges that all such certificates shall name Landlord, its successors and assigns, and Mortgagee, its successors and assigns, as additional insureds on the general liability and umbrella policies and as a loss payee/mortgagee, as their interests may appear, on the property and boiler and machinery policies.

Section 6.3   Waiver of Subrogation.   Landlord and Tenant hereby waive all rights of recovery for causes of action which either has or may have or which may arise hereafter against the other for any damage to the Leased Premises or the property or business of either of them or of anyone claiming through either of them, by way of subrogation or otherwise, caused by any of the perils covered by a special form policy of property insurance or contents insurance or by any other insurance for damage to property carried by the party whose property was damaged; provided, however, that the foregoing waiver shall apply only if and to the extent that

24



a waiver of subrogation for property damage is not prohibited in the State of New York, has been consented to by the applicable insurance carrier, and only to the extent of such insurance coverage.

## ARTICLE VII

### SECURITY, ACCESS AND REPORTING OBLIGATIONS, WORKING CAPITAL

      Section 7.1            Security Deposit/Guaranty.

      (a)      Contemporaneously with the execution of this Lease, Tenant, shall deliver a guarantee of this Lease (the "Guaranty") from Lizer Josefovic and Mark Neuman (collectively, the "Guarantors") in the form of Exhibit "B" attached hereto, or in form and amounts as may be otherwise required by the Landlord and Landlord's first and second Mortgages. The Guaranty shall set forth that the Guarantors will be required to cooperate in turning the license over to the Landlord's designee or be personally liable for all costs, expenses and damages or deficiencies. The Guarantors shall ensure that the Tenant shall deliver all of the documents required to transfer the license in escrow to Posternak, Blankstein & Lund,, or such other party as Landlord designates. As further security for the Tenants performance under the Lease, the Tenant hereby agrees as follows:

          (i)        Tenant agrees that it shall deliver to Landlord 60 days prior to the Commencement Date, an agreement by Capital Funding Group, which cannot be amended except by an agreement in writing signed by Landlord, Tenant and Capital Funding Group, in the form attached hereto as Exhibit 7.1(a) or otherwise approved by Landlord and Landlord's lenders in their reasonable discretion, wherein and whereby Capital Funding Group agrees to allow Tenant to draw down on its Credit Line each month so as to enable Capital Funding Group to pay directly to Landlord the sum of $506,096.50 per month commencing the Commencement Date and on each day Fixed Rent is due under the Lease for the following 11 months.

          (ii)        Tenant agrees that it shall deliver 60 days prior to the anticipated Commencement Date either (i) an unconditional Letter of Credit, in accordance with the Letter of Credit Agreement attached hereto as Exhibit 7.1(b) (which shall be executed simultaneously herewith), in the amount of $3,700,000, or (ii) $3,700,000 in cash ("Security Deposit") to secure the full and timely payment and performance of Tenant's obligations under this Lease. Tenant's failure to deliver the Letter of Credit or timely pay to Landlord the Security Deposit shall be deemed a Lease Default by Tenant. Landlord may retain the Security Deposit in such accounts as Landlord elects in its sole discretion and Landlord may commingle the Security Deposit with other funds of Landlord or its affiliates. Tenant shall have no right to any interest on the funds comprising the Security Deposit that it delivers to Landlord.

          (iii)    Sixty days prior to the anticipated Commencement Date, the funds in the controlled account number ▮▮▮▮▮ in JPMorgan Chase Bank, N.A. (the "Bank") in the amount not less than $1,500,000 shall be delivered by Tenant to Landlord and released by Tenant to Landlord to be held as an additional Security



Deposit by Landlord. The letter to Bank implementing the Tenant's obligations pursuant to the preceding sentence, attached hereto as Exhibit 7.1(c), which shall be held in escrow by Posternak, Blankstein & Lund, shall be delivered by it to the Bank sixty days prior to the anticipated Commencement Date upon notice from Landlord.

(b)    The term "Letter of Credit" shall mean an irrevocable, unconditional, transferable, clean sight draft letter of credit in favor of Landlord in form and content reasonably satisfactory to Landlord and entitling Landlord to draw thereon without the payment of any fees or charges in New York, New York, issued by a domestic banking institution or the U.S. agency or branch of a foreign banking institution; provided, that such banking institution has a long term senior unsecured debt obligation rating of at least "AA" by S&P. The Letter of Credit shall have an expiration date of the date that is the first anniversary of the date hereof. The Letter of Credit shall provide that it shall be deemed automatically renewed (without amendment) for consecutive periods of one year each thereafter during the Term unless the issuing bank sends written notice to Landlord and Tenant by certified mail, return receipt requested, not less than thirty (30) days preceding the then expiration date of the Letter of Credit that it elects not to have such Letter of Credit renewed. If such notice is sent, then at least twenty (20) days prior to the expiration of the Letter of Credit (and each subsequent or replacement Letter of Credit), Tenant shall deliver to Landlord a new Letter of Credit in the same amount and a failure to do so shall entitle Landlord to draw upon the existing Letter of Credit and to receive the proceeds therefrom and hold such proceeds as a cash Security Deposit pursuant to this Section 7.1 pending delivery of a new Letter of Credit.

(c)    Upon a Lease Default, Landlord shall have the right, but not the obligation, in Landlord's sole and absolute discretion, to draw upon the Security Deposit and/or Letter of Credit and apply some or all of the funds to remedy such default or occurrence and to compensate Landlord for any loss or damage resulting therefrom, without prejudice to any other rights or remedies of Landlord under this Lease or at law or in equity. Upon any such application by Landlord, Tenant shall promptly deposit with Landlord an amount in cash equal to the amount from the Security Deposit so utilized by Landlord. Landlord shall at all times have, as security hereunder, Letter of Credit and cash Security Deposit in the amounts stated in Section 7.1(a). Upon the termination or expiration of this Lease, as long as Tenant has performed all of its obligations pursuant to this Lease and no Lease Default has occurred which is continuing, the remaining amount of the Security Deposit shall be returned or refunded to Tenant, without interest, subject in all events to Landlord's right to apply the Security Deposit as provided herein.

(d)    Upon the occurrence of a Lease Default, Landlord may use, apply or retain the whole or any part of the Security Deposit or draw under a Letter of Credit to the extent required for the payment of any Rent or any other sums as to which Tenant is in default or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease, including, but not limited to, any damages or deficiency in the reletting of all or any portion of the Leased Premises, whether such damages or deficiency accrue before or after summary proceedings or other re-entry by Landlord. If Landlord shall so use, apply or retain the whole or any part of the Security Deposit, Tenant shall upon demand immediately deposit with Landlord a sum equal to the amount so used, applied or retained. In the event of any sale or financing of Landlord's interest in the Leased Premises, Landlord shall have the right to assign its interests in the

26



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM INDEX NO. 60278/2020

NYSCEF DOC. NO. 2    21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice    RECEIVED NYSCEF: 09/18/2020

part 1    Pg 62 of 150

Security Deposit to the transferee, assignee or mortgagee, as the case may be, and if Landlord has given notice to Tenant of the assignment of Landlord's interest in the Security Deposit and if assignee or transferee of the Security Deposit has accepted liability for the Security Deposit, Landlord shall thereupon be released by Tenant from all liability for the return or payment thereof; and Tenant shall look solely to the new landlord or mortgagee for the return or payment of the same. Tenant shall not assign or encumber or attempt to assign or encumber the Security Deposit and neither Landlord, nor its successors or assigns, shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

    Section 7.2  Access to Leased Premises.  Tenant shall permit Landlord, Mortgagee and their agents to enter upon the Leased Premises at all reasonable times during ordinary business hours and upon at least twenty-four (24) hours advance oral notice (except that in the case of emergency, Landlord may enter at any time and without prior notice) to inspect and examine the Leased Premises, to perform repairs as to Landlord's Work pursuant to Section 5.1, and to inspect and copy any operating manuals, procedures manuals, training manuals, and other books and records concerning unemployment, workers' compensation, insurance, tax, and any other business issues pertaining to the Leased Premises (subject to applicable laws and regulations governing patient confidentiality and privacy and the confidentiality of medical records) and any information necessary for audit relating to cost reimbursement, collections, general financial matters, litigation, inquiries and related activities (as may be necessary in connection with the Lease or the Leased Premises or any matters relating to periods prior to the Commencement Date).  Any access by Landlord to patient records or medical records shall be strictly governed by Laws governing patient confidentiality and privacy and the confidentiality of medical records and all appropriate consents and/or waivers from residents or their guardians or representatives shall have been obtained before access to such records shall be granted. Landlord shall make reasonable efforts not to materially interfere with or materially disrupt Tenant's business and use and enjoyment of the Leased Premises during any such inspection or examination.  Landlord shall also have the right but not the obligation to conduct a physical inspection of the Facility and from time to time and within ninety (90) days prior to the expiration of the Term or earlier termination of the Lease, upon twenty-four (24) hours advance oral notice.  If Landlord reasonably determines based on this inspection that the Facility, or any portion of the Facility, requires repairs or maintenance so that the condition of the Facility is in compliance with this Lease and all Laws, then within thirty (30) days of notification by Landlord, Tenant shall commence making said repairs and diligently pursue such repairs to completion.  Should Tenant fail to do so, within seven (7) days of notification by Landlord, Tenant shall pay to Landlord a deposit of funds in an amount equal to Landlord's reasonable estimate of the costs of such repairs or maintenance, which funds shall be released to Tenant from time to time during the progress of such repairs and maintenance based on submission by Tenant of evidence reasonably satisfactory to Landlord that such work is complete and all costs and expenses incurred to date have been paid in full.  Tenant and Landlord acknowledge that the operations of the Facility and its maintenance are the sole and absolute responsibility of Tenant. Landlord shall have no liabilities or obligations with respect to the Facility, including no liabilities or obligations with respect to inspections of the Facility or the failure by Landlord to inspect the Facility.

    Notwithstanding anything to the contrary in this in this Lease, Landlord and Tenant agree that all information, records and data collected or maintained regarding Facility

2305449v5/17057-6



residents shall be confidential. Landlord, Tenant, and their respective employees and agents shall maintain the confidentiality of all Facility resident information received in accordance with applicable New York and federal laws, including the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-91) and the regulations issued in connection therewith (collectively, "HIPAA"). No employee or agent of Landlord or Tenant shall discuss, transmit or narrate in any manner the Facility resident information of a personal, medical, or other nature except as a necessary part of providing services to the resident, effectuating a transfer of the Facility's assets, or otherwise fulfilling its obligations under this Lease or under law. The obligations under this Section 7.2 shall survive the termination of this Lease, whether by rescission or otherwise.

Section 7.3    Changes in Licensure and Certification Status.    As of the Commencement Date, Tenant represents and warrants that the number of beds licensed or certified for the Facility is one hundred sixty (160). Tenant shall not increase or decrease the licensed or certified number of beds, or change the license or certification thereof, without the consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion; Tenant may increase the number of licensed or certified beds of the Facility upon thirty (30) days prior written notice to Landlord, but without the prior written consent of Landlord. If required, Tenant shall not increase the number of beds without the consent of the Commissioner and/or the DOH and Tenant agrees to return to Landlord upon the expiration of the Lease, the Leased Premises. Should Tenant increase the number of licensed beds at the Facility, the Fixed Rent payable for the Facility shall be increased proportionately for such additional beds. In no event shall the Fixed Rent be reduced in the event the number of Licensed Beds at the Facility is reduced. Landlord and Tenant acknowledge that the Leased Premises are, and at all times under the Term of this Lease are, the sole and absolute property of Landlord. Upon any termination of this Lease or any Lease Default by Tenant hereunder (which breach or default is not cured within any applicable grace period), and subject to the approval of the DOH, Landlord shall have the right to cause the Facility's licenses to be reissued in Landlord's name or in the name of Landlord's designee upon application therefor to, and the receipt of approval from, the DOH and to further have the right to have any and all Medicare, Medicaid and any other provider and/or third party payor agreements issued in Landlord's name or in the name of Landlord's designee. In the event Landlord exercises its rights pursuant to this Section 7.3, Tenant and Guarantors shall cooperate with Landlord in transferring the aforementioned items to Landlord's name or for the benefit of Landlord or as Landlord may direct pursuant to the terms of this Lease.

Section 7.4    Reporting and Other Obligations.

(a)    During the Term, Tenant shall and shall cause all Subtenants, sub-subtenants and any operators of the Facility to provide (without duplication) Landlord and Mortgagor with the following reports, statements, and inspections:

(i)    Annual Budget. Within 60 days prior to the projected Substantial Completion Date, and no later than thirty (30) days prior to the end of each calendar year thereafter, Tenant shall submit to Landlord an annual budget (each an "Annual Budget") covering the operations of and proposed capital expenditures to be made with respect to the Facility for the next calendar year (or the remainder of the current calendar year, in the case of the initial Annual Budget).

28

2305449v5/17057-6



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2
INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 64 of 150

(A)    Capital Expenditures.  The Annual Budget shall include a capital budget (the "**Capital Budget**") outlining a program of capital expenditures as may be required by Laws, any lender to Landlord, or Tenant's reasonable business judgment during the next calendar year (or the remainder of the current calendar year, in the case of the initial Capital Budget), in which each proposed capital expenditure will be designated as either mandatory, highly recommended or desirable.  Tenant shall be responsible for designating as a "mandatory capital expenditure" any expenditure which, if not made would, in Tenant's reasonable judgment: (a) cause the Facility to lose or put at risk its License; (b) place at risk the safety of a patient or resident or employee of the Facility; (c) cause the ineligibility of the Facility under any third party payor program applicable to the Facility; (d) cause the issuance of a formal notice that any of the operating licenses for the Facility or any substantial portion of the Facility will be revoked or suspended or qualified in any material adverse respect; or (e) subject Landlord or Tenant to criminal prosecution.  Tenant shall make during the calendar year, or calendar quarter for which they are budgeted, all capital expenditures approved by Landlord.  On and after the Commencement Date, Tenant shall expend at least Five Hundred Twenty-Three Dollars ($523.00) per bed per annum for capital expenditures at the Facility, including amounts expended to comply with the licensure and other expenditures required by any Governmental Authority or such other amounts as may be required by Mortgagee from time to time.  If Mortgagee requires Landlord to deposit sums for capital expenditures, replacements and/or refurbishments relating to furniture, fixtures, equipment and/or improvements to the Facility, then Tenant shall pay to Landlord, as Additional Rent hereunder, all reserve or escrow amounts, sums and/or deposits which Landlord is required to pay to such Mortgagee with respect to such capital expenditures, replacements and/or refurbishments.  Tenant shall pay any and all of such amounts and sums to or as directed by Landlord as Additional Rent hereunder together with each payment of Fixed Rent hereunder.  Tenant acknowledges that as of the date hereof, Mortgagee requires a monthly deposit of Five Hundred Twenty-Three Dollars ($523.00) per bed with respect to the Facility.  In the event that such deposits are made by Tenant hereunder, Landlord shall use its reasonable efforts, subject to the terms and conditions of the loan agreements with Mortgagee, to obtain disbursements of such funds to be used for the payment of or reimbursement for the costs of such capital expenditures, replacements and/or refurbishments.

(B)    Operating Budget.  The Annual Budget shall include an operating budget (the "**Operating Budget**") setting forth an estimate of operating revenues and expenses for the Facility for the next calendar year (or the remainder of the current calendar year, in the case of the initial Operating Budget), together with an explanation of anticipated changes in the Facility.  Tenant shall provide to Landlord upon written request such other reports, including a cost comparison report, and all appropriate Medicare and Medicaid reports, as may be required under these programs, as are normally provided by Tenant to the owners of other similar rehabilitation hospitals, psychiatric hospitals, and skilled nursing facilities leased by Tenant.

(ii)    Financial Reporting.  Tenant will keep and maintain or will cause to be kept and maintained on a calendar year basis, in accordance with GAAP, proper and accurate books, records and accounts reflecting all of the financial affairs of Tenant and all items of income and expense in connection with the operation on an individual basis of the Facility.  Notwithstanding the foregoing, Tenant's interim unaudited financial statements shall be prepared in accordance GAAP for interim financial information, but may not include all information or notes required by GAAP for a complete set of financial statements; such financial statements

29



shall include all adjustments and reclassifications of a normal recurring nature considered necessary for a fair and comparable presentation; all such interim financial statements shall be read in conjunction with most recent audited financial statements. Landlord and Mortgagee shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Tenant or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Landlord and/or Mortgagee shall desire. After the occurrence of a Lease Default, Tenant shall pay any costs and expenses incurred by Landlord and/or Mortgagee to examine Tenant's accounting records with respect to the Facility, as Landlord and/or Mortgagee shall reasonably determine to be necessary or appropriate in the protection of Landlord and/or Mortgagee's interest.

(iii) Tenant, at its expense, shall submit to Landlord and, upon Landlord's request to Mortgagee, as soon as available, and in any event (A) within thirty (30) days after each calendar month's end, unaudited monthly financial statements (which include income statements, balance sheets, statements of cash flows, occupancy and payor mixes) of Tenant for the month then-ended and year to date, prepared on a basis consistent with the annual statements; monthly census and revenue information of the Facility as of the end of such month and year to date in sufficient detail to show by patient-mix and revenue-mix (i.e., private, Medicare, Medicaid and V.A. and managed care (by program)) the average monthly census of the Facility and year to date; an aged accounts receivable report from the Facility in sufficient detail to show amounts due from each class of patient-mix by the account age classifications of 30 days, 60 days, 90 days, 120 days, and over 120 days; (B) within forty-five (45) days after the end of each calendar quarter, unaudited quarterly financial statements (which include income statements, balance sheets, statements of cash flows, occupancy and payor mixes) of Tenant for the quarter then-ended, prepared on a basis consistent with the annual statements; quarterly census and revenue information of the Facility as of the end of such quarter in sufficient detail to show by patient-mix and revenue-mix (i.e., private, Medicare, Medicaid and V.A. and managed care (by program)) the average quarterly census of the Facility; (C) no later than 120 days after the end of each calendar year of Tenant, audited annual financial statements of Tenant, prepared by an independent certified public accounting firm reasonably acceptable to Landlord, prepared in accordance with generally accepted accounting principles, with an unqualified opinion, and including a balance sheet, a statement of income and expenses for the year then ended, a statements of cash flow, and a schedule audited by such independent certified public accountant reconciling Tenant's, net operating income to net cash flow, which shall itemize all adjustments made to net operating income to arrive at net cash flow deemed material by such independent certified public accountant.

(iv)    Each financial report provided by Tenant shall reconcile and show variances between the actual experience incurred during each such reporting period with respect to each metric to the metric shown on the Operating Budget and Capital Budget for such period.

(v)    Tenant, at its expense, shall submit to Landlord and, upon Landlord's request to Mortgagee, any other reports and certificates reasonably requested by Landlord or Mortgagee from time to time.

2305449v5/17057-6

(vi)　　In addition, Tenant shall prepare and deliver to Landlord, and upon request or if required by Landlord's then existing Mortgagee, to Mortgagee, a written report providing an operational overview of significant events and circumstances at the Facility during the prior month, during the first six months of the Term and then quarterly thereafter, including, but not limited to, clinical events, employee relations and staffing matters and provide such other information as Mortgagee may require from time to time. Tenant shall provide Landlord, and upon request or if required by Landlord's then existing Mortgagee, to Mortgagee, with a copy of all federal income tax returns of Tenant and its Subtenants within fifteen (15) days after filing thereof. Whenever practicable, all reports shall be delivered to Landlord electronically in a format usable by Landlord.

(b)　　All unaudited financial reports from Tenant shall include an Officer's Certificate certifying that such financial statements present fairly the financial condition and the results of the operations of Tenant and the properties being reported upon and that such financial statements have been prepared in accordance with the Tenant's customary accounting procedures. The Officer's Certificate accompanying the annual audited financial statements of Tenant shall also include a statement that they have been prepared in accordance with GAAP and whether there exists an event or circumstance which constitutes a default or an event of default under the Lease, the nature thereof, the period of time it has existed, and the action then being taken to remedy the same.

(c)　　Tenant shall furnish Landlord and Mortgagee, within five (5) days of the receipt by Tenant, any and all notices (regardless of form) from any Health Care Authority that Tenant's license, Medicare or Medicaid certification, or VA or other governmental program participation is being, or could be revoked or suspended, that action is pending, being considered or being taken to revoke or suspend the Tenant's license or certification or to fine or penalize the Tenant, or that action is pending, being considered, or being taken, to discontinue, suspend, deny, decrease or recoup any payments due, made or coming due to Tenant or related to the operation of the Facility other than in the ordinary course of business related to billing adjustments.

(d)　　Tenant shall furnish Landlord and Mortgagee, within two (2) days of the receipt by Tenant, any and all notices (regardless of form) from any Governmental Authority or third party payor (i) alleging that the Facility has three or more deficiency(ies) of a scope and severity of "G" or hire, or one or more deficiency(ies) of a scope and severity of "J" or higher, (ii) alleging that the residents of the Facility are in jeopardy, (iii) freezing admissions to the Facility or (iv) denying reimbursement for any class of residents by any third party payor.

(e)　　Tenant shall furnish Landlord and Mortgagee, within two (2) days of the sending or receipt by Tenant of any communication copies thereof, including a plan of correction, with respect to the matters referenced in Section 7.4(d).

(f)　　Tenant shall file all required reports, including without limitation, Medicare or Medicaid cost reports, on or prior to the date such reports are due (such due date to include approved regulatory extensions allowed by the applicable Governmental Authority for the filing of such reports) and shall furnish Landlord and Mortgagee, within thirty (30) days of the date of filing, a complete and accurate copy of the annual Medicare or Medicaid cost report

31



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 67 of 150

for Tenant, which will be prepared by Tenant and accompanied by an Officer's Certificate of Tenant certifying as of the date thereof that such report is accurate, complete and not misleading, and promptly furnish Landlord and Mortgagee any amendments filed with respect to such reports and all notices, responses, audit reports or inquiries with respect to such reports.

(g)     Tenant shall furnish Landlord and Mortgagee, within thirty (30) days of the receipt by Tenant, the annual Medicaid and Medicare provider agreement(s) and the annual Medicaid and Medicare reimbursement rate sheets for the Facility.

(h)     Tenant shall furnish Landlord and Mortgagee, within ten (10) days of receipt but at least five (5) days prior to the earliest date on which Tenant is required to take any action with respect thereto or would suffer any adverse consequence, a copy of any Medicare, Medicaid or other licensing or accreditation or rating agency or entity survey, report, warning letter, or notice, and any statement of deficiencies, and within the time period required by the particular agency for furnishing a plan of correction also furnish or cause to be furnished to Landlord and Mortgagee a copy of the plan of correction generated from such survey, report, warning letter, or notice to Tenant and any subsequent correspondence related thereto, and correct or cause to be corrected any deficiency, the curing of which is a condition of continued licensure or of full participation in Medicare or Medicaid or a care program offered by an insurance company, managed care company, or other third-party payor by the date required for cure by such agency or entity (plus extensions granted by such agency or entity).

(i)     Tenant shall furnish Landlord and Mortgagee, within ten (10) days of receipt by Tenant, any other notices or charges issued relating to the non-compliance by Tenant with any Governmental Authority, insurance company, managed care company, or other third-party payor laws, regulations, requirements, licenses, permits, certificates, authorizations or approvals, but only such matters which could reasonably be expected to have a material adverse effect on the financial condition of such Person or the operation of the Facility.

(j)     Tenant shall furnish Landlord and Mortgagee, within ten (10) days of receipt by Tenant, any new, revised or amended Medicare or Medicaid reimbursement rate sheets which may be issued subsequent to the annual reimbursement rate sheets.

(k)     Tenant shall notify Landlord within five (5) days of any condition or event that constitutes a breach of any term, condition, warranty, representation or provision of this Lease or any other agreement between Landlord or its Affiliates and any Tenant, any Guarantor or any of their Affiliates, and of any adverse change in the financial condition of any Tenant, any Guarantor or any Affiliate of any Tenant or any Guarantor and of any Event of Default. Additionally, Tenant shall notify Landlord within seven (7) days after receipt of any formal or informal written notice or advice from its insurance carrier, reinsurance provider, accountants, actuary, any Governmental Authority, or any third party payor program provider of any actual, pending, threatened or contemplated increase in Tenant's reserves for expenses relating to malpractice or professional liability claims or any material increase in the premium costs for malpractice or professional liability insurance.

(l)     To the extent performed, Tenant shall furnish Landlord and Mortgagee, a copy of written external consultant reports (including environmental, operations,

32



quality assurance, physical plant, property inspection, etc.) (which shall be delivered promptly upon receipt from the consultant).

(m)      Tenant shall furnish Landlord and Mortgagee, a copy of cost reports as filed by Tenant.

(n)      Any supporting documents or data requested by Landlord in connection with the items in this <u>Section 7.4</u>.

(o)      Within 10 days of event of any of the following, Tenant shall deliver to Landlord, notice of:

(i)      any rate appeal brought before any Governmental Authority or any administrator of any third party payor program or referral source;

(ii)      any reimbursement appeals or recoupment claims made or contests pending or threatened as a result of any audits by any third party payor; and

(iii)      any claim, requirement or demand (excluding all claims, requirements, and demands, if any, that have been waived) of any Governmental Authority, third party payor or insurance body or carrier having or claiming any licensing, certifying, supervising, evaluating or accrediting authority over the Leased Premises to rework or redesign the Leased Premises, its professional staff or its professional services, procedures or practices in any material respect or to make any of the Leased Premises conform to or comply with a legal requirement.

(p)      The receipt by Landlord of any reports, statements, financial information, surveys or otherwise from Tenant or its Affiliates shall not in any way impose any obligation or liability upon Landlord to act or take any action upon any information, facts or circumstances which may be disclosed or shown therein and Landlord shall have no liability for its failure to act thereon or as a result thereof.

(q)      <u>Financial Covenants</u>. Tenant covenants and agrees to the following, as may be amended time to time as required by Landlord's 1st or 2nd Mortgagee:

(i)      Commencing the third full quarter of the Term Tenant's Current Ratio shall not be less than 1.1 to 1.0. The term "**Current Ratio**" means the current assets of Tenant divided by the current liabilities of Tenant determined in accordance with GAAP.

