Gregory M. Juell
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Email:  gregory.juell@us.dlapiper.com

Rachel Nanes (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8500
Email:  rachel.nanes@us.dlapiper.com

*Counsel to Security Benefit Life Insurance Company
and Security Benefit Corporation*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | Chapter 11 |
| HBL SNF, LLC, d/b/a EPIC REHABILITATION AND NURSING AT WHITE PLAINS, | Case No. 21-22623 (SHL) |
| Debtor. | |

---

**RESPONSE OF SECURITY BENEFIT LIFE INSURANCE COMPANY AND
SECURITY BENEFIT CORPORATION TO OBJECTION OF
WHITE PLAINS HEALTHCARE PROPERTIES I, LLC TO ENTRY OF THE
PROPOSED FINAL ORDER AUTHORIZING THE DEBTOR TO BORROW
PURSUANT TO A POST-PETITION SENIOR SECURED FINANCING FACILITY**

Security Benefit Life Insurance Company and Security Benefit Corporation (together, "Security Benefit"), by and through their undersigned counsel, hereby submit this response (the "Response") to the *Objection of White Plains Healthcare Properties I, LLC to Entry of the Proposed Final Order Authorizing the Debtor to Borrow Pursuant to a Post-Petition Senior Secured Financing Facility* [Docket No. 61] (the "Objection").  In support of this Response, Security Benefit respectfully states as follows:

**PRELIMINARY STATEMENT**

In August 2017, and in connection with an agreement reached between White Plains Healthcare Properties I, LLC ("WPHP") and HBL SNF, LLC (the "Debtor"), Security Benefit

agreed to loan up to $38.5 million (the "Loan") to WPHP to fund the construction of a skilled nursing facility (the "Facility") located at 120 Church Street, White Plains, New York (the "Property"), which is now operated by the Debtor.  Pursuant to the terms of that certain Construction Loan Agreement, dated as of August 18, 2017, between WPHP and Security Benefit (the "Loan Agreement"), WPHP was obligated to repay the entire principal balance of the Loan and all accrued interest thereon on August 1, 2020 (the "Maturity Date").  To secure the payment of the Loan and the performance of the other obligations under the Loan Documents (as defined below), WPHP and the Debtor pledged certain collateral and provided certain rights to Security Benefit, including, but not limited to, the right to collect all Rents (as defined in the Loan Agreement) paid by the Debtor under the Operating Lease (as defined below).  In turn, Security Benefit granted to WPHP a revocable license to collect Rents but only so long as there was no default under the Loan Documents.  Notwithstanding the clear provisions of the Loan Documents, WPHP has disavowed, and continues to disavow, its obligations to Security Benefit.

As will be discussed in greater detail herein, WPHP first defaulted under the Loan Documents in October 2019 and has remained in default by, *inter alia*, (i) failing to pay the principal balance of the Loan and all interest accrued thereon on the Maturity Date; (ii) failing to make timely monthly interest payments; (iii) failing to create a cash management account for the collection of all revenue generated at the Mortgaged Property, (iv) sending a notice of termination of the Operating Lease without Security Benefit's prior written consent; (v) failing to direct the Debtor to pay the Rents to Security Benefit; and (vi) failing to deliver financial statements and compliance certificates.  In response to such defaults, Security Benefit has taken numerous affirmative steps to enforce its rights and exercise its remedies under the Loan Documents.  Most significantly, on May 1, 2021 and September 1, 2021, Security Benefit initiated foreclosure

proceedings against WPHP. Such proceedings, however, were voluntarily dismissed without prejudice as a result of the commercial foreclosure moratorium instituted in New York during the COVID-19 pandemic.

Now, in addition to defaulting under the Loan Documents for over two years, WPHP seeks to undermine the very contractual rights and interests it agreed to provide to Security Benefit upon its default. WPHP should not be permitted to disregard its contractual obligations and interfere with Security Benefit's rights simply because it is engaged in litigation with the Debtor. Rather, Security Benefit should be permitted to exercise its rights and protect its interests to the maximum extent permitted under the Loan Documents and applicable law as it has done in the Proposed Final DIP Order (as defined below). For these reasons, and for the reasons discussed in greater detail below, the Objection should be overruled.

## **BACKGROUND**

### A.     **WPHP Enters into the Development and Lease Agreements with the Debtor.**

1.      In or around November 2015, WPHP entered into certain agreements with the Debtor for the construction and financing of the Facility, including that certain Development Agreement, dated as of November 19, 2015 between the Debtor, as operator/tenant, and WPHP, as developer. *See* Lizer Decl.[1] at ¶ 9.

