Joseph J. Tomaino
Grassi Healthcare Advisors LLC
488 Madison Avenue
New York, NY 10022 (212) 223-5020
*Patient Care Ombudsman*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X

| | |
|---|---|
| In Re: | Chapter 11 |
| HBL SNF LLC d/b/a EPIC REHABILITATION AND NURSING AT WHITE PLAINS, | Case No. 21-22623 (SHL) |
| Debtor. | |

---------------------------------------------------------------- X

### FIRST REPORT OF JOSEPH J. TOMAINO AS PATIENT CARE OMBUDSMAN

I, Joseph J. Tomaino, the duly appointed Patient Care Ombudsman (the "PCO") appointed by the United States Trustee pursuant to an order of the Court entered in the above-captioned bankruptcy cases, file this first report pursuant to 11 U.S.C. § 333 (b)(2). This case involves HBL SNF LLC d/b/a Epic Rehabilitation and Nursing at White Plains (the "Debtor") a licensed 160 bed skilled nursing facility located at 120 Church St., White Plains, NY. A review of New York State Nursing Home Profile page confirms that Epic is licensed to operate baseline nursing home services.

On November 5, 2021, the Bankruptcy Court entered an order designating the Debtor as a Health Care Business and directing the appointment of a Health Care Ombudsman. On November 21, 2021, the United States Trustee appointed Joseph Tomaino to serve as Patient Care Ombudsman.

On January 6, 2022, a notice of the PCO's first report was filed by Ronald Friedman, Esq., proposed counsel to the PCO.

*Approach*

On November 29, 2021, the PCO had an introductory call with the Debtor and reviewed the PCO's role and established contact with the facility administrator and arranged for a site visit on the following day. The site tour and staff and resident interviews was conducted on November 30, 2021 and follow up interviews were conducted on January 20, 2022.

*Findings*

The New York State Department of Health Nursing Facility Profile site was reviewed, and the licensure status of the Debtor confirmed. The facility is licensed for 160 beds and the site

reported an occupancy level of 80%. The overall star rating for the facility is reported on the site as 2 out of 5 stars. Quality of care was listed as 1 out of 5 stars. The star rating system is maintained by the Centers for Medicare and Medicaid and is based on data collected from resident assessments submitted by the facility, staffing reports collected from the facility's payroll system, and survey findings. In the PCO's experience, he has found the star rating system to not be totally reflective of facility performance during the pandemic due to a decreased frequency of certification surveys and lack of timely updating of observations by regulatory bodies. Additionally, the workforce issues during the pandemic have resulted in overall lower staffing reports across the industry. Nonetheless, the observation of this low star rating caused the PCO to be particularly tuned in to potential issues. No significant patient complaints or survey findings are reported on the Department of Health site.

On November 30, 2021, the PCO conducted a site visit at the Debtor's facility. An entrance conference was held with an administrator of the Debtor. It was represented to the PCO that the organization has sufficient cash flow to allow it to meet its payroll and operating financial obligations, and that it is anticipated that the organization will emerge from bankruptcy successfully and will continue to operate.

The director of nursing and administrator guided the PCO on a tour of the facility, which appeared clean, well maintained, and without odors. Residents appeared well groomed, dressed, and were mostly out of their rooms and engaged in activities in multi-purpose day rooms. There was observation of formal activity programs underway during the tour, and staff were also observed engaged with residents informally. Meals were observed, and residents interviewed voiced satisfaction of the quality of the food. The PCO engaged with several residents who verbalized satisfaction with care and offered no complaints.

The PCO observed nursing staff on the resident units providing care and administering medications. Questioning several of these staff revealed no issues with obtaining needed supplies for patient care or medications. Units appeared sufficiently staffed, and the director of nursing and administrator related that the organization has not experienced the level of workforce disruption during Covid-19 pandemic that other facilities have. They attribute this to a good work environment and proximity to mass transportation.

