**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:

HBL SNF, LLC, d/b/a EPIC REHABILITATION
AND NURSING AT WHITE PLAINS,

                              Debtor.

------------------------------------------------------------------------x

Chapter 11

Case No. 21-22623 (SHL)

**OBJECTION OF WHITE PLAINS HEALTHCARE PROPERTIES I, LLC TO MOTION OF SECURITY BENEFIT CORPORATION AND GARFIELD PARK, LLC FOR EITHER (I) A DETERMINATION THAT THE AUTOMATIC STAY DOES NOT APPLY OR (II) RELIEF FROM THE AUTOMATIC STAY**

White Plains Healthcare Properties I, LLC ("WPHP" or the "Landlord"), by and through its undersigned counsel, respectfully submits this objection (the "Objection") to the motion (the "Motion") of Security Benefit Corporation and Garfield Park, LLC (collectively, "Security Benefit") for either (i) a determination that the exercise of their state law and contractual remedies against WPHP, including the commencement of a foreclosure action, does not violate the automatic stay, or (ii) relief from the automatic stay, to the extent necessary, to pursue such remedies against WPHP. For the reasons set forth below, Security Benefit's Motion should be denied.

**PRELIMINARY STATEMENT**

Security Benefit seeks relief from the automatic stay to foreclose against and ultimately auction the Property (defined below), arguing that foreclosure will not have an effect on the Debtor's estate because the Debtor's leasehold interest in the Property supposedly will not be disturbed. Security Benefit's argument fails to account for the lynchpin of the Debtor's entire bankruptcy case: the Debtor's contention that it has the right to exercise a purchase option to buy

the Property for $65 million. Indeed, the Debtor contends that it already has exercised this purchase option and thus claims an exclusive right to buy the Property. The Debtor's claimed right to purchase the Property, though disputed, is a potentially valuable interest that is property of the bankruptcy estate protected by the automatic stay.

While Security Benefit's motion offers unreliable assurances that the Debtor's tenancy will be protected during a foreclosure process, it offers no such assurances with regard to the Debtor's claimed exclusive status as prospective purchaser of the Property. Security Benefit's motion does not once mention the purchase option, because it is hard to imagine a scenario in which the Debtor's claim to have an exclusive right to purchase the Property would be unaffected by a foreclosure.

Further, Security Benefit's argument that the Subordination, Non-Disturbance and Attornment Agreement ("SNDA") will protect the Debtor during a foreclosure sale is misguided. By its terms, the SNDA is inapplicable in circumstances where, as here, the Debtor has failed to perform all terms, covenants and conditions of the Lease (defined below).

Allowing the foreclosure process against the Property to go forward now, while the issues of Lease termination and the purchase option are still being litigated, will only complicate and multiply the issues in the case, rather than contribute to their resolution, as Security Benefit wrongly contends. As a practical matter, proceeding with a foreclosure process at the same time that there is substantial pending litigation concerning Lease termination and the purchase option will only depress the value that the Property could realize in a sale to the detriment of WPHP, the Debtor's single largest creditor.

Moreover, because the Lease obligates the Debtor and the guarantors of the Lease to indemnify WPHP for all losses and costs that arise out of or are attributable, in whole or in part,

to the Debtor's failure to perform under the Lease, the costs associated with any foreclosure litigation, which is a cascading consequence of the Debtor's Lease defaults, will ultimately be borne by the Debtor and the guarantors of the Lease.

Finally, and in the alternative, in the event that Security Benefit's request for relief from the stay is not denied, this Court should sequence adjudication of Security Benefit's lift-stay motion to ensure that the Lease termination issues are resolved first. The hearing on summary judgment on the Lease termination issues is scheduled for March 24, 2022. There is no prejudice to Security Benefit that would result from a brief deferral of its motion to lift the stay.

It is not lost on us that it is odd for WPHP to have to step forward to defend the Debtor's claimed property interests in this case, in a circumstance where the Debtor itself seems to be disclaiming the protections offered to it by the automatic stay. But there is a simple explanation for this unusual turn of events. As has been true from the outset, chaos and complexity serve the Debtor's tactical interests in avoiding resolution of the Lease litigation, while at the same time the Debtor looks for avenues to put extreme financial pressure on WPHP. Shared antagonism towards WPHP has made strange bedfellows of the Debtor and Security Benefit in this instance (and others). Ultimately, however, resolution of the Lease litigation should be prioritized above all else, because therein lies the pathway towards the successful conclusion of this bankruptcy proceeding.