(ii)      For each quarter of the Lease Term commencing the third full quarter following the Commencement Date, Tenant's Lease Coverage Ratio shall be not less than 1.25 to 1.0.

(iii)      For each quarter of the Lease Term commencing the second full quarter following the Commencement Date, the Facility shall have achieved the EBITDAR benchmarks as described on <u>Schedule 7.4</u>, attached hereto. The term "**EBITDAR**" is defined in Schedule 7.4.

33



     Section 7.5     <u>Payment in the Ordinary Course</u>.  Tenant shall pay in full:
(a) prior in each case to the date when penalties would attach, all Impositions (except only those
so long as and to the extent that the same shall be contested in good faith by appropriate and
timely proceedings and for which adequate reserves have been established in accordance with
GAAP), provided that (i) Landlord has given its prior written consent to such contest, which
consent shall not be unreasonably withheld or delayed) for which Tenant may be or become
liable; (ii) no Lease Default has occurred and remains uncured, (iii) such proceeding shall
suspend the collection of such Impositions or the Impositions shall have been paid, (iv) such
proceeding shall be permitted under and be conducted in accordance with the provisions of any
other instrument to which Tenant is subject and shall not constitute a default thereunder, (v) no
part of or interest in the Leased Premises will be in danger of being sold, forfeited, terminated,
canceled or lost, (vi) Tenant shall have furnished such security as may be required in the
proceeding, or as may be requested by Landlord or Mortgagee, to insure the payment of any such
Impositions, together with all interest and penalties thereon, which shall not be less than 125% of
the unpaid Impositions being contested and (vii) Tenant shall promptly upon final determination
thereof pay the amount of such Impositions, together with all costs, interest and penalties; (b) all
of Tenant's wage obligations to Tenant's employees in compliance with the Fair Labor
Standards Act (29 U.S.C. §§ 206-207) or any comparable provisions under federal, state or local
law; (c) all obligations owed in connection with any claim, demand or notice of any overpayment
received from Medicare, Medicaid or other third party payor; and (d) all of Tenant's obligations
calling for the payment of money (except only those so long as and to the extent that the same
shall be contested in good faith and for which adequate reserves have been established in
accordance with GAAP, provided that Landlord has given its prior written consent to such
contest, which consent shall not be unreasonably withheld or delayed) before such payment
becomes overdue.

     Section 7.6     <u>Security Agreement.</u>  In order to secure the payment and
performance of all of Tenant's obligations under this Lease and all of Tenant's obligations to
Landlord, and all and all other documents contemplated thereby, Tenant hereby grants to
Landlord a first priority security interest in and lien upon, all of the assets of Tenant including,
without limitation, (i) all trade fixtures, equipment, furniture, merchandise, inventory and other
personal property located from time to time in or upon the Leased Premises (including the
proceeds thereof), and (ii) to the fullest extent permitted by applicable law, all accounts, accounts
receivable, licenses, certifications, certificates, accreditations, approvals, permits, variances,
waivers, provider agreements, certificates of need, and other authorizations issued to or held by
Tenant with respect to the operation of the Facility skilled nursing facility and Tenant's interest
in and rights under all third party payor provider agreements with respect to the Facility (the
items listed in clauses (i) and (ii), together with the proceeds of same, are collectively,
"<u>Collateral</u>").  The security interest granted to Landlord with respect to Tenant's tangible
personal property is intended to be subordinate to any purchase money security interest or capital
lease on any of Tenant's tangible personal property provided that Tenant has notified Landlord
of the creation of such security interest or capital lease prior to the creation thereof and Landlord
has approved same.  Landlord agrees to subordinate its lien on Tenant's accounts receivable in
favor of Tenant's accounts receivable lender, which shall be a nationally recognized nursing
home accounts receivable lender with experience acceptable to HUD or Mortgagee on at least 20
nursing homes, securing up to a $2,000,000.00 accounts receivable loan, provided such lender
enters into an intercreditor agreement reasonably acceptable to Mortgagee and Landlord. Should

2305449v5/17057-6



Mortgagee require a subordination of the priority of Landlord's security interest in the Collateral, Landlord and Tenant shall execute such documents as Mortgagee may request to subordinate Landlord's lien to the Mortgagee's security interest in the collateral. In addition, Tenant's members shall grant to Landlord a first lien pledge (subject to the following sentence) of the membership interests of Tenant. To the extent required by Tenant's accounts receivable lender, Landlord agrees to subordinate its lien on Tenant's membership interests to a lien in favor of such lender securing up to a $2,000,000.00 accounts receivable loan; provided such lender enters into an intercreditor agreement reasonably acceptable to Mortgagee and Landlord. On or before the Commencement Date, Tenant shall provide Landlord with a detailed list and description of all the Collateral. Upon a Lease Default by Tenant, Landlord shall have all the rights and remedies of a secured party under the laws of the State of New York. Tenant, as debtor, shall cause to be executed (if appropriate or necessary) and delivered to Landlord, as the secured party, upon execution of this Lease by Tenant, UCC-1 Financing Statements in proper form, and thereafter, from time to time, deliver to Landlord such extensions and/or updates of such financing statements as are required for the purpose of perfecting and maintaining the priority of the security interest granted to Landlord herein, and to perform any other acts reasonably necessary to the perfection of such security interest. Tenant and Tenant's members consent to Landlord's preparation of and the filing of such financing statements by Landlord and agrees that the provisions of this <u>Section 7.6</u> shall constitute a security agreement for the purposes contemplated hereby. The security interest granted by this <u>Section 7.6</u> shall be in addition to any lien of Landlord that may now or at any time hereafter be provided by law. In the event Landlord exercises its remedies to foreclose the security interest created under this <u>Section 7.6</u>, or elsewhere in this Lease, Tenant shall cooperate with Landlord in transferring all of the aforementioned items promptly as requested by Landlord in Landlord's or its designee's name or for the benefit of Landlord. Tenant covenants and agrees that it shall not sell, move, surrender, cancel, modify, transfer, assign, relocate, pledge, grant a security interest in, convey or in any other manner encumber any assets of Tenant including, without limitation, the personal property, the certificate of need approval or any of the licensed or Medicare- and/or Medicaid-certified beds at the Facility, or any licenses for the Facility, or attempt at any time to do same, except as expressly provided hereunder and with the written consent of Landlord. This <u>Section 7.6</u> and Landlord's rights and remedies hereunder shall survive the termination of the Lease.

Section 7.7  <u>Working Capital</u>. As of the Effective Date, Tenant shall have and maintain until the Commencement Date in accounts, acceptable to Landlord in its sole and complete discretion, an amount of funds equal to the greater of ("Working Capital") (i) any debt service reserve required by Mortgagee, (ii) the aggregate negative net operating income of Tenant for the period of months from the Commencement Date to the first day of the first two month period in which aggregate net income from operations exceeds zero, all as reflected in the projections attached hereto as <u>Schedule 7.7</u> ("Cash Requirement"); for the purpose of this calculation net operating income shall be determined on a cash basis, and (iii) 4.5 million dollars. Working Capital shall not include any accounts or reserves established to satisfy the requirements of Section 7.1(a) (i) and (ii). From and after the Commencement Date, the Working Capital, subject to any requirement of the Mortgagee, may be used by Tenant only to fund the Cash Requirement.

7.8  <u>Refinance</u>. Tenant shall fully cooperate with Landlord in its efforts to Refinance from time to time, including without limitation, providing all information and executing all

35



documents required by Landlord or its lender(s). On and after each Refinance Date the Fixed Rent for each twelve month period shall equal the sum of the amounts provided for in clauses (a) through (e): (a) the annual debt service payments (principal, interest, and mortgage insurance premiums, if any) that Landlord is required to pay to Lender pursuant to the first Mortgage (the "**Mortgage Debt**"), plus such additional amounts as Landlord may be required to pay under any of the Loan Documents with respect to tax, insurance and other reserve requirements and/or payment obligations; (b) the annual aggregate debt service payments or preferred equity payments that the Landlord is required to pay pursuant to the Junior Debt (or replacement thereof) (with the Mortgage Debt, the "**New Debt Service**"); plus such additional amounts as Landlord may be required to pay under any of the Loan Documents with respect to tax, insurance and other reserve requirements and/or payment obligations under the Junior Debt (or replacement thereof); (c) an annual amount equal to $1,390,115; (d) an additional amount of $250,000 per year prior to the fourth year of the Term; $350,000 per year during Lease Years 4 and 5; and $400,000.00 per Lease Year thereafter until the end of the Term, including all Extension Terms; and (e) an additional amount equal to one-half of the amount that (i) a sum equal to the last 12 months interest payment on the original Mortgage and Junior Debt exceeds (ii) New Debt Service.

## ARTICLE VIII

## PERSONAL PROPERTY

Section 8.1    Landlord's Personal Property. Upon the expiration or termination of this Lease, Tenant shall leave all personal property leased to Tenant hereunder, as repaired, rebuilt, replaced, restored, altered or added to as permitted or required by provisions of this Lease, in or on the Leased Premises, except for ordinary wear and tear. Any and all restorations, alterations or replacements of, or repairs, reconstructions or additions to, the personal property at the Facility made by Tenant shall become part of Landlord's personal property, and any and all security interests (except in favor of Landlord) in Tenant's personal property and financing statements shall be cleared, terminated and/or released to the satisfaction of Landlord at Tenant's expense. Tenant shall pay off in full the remaining payments due on all personal property leased by Tenant and such personal property shall become part of Landlord's personal property and financing statements shall be cleared, terminated and/or released to the satisfaction of Landlord at Tenant's expense. Any of Tenant's software, software licenses, proprietary information, and policies, and procedures of Tenant ("**Retained Assets**") shall not become part of Landlord's personal property except in the event of the termination of this Lease as a result of a Lease Default, in which case the Retained Assets shall become the personal property of Landlord; provided, however, upon request of Landlord, in consideration of a payment by Landlord or its designee of Ten Dollars ($10.00) and any applicable lease, rent, or license fees owed to any third parties during the Transition Period (hereinafter defined), Tenant shall license Landlord or its designee(s) (at Tenant's cost with no mark-up) to utilize the Retained Assets for a period of one hundred twenty (120) days (the "**Transition Period**") in connection with the transition of operations from Tenant and Landlord's new operator(s). To the extent Tenant or any Subtenants are obligated under license agreements with third party vendors supplying software (and/or computer hardware which Tenant does not own or lease) to such Tenant, Tenant shall use its best

36

efforts to arrange for Landlord or Landlord to enter into licensing agreements with such third party vendors to allow Landlord or its designee to utilize such software and computer hardware supplied by such third party vendors for the duration of the Transition Period.

Section 8.2 <u>Tenant's Retained Assets.</u> At the termination of the Lease, Landlord shall have the right to purchase all or a portion of Tenant's Retained Assets located at the Facility at the lower of its fair market value or book value. To the extent any of Tenant's Retained Assets is subject to a license, Landlord shall have the right but not the obligation to assume some or all of such license Landlord's sole cost and expense and at no additional liability to Tenant.

## ARTICLE IX

## INDEMNIFICATION

Section 9.1 <u>Tenant's Indemnification</u> (a) During the Term of this Lease and after the surrender of the Leased Premises in accordance with <u>Section 5.5</u> of this Lease, Tenant shall protect, defend (at Landlord's request), indemnify and hold harmless Landlord, Landlord's members, managers, officers, owners, directors, employees, agents, representatives, and Mortgagee and their respective agents, executors, heirs, representatives and assigns, and any entity providing financing which is secured by the Leased Premises (collectively the **"Landlord's Indemnitees"**), from and against any claims, losses, costs, penalties, damages, charges and/or expenses (including reasonable attorneys' and consultants' fees and expenses) imposed or resulting from, arising out of or attributable in whole or in part to any of the following: (i) any violation of any Law, order of Governmental Authority, whether occasioned by the intentional act, omission, or negligence of Tenant or those holding under Tenant, (ii) any accident or other occurrence on or about the Leased Premises on or after the Commencement Date causing injury to any person or property whomsoever or whatsoever, including but not limited to patient care claims or elder abuse, (iii) any failure of Tenant in any respect to comply with or perform any term, condition, covenant, requirement and/or provision of this Lease, or a breach of this Lease by Tenant, including, but not limited to, a breach of any of Tenant's representations and warranties under <u>Section 19.1</u> of this Lease, (iv) in any way relating to Tenant's use, operation and/or maintenance of the Facility (including, without limitation, third-party claims, whether by the State of New York, the United States, private insurers, private parties, for recoupment, false claims, or any other claims, assumption of and use by Tenant of Landlord's permits, variances, waivers, and certificate of need approval or its possession of the Leased Premises and/or (v) any liability under <u>Section 20.14</u>. The indemnity provided for herein shall survive the expiration of this Lease or the surrender of the Leased Premises for the period of the relevant statute of limitations.

(b) Any amounts which become payable by Tenant under this Article IX shall be paid within ten (10) days after liability therefor is determined by litigation or otherwise, and if not timely paid shall bear interest at the Prime Rate plus 5% (the "Overdue Rate") from the date of such determination to the date of payment. Tenant, at its sole cost and expense, shall contest, resist and defend any such claim, action or proceeding asserted or instituted against Landlord or may compromise or otherwise dispose of the same as Tenant sees fit provided that Landlord receives a full and complete release with respect to such claim, action or proceeding. Any legal



counsel selected by Tenant to defend Landlord shall be reasonably satisfactory to Landlord. All indemnification covenants are intended to apply to losses, damages, injuries, claims, costs, penalties, charges and/or expenses (including reasonable attorneys' and consultants' fees and expenses) incurred directly or indirectly by the indemnified parties and their property, as well as by the indemnifying party or third party, and their property. For purposes of this Article IX, any acts or omissions of Tenant, or by employees, agents, assignees, contractors, subcontractors or others acting for or on behalf of Tenant (whether or not they are negligent, intentional, willful or unlawful), shall be strictly attributable to Tenant. It is understood and agreed that payment shall not be a condition precedent to enforcement of the foregoing indemnification obligations. The **"Prime Rate"** shall mean on any date, a rate equal to the annual rate on such date publicly announced by Citibank, N.A., as its prime, base or reference rate. Such rate need not be the lowest rate charged by Citibank, N.A. If Citibank, N.A. discontinues its use of such prime, base or reference rate or ceases to exist, Landlord shall designate the prime, base or reference rate of another state or federally chartered bank with offices in New York, N.Y. to be used for the purpose of calculating the Prime Rate hereunder.

## ARTICLE X

### USE OF LEASED PREMISES

Section 10.1    Compliance with Laws and Regulations. Tenant shall use the Leased Premises solely as a licensed Medicare- and Medicaid-certified skilled nursing facility with at least the number of licensed and certified beds existing at the Facility on the Commencement Date, and for no other purpose (the "Intended Use"). On or before the Commencement Date, Tenant shall have acquired, and thereafter Tenant shall maintain all licenses, certificates, accreditations, approvals, permits, variances, waivers, provider agreements and other authorizations needed to operate the Leased Premises as a licensed, Medicare and Medicaid certified skilled nursing facility. Tenant hereby covenants, warrants and represents to Landlord that as of the Commencement Date and throughout the Term: (a) Tenant (and any subtenant, operator or manager of Tenant) shall be, and shall continue to be validly licensed and Medicare and Medicaid certified to operate a skilled nursing facility in accordance with the applicable rules and regulations of the DOH, federal governmental authorities and accrediting bodies, including, but not limited to, the United States Department of Health and Human Services ("DHHS"), CMS, and the DOH; (b) Tenant (and any subtenant, operator or manager of Tenant) shall be, and shall continue to be, certified by and the holder of valid provider agreements with Medicare and Medicaid issued by DHHS, DOH and/or CMS and shall remain so certified and shall remain such a holder in connection with its operation of the Leased Premises as a licensed and Medicare and Medicaid certified skilled nursing facility; (c) Tenant (and any subtenant, operator or manager of Tenant) shall be, and shall continue to be in compliance with and shall remain in compliance with all applicable Laws with regard to the operation of the Facility, including, without limitation, compliance under Laws governing patient confidentiality and privacy and the confidentiality of medical records; (d) Tenant (and any subtenant, operator or manager of Tenant) shall operate the Facility in a manner consistent with high quality skilled nursing services and sound reimbursement principles under the Medicare and Medicaid programs and as required under Laws; and (e) Tenant (and any subtenant, operator or manager of Tenant) shall not abandon, terminate, vacate or fail to renew any licenses,

2305449v5/17057-6

certifications, accreditations, certificates, approvals, permits, variances, waivers, provider agreements or any other authorization which relates to the operation of the skilled nursing facility business or other permitted operations on the Leased Premises or in any way commit any act which will or may cause any such licenses, certifications, accreditations, certificates, approvals, permits, variances, waivers, provider agreements or other authorization to be revoked by any Governmental Authority or accrediting body having jurisdiction thereof.

Section 10.2    No Waste.    Tenant shall not commit or suffer to be committed any waste on the Leased Premises nor shall Tenant cause or permit any nuisance thereon.

Section 10.3    Hazardous Materials and Hazardous Waste.    (a) Tenant shall not place or hold any Hazardous Materials on or at the Leased Premises, except as is necessary for the ordinary course of its business as a skilled nursing facility in compliance with Section 10.1. If Tenant's business requires the use of any Hazardous Materials, other than such cleaning materials as are typically found in skilled nursing facilities in compliance with Section 10.1, Tenant shall notify Landlord in writing and shall comply with hazard communication and notification requirements of the Occupational Safety and Health Act ("OSHA") and all Laws which require notification of employees, the community or any governmental agency of the hazardous properties of such Hazardous Materials. For purposes of this Lease, "Hazardous Materials" means and includes any hazardous substance defined as such in OSHA, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the Toxic Substances Control Act ("TSCA"), or any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any hazardous substance or material, as now or at any time hereafter in effect.

(c)    Tenant shall not cause or allow any asbestos or any asbestos containing materials to be incorporated into any improvements or alterations which it makes or causes to be made on or to the Leased Premises. Tenant shall obtain and maintain O&M Programs for the Facility is if the Facility is determined to contain asbestos or asbestos containing materials and upon Landlord's request, shall furnish copies of same to Landlord, Mortgagee or their designee(s).

(d)    Tenant shall not place, hold or dispose of any Hazardous Waste on, under or at the Leased Premises except as specifically allowed in this Section 10.3. Tenant further agrees that it shall not use the Leased Premises as a treatment, storage, or disposal (whether permanent or temporary) facility for Hazardous Waste. If Tenant, in the ordinary course of its business as a skilled nursing facility generates Hazardous Waste, then Tenant shall comply with all applicable federal, state and local laws, statutes, ordinances, codes, rules, regulations, orders or decrees relating to the appropriate use, storage, transportation and disposal of Hazardous Waste. For the purposes of this Lease, "Hazardous Waste" means and includes any hazardous material that has entered the waste stream or any contaminant or pollutant as defined as such in the Resource Conservation and Recovery Act, CERCLA, as amended, any so-called "Superfund" or "Superlien" law, the TSCA, or any other Law, relating to or imposing liability or standards of conduct concerning, any hazardous, toxic or dangerous waste. Tenant further agrees that it shall properly dispose in accordance with Laws of all "infectious waste" such as laboratory waste, pathological waste, blood specimens or products, patient or resident waste including, without

2305449v5/17037-6



limitation, bandages and disposable gowns, sharp waste and any material generated by the production or testing of biological agents. Immediately upon receipt of any Environmental Notice (as hereinafter defined) from any Person, Tenant shall deliver to Landlord a true, correct and complete copy of same. "Environmental Notice" shall mean any note, notice, or report of any suit, proceeding, investigation, order, consent order, injunction, writ, award, or action related to or affecting or indicating the treatment, storage, handling, disposal, generation, spill, release or discharge of any Hazardous Waste or Hazardous Materials in upon, under, from or affecting the Leased Premises. All of the terms, covenants, warranties and indemnifications contained in this Section 10.3 shall survive the expiration or termination of this Lease.

(e)     Without in any way limiting Tenant's obligation to indemnify Landlord and Landlord's Indemnitees under Section 9.1 of this Lease, Tenant shall indemnify, defend (at Landlord's request) and hold harmless Landlord and Landlord's Indemnitees from and against any claims, losses, costs, damages or expenses of any and every kind whatsoever (including reasonable attorney's fees and expenses and consultant's and expert's fees and expenses) which at any time or from time to time may be paid, incurred or suffered by, or asserted against Landlord and/or Landlord's Indemnitees for, with respect to, or as a direct or indirect result of: (a) a breach by Tenant of the covenants set forth in Section 10.3 or, (b) caused, permitted or allowed by Tenant or any agent, employee, invitee, or licensee of Tenant, the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission, or release from, onto, or into the Leased Premises, the atmosphere, or any watercourse, body of water, or groundwater, of any Hazardous Material (including, without limitation, any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under CERCLA, as amended, any so-called "Superfund" or "Superlien" law, or any other Law, relating to or imposing liability or standards of conduct concerning, any Hazardous Material) occurring from and after the Commencement Date; and the provisions of and undertakings and indemnification set out in this Section 10.3(d) shall survive the termination of this Lease, and shall continue to be the personal liability, obligation and indemnification of Tenant, binding upon Tenant, forever. If required by Mortgagee, Tenant shall enter into an agreement to indemnify, defend and hold harmless Mortgagee with respect to matters contained in this Section 10.3 and other similar matters pursuant to a form of agreement reasonably acceptable to Mortgagee. In no event however shall Tenant have any liability to Landlord or Landlord's Indemnitees for Hazardous Materials located at or under the Leased Premises prior to the Commencement Date or for the remediation of same.

(f)     If Tenant or its employees, agents, or contractors violate the provisions of this Section 10.3, then, in addition to any other duty or obligation of Tenant hereunder, at law or in equity, Tenant shall be obligated to clean up, remove, and dispose of the material causing the violation, in compliance with all applicable environmental laws and repair any damage to and remediate the Leased Premises within such period of time as may be reasonable under the circumstances after written notice by Landlord; provided that such work shall commence no later than thirty (30) days from the date of such notice and be diligently and continuously carried to completion by Tenant or Tenant's designated contractors. Tenant shall notify Landlord of its method, time and procedure for any clean-up, remediation or removal of material causing the violation under this provision, and Landlord shall have the right to require reasonable changes in such method, time or procedure.

2305449v5/17057-6



(g)     Landlord reserves the right from time to time, but not more than once a year, except in the event of an emergency or during the occurrence and continuation of an uncured Lease Default during the Term hereof, at Landlord's cost and expense (except that, in the event of a continuing and uncured Lease Default, at Tenant's sole cost and expense), to have the Leased Premises inspected by environmental engineers and/or specialists for the purpose of determining compliance by Tenant with any environmental laws, rules and regulations applicable to Tenant's operations in or about the Leased Premises and with the terms and conditions of this Lease dealing with environmental matters, including without limitation, the provisions of this Section 10.3. If the environmental assessment or report resulting from such inspection discloses any non-compliance with Laws, Tenant shall immediately, following receipt of the environmental assessment, take all such steps as are necessary to put the Leased Premises into compliance, including without limitation, cleaning up any spills or other emissions of Hazardous Wastes or Hazardous Materials, and reimburse Landlord for the costs of its inspection.

(h)     Upon the expiration of the Term, or the earlier termination thereof, subject to the last sentence of Section 10.3(d) above, Tenant shall forthwith remove all Hazardous Materials and Hazardous Waste from the Leased Premises or any portion thereof in accordance with applicable Law. Landlord shall have the right to inspect the Leased Premises with regard to the management and disposal of Hazardous Materials and Hazardous Waste at all reasonable times during the Term.

## ARTICLE XI

### DAMAGE OR DESTRUCTION

Section 11.1     Damage or Destruction. Tenant shall immediately notify Landlord of any casualty, fire, damage, destruction or injury ("Casualty") affecting the Facility, including a description of the Casualty, and whether the Casualty is such as to cause the Leased Premises to be unsuitable, in whole or in part, for the Intended Use . Tenant shall proceed with reasonable diligence to repair or reconstruct the Leased Premises and Tenant shall be liable for any costs of repair or replacement to the Leased Premises, whether or not such Casualty, or the costs of repairing such Casualty, are fully covered by the proceeds of Tenant's insurance required to be carried hereunder. If such Casualty renders the Facility unsuitable for the purpose of this Lease and if Landlord's Mortgagee so requires, Landlord, upon notice to Tenant, Landlord may terminate this Lease and Landlord and Tenant shall be released from any further liability hereunder thereafter accruing with respect to the Facility, except that Tenant shall be responsible and shall pay Landlord an amount equal to the difference between the fair market value of the Leased Premises immediately prior to such Casualty and the proceeds of Tenant's insurance to the extent such difference results from Tenant's breach of Article VI. Notwithstanding the ·foregoing, if Landlord's obligations to its Mortgagee have been satisfied in full and the DOH approves and agrees to reimburse the costs of rebuilding the Facility, Landlord shall not so terminate this Lease with respect to the Facility, and Tenant shall repair or reconstruct the Leased Premises in substantially the same condition as just prior to the incident with the proceeds of the property casualty insurance carried by Tenant, as required hereunder (if not otherwise paid to the Mortgagee), and/or with funds of Tenant. Regardless of any Casualty, except as provided above, this Lease shall continue in full force and effect without any abatement of Rent, and Tenant shall

41



not be entitled to surrender possession of the Leased Premises as a result of such casualty. Landlord's receipt of Rent from Tenant's rental interruption insurance shall be credited against Rent payments due from Tenant hereunder. If Tenant fails to commence such repair or reconstruction within thirty (30) days of the Casualty, Landlord shall have the option, subject to the approval of the DOH if required by Laws, to either terminate this Lease upon written notice to Tenant or repair and reconstruct the Leased Premises in substantially the same condition just prior to the incident and costs and expenses incurred as a result thereof shall be deemed Additional Rent hereunder and shall be payable to Landlord by Tenant, upon demand. Upon payment of all such sums demanded by Landlord, Tenant may re-enter and resume possession of the Leased Premises pursuant to the terms of this Lease. All insurance proceeds collected under the Policies shall be paid to Landlord, and made available to Tenant to pay for or reimburse Tenant for the costs and expenses for such repairs and reconstruction subject to the terms, conditions and provisions of any mortgage or other loan documents encumbering the Leased Premises. If Mortgagee does not make the insurance proceeds available to Landlord, then Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, and Landlord and Tenant shall be released from any further liability hereunder thereafter accruing with respect to the Facility, except that Tenant shall be responsible and shall pay Landlord an amount equal to the difference between the fair market value of the Leased Premises immediately prior to such Casualty and the proceeds of Tenant's insurance.