2.      Additionally, WPHP and the Debtor entered into that certain Operating Lease, dated as of November 19, 2015 (as amended, the "Operating Lease"), pursuant to which (i) WPHP agreed, in relevant part, to lease the Leased Premises (as defined in the Operating Lease) to the Debtor for a thirty (30) year term; and (ii) the Debtor agreed, in relevant part, to pay a monthly fixed rent in the amount of $506,096.50. *See id.* ¶¶ 10-11. In the Operating Lease, the Debtor

---

[1] "Lizer Decl." refers to the *Declaration of Lizer Jozefovic Pursuant to Local Bankruptcy Rule 1007-2 in Support of the Chapter 11 Subchapter V Petition and First Day Motions* [Docket No. 3].

acknowledged that "all of the interest of Landlord in and to this Lease has been or will be assigned to [Security Benefit] pursuant to the Loan Documents."  Operating Lease, § 3.5.

**B.      WPHP and the Debtor Enter into the Loan Documents with Security Benefit.**

3.      On August 18, 2017, Security Benefit and WPHP entered into the Loan Agreement, pursuant to which Security Benefit agreed to loan up to $38,500,000 to WPHP to fund the construction of the Facility on the Property.  The Loan Agreement was duly recorded in the Westchester County Clerk's Office on August 25, 2017.  A true and correct copy of the Loan Agreement is attached hereto as **Exhibit A**.

4.      To evidence its indebtedness to Security Benefit, WPHP executed a Promissory Note, dated August 18, 2017, in the sum of $38,500,000 (the "Note").

5.      To secure the payment of the Loan and WPHP's performance of all of its obligations under Loan Agreement, WPHP entered into that certain *Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing*, dated as of August 18, 2017 (the "Mortgage"), pursuant to which WPHP mortgaged and pledged to Security Benefit all of its right, title and interest in, among other property, (i) the Property and improvements, equipment and fixtures located on or used in connection with the Property; and (ii) "all rents, additional rents, revenues, issues and profits . . . from the Land and the Improvements . . . and the right to receive and apply the Rents to the payment and performance of the Obligations, including the payment of the Secured Indebtedness."  Mortgage, § 1.1.  The Mortgage was duly recorded in the Westchester County Clerk's Office on August 31, 2017.  A true and correct copy of the Mortgage is attached hereto as **Exhibit B**.

6.      To further secure WPHP's obligations under the Loan Agreement, WPHP entered into that certain *Assignment of Leases and Rents*, dated as of August 18, 2017, with Security

Benefit (the "<u>ALR</u>"), pursuant to which WPHP "absolutely and unconditionally" assigned and granted to Security Benefit all of WPHP's right, title and interest to, among other things, all Leases, Rents, Lease Guaranties and Security Deposits (as such terms are defined in the ALR). ALR, § 1.1. The ALR was duly recorded in the Westchester County Clerk's Office on August 31, 2017. A true and correct copy of the ALR is attached hereto as **Exhibit C**.

7.     Finally, as additional security for WPHP's obligations under the Loan Agreement and as part of the consideration for approval of the Operating Lease, WPHP, Security Benefit and the Debtor entered into that certain *Security Agreement, Assignment of Leases and Rents, and Fixture Filing (Operating Lease)* (the "<u>Tenant Security Agreement</u>" and collectively with the Loan Agreement, Note, Mortgage, ALR and such other documents evidencing, securing or pertaining to the Loan, the "<u>Loan Documents</u>"),[2] pursuant to which the Debtor pledged certain collateral to Security Benefit, including, but not limited to, all accounts, awards, contracts, improvements, leases, personalty, rents, and all of the products and proceeds of the foregoing, to the extent such collateral is part of the mortgaged property or is used "in connection with or arising from the ownership, leasing, management or operation of the Mortgaged Property" (collectively, the "<u>Collateral Property</u>"). *See* Tenant Security Agreement, §2.1. A true and correct copy of the Tenant Security Agreement is attached hereto as **Exhibit D**.

8.     Security Benefit perfected its security interest in certain of the Collateral Property by recording the UCC-1 Financing Statement attached hereto as **Exhibit E**.

C.     **WPHP Defaults under the Loan Documents.**

9.     Under the terms of the Loan Documents, WPHP is required to, among other things: (i) make monthly payments of accrued and unpaid interest to Security Benefit on the first day of

---

[2]  Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the Loan Documents.

each calendar month; and (ii) pay the entire principal balance of the Loan then unpaid and all accrued interest then unpaid on the Maturity Date, *i.e.*, August 1, 2020, to Security Benefit. *See* Loan Agreement, § 2.12.

10.    In addition to its monetary obligations, WPHP agreed to various other terms and conditions under the Loan Documents, including, *inter alia*, (i) establishing a Cash Management Account within sixty days prior to the commencement date under the Operating Lease "in the name of [WPHP] for the sole and exclusive benefit of [Security Benefit] into which [WPHP] shall deposit, or cause to be deposited, all revenue generated by the Property" (Loan Agreement, § 8.1(a)); (ii) depositing all revenue derived from the Property and received by WPHP into the Cash Management Account (*id.*, § 8.1(b)); (iii) sending a Tenant Direction Notice to the Debtor, pursuant to which the Debtor is directed to pay all Rents and other sums due under the Operating Lease to Security Benefit (*id.*); (iv) providing financial statements for WPHP and the Guarantors (*id.*, § 3.13); and (v) obtaining Security Benefit's written consent prior to modifying or terminating the Operating Lease (*id.*, § 3.5).