The director of nursing also reported that a formal skin breakdown prevention and monitoring program is in place. Skin breakdown rounds are conducted weekly to provide monitoring and oversight of care.

A social worker was encountered during the tour and was interviewed privately in her office. She related no complaints or patient care issues related to the bankruptcy. The PCO contact information was provided to her and she was asked to contact the PCO if any issues arise. Both she and the administrator indicated that several families had come to them regarding the bankruptcy with questions. They reported that these families were reassured that the restructuring would not be impacting patient care and that there was no plan to close the facility. The potential closure of the facility appeared to be the primary concern of the families.

The PCO interviewed the person responsible for facility management. He related no issues

related to payment for utilities, vendors for repairs, etc. Likewise, the food service director was interviewed and reported no difficulties getting food.

On January 20, 2022, in lieu of an in-person site visits due to Coved prevention recommendations, the PCO conducted a phone interview with the administrator and the director of nursing. They related that, like other facilities, they have been dealing with residents and staff with Covid-19 infections, but that the incidence is decreasing. They report that staff availability has been adequate, and that unlike many other facilities, they have not had to curtail admissions. Both reported no difficulties getting supplies, medications, linen, food, etc. The administrator reported that one new resident's family came to him with concerns about the bankruptcy, but was assured care would not be affected, and seemed satisfied.

### *Complaints*

During the initial site visit, the PCO provided the Debtor with a PCO contact information sheet which he asked to be posted in the facility where the facility survey findings are posted. Since the initial site visit, the PCO has received no calls or emails with patient or employee complaints.

### *Risk Assessment*

This PCO assesses each debtor he is appointed to monitor for level of risk. Based on this level of risk, he plans an appropriate level of monitoring. The PCO assigns the debtor to one of three categories of risk-- low, medium, or high. The level is based on data collected and interviews with management, patients, and staff. This initial determination of level of risk may be adjusted as findings either improve or deteriorate. These three potential levels are outlined below:

- Low-level risk evidenced by transparent reporting, and no observable staffing, supply or quality of care issues that are not readily resolved.

- Mid-level risk evidenced by transparent reporting with some significant observable staffing, supply, or quality issues, or lack of transparent reporting.

- High-level risk evidenced by significant staffing, supply, or quality issues observed, or risk of partial or full closing of services.

Healthcare debtors can move between levels of risk over the course of the bankruptcy, and the risk level will continue to be reassessed with each encounter between the PCO and the facility.

In the case of this Debtor, there appears to be no difficulty currently meeting payroll obligations, nor with obtaining supplies, medications, vendor services, etc. There are no reported or observable staffing, medical records, or quality of care issues. The Debtor and its management have been cooperative, and communication with the PCO appears to be transparent.

Based on the above findings made during this monitoring period, the risk level at this time is determined to be low.

2775880v1 / . / HTRUST

*Monitoring Plan*

Based on the low-level risk determination, the PCO will implement the following monitoring plan for the next 60-day period:

- Monthly on-site tour of the facility and interviews with key staff and residents;
- Review of quality assurance reports from each facility;
- Maintain phone and email hotline posted in facility and investigate any complaints from patients, families, or staff;
- Monitoring of operating reports and other filings in the case for potential red flags;
- Monitor status conferences with attendance periodically as needed or requested by parties; and
- Provide a written report to the Bankruptcy Court submitted at the end of the two months

Consistent with requirements outlined in Federal Rule of Bankruptcy Procedure 2015.1-1, notice of this report will be served on each entity that issues licenses or regulates the debtor. In this case, that is the New York State Department of Health. A copy will also be sent to the New York State Long Term Care Ombudsman.

The PCO will make his next report in sixty (60) days or sooner, if circumstances warrant.

Dated: January 20, 2022
New York, New York

JOSEPH J. TOMAINO, SOLELY IN HIS CAPACITY AS THE COURT APPOINTED PATIENT CARE OMBUDSMAN

_/s/ *Joseph J. Tomaino*___
JOSEPH J. TOMAINO