## BACKGROUND

### A.    The Relationship Between WPHP, Security Benefit, and the Debtor

1.    WPHP is the owner of the real property at 116-120 Church Street, White Plains, New York, on which WPHP built a brand new, state-of-the-art, 160-bed skilled nursing facility (the "Facility" or the "Property").

3

2.     To fund construction of the Facility, WPHP entered into the Construction Loan Agreement (the "Loan Agreement"), dated as of August 18, 2017, by and among WPHP, as borrower, and Security Benefit Life Insurance Company, as lender ("Security Benefit"), and Security Benefit Corporation, as agent, pursuant to which Security Benefit agreed to loan up to $38,500,000 to WPHP (the "Loan").

3.     In 2017, WPHP, as Landlord, and the Debtor, as tenant, entered into the amended and restated Lease of the Real Property, dated as of November 19, 2015 (the "Lease").  A copy of the Lease is attached hereto as Exhibit A.

4.     Among other provisions, Section 3.8 of the Lease provides an option for the Debtor to purchase the Facility (the "Purchase Option") that states, in pertinent part:

> Commencing on the latter of (i) the first day after the Commencement Date and (ii) 24 months from the date of the closing of the Original Mortgage, and ending on the last day of the fifteenth Lease Year of the Lease, Tenant shall have the option to purchase the Leased Premises from Landlord for a purchase price of $65,055,000 by giving notice of its exercise of the Option to Purchase including a proposed closing date . . . .

Ex. A (Lease § 3.8).

5.     On September 30, 2019, HBL took possession of the Facility and the Lease term commenced.  HBL has been the operator of the Facility ever since.

**B.     The Lease Termination and Default Under the Loan Agreement**

6.     Immediately upon commencement of the Lease term, the Debtor defaulted under the Lease and failed to cure numerous breaches.

7.     Ultimately, on January 7, 2020, due to the Debtor's failure to cure the Lease defaults, WPHP sent Debtor a notice of default and election to terminate the Lease upon five days' notice and accelerate all rents due for the balance of the lease term.

8.     The Debtor's Lease defaults include, among other things, the failure to provide security deposits to WPHP in the total amount of $5,300,000 consisting of: (i) an unconditional

4

letter of credit or cash in the amount of $3,700,000; and (ii) an additional $1,600,000 that was being held in the Debtor's account during construction of the Facility and should have been, but never was, delivered to WPHP prior to commencement of the Lease.

9. On September 18, 2020, WPHP commenced an action in New York state court against the Debtor regarding the defaults and consequent termination of the Lease.

10. On September 17, 2021, notwithstanding the Debtor's numerous continuing Lease defaults and pending litigation with WPHP regarding those defaults and the Lease termination, the Debtor sent WPHP a notice purporting to exercise the Purchase Option. A copy of the September 17, 2021 letter is attached hereto as Exhibit B. On September 24, 2021, WPHP sent a letter in response, rejecting the Debtor's attempt to exercise the Purchase Option as a result of the numerous defaults and the fact that the Lease had already been terminated. A copy of the September 24, 2021 letter is attached hereto as Exhibit C.

11. On November 3, 2021, the litigation between the Debtor and WPHP was removed by the Debtor and is now pending before this Court, Case No. 21-07096 (the "Adversary Proceeding").

12. WPHP filed a motion for summary judgment regarding the lease termination and other issues while the litigation was still pending in state court. The parties fully briefed WPHP's summary judgment motion. After the Adversary Proceeding was removed to this Court, the Debtor requested permission to take limited discovery in connection with the fully briefed summary judgment motion, which the Court permitted. With the exception of a few documents identified during depositions that the Debtor may request, discovery is now complete, the parties have agreed to a supplemental briefing schedule, and the hearing on the summary judgment motion before this Court is set for March 24, 2022.

13. As a result of HBL's numerous defaults under the Lease, WPHP was unable to refinance the Loan to Security Benefit on its maturity date (August 1, 2020). Primarily, due to the Debtor's Lease defaults, WPHP was unable to obtain the estoppel certificate required for any refinancing transaction, and thus it could not refinance and repay the Security Benefit loan in full.

14. Security Benefit has sent notices of default to WPHP in connection with the Loan Agreement.

15. Security Benefit then commenced litigation against WPHP, attempting to foreclose on the Facility, but the actions were discontinued because of New York State's moratorium on such actions due to the COVID-19 global pandemic.