Section 11.2    Precedence of Rights of Mortgagee. All provisions contained in the loan documents between Landlord and Mortgagee, or any other document in connection therewith which concern or pertain to the restoration of the Leased Premises, the application of insurance proceeds and any and all matters concerning a casualty, shall take precedence over and be in lieu of any contrary provision provided for in this Lease, and in all respects are binding upon Tenant who agrees to and acknowledges the same.

Section 11.3    Tenant hereby waives the provisions of Section 227 of the Real Property Law of the State of New York and acknowledges that the terms of this Article XI shall govern in lieu thereof.

## ARTICLE XII

## EMINENT DOMAIN

Section 12.1    Eminent Domain. (a) In the event that all or substantially all of the Leased Premises, or such portion of the Real Property which renders the balance of the Facility unsuitable for the purpose of this Lease, shall be taken by condemnation or right of eminent domain, this Lease shall terminate as of the day the taking authority takes possession of the Leased Premises, and Landlord and Tenant shall be released from any further liability hereunder thereafter accruing with respect to the Facility, except as otherwise expressly provided in this Lease. In the event only a portion (and less than substantially all) of the Leased Premises is taken by condemnation or right of eminent domain and the portion so taken does not render the balance of the Leased Premises unsuitable for the purposes of this Lease, as determined by Landlord, this Lease shall not terminate. In such an event, Tenant shall restore the Leased Premises with reasonable diligence with its own funds and with the proceeds of any award from the applicable public or quasi-public authority, or private corporation or individual having the

2305449v5/17057-6



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2
21-22623-shl   Doc 29-2   Filed 11/08/21   Entered 11/08/21 16:50:03   Doc 3 Notice
part 1   Pg 78 of 150
INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020

power of condemnation ("Award") to an architectural unit as nearly like its condition prior to such taking as shall be practicable.   Notwithstanding anything to the contrary herein, this Section 12.1(a) is subject to the terms, conditions and provisions of any mortgage and other loan documents encumbering the Leased Premises.

(i)      Notwithstanding anything to the contrary contained in Section 12.1(a), Landlord may cancel this Lease with no further liability to Tenant, in the event that following a taking by condemnation or right of eminent domain, Mortgagee elects to require Landlord to repay the mortgage on the Leased Premises.

(j)      Tenant shall not be entitled to any part of any award or settlement of damages representing the value of land and buildings appropriated, the value of this Lease or any estate therein, or damage to the residue of the Leased Premises or other property of Landlord; it being agreed as between Landlord and Tenant any such award shall be the sole property of Landlord.  No appropriation of part or all of the Leased Premises or cancellation of this Lease pursuant to this Article XII shall be deemed an eviction of Tenant or a breach of any covenants of Landlord hereunder.

## ARTICLE XIII

## NOTICES

Section 13.1      Notices.  All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if (a) hand delivered or sent by (b) certified or registered United States mail, postage prepaid, return receipt requested or (c) Federal Express or other nationally recognized overnight next business day courier service at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a notice to the other parties hereto in the manner provided for in this Section 13.1):

If to Tenant:

HBL SNF, LLC
1280 Albany Post Road
Croton-on-Hudson, New York 10520

with a copy to:
Michelman & Robinson
800 Third Avenue, 24th Floor
New York, NY 10022
Attn:  Mark Zafrin, Esq.
Telephone:  212.730.7700

If to Landlord:
White Plains Healthcare Properties I, LLC,

43

2 Bourbon Street ,Suite 200
Peabody, Ma 01960

with a copy to:
Gerald J. Billow, Esq.
Posternak Blankstein & Lund LLP
800 Boylston Street, Suite 3200
Boston, Massachusetts 02199

-and-

Howard Fensterman, Esq.
Abrams Fensterman
1111 Marcus Avenue
Lake Success, New York 11042

The effective date of such notices shall be as follows: (a) upon delivery or refusal of delivery if sent by personal delivery, (b) two (2) Business Days after mailing (or upon actual receipt, if earlier), if sent by certified or registered mail, (c) one (1) Business Day after deposit with the courier for next business day delivery, if sent by overnight courier. The term "Business Day" means any day other than (i) a Saturday or a Sunday, and (ii) a day on which federally insured depository institutions in New York, New York are authorized or obligated by law, regulation, governmental decree or executive order to be closed.

Section 13.2    Notices to Mortgagee. (a) Tenant hereby agrees, upon request of Mortgagee, to give to Mortgagee copies of all notices given by Tenant of default by Landlord under this Lease at the same time and in the same manner as, and whenever, Tenant shall give any such notice of default to Landlord. Such Mortgagee shall have the right to remedy any default under this Lease, or to cause any default of Landlord under this Lease to be remedied, and for such purpose Tenant hereby grants such Mortgagee such period of time as may be reasonable to enable such Mortgagee to remedy, or cause to be remedied, any such default in addition to the period given to Landlord for remedying, or causing to be remedied, any such default which is a default. Tenant shall accept performance by such Mortgagee of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. No default by Landlord under the Lease shall exist or shall be deemed to exist (i) as long as such Mortgagee, in good faith, shall have commenced to cure such default and shall be prosecuting the same to completion with reasonable diligence, subject to Force Majeure, or (ii) if possession of the Leased Premises is required in order to cure such default, or if such default is not susceptible of being cured by such Mortgagee, as long as such Mortgagee, in good faith, shall have notified Tenant that such Mortgagee intends to institute proceedings under the mortgage and, thereafter, as long as such proceedings shall have been instituted and shall prosecute the same with reasonable diligence and, after having obtained possession, prosecutes the cure to completion with reasonable diligence. This Lease shall not be assigned by Tenant or modified, amended or terminated without Mortgagee's prior written consent in each instance, which consent shall not be unreasonably withheld or delayed. In the event of the termination of this Lease by reason of any default thereunder or for any other reason whatsoever except the expiration thereof, upon such Mortgagee's written request, given

44



within thirty (30) days after any such termination, Tenant, within fifteen (15) days after receipt of such request, shall execute and deliver to such Mortgagee or its designee or nominee a new lease of the Leased Premises for the remainder of the Term of the Lease upon, at a minimum, all of the terms, covenants and conditions of this Lease. Neither such Mortgagee or its designee or nominee shall become liable under this Lease unless and until such Mortgagee or its designee or nominee becomes, and then only for so long as such Mortgagee or its designee or nominee remains, the fee owner of the Leased Premises or the owner of the leasehold interest of Landlord under this Lease. Such Mortgagee shall have the right, without Tenant's consent, to, as the case may be, foreclose its mortgage or to accept a deed in lieu of foreclosure of such mortgage.

(b)    In the event of any act or omission of Landlord which would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease, or to claim a partial or total eviction, Tenant shall not exercise such right (i) until it has given written notice of such act or omission to Mortgagee, and (ii) unless such act or omission shall be one which is not capable of being remedied by Landlord or such Mortgagee within a reasonable period of time, until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice and following the time when such Mortgagee shall have become entitled under its loan documents with Landlord in connection therewith, as the case may be, to remedy the same (which reasonable period shall in no event be less than the period to which Landlord would be entitled under this Lease or otherwise, after similar notice, to effect such remedy).

## ARTICLE XIV

## QUIET ENJOYMENT

Section 14.1    Quiet Enjoyment.Landlord covenants, warrants and represents to Tenant that, provided no Lease Default exists under this Lease, Tenant shall at all times during the Term peaceably and quietly have, hold, occupy and enjoy the Leased Premises, subject to the terms and conditions of this Lease, without any hindrance, interference or molestation by Landlord or by, under or through Landlord.

## ARTICLE XV

## SUBLETTING AND ASSIGNMENT

Section 15.1    Subletting and Assignment    (a) Tenant shall not, without the prior written consent of Landlord, which consent may be withheld in the Landlord's sole and absolute discretion (and, if required by law, without the prior written consent of the Commissioner, which consent may be withheld in the Commissioner's sole and absolute discretion), transfer or assign this Lease or Tenant's interest in the Leased Premises or any part thereof or sublease all or any part of the Leased Premises. In all events of assignment, transfers or subletting, the prior approval of the DOH shall be required. Tenant shall not at any time, without the prior written consent of Landlord, which consent may be withheld or given in the sole and absolute discretion

2305449v5/17057-6



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 81 of 150

of Landlord, pledge, mortgage, or hypothecate the leasehold estate hereby created or any interest of Tenant therein. The issuance of or a transfer or series of transfers (including transfers caused by mergers, acquisitions or consolidations of any direct or indirect interests in the equity ownership interests in Tenant or any subtenant aggregating to forty-nine percent (49%) or more of the stock, membership or ownership interest in Tenant or any subtenant shall constitute an assignment for purposes of this Lease, requiring Landlord's consent thereof; notwithstanding anything to the contrary, any change in the management or control of Tenant such that Lizer Josefovic does not control all of the decisions of Tenant shall constitute an assignment for purposes of this Lease, requiring Landlord's consent thereof. Notwithstanding anything to the contrary, the issuance of or a transfer or series of transfers (including transfers caused by mergers, acquisitions or consolidations of any direct or indirect interests in the equity ownership interests in Tenant or any subtenant resulting in the aggregate interest of Lizer Josefovic, Marc Neuman, and their spouse or issue, or a trust for their benefit, equaling less than seventy-five percent (75%) of the stock, membership or ownership interest in Tenant or any subtenant to any person or entity shall constitute an assignment for purposes of this Lease, requiring Landlord's consent thereof; provided that any assignment by Lizer Josefovic to Joseph Josefovic made after five years after the Commencement date shall not be unreasonably denied by Landlord taking into account, among other things, the experience, performance record, and financial strength of Joseph Josefovic. The consent by Landlord to any transfer shall not constitute consent to any subsequent transfer or to any successive transfer. Further, subject to the provisions of Section 2.2, and without in any way limiting or otherwise affecting the provisions of this Lease, Landlord shall be permitted to assign this Lease and all agreements, duties, obligations and rights incidental thereto to any entity related to, or affiliated with Landlord, without any consent from Tenant. The term "transfer" shall mean any direct or indirect sale, conveyance, transfer, lease (including any amendment, extension, modification, waiver or renewal thereof), sublease, sub-sublease, assignment, mortgage, pledge, grant of a security interest or hypothecation, whether by operation of law or otherwise, whether voluntary or not, of or in (i) all or part of the Leased Premises (including any legal or beneficial direct or indirect interest therein) or (ii) any direct or indirect interest in Tenant. Notwithstanding anything to the contrary contained herein, Tenant may assign this Lease to, or enter into a sublease with, or transfer interests in an entity comprising Tenant to, an affiliate under common control with Tenant, or owned by Lizer Josefovic, Marc Neuman, or their spouse or issue, or a Trust for their benefit, without Landlord's consent, provided (x) Landlord is given thirty (30) days prior written notice of such intended transfer, assignment or sublease with copies of the organizational documents of the assignee, transferree or sublessee, (y) after such transfer, assignment or sublease, Lizer Josefovic controls all of the decisions of the assignee, transferree or sublessee, and (z) all required consents from, the Mortgagee, the DOH and/or the Commissioner (if required), have been obtained by Tenant. Notwithstanding the foregoing and any other provision contained herein to the contrary, no transfer or series of transfers of legal, economic, beneficial or equitable (direct or indirect) interest in the Lease or in Tenant's membership interest that requires DOH's consent shall occur without the prior written consent of Landlord and DOH. Tenant shall enter into such subordination agreements or subordination, non-disturbance agreements ("SNDAs") as Mortgagee may request from time to time.

Section 15.2    Attornment and Related Matters. Any sublease shall be expressly subject and subordinate to all applicable terms and conditions of this Lease and provide that upon the expiration or earlier termination of this Lease, Landlord, at its option and without any

46



obligation to do so, may require any subtenant to attorn to Landlord, its successors and assigns, in which event Landlord shall undertake the obligations of Tenant, under such sublease from the time of the exercise of such option to the termination of such sublease; provided, however, that in such case Landlord shall not be liable for any prepaid rents, fees or other charges or for any prepaid security deposits paid by such subtenant to Tenant or for any other prior defaults of Tenant under such sublease. In the event that Landlord shall not require such attornment with respect to any sublease, then such sublease shall automatically terminate upon the expiration or earlier termination of this Lease, including any early termination by mutual agreement of Landlord and Tenant. In addition, any such sublease shall provide that in the event that the subtenant or other transferee receives a written notice from Landlord stating that a Lease Default has occurred or that an event or circumstance has occurred which with notice and/or passage of time would constitute a Lease Default, such subtenant or other transferee thereafter shall without further consent or instruction of Tenant pay all rentals accruing under such sublease directly to Landlord or as Landlord may direct; provided, however, that (a) as and to the extent that the amounts so paid to Landlord, together with other amounts paid to or received by Landlord on account of this Lease, exceed the amounts then due Landlord from Tenant under this Lease, the excess shall be promptly remitted to Tenant, and (b) at such time as the Lease Default has been cured and this Lease reinstated (if ever), Landlord shall notify and direct the subtenant(s) in writing to resume making payments of rentals under their sublease(s) directly to Tenant, or as Tenant may direct. Any such rentals collected from such subtenant or other transferee by Landlord shall be credited against the amounts owing by Tenant under this Lease in such order of priority as Landlord shall reasonably determine. Furthermore, any sublease or other agreement regarding a transfer shall expressly provide that the subtenant, assignee, manager or other transferee shall furnish Landlord, its lender, the Mortgagee, if applicable, the HUD Mortgagee, and/or the Commissioner, and /or DOH, if applicable,  with such financial, operational and other information about the Facility and subtenant, etc., as Landlord may request from time to time.

Section 15.3    Assignment of Subleases. To secure the prompt and full payment by Tenant of the Rent and the faithful performance by Tenant of all the other terms and conditions herein contained on its part to be kept and performed, Tenant hereby assigns, transfers and sets over unto Landlord, subject to the conditions hereinafter set forth and any required consent(s) from DOH, all of Tenant's right, title and interest in and to all permitted subleases, assignments, licenses and occupancy agreements, to the extent permitted by law, involving the Facility, as set forth on Schedule 15.3 attached hereto (the "Sublease", and the subtenant under a Sublease herein referred to as a "Subtenant") and hereby confers upon Landlord, its agents and representatives, a right of entry (subject to prior notice) in, and sufficient possession of, the Leased Premises to permit and insure the collection by Landlord of the rentals and other sums payable under the Sublease, and further agrees that the exercise of said right of entry and qualified possession by Landlord shall not constitute an eviction of Tenant from the Leased Premises or any portion thereof and that should said right of entry and possession be denied Landlord, its agent or representative, Landlord, in the exercise of said right, may use all requisite force to gain and enjoy the same without responsibility or liability to Tenant, its servants, employees, guests or invitees, or any Person whomsoever; provided, however, that such assignment shall become operative and effective only if (a) a Lease Default shall occur and be continuing or (b) this Lease and the Term shall be cancelled or terminated pursuant to the terms, covenants and conditions hereof or (c) there occurs a repossession under a dispossessory warrant



or other re-entry or repossession by Landlord under the provisions hereof or (d) a receiver for all or a portion of the Leased Premises is appointed, and then only as to such of the subleases that Landlord may elect to take over and assume. At any time and from time to time within ten (10) days after Landlord's written demand, Tenant promptly shall deliver to Landlord a schedule of all Subleases, setting forth the names of all Subtenants, with a photostatic copy of each of the Subleases. Upon request of Landlord, Tenant shall permit Landlord and its agents and representatives, and Mortgagee, its agents and representatives, to inspect all Subleases affecting the Leased Premises. Tenant covenants that each Sublease shall provide that the Subtenant thereunder shall be required from time to time, upon request of Landlord or Tenant, to execute, acknowledge and deliver, to and for the benefit of Landlord, an estoppel certificate confirming with respect to such Sublease the information set forth in Section 20.11 hereof.

Section 15.4    Additional Sublease Requirements. Tenant covenants and agrees that all Subleases hereafter entered into affecting the Leased Premises shall provide that (a) they are subject to this Lease and that the principals of the Subtenant acknowledge that they have read this Lease and accept the terms hereof, (b) the term thereof shall not end less than one (1) day prior to the Expiration Date hereof, unless Landlord shall consent otherwise, which consent may be withheld in Landlord's sole and absolute discretion, (c) the Subtenants will not do, authorize or execute any act, deed or thing whatsoever or fail to take any such action which will or may cause Tenant to be in violation of any of its obligations under this Lease, (d) the Subtenants will not pay rent or other sums under the Subleases with Tenant for more than one (1) month in advance, (e) the Subtenants shall give to Landlord at the address and otherwise in the manner specified in Section 13.1 hereof, a copy of any notice of default by Tenant as the landlord under the Subleases at the same time as, and whenever, any such notice of default shall be given by the Subtenants to Tenant; and (f) all of the representations, warranties and covenants given by Tenant to Landlord in this Lease, including but not limited to all reporting requirements and covenants set forth in Section 7.4 above, shall be made and given by each Subtenant for the benefit of Landlord, Mortgagee, and their respective successors and assigns.

Section 15.5    Transfers In Bankruptcy.    (a)    In the event of a transfer pursuant to the provisions of Title 11 of the United States Code or any statute of similar purpose or nature (the "Bankruptcy Code"), all consideration payable or otherwise to be delivered in connection with such transfer shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any consideration constituting Landlord's property pursuant to the immediately preceding sentence and not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and be promptly paid or delivered to Landlord. For purposes of this Section 15.5, the term "consideration" shall mean and include money, services, property and any other thing of value such as payment of costs, cancellation or forgiveness of indebtedness, discounts, rebates, barter and the like. If any such consideration is in a form other than cash (such as in kind, equity interests, indebtedness earn-outs, or other deferred payments, consulting or management fees, etc.), Landlord shall be entitled to receive in cash the then present fair market value of such consideration. If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of the Bankruptcy Code to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to Tenant, then notice of such proposed assignment shall be given to Landlord by Tenant no later than fifteen (15) days after receipt of such offer by Tenant, but in any event no

48



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 84 of 150

INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020

later than ten (10) days prior to the date that Tenant shall file any application or motion with a court of competent jurisdiction for authority and approval to enter into such assumption and assignment. Such notice shall set forth (a) the name and address of the assignee, (b) all of the terms and conditions of such offer, and (c) the proposal for providing adequate assurance of future performance by such person under the Lease, including, without limitation, the assurance referred to in Section 365 of the Bankruptcy Code. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease from and after the date of such assignment. Any such assignee shall execute and deliver to Landlord upon demand an instrument confirming such assumption.

(b)  The term "adequate assurance of future performance" as used in this Lease shall mean (in addition to the assurances called for in Bankruptcy Code Section 365(1)) that any proposed assignee shall, among other things, (i) deposit with Landlord on the assumption of this Lease an amount equal to the greater of (x) two (2) times the then monthly Fixed Rent and Additional Rent or (y) such other amount deemed by the Bankruptcy Court to be reasonably necessary for the adequate protection of Landlord under the circumstances, as security for the faithful performance and observance by such assignee of the terms and obligations of this Lease, (ii) furnish Landlord with financial statements of such assignee for the prior three (3) calendar years, as finally determined after an audit and certified as correct by a certified public accountant, which financial statements shall show a net worth at least equal to the amount of the deposit referenced in (i) above, (iii) if determined by the Bankruptcy Court to be appropriate under the circumstances, grant to Landlord a security interest in such property of the proposed assignee as Landlord shall deem necessary to secure such assignee's future performance under this Lease, and (iv) provide such other information or take such action as Landlord, in its reasonable judgment, shall determine is necessary to provide adequate assurance of the performance by such assignee of its obligations under the Lease.

(c)  If, at any time after Tenant may have assigned Tenant's interest in this Lease in a proceeding of the type described in Section 16.1 (iv) through (vii), this Lease shall be disaffirmed or rejected in any proceeding of the types described in Section 16.1 (iv) through (vii) hereof, or in any similar proceeding, or in the event of termination of this Lease by reason of any such proceeding or by reason of lapse of time following notice of termination given pursuant to Article XVI based upon any of the Lease Defaults set forth in said Section 16.1 (iv) through (vii) Tenant, upon request of Landlord given within thirty (30) days next following any such disaffirmance, rejection or termination (and actual notice thereof to Landlord in the event of a disaffirmance or rejection or in the event of termination other than by act of Landlord), shall (a) pay to Landlord all Rent due and owing by the assignee to Landlord under this Lease to and including the date of such disaffirmance, rejection or termination, and (b) as "tenant", enter into a new lease with Landlord for a term commencing on the effective date of such disaffirmance, rejection or termination and ending on the expiration date of the term, unless sooner terminated as in such lease provided, at the same Fixed Rent and Additional Rent upon the then executory terms, covenants and conditions as are contained in this Lease, except that (i) Tenant's rights under the new lease shall be subject to the possessory rights, if any, of the assignee under this Lease and the possessory rights of any person claiming through or under such assignee or by virtue of any applicable Law, (ii) such new lease shall require all defaults existing under this Lease to be cured by Tenant with due diligence, and (iii) such new lease shall require Tenant to

49



pay all Rent reserved in this Lease which, had this Lease not been so disaffirmed, rejected or terminated, would have accrued under the provisions of this Lease after the date of such disaffirmance, rejection or termination with respect to any period prior thereto. If Tenant shall default in its obligation to enter into said new lease for a period of ten (10) days next following Landlord's request therefor, then in addition to all other rights and remedies by reason of such default, either at law or in equity, Landlord shall have the same rights and remedies against Tenant as if Tenant had entered into such new lease and such new lease had thereafter been terminated as of the commencement date thereof by reason of Tenant's default thereunder.

Section 15.6   Management Agreement. Tenant agrees and acknowledges that it will not enter into any management agreements during the Term with regard to the Facility except with an entity (i) owned wholly by a an individual principal of Tenant which entity has been received establishment approval from the New York State Department of Health Public Health and Health Planning Council in compliance with 10 NYCRR 600.9(d)(1) and (ii) approved by HUD if the Facility is, or is about to be financed by a HUD program, and/or Mortgagee. Any such management agreement  shall be subordinate to Landlord's rights hereunder, to the rights of Mortgagee and to the rights of the Commissioner. Tenant shall cause such manager to execute such documents as are required by Landlord or Mortgagee or by the Commissioner to effect such subordination.

Section 15.7   Memorandum of Lease. This Lease shall not be recorded, but either party may record a memorandum of lease in which shall describe the parties to this Lease, a description of the Leased Premises and a recitation of the Term. The party requesting that the memorandum of lease be recorded shall prepare and pay all costs of recording the memorandum of lease, and the other party agrees to execute at any and all times such instruments as may be reasonably required for such recording. Upon the expiration or earlier termination of this Lease, Landlord may release the memorandum of lease. For this purpose Tenant constitutes and appoints Landlord its true and lawful attorney-in-fact with full power of substitution to execute a release of such memoranda in the name of Tenant. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked. To the extent any transfer tax, conveyance tax, excise tax, or similar tax is imposed by any Governmental Authority as a result of the recording of such Memorandum of Lease, or is otherwise due and payable as to Tenant's leasehold interest granted pursuant to this Lease, Tenant shall pay same to the applicable Governmental Authority.