11.    To date, WPHP has repeatedly defaulted on its obligations to Security Benefit under the Loan Documents. Such defaults include the following:[3]

    a.    Failing to pay the entire principal balance of the Loan and all accrued and unpaid interest on the Maturity Date;

    b.    Failing to timely pay accrued and unpaid interest on the first of the month, on numerous occasions;

    c.    Sending a notice of termination of the Operating Lease without the prior written consent of Security Benefit;

    d.    Failing to establish a Cash Management Account by no later than 60 days prior to the anticipated rent commencement date under the Operating Lease;

---

[3] The list of defaults is not intended to be exhaustive, nor should it be construed as a limitation, restriction or waiver, express or implied, of any of Security Benefit's rights, remedies, defenses, and counterclaims in connection with the Loan Documents, all of which are expressly reserved.

e.      Failing to deposit, or cause to be deposited, all revenues generated by the Property into the Cash Management Account;

f.      Failing to notify Security Benefit in writing of (i) any Defaults or potential Defaults under the Loan Agreement and other Documents and (ii) any occurrence or event that would reasonably be expected to result in a Material Adverse Effect; and

g.      Failing to provide financial statements, compliance certificates and all other documents required to be provided to Security Benefit under the Loan Documents.

12.     Security Benefit sent notices regarding the foregoing defaults to WPHP on October 16, 2019, November 5, 2019, April 16, 2020, May 13, 2020, May 22, 2020, and December 3, 2021, and has consistently sent monthly invoices reflecting the amount owed.

13.     On May 1, 2021, Security Benefit commenced a foreclosure action by filing a Verified Complaint (the "Foreclosure Complaint") against WPHP in New York State Supreme Court, Westchester County.  Security Benefit also filed a Notice of Pendency with the Westchester County Clerk.  As previously noted, Security Benefit's Foreclosure Complaint was voluntarily dismissed without prejudice as a result of a COVID-19-related moratorium on commercial foreclosures instituted in New York.  Security Benefit refiled the Foreclosure Complaint on September 1, 2021, when the moratorium lapsed, and again voluntarily dismissed the action without prejudice when the moratorium was reinstated.  A true and correct copy of the Foreclosure Complaint is attached hereto as **Exhibit F**.  The current moratorium is set to expire on January 15, 2022.

14.     On December 3, 2021, Security Benefit sent a default notice (the "December Default Notice") to WPHP that, among other things, provided notice to WPHP of its continued defaults under the Loan Documents and demanded the immediate turnover of past and future Rents paid to WPHP under the Operating Lease.  A true and correct copy of the December Default Notice

is attached hereto as **Exhibit G**.  As of the date hereof, WPHP has neither responded to the December Default Notice, turned over any Rents nor paid the principal amount of the Loan and accrued interest thereon.

15.    As of December 1, 2021, the total amount due to Security Benefit under the Loan Documents, including unpaid interest and fees, totaled $43,013,744.96.

### D.    The Debtor's Chapter 11 Case and Proposed Final DIP Order.

16.    On November 1, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

17.    On the Petition Date, the Debtor also filed the *Debtor's Motion for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507, and F.R. Bankr. P. 4001 and 9014, (I) Authorizing the Debtor to Borrow Pursuant to a Post-Petition Senior Secured Financing Facility; and (II) to the Extent Necessary, Authorizing the Debtor's Use of Cash Collateral* [Docket No. 11] (the "DIP Motion").  As discussed in greater detail in the DIP Motion, the Debtor seeks approval "to obtain the DIP Facility on a senior secured priming basis and authority to use cash collateral as a result of the potential arguments by [WPHP] and . . . Security Benefit, that they hold a lien on substantially all of the Debtor's assets."  DIP Motion, p. 3.

18.    After entry of the first interim order approving the DIP Motion on November 8, 2021 [Docket No. 34], the Debtor and Security Benefit engaged in discussions regarding Security Benefit's security interests in the Collateral Property, the proposed priming liens offered to the DIP Lender (as defined in the DIP Motion) and the adequate protection to be afforded to Security Benefit, all in an effort to avoid the time and expense of an objection to the DIP Motion.  The

agreements and compromises reached between the Debtor and Security Benefit with respect to the relief sought in the DIP Motion are reflected in the form of a proposed final order (the "Proposed Final DIP Order") filed as an exhibit to the *Notice of Filing of Proposed Final DIP Financing Order* [Docket No. 57].