16. Now that the moratorium has expired, Security Benefit seeks permission to commence another proceeding against WPHP to foreclose on the Property and, ultimately, to sell the Property at a public auction.

    C.    **The Debtor's Bankruptcy**

17. On November 1, 2021, HBL filed a voluntary petition for relief under Subchapter V of Chapter 11 of the United States Bankruptcy Code (the "HBL Bankruptcy") in the United States Bankruptcy Court for the Southern District of New York.

18. The Debtor has represented that it is "financially and operationally sound," but claims that it was forced to file for bankruptcy because of the lawsuit with WPHP about termination of the Lease. Bankr. Dkt. 3 (Jozefovic Decl. ¶ 26). If it were to be determined that the Lease was terminated, then the Debtor would ultimately be replaced as operator of the Facility under the oversight of the New York State Department of Health, and the Debtor's $65 million Purchase Option would be extinguished.

19. The Debtor has expressly stated that it intends "to fund its plan of reorganization by obtaining exit financing and/or exercising its right to purchase the real property subject of its Lease." Bankr. Dkt. No. 49 (Status Report ¶ 4).

20. The Debtor also has filed a motion seeking an extension of its time to file a plan of reorganization because it is "unable to prepare a plan of reorganization" without clarity on whether it has the right to exercise the Purchase Option under the Lease. Bankr. Dkt. 84 (Extension Motion ¶¶ 11,12).

21. Exercise of the Purchase Option is the only path to reorganization that has been articulated by the Debtor, though the Debtor has not made any showing as to how it would secure the funding needed to exercise the Purchase Option.

22. Security Benefit's motion for relief from the stay to proceed with a foreclosure action against the Property does not address the effect of any foreclosure sale on the Debtor's claim to have the right to exercise the Purchase Option.

## OBJECTIONS

I. **THE AUTOMATIC STAY APPLIES BECAUSE SECURITY BENEFIT'S FORECLOSURE WILL DIRECTLY IMPACT THE DEBTOR'S PROPERTY AND STATED PLAN OF REORGANIZATION**

23. Security Benefit argues in its Motion that the automatic stay does not apply because there will be no impact on the Debtor's leasehold interest in the Facility.[1] Bankr. Dkt. 92 (Motion ¶¶ 21-25). In stating that the Debtor's leasehold interest will be undisturbed by a

---

[1] Security Benefit cites cases for the proposition that foreclosure actions against a non-debtor are not impacted by the automatic stay where the debtor-tenant is not named as a party. Bankr. Dkt. 92 (Motion ¶¶ 22, 23). These cases are inapposite because none of them addresses a situation, like this one, where the Debtor's entire bankruptcy plan turns on its ability to exercise a purchase option for the property that is the subject of the foreclosure action. Moreover, the Debtor here purports to have already exercised its purchase option for the Property. In other words, the Debtor's position here is not solely that of tenant. As importantly, the Debtor claims to have a right to purchase the Property for a specified price.

7

foreclosure sale, Security Benefit relies on the Subordination, Non-Disturbance and Attornment Agreement ("SNDA"), which states that a purchaser at a foreclosure sale will take the Property subject to the Lease provided that the Debtor observes and performs "all of the terms, covenants and conditions of the Lease."  Bankr. Dkt. 92-1 (Motion Ex. A § 3(b)); *see also* Bankr. Dkt. 92 (Motion ¶ 24).  However, the Debtor has not performed its obligations under the Lease, and thus it is wrong to assume that any purchaser at a foreclosure sale has any obligation to leave the Debtor's leasehold interest intact as a condition of the sale.  Thus, a foreclosure sale will most likely have an adverse impact on the Debtor's Lease and the Debtor's ability to continue operation of its business and exercise its Purchase Option (assuming the Lease has not been terminated).  The most likely purchaser at auction would be a nursing home operator seeking the real estate and the operations of the facility.  Any such purchaser will have no interest in the Debtor's continued tenancy.

24.     But whether the Debtor's leasehold interest will be impacted by a foreclosure sale is only part of the story.  Absent from Security Benefit's argument as to why the stay does not apply is any mention of the fact that, in addition to being the tenant in possession of the Facility, the Debtor has also purportedly exercised its option to purchase the Facility under the Lease.  And the Debtor's exercise of its purchase option is central to its professed path of reorganization. Bankr. Dkt. No. 49 (Status Report ¶ 4); Bankr. Dkt. 84 (Motion ¶¶ 11,12).