## ARTICLE XVI

## DEFAULT

Section 16.1   Default by Tenant and Remedies of Landlord. (a) Tenant shall be in default under this Lease upon the occurrence of any of the following events referred to herein individually or collectively as a "Lease Default" (any reference to such event occurring or involving Tenant shall be deemed to include any such event occurring or involving any of Tenant's Subtenants):

2305449v5/17057-6



(i)     if Tenant fails to pay any installment of Rent within five (5) days after the date when due;

(ii)     if Tenant defaults in the prompt and full performance of any other of Tenant's covenants, obligations or agreements hereunder which are not specifically enumerated herein as a Lease Default and fails to correct such failure within thirty (30) days of receipt of written notice from Landlord of such default (unless such default cannot reasonably be cured within thirty (30) days, in which event such period shall be extended, **provided** Tenant shall have commenced in good faith to cure such default within the first such thirty (30) day period and shall proceed with all due diligence to correct such default thereafter but in no event more than ninety (90) days of receipt of such written notice);

(iii)     if the leasehold interest of Tenant shall be levied upon under execution or be liened or attached and such levy, lien or attachment is not removed within sixty (60) days of the date Tenant receives notice of it;

(iv)     in the event of a filing by or against Tenant of a petition under federal or state law pertaining to bankruptcy or insolvency or for a reorganization or other relief;

(v)     if Tenant shall admit in writing its inability to pay its debts generally as they become due;

(vi)     . if Tenant is adjudicated as bankrupt or a court of competent jurisdiction shall enter an order or decree appointing, with or without the consent of Tenant, a receiver or trustee of Tenant or of the whole or substantially all of its property;

(vii)     if Tenant makes any general assignment for the benefit of creditors;

(A)     if Tenant abandons the Leased Premises or if, except as a result of damage, destruction or a partial or complete condemnation, Tenant ceases operations of the Facility, or Tenant closes any portion of the Facility;

(viii)     if Tenant receives a state or federal notice of termination of license or de-certification and such notice has not been suspended, extended, withdrawn or terminated prior to 30 days before the effective date of such termination or decertification by any Governmental Authority;

(ix)     if Tenant fails to maintain its qualifications for licensure as required by this Lease if failure to do so would result in an inability to operate the Facility or would result in the appointment of a receiver with respect to the Facility;

(x)     if any transfer or assignment of this Lease or Tenant's direct or indirect interest therein or a transfer of Tenant's direct or indirect equity ownership interests occurs in violation of this Lease;

(xi)     if any malpractice award or judgment exceeding any applicable malpractice insurance coverage and any applicable umbrella coverage by more than One Million

2305449v5/17057-6



Dollars ($1,000,000.00) shall be rendered against Tenant or any subtenant, and either (A) enforcement proceedings shall have been commenced by any creditor upon such award or judgment or (B) such award or judgment shall continue unsatisfied and in effect for a period of sixty (60) consecutive days without an insurance company reasonably satisfactory to Landlord having agreed to fund such award or judgment in a manner reasonably satisfactory to Landlord, or (C) such award or judgment has been appealed and without a bond having been posted to cover such amount that exceeds any insurance coverage, and in any case such award or judgment shall, in the reasonable opinion of Landlord, have a material adverse affect on the ability of Tenant or any subtenant to operate the Facility;

(xii)   upon the denial, refusal to issue, or loss of any licenses, certifications, certificates, approvals, permits, variances, waivers, provider agreements and other authorizations necessary or required for Tenant to operate the Facility in accordance with the requirements of this Lease;

(xiii)   if any of the representations or warranties made by Tenant under this Lease or any subtenant under its Sublease or otherwise proves to be untrue when made in any material respect;

(xiv)   if any Governmental Authority having jurisdiction over the operation of the Facility removes ten percent (10%) or more of the patients or residents who reside in the Facility for violations of standards of care;

(xv)   Tenant fails to give Landlord and Mortgagee timely notice or timely deliver copies of documents within the times required under Section 7.4 (c) through (o);

(xvi)   Tenant's receipt of notice of an allegation or determination of "Immediate Jeopardy" (as such term is customarily used) or equivalent notice from any Governmental Authority or officer, acting on behalf thereof relating to the Facility;

(xvii)   Tenant's receipt of notice of the freeze on admissions or the imposition of a denial of payment for new admissions or equivalent notice from any Governmental Authority or officer acting on behalf thereof relating to the Facility;

(xviii)   Tenant's breach of its obligations under Section 3.5 including Tenant's failure to execute and deliver to Landlord within seven days of its request therefore any and all documents, certificate or agreement required or reasonably requested by Landlord, a Mortgagee, Prospective Mortgagee, HUD and/or HUD's Approved Lender or the Commissioner, including confirming the subordination required hereunder;

(xix)   Tenant's breach of its obligations under Section 15.6 Management Agreement;

(xx)   Tenant's breach of its obligations under Section 7.6 Security Agreement;

52



(xxi)    Tenant fails to notify Landlord within twenty-four (24) hours after receipt of any notice from any Governmental Authority, terminating or suspending or threatening termination or suspension of any material license or certification relating to the Facility;

(xxii)    a default beyond any applicable notice and cure periods under any Sublease, operating agreement, management agreement or any other material agreement relating to the Leased Premises or to which Landlord and Tenant are a party;

(xxiii)    the creation of any indebtedness relating to the Leased Premises (other than trade payables which are not more than 30 days past due, not evidenced by a note and not in excess of One Million Dollars $1,000,000.00);

(xxiv)    the amendment, modification, restatement, termination or cancellation of any material contract relating to the Leased Premises, including but not limited to any Sublease, without Landlord's prior written consent, which consent shall not be unreasonably withheld;

(xxv)    default or breach by Guarantor under the Guaranty beyond the expiration of any applicable cure period contained therein;

(xxvi)    failure by Tenant to deposit all or any portion of the Security Deposit or Letter of Credit or to replace any portion of the Security Deposit or Letter of Credit utilized by Landlord;

(xxvii)    a default or breach of any of the provisions set forth in Article XIX;

(xxviii)    Tenant violates any term, covenant or condition of Tenant's Regulatory Agreement (with respect to a HUD financing) which violation is not cured within thirty (30) days of written notice to Tenant;

(xxix)    a default or breach of the provisions set forth in Section 7.4(b) or a report required by Section 7.4 proves to be untrue in any material respect;

(xxx)    any act or omission by Tenant or any Subtenant referenced in Section 7.4 that constitutes a default by Landlord under its loan documents with Mortgagee;

(xxxi)    Tenant's failure to meet the covenants provided in Section 7.4 (q)

(xxxii)    the sale or transfer or attempted sale or transfer of all or any portion of any certificate of need, bed or unit right or other similar authorization relating to any portion of the Facility or the Leased Premises. assignment or subletting in violation of the provisions of Section 15.1;

(xxxiii)    the use of any portion of the Premises other than for the Intended Use;

53

2305449v5/17057-6



21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 89 of 150

(xxxiv)    the Facility appears on the Special Focus Facility List, or similar list established by CMS;

(xxxv)    Tenant fails to procure the insurance coverage, or loss of the insurance coverage, required by this Lease;

(xxxvi) Tenant enters into any corporate integrity agreement, settlement or consent decree, or deferred prosecution agreement with any Governmental Authority;

(xxxvii)    Any Governmental Authority assesses a fine or penalty against, or with, Tenant that imposes a payment or fine upon Tenant in excess of $75,000;

(xxxviii)    The conviction of, or plea of no contest or nolo contendere by, Tenant or any member or beneficial owner of Tenant with respect to (1) any felony or (2) any misdemeanor that involves any act of fraud, embezzlement, theft or misappropriation;

(xxxx)    Tenant fails to comply with its obligations in Section 18.1(n) within 10 days after written notice from Landlord; or

(xxxxi)    Tenant or any Subtenant fails or refuses to execute estoppel certificate required pursuant to Section 20.11, or otherwise complying with the requirements of Section 23 within ten (10) days after Tenant's receipt thereof.

Upon the occurrence of a Lease Default, Landlord, may, if Landlord so elects, upon five (5) days written notice of such election, forthwith terminate this Lease and Tenant's right to possession of the Leased Premises and, at Landlord's sole and absolute discretion, accelerate the payment of all Rent for the balance of the Term and declare the same presently due and payable in full provided, however, that with respect to a Lease Default under Section 16.1(a)(iv), this Lease shall automatically terminate. In the event of such Lease termination, Tenant shall immediately pay Landlord the then present value of all such accelerated Rent. Landlord, in addition to all other remedies given to Landlord at law or in equity, may by written notice to Tenant, without terminating this Lease, cause Tenant to apply to the DOH to install a manager and/or management consultant and/or a receiver having the necessary approvals from Governmental Authorities, of Landlord's choice, at Tenant's sole cost and expense or to the extent permitted by applicable law, reenter the Leased Premises by summary proceedings or otherwise. In any event, upon a Lease Default, Landlord may require Tenant to consent to a so-called "Change of Ownership" and Landlord may dispossess Tenant upon approval of the Change of Ownership or Certificate of Need by DOH, it being the understanding that under no circumstances is this Lease to be an asset for Tenant's creditors by operation of law or otherwise. In the event of such reentry, Landlord may relet the Leased Premises without being obligated so to do, and in the event of a reletting may apply the Rent therefrom first to the payment of Landlord's cost and expenses, including consultant and/or expert and attorneys' fees and expenses incurred by reason of such Lease Default, and the cost and expense of reletting including, but not limited to, repairs, renovation, or alteration of the Leased Premises and then to the amount of Rent and all other sums due from or payable by Tenant hereunder, Tenant remaining liable for all other sums due from or payable by Tenant hereunder and for any deficiency. Tenant shall also be liable for and indemnify Landlord against all amounts owed to

54



Medicare, Medicaid, all applicable third-party payor programs, third party payors, or residents, including, but not limited to, any overpayments received by Tenant, relating to the Term. Any and all such deficiencies shall constitute Additional Rent hereunder and shall be payable by Tenant monthly on the date herein provided for the payment of Rent. In addition to the foregoing remedies, Landlord shall immediately be entitled to retain the Security Deposit and draw on and retain proceeds of the Letter of Credit, and thereafter Tenant shall have no further claim, right, title or interest therein to the extent of Landlord's claims only.

Landlord acknowledges that its rights of reentry onto the Leased Premises set forth in this Lease do not confer on Landlord the authority to operate a nursing facility as defined in Article 28 of the Public Health Law on the Leased Premises and agrees that except in the event of a Lease Default Landlord will give the DOH, Tower Building, Empire State Plaza, Albany, NY 12237, notification by certified mail of its intent to reenter the Leased Premises or to initiate dispossessory proceedings or that the Lease is due to expire at least thirty (30) days prior to the date on which Landlord intends to exercise a right of reentry or to initiate such proceedings or at least sixty (60) days before expiration of the Lease.

Upon receipt of notice from Landlord of its intent to exercise its right of reentry or upon the service of process in dispossessory proceedings and sixty (60) days prior to the expiration of the Lease, Tenant shall immediately notify by certified mail the DOH, Tower Building, Empire State Plaza, Albany, NY 12237 (or its then current address), of the receipt of such notice or service of such process or that the Lease is about to expire.

(b)     Except as provided in this Lease to the contrary, Rent and other sums not paid when due (unless paid within any applicable grace period) shall bear interest from the date when the same are first payable under the terms of this Lease until the same shall be paid at an annual rate of interest equal to the Overdue Rate.

(c)     Upon the filing of a petition by or against Tenant pursuant to the Bankruptcy Code, Tenant, as debtor and as debtor-in-possession, and any trustee who may be appointed shall: (i) timely perform each and every obligation of Tenant under this Lease until such time as this Lease is either rejected or assumed by order of the United States Bankruptcy Court; (ii) pay monthly in advance on the first day of each month as reasonable compensation for use and occupancy of the Leased Premises an amount equal to the Rent and other charges otherwise due pursuant to this Lease; and (iii) reject or assume this Lease within one hundred twenty (120) days after the filing of such petition under the Bankruptcy Code or within such time period as the Bankruptcy Code may allow. Tenant, as debtor and as debtor-in-possession and any trustee shall be deemed to have rejected this Lease in the event of the failure to comply with any of the above. Included within and in addition to any other conditions or obligations imposed upon Tenant or its successor, in the event of assumption and/or assignment is the prior written consent of any mortgagee to which this Lease has been assigned as collateral security.

(d)     In the event of termination of this Lease by reason of any Lease Default by Tenant, or upon the expiration of the Term, then, and in any of such events, Tenant, upon Landlord's written request, shall to the greatest extent permitted by law, transfer to Landlord or its designees or assigns, or cause its Subtenants and/or Affiliates, to transfer to Landlord or its designees or assigns, the following: (i) all federal, state or municipal licenses,

55



certifications, certificates, accreditations, approvals, permits, variances, waivers, provider agreements (including non-governmental) and other authorizations which relate to the operation of the Facility; and (ii) the name of the Facility as then commonly known to the general public. Tenant shall also prepare and file all notices required by applicable law in connection with such termination and shall also prepare and timely file all final Medicare and Medicaid cost reports. In the event Tenant fails or refuses to transfer any such licenses, certifications, certificates, accreditations, approvals, permits, variances, waivers, provider agreements, other authorization or trade name, then this provision shall constitute an act of assignment by Tenant to Landlord or its assigns without the necessity of any further written instrument. For this purpose, Tenant constitutes and appoints Landlord its true and lawful attorney-in-fact with full power of substitution to complete or undertake such replacements in the name of Tenant. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

(e)     Landlord shall have the option of taking over the operation of the Facility, or having the operation of the Facility taken over by a designee, in the event of a termination of this Lease for any reason, without Landlord or designee assuming any of Tenant's liabilities or obligations, including Tenant's liabilities and obligations with respect to employees, such as vacation, sick leave, health insurance and pension liabilities and Tenant's obligations under applicable law to offer and provide group health continuation coverage. Landlord shall give Tenant written notice of Landlord's intent to exercise the right set forth above, in which event, upon the approval of the DOH of the Change of Ownership, Tenant shall and shall cause the Subtenant to immediately turn over possession and control of the Facility without any further action having to be taken on the part of Landlord. At the request of Landlord, Tenant shall and shall cause the Subtenant to turn over any or all of inventories, personal property (including computer and telecommunications equipment but excluding any leased equipment) vehicles, and material contracts (including hospital, transfer, vendor, and managed care contracts).

(f)     No failure of Landlord to enforce any rights or remedies upon default of Tenant shall prejudice or affect the rights of Landlord upon any subsequent or similar default.

(g)     In the event of a Lease Default by Tenant of any of the terms, covenants, conditions or provisions of this Lease, which Lease Default is not cured within any applicable grace or cure period, Landlord shall have the right to invoke any remedy permitted to Landlord at law, in equity or otherwise. All remedies available to Landlord are declared to be cumulative and concurrent and the exercise of one shall not preclude or waive the right to exercise any other. No termination of this Lease and no taking or recovering of possession of the Leased Premises shall deprive Landlord of any of its remedies or actions against Tenant and Tenant shall remain liable for all past or future Rent, including all taxes, insurance premiums and all other charges and Rent payable by Tenant under this Lease, during and for the balance of the Term hereof. The bringing of any action for Rent or other default shall not be construed as a waiver of the right to obtain possession of the Premises.

(h)     If suit shall be brought for recovery of possession of the Leased Premises, for the recovery of Rent, or any other amount due under the provisions of this Lease, or because of the breach of any other covenant herein contained on the part of Tenant to be kept or performed, and breach shall be established, Tenant shall pay to Landlord all expenses,

56



including reasonable attorney fees, incurred therefor. This subsection shall survive termination of this Lease.

Section 16.2    Facility Operating Deficiencies. On written notice of a request therefor by Landlord to Tenant, upon a Lease Default and for a period of time necessary to fully remedy the Lease Default, Tenant shall engage the services of a consultant, unaffiliated with Tenant and approved by Landlord, which approval shall not be unreasonably withheld, to review the management of the facility for the purpose of making recommendations to remedy the Lease Default. Subject to applicable legal requirements governing confidentiality of patient records, the consultant shall have complete access to the Facility, its records, offices and facilities, in order that it may carry out its duties. Tenant shall cause such consultant to prepare and deliver to Landlord and Tenant a written report of its recommendations within ten (10) days after its engagement. If Tenant shall fail to designate a consultant approved by Landlord as provided above within five (5) days after Tenant's receipt of Landlord's notice, Landlord may designate such consultant by further notice to Tenant. Tenant shall be responsible for payment of all fees and expenses reasonably charged and incurred by the consultant in carrying out its duties. Tenant shall promptly implement any and all reasonable recommendations made by such consultant in order to promptly correct or cure the Lease Default; provided, however, that in no event shall Tenant implement any such recommendations if the same would constitute a violation of applicable legal requirements, violate any rule or regulation of the DOH, or would otherwise cause a Lease Default hereunder (e.g., a transfer or change in use of the Leased Premises), unless Landlord consents in writing to such Lease Default, which consent may be given or withheld in Landlord's sole and absolute discretion. Nothing herein shall impose any liability or obligation on Landlord to (a) request the appointment of a consultant or (b) otherwise remedy the Facility Operating Deficiency(ies) nor shall it deem Landlord an operator of the Facility.

Section 16.3    Receivership.

Tenant acknowledges that one of the rights and remedies available under applicable law for nursing facilities which fail to comply with the conditions of participation for Medicare or Medicaid is to apply to a court of competent jurisdiction for the appointment of a receiver to take possession of the Facility, to collect the rents, issues, profits and income of the Facility and to manage the operation of the Facility. Tenant further acknowledges that the revocation, suspension or material limitation of the certification of the Facility for provider status under Medicare or Medicaid (or successor programs) and/or the revocation, suspension or material limitation of a license relating to the operation of the Facility for its intended use under the laws of the State of New York will materially and irreparably impair the value of Landlord's investment in the Facility. Therefore, in the event of a Lease Default, and in addition to any other right or remedy of Landlord under this Lease, at the request of Landlord, Tenant shall request DOH to, or to the extent permissible under law, Tenant shall, petition any appropriate court, for the appointment of a receiver to take possession of the Facility, to manage the operation of the Facility under Tenant's licenses and certifications, to collect and disburse all rents, issues, profits and income generated thereby and to preserve or replace to the extent possible any such license and provider certification for the Facility or to otherwise substitute the licensee or provider thereof. The receiver shall be entitled to a reasonable fee for its services as a receiver. All such fees and other expenses of the receivership estate shall be added to the

57

2305449v5/17057-6



monthly Rent due to Landlord under this Lease as Additional Rent. Tenant hereby irrevocably stipulates to the voluntary appointment of a receiver under such circumstances and for such purposes and agrees not to contest such appointment.

Section 16.4    Tenant's Waiver; Mitigation.  In connection with the exercise by Landlord of any of its remedies under this Section 16, including the termination of this Lease, in whole or in part, Tenant waives, to the maximum extent permitted by applicable Laws, (1) any right of redemption, re-entry or repossession, (2) the benefit of any moratorium laws or any laws now or hereafter in force exempting property from liability for rent or for debt, (3) any duty on the part of Landlord to mitigate the damages recoverable from Tenant on account of any Lease Default by Tenant, except that, notwithstanding the foregoing or anything in this Lease to the contrary, Landlord agrees to comply with any duty to mitigate damages where applicable Laws do not allow Tenant to waive such right, (4) the right to interpose any counterclaim (other than compulsory counterclaims) in any summary proceeding instituted by Landlord against Tenant in any court or in any action instituted by Landlord in any court for unpaid Rent under this Lease, and (5) any other right provided to Tenant under applicable Laws relating to a breach of or Lease Default under this Lease, including any rights to cure such breach or Lease Default.

## ARTICLE XVII

## ENTRY AND REIMBURSEMENT RIGHTS OF LANDLORD

Section 17.1    Entry and Reimbursement Rights of Landlord. In addition to those rights set forth in Section 7.2 of this Lease, Landlord reserves the right at all reasonable times during business hours and upon at least twenty-four (24) hours' advance oral notice to go upon and inspect the Facility and every part thereof (subject to applicable Laws pertaining to patient confidentiality and privacy and the confidentiality of medical records).  If Landlord shall make any payments or perform any repairs on behalf of Tenant which are Tenant's obligation and which Tenant has failed to make after applicable notice from Landlord, then any reasonable amounts so paid by Landlord are agreed and declared to be Additional Rent, and shall be due and payable to Landlord by Tenant upon submission to Tenant of an invoice, bill, or statement therefor, together with interest charged at the Overdue Rate commencing on the date of such invoice, bill, or statement.  Nothing in this Section 17.1 shall impose any liability or obligation upon Landlord.

## ARTICLE XVIII

## REPRESENTATIONS AND WARRANTIES

Section 18.1    Tenant's Representations, Warranties and Additional Covenants. Tenant represents, warrants and covenants to Landlord and agrees (all of which shall survive the delivery and execution of this Lease) as follows (all of Tenant's representations, warranties, and covenants shall be deemed to include, in addition to that specified herein, the identical warranties, representations, and covenants of all Subtenants, which Tenant agrees to set forth in any Sublease and which are hereby incorporated herein by reference as if set forth in full herein):

2305449v5/17057-6

(a)    Corporate.  Tenant is a limited liability company duly formed and validly existing and in good standing under the laws of the State of New York, and has the limited liability company power and authority to own its property and assets and to carry on its business as now being conducted or as will be conducted on and after the Commencement Date.

(b)    No Breach of Statute or Contract.  The execution, delivery and performance of this Lease by Tenant and any Sublease by a subtenant will not breach any statute or regulation of any Governmental Authority, and will not as of the Commencement Date conflict with or result in a breach of or default under any of the terms, conditions or provisions of Tenant's articles of organization, operating agreement, other material agreements, or any order, writ, injunction, decree, agreement or instrument to which Tenant is a party, or by which it or its property, may be bound.

(c)    Authorization of Lease.  The execution, delivery and performance of this Lease, and all Subleases, has been duly authorized by all necessary individuals, shareholders, members, officers, directors, managers and/or owners of Tenant and this Lease constitutes the valid and binding obligation of Tenant, fully enforceable in accordance with its terms.

(d)    No Litigation or Adverse Events.  Except as set forth on Schedule 18.1(d) attached hereto and incorporated herein, there is no suit, claim, action or legal, administrative, arbitration, or other proceeding or governmental investigation pending or threatened, by or against Tenant, and there exists no event or condition of any character, which could prevent the consummation of the transactions contemplated by this Lease or materially adversely affect Tenant's performance of the terms and conditions hereunder.

(e)    Conduct of Business.  Subject to the express provisions herein, at all times after the Effective Date, Tenant shall, and cause its subtenants to (i) operate the Leased Premises (after the Commencement Date) and otherwise conduct its/their business in the ordinary course, and in compliance with all statutory and regulatory requirements of any federal, state or local authority, (ii) continue to operate the Leased Premises after the Commencement Date and maintain it in substantially its condition as of the Commencement Date, reasonable wear and tear excepted, including but not limited to repairs and replacements permitted or required under this Lease, and in a lawful manner, (iii) not encumber all or any portion of its assets or properties or the Leased Premises, including without limitation, certificates of need, bed rights, or provider agreements, (iv) preserve the goodwill of the Facility, (v) not take any action from an accounting perspective which would materially adversely affect the reimbursement formula or tax benefits with respect to the Leased Premises or any portion thereof, (vi) utilize the Leased Facility only for the Intended Purpose, (vii) not relinquish or attempt to transfer the location of or sell the skilled nursing facility license, certificate of need approval, Medicare or Medicaid certification or any other licenses, certifications, certificates, accreditations, approvals, permits, variances, waivers, provider agreements or other authorizations , (viii) not refuse to admit patients without 30 days' written notice of intent to, and prior written consent of, Landlord, (ix) not dissolve, merge or consolidate with or into any other person or entity, or otherwise change its identity or company or capital structure, or (x) not change its name or its business address..

2305449v5/17057-6



(f)    Continued Existence.  At all times on and after the Effective Date, Tenant shall cause to be done all things needed to preserve its rights and franchises and comply with all Laws applicable to it, and to continue to conduct its business in the ordinary course.

(g)    Payment of Obligations.  At all times on and after the Effective Date, Tenant shall timely pay, and cause its subtenants to timely pay, all of its/their obligations, indebtedness, taxes, charges and impositions, whether or not relating to the Leased Premises or this Lease, as they become due unless contested in good faith and diligently pursued only if permitted under and subject to the terms and conditions of this Lease.

(h)    Notice of Default.  At all times on and after the Effective Date, Tenant shall promptly notify Landlord of (i) any material default by Tenant relating to any indebtedness or obligation of Tenant, whether or not relating to the Leased Premises or this Lease, and (ii) any material violations by the Facility of any applicable Law.

(i)    Compliance with Law.  At all times on and after the Effective Date, Tenant shall comply in all respects, and cause its subtenants to comply in all respects, with all applicable Laws, including Medicare and Medicaid conditions of participation, to which it is subject or which are applicable to the Leased Premises and to Tenant's operation of the Leased Premises as a licensed, Medicare and Medicaid certified skilled nursing facility.

(j)    Beds and CON.  Tenant has been awarded a CON for construction and operation of 160 skilled nursing facility beds for use at the Lease Premises by DOH and such CON may be used in connection with this Lease.

(k)    Tenant, on behalf of itself and its Subtenants, makes the Health Care warranties and representations set forth in Schedule 18(k) attached hereto and incorporated herein, to Landlord, it's successors and assigns, which warranties and representations shall be true and correct as of Commencement Date and at all times during the Term.

(l)    Except for the Subleases of the Leased Premises to the Operators, there are no subleases or sub-subleases or occupancy agreements (other than residence agreements with patients or residents) for any portion of the Leased Premises.

(m)    Tenant shall maintain and comply at all times with all O&M Plans (Operation and Maintenance Plans covering the handling, treatment or maintenance of asbestos or Hazardous Materials) relating to the Leased Premises, or that shall be required in the future by Mortgagee or any HUD mortgagee or, where applicable, the Commissioner.

(n)    Obligations prior to Commencement Date.  In addition to all of Tenant's obligations provided in this Lease, Tenant shall:

(i) as soon as practical after the Effective Date, apply for all and rigorously pursue until obtained all Health Care Licenses;

(ii) as soon as practical after the Effective Date and continuing thereafter take all actions necessary or appropriate to obtain from DOH the maximize total project cost for the Facility approvable by DOH;

60

2305449v5/17057-6



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM    INDEX NO. 60278/2020

NYSCEF DOC. NO. 2    21-22623-shl   Doc 29-2   Filed 11/08/21   Entered 11/08/21 16:50:03   Doc 3 Notice   RECEIVED NYSCEF: 09/18/2020

part 1    Pg 96 of 150

(iii) as soon as practical after the Effective Date and continuing thereafter take all actions necessary or appropriate to obtain the highest possible reimbursement rate with respect to the Medicare and Medicaid programs;

(iv) as soon as practical after the Effective Date, apply for and rigorously pursue until obtained provider agreements with third party payors providing reimbursement for skilled nursing facility services in the geographic area of the Facility;

(v) after the Effective Date take all actions requested by Landlord in order for Landlord to finance and complete Landlord's Work.

(vi) as soon as practical prior to the Commencement Date, hire, employ and train a staff adequate to provide services to the residents of the Facility immediately after the Commencement Date;

(viii) as soon as practical prior to the Commencement Date, purchase a sufficient inventory of food, medicines and other perishable items necessary to provide services to the residents of the Facility immediately after the Commencement Date;

(ix) as soon as practical prior to the Commencement Date, purchase and deliver to the Facility all small wares necessary provide services to the residents of the Facility immediately after the Commencement Date;

(x) six months after the Effective Date and thereafter every six months until the Commencement Date, deliver to Landlord a detailed projected statement of income and expenses and cash flow for a three year period.

Section 18.2    Representation and Warranties. Landlord hereby represents and warrants to Tenant, all of which shall survive the delivery and execution of this Lease, and agrees, as follows:

(a)    No Breach of Statute or Contract. The execution, delivery, and performance of this Lease will not violate any provision of law, any order of any court or other agency of federal or state government or any provision of any indenture, agreement, or other instrument to which Landlord is a party or by which it or any of its properties or assets are bound; conflict with, result in a breach of, or constitute (with passage of time or delivery of notice, or both), a default under any such indenture, agreements or other instrument; or result in the creation or imposition of any lien or other encumbrance of any nature whatsoever upon any of the properties or assets of Landlord.