19.     On December 13, 2021, despite having no security interests in the Debtor's assets and no license to collect the Rents from the Debtor, WPHP filed the Objection asserting that Security Benefit was not entitled to adequate protection as reflected in the Proposed Final DIP Order because (i) it is adequately protected by a purported equity cushion in the Property; (ii) WPHP is entitled to payment of the Rents under the Operating Lease; and (iii) Security Benefit is not entitled to enforce its rights to collect the Rents as part of the Debtor's chapter 11 proceeding.

20.     For the reasons discussed below, Security Benefit is entitled to collect the Rents paid by the Debtor under the Operating Lease and the adequate protection rights afforded to it under the Proposed Final DIP Order.

## ARGUMENT

**I.     Security Benefit Has the Absolute and Unconditional Right to Collect the Rents Directly from the Debtor.**

21.     Given WPHP's myriad defaults under the Loan Documents, Security Benefit has an absolute and unconditional right to collect the Rents paid by the Debtor under the Operating Lease.  Specifically, as an express condition of the Loan, Security Benefit granted WPHP a license to collect the Rents so long as it did not default under the Loan Documents.  *See* ALR, § 2.1. However, upon the occurrence of WPHP's defaults, the license was automatically revoked.  *See* ALR, §§ 2.1, 3.2; Mortgage, § 4.1.

22.     WPHP does not and cannot contest these facts.  Yet, despite the revocation of its license to collect the Rents, WPHP argues that it – not Security Benefit – is entitled to the Rents

as "adequate protection." *See* Objection, at ¶¶ 42-47. This argument, however, is meritless because WPHP cannot seek to protect a right that was revoked by its own actions under the Loan Documents.

23.     Moreover, WPHP argues, on the one hand, that the "Debtor must comply with its obligations under the Lease", and, on the other hand, that Security Benefit's effort to enforce its own rights under the Loan Documents is somehow "improper[]" and an "egregious overreach" *See id.* ¶¶ 43, 50. WPHP cannot seek to vindicate rights owed to it under one contract while simultaneously denying the rights it agreed to provide to Security Benefit under the Loan Documents.

24.     Notwithstanding WPHP's ongoing dispute with the Debtor, the plain terms of the ALR and controlling precedent provide that the Rents should be turned over to Security Benefit as contemplated in the Proposed Final DIP Order. As this Court recognized in *In re Soho Retail, LLC*, a lender's right to rents under an assignment of leases and rents is either self-executing or requires some "affirmative step" by the lender to be enforceable. *In re Soho 25 Retail, LLC*, 2011 WL 1333084, at *8 (Bankr. S.D.N.Y. Mar. 31, 2011) (Lane, J.). In either of these circumstances, the result is the same here: Security Benefit has the right, as a matter of law, to collect the Rents directly from the Debtor as contemplated by the Proposed Final DIP Order.

   **a.   WPHP's Defaults Trigger Security Benefit's Right to Collect the Rents Directly from the Debtor.**

25.     The Loan Documents expressly provide Security Benefit with a right to collect the Rents upon WPHP's default. Specifically, pursuant to Section 1.1 of the ALR, WPHP "absolutely and unconditionally" assigned and granted to Security Benefit all of WPHP's right, title and interest to all Leases, Rents, and Lease Guaranties (as such terms are defined in the ALR). ALR, § 1.1. WPHP further agreed that it intended this assignment of Rents "to constitute a present,

absolute assignment of the Leases, Rents, Lease Guaranties and Bankruptcy Claims and not an

assignment for additional security only." *Id*. at § 2.1.  In fact, WPHP retained only a license to

collect and receive Rents, revocable upon an event of default, and to hold such Rents, or a portion

thereof sufficient to discharge all current sums due on the debt, in trust for the benefit of Security

Benefit.  *Id*. at § 3.2   In particular, Section 2.1 of the ALR states as follows:

> 2.1    **Present Assignment and License Back**.  It is intended by Borrower
> that this Assignment constitute a present, absolute assignment of the
> Leases, Rents, Lease Guaranties and Bankruptcy Claims and not an
> assignment for additional security only.  Nevertheless, subject to the
> terms of this <u>Section 2.1</u>, and the terms of the Loan Agreement,
> Agent grants to Borrower a revocable license (the "**License**") to
> collect, receive, use and enjoy the Rents and other sums due under
> the Lease Guaranties.  Borrower shall hold the Rents and all sums
> received pursuant to any Lease Guaranty, or a portion thereof
> sufficient to discharge all current sums due on the Debt, in trust for
> the benefit of Lender for use in the payment of such sums.

*Id.* at § 2.1.

26.    As provided in the provision below, WPHP's license to collect Rents was

automatically revoked when it defaulted under the Loan Documents:

> 3.2.    **Remedies of Lender**.  Upon or at any time after the occurrence and
> during the continuance of a Default, the *License shall automatically
> be revoked*, and Agent shall immediately be entitled to possession
> of all Rents and all sums due under any Lease Guaranties, whether
> or not Agent enters upon or takes control of the Property . . . .

*Id.* § 3.2 (emphasis added).