25.     It is fundamental that the automatic stay "is broadly written and broadly construed" and applies to "most actions against the debtor, the debtor's property and any property of the estate."  *Grinspan v. Grinspan (In re Grinspan)*, 597 B.R. 725, 733 (Bankr. E.D.N.Y. 2019) (internal quotation omitted).  As relevant here, the automatic stay applies to, inter alia, "(3) any act to obtain possession of property of the estate or of property from the estate

8

or to exercise control over property of the estate; (4) any act to create, perfect, or enforce any lien against property of the estate; [and] (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title." 11 U.S.C.A. § 362.

26. "[C]ourts have consistently said that options or contingent interests are property of the bankruptcy estate." *Harsh Inv. Corp. v. Bialac (In re Bialac)*, 712 F.2d 426, 431 (9th Cir. 1983) (automatic stay prohibited creditor from foreclosing on property in which debtor had right of redemption, even though property was owned by non-bankrupt individuals). "The term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or enjoyment must be postponed." *Id.* (quoting *Segal v. Rochelle,* 382 U.S. 375, 379 (1966)).

27. "If action taken against the non-bankrupt party would inevitably have an adverse impact on property of the bankrupt estate, then such action should be barred by the automatic stay." *Steakhouse, Inc. v. Rockefeller Grp. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987); *see also I & J Disposal of W. N.Y., Inc. v. Town of Albion (In re Albion Disposal, Inc.)*, 217 B.R. 394, 408 (W.D.N.Y. 1997) (holding that "'estoppel rights'— *i.e.,* a plaintiff's 'right' to have the defendant estopped from doing something" was property of a debtor's estate and seeking to terminate those rights was "an act to exercise control over property of the estate" subject to the automatic stay).

28. Security Benefit's anticipated foreclosure action seeking to sell the Facility to the highest bidder will have an adverse impact on the Debtor's claimed option to purchase the facility and is thus subject to the automatic stay. Because of the claimed Purchase Option, the Debtor is a necessary party to the foreclosure, and Security Benefit has failed to articulate how it

9

intends to accomplish a foreclosure sale of the Facility without naming the Debtor and without adversely impacting the Debtor's claimed option to purchase the very same Facility. *See, e.g., Condon v. Murphy*, 34 N.Y.S.2d 390 (N.Y. Sup. Ct. 1942) (holding that the holder of an option to purchase the mortgaged premises is a necessary party to the foreclosure of a mortgage whether the option is recorded or not where the plaintiff had knowledge of its existence); *see also Danzy v. Nia Abstract Corp.*, 7 Misc. 3d 1025(A), at *5, 801 N.Y.S.2d 232 (N.Y. Sup. Ct. 2005) (holding that since defendant had been served and defaulted in the foreclosure action, its interest in property, "including its option to purchase the property at the end of the lease had been terminated by the judgment of foreclosure and sale.").

29. Security Benefit's foreclosure action and the Adversary Proceeding impacting the Debtor's purported exercise of the Purchase Option simply cannot proceed in tandem without adversely impacting the Debtor's property.

## II.   SECURITY BENEFIT IS NOT ENTITLED TO RELIEF FROM THE AUTOMATIC STAY

30. Security Benefit's request that this Court grant relief from the stay so that it may commence foreclosure proceedings for the purpose of selling the Facility should be denied.

31. As set forth in the Motion, the Second Circuit considers a variety of factors in determining whether to allow litigation to proceed in another forum, Bankr. Dkt. 92 (Motion ¶ 28), and all factors applicable here weigh against lifting the stay.

32. With regard to the first factor—whether relief would result in a partial or complete resolution of the issues—Security Benefit inexplicably states that stay relief would result in a "complete resolution of the issues with respect to Security Benefit's right to foreclose on the Property." Bankr. Dkt. 92 (Motion ¶ 30). Security Benefit does not indicate how it would accomplish "complete resolution" without addressing the Debtor's claimed purchase option.

This Court will soon decide whether the Lease was terminated prior to the Debtor's purported exercise of its purchase option, and thus whether the Debtor has an option that it can exercise. Security Benefit says nothing about how it can "completely resolve" sale of the Property without resolution of whether or not the Debtor validly exercised its right to purchase the same Facility.