(b)    Authorization of Lease. This Lease has been duly authorized by all necessary individuals, shareholders, members, officers, directors, managers and/or owners of Landlord and this Lease constitutes the valid and binding obligation of Landlord, fully enforceable in accordance with its terms.

(c)    No Litigation or Adverse Events. There is no action, suit, examination, review, or proceeding by or before any governmental instrumentality or agency now pending or, to the knowledge of Landlord, threatened against Landlord, which, if adversely determined,

2305449v5/17057-6



would materially impair the right of Landlord to carry on the business as contemplated under this Lease.

      (d)   <u>No Default</u>.  Landlord is not in default in the performance, observation, or fulfillment of any of the obligations, covenants, or conditions contained in any agreement or instrument to which it is a party relating to the Leased Premises and which default would have a material adverse affect on the Leased Premises; and

      (e)   <u>Corporate</u>.  Landlord is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of New York and is qualified to do business in the State of New York, and has the limited liability company power and authority to own its properties and assets and to carry on its business as now being conducted.

**ARTICLE XIV**

**OPERATION, MERGER AND CONSOLIDATION RESTRICTIONS**

      Section 19.1    Intentionally Omitted

      Section 19.2    <u>SPE Provisions.</u>  At all times during the term of this Lease, Tenant represents, warrants and covenants that Tenant and each Subtenant, and all successors and assigns of Tenant and Subtenants, is, shall be and shall continue to be a **"Special Purpose Entity"** as defined in <u>Schedule 19.2</u>.  The Operating Agreement of Tenant and each subtenant shall include the Special Purpose Entity provisions set forth in <u>Schedule 19.2</u>.

      Section 19.3    <u>Injunctive Relief.</u>  Notwithstanding anything to the contrary set forth in this Lease, the Parties hereto understand and agree that: (a) each term of Article XIX of this Lease is fully required to protect Landlord's interests, and that no such term confers a benefit on Landlord that is disproportionate to the detriment imposed on Tenant, if any; (b) the remedy at law for any breach by Tenant of Article XIX would be inadequate; (c) the damages flowing from such breach are not readily susceptible to measurement in monetary terms; and (d) Landlord shall be entitled to immediate injunctive relief restraining any breach thereof. Nothing in this Agreement shall be deemed to limit Landlord's remedies at law or in equity for any such breach by Tenant of any term or provision of Article XIX of this Lease.

      Section 19.4    <u>Equity Interests.</u>  In the event that Tenant or any constituent entity under this Lease is ever a form of entity other than a limited liability company, the term **"membership interest"** as used in Articles XIX and XX hereof shall be deemed to mean the analogous form of equity ownership interest in such other type of entity, such as capital stock, partnership interest, beneficial interest or the like.

      Section 19.5    <u>No Merger or Consolidation.</u>  Except as expressly provided elsewhere in this Lease, Tenant shall not sell, or offer for sale, its assets or otherwise merge, consolidate, amalgamate or otherwise combine with any other entity other than selling non-material assets in the ordinary course of business, to any other entity, business or activity involving any of Tenant's officers, directors, members, managers, owners, representatives, agents, successors and assigns, and their respective successors, assigns, agents and

62



representatives. Except as expressly provided elsewhere in this Lease, Tenant, Subtenants, Guarantor(s) and their Affiliates, shall not sell or offer to sell, assign, transfer, convey, pledge, or encumber its/their membership interests to, or otherwise attempt to merge with or otherwise merge, consolidate, amalgamate or otherwise combine with any other entity, business or activity, whether involving any of Tenant's officers, directors, members, managers, owners, representatives, agents, successors and assigns, and their respective successors, assigns, agents and representatives, or otherwise.

## ARTICLE XX

## MISCELLANEOUS

Section 20.1    GOVERNING LAW. (a) ALL MATTERS PERTAINING TO THIS LEASE OR THE LEASED PREMISES SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAWS OF THE STATE OF NEW YORK AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, TENANT HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS LEASE, AND THIS LEASE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS).

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LANDLORD OR TENANT ARISING OUT OF OR RELATING TO THIS LEASE MAY AT LANDLORD'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF WHITE PLAINS, COUNTY OF WESTCHESTER, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND TENANT WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR *FORUM NON CONVENIENS* OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND TENANT HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. TENANT DOES HEREBY DESIGNATE AND APPOINT:

> Lizer Josefovic
> HBL SNF, LLC
> 1280 Albany Post Road
> Croton-on-Hudson, New York 10520

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO TENANT IN THE MANNER PROVIDED IN ARTICLE XIII OF THIS LEASE SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON TENANT IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE

2305449v.5/17057-6



STATE OF NEW YORK. TENANT (A) SHALL GIVE PROMPT WRITTEN NOTICE TO LANDLORD OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (B) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE, IN THE FORM OF A WRITTEN NOTICE TO LANDLORD, A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN WHITE PLAINS, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (C) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR AND NOTIFY LANDLORD IN WRITING OF SUCH SUBSTITUTION.

Section 20.2    Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Lease shall not operate as, or be construed to be a waiver of, any subsequent breach of the same or other provision hereof. No waiver shall be effective unless set forth in writing and signed by the party against whom such waiver is asserted.

Section 20.3    Delay Not a Waiver. Neither any failure nor any delay on the part of any party hereto in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or any other document or instrument entered into or delivered in connection herewith or pursuant hereto, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. A waiver of one default with respect to any Person shall not be construed to be a waiver of any subsequent default with respect to such Person or any other Person or to impair any remedy, right or power consequent thereon.

Section 20.4    Force Majeure. Neither party shall be liable nor deemed to be in default (other than monetary defaults) for any delay or failure in performance under this Lease or other interruption of service or employment deemed resulting, directly or indirectly, from acts of God, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, strikes or other work interruptions by either Parties' employees, or any similar or dissimilar cause beyond the reasonable control of either party ("Force Majeure").

Section 20.5    Severability. In the event any provision of this Lease is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Lease so long as the intent of the parties under this Lease can still be effected, which shall remain in full force and effect and enforceable in accordance with its terms.

Section 20.6    Entire Agreement: Amendments. This instrument contains the entire agreement between the Parties hereto with respect to the subject matter hereof. All representations, promises and prior or contemporaneous undertakings between such Parties are merged into and expressed in this instrument, and any and all prior agreements between such Parties are hereby canceled. The agreements contained in this instrument shall not be amended, modified, or supplemented except by a written agreement duly executed by both Landlord and Tenant.

2305449v5/17057-6



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM INDEX NO. 60278/2020

NYSCEF DOC. NO. 2    21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice RECEIVED NYSCEF: 09/18/2020

part 1    Pg 100 of 150

Section 20.7    Counterpart Execution; Electronic Execution. This Lease may be executed in any number of counterparts with the same effect as if the Parties hereto had signed the same document. All counterparts will be construed together and shall constitute one lease. Signatures transmitted by email as PDFs shall have the same effect as original signatures.

Section 20.8    Survival of Representations and Warranties. Except as specifically provided otherwise in this Lease, all representations and warranties of Landlord and Tenant shall survive the Term of this Lease.

Section 20.9    Use of Brokers. Landlord and Tenant each represent and warrant to the other that no broker, finder or other person has been involved in regard to this Lease. Landlord and Tenant hereby agree to indemnify, defend and hold the other harmless from and against any and all claims, liabilities, costs and expenses of any kind (including the injured party's reasonable attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of a party to this Lease in connection with the transactions contemplated herein. The provisions of this Section 20.9 shall survive the expiration and termination of this Lease.

Section 20.10    Owner for Federal Tax Purposes. It is hereby agreed between Landlord and Tenant that for federal, state and local income tax purposes Landlord will be the owner of the Leased Premises and Tenant will be the lessee thereof, and each party hereto agrees to characterize this Lease as a lease for federal, state and local income tax purposes and to file all tax returns consistent therewith.

Section 20.11    Estoppel Certificates. Tenant shall, without charge, at any time and from time to time, within ten (10) days after written request by Landlord or Mortgagee, deliver a written instrument to Landlord or any other person specified by Landlord, duly executed and acknowledged, certifying the following and such other matters as may be reasonably required by Landlord, including without limitation, current financial information relating to Tenant:

(a)    That Tenant has accepted and is in possession of the Leased Premises;

(b)    That this Lease is unmodified and in full force and effect or, if there has been any modification, that the same is in full force and effect as so modified, and identifying any such modification;

(c)    Whether or not there are then existing any setoffs or defenses in favor of Tenant against the enforcement of any of the terms, covenants, and conditions of this Lease by Landlord and, if so, specifying the same, and also whether or not Landlord has observed and performed all of the terms, covenants, and conditions on the part of Landlord to be observed and performed and, if not, specifying same;

(d)    That no Lease Defaults exist or are continuing; and

(e)    The dates to which Rent and all other charges hereunder have been paid.

2305449v5/17057-6



Section 20.12 Confidentiality. (a) Landlord and Tenant agree to keep all aspects of (but not the existence of) this Lease confidential, and shall not disclose to any person other than the members, managers, owners, directors, officers, employees, agents, advisors, affiliates, brokers, lenders, attorneys or accountants (collectively the "Representatives") of the Parties hereto on a need-to-know basis, or to any Governmental Authority pursuant to regulatory authority, any confidential or proprietary information, knowledge or data concerning the business, affairs, operations, secrets, dealings or finances of the other party furnished directly or indirectly by such other party (collectively referred to as the "Confidential Information"). As used in this Lease, the term "Confidential Information" does not include any information which: (i) at the time of disclosure is generally available to and known by the public (other than as a result of a disclosure directly or indirectly by either party or their Representatives); (ii) was available to either party on a non-confidential basis from a source other than a party to this Lease or its Representatives, provided that such source is not and was not bound by a confidentiality agreement with the party hereto; (iii) has been independently acquired or developed by either party or their Representatives without violating any of the obligations hereunder; (iv) is required by law to be disclosed; or (v) relates to the tax structure, tax strategy or tax planning of this transaction.

(f)    In the event that either party or any of the Representatives receives notice of a legal request for disclosure of any of the Confidential Information (by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process), the party receiving such notice ("Receiving Party") shall promptly notify the other party ("Notified Party") so that the Notified Party may seek a protective order or other appropriate remedy if it chooses to do so. Failure by the Notified Party to take action to seek a protective order or other remedy and to notify the Receiving Party of such action prior to the required disclosure date, shall be deemed a waiver of the provisions of this section. In the event that a protective order or other remedy is not obtained or that the Notified Party waives compliance with the provisions hereof, the Receiving Party shall exercise its best efforts to obtain a confidentiality agreement or protective order concerning the Confidential Information, and in the absence thereof, shall disclose only that portion of the Confidential Information which it is advised by written opinion of counsel is legally required to be disclosed, or which is compelled by court order.

(g)    In the event of any breach or threatened breach hereof, Landlord or Tenant shall be entitled to equitable relief, including a temporary preliminary and permanent injunction and specific performance, in addition to all other remedies available to them at law or in equity.

(h)    Notwithstanding anything herein to the contrary, Landlord (and each employee, agent, or other Representative of Landlord) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of this Lease, related documents and all materials of any kind (including opinions or other tax analyses) that are provided to Landlord relating to such tax treatment and tax structure. For this purpose, the tax treatment of a transaction is the purported or claimed U.S. federal income tax treatment of the transaction and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of the transaction.

66



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM          INDEX NO. 60278/2020

NYSCEF DOC. NO. 2          21-22623-shl   Doc 29-2   Filed 11/08/21   Entered 11/08/21 16:50:03   Doc 3 Notice   RECEIVED NYSCEF: 09/18/2020

part 1   Pg 102 of 150

Section 20.13   Holdover.  If, at the expiration of the Term, or earlier termination of the Lease, Tenant continues to occupy the Leased Premises except during a Reimbursement Period, with Landlord's consent, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a Tenant from month-to-month at 300% of the most recent Rent payable by Tenant hereunder, at Landlord's sufferance, and under the same terms and conditions as were in force and effect at the expiration of the Term (except only as to the Term), and except that in the event Tenant shall continue to occupy the Leased Premises after the expiration of the Term, without a duly executed extension agreement in writing having been entered into by and between Landlord and Tenant, then if Landlord shall suffer any damage, loss, cost or expense as a result of such holdover, then Tenant, in addition to such increased Rent, shall pay the amount thereof to Landlord immediately on demand. The provisions of this Section shall be deemed to be "an agreement expressly provided" otherwise as provided in Section 232-C of the Real Property Law of the State of New York, Holding Over.  Nothing contained herein shall constitute the consent, express or implied, of Landlord to the holding over of Tenant after the Expiration Date or earlier termination of this Lease, nor shall anything contained herein be deemed to limit Landlord's remedies.

Section 20.14   Tenant's Waiver of Claim for Physical Injury.  Landlord and Landlord's Indemnitees shall not be liable for, and Tenant waives and indemnifies Landlord and Landlord's Indemnitees against all claims for, damage or injury to person or property sustained by Tenant or any person claiming through Tenant, or otherwise, resulting from any accident or occurrence in, about, or upon the Leased Premises, whether occurring as a result of Landlord's active or passive negligence, or otherwise.

(a)      Such waiver shall include, but not be limited to, claims for damage resulting from: (i) any equipment or appurtenances becoming out of repair or any other capital improvement, replacement, repair or maintenance; (ii) injury done or occasioned by wind; (iii) any defect in or failure of plumbing, heating, or air conditioning equipment, electric wiring, gas, water and steam pipes, stairs, rail or walks; (iv) broken glass; (v) the backing up of any sewer pipe or washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Leased Premises; (vi) the escape of steam or hot water; (vii) water, snow or ice being upon, falling from or coming through the roof, skylight, trap door, stairs, walks or any other place upon or near the Leased Premises; (viii) the falling of any fixture, plaster, drywall or stucco; and (ix) any act, omission or negligence of trespassers.

Section 20.15   Binding Effect.  This Lease does not constitute an offer to lease and shall not bind Landlord or Tenant unless and until each such party elects to be bound hereby by executing and delivering to the other party an executed original counterpart hereof.

Section 20.16   Default by Landlord.  Landlord shall in no event be charged with default in the performance of any of its obligations hereunder unless and until Landlord shall have failed to perform such obligations within sixty (60) days of when they are due to be performed, except in cases when documents are required or consents needed in less than sixty (60) days in which case failure to render timely shall be deemed to be approval or consent of Landlord (or such additional time as is reasonably required to correct any such default) except for Landlord's default in making timely payment of taxes and interest, in which case Landlord shall be in default when such payments are delinquent or past due.  Tenant agrees to give to the

67



holder of record of any mortgage covering the Leased Premises notice simultaneously with any notice given to Landlord to correct any default of Landlord as hereinabove provided and agrees that the holder of record of any mortgage shall have the right, after receipt of notice of such default, within sixty (60) days after the expiration of Tenant's applicable cure period with respect thereto, to correct or remedy such default before Tenant may take any action under this Lease by reason of such default. Landlord shall also give to the holder of any mortgage copies of any notices of default which it may give or send to Tenant.

Section 20.17    Liens. Tenant shall not do or suffer anything to be done whereby the Leased Premises, or any portion thereof, or any interest therein, may be encumbered by any liens of mechanics, laborers, or materialmen, chattel mortgages or any other liens. Tenant shall, whenever and as often as any such liens are filed against the Leased Premises, or any portion thereof, purporting to be for labor or material furnished or to be furnished to Tenant, discharge the same of record within thirty (30) days after the date of filing by payment, bonding or otherwise, as provided by law. In the event of the default of Tenant in procuring the discharge, as aforesaid, of any such lien, Landlord may, with five (5) days prior notice, procure such discharge and the expenses incurred by Landlord in obtaining such discharge shall be paid by Tenant as Additional Rent within ten (10) days after notice from Landlord of the amount thereof.

Section 20.18    Publicity. All news releases, publicity or advertising by Tenant or their Affiliates through any media intended to reach the general public which refers to Landlord, or its Affiliates, this Lease or the purchase of the Real Property shall be subject to the prior written approval of Landlord.

Section 20.19    Trial by Jury. **TENANT HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS LEASE, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY TENANT, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LANDLORD IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY TENANT.**

Section 20.20    Construction and Interpretation. The Parties have each negotiated the terms and conditions hereof and reviewed this Lease carefully. It is the intent of the Parties that each word, phrase, sentence and other part hereof shall be given its plain meaning, and that rules of interpretation or construction of contracts that would construe any ambiguity of any part hereof against the draftsman, by virtue of being the draftsman, shall not apply.

Section 20.21    Accord and Satisfaction. No payment by Tenant or receipt by Landlord of a lesser amount than shall be due hereunder, shall be deemed to be other than a payment on account nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be given any effect or be deemed an accord and

2305449v5/17057-6



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 104 of 150

satisfaction, and Landlord may accept such checks without prejudice to any other rights or remedies which Landlord may have.

Section 20.22    Captions and Headings.  The captions and headings set forth in this Lease are included for convenience and reference only, and the words obtained therein shall in no way be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of, or the scope or intent of, this Lease, or any parts hereof or thereof.

Section 20.23    Time is of the Essence.  Time is of the essence of each and every term, condition, covenant and warranty set forth herein or in any of the other Lease Documents.

Section 20.24    Successors and Assigns.  This Lease and the other Lease Documents shall (a) be binding upon Tenant and Tenant's legal representatives and permitted successors and permitted assigns, and (b) inure to the benefit of Landlord and any other person or entity who may now or hereafter hold the interest of Landlord under this Lease and their respective successors and assigns.

Section 20.25    No Third Party Beneficiaries  This Lease is solely for the benefit of Landlord, its successors and assigns, and Tenant, and nothing contained herein shall confer upon any person other than Tenant or Landlord or their respective successors and assigns, any right to insist upon or to enforce the performance or observance of any of the obligations contained herein, except only as may be otherwise specifically provided for in this Lease.  All conditions to the obligations of Landlord to advance or make available proceeds of insurance or condemnation are imposed solely and exclusively for the benefit of Landlord, its successors and assigns.  No other person or entity shall have standing to require satisfaction of such conditions in accordance with their terms, and no other person or entity shall, under any circumstances, be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Landlord at any time, if in Landlord's sole and absolute discretion, Landlord deems it advisable or desirable to do so.

Section 20.26    Non Competition and Non Solicitation.

Tenant agrees to the following restrictive covenants and agreements which covenants are not severable from this Lease and which are included to protect the value of the Leased Premises.  Accordingly, Tenant agrees that it and their Affiliates will not, during the Term of this Lease at any time for a period of two (2) years after the expiration or early termination of this Lease, directly or indirectly, together or alone or in conjunction with any others, engage in the following:

(i)    compete with the business conducted at the Facility, and for these purposes will not own, manage, operate, join, control or participate in, or be connected as an officer, employee, partner, director, trustee or otherwise in any manner with a company which owns or operates (or provides consulting and/or management services to any skilled nursing facility located within the Primary Market of the Facility or (ii) any company providing hospice services in the Commonwealth of Massachusetts, or,  otherwise lend credit to a person, firm or entity of a type which they prohibited from owning,

2305449v5/17057-6



(ii)  solicit or hire any then current or former (having provided services during the period commencing one year prior to such date of solicitation or hire) employees of the Facility (except for employment at the Facility),

(iii)  solicit or cause any then current resident of the Facility to move to another nursing facility unless, except during the Term of this Lease the Facility can no longer provide adequate care for such resident.

Tenant acknowledges and agrees that the remedy at law for any breach or threat of breach of the foregoing agreements will be inadequate and that Landlord shall be entitled to in-junctive relief in addition to any rights or remedies available to it for any breach or threat of breach hereof. The foregoing covenants shall be deemed to be severable and if the same be held invalid by reason of length of time or area covered, or both, the Tenant agrees that such length of time or area covered, or either of them, shall be reduced to the extent necessary to cure such invalidity and the provisions hereof shall be enforceable to the fullest extent permitted by law.

Section 20.27    Subdivision. If the Leased Premises are in excess of that which is required to operate the Facility in accordance with the Intended Use, Landlord may subdivide the Leased Premises and amend this Lease to include only so much of the Leased Premises as is necessary to operate the Facility in accordance with the Primary Intended Use. If Landlord subdivides the Leased Premises there shall be no change in the Rent payable hereunder. After any such subdivision, Tenant shall have no rights to any land which is no longer part of the Leased Premises and Landlord may sell, lease or develop any land which is no longer part of the Leased Premises. If Landlord elects to subdivide the Leased Premises Tenant shall cooperate with Landlord and take all actions reasonably requested by Landlord to effect such subdivision.

Section 20.28    Landlord Not in Control; No Partnership. None of the covenants or other provisions contained in this Lease shall, or shall be deemed to, give Landlord the right or power to exercise control over the affairs or management of Tenant, the power of Landlord being limited to the rights to exercise the remedies referred to in this Lease. The relationship between Tenant, on the one hand, and Landlord, on the other hand, is, and at all times shall remain, solely that of landlord and tenant. No covenant or provision of this Lease is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest in profits or income between Landlord, on the one hand, and Tenant, on the other hand. Landlord undertakes or assumes no responsibility or duty to Tenant or to any other person with respect to the Facility or this Lease, except as expressly provided in this Lease; and notwithstanding any other provision of this Lease (a) Landlord shall not be construed as, a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Tenant or its stockholders, members, or partners and Landlord never intends to ever assume such status; (b) Landlord shall not in any event be liable for any debts, expenses or losses incurred or sustained by Tenant; and (c) Landlord shall not be deemed responsible for or a participant in any acts, omissions or decisions of Tenant or their stockholders, members, or partners. Landlord, on the one hand, and Tenant, on the other hand, disclaim any intention to create any partnership, joint venture, agency or common interest in profits or income between Landlord, on the one hand, and Tenant, on the other hand, or any sharing of liabilities, losses, costs or expenses.

2305449v5/17057-6



Section 20.29  <u>Tenant Cooperation</u>.  Tenant agrees to cooperate with Landlord in providing, and upon request by Landlord or its lender, Tenant shall provide or cause its subtenants to provide, such documents, information, financial reports, and such other items as may be required by Mortgagee in connection with Landlord's loan or loans to acquire the Leased Premises.  Tenant agrees to cause its outside counsel to provide updated healthcare opinions required by Mortgagee in connection with the healthcare operations by Tenant or its subtenants at the Facility, and if required by Mortgagee, an opinion of counsel as to the due formation of Tenant and its subtenants and due execution by said parties, and Tenant Affiliates, of the Lease, all subleases, all guaranties of the Lease, and any other documents executed by such parties in connection with the loan(s) from Mortgagee to Landlord.  Tenant agrees to execute, and cause the subtenants to execute, SNDAs in form and substance required by Mortgagee and by its prospective lender who will be making HUD-insured loans to Landlords.  Tenant further agrees to cooperate with Landlord and with its lenders who are processing and will be making HUD Loans to Landlords.

Section 20.30  <u>Capitalized Terms</u>.  To the extent capitalized terms used herein are not defined, they shall have the same meaning as capitalized terms in the Loan Documents.

Section 20.31  <u>Affiliate</u>.  The term "<u>Affiliate</u>" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

## ARTICLE XXI

## REMEDIES CUMULATIVE

Section 21.1     The rights and remedies set forth under this Lease are in addition to all other rights and remedies afforded to Landlord under any of the other documents contemplated under this Lease ("<u>Lease Documents</u>") or at law or in equity, all of which are hereby reserved by Landlord, and this Lease is made and accepted without prejudice to any such rights and remedies.  All of the rights and remedies of Landlord under each of the Lease Documents shall be separate and cumulative and may be exercised concurrently or successively in Landlord's sole and absolute discretion.

## ARTICLE XXII

## LIMITATION OF LIABILITY

Section 22.1     <u>Liability</u>.  No member, manager, officer, shareholder, employee or agent of Landlord or its respective affiliates shall be held to any personal liability, jointly, or severally, for any obligation of, or claim against Landlord under this Lease.  All persons dealing with Landlord, in any way, shall look only to the assets of Landlord for the payment of any sum or the performance of any obligations.

2305449v5/17057-6



Section 22.2    Consequential Damages.    Under no circumstances shall Landlord be liable to Tenant or any subtenant or Affiliate of Tenant for any consequential, specified, exemplary or permitted damages.

Section 22.3    Liability Limited to Interest in Premises.    Tenant shall look solely to Landlord's interest in the Leased Premises owned by Landlord to satisfy any liability arising under this Lease.  It is specifically agreed that no constituent partner in Landlord or officer, director, member, manager or employee of Landlord shall ever be personally liable for any such judgment or for the payment of any monetary obligation to Tenant.  Except as otherwise expressly provided herein, in no event shall Landlord ever be liable to Tenant for any indirect or consequential damages suffered by Tenant from whatever cause.

## ARTICLE XXIII

## REGULATORY ACTIONS

Section 23.1    Notice of Litigation.    (a)  Promptly after receipt by Tenant or its Affiliates of notice of the commencement thereof, Tenant shall provide Landlord with notice of all actions, suits, and proceedings before any Governmental Authority affecting Tenant, or its Affiliates or its Subtenants, which, if determined adversely to Tenant, its Affiliates or its Subtenants, could result in a judgment equal to or greater than Fifty Thousand Dollars ($50,000.00).

(b)    Notice of Regulatory Actions.    Promptly after receipt by Tenant or its Affiliates of the notice of commencement thereof, Tenant shall provide Landlord with notice of (i) any audit, investigation, claim (excluding adjustments, complaints, and corrective activity in the ordinary course of business), proceeding, settlement, judgment, consent order, or corporate integrity agreement by or imposed by any Governmental Authority, (ii) any suspension, debarment or disqualification of Tenant, its officers and members, or its Affiliates from being a health care provider, government contractor, holder of any health care license or recipient of reimbursement from any third party payor, (iii) any suspension, termination, or revocation of any health care license of Tenant or any or any of Tenant's Affiliates or (iv) any self or voluntary disclosure of any overpayment to a third party payor by Tenant or any of Tenant's Affiliates.