27.    Furthermore, pursuant to the Mortgage, WPHP agreed that "[w]hile any Default is

continuing, *all Rents shall be paid directly to [Security Benefit] and not through [WPHP]*, all

without the necessity of any further action by [Security Benefit] . . . ."  Mortgage, § 4.1 (emphasis

added).  The Mortgage further provides that WPHP:

> [A]uthorizes and directs the tenants under the Leases to pay Rents
> to [Security Benefit] *upon written demand by [Security Benefit],
> without further consent of [WPHP]*, without any obligation of such

tenants to determine whether a Default has in fact occurred and regardless of whether [Security Benefit] has taken possession of any portion of the Property, and the tenants may rely upon any written statement delivered by [Security Benefit] to the tenants."

Mortgage, § 4.1 (emphasis added).

28.     WPHP also agreed that Security Benefit would not be deemed to have waived its right to collect the Rents if it chose not to immediately enforce those rights: "[N]o act done or omitted by [Security Benefit] pursuant to the power and rights granted to [Security Benefit] hereunder, shall be deemed to be a waiver by [Security Benefit] of its rights and remedies under the [Loan Documents] and this [ALR] is made and accepted without prejudice to any of the rights and remedies possessed by [Security Benefit] under the terms thereof."  ALR, § 3.3.

### b. Security Benefit Was Entitled to Collect Rents Upon WPHP's Default.

29.     The express language of the ALR provides that Security Benefit's interest in the Rents is self-executing and entitles Security Benefit to all rental income automatically from the date of default, without the need for any affirmative steps to be taken by Security Benefit.[4]  *See* ALR, §§ 2.1, 3.2; Mortgage, § 4.1.  In fact, New York courts have determined that "the mortgage lender is entitled to all rents paid to the mortgagor from the date of the mortgagor's default" where, as here, "an assignment of rents is a present tense assignment of all rents to be held in trust for the benefit of the mortgage lender . . . ."  *Credit Lyonnais v. Getty Square Assocs.*, 876 F. Supp. 517, 521 (S.D.N.Y. Feb. 3, 1995); *see also Fed. Home Loan Mortg. Corp. v. Dutch Lane Assocs.*, 775 F. Supp. 133, 139-40 (S.D.N.Y. Oct. 16, 1991) (upon notice of default, mortgagee was "immediately entitled to all rents without any further action required" or need to "take any affirmative steps").

---

[4] WPHP agreed in the Loan Documents to create a Cash Management Account that would enable Security Benefit to automatically sweep the Rent upon a default.  *See* Loan Agreement, § 8.1.  However, WPHP failed to establish such an account in breach of the Loan Documents.

30.     For example, in *In re Loco Realty Corp.*, 2009 WL 2883050 (Bankr. S.D.N.Y. June 25, 2009), the Court found an assignment of rents provision to constitute an absolute assignment of rents, rather than a pledge of the rents as security, where the assignment provision evidenced the parties' intent to enter into a present assignment. *See id*. at *5. The Court made such a determination based upon controlling language in the assignment of rents provision of the mortgage expressly stating that the assignment was intended to be an absolute assignment and not merely to create a security interest. *Id.* at *4-5. The Court was also persuaded because the effectiveness of the assignment was "not dependent on any default on the part of the Debtor," because title to the rents was immediately assigned to the lender upon execution of the mortgage and then licensed back to the borrower. *Id.* at *5.

31.     Here, Sections 2.1 and 3.2 of the ALR are substantially similar to the assignment provisions at issue in *Dutch Lane* and *In re Loco*, and convey the same intent to create an absolute assignment and not merely a security interest. Likewise, here, the assignment of Rents was a present and immediately effective assignment, leaving WPHP with only a license to collect Rents that was automatically revoked upon an event of default, without any action necessary by Security Benefit. *See* ALR, § 3.2 ("the License shall automatically be revoked . . . whether or not [Security Benefit] enters upon or takes control of the Property"); Mortgage, § 4.1 ("all without the necessity of any further action by [Security Benefit], including any action to obtain possession of the Land, Improvements or any other portion of the Property of any action for the appointment of a receiver.").

32.     Accordingly, the assignment of Rents provision contained in the ALR constitutes a present and absolute assignment of the Rents upon execution of the agreement. Additionally, no

further action was required by Security Benefit to obtain the Rents once WPHP defaulted, commencing in October 2019.[5]

>   ### c.   Even if the ALR Is Not Deemed Self-Executing, Security Benefit Has Taken Sufficient Affirmative Steps to Make the Assignment Effective.

33.     To the extent WPHP claims it is entitled to the Rents because the ALR is not self-executing, this argument should be rejected.  Security Benefit has taken sufficient affirmative steps to assert its interests in the Rents.  As this Court has recognized, "[r]egardless of whether [an] Assignment [of Rents] is considered absolute or merely a pledge of additional security, the Lender is entitled [under New York law] to the rent if it took sufficient affirmative steps toward asserting its interest."  *In re Soho 25 Retail, LLC*, 2011 WL 1333084, at *7-8 (internal citations omitted).