33. Security Benefit's argument as to the second factor—lack of any connection with or interference with the bankruptcy case—is equally specious. Security Benefit states that foreclosure proceedings "would not interfere with Debtor's bankruptcy case." Bankr. Dkt. 92 (Motion ¶ 31). But that is not an accurate assessment. If Security Benefit moves forward with the foreclosure proceeding with the Debtor's consent, Security Benefit's anticipated foreclosure sale will potentially extinguish the Debtor's claimed purchase option, thereby eradicating any potential path to its stated plan of reorganization. Alternatively, any effort by Security Benefit to sell the Property in a foreclosure sale while the Debtor is litigating its right to exercise the purchase option before this Court will also directly interfere with the bankruptcy proceeding and the pending Adversary Proceeding between the Debtor and WPHP.

34. As to the fourth factor—whether a specialized tribunal with the necessary expertise has been established to hear the cause of action—WPHP does not contest the state court's expertise in handling foreclosure actions. However, WPHP states that the foreclosure action should be subject to the automatic stay at least until this Court determines the lease termination issue. It is not an issue of the appropriate "tribunal" to adjudicate the foreclosure, but rather an issue of timing and interference with the bankruptcy proceeding.

35. The sixth factor—whether the action primarily involves third parties—also weighs against lifting the stay. Security Benefit erroneously contends that the foreclosure action "only involves third parties" because (i) the Debtor's leasehold interest would not be affected;

and (ii) the Property "is not property of the Debtor's estate." Bankr. Dkt. 92 (Motion ¶ 33). But the Debtor's purported Purchase Option, which it claims to have exercised, *is* property of the estate and is inextricably linked to Security Benefit's effort to commence a foreclosure proceeding and sell the Property. In addition, pursuant to the Security Agreement, Assignment of Leases and Rents and Fixture Filings between and among Security Benefit, WPHP, and the Debtor (the "Security Agreement"), the Debtor has pledged certain collateral directly to Security Benefit—namely the furniture, fixtures, and equipment (the "FF&E") "to the extent, and only to the extent, it is a part of the Mortgaged Property or attached to, used in connection with, or arising from the ownership, leasing, management or operation of the Mortgaged Property." Bankr. Dkt. 58-4 (Security Agreement § 2.1). Security Benefit's Motion omits any mention that the foreclosure proceeding may also impact the Debtor's FF&E.

36.     In connection with the seventh factor—whether litigation in another forum would prejudice the interests of other creditors—Security Benefit argues that because there will be "no impact" on Debtor's leasehold interest, the "Debtor will be able to continue to operate its business and pursue its reorganization efforts for the benefit of all of its creditors." Bankr. Dkt. 92 (Motion ¶ 34). Since Debtor's reorganization efforts are premised on its ability to exercise its purported option to purchase the Property, Security Benefit's efforts to have the Property sold at auction to a third-party in connection with a foreclosure proceeding certainly will have a negative impact on the Debtor's reorganization. In addition, the Debtor's claim to protection under the SNDA is unlikely to survive due to the Debtor's defaults under the Lease. Moreover, WPHP is by far the Debtor's largest creditor. If Security Benefit endeavors to auction the Property without regard to the Debtor's professed purchase option, it will make the Property unsaleable because of the pending litigation regarding Debtor's Purchase Option and the

12

resulting taint on the Property's title. At a minimum, a foreclosure sale under the cloud of litigation over the Debtor's Purchase Option will significantly depress the value of the sale to the detriment of WPHP, the Debtor's largest creditor.

37. The tenth factor—the interests of judicial economy and the expeditious and economical resolution of litigation—also significantly weighs in favor of not lifting the stay. Adjudication of the lease termination issue, which will be heard by this Court in March, will significantly define the landscape of the Debtor's bankruptcy and the future of the Property. Whether or not the Debtor holds the Lease, and whether the Debtor has a right to Purchase the Property, are critical issues that are currently being litigated. It would be a waste of judicial and party resources to engage in yet another litigation at the same time regarding a competing effort by Security Benefit to auction the very same Property.