(c)    Notice of Settlement Negotiations.    Tenant shall provide Landlord with reasonable notice of any and all settlement discussions and/or negotiations (excluding adjustments, complaints and corrective activity in the ordinary course of business) between representatives of Tenant and/or its Subtenants and any Governmental Authority, including without limitation negotiations with respect to any claim, settlement agreement, consent order or corporate integrity agreement between Tenant and its Affiliates and any Governmental Authority ("Settlement Discussions").  In connection with Settlement Discussions, (i) Tenant shall timely provide Landlord with copies of any and all documents that Tenant and/or its Subtenants intends to submit, or that Tenant and/or its Subtenants receives, in connection with any Settlement Discussions, and (ii) Tenant shall advise Landlord as to the status of the Settlement Discussions.

2305449v5/17057-6



No receipt of any such notice under subsections (a), (b) and (c) shall impose any obligation on Landlord to take any action or to enforce its rights hereunder or otherwise remedy the circumstances leading to such notice.

## ARTICLE XXIV

### ANTI-TERRORISM AND ANTI-MONEY LAUNDERING COMPLIANCE

Section 24.1    Compliance with Anti-Terrorism LawsTenant represents and warrants to Landlord that it is not, and, after making due inquiry, that no person who owns a controlling interest in or otherwise controls Tenant is, (i) listed on the Specially Designated Nationals and Blocked persons List (the "SDN List") maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or on any other similar list ("Other Lists" and, collectively with the SDN List, the "Lists") maintained by the OFAC pursuant to any authorizing statute, Executive Order or regulation (collectively, "OFAC Laws and Regulations"); or (ii) a person (a "Designated Person") either (A) included within the term "designated national" as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (B) designated under Sections 1(a), 1(b), 1(c) or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or similarly designated under any related enabling legislation or any other similar Executive Orders (collectively, the "Executive Orders"). The OFAC Laws and Regulations and the Executive Orders are collectively referred to in this Agreement as the "Anti-Terrorism Laws". Tenant represents and warrants that it requires, and has taken reasonable measures to ensure compliance with the requirement, that no person who owns any other direct interest in Tenant is or shall be listed on any of the Lists or is or shall be a Designated Person. This Section 24.1 shall not apply to any person to the extent that such person's interest in Tenant is through a U.S. Publicly-Traded Entity. As used in this Lease, "U.S. Publicly-Traded Entity" means a person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a person.

Section 24.2    Funds Invested in Tenant. Tenant represents and warrants that it has taken reasonable measures appropriate to the circumstances (and in any event as required by law), with respect to each holder of a direct or indirect interest in Tenant, to assure that funds invested by such holders in Tenant are derived from legal sources ("Anti-Money Laundering Measures"). The Anti-Money Laundering Measures have been undertaken in accordance with the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq. ("BSA"), and all applicable laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations under 18 U.S.C. §§ 1956 and 1957 (collectively with the BSA, "Anti-Money Laundering Laws").

Section 24.3    No Violation of Anti-Money Laundering Laws. Tenant represents and warrants to Landlord, to its actual knowledge after making due inquiry, that neither Tenant nor any holder of a direct or indirect interest in Tenant (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering under 18 U.S.C. §§ 1956 and 1957, drug trafficking, terrorist-related activities or other money laundering predicate crimes, or any violation of the BSA, (ii) has been assessed civil penalties

73



INDEX NO. 60278/2020
RECEIVED NYSCEF: 09/18/2020

under any Anti-Money Laundering Laws, or (iii) has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws.

      Section 24.4     Tenant Compliance with Anti-Money Laundering Laws.  Tenant represents and warrants to Landlord that it has taken reasonable measures appropriate to the circumstances (in any event as required by law), to ensure that Tenant is in compliance with all current and future Anti-Money Laundering Laws and laws, regulations and government guidance for the prevention of terrorism, terrorist financing and drug trafficking.

<strong>[SEE ATTACHED SIGNATURE PAGES]</strong>

74



IN WITNESS WHEREOF, the Parties have executed or caused the execution of this Lease by their respective officers duly authorized as of the day and year first above written.

**LANDLORD:**

White Plains Healthcare Properties I, LLC, ,
a Massachusetts limited liability company

By: _____
                           , Manager

**TENANT:**

HBL SNF, LLC,
a New York limited liability company

By: _____
Name: _____
Its: _____

IN WITNESS WHEREOF, the Parties have executed or caused the execution of this Lease by their respective officers duly authorized as of the day and year first above written.

**LANDLORD:**

White Plains Healthcare Properties I, LLC, ,
a Massachusetts limited liability company

By:_____
                    , Manager

**TENANT:**

HBL SNF, LLC,
a New York limited liability company

By: _____
Name: _____
Its: _____

2305449v5/17057-6

## SCHEDULE 18(k)

### Health Care Representations

**Health Care Representations.** Tenant, for itself, and for the Subtenants, do hereby represent and warrant to Landlord, its successors and assigns, as of the date of the Lease, that:

      (a)     All Medicare and Medicaid provider agreements, certificates of need, if applicable, certifications, governmental licenses, permits, regulatory agreements or other agreements and approvals, including certificates of operation, completion and occupancy, and state nursing facility licenses or other licenses required by Health Care Authorities (as defined in the Lease) for the legal use, occupancy and operation of the Facility (collectively, the "**Health Care Licenses**") for the Facility have been obtained by the party required to hold such Health Care Licenses and are in full force and effect, including approved provider status in any approved third-party payor program. **Each Subtenant (hereinafter "Operator")** owns and/or possesses, and holds free from restrictions or conflicts with the rights of others, all such Health Care Licenses and will operate or cause the Facility to be operated in such a manner that the Health Care Licenses shall remain in full force and effect;

      (b)     The Facility is duly licensed as a skilled nursing facility as required under the applicable laws of the State of New York. The licensed bed capacity of the Facility and the actual bed count operated at the Facility is 160. The Tenant has not applied to reduce the number of licensed or certified beds of the Facility or to move or transfer the right to any and all of the licensed or certified beds of the Facility to any other location or to amend or otherwise change the Facility and/or the number of beds approved by the DOH or other applicable state licensing agency, and there are no proceedings or actions pending or contemplated to reduce the number of licensed or certified beds of the Facility;

      (c)     The Health Care License with respect to the Facility (i) has not been and will not be (A) transferred to any location other than the Facility or (B) pledged as collateral security (other than any pledge as collateral security to Tenant's accounts receivable lender approved by Landlord which pledge is subject to the interests of (x) Landlord under the Lease and (y) Mortgagee, including the liens and security interests of the Loan Documents), (ii) is and will continue to be held free from restrictions or known conflicts that would materially impair the use or operation of the Facility as intended, and (iii) is not provisional, probationary, or restricted in any way, except in instances where a Governmental Authority or Health Care Authority has issued a provisional, probationary or restricted license, permit or certification in the ordinary course pending issuance of a final license, permit or certification;

      (d)     Tenant has or will take any action to rescind, withdraw, revoke, amend, modify, supplement or otherwise alter the nature, tenor or scope of any Health Care

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM    INDEX NO. 60278/2020

NYSCEF DOC. NO. 2    21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice    RECEIVED NYSCEF: 09/18/2020

part 1    Pg 113 of 150

License or applicable provider payment program participation other than non-material alterations effected in the ordinary course of business;

(e)    Tenant and the operation of the Facility are in material compliance with the applicable provisions of the Laws and all orders, standards, policies, restrictions or rules of any Health Care Authority having jurisdiction over the ownership, use, occupancy or operation of the Facility, including (i) staffing requirements, (ii) health and fire safety codes including quality and safety standards, (iii) accepted professional standards and principles that apply to the Operator's provision of services at the Facility, (iv) federal, state or local laws, rules, regulations or published interpretations or policies relating to the prevention of fraud and abuse, (v) insurance, reimbursement and cost reporting requirements, government payment program requirements and disclosure of ownership and related information requirements, (vi) requirements of applicable Health Care Authorities, including those relating to the Facility's physical structure and environment, licensing, quality and adequacy of nursing facility care, distributions of pharmaceuticals, rate setting, equipment, personnel, operating policies, and additions of Facility and services, and (vii) any other applicable laws, regulations or agreements for reimbursement for the type of care or services provided by Tenant and/ with respect to the Facility.  As used herein, "material compliance" means a level of compliance that would keep Tenant and/ (and the operation of the Facility) free from any final orders or sanctions by any Governmental Authority or Health Care Authority having jurisdiction over the operation of the Facility and would not adversely affect Tenant's and/'s operations, including, but not limited to, its right to receive reimbursement or insurance payments;

(f)    Tenant and the Facility are each in material compliance with the requirements for participation in the Medicare and Medicaid programs with respect to the Facility that currently participates in such programs and has a current provider agreement under Title XVIII and/or XIX of the Social Security Act which is in full force and effect. Facility has not had any deficiencies on its most recent survey (standard or complaint that would result in a denial of payment for new admissions with no opportunity to correct prior to termination.  The Facility had not any deficiencies at "level G" or above on its most recent survey (standard or complaint), nor has Tenant been cited with any substandard quality of care deficiencies (as that term is defined in Part 488 of 42 C.F.R.) for the past two consecutive surveys.  The Facility has not been designated as a Special Focus Facility (as such term is defined by the Centers for Medicare and Medicaid Services Special Focus Facility Program);

(g)    Neither Tenant nor the Facility is a target of, participant in, or subject to any action, proceeding, suit, audit, investigation or sanction by any Health Care Authority or any other administrative or investigative body or entity or any other third party payor or any patient or resident (including, without limitation, whistleblower suits, or suits brought pursuant to federal or state False Claims Acts, and Medicaid/Medicare/State fraud/abuse laws, but excluding medical malpractice claims and other civil liability lawsuits for which the Facility is maintaining insurance coverage in the ordinary course of business) which may result, directly or indirectly or with the passage of time, in the imposition of a fine, penalty, alternative, interim or final sanction, a lower rate

certification, recoupment, recovery, suspension or discontinuance of all or part of reimbursement from any Health Care Authority, third-party payor, insurance carrier or private payor, a lower reimbursement rate for services rendered to eligible patients, or any other civil or criminal remedy, or which could reasonably be expected to have a material adverse effect on Landlord, Tenant , or the operation of the Facility, including the Facility's ability to accept or retain residents, or which could result in the appointment of a receiver or manager, or in the modification, limitation, annulment, revocation, transfer, surrender, suspension or other impairment of a Health Care License, or affect Tenant's 's participation in the Medicare, Medicaid, or third-party payor program, as applicable, or any successor program thereto, at current rate certification, nor has any such action, proceeding, suit, investigation or audit been threatened;

(h)    There are no agreements with residents of the Facility or with any other persons or organizations that deviate in any material adverse respect from or that conflict with, any statutory or regulatory requirements. All resident records at the Facility, including patient and/or resident accounts records, are true, complete, and correct in all material respects;

(i)    Other than the Medicare, Medicaid, and Veteran Administration programs, Tenant is not a participant in any federal, state or local program whereby any federal, state or local government or quasi-governmental body, or any intermediary, agency, board or other authority or entity may have the right to recover funds with respect to any Individual Property by reason of the advance of federal, state or local funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.). Tenant has received no notice, and is not aware of any violation of applicable antitrust laws;

(j)    Tenant's  private payor, Medicaid, Medicare, and/or managed care company, insurance company or other third-party insurance accounts receivable with respect to the Facility are free of any liens and Tenant has not pledged any of its receivables as collateral security for any loan or indebtedness;

(k)    Tenant is not a party to any collective bargaining agreement or other labor contract applicable to persons employed by it at the Facility and there are no threatened or pending labor disputes at the Facility;

(l)    Tenant has instituted, and the Facility is operated in material compliance with, a compliance plan which follows applicable guidelines established by Health Care Authorities;

(m)    Tenant is in compliance with the Health Care Insurance Portability and Accountability Act of 1996, and the regulations promulgated thereunder;

(n)    There is no threatened or pending revocation, suspension, termination, probation, restriction, limitation, or non-renewal affecting Tenant and/or the Facility or provider agreement with any third-party payor, Medicare or Medicaid;

(o)     All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by or on behalf of the Facility are and will continue to be materially accurate and complete and have not been and will not be misleading in any material respects;

(p)     The Facility and the use thereof complies in all material respects with all applicable local, state, and federal building codes, fire codes, and other similar regulatory requirements and no waivers of such physical plant standards exist at the Facility;

(q)     Any existing agreement relating to the management or operation of the Facility is in full force and effect and is not in default by any party. In the event any management or operating agreement is terminated or in the event of foreclosure or other acquisition, the subsequent operator need not obtain a certificate of need prior to applying for and receiving a license to operate the Facility or prior to receiving Medicare or Medicaid payments, as applicable;

(r)     There are no actions, suits, or proceedings at law or in equity by any person or entity, including any Governmental Authority or any Health Care Authority or other agency now pending or threatened against or affecting Tenant and/or the Facility, which actions, suits or proceedings, individually or collectively, if determined against Tenant and/or the Facility, might materially adversely affect the condition (financial or otherwise) or business of Tenant and/or the   condition, ownership or operation of the Facility.



FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 2
21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 116 of 150

INDEX NO. 60278/2020

RECEIVED NYSCEF: 09/18/2020

## SCHEDULE 19.2

"**Special Purpose Entity**" shall mean a corporation, limited partnership or limited liability company (such entity sometimes referred to herein as the "**Company**") which at all times on and after the date hereof:

(d) is organized solely for the purpose of (i) acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Leased Premises, entering into this Lease with Landlord, subleasing the Leased Premises to affiliated subtenants; and (ii) transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(e) is not engaged and will not engage, directly or indirectly, in any business unrelated to those activities required or permitted to be performed under the Lease, including pursuant to this definition of "Special Purpose Entity" and Subsection (a) above, as applicable;

(f) does not have and will not have any assets other than those (i) related to the Leased Premises or its partnership interest in the limited partnership or the member interest in the limited liability company that operates the Leased Premises or acts as the general partner or managing member thereof, as applicable, and (ii) incidental personal property necessary for the conduct of its business, as applicable;

(g) has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company) or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable) with respect to the matters set forth in this definition;

(h) is and will remain solvent and pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, and is maintaining and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(i) has not failed and will not fail to correct any known misunderstanding regarding its separate identity;

(j) has maintained and will maintain its accounts, books and records separate from those of any other person, individual or entity (a "**Person**") and maintain its bank accounts separate from those of any other Person. To the extent required by law to file a tax return, will file its own tax returns, except to the extent it is required to file consolidated tax returns by law;

2305449v5/17057-6

(k) has maintained and will maintain its own records, books, resolutions and agreements;

(l) has not commingled and will not commingle its funds or assets with those of any other Person and has not participated and will not participate in any cash management system with any other Person other than pursuant to its *[insert any credit facilities or accounts receivables financings]*;

(m) has held and will hold its assets in its own name;

(n) has conducted and will conduct its business in its name;

(o) has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity except as required by GAAP; provided, however, that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(p) has paid and will pay its own liabilities and expenses, including the salaries of its own employees, if any, out of its own funds and assets, and has maintained and will maintain a sufficient number of employees, if any, in light of its contemplated business operations and in accordance with all Laws;

(q) has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(r) has and will have no indebtedness other than (i) liabilities under this Lease or any Sublease (ii) liabilities incurred in the ordinary course of business relating to the ownership and operation of the Leased Premises and the routine administration of Tenant, and (iii) such other liabilities that are permitted under this Lease;

(s) has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except as permitted pursuant to this Lease;

(t) has not and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

(u) has allocated and will allocate fairly, reasonably and in accordance with all Laws, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(v) maintains and uses and will maintain and use separate stationery, invoices and checks bearing its name. The stationery, invoices, and checks utilized by the Tenant or utilized to collect its funds or pay its expenses shall bear its own name and shall not bear the name of any other entity;

(w) has not pledged and will not pledge its assets for the benefit of any other Person;

(x) has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(y) has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(z) has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity;

(aa) has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself and shall not identify itself as a division of any other Person;

(bb) has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except (A) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are in compliance with all Laws and no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party and (B) in connection with this Lease;

(cc) has not and will not have any obligation to, and will not, indemnify its partners, officers, directors or members, as the case may be, unless such an obligation is fully subordinated to the Rent payable under this Lease and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Rent is insufficient to pay such obligation;

(dd) it shall consider the interests of its creditors in connection with all limited liability company actions;

(ee) does not and will not have any of its obligations guaranteed by any Affiliate except obligations under this Lease;

(ff) if such entity is a limited liability company, it shall have its own board of directors or board of managers, and shall cause such board to meet at least annually or act pursuant to written consent and keep minutes of such meetings and actions and observe all other corporate formalities;

(gg) has complied and will comply with all of the terms and provisions contained in its organizational documents. The statement of facts contained in its organizational documents are true and correct and will remain true and correct;

(hh) has not and will not permit any other Person independent access to its bank accounts;

(ii) has caused and will cause all representatives of Tenant to act at all times with respect to Tenant consistently and in furtherance of the foregoing; and

(jj) has not and will not form, acquire, or hold any subsidiary or own any equity interest in any other entity.

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM

INDEX NO. 60278/2020

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 120 of 150

2305449v5/17057-6

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM INDEX NO. 60278/2020

NYSCEF DOC. NO. 3    21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice    RECEIVED NYSCEF: 09/18/2020
part 1    Pg 121 of 150

# Exhibit 2 to

# Verified Complaint

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM INDEX NO. 60278/2020

NYSCEF DOC. NO. 3    21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice    RECEIVED NYSCEF: 09/18/2020

part 1    Pg 122 of 150

## GUARANTY OF LEASE

THIS **GUARANTY OF LEASE** (this "**Guaranty**") is made as of November 19, 2015, by **Lizer Jozofovic** ("**Guarantor**"), to **WHITE PLAINS HEALTHCARE PROPERTIES I, LLC**, a Massachusetts limited liability company ("**Landlord**").

## RECITALS

A.    Landlord has been requested by HBL SNF, LLC a New York Limited Liability Company ("**Tenant**") to enter into an Amended and Restated Lease and Security Agreement dated as of November 19, 2015 (the "**Lease**"), whereby Landlord would lease to Tenant, and Tenant would lease from Landlord, certain premises located in White Plains, New York, as more particularly described in the Lease (the "**Premises**").

B.    Tenant is owned by Guarantor, and Guarantor will derive substantial economic benefit from the execution and delivery of the Lease.

C.    Guarantor acknowledges that Landlord would not enter into the Lease unless this Guaranty accompanied the execution and delivery of the Lease.

D.    Guarantor hereby acknowledges receipt of a copy of the Lease.

**NOW, THEREFORE,** in consideration of the execution and delivery of the Lease and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.    **DEFINITIONS.** Defined terms used in this Guaranty and not otherwise defined herein have the meanings assigned to them in the Lease.

2.    **COVENANTS OF GUARANTOR.**

2.1    Guarantor absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not merely as a surety: (i) the full and prompt payment of all Minimum Rent and Additional Rent and all other rent, sums and charges of every type and nature payable by Tenant under the Lease, whether due by acceleration or otherwise, including costs and expenses of collection (collectively, the "**Monetary Obligations**"), and (ii) the full, timely and complete performance of all covenants, terms, conditions, obligations, indemnities and agreements to be performed by Tenant under the Lease, including any indemnities or other obligations of Tenant that survive the expiration or earlier termination of the Lease (all of the obligations described in clauses (i) and (ii), are collectively referred to herein as the "**Obligations**").

2.2    Guarantor agrees with Landlord that (i) any action, suit or proceeding of any kind or nature whatsoever (an "**Action**") commenced by Landlord against Tenant, Guarantor or any Other Guarantor of the Lease ("**Other Guarantor**") to enforce the Obligations shall not prejudice in any way Landlord's rights to enforce the Obligations in any subsequent Action against Tenant, Guarantor or any Other Guarantor, (ii) Landlord may, at its option, join Guarantor in any Action against Tenant or any Other Guarantor or seek recover against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim

against Tenant or any Other Guarantor and (iii) Guarantor will be conclusively bound by a judgment entered in any Action in favor of Landlord against Tenant whether or not Guarantor is entered as a party or participates in such Action.

2.3    If Landlord proposes to grant a mortgage on, or refinance any mortgage encumbering the Premises or any portion thereof, Guarantor shall cooperate in the process, and shall permit Landlord and the proposed mortgagee to meet with Guarantor or, if applicable, officers of Guarantor and to discuss Guarantor's business and finances. On request of Landlord, Guarantor agrees to provide any such prospective mortgagee the information to which Landlord is entitled hereunder, provided that if any such information is not publicly available, such nonpublic information shall be made available on a confidential basis. Guarantor agrees to execute, acknowledge and deliver documents requested by the prospective mortgagee (such as a consent to the financing, without encumbering Guarantor's or Tenant's assets, a consent to a collateral assignment of the Lease and of this Guaranty, estoppel certificate, and a subordination, non-disturbance and attornment agreement), customary for tenants and their guarantors to sign in connection with mortgage loans to landlords, so long as such documents are in form then customary among institutional lenders (provided the same do not materially and adversely change Tenant's rights or obligations under the Lease or materially and adversely change Guarantor's rights and obligations under this Guaranty).

## 3.    GUARANTOR'S OBLIGATIONS UNCONDITIONAL.

3.1    This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection, and shall be enforceable against Guarantor without the necessity of the commencement by Landlord of any Action against Tenant, and without the necessity of any notice of nonpayment, nonperformance or nonobservance, or any notice of acceptance of this Guaranty, or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives in advance. The obligations of Guarantor hereunder are independent of, and may exceed, the obligations of Tenant.

3.2    This Guaranty shall apply notwithstanding any extension or renewal of the Lease, or any holdover following the expiration or termination of the Lease Term or any renewal or extension of the Lease Term.

3.3    This Guaranty is a continuing guarantee and will remain in full force and effect notwithstanding, and the liability of Guarantor hereunder shall be absolute and unconditional irrespective of any or all of the following: (i) any renewals, extensions, modifications, alterations or amendments of the Lease (regardless of whether Guarantor consented to or had notice of same); (ii) any releases or discharges of Tenant or any Other Guarantor other than the full release and complete discharge of all of the Obligations; (iii) Landlord's failure or delay to assert any claim or demand or to enforce any of its rights against Tenant or any Other Guarantor ; (iv) any extension of time that may be granted by Landlord to Tenant or any Other Guarantor; (v) any assignment or transfer of all of any part of Tenant's interest under the Lease (whether by Tenant, by operation of law, or otherwise); (vi) any subletting, concession, franchising, licensing or permitting of the Premises or any portion thereof; (vii) any changed or different use of the Premises (or any portion thereof);

2

(viii) any other dealings or matters occurring between Landlord and Tenant or any Other Guarantor; (ix) the taking by Landlord of any additional guarantees, or the receipt by Landlord of any collateral, from Tenant, any Other Guarantor or any other persons or entities; (x) the release by Landlord of any Other Guarantor; (xi) Landlord's release of any security provided under the Lease or any other guaranty; (xii) Landlord's failure to perfect any landlord's lien or other lien or security interest available under applicable Legal Requirements; (xiii) any assumption by any person of any or all of Tenant's obligations under the Lease or any Other Guarantor's obligations under any other guaranty, or Tenant's assignment of any or all of its rights and interests under the Lease, (xiv) the power or authority or lack thereof of Tenant to execute, acknowledge or deliver the Lease; (xv) the existence, non-existence or lapse at any time of Tenant as a legal entity or the existence, non-existence or termination of any corporate, ownership, business or other relationship between Tenant and Guarantor; (xvi) any sale or assignment by Landlord of any or all of this Guaranty, any other guaranty and the Lease (including any direct or collateral assignment by Landlord to any mortgagee); (xvii) the solvency or lack of solvency of Tenant or any Other Guarantor at any time or from time to time; or (xviii) any other cause, whether similar or dissimilar to any of the foregoing, that might constitute a legal or equitable discharge of Guarantor (whether or not Guarantor shall have knowledge or notice thereof) other than payment and performance in full of the Obligations; (xix) the release or discharge of Tenant in any state or federal creditors' proceedings, receivership, bankruptcy or other proceeding; (xx) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code (11 U.S.C. § 101 et seq., as amended), or from other statute, or from the order of any court; (xxi) the rejection, disaffirmance or other termination of the Lease in any such proceeding; (xxii) the assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease; or (xxiii) if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason, in such event, Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned. This Guaranty shall continue to be effective if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason. Without in any way limiting the generality of the foregoing, Guarantor specifically agrees that (A) if Tenant's obligations under the Lease are modified or amended with the express written consent of Landlord, this Guaranty shall extend to such obligations as so amended or modified without notice to, consideration to, or the consent of, Guarantor, and (B) this Guaranty shall be applicable to any obligations of Tenant arising in connection with a termination of the Lease, whether voluntary or otherwise. Guarantor hereby consents, prospectively, to Landlord's taking or entering into any or all of the foregoing actions or omissions. For purposes of this Guaranty and the obligations and liabilities of Guarantor hereunder, "Tenant" shall be deemed to include any and all concessionaires, licensees, franchisees, department operators, assignees, subtenants, permittees or others directly or indirectly operating or conducting a business in or from the Premises or any portion thereof, as fully as if any of the same were the named Tenant under the Lease.

3.4    Notwithstanding anything to the contrary hereunder, Guarantor shall be released and discharged from all liability with respect to any obligations of Tenant under the Lease arising or accruing after the Commencement Date (the "**Guaranty Termination Date**"); provided that 60 days prior to the Commencement Date Tenant has delivered to Landlord (i) (a)

3

an unconditional Letter of Credit, in accordance with the Section 7.1(a)(ii) of the Lease in the amount of $3,700,000, or (b) $3,700,000 in cash to secure the full and timely payment and performance of Tenant's obligations under the Lease, (ii) an agreement by Capital Funding Group, which cannot be amended except by an agreement in writing signed by Landlord, Tenant and Capital Funding Group, in the form attached as Exhibit 7.1(a) of the Lease or otherwise approved by Landlord and Landlord's lenders in their reasonable discretion, wherein and whereby Capital Funding Group agrees to allow Tenant to draw down on its Credit Line each month so as to enable Capital Funding Group to pay directly to Landlord the sum of $506,096.50 per month commencing the Commencement Date and on each day Fixed Rent is due under the Lease for the following 11 months, and (iii) and released to Landlord all funds in the controlled account number ████████ in JPMorgan Chase Bank, N.A. in the amount not less than $1,600,000 to be held as an additional Security Deposit by Landlord. After the Guaranty Termination Date, Guarantor shall continue to remain personally liable pursuant to the terms of this Guaranty for (i) all obligations of Tenant under the Lease which arose or accrued on or prior to the Guaranty Termination Date and (ii) any liability of Tenant arising out of a breach of any warranty or representation of Tenant under Lease, and all documents executed by Tenant in connection therewith, (iii) and any liability of Guarantor arising out of a breach of any warranty of representation hereunder.