34.     In *Soho 25 Retail*, this Court identified several affirmative steps that can be taken by a lender to enforce its rights: requesting the appointment of a receiver to collect the rents, demanding or taking possession, commencing foreclosure proceedings, or seeking an order for the sequestration of rents."  *Id*. at *7.  The Court noted that the foregoing list of affirmative steps is in the disjunctive and that "[t]he underlying idea is to reward 'parties who are diligent in protecting their interests by requiring affirmative action by the secured party before an assignment of rents is enforceable.'"  *Id*. (internal citations omitted).  Among other examples of sufficient affirmative steps, the Court found that "possession is not required as long as a formal demand for possession

---

[5] WPHP also claims that Security Benefit violated the automatic stay.  *See* Objection, ¶ 51.  The sole authority WPHP cites for this proposition is inapposite to the circumstances here because it involves the application of Virginia law, which unlike New York law, requires a secured party holding a security interest in rents to obtain possession of the property subject to the lien before collecting the rental income. *See Vienna Park Props.*, 136 B.R. 43 (S.D.N.Y. Jan. 24, 1992), *aff'd*, 976 F.2d 106 (2d Cir. 1992).  In *Vienna Park Prop.*, the Court held that because the automatic stay prevented the secured creditor from obtaining possession of the property, the secured creditor's Motion for Sequestration of the Rents served as an appropriate "enforcement surrogate."  *Id*. at *55.  Accordingly, the secured creditors were entitled to the rental income from the date they filed their motion. *Id*. Contrary to WPHP's assertion, there was no violation of automatic stay here.  Unlike the secured creditors in *Vienna Park Prop*., Security Benefit received a present and absolute assignment of Rents upon execution of the ALR, not a mere security interest in Rents.  Even if the Court were to find otherwise, Security Benefit took all of the necessary enforcement steps prior to the Petition Date.

is met with refusal." *Id.* at *7 (internal citations omitted) (finding that a lender's formal written demand to the tenant directing that rent be paid directly to the lender supports a finding the sufficient affirmative steps were taken by lender).

35.    Numerous other courts have held that, upon taking sufficient affirmative steps, a lender is entitled to assert its right to collect rent directly from a tenant. *See also Builders Bank v. Rockaway Equities, LLC*, 2011 WL 4458851, at *110 (E.D.N.Y. Sept. 23, 2011) ("Although the assignment of rents clause at issue here is not self-executing, plaintiff has taken the necessary actions to assert its rights to possession and to collect the rents."); *In re Loco Realty Corp.*, 2009 WL 2883003, at *56 (Bankr. S.D.N.Y. June 25, 2009) ("even if the assignment could be construed as a security interest, the Bank took affirmative actions by appointing the receiver of February 23, 2009, before the petition date. Therefore, whether the assignment of rents is construed as a security interest or not, the Debtor absolutely assigned its interests and title to the rents prepetition); *Mutual Life Ins. Co. of N.Y. v. Gotham Silk Hosiery Co.*, 179 Misc. 557, 561 (Sup. Ct. 1943) ("Nothing more need have been done by plaintiff to perfect its legal right to collect the rents due [than] . . . to enter upon the premises and to demand and receive the rent from the tenant."); *BNF NY Realty, LLC v. Nissan Motor Acceptance Corp.*, 2019 WL 140648, at *7 (S.D.N.Y. Jan. 9, 2019) (finding that lender had taken sufficient affirmative steps to enforce the assignment of rents clause by asserting a claim for foreclosure on the property, filing a notice of pendency, and writing a demand letter to the tenant stating that due to the landlord's default, the landlord's right to collect rent had been terminated and the tenant was to turn over all rent to the lender); *Laura Andrew, Inc. v. DLRA Group, LLC*, 90 N.Y.S.3d 829, 833 (Sup. Ct. Suffolk Cty. Dec. 6, 2018) (finding that plaintiff took sufficient steps to enforce its security interest in the rent by sending a demand letter to the borrower

for the turnover of all rents received on the property, initiating a related mortgage foreclosure action, and moving for the appointment of a receiver).

36.     Here, to the extent that WPHP's assignment of Rents is construed as a pledge of the Rents as security only, the Court should find that Security Benefit took sufficient affirmative steps, as a matter of law, to enforce its rights to the Rents.  Such affirmative actions include:

a.     Sending numerous default letters to WPHP regarding its failure to, among other things, (i) establish a Cash Management Account where all revenue generated at the Mortgaged Property was to be deposited and (ii) send a Tenant Direction Notice to Debtor directing all Rents to be paid to Security Benefit;

b.     Commencing a foreclosure action by filing the Foreclosure Complaint against WPHP in New York State Supreme Court, Westchester County;

c.     Filing a Notice of Pendency with the Clerk of the Court for Westchester County; and

d.     Sending the December Default Letter to WPHP demanding turnover of past and future Rents to Security Benefit.