38. Finally, the Debtor is obligated, under Section 9.1 of the Lease, to indemnify WPHP from any "claims, losses, costs, penalties, damages, charges and/or expenses (including reasonable attorneys' and consultants' fees and expenses) . . . arising out of or attributable in whole or in part to . . . (iii) any failure of Tenant in any respect to comply with or perform any term, condition, covenant, requirement and/or provision of this Lease, or a breach of this Lease by Tenant . . . ." Ex. A (Lease § 9.1). Thus, all costs associated with WPHP's inability to refinance the Loan and repay Security Benefit in full as a result of Debtor's defaults will be the subject of WPHP's proof of claim and will ultimately be borne by the Debtor and the guarantors of the Lease. Allowing additional litigation that will deplete the Debtor's estate amplifies the waste of resources associated with allowing the foreclosure litigation to proceed.

### III. AT A MINIMUM, THE STAY SHOULD NOT BE LIFTED UNTIL AFTER THIS COURT DETERMINES THE LEASE TERMINATION MOTION

39. The Debtor filed for bankruptcy as a litigation tactic seeking to delay adjudication of the lease termination issue and, presumably, to avoid an adverse decision likely to be issued by the state court.

40. Once the Debtor removed the Adversary Proceeding, it once again sought to delay adjudication by seeking discovery in connection with a motion that had already been fully briefed.  The parties have now completed that limited discovery (except for the few documents mentioned earlier that Debtor may request) and the lease termination is scheduled to be heard by this Court on March 24, 2022.

41. All of WPHP's remedies, as Landlord, have been put on hold pending adjudication of the lease termination issue.  WPHP is powerless to work with the Department of Health to put a new tenant in the facility who will respect and comply with the terms of a lease, evict the Debtor, obtain financing to pay off the loan to Security Benefit, or do anything at all to protect its interests in the Facility.

42. At the same time, the Debtor has tried at every turn to delay adjudication of the dispute with WPHP, it has gone out of its way to assist Security Benefit in enforcing its rights against WPHP, in order to put extreme financial pressure on WPHP and prevent it from having the wherewithal to litigate the lease termination question to judicial resolution.

43. First, the Debtor attempted to insert a paragraph in the DIP Order the night before the DIP Hearing that would have rerouted all rent payments directly to Security Benefit, which would have left WPHP with no payment at all for the Debtor's continued use of the Facility.

44. Now, the Debtor "consents" to Security Benefit's motion to move forward with foreclosure without any consideration as to the impact on the Debtor's own purported right to

purchase the Facility. This omission is puzzling since the Purchase Option is so central to the Debtor's reorganization that it claims to be unable to submit a plan within the required period of time because this Court has not yet decided whether there is a valid Lease and Purchase Option.

45.  At a minimum, this Court should refuse to lift the automatic stay until the Lease termination issue has been decided. It is then, and only then, that there will be clarity as to who holds the Lease, whether the Debtor has an option to purchase the Facility for $65 million, or whether the Facility can be sold to the highest bidder at a foreclosure sale.

46.  There is no prejudice to Security Benefit to delay foreclosure for a brief time until the Lease termination issue is decided by this Court. If the Court decides that the Lease has not been terminated, and the Debtor exercises its Purchase Option, then Security Benefit will be paid in full because the Purchase Option price of $65 million is far in excess of the $43 million that Security Benefit claims to be owed under the Loan. If the Court decides that the Lease was terminated, WPHP has already provided evidence of its intention to refinance the Property.

47.  Thus, to ensure an orderly bankruptcy process that protects the Debtor's claimed interests in the Property until the Lease termination issue is adjudicated, the automatic stay should remain in place at least until this Court renders a decision on the Lease termination issue.

## CONCLUSION

48. For the foregoing reasons, WPHP requests that (i) the Court deny Security Benefit's motion to lift the automatic stay, and (ii) grant such other and further relief as the Court deems just and proper.

Dated: January 20, 2022
       New York, New York

Respectfully submitted,

BINDER & SCHWARTZ LLP

/s/ Eric B. Fisher
Eric B. Fisher
Lindsay A. Bush
366 Madison Avenue, 6th Floor
New York, NY 10017
Tel.: (212) 510-7272
Email: efisher@binderschwartz.com
Email: lbush@binderschwartz.com

-and-

DELBELLO DONNELLAN WEINGARTEN WISE &
WIEDERKEHR, LLP
Alfred E. Donnellan
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
Tel.: (914) 681-0200
Email: aed@ddw-law.com

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN,
FORMATO, FERRARA, WOLF & CARONE, LLP
Robert A. Spolzino
81 Main Street, Suite 306
White Plains, New York 10601
Tel.: (914) 607-7010
Email: RSpolzino@Abramslaw.com

*Counsel for White Plains Healthcare Properties I, LLC*