## 4.    WAIVERS OF GUARANTOR.

4.1    Without limitation of the foregoing, Guarantor waives (i) notice of acceptance of this Guaranty, protest, demand and dishonor, presentment, and demands of any kind now or hereafter provided for by any statute or rule of law, (ii) notice of any actions taken by Landlord or Tenant under the Lease or any other agreement or instrument relating thereto, (iii) notice of any and all defaults by Tenant in the payment of Minimum Rent and Additional Rent or other rent, charges or amounts, or of any other defaults by Tenant under the Lease, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which, but for the provisions of this Section 4, might constitute grounds for relieving Guarantor of its obligations hereunder, (v) any requirement that Landlord protect, secure, perfect, insure or proceed against any security interest or lien, or any property subject thereto, or exhaust any right or take any action against Tenant, any Other Guarantor or any other person or entity (including any additional guarantor or Guarantor) or against any collateral, and (vi) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

4.2    GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PERSON OR ENTITY WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH: THIS GUARANTY; THE LEASE; ANY LIABILITY OR OBLIGATION OF TENANT IN ANY MANNER RELATED TO THE PREMISES OR ANY PORTION THEREOF; ANY CLAIM OF INJURY OR DAMAGE IN ANY WAY RELATED TO THE LEASE AND/OR THE PREMISES (OR ANY PORTION THEREOF); ANY ACT OR OMISSION OF TENANT, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUPPLIERS, SERVANTS, CUSTOMERS, CONCESSIONAIRES, FRANCHISEES, PERMITTEES OR LICENSEES; OR ANY ASPECT OF THE USE OR OCCUPANCY OF, OR THE CONDUCT OF BUSINESS IN, ON OR FROM THE PREMISES (OR ANY PORTION THEREOF).

4

GUARANTOR SHALL NOT INTERPOSE ANY COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION BROUGHT BY LANDLORD AGAINST GUARANTOR UNDER THIS GUARANTY. GUARANTOR SHALL NOT BE ENTITLED TO MAKE, AND HEREBY WAIVES, ANY AND ALL DEFENSES AGAINST ANY CLAIM ASSERTED BY LANDLORD OR IN ANY SUIT OR ACTION INSTITUTED BY LANDLORD TO ENFORCE THIS GUARANTY OR THE LEASE. IN ADDITION, GUARANTOR HEREBY WAIVES, BOTH WITH RESPECT TO THE LEASE AND WITH RESPECT TO THIS GUARANTY, ANY AND ALL RIGHTS WHICH ARE WAIVED BY TENANT UNDER THE LEASE, IN THE SAME MANNER AS IF ALL SUCH WAIVERS WERE FULLY RESTATED HEREIN. THE LIABILITY OF GUARANTOR UNDER THIS GUARANTY IS PRIMARY AND UNCONDITIONAL.

4.3    Guarantor expressly waives any and all rights to defenses arising by reason of (i) any "one-action" or "anti-deficiency" law or any other law that may prevent Landlord from bringing any action, including a claim for deficiency, against Guarantor before or after Landlord's commencement or completion of any action against Tenant or any Other Guarantor; (ii) ANY ELECTION OF REMEDIES BY LANDLORD (INCLUDING ANY TERMINATION OF THE LEASE) THAT DESTROYS OR OTHERWISE ADVERSELY AFFECTS GUARANTOR'S SUBROGATION RIGHTS OR GUARANTOR'S RIGHTS TO PROCEED AGAINST TENANT FOR REIMBURSEMENT; (iii) any disability, insolvency, bankruptcy, lack of authority or power, death, insanity, minority, dissolution, or other defense of Tenant, of any other guarantor (or any other Guarantor), or of any other person or entity, or by reason of the cessation of Tenant's liability from any cause whatsoever, other than full and final payment in legal tender and performance of the Obligations; (iv) any right to claim discharge of any or all of the Obligations on the basis of unjustified impairment of any collateral for the Obligations; (v) any change in the relationship between Guarantor and Tenant or any Other Guarantor or any termination of such relationship; (vi) any irregularity, defect or unauthorized action by any or all of Landlord, Tenant, any Other Guarantor or surety, or any of their respective officers, directors or other agents in executing and delivering any instrument or agreements relating to the Obligations or in carrying out or attempting to carry out the terms of any such agreements; (vii) any assignment, endorsement or transfer, in whole or in part, of the Obligations, whether made with or without notice to or consent of Guarantor; (viii) if the recovery from Tenant or any other Person (including any Other Guarantor) becomes barred by any statute of limitations or is otherwise prevented; (ix) the benefits of any and all statutes, laws, rules or regulations applicable in the State of Illinois which may require the prior or concurrent joinder of any other party to any action on this Guaranty; (x) any release or other reduction of the Obligations arising as a result of the expansion, release, substitution, deletion, addition, or replacement (whether or not in accordance with the terms of the Lease) of the Premises or any portion thereof; or (xi) any neglect, delay, omission, failure or refusal of Landlord to take or prosecute any action for the collection or enforcement of any of the Obligations or to foreclose or take or prosecute any action in connection with any lien or right of security (including perfection thereof) existing or to exist in connection with, or as security for, any of the Obligations, it being the intention hereof that Guarantor shall remain liable as a principal on the Obligations notwithstanding any act, omission or event that might, but for the provisions hereof, otherwise operate as a legal or equitable discharge of Guarantor. Guarantor hereby waives all defenses of a surety to which it may be entitled by statute or otherwise.

5

2304088v4/17057-6

## 5.    SUBORDINATION; SUBROGATION.

**5.1**    Guarantor subordinates to and postpones in favor of the Obligations (i) any present and future debts and obligations of Tenant or any Other Guarantor to Guarantor (the "**Indebtedness**"), including:  (A) salary, bonuses, and other payments pursuant to any employment arrangement; (B) fees, reimbursement of expenses and other payments pursuant to any independent contractor arrangement; (C) principal and interest pursuant to any Indebtedness; (D) distributions payable to any partners, members or shareholders of Guarantor or Affiliates of Guarantor; (E) lease payments pursuant to any leasing arrangement; (F) any management fees; and (G) all rights, liens and security interests of Guarantor, whether now or hereafter arising, in any assets of the Tenant or any Other Guarantor, and (ii) any liens or security interests securing payment of the Indebtedness.  Guarantor shall have no right to possession of any assets of Tenant or any Other Guarantor or to foreclose upon any such asset, whether by judicial action or otherwise, unless and until the Obligations have been paid and performed in full. · Guarantor agrees that Landlord shall be subrogated to Guarantor with respect to Guarantor's claims against Tenant or any Other Guarantor and Guarantor's rights, liens and security interest, if any, in any of Tenant's or any Other Guarantor's assets and proceeds thereof until all of the Obligations have been paid and performed in full.

**5.2**    After the occurrence of an Event of Default and until such Event of Default is cured or after the commencement of any bankruptcy or insolvency proceeding by or against Tenant and until such proceeding is dismissed, Guarantor shall not: (i) make any distributions or other payments to any partners, parent entities, or Affiliates of Guarantor (other than to Tenant); or (ii) ask for, sue for, demand, take or receive any payment, by setoff or in any other manner, including the receipt of a negotiable instrument, for all or any part of the Indebtedness owed by Tenant, or any successor or assign of Tenant, including a receiver, trustee or debtor in possession (the term "**Tenant**" shall include any such successor or assign of Tenant) until the Obligations have been paid in full; however, if Guarantor receives such a payment, Guarantor shall immediately deliver the payment to Landlord for credit against the then outstanding balance of the Obligations, whether matured or unmatured.  Notwithstanding anything in this **Section 5** to the contrary, after an Event of Default has occurred and is outstanding, Guarantor may make cash contributions to Tenant.

**5.3**    Guarantor shall not be subrogated, and hereby waives and disclaims any claim or right against Tenant by way of subrogation or otherwise, to any of the rights of Landlord under the Lease or otherwise, or in the Premises (or any portion thereof), which may arise by any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its Obligations hereunder.  Guarantor shall look solely to Tenant for any recoupment of any payments made or costs or expenses incurred by Guarantor pursuant to this Guaranty.  If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and performed in full, Guarantor shall immediately deliver the payment to Landlord for credit against the then outstanding balance of the Obligations, whether matured or unmatured.

## 6.    REPRESENTATIONS AND WARRANTIES OF GUARANTOR.  Guarantor represents and warrants that:

6

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 3
21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
RECEIVED NYSCEF: 09/18/2020
part 1    Pg 128 of 150

6.1    This Guaranty is valid and binding upon and enforceable against Guarantor without the requirement of further action or condition.

6.2    The execution, delivery and performance by Guarantor of this Guaranty does not and will not (i) contravene any applicable Legal Requirements, the organizational documents of Guarantor, if applicable, any order, writ, injunction, decree applicable to Guarantor, or any contractual restriction binding on or affecting Guarantor or any of its properties or assets, or (ii) result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties or assets.

6.3    No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any governmental authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Guarantor of this Guaranty or any other instrument or agreement required hereunder.

6.4    There is no action, suit or proceeding pending or threatened against or otherwise affecting Guarantor before any court or other governmental authority or any arbitrator that may materially adversely affect Guarantor's ability to perform its obligations under this Guaranty.

6.5    Tenant is directly or indirectly owned and controlled by Guarantor.

6.6    Guarantor has derived or expects to derive financial and other advantages and benefits directly or indirectly, from the making of the Lease and the payment and performance of the Obligations. Guarantor hereby acknowledges that Landlord will be relying upon Guarantor's guarantee, representations, warranties and covenants contained herein.

6.7    All reports, statements (financial or otherwise), certificates and other data furnished by or on behalf of Guarantor to Landlord in connection with this Guaranty or the Lease are: true and correct, in all material respects, as of the applicable date or period provided therein; do not omit to state any material fact or circumstance necessary to make the statements contained therein not misleading; and fairly represent the financial condition of Guarantor as of the respective date thereof; and no material adverse change has occurred in the financial condition of Guarantor since the date of the most recent of such financial statements.

7.    **NOTICES.**    Any consents, notices, demands, requests, approvals or other communications given under this Guaranty shall be in writing and shall be given as provided in the Lease, as follows or to such other addresses as either Landlord or Guarantor may designate by notice given to the other in accordance with the provisions of this **Section 7**:

If to Landlord:

White Plains Healthcare Properties I, LLC
c/oThe Congress Companies
2 Bourbon Street, Suite 200
Peabody, Ma 01960
Attn: William Nicholson

7

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 3
21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 129 of 150
RECEIVED NYSCEF: 09/18/2020

With a copy to:

Posternak Blankstein & Lund LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Attn: Gerald J. Billow, Esq.

And

Abrams Fensterman
1111 Marcus Avenue
Lake Success, New York 11042
Attn: Howard Fensterman, Esq.
Attn: Greg Stoller, Esq.

If to Guarantor:

HBL SNF, LLC
537 Routes 22
Purdys, New York 10578
Attn: Lizer Jozefovic

With a copy to:

Michelman & Robinson
800 Third Avenue
New York, New York
Attn: Mark Zafrin, Esq.

　　　8.　　**CONSENT TO JURISDICTION**. Guarantor hereby (a) consents and submits to the jurisdiction of the courts of the State of New York and the federal courts sitting in the State of New York with respect to any dispute arising, directly or indirectly, out of this Guaranty, (b) waives any objections which the undersigned may have to the laying of venue in any such suit, action or proceeding in either such court, (c) agrees to join Landlord in any petition for removal to either such court, and (d) irrevocably designates and appoints Tenant as its authorized agent to accept and acknowledge on its behalf service of process with respect to any disputes arising, directly or indirectly, out of this Guaranty. The undersigned hereby acknowledges and agrees that Landlord may obtain personal jurisdiction and perfect service of process through Tenant as the undersigned agent, or by any other means now or hereafter permitted by applicable law. Nothing above shall limit Landlord's choice of forum for purposes of enforcing this Guaranty.

　　　9.　　**CERTAIN ADDITIONAL COVENANTS**.

8

2304088v4/17057-6

**9.1    Financial Deliveries.**  Guarantor shall deliver the following information to Landlord:

**9.1.1**    As soon as available, and in any event within 120 days after the close of each calendar year, in hard copy and electronic format, in form satisfactory to Landlord, and presented on a consolidated as well as a property-by-property basis, complete financial statements prepared for such year with respect to Guarantor including a balance sheet as of the end of such year, together with related statements of operations, cash flows and changes in equity for such calendar year, prepared in accordance with GAAP applied on a consistent basis.

Upon the delivery of any financial information by or on behalf of Guarantor pursuant to this **Section 9** from time to time during the Lease Term, Guarantor shall be deemed (unless Guarantor specifically states otherwise in writing) to automatically represent and warrant to Landlord that the financial information delivered to Landlord is true, accurate and complete, presents fairly the results of operations of Guarantor for the respective periods covered thereby, reflects accurately the books and records of account of Guarantor as of such dates and for such periods, and that there has been no adverse change in the financial condition of Guarantor since the date of the then applicable financial information.

**9.2    Assignment; Sale of Assets; Change in Control.**  Without the prior consent of Landlord, which consent may be withheld or granted in Landlord's sole discretion, Guarantor shall not assign (whether directly or indirectly), in whole or in part, this Guaranty or any obligation hereunder or, through one or more step transactions or tiered transactions, do, or permit to be done, any activity, transaction or Transfer prohibited under **Section 10.1** of the Lease.

**9.3    Payment Method; Default Interest.**  Guarantor shall make any payments due hereunder in immediately available funds by wire transfer to Landlord's bank account as notified by Landlord, unless Landlord agrees to another method of payment of immediately available funds. If Guarantor does not pay an amount due hereunder on its due date, Guarantor shall pay, on demand, interest at 18% annually on the amount due for a period ending on the full payment of such amount, including the day of repayment, whether before or after any judgment or award, to the extent permitted under applicable law.

**10.    MISCELLANEOUS.**

**10.1**    Guarantor further agrees that Landlord may, without notice, assign this Guaranty in whole or in part.  If Landlord disposes of its interest in the Lease, "**Landlord**," as used in this Guaranty, shall mean Landlord's successors and assigns.

**10.2**    Guarantor promises to pay all costs of collection or enforcement incurred by Landlord in exercising any remedies provided for in the Lease or this Guaranty whether at law or in equity.  If any legal action or proceeding is commenced to interpret or enforce the terms of, or obligations arising out of, this Guaranty, or to recover damages for the breach thereof, the party prevailing in any such action or proceedings shall be entitled to recover from the non-prevailing party all attorneys' fees and reasonable costs and expenses incurred by the prevailing party.  As used herein, "attorneys' fees" shall mean the fees and expenses of counsel

9

to the parties hereto, which may include printing, photocopying, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians and others not admitted to the bar but performing services under the supervision of an attorney. The term "attorneys' fees" shall also include all such fees and expenses incurred with respect to appeals, arbitrations and bankruptcy proceedings.

10.3    Guarantor shall, from time to time within 10 days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating such modifications), and setting forth such other information as Landlord may reasonably request. Such certificate may be relied upon by any prospective purchaser, lessor or lender of all or a portion of the Premises (or any portion thereof).

10.4    If any portion of this Guaranty shall be deemed invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty, which shall remain in full force and effect to the maximum permitted extent.

10.5    The provisions, covenants and guaranties of this Guaranty shall be binding upon Guarantor and its heirs, successors, legal representatives and assigns, and shall inure to the benefit of Landlord and its successors and assigns, and shall not be deemed waived or modified unless such waiver or modification is specifically set forth in writing, executed by Landlord or its successors and assigns, and delivered to Guarantor.

10.6    Whenever the words "include", "includes", or "including" are used in this Guaranty, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa. This Guaranty shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

10.7    Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty.

10.8    The provisions of this Guaranty shall be governed by and interpreted solely in accordance with the internal laws of the State of New York, without giving effect to the principles of conflicts of law.

10.9    The execution of this Guaranty after the execution of the Lease shall not invalidate this Guaranty or lessen the Obligations of Guarantor hereunder.

10.10    This Guaranty may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute but one instrument. The signature page of any counterpart may be detached therefrom and reattached to any other counterpart to physically form a single document.

2304088v4/17057-6

**10.11**  The Recitals set forth above are hereby incorporated by this reference and made a part of this Guaranty.  Guarantor hereby represents and warrants that the Recitals are true and correct.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty under seal as of the day and year first above written.

GUARANTOR:

_____
Lizde Iozefovic

11

2304088v4/17057-6

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 09/18/2020

1

2304088v4/17057-6

# Exhibit 3 to

# Verified Complaint

## GUARANTY OF LEASE

THIS **GUARANTY OF LEASE** (this "**Guaranty**") is made as of November 19, 2015, by **Mark Neuman** ("**Guarantor**"), to **WHITE PLAINS HEALTHCARE PROPERTIES I, LLC**, a Massachusetts limited liability company ("**Landlord**").

### R E C I T A L S

A.    Landlord has been requested by HBL SNF, LLC a New York Limited Liability Company ("**Tenant**") to enter into an Amended and Restated Lease and Security Agreement dated as of November 19, 2015 (the "**Lease**"), whereby Landlord would lease to Tenant, and Tenant would lease from Landlord, certain premises located in White Plains, New York, as more particularly described in the Lease (the "**Premises**").

B.    Guarantor will derive substantial economic benefit from the execution and delivery of the Lease.

C.    Guarantor acknowledges that Landlord would not enter into the Lease unless this Guaranty accompanied the execution and delivery of the Lease.

D.    Guarantor hereby acknowledges receipt of a copy of the Lease.

NOW, **THEREFORE**, in consideration of the execution and delivery of the Lease and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.    **DEFINITIONS.** Defined terms used in this Guaranty and not otherwise defined herein have the meanings assigned to them in the Lease.

2.    **COVENANTS OF GUARANTOR.**

2.1    Guarantor absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not merely as a surety: (i) the full and prompt payment of all Minimum Rent and Additional Rent and all other rent, sums and charges of every type and nature payable by Tenant under the Lease, whether due by acceleration or otherwise, including costs and expenses of collection (collectively, the "**Monetary Obligations**"), and (ii) the full, timely and complete performance of all covenants, terms, conditions, obligations, indemnities and agreements to be performed by Tenant under the Lease, including any indemnities or other obligations of Tenant that survive the expiration or earlier termination of the Lease (all of the obligations described in clauses (i) and (ii), are collectively referred to herein as the "**Obligations**").

2.2    Guarantor agrees with Landlord that (i) any action, suit or proceeding of any kind or nature whatsoever (an "**Action**") commenced by Landlord against Tenant, Guarantor or any Other Guarantor of the Lease ("**Other Guarantor**") to enforce the Obligations shall not prejudice in any way Landlord's rights to enforce the Obligations in any subsequent Action against Tenant, Guarantor or any Other Guarantor, (ii) Landlord may, at its option, join Guarantor in any Action against Tenant or any Other Guarantor or seek recover against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim

2308382v1/13139-6

against Tenant or any Other Guarantor and (iii) Guarantor will be conclusively bound by a judgment entered in any Action in favor of Landlord against Tenant whether or not Guarantor is entered as a party or participates in such Action.

      2.3    If Landlord proposes to grant a mortgage on, or refinance any mortgage encumbering the Premises or any portion thereof, Guarantor shall cooperate in the process, and shall permit Landlord and the proposed mortgagee to meet with Guarantor or, if applicable, officers of Guarantor and to discuss Guarantor's business and finances. On request of Landlord, Guarantor agrees to provide any such prospective mortgagee the information to which Landlord is entitled hereunder, provided that if any such information is not publicly available, such nonpublic information shall be made available on a confidential basis. Guarantor agrees to execute, acknowledge and deliver documents requested by the prospective mortgagee (such as a consent to the financing, without encumbering Guarantor's or Tenant's assets, a consent to a collateral assignment of the Lease and of this Guaranty, estoppel certificate, and a subordination, non-disturbance and attornment agreement), customary for tenants and their guarantors to sign in connection with mortgage loans to landlords, so long as such documents are in form then customary among institutional lenders (provided the same do not materially and adversely change Tenant's rights or obligations under the Lease or materially and adversely change Guarantor's rights and obligations under this Guaranty).

## 3.    GUARANTOR'S OBLIGATIONS UNCONDITIONAL.

      3.1    This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection, and shall be enforceable against Guarantor without the necessity of the commencement by Landlord of any Action against Tenant, and without the necessity of any notice of nonpayment, nonperformance or nonobservance, or any notice of acceptance of this Guaranty, or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives in advance. The obligations of Guarantor hereunder are independent of, and may exceed, the obligations of Tenant.

      3.2    This Guaranty shall apply notwithstanding any extension or renewal of the Lease, or any holdover following the expiration or termination of the Lease Term or any renewal or extension of the Lease Term.

      3.3    This Guaranty is a continuing guarantee and will remain in full force and effect notwithstanding, and the liability of Guarantor hereunder shall be absolute and unconditional irrespective of any or all of the following: (i) any renewals, extensions, modifications, alterations or amendments of the Lease (regardless of whether Guarantor consented to or had notice of same); (ii) any releases or discharges of Tenant or any Other Guarantor other than the full release and complete discharge of all of the Obligations; (iii) Landlord's failure or delay to assert any claim or demand or to enforce any of its rights against Tenant or any Other Guarantor ; (iv) any extension of time that may be granted by Landlord to Tenant or any Other Guarantor; (v) any assignment or transfer of all of any part of Tenant's interest under the Lease (whether by Tenant, by operation of law, or otherwise); (vi) any subletting, concession, franchising, licensing or permitting of the Premises or any portion thereof; (vii) any changed or different use of the Premises (or any portion thereof);

2

(viii) any other dealings or matters occurring between Landlord and Tenant or any Other Guarantor; (ix) the taking by Landlord of any additional guarantees, or the receipt by Landlord of any collateral, from Tenant, any Other Guarantor or any other persons or entities; (x) the release by Landlord of any Other Guarantor; (xi) Landlord's release of any security provided under the Lease or any other guaranty; (xii) Landlord's failure to perfect any landlord's lien or other lien or security interest available under applicable Legal Requirements; (xiii) any assumption by any person of any or all of Tenant's obligations under the Lease or any Other Guarantor's obligations under any other guaranty, or Tenant's assignment of any or all of its rights and interests under the Lease, (xiv) the power or authority or lack thereof of Tenant to execute, acknowledge or deliver the Lease; (xv) the existence, non-existence or lapse at any time of Tenant as a legal entity or the existence, non-existence or termination of any corporate, ownership, business or other relationship between Tenant and Guarantor; (xvi) any sale or assignment by Landlord of any or all of this Guaranty, any other guaranty and the Lease (including any direct or collateral assignment by Landlord to any mortgagee); (xvii) the solvency or lack of solvency of Tenant or any Other Guarantor at any time or from time to time; or (xviii) any other cause, whether similar or dissimilar to any of the foregoing, that might constitute a legal or equitable discharge of Guarantor (whether or not Guarantor shall have knowledge or notice thereof) other than payment and performance in full of the Obligations; (xix) the release or discharge of Tenant in any state or federal creditors' proceedings, receivership, bankruptcy or other proceeding; (xx) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code (11 U.S.C. § 101 et seq., as amended), or from other statute, or from the order of any court; (xxi) the rejection, disaffirmance or other termination of the Lease in any such proceeding; (xxii) the assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease; or (xxiii) if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason, in such event, Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned. This Guaranty shall continue to be effective if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason  Without in any way limiting the generality of the foregoing, Guarantor specifically agrees that (A) if Tenant's obligations under the Lease are modified or amended with the express written consent of Landlord, this Guaranty shall extend to such obligations as so amended or modified without notice to, consideration to, or the consent of, Guarantor, and (B) this Guaranty shall be applicable to any obligations of Tenant arising in connection with a termination of the Lease, whether voluntary or otherwise.  Guarantor hereby consents, prospectively, to Landlord's taking or entering into any or all of the foregoing actions or omissions.  For purposes of this Guaranty and the obligations and liabilities of Guarantor hereunder, "Tenant" shall be deemed to include any and all concessionaires, licensees, franchisees, department operators, assignees, subtenants, permittees or others directly or indirectly operating or conducting a business in or from the Premises or any portion thereof, as fully as if any of the same were the named Tenant under the Lease.

3.4    Notwithstanding anything to the contrary hereunder, Guarantor shall be released and discharged from all liability with respect to any obligations of Tenant under the Lease arising or accruing after the Commencement Date (the "**Guaranty Termination Date**"); provided that 60 days prior to the Commencement Date Tenant has delivered to Landlord (i) (a)

3

2308382v1/13139-6

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM    INDEX NO. 60278/2020
NYSCEF DOC. NO. 4    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice    RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice

part 1    Pg 138 of 150

an unconditional Letter of Credit, in accordance with the Section 7.1(a)(ii) of the Lease in the amount of $3,700,000, or (b) $3,700,000 in cash to secure the full and timely payment and performance of Tenant's obligations under the Lease, (ii) an agreement by Capital Funding Group, which cannot be amended except by an agreement in writing signed by Landlord, Tenant and Capital Funding Group, in the form attached as Exhibit 7.1(a) of the Lease or otherwise approved by Landlord and Landlord's lenders in their reasonable discretion, wherein and whereby Capital Funding Group agrees to allow Tenant to draw down on its Credit Line each month so as to enable Capital Funding Group to pay directly to Landlord the sum of $506,096.50 per month commencing the Commencement Date and on each day Fixed Rent is due under the Lease for the following 11 months, and (iii) and released to Landlord all funds in the controlled account number ⬛⬛⬛⬛⬛ in JPMorgan Chase Bank, N.A. in the amount not less than $1,600,000 to be held as an additional Security Deposit by Landlord. After the Guaranty Termination Date, Guarantor shall continue to remain personally liable pursuant to the terms of this Guaranty for (i) all obligations of Tenant under the Lease which arose or accrued on or prior to the Guaranty Termination Date and (ii) any liability of Tenant arising out of a breach of any warranty or representation of Tenant under Lease, and all documents executed by Tenant in connection therewith, (iii) and any liability of Guarantor arising out of a breach of any warranty of representation hereunder.