37.     To the extent WPHP claims that Security Benefit should have taken additional steps, the present moratorium on commercial foreclosure proceedings is the reason why Security Benefit's efforts to enforce its rights have not advanced further.  *See* 2021 N.Y. Laws ch. 417.

38.     Nothing in the moratorium law precludes Security Benefit from enforcing its rights under the ALR.  In fact, the purpose of an assignment of rents is to ensure a lender can obtain funds during the pendency of a protracted foreclosure proceeding.  *See* 12B Purchase and Sale of Real Property § 36.04 (2021) ("A lease is often a crucial part of the security available to the mortgagee.  The mortgagee may be relying heavily on the flow of rent payments being made by the tenant as the source of repayment of the mortgage debt . . . [a] major advantage of an assignment of rents is that the mortgagee has rights to reach the rent payments without going into possession of the property."); § 4:23 Assignments of Rents, 1 Real Estate Finance Law § 4:23 (6th

ed.) (an ALR is provided to enhance a lender's rights in jurisdictions where default does not trigger lender's automatic right to rents under the mortgage, and in "which the foreclosure process is relatively slow"). In other words, the purpose behind the ALR will be advanced by ensuring that Security Benefit's interest in the Rents is realized.

39.    In sum, the "affirmative steps" taken by Security Benefit here to enforce its rights to the Rents are "sufficient[] as a matter of law" and consistent with this Court's findings in *In re Soho 25 Retail, LLC*, and in proceedings addressed by other courts. Security Benefit is entitled to collect the Rents as set forth in the Proposed Final DIP Order.

## II.    <u>Security Benefit Is Entitled to Adequate Protection</u>.

40.    For over two years, WPHP has failed to honor its obligations to Security Benefit. Most significantly, WPHP has failed to pay approximately $43 million owed to Security Benefit on account of the Loan. Now, in addition to interfering with Security Benefit's contractual right to the Rents paid under the Operating Lease, it asks this Court to deny the adequate protection rights that have been agreed to between the Debtor and Security Benefit with respect to the Collateral Property. In support of its Objection, WPHP asserts that: (i) Security Benefit is not a creditor of the Debtor, and (ii) a purported equity cushion in the Property provides adequate protection to Security Benefit. *See* Objection, section I. These arguments, however, lack merit.

### a.    **Security Benefit Is Entitled to Adequate Protection with Respect to the Collateral Property that the Debtor Seeks to Prime Under the DIP Facility.**

41.    Security Benefit is entitled to adequate protection for the simple reason that the Debtor is seeking approval of a DIP Facility that will prime the Collateral Property that the Debtor pledged to Security Benefit under the Tenant Security Agreement. The Collateral Property was

pledged to Security Benefit to, among other things, secure the payment of the Loan—a payment that WPHP has failed to make since August 2020.

42.     Specifically, under the Tenant Security Agreement, in order to secure the Debtor's obligations under the Operating Lease and WPHP's obligations under the Loan Documents, the Debtor granted Security Benefit a security interest in, among other assets, the Debtor's "Accounts," which is defined to include all of the Debtor's "inventory, accounts (including health care insurance receivables, accounts receivable, contract rights, general intangibles, and all proceeds thereof" in connection with or arising from use of the collateral.  *See* Tenant Security Agreement, Article I; § 2.1.  The Debtor further granted Security Benefit a security interest in "Rents," which include rents, revenues, and other income from the Land (as defined in the Tenant Security Agreement).  *Id.*

43.     A court may authorize a debtor to obtain credit by a senior or equal lien on encumbered property only where the debtor cannot otherwise obtain credit, and "only if there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  *See In re Barbara K. Enterprises, Inc.*, 2008 WL 2439649, at *13 (Bankr. S.D.N.Y. June 16, 2008) (denying approval of a DIP facility where "[t]he financing proposal would prime [the prepetition secured lender's] valid liens on certain post-petition assets, and no adequate protection is offered to compensate [the prepetition secured lender] for the corresponding diminution in its interest.") (internal quotation marks omitted) (*citing* 11 U.S.C. § 364(d)(1)).  Further, proposed DIP financing should provide a prepetition secured creditor

with "the same level of protection it would have had if there had not been post-petition superpriority financing." *Id.* at *8 (internal quotation marks omitted).

44.     This adequate protection may take various forms.  Under section 361 of the Bankruptcy Code, when adequate protection is required under section 364, such adequate protection may be granted by "providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property." *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (*quoting* 11 U.S.C. § 361(2)).  Further, where a debtor provides adequate protection to a prepetition secured creditor under section 364 and the creditor has a claim from the granting of a lien under section 364(d), such creditor's claim is entitled to priority over all other claims allowable under section 507(b) of the Bankruptcy Code.  *See* 11 U.S.C. § 507(b); *see also In re Scopac*, 624 F.3d 274, 282 (5th Cir. 2010) (noting that a secured creditor whose collateral is subject to the automatic stay may first seek adequate protection and, if the protection proves inadequate, a priority administrative claim under section 507(b)).