### 4. WAIVERS OF GUARANTOR.

4.1    Without limitation of the foregoing, Guarantor waives (i) notice of acceptance of this Guaranty, protest, demand and dishonor, presentment, and demands of any kind now or hereafter provided for by any statute or rule of law, (ii) notice of any actions taken by Landlord or Tenant under the Lease or any other agreement or instrument relating thereto, (iii) notice of any and all defaults by Tenant in the payment of Minimum Rent and Additional Rent or other rent, charges or amounts, or of any other defaults by Tenant under the Lease, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which, but for the provisions of this Section 4, might constitute grounds for relieving Guarantor of its obligations hereunder, (v) any requirement that Landlord protect, secure, perfect, insure or proceed against any security interest or lien, or any property subject thereto, or exhaust any right or take any action against Tenant, any Other Guarantor or any other person or entity (including any additional guarantor or Guarantor) or against any collateral, and (vi) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

4.2    GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PERSON OR ENTITY WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH: THIS GUARANTY; THE LEASE; ANY LIABILITY OR OBLIGATION OF TENANT IN ANY MANNER RELATED TO THE PREMISES OR ANY PORTION THEREOF; ANY CLAIM OF INJURY OR DAMAGE IN ANY WAY RELATED TO THE LEASE AND/OR THE PREMISES (OR ANY PORTION THEREOF); ANY ACT OR OMISSION OF TENANT, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUPPLIERS, SERVANTS, CUSTOMERS, CONCESSIONAIRES, FRANCHISEES, PERMITTEES OR LICENSEES; OR ANY ASPECT OF THE USE OR OCCUPANCY OF, OR THE CONDUCT OF BUSINESS IN, ON OR FROM THE PREMISES (OR ANY PORTION THEREOF).

4

GUARANTOR SHALL NOT INTERPOSE ANY COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION BROUGHT BY LANDLORD AGAINST GUARANTOR UNDER THIS GUARANTY. GUARANTOR SHALL NOT BE ENTITLED TO MAKE, AND HEREBY WAIVES, ANY AND ALL DEFENSES AGAINST ANY CLAIM ASSERTED BY LANDLORD OR IN ANY SUIT OR ACTION INSTITUTED BY LANDLORD TO ENFORCE THIS GUARANTY OR THE LEASE. IN ADDITION, GUARANTOR HEREBY WAIVES, BOTH WITH RESPECT TO THE LEASE AND WITH RESPECT TO THIS GUARANTY, ANY AND ALL RIGHTS WHICH ARE WAIVED BY TENANT UNDER THE LEASE, IN THE SAME MANNER AS IF ALL SUCH WAIVERS WERE FULLY RESTATED HEREIN. THE LIABILITY OF GUARANTOR UNDER THIS GUARANTY IS PRIMARY AND UNCONDITIONAL.

4.3     Guarantor expressly waives any and all rights to defenses arising by reason of (i) any "one-action" or "anti-deficiency" law or any other law that may prevent Landlord from bringing any action, including a claim for deficiency, against Guarantor before or after Landlord's commencement or completion of any action against Tenant or any Other Guarantor; (ii) ANY ELECTION OF REMEDIES BY LANDLORD (INCLUDING ANY TERMINATION OF THE LEASE) THAT DESTROYS OR OTHERWISE ADVERSELY AFFECTS GUARANTOR'S SUBROGATION RIGHTS OR GUARANTOR'S RIGHTS TO PROCEED AGAINST TENANT FOR REIMBURSEMENT; (iii) any disability, insolvency, bankruptcy, lack of authority or power, death, insanity, minority, dissolution, or other defense of Tenant, of any other guarantor (or any other Guarantor), or of any other person or entity, or by reason of the cessation of Tenant's liability from any cause whatsoever, other than full and final payment in legal tender and performance of the Obligations; (iv) any right to claim discharge of any or all of the Obligations on the basis of unjustified impairment of any collateral for the Obligations; (v) any change in the relationship between Guarantor and Tenant or any Other Guarantor or any termination of such relationship; (vi) any irregularity, defect or unauthorized action by any or all of Landlord, Tenant, any Other Guarantor or surety, or any of their respective officers, directors or other agents in executing and delivering any instrument or agreements relating to the Obligations or in carrying out or attempting to carry out the terms of any such agreements; (vii) any assignment, endorsement or transfer, in whole or in part, of the Obligations, whether made with or without notice to or consent of Guarantor; (viii) if the recovery from Tenant or any other Person (including any Other Guarantor) becomes barred by any statute of limitations or is otherwise prevented; (ix) the benefits of any and all statutes, laws, rules or regulations applicable in the State of Illinois which may require the prior or concurrent joinder of any other party to any action on this Guaranty; (x) any release or other reduction of the Obligations arising as a result of the expansion, release, substitution, deletion, addition, or replacement (whether or not in accordance with the terms of the Lease) of the Premises or any portion thereof; or (xi) any neglect, delay, omission, failure or refusal of Landlord to take or prosecute any action for the collection or enforcement of any of the Obligations or to foreclose or take or prosecute any action in connection with any lien or right of security (including perfection thereof) existing or to exist in connection with, or as security for, any of the Obligations, it being the intention hereof that Guarantor shall remain liable as a principal on the Obligations notwithstanding any act, omission or event that might, but for the provisions hereof, otherwise operate as a legal or equitable discharge of Guarantor. Guarantor hereby waives all defenses of a surety to which it may be entitled by statute or otherwise.

5.   **SUBORDINATION; SUBROGATION.**

**5.1**   Guarantor subordinates to and postpones in favor of the Obligations (i) any present and future debts and obligations of Tenant or any Other Guarantor to Guarantor (the "**Indebtedness**"), including:  (A) salary, bonuses, and other payments pursuant to any employment arrangement; (B) fees, reimbursement of expenses and other payments pursuant to any independent contractor arrangement; (C) principal and interest pursuant to any Indebtedness; (D) distributions payable to any partners, members or shareholders of Guarantor or Affiliates of Guarantor; (E) lease payments pursuant to any leasing arrangement; (F) any management fees; and (G) all rights, liens and security interests of Guarantor, whether now or hereafter arising, in any assets of the Tenant or any Other Guarantor, and (ii) any liens or security interests securing payment of the Indebtedness. Guarantor shall have no right to possession of any assets of Tenant or any Other Guarantor or to foreclose upon any such asset, whether by judicial action or otherwise, unless and until the Obligations have been paid and performed in full.  Guarantor agrees that Landlord shall be subrogated to Guarantor with respect to Guarantor's claims against Tenant or any Other Guarantor and Guarantor's rights, liens and security interest, if any, in any of Tenant's or any Other Guarantor's assets and proceeds thereof until all of the Obligations have been paid and performed in full.

**5.2**   After the occurrence of an Event of Default and until such Event of Default is cured or after the commencement of any bankruptcy or insolvency proceeding by or against Tenant and until such proceeding is dismissed, Guarantor shall not: (i) make any distributions or other payments to any partners, parent entities, or Affiliates of Guarantor (other than to Tenant); or (ii) ask for, sue for, demand, take or receive any payment, by setoff or in any other manner, including the receipt of a negotiable instrument, for all or any part of the Indebtedness owed by Tenant, or any successor or assign of Tenant, including a receiver, trustee or debtor in possession (the term "**Tenant**" shall include any such successor or assign of Tenant) until the Obligations have been paid in full; however, if Guarantor receives such a payment, Guarantor shall immediately deliver the payment to Landlord for credit against the then outstanding balance of the Obligations, whether matured or unmatured.  Notwithstanding anything in this Section 5 to the contrary, after an Event of Default has occurred and is outstanding, Guarantor may make cash contributions to Tenant.

**5.3**   Guarantor shall not be subrogated, and hereby waives and disclaims any claim or right against Tenant by way of subrogation or otherwise, to any of the rights of Landlord under the Lease or otherwise, or in the Premises (or any portion thereof), which may arise by any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its Obligations hereunder.  Guarantor shall look solely to Tenant for any recoupment of any payments made or costs or expenses incurred by Guarantor pursuant to this Guaranty.  If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and performed in full, Guarantor shall immediately deliver the payment to Landlord for credit against the then outstanding balance of the Obligations, whether matured or unmatured.

**6.**   **REPRESENTATIONS AND WARRANTIES OF GUARANTOR.**  Guarantor represents and warrants that:

6

6.1     This Guaranty is valid and binding upon and enforceable against Guarantor without the requirement of further action or condition.

6.2     The execution, delivery and performance by Guarantor of this Guaranty does not and will not (i) contravene any applicable Legal Requirements, the organizational documents of Guarantor, if applicable, any order, writ, injunction, decree applicable to Guarantor, or any contractual restriction binding on or affecting Guarantor or any of its properties or assets, or (ii) result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties or assets.

6.3     No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any governmental authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Guarantor of this Guaranty or any other instrument or agreement required hereunder.

6.4     There is no action, suit or proceeding pending or threatened against or otherwise affecting Guarantor before any court or other governmental authority or any arbitrator that may materially adversely affect Guarantor's ability to perform its obligations under this Guaranty.

6.5     Tenant is directly or indirectly owned and controlled by Guarantor.

6.6     Guarantor has derived or expects to derive financial and other advantages and benefits directly or indirectly, from the making of the Lease and the payment and performance of the Obligations. Guarantor hereby acknowledges that Landlord will be relying upon Guarantor's guarantee, representations, warranties and covenants contained herein.

6.7     All reports, statements (financial or otherwise), certificates and other data furnished by or on behalf of Guarantor to Landlord in connection with this Guaranty or the Lease are: true and correct, in all material respects, as of the applicable date or period provided therein; do not omit to state any material fact or circumstance necessary to make the statements contained therein not misleading; and fairly represent the financial condition of Guarantor as of the respective date thereof; and no material adverse change has occurred in the financial condition of Guarantor since the date of the most recent of such financial statements.

7.     **NOTICES.** Any consents, notices, demands, requests, approvals or other communications given under this Guaranty shall be in writing and shall be given as provided in the Lease, as follows or to such other addresses as either Landlord or Guarantor may designate by notice given to the other in accordance with the provisions of this **Section 7:**

If to Landlord:

White Plains Healthcare Properties I, LLC
c/oThe Congress Companies
2 Bourbon Street, Suite 200
Peabody, Ma 01960
Attn: William Nicholson

7

2308382v1/13139-6

With a copy to:

Posternak Blankstein & Lund LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Attn: Gerald J. Billow, Esq.

And

Abrams Fensterman
1111 Marcus Avenue
Lake Success, New York 11042
Attn: Howard Fensterman, Esq.
Attn: Greg Stoller, Esq.

If to Guarantor:

HBL SNF, LLC
537 Routes 22
Purdys, New York 10578
Attn: Mark Neuman

With a copy to:

Michelman & Robinson
800 Third Avenue
New York, New York
Attn: Mark Zafrin, Esq.

8.   **CONSENT TO JURISDICTION**.  Guarantor hereby (a) consents and submits to the jurisdiction of the courts of the State of New York and the federal courts sitting in the State of New York with respect to any dispute arising, directly or indirectly, out of this Guaranty, (b) waives any objections which the undersigned may have to the laying of venue in any such suit, action or proceeding in either such court, (c) agrees to join Landlord in any petition for removal to either such court, and (d) irrevocably designates and appoints Tenant as its authorized agent to accept and acknowledge on its behalf service of process with respect to any disputes arising, directly or indirectly, out of this Guaranty.  The undersigned hereby acknowledges and agrees that Landlord may obtain personal jurisdiction and perfect service of process through Tenant as the undersigned agent, or by any other means now or hereafter permitted by applicable law.  Nothing above shall limit Landlord's choice of forum for purposes of enforcing this Guaranty.

9.   **CERTAIN ADDITIONAL COVENANTS**.

8

**9.1**    **Financial Deliveries**.  Guarantor shall deliver the following information to Landlord:

**9.1.1**    As soon as available, and in any event within 120 days after the close of each calendar year, in hard copy and electronic format, in form satisfactory to Landlord, and presented on a consolidated as well as a property-by-property basis, complete financial statements prepared for such year with respect to Guarantor including a balance sheet as of the end of such year, together with related statements of operations, cash flows and changes in equity for such calendar year, prepared in accordance with GAAP applied on a consistent basis.

Upon the delivery of any financial information by or on behalf of Guarantor pursuant to this **Section 9** from time to time during the Lease Term, Guarantor shall be deemed (unless Guarantor specifically states otherwise in writing) to automatically represent and warrant to Landlord that the financial information delivered to Landlord is true, accurate and complete, presents fairly the results of operations of Guarantor for the respective periods covered thereby, reflects accurately the books and records of account of Guarantor as of such dates and for such periods, and that there has been no adverse change in the financial condition of Guarantor since the date of the then applicable financial information.

**9.2**    **Assignment; Sale of Assets; Change in Control**.  Without the prior consent of Landlord, which consent may be withheld or granted in Landlord's sole discretion, Guarantor shall not assign (whether directly or indirectly), in whole or in part, this Guaranty or any obligation hereunder or, through one or more step transactions or tiered transactions, do, or permit to be done, any activity, transaction or Transfer prohibited under **Section 10.1** of the Lease.

**9.3**    **Payment Method; Default Interest**.  Guarantor shall make any payments due hereunder in immediately available funds by wire transfer to Landlord's bank account as notified by Landlord, unless Landlord agrees to another method of payment of immediately available funds. If Guarantor does not pay an amount due hereunder on its due date, Guarantor shall pay, on demand, interest at 18% annually on the amount due for a period ending on the full payment of such amount, including the day of repayment, whether before or after any judgment or award, to the extent permitted under applicable law.

**10.**    **MISCELLANEOUS**.

**10.1**    Guarantor further agrees that Landlord may, without notice, assign this Guaranty in whole or in part.  If Landlord disposes of its interest in the Lease, **"Landlord,"** as used in this Guaranty, shall mean Landlord's successors and assigns.

**10.2**    Guarantor promises to pay all costs of collection or enforcement incurred by Landlord in exercising any remedies provided for in the Lease or this Guaranty whether at law or in equity.  If any legal action or proceeding is commenced to interpret or enforce the terms of, or obligations arising out of, this Guaranty, or to recover damages for the breach thereof, the party prevailing in any such action or proceedings shall be entitled to recover from the non-prevailing party all attorneys' fees and reasonable costs and expenses incurred by the prevailing party.  As used herein, "attorneys' fees" shall mean the fees and expenses of counsel

9

to the parties hereto, which may include printing, photocopying, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians and others not admitted to the bar but performing services under the supervision of an attorney. The term "attorneys' fees" shall also include all such fees and expenses incurred with respect to appeals, arbitrations and bankruptcy proceedings.

10.3   Guarantor shall, from time to time within 10 days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating such modifications), and setting forth such other information as Landlord may reasonably request. Such certificate may be relied upon by any prospective purchaser, lessor or lender of all or a portion of the Premises (or any portion thereof).

10.4   If any portion of this Guaranty shall be deemed invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty, which shall remain in full force and effect to the maximum permitted extent.

10.5   The provisions, covenants and guaranties of this Guaranty shall be binding upon Guarantor and its heirs, successors, legal representatives and assigns, and shall inure to the benefit of Landlord and its successors and assigns, and shall not be deemed waived or modified unless such waiver or modification is specifically set forth in writing, executed by Landlord or its successors and assigns, and delivered to Guarantor.

10.6   Whenever the words "include", "includes", or "including" are used in this Guaranty, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa. This Guaranty shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

10.7   Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty.

10.8   The provisions of this Guaranty shall be governed by and interpreted solely in accordance with the internal laws of the State of New York, without giving effect to the principles of conflicts of law.

10.9   The execution of this Guaranty after the execution of the Lease shall not invalidate this Guaranty or lessen the Obligations of Guarantor hereunder.

10.10   This Guaranty may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute but one instrument. The signature page of any counterpart may be detached therefrom and reattached to any other counterpart to physically form a single document.

2308382v1/13139-6

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
NYSCEF DOC. NO. 4

INDEX NO. 60278/2020

RECEIVED NYSCEF: 09/18/2020

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
part 1    Pg 145 of 150

**10.11**  The Recitals set forth above are hereby incorporated by this reference and made a part of this Guaranty.  Guarantor hereby represents and warrants that the Recitals are true and correct.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty under seal as of the day and year first above written.

GUARANTOR:

Mark Neuman

11

# Exhibit 4 to

# Verified Complaint

**HBL-SNF, LLC**
**1280 Albany Post Road**
**Croton-on-Hudson, NY 10520**

November 20, 2019

White Plains Healthcare Properties, I, LL
West Peabody Executive Center
2 Bourbon Street
Peabody, MA 01960
Attn: William Nicholson

        **Re:**    **Letter of Intent**
                  **Premises: 116-120 Church Street**
                  **White Plains, New York**

Dear Mr. Nicholson:

       This Letter of Intent ("LOI") outlines our proposal for White Plains Health Care Properties, I, LLC (the "Contributor") to transfer the premises known as 116-120 Church Street, White Plains New York (the "Premises") to a Delaware Statutory Trust where we would jointly hold the beneficial interests in the Trust on the terms and conditions set forth below. The Building a skilled nursing home facility consisting of one hundred sixty (160) beds (the "Facility") had been constructed pursuant to a Development Agreement dated November 19th, 2015 and for which we had simultaneously entered into that certain operating lease by and between you as Landlord and us as Tenant/Operator, (the "Lease").

1) **Basic Transaction:** (the "Transaction"): Contributor shall contribute premises 116-120 Church Street White Plains, New York to a newly formed Delaware Statutory Trust (the "Trust") formed by the parties. This transaction shall be memorialized by a contribution agreement in substantially the form annexed hereto as Exhibit A. The Contribution shall be governed by IRC Sec. 721. The agreed upon cost and fair market basis shall be $67,345,348.00

   a) Lizer Jozefovic and Mark Neuman will acquire from the Trust by a Purchase Agreement 77.50 Percent of the Beneficial Interests in the Trust and redemption of a portion of the B Beneficiaries' interest for a purchase price of $52,200,000.00 paid as follows;

      i) By a down payment (the "Down Payment") not to be held in escrow, but to be made upon the execution and delivery of this LOI of $2,200,000.00 by wire transfer to the account of White Plains Healthcare Properties I, LLC according to the wire instructions annexed hereto.

      ii) By the Trust obtaining a new first mortgage of $51,000,000.00 to pay the balance of the Purchase Price and cover closing costs to be used as follows;

FILED: WESTCHESTER COUNTY CLERK 09/18/2020 01:11 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 5
21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
RECEIVED NYSCEF: 09/18/2020
DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A8CF1    Pg 148 of 150

    (1) To pay the first Mortgage held by Security Benefit Life Insurance in the approximate amount of $39,226,253 plus accrued interest and fees.

    (2) To pay the loan encumbering the membership interests of the Contributors by Bradford Allen in the approximate amount of $9,770,963 plus accrued interest and fees;

    (3) By the Trust making a non-refundable down payment of $2,200,000.00

    (4) To pay the costs of the financing.

b)   Lizer Jozefovic and Mark Neuman shall be the A Beneficiaries of the trust holding a 77.50% Beneficial interest, and the present members of the Contributor or their designees shall be the B Beneficiary with a 22.5% equity position.

c)   The A Beneficiaries shall be the personal guarantors of the new financing in the amount of Fifty-One Million ($51,000,000.00) Dollars. The Transaction is to close thirty (30) days after Buyer has received approval for the Financing set forth in paragraph 1)a) ii)). The Contribution Agreement shall call for a purchase price equal to Transferors cash basis in the property and shall not result in a taxable event for Contributor;

d)   The Financing shall be an obligation of the Trust secured by a first mortgage loan on the Facility and the Premises.

e)   Lizer Jozefovic and Mark Neuman shall act as the Personal Guarantors and shall be obligated if necessary, to secure additional personal guarantors to ensure that none of the B beneficiaries shall have any obligation to guarantee the Financing. Any additional guarantors on the Financing shall also execute and deliver a personal guaranty of Tenant's obligations to Landlord on the Lease. All guaranties on the Lease shall be full unlimited personal guarantees.

f)   The Financing shall bear interest at a constant rate of no more than 7% per annum with Principal and Interest paid on an amortization schedule of 35 years and shall be subject to the reasonable approval of the Contributor, which consent shall not be unreasonably withheld or delivered without cost to the Tenant Borrower.

g)   Formal Contracts: The Parties intend that additional agreements including the Contribution Agreement, Redemption Agreement and Trust Agreement (the Formal Contracts") shall be complete as of November 22nd, 2019, and absent execution of Formal Contracts this LOI shall govern provided the Down Payment is received in good funds by Contributor upon execution of this LOI, and in no event latter than the end of business November 22, 2019. In the event Tenant defaults in the payment of rent on the Lease and such default continues for five (5) days, Contributor shall have the right to terminate this LOI and all Formal Contracts.

h)   Closing: The Closing of the Transaction ("Closing") will occur at the offices of the First Mortgagee Bank's counsel or such other location within the State of New York as may be agreed upon by the Parties thirty (30) days after receipt by the Trust of approval for

the Financing but no later than April 1st, 2020. If the Tenant has a commitment letter on April 1st, 2020 that is in the process of closing or if the closing is delayed by a title issue, the closing date shall be automatically extended for another Ninety-Days. If the closing does not occur by such date, time being of the essence, this LOI and the Formal Contracts shall be terminated and no party shall have any rights with respect thereto. The parties shall remain as Landlord and Tenant pursuant to the existing Lease until such time as the Transaction closes. The Lease may be amended as provided herein but only if and when such amendments are approved by Contributor's existing Lender.

2) **Structure of the Trust:** The Contributor and Tenant have agreed to create a Trust as a "statutory trust" in accordance with Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. 3801 and enter into a Trust Agreement which shall constitute the "governing instrument" of the Trust. Each party will become a Beneficiary and will transfer certain sums of money and/or property to the Trust in exchange for a beneficial interest in the Trust as set forth above;

a) The Trust shall be a special purpose entity which is being formed solely for the purpose of acquiring the Trust Property from the Contributor and maintaining, improving, building upon, and leasing the Trust Property for use as a skilled nursing facility and all and such other activities incident or appropriate to the preceding

b) Simultaneously upon the closing of the transaction, the existing lease shall be modified only as set forth herein.

c) The trust shall be permitted to have only the following liens on the Trust Property and no other:

    i) A Mortgage in the amount of Fifty-One Million ($51,000,000.00) Dollars (the "First Mortgage") the terms of which shall be acceptable to the Department of Health and the Contributor.

    ii) The Trust will designate Howard Fensterman and William Nicholson as the Administrative Trustees of the B interests.

        (1) The Trust Agreement shall provide that Howard Fensterman and William Nicholson as the B beneficiaries Administrative Trustees shall have the sole authority to all issues governing administering and enforcing the terms of the Lease including the collection and distribution of rent.

        (2) Lizer Jozefovic shall be responsible as the overall Administrative Trustee for all other matters concerning the building including but not limited to repairs, maintenance, and operation of the building. Any Trustee may be removed for cause including misconduct, bad faith, fraud or gross negligence.

        (3) Except as otherwise provided in a Trust Agreement to be executed and notwithstanding any provision of the Act that otherwise so empowers the Trust, neither the Beneficiaries nor any Trustees nor any other Person shall be authorized or empowered, nor shall they permit the Trust, to take any of the following actions

21-22623-shl    Doc 29-2    Filed 11/08/21    Entered 11/08/21 16:50:03    Doc 3 Notice
DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C544peat 1    Pg 150 of 150

without the prior unanimous written consent of all of the Beneficiaries:

(a) Make any arrangements to reduce, modify, or forebear on the payment of rent by the Tenant.

(b) Guarantee any obligation of any Person, including any Affiliate;

(c) engage, directly or indirectly, in any business other than the actions required or permitted to be performed hereunder;

(d) incur, create or assume any indebtedness;

(e) make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person;

(f) To the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, merger, asset sale or transfer of their Interests subject to obtaining any approvals required under this Trust Agreement other than a sale of the interests to qualified purchasers under a syndicated offering of the B interests. The cost of such syndication shall not be charged to the B Beneficiaries and all monies derived therefrom and due hereunder shall be net of the costs of the syndication.

(g) allow any business to be conducted on the Property other than the operation of a skilled nursing facility and ancillary uses;

(h) own any other property or engage in any business other than owning and leasing the Trust Property for use as a skilled nursing facility;

(i) take any action to consolidate or merge the Trust with or into any Person;

(j) sell all or any portion of or any interest in the Trust Property;

(k) grant an option to lease all or any portion of the Trust Property for a term (with all extension periods) ending on or after the 45th Anniversary Date;

(l) amend, terminate or waive any material provisions of any lease for all or any portion of the Trust Property;

(m) enter into any agreement with any Person giving any Person any rights with respect to the Trust Property that extend beyond the 45th Anniversary Date or which are not terminable without penalty on less than 90 days' notice;

(n) encumber the Trust Property with any mortgages or another lien, easement, covenant or restriction other than the First Mortgage, or a HUD Mortgage to refinance the debt contemplated by this Agreement, at such time as HUD regulations shall allow;

(o) modify the Trust Agreement or the Trust's certificate of trust in any manner, issue additional Interests in the Trust to any Person, or modify the rights and privileges of the Interest owners;

(p) institute proceedings to have the Trust be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Trust or file a petition seeking, or consent to, reorganization or relief with respect to the Trust under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrate (or other similar official) of the Trust or a substantial part of its property;

(q) make any assignment for the benefit of creditors of the Trust;

4