45.     The proposed priming lien under the DIP Facility would grant the DIP Lender "a first-priority priming lien, pursuant to 11 U.S.C. § 364(c)(2), on all encumbered assets of the Debtor, including, to the extent encumbered, all accounts receivable . . ."  DIP Motion, p. 11. Accordingly, the Collateral Property, which is subject to Security Benefit's security interests, will be subordinated to the first priority priming lien.  Thus, Security Benefit is entitled to precisely the type of adequate protection provided for in the Proposed Final DIP Order, including replacement security interests and liens.  Further, as provided for in the Proposed Final DIP Order, Security

Benefit should be granted a priority administrative expense claim under section 507(b) of the Bankruptcy Code to the extent there is a diminution in value of the Collateral Property.

> **b.   The Equity Cushion in the Property May be Illusory and Should Not Deprive Security Benefit of Adequate Protection in the Collateral Property.**

46.     Finally, WPHP objects to the adequate protection afforded to Security Benefit under the Proposed Final DIP Order on the basis that there is a purported equity cushion in the Property. *See* Objection, ¶¶ 37-41.  WPHP's argument, however, should be dismissed as meritless.

47.     WPHP's assertions of an alleged equity cushion in the Property are based on an appraisal conducted in April 2020, more than a year and a half ago, by JLL Valuation and Advisory Services, LLC (the "JLL Appraisal").[6]  As noted in the JLL Appraisal, the Facility was appraised "based upon the going concern premise" and "the assumption that a company is expected to continue operating well into the future (usually indefinitely.)."  JLL Appraisal, p. 14-15.  Now, twenty (20) months later, the Debtor states that it was forced to seek bankruptcy relief "in order to prevent the threatened abrupt termination of its Lease and ability to provide care and service to its patients."  Lizer Dec., ¶ 26.  If WPHP is successful in its litigation against the Debtor, the Operating Lease will be deemed terminated causing the Debtor to lose the ability to operate the Facility as a going concern.   An abrupt termination of the Operating Lease threatens to cause significant operational, financial and regulatory issues.   Accordingly, the very equity cushion that the Landlord relies upon as the basis for its Objection may materially diminish, if not disappear, in the immediate future.

48.     Even assuming, *arguendo*, that there is an equity cushion in the Property and that the equity cushion is not likely to dimmish in the near future, Security Benefit has distinct rights to the Collateral Property owned by the Debtor.   Such rights in the Collateral Property were

---

[6]         *See* Lizer Dec., Exhibit 6.

afforded to Security Benefit by WPHP and the Debtor *in addition to the Mortgage*.  In particular, Section 2.4 of the Tenant Security Agreement provides as follows:

> If an Event of Default has occurred and is continuing, [Security Benefit] will have the remedies of a secured party under the Code, in addition to all remedies provided by this Agreement or existing under applicable law or in equity.  In exercising any remedies, [Security Benefit] may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of [Security Benefit's] other remedies.

Tenant Security Agreement, § 2.4.

49.    Even further, pursuant to the Tenant Security Agreement, WPHP and the Debtor waived "any and all right to require the marshalling of assets" and granted to Security Benefit the right "to determine the order in which any or all of the Mortgaged Property and Collateral Property will be subjected to the remedies provided in [the Tenant Security Agreement] or in the Security Instrument, the Loan Agreement, the Note, any other Loan Document or applicable law."  Tenant Security Agreement, § 10.23.

50.    Accordingly, whether the Property has an equity cushion is not determinative of Security Benefit's rights to adequate protection as to its distinct security interests in the Collateral Property owned by the Debtor.

*[Remainder of page intentionally blank.]*

## **CONCLUSION**

WHEREFORE, for the reasons stated above, Security Benefit submits that the Objection

should be overruled and respectfully requests that the Court grant the DIP Motion by entering the

Proposed Final DIP Order annexed to the *Notice of Filing of Proposed Final DIP Financing Order*

[Docket No 57].

Dated:  December 16, 2021                           Respectfully submitted,
       New York, New York

                                                Gregory M. Juell
                                                **DLA PIPER LLP (US)**
                                                1251 Avenue of the Americas
      New York, New York 10020-1104
      Telephone:  (212) 335-4500
      Email:  gregory.juell@dlapiper.com

      - and -

      */s/ Rachel Nanes*
      Rachel Nanes (admitted *pro hac vice*)
      **DLA PIPER LLP (US)**
      200 South Biscayne Boulevard, Suite 2500
      Miami, Florida 33131
      Telephone:  (305) 423-8566
      Email:  rachel.nanes@us.dlapiper.com

      *Counsel to Security Benefit Life Insurance*
      *Company and Security Benefit Corporation*