**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

In re                                                                              :        Chapter 11
                                                                                        :
HBL SNF, LLC, d/b/a EPIC REHABILITATION          :        Case No. 21-22623 (SHL)
AND NURSING AT WHITE PLAINS,                           :
                                                                                        :
                                                 Debtor.          :
-----------------------------------------------------------------x

## DEBTOR'S THIRD AMENDED CHAPTER 11 SUBCHAPTER V PLAN OF REORGANIZATION

**THE DEBTOR IN THIS CASE IS A SMALL BUSINESS. THE BANKRUPTCY COURT HAS CONDITIONALLY FOUND THAT THIS PLAN PROVIDES ADEQUATE INFORMATION AS REQUIRED UNDER 11 U.S.C. § 1125(a)(1). AS A RESULT, THE DEBTOR MAY DISTRIBUTE THIS PLAN WITHOUT FILING A DISCLOSURE STATEMENT. IF A PARTY IN INTEREST FILES AN OBJECTION TO THIS PLAN BASED ON LACK OF ADEQUATE INFORMATION, THE BANKRUPTCY COURT SHALL MAKE A FINDING REGARDING COMPLIANCE WITH 11 U.S.C. § 1125(a)(1) AT OR BEFORE THE HEARING ON CONFIRMATION OF THIS PLAN.**

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Tracy L. Klestadt
Stephanie R. Sweeney
Christopher Reilly

*Attorneys for the Debtor and Debtor in Possession*

Dated: New York, New York
          April 10, 2025

## TABLE OF CONTENTS

BACKGROUND ...........................................................................................................................1

    I.       Nature of the Debtor's Business and Corporate Structure .........................................1

    II.     Circumstances Leading to Filing the Chapter 11 Case ..............................................1

    III.    The Debtor's Real Property Lease and the Landlord Litigation................................2

    IV.    Settlement of the Landlord Litigation and New Lease Agreement ...........................3

ARTICLE I – Definitions and Rules of Interpretation .....................................................................4

    A.     Definitions..................................................................................................................4

    B.     Rules of Interpretation ............................................................................................10

ARTICLE II – Summary of Plan Distributions .............................................................................11

ARTICLE III – Treatment of Administrative Claims.....................................................................11

   3.1    Administrative Claims .............................................................................................11

ARTICLE IV – Treatment of Priority Tax Claims ........................................................................12

   4.1    Priority Tax Claims..................................................................................................12

ARTICLE V – Classification of Claims and Interests....................................................................12

   5.1    Designation of Classes Pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy
          Code .........................................................................................................................12

   5.2    Allowed Amount in a Particular Class.....................................................................12

   5.3    Classes.....................................................................................................................12

ARTICLE VI – Treatment of Claims and Interests .......................................................................13

   6.1    Class 1: Secured Claims...........................................................................................13

      (a) Treatment ...............................................................................................................13

      (b) Full Settlement .......................................................................................................13

   6.2    Class 2: Priority Unsecured Claims .........................................................................14

      (a) Treatment ...............................................................................................................14

(b) Full Settlement ................................................................................................14

6.3    Class 3: Landlord General Unsecured Claim.................................................14

(a) Treatment .........................................................................................................14

(b) Full Settlement ................................................................................................14

6.4    Class 4: General Unsecured Claims Not Otherwise Classified .....................14

(a) Treatment .........................................................................................................14

(b) Full Settlement ................................................................................................15

6.5    Class 5: Allowed Claim of HHHW ...............................................................15

(a) Treatment .........................................................................................................15

(b) Full Settlement ................................................................................................15

6.6    Class 6: Interests ............................................................................................15

(a) Treatment .........................................................................................................15

(b) Full Settlement ................................................................................................15

ARTICLE VII – Identification of Classes of Claims and Interests Impaired and Unimpaired
       Under the Plan..............................................................................................16

7.1    Classes of Claims Impaired by the Plan and Entitled to Vote .......................15

7.2    Acceptance by an Impaired Class of Claims .................................................16

7.3    Classes of Claims and Interests Unimpaired and Conclusively Presumed to Accept
       the Plan..........................................................................................................16

7.4    Confirmation Pursuant to Section 1191 of the Bankruptcy Code ("Cram Down")........16

ARTICLE VIII – Controversy with Respect to Impairment ........................................16

ARTICLE IX – Unexpired Leases and Executory Contracts ........................................16

9.1    Assumption and Rejection of Executory Contracts and Leases .....................16

9.2    Bar Date for Rejection Damage Claims..........................................................17

ARTICLE X – Means of Implementing the Plan ..........................................................17

10.1   Continuation of Reorganized HBL ................................................................17

10.2    Approval of the Settlement Transactions and Documentation in Respect Thereof.........18

10.4    Satisfaction of DIP Loan and Exit Financing ...............................................................18

10.5    Funding .........................................................................................................................18

10.6    Execution of Documents ...............................................................................................19

10.7    Transfer Taxes ..............................................................................................................19

10.8    Recording of Documents ..............................................................................................19

10.9    Transactions on Business Days.....................................................................................19

10.10   Preservation and Vesting of Claims, Rights, Demands, and Causes of Action..............19

ARTICLE XI – Distributions; Disputed Claims Reserve .............................................................20

11.1    Timing of Distributions Due Under Plan ......................................................................20

11.2    Manner of Distributions ...............................................................................................20

11.3    Cash Payments ..............................................................................................................20

11.4    Disputed Claims Reserve ..............................................................................................20

11.5    No Interest .....................................................................................................................21

11.6    Withholding Taxes ........................................................................................................21

11.7    Undeliverable or Unclaimed Distributions ..................................................................21

11.8    Post-Effective Date Services by the Debtor's Professionals ........................................22

ARTICLE XII – Procedures for Resolving Disputed Claims.......................................................22

12.1    Objections to Claims.....................................................................................................22

12.2    Payments and Distributions with Respect to Disputed Claims.....................................22

12.3    Claims Reserve – Estimation ........................................................................................23

12.4    Distributions After Allowance of Disputed Claims......................................................23

12.5    Distributions After Disallowance of Disputed Claims .................................................23

12.6    Setoffs and Recoupments ..............................................................................................23

12.7    Provider Relief Fund.....................................................................................................23

iii

ARTICLE XIII – General Compromise and Settlement; Injunction, Release and Exculpation .......24

13.1    General Compromise and Settlement ...............................................24

13.2    Injunction .................................................................................24

13.3    Release ....................................................................................24

13.4    Exculpation ..............................................................................25

ARTICLE XIV – Conditions Precedent to Confirmation and the Effective Date...........................25

14.1    Conditions Precedent to Confirmation of the Plan .........................25

14.2    Conditions Precedent to the Effective Date ..................................25

ARTICLE XV – Discharge of Debt; Termination of Subchapter V Trustee Services; Discharge of Patient Care Ombudsman; Continuation of Stays .......................................26

15.1    Discharge of Debt and Termination of Subchapter V Trustee Services .........................26

15.2    Continuation of Stays...............................................................26

15.3    Discharge of Patient Care Ombudsman .......................................26

ARTICLE XVI – Miscellaneous Provisions...............................................27

16.1    Bankruptcy Court to Retain Jurisdiction......................................27

16.2    Binding Effect of the Plan.........................................................28

16.3    Fractional Cents ......................................................................28

16.4    Successor and Assigns ..............................................................28

16.5    Blank Ballots...........................................................................28

16.6    Authorization of Corporate Action .............................................28

16.7    Withdrawal of the Plan .............................................................28

16.8    Captions .................................................................................28

16.9    Method of Notice .....................................................................28

16.10   Amendments and Modifications to Plan.......................................30

16.11   Section 1125(e) of the Bankruptcy Code .....................................30

iv

**Exhibits**

| |
|---|
| Exhibit A – Stipulation of State Court Litigation and Escrow Agreement |
| Exhibit B – New Lease Agreement |
| Exhibit C – Projections |
| Exhibit D – Liquidation Analysis |

HBL SNF, LLC, d/b/a Epic Rehabilitation and Nursing at White Plains (the "Debtor") hereby proposes the following Third Amended Plan of Reorganization pursuant to the provisions of Subchapter V of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

### I.    Nature of the Debtor's Business and Corporate Structure

The Debtor is a 160-bed skilled nursing and rehabilitation facility located at 120 Church Street, White Plains, New York, which opened in late 2019. The Debtor is approximately 95% occupied and maintains a staff of over 250 employees, including registered nurses, therapists and other healthcare professionals. The Debtor offers both short-term and long-term care to its patients and residents and provides an array of healthcare services, including neurological, respiratory, orthopedic, occupational, psychiatric, and many other medical and rehabilitative services.  The annual gross revenue of the Debtor for fiscal year 2020 was over $10 million.

The Debtor is a New York registered limited liability company formed on or about August 14, 2012. As of the Petition Date, the Debtor's members were Westchester Health Care Properties I, LLC ("WHCP") (51%), HHH Liquidation Trust (successor to Hebrew Hospital Home of Westchester, Inc.) ("HHHW") (39%),[1] and Bethel Nursing Home Company, Inc. ("Bethel") (10%).[2] Lizer Jozefovic, the Debtor's Chief Executive Officer, Mark Neuman, the Debtor's Chief Financial Officer, and Danielle Feminella, the Debtor's Vice President, are the officers of the Debtor. The Debtor is one of a family of rehabilitation and long-term care facilities operated through Epic Healthcare Management, LLC along the east coast of the United States, and one of six such facilities owned, directly or indirectly, by Mr. Jozefovic and Mr. Neuman throughout New York's Westchester County, Hudson County and Orange County.

### II.    Circumstances Leadings to Filing the Chapter 11 Case

Although the Debtor is generally financially and operationally sound, it was forced to file the Chapter 11 Case as a result of litigation commenced by its landlord, White Plains Healthcare Properties I, LLC ("WPHP" or the "Landlord"), captioned *White Plains Healthcare Properties I, LLC v. HBL SNF, LLC, et al.*, Index No. 60278-20 (N.Y. Sup. Ct. 2020) (the "Landlord

---

[1] HHHW is a debtor in a chapter 11 case pending before the Bankruptcy Court that was jointly administered with the cases of its affiliated debtors under Case Number 15-11158 (MEW) (Bankr. S.D.N.Y.), entitled *In re HHH Choices Health Plan, LLC, et al*. A plan of reorganization for HHHW and its affiliated debtors was confirmed on November 2, 2017. The jointly administered cases, with the exception of HHHW's case, were closed, and a final decree was entered, on February 21, 2024 [Case No. 15-11158, Dkt. No. 1204]. HHHW's case remains open under Case Number 16-10028 (MEW) pending further order of the Court.

[2] HHHW and Bethel had exercised put rights on December 27, 2019 pursuant to the terms of the Operating Agreement of HBL SNF, LLC dated February 1, 2017, pursuant to which their membership interests in the Debtor were tendered to WHCP.  This tender remained unfulfilled as of the Petition Date, necessitating the consent of HHHW and Bethel to the commencement of the Chapter 11 case by the Debtor.  As discussed in more detail below, HHHW has filed a proof of claim against the Debtor, which shall be an Allowed Claim in the sum of $2,376,416. Bethel filed a proof of claim in the sum of $534,694; this Claim shall be disallowed, and Bethel shall retain its 10% ownership interest in Reorganized HBL post-Effective Date.

Litigation"), which threatened to terminate the Debtor's real estate lease for its operating premises.

On November 1, 2021, the Debtor filed a voluntary petition for relief before the Bankruptcy Court for the Southern District of New York under Subchapter V of Chapter 11 of the Bankruptcy Code. On November 2, 2021, Heidi J. Sorvino, Esq. was appointed as Subchapter V Trustee in the Chapter 11 Case [Dkt. No. 15]. On November 5, 2021, the Bankruptcy Court directed appointment of a patient care ombudsman pursuant to Section 333(a) of the Bankruptcy Code [Dkt. No. 25]. On November 21, 2021, Joseph J. Tomaino was appointed as the patient care ombudsman in the Chapter 11 Case [Dkt. No. 46].

On November 8, 2021, the Debtor removed and transferred the Landlord Litigation to the Bankruptcy Court [Adv. Pro. No. 21-07096, Dkt. No. 1].

### III.     The Debtor's Real Property Lease and the Landlord Litigation

Prior to the Petition Date, the Debtor entered into that certain Amended and Restated Operating Lease, dated November 19, 2015 (as amended from time to time, together with all schedules and exhibits thereto, the "Lease"), by and between the Debtor, as tenant, and WPHP, as landlord, with respect to the real property on which the Debtor's business is operated, located at 116-120 Church Street, White Plains, New York (the "Premises").   A copy of the Lease was filed with the Bankruptcy Court as Exhibit F to the Debtor's Notice of Filing of Exhibits dated December 6, 2021 [Dkt. No. 58].

The Debtor entered into certain related agreements, including (i) that certain Development Agreement, dated as of November 19, 2015, between the Debtor, as operator/tenant, and the Landlord, as developer, for the construction and finance of the Debtor's facility on the Premises, and (ii) that certain Security Agreement, Assignment of Leases and Rents and Fixture Filing (Operating Lease), dated as of August 18, 2017, by and among the Debtor, as operator, Security Benefit Corporation, as agent for Security Benefit Life Insurance Company, as lender, and the Landlord, as borrower.

On May 20, 2022, the Bankruptcy Court issued its Memorandum of Decision [Adv. Pro. No. 21-07096, Dkt. No. 51] (the "Lease Decision") holding, among other things, that the Lease was terminated prior to the Petition Date. The Bankruptcy Court's Order effectuating the Lease Decision was entered on June 29, 2022 [Adv. Pro. No. 21-07096, Dkt. No. 61].

On June 8, 2022, in the context of a pending state court foreclosure proceeding with respect to the Premises commenced against the Landlord by its lender, captioned *Garfield Park, LLC v. White Plains Healthcare Properties I, LLC et al.*, Index No. 5701/2022 (the "State Court Action"), the New York State Supreme Court Westchester County (the "State Court") entered an order appointing Ms. Theresa A. Driscoll as temporary receiver of the Premises (the "Receiver").

Following issuance of the Lease Decision and appointment of the Receiver, the parties entered into mediation in an effort to achieve a global settlement of all issues concerning the Premises. The Debtor has remained current on monthly payment of rent in the amount of

$506,096.50 pursuant to the Lease and consistent with applicable orders of the Bankruptcy Court and State Court.

## IV.    Settlement of the Landlord Litigation and New Lease Agreement

The parties' protracted settlement discussions culminated in the dismissal of pending State Court litigation (see **Exhibit A)**, and the ability of Reorganized HBL to remain in possession of the Premises and continue uninterrupted operation of its business upon emergence from this Chapter 11 Case.

Subject to approval by the Bankruptcy Court in the Confirmation Order, the Debtor has agreed to a new lease (the "New Lease Agreement") to be entered into by and among the Landlord, as lessor, and Reorganized HBL, as tenant, substantially in the form attached hereto as **Exhibit B**. Pursuant to the New Lease Agreement, Reorganized HBL will rent the Premises from the Landlord for a period of 20 years with an initial monthly rental of $575,000.

The consummation of Reorganized HBL's entry into the New Lease Agreement, and the settlement and release of all claims pursuant to the Settlement Term Sheet (collectively, the "Settlement Transactions"), shall occur substantially contemporaneously upon the Effective Date of this Plan. As set forth in the Settlement Term Sheet, upon consummation of the Settlement Transactions, (i) all disputes among the Debtor, the Landlord and their respective principals (including any personal guarantees and the Landlord General Unsecured Claim) shall be automatically released and settled and any and all collateral released, and the Landlord Litigation shall be dismissed with prejudice, and (ii) the Allowed Secured Claim of Garfield Park shall automatically be deemed satisfied and released.

The Debtor believes that the terms of the Settlement Transactions are fair and equitable and that entry into the New Lease Agreement and the other documents in respect of the Settlement Transactions by the parties thereto is in the best interests of the Debtor, its estate and all creditors. The New Lease Agreement and Settlement Transactions are the product of protracted good-faith, arms-length negotiations among the Debtor, the Landlord, the other parties in interest and their respective representatives. By entry into the New Lease Agreement and related Settlement Transactions, the Debtor will obtain full and final resolution of the Landlord Litigation and related disputes and remain in possession of the Premises in order to ensure the continued operation of its skilled nursing facility and continuity of care for its residents.

## ARTICLE I

## Definitions and Rules of Interpretation

### A.    Definitions.

For the purposes of this Plan, the following terms shall have the respective meanings set forth below (such meanings to be equally applicable to the singular and plural forms of the terms defined, unless the context otherwise requires):

    1.1    "Administrative Claims" shall mean all costs and expenses of administration of

the Chapter 11 Case Allowed under Section 503(b) or 330(a) of the Bankruptcy Code and that are entitled to priority under Section 507(a)(2) of the Bankruptcy Code.

1.2     "Allowed" shall mean a Claim or Interest or any portion thereof that (i) has been timely filed with the Bankruptcy Court and is liquidated in amount and has not been objected to; (ii) has been listed by the Debtor in its Schedules as being neither contingent, unliquidated nor disputed; or (iii) has been allowed by a Final Order of the Bankruptcy Court.

1.3     "Allowed Administrative 503(b)(9) Claim" shall mean that certain Allowed Claim of Pharmscript, LLC (claim no. 21) to the extent asserted pursuant to Section 503(b)(9) of the Bankruptcy Code in the amount of $22,652.00.

1.4     "Allowed Secured Claims of Ascentium Capital LLC" shall mean the Allowed secured Claims of Ascentium Capital LLC in the amounts of $145,216.00, $16,829.00 and $86,004.00, representing the balances owed under certain equipment loans to the Debtor.

1.5     "Allowed Secured Claim of Garfield Park" shall mean the Allowed Secured Claim of Garfield Park, LLC, as successor in interest to Security Benefit Corporation and/or Security Benefit Life Insurance Company.

1.6     "Allowed Claim of HHHW" shall mean the Allowed unsecured Claim of the HHHW Liquidation Trust in the amount of $2,376,416.00, in full and final satisfaction of Proof of Claim Number 14 arising from the Debtor's indemnification, reimbursement and related obligations to HHHW under the Operating Agreement of HBL SNF, LLC dated February 1, 2017.

1.7     "Avoidance Actions" shall mean any and all Claims or Causes of Action of a trustee or debtor-in-possession under the Bankruptcy Code, including, without limitation, under Sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, New York State Debtor and Creditor law, or other applicable law, against any Entity or Person, whether arising before or after the Effective Date, that have not been fully resolved or disposed of prior to the Effective Date, whether or not litigation with respect to same has been commenced prior to the Effective Date.

1.8     "Ballot" shall mean the voting form distributed to holders of Claims or Interests in Classes that are Impaired and entitled to vote on the Plan for purposes of indicating acceptance or rejection of the Plan.

1.9     "Bankruptcy Code" shall have the meaning assigned to it in the preamble of this Plan.

1.10     "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York.

1.11     "Business Day" shall mean any day other than a Saturday, Sunday or "legal holiday" as defined in Rule 9006(a).

1.12     "Cash" shall mean cash and cash equivalents, including but not limited to bank

deposits, checks and other similar items, in each case denominated in United States dollars.

1.13   "Causes of Action" shall mean any and all actions, causes of action, suits, debts, rights to payment and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

1.14   "Chapter 11 Case" shall mean the Debtor's case filed under Subchapter V of Chapter 11 of the Bankruptcy Code currently pending before the Bankruptcy Court under the case caption *In re HBL SNF, LLC*, Case No. 21-22623 (SHL) (Bankr. S.D.N.Y. 2021).

1.15   "Claim" is defined in Section 101(5) of the Bankruptcy Code, and shall include, without limitation, any claims of whatsoever type or description against the Debtor, any claim for pre-petition interest, post-petition interest or contingent interest, any claim against the Debtor arising out of the rejection of executory contracts, any claim against the Debtor arising from the recovery of property under Sections 550 and 553 of the Bankruptcy Code and any claim against the Debtor that does not arise until after the commencement of the Chapter 11 Case for a tax entitled to priority under Section 507(a) of the Bankruptcy Code.

1.16   "Class" shall mean a group of Claims or Interests that are substantially similar in nature and are grouped together for similar treatment pursuant to the Plan.

1.17   "Closing" shall have the meaning assigned to it in the Background Section of this Plan.

1.18   "CMS" shall mean Centers for Medicare & Medicaid Services, a branch of the U.S. Department of Health and Human Services.

1.19   "Conditions Precedent to the Effective Date" shall mean all of the conditions set forth in Section 14.2 of the Plan, which must be satisfied or waived, if subject to waiver, prior to the Effective Date of the Plan.

1.20   "Confirmation Date" shall mean the date upon which the Confirmation Order is entered by the Bankruptcy Court.

1.21   "Confirmation Order" shall mean the order entered by the Bankruptcy Court confirming the Plan pursuant to Sections 1129 and 1191 of the Bankruptcy Code.

1.22   "Debtor" shall have the meaning assigned to it in the preamble of this Plan.

1.23   "DIP Credit Agreement" shall mean that certain Super Priority Debtor-in-Possession Credit and Security Agreement, dated as of November 4, 2021, by and between HBL SNF, LLC, as borrower and CNH Finance Fund I, L.P., as lender.

1.24   "DIP Lender" shall mean CNH Finance Fund I, L.P., n/k/a eCapital Corp.

1.25   "Disputed Claim" or "Disputed Interest" shall mean any Claim or Interest, as

5

applicable, designated as disputed, contingent or unliquidated on the Schedules and/or any Claim or Interest, as applicable, against which an objection to the allowance thereof has been interposed, which objection has not been determined by order of the Bankruptcy Court.

1.26    "Disputed Claims Reserve" shall mean the reserve to be established for Disputed Claims in accordance with the terms hereof, which shall be established as soon as practicable after the Effective Date.

1.27    "Distribution" shall mean a distribution of Cash pursuant to the Plan, which shall commence on the Effective Date or as soon thereafter as is practicable unless indicated otherwise.

1.28    "Effective Date" shall mean the date upon which all of the Conditions Precedent to the Effective Date of the Plan shall have been satisfied.

1.29    "Entity" shall have the meaning assigned to it in Section 101(15) of the Bankruptcy Code.

1.30    "Equity Infusion" shall have the meaning assigned to it in the Background Section of this Plan.

1.31    "Equity Term Sheet" shall have the meaning assigned to it in the Background Section of this Plan.

1.32    "Final Decree" shall mean the order to be entered by the Bankruptcy Court closing the Chapter 11 Case in accordance with Section 350(a) of the Bankruptcy Code and Rule 3022.

1.33    "Final Order" shall mean an order or judgment which has not been stayed and as to which order or judgment the time to appeal or seek review or rehearing has been waived or expired and as to which no appeal, petition for review or rehearing is pending or, in the case of an appeal, any such appeal or petition for review, rehearing or certiorari has been dismissed.

1.34    "Garfield Park" shall mean Garfield Park, LLC, as successor in interest to Security Benefit Corporation and/or Security Benefit Life Insurance Company.

1.35    "General Unsecured Claim" shall mean any Claim that is not an Interest and does not qualify as an Administrative Claim, Priority Tax Claim, Secured Claim or Priority Unsecured Claim, including, without limitation, any Claim based upon pre-petition trade accounts payable or the rejection of an executory contract during the pendency of this Chapter 11 Case.

1.36    "Impaired" shall have the meaning assigned to it in Section 1124 of the Bankruptcy Code.

1.37    "Interest" shall mean any equity interest in the Debtor, including, but not limited to, membership interests, shares of common stock, any stock rights, options, warrants, calls, subscriptions or other similar rights, agreements or commitments or other outstanding agreements obligating the Debtor to issue, transfer or sell any shares of any type of stock of the

Debtor.

1.38    "Landlord" shall have the meaning assigned to it in the Background Section of this Plan.

1.39    "Landlord General Unsecured Claim" shall mean the Claim asserted by the Landlord (claim no. 29).

1.40    "Landlord Litigation" shall have the meaning assigned to it in the Background Section of this Plan.

1.41    "Lease" shall have the meaning assigned to it in the Background Section of this Plan.

1.42    "Lease Decision" shall have the meaning assigned to it in the Background Section of this Plan.

1.43    "Lien" shall have the meaning assigned to it in Section 101(37) of the Bankruptcy Code.

1.44    "Maximum Amount" shall mean, with respect to any Disputed Claim: (a) the amount agreed to by the Debtor and the holder of such Claim; (b) the amount, if any, estimated or determined by the Bankruptcy Court in accordance with Section 502(c) or 503(b) of the Bankruptcy Code; or (c) absent any such agreement, estimation or determination, the liquidated amount set forth in the proof of claim filed by the holder of such Claim, or if no amount is so set forth, the amount estimated by the Debtor.

1.45    "Medicare Cure" shall have the meaning assigned to it in Section 9.1 of this Plan.

1.46    "Medicare Provider Agreement" means the Debtor's Medicare Provider Agreement , identified by CMS Certification Number 335878, including all benefits and burdens thereunder.

1.47    "Mortgage" shall have the meaning assigned to it in the Background Section of this Plan.

1.48    "New Lease Agreement" shall have the meaning assigned to it in the Background Section of this Plan.

1.49    "Person" shall have the meaning assigned to it in Section 101(41) of the Bankruptcy Code.

1.50    "Petition Date" shall mean November 1, 2021.

1.51    "Plan" shall mean this Chapter 11 Subchapter V Plan of Reorganization, together with all exhibits and schedules hereto, and any amendments hereto or modifications hereof made in accordance with the provisions hereof and the Bankruptcy Code.

1.52   "Premises" shall have the meaning assigned to it in the Background Section of this Plan.

1.53   "Priority Tax Claim" shall mean a Claim that is entitled to priority treatment under Section 507(a)(8) of the Bankruptcy Code.

1.54   "Priority Unsecured Claim" shall mean a Claim, other than an Administrative Claim or a Priority Tax Claim, that is entitled to priority under Section 507(a) of the Bankruptcy Code.

1.55   "Professional" shall mean any attorney, accountant, appraiser, consultant and other professional retained or to be compensated pursuant to an order of the Bankruptcy Court pursuant to, inter alia, Section 327, 328, 330, 503(b) or 1103 of the Bankruptcy Code in this Chapter 11 Case.

1.56   "Professional Fees" shall mean any claim for compensation and/or reimbursement of expenses under Section 330, 331 or 503(b) of the Bankruptcy Code by any Professional retained by order of the Bankruptcy Court, which must be applied for in accordance with the Bankruptcy Code and the Plan and Allowed by order of the Bankruptcy Court before payment thereof may be made.

1.57   "Rejection Damage Claim" shall mean any Claim arising from the rejection of any executory contract or unexpired lease in accordance with this Plan or any order of the Bankruptcy Court, excluding, for the avoidance of doubt, the Landlord General Unsecured Claim.

1.58   "Rejection Damages Bar Date" shall mean the date that is the first Business Day that is at least thirty (30) calendar days after the Confirmation Date.

1.59   "Reorganized HBL" shall mean HBL SNF, LLC, as successor to the Debtor, which shall be owned 90% by WHCP and 10% by Bethel.

1.60   "Rules" shall mean, collectively, the Federal Rules of Bankruptcy Procedure recommended by the Judicial Conference of the United States and prescribed by the Supreme Court of the United States and all amendments thereto, and the local bankruptcy Rules for the Southern District of New York.

1.61   "Schedules" shall mean the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor as required by Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments thereto.

1.62   "Secured Claim" shall mean a Claim secured by a valid, perfected and enforceable Lien in the assets of the Debtor, to the extent of the value of the interest of the holder of such Secured Claim in such assets as determined by the Bankruptcy Court pursuant to Section 506(a) of the Bankruptcy Code or acknowledged by the Debtor in writing or provided for in this Plan.

1.63   "Settlement Term Sheet" shall have the meaning assigned to it in the Background

Section of this Plan.

1.64   "Settlement Transactions" shall have the meaning assigned to it in the Background Section of this Plan.

1.65   "State Court" shall have the meaning assigned to it in the Background Section of this Plan.

1.66   "State Court Action" shall have the meaning assigned to it in the Background Section of this Plan.

1.67   "Subchapter V Trustee" shall mean Heidi J. Sorvino, Esq., who was appointed by the United States Trustee by *Notice of Appointment of Subchapter V Trustee* filed on the docket of this Chapter 11 Case on November 2, 2021 [Dkt. No. 15].

1.68   "Transfer Taxes" shall mean any and all real estate transfer, stamp, sales, use, mortgage recording, or similar taxes, if and as applicable, that, absent the operation of Section 1146 of the Bankruptcy Code, may be incurred or arise in connection with the transactions contemplated by the Plan.

1.69   "Unimpaired" shall mean any Class of Claims or Interests that is not Impaired.

1.70   "United States Trustee" shall mean any and all representatives of the Office of the United States Trustee for the Southern District of New York empowered to administer this Chapter 11 Case.

1.71   "WHCP" shall have the meaning assigned to it in the Background Section of this Plan.

**B.**   **Rules of Interpretation**.

For purposes of this Plan: (a) where appropriate in the relevant context, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any references in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) unless otherwise provided in the Plan, any reference in the Plan to an existing document or appendix filed or to be filed means such document or appendix, as it may have been or may be amended, modified or supplemented pursuant to the Plan; (d) unless otherwise specified herein, any reference to a Person as a holder of a Claim or Interest includes that Person's successors, assigns and affiliates; (e) unless otherwise specified, all references in the Plan to Sections and Articles are references to Sections and Articles of or to the Plan; (f) the words "herein", "hereto" and "hereof" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the Plan.

**ARTICLE II**

9

## Summary of Plan Distributions

2.1    The Plan proposes to pay Allowed Claims of creditors of the Debtor from the Debtor's disposable income from its operations for a period of forty-eight (48) consecutive months as set forth in the projections annexed hereto as **Exhibit C**. The Plan generally provides for the following classes of claims:

- **Class 1 (a)-(d) (Secured Claims)**
- **Class 2 (Priority Unsecured Claims)**;
- **Class 3 (Landlord General Unsecured Claim)**;
- **Class 4 (General Unsecured Claims Not Otherwise Classified)**;
- **Class 5 (Allowed Claim of HHHW)**; and
- **Class 6 (Interests)**.

The Plan provides that the Debtor or Reorganized HBL will make distributions for the payment in full of Allowed Administrative, Allowed Secured and Allowed Priority Tax claims before making any distributions to other Classes.

All creditors should refer to Articles III through IX of the Plan for information regarding the precise treatment of their Claims.  In addition, to confirm this Plan, the Bankruptcy Court must find that each creditor who does not accept this Plan will receive at least as much under this Plan as such creditor would receive in a chapter 7 liquidation.  To demonstrate the satisfaction of this requirement, the Debtor has prepared a Liquidation Analysis, which is annexed hereto as **Exhibit D.**

## ARTICLE III

## Treatment of Administrative Claims

3.1    <u>Administrative Claims</u>. Administrative Claims are not classified under the Plan in accordance with Section 1123(a)(1) of the Bankruptcy Code. Each Allowed Administrative Claim shall be paid in full in the Allowed amount of such Administrative Claim in Cash from the Debtor's assets either: (i) within fifteen (15) Business Days after the date on which the Bankruptcy Court enters an order allowing such Administrative Claim; (ii) on the Effective Date of the Plan; or (iii) upon such later date as the Debtor and the holder of such Allowed Administrative Claim otherwise agree in writing. The Confirmation Order shall constitute an order allowing the Administrative 503(b)(9) Claim and approving payment thereof on the Effective Date of the Plan.

## ARTICLE IV

## Treatment of Priority Tax Claims

4.1    <u>Priority Tax Claims</u>.    Priority Tax Claims are not classified under the Plan in accordance with Section 1123(a)(1) of the Bankruptcy Code.  Each holder of an Allowed Priority

Tax Claim shall either be paid (i) in full in Cash on the date that is fifteen (15) days after the date on which the Bankruptcy Court enters an order allowing such Priority Tax Claim, or as soon thereafter as is practicable, or (ii) in equal semi-annual installments over a period ending not later than four (4) years after the Effective Date, or such other time fixed by the Bankruptcy Court not to exceed five (5) years, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code.  The Debtor estimates the total amount of Priority Tax Claims that will be outstanding as of the Effective Date of the Plan will be $9,489.99.

## ARTICLE V

## Classification of Claims and Interests

5.1    Designation of Classes Pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code.  Set forth in Section 5.3 below is the designation of Classes of Claims and Interests. Administrative Claims and Priority Tax Claims of the kinds specified in Sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code (set forth in Articles III and IV above) have not been classified and are excluded from classification in accordance with Section 1123(a)(1) of the Bankruptcy Code.

5.2    Allowed Amount in a Particular Class.  An Allowed Claim or Allowed Interest is part of a particular Class only to the extent of the amount of the Allowed Claim or Allowed Interest that qualifies for treatment within that Class and is in a different Class to the extent that the remaining amount of the Allowed Claim or Allowed Interest qualifies for treatment within that different Class.

5.3    Classes.   All Claims and Interests shall be divided into the following Classes for all purposes, including voting, confirmation and Distribution pursuant to the Plan, as follows, which Classes shall be mutually exclusive:

| Class | Description | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Class 1(a), Class 1(b), Class 1(c), and Class 1(d) each consists of a Secured Claim | Unimpaired | No |
| Class 2 | Class 2 consists of all Priority Unsecured Claims | Unimpaired | No |
| Class 3 | Class 3 consists of the Landlord General Unsecured Claim | Impaired | Yes |
| Class 4 | Class 4 consists of all other General Unsecured Claims not otherwise classified herein | Impaired | Yes |
| Class 5 | Class 5 consists of the Allowed Claim of HHHW | Impaired | Yes |
| Class 6. | Class 6 consists of all Interests | Unimpaired | No |

## ARTICLE VI

### Treatment of Claims and Interests

6.1     Class 1:  Secured Claims

1. **Class 1(a)-(c)** consists of the Allowed Secured Claims of Ascentium Capital LLC;
2. **Class 1(d)** consists of the Allowed Secured Claim of Garfield Park

(a)  Treatment.

Subsequent to the Confirmation of the Plan, each holder of an Allowed Secured Claim in Classes 1(a)-(c) will retain its Lien securing its Claim and will be paid by the Debtor or Reorganized HBL in the ordinary course in accordance with its applicable contractual agreements.

On the Effective Date, in exchange for the consideration provided under and in connection with the Settlement Transactions, the alleged lien securing the Allowed Secured Claim of Garfield Park in Class 1(d) will be deemed satisfied and released, and the Class 1(d) claim shall be deemed satisfied in full.

The Debtor represents that it is current on all pre- and post-petition obligations on account of each of the Secured Claims, and the value of the respective collateral for each obligation is believed to exceed the amounts owed by the Debtor on account of each of the Secured Claims. To the extent that it may be agreed or determined by Final Order of the Bankruptcy Court that any pre-petition arrears are owed by the Debtor to any of the holders of the Allowed Secured Claims, such amounts will be fully paid on the Effective Date of the Plan, or on the date on which any such pre-petition arrears become an Allowed Claim, whichever is later.

(b)     Full Settlement.  The treatment and consideration to be received by holders of Class 1 Claims shall be in full and final satisfaction, release and discharge of their respective Class 1 Claims.

(c)     Class 1(a), Class 1(b), Class 1(c) and Class 1(d) are Unimpaired under the Plan.

6.2     Class 2:  Priority Unsecured Claims

(a)     Treatment. Each holder of a Class 2 Claim shall receive Cash in an amount equal to the Allowed amount of its Class 2 Claim in equal semi-annual installments over a period of four (4) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of (x) the Effective Date and (y) the date on which each Class 2 Claim becomes an Allowed Claim, or as soon thereafter as practicable. The Debtor is not presently aware of any Priority Unsecured Claims asserted against the Debtor, except the Administrative 503(b)(9) Claim, which shall be treated as set forth in

Article III.

      (b)    <u>Full Settlement.</u>  The treatment and consideration to be received by holders of Class 2 Claims shall be in full and final satisfaction, release and discharge of their respective Class 2 Claims.

      (c)    Class 2 is Unimpaired under the Plan.

   6.3    <u>Class 3:</u>  <u>Landlord General Unsecured Claim</u>

      (a)    <u>Treatment</u>.  On the Effective Date, in exchange for the consideration provided under and in connection with the Settlement Transactions, the Class 3 Claim shall be released and shall automatically be deemed disallowed and expunged.

      (b)    <u>Full Settlement.</u>  The treatment and consideration to be received by the holder of the Class 3 Claim shall be in full and final satisfaction, release and discharge of the Class 3 Claim.

      (c)    Class 3 is Impaired under the Plan.

   6.4    <u>Class 4</u>: <u>General Unsecured Claims Not Otherwise Classified</u>

      (a)    <u>Treatment.</u> Each holder of a Class 4 Claim shall receive a pro rata share of Cash based on the Allowed amount of its Class 4 Claim in semi-annual installments over a period of four (4) years, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, beginning on the later of (x) the Effective Date and (y) the date on which each Class 4 Claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtor's operations available after payment in full of all Allowed Claims in Class 1 and Class 2, Priority Tax Claims and other costs of administration, including Allowed Administrative Claims.  The Debtor estimates the total amount of Allowed Class 4 Claims that will be outstanding as of the Effective Date of the Plan will be $5,230,043.30 The Debtor projects that pro rata distributions to holders of Allowed Class 4 Claims will total approximately 28 cents on the dollar as set forth in the Projections.

      (b)    <u>Full Settlement.</u>  The treatment and consideration to be received by the holders of Class 4 Claims shall be in full and final satisfaction, release and discharge of their respective Class 4 Claims.

      (c)    Class 4 is Impaired under the Plan.

   6.5    <u>Class 5: Allowed Claim of HHHW</u>

      (a)    <u>Treatment.</u>  The holder of the Class 5 Claim shall receive a pro rata share of Cash based on the Allowed amount of the Class 5 Claim in semi-annual installments over a period of four (4) years, or such other time not to exceed five (5) years

13

as fixed by the Bankruptcy Court, beginning on the later of (x) the Effective Date and (y) the date on which the Class 5 Claim becomes an Allowed Claim, or as soon thereafter as practicable, to be paid from the disposable income from the Debtor's operations available after payment in full of all Allowed Claims in Class 1 and Class 2, Priority Tax Claims and other costs of administration, including Allowed Administrative Claims. The Debtor estimates the total amount of the Allowed Class 5 Claim that will be outstanding as of the Effective Date of the Plan will be $2,376,416. The Debtor projects that pro rata distributions to the holder of the Allowed Class 5 Claim will total approximately 28 cents on the dollar as set forth in the Projections.

(b)    Full Settlement.  The treatment and consideration to be received by the holder of the Class 5 Claim shall be in full settlement and final satisfaction of its Interests.

(c)    Class 5 is Impaired under the Plan.

6.6    Class 6: Interests

(a)    Treatment.  The holders of Interests in the Debtor shall retain such Interests.

(b)    Full Settlement.  The treatment and consideration to be received by holders of Class 6 Interests shall be in full settlement and final satisfaction of their respective Interests.

(c)    Class 6 is Unimpaired under the Plan.

## ARTICLE VII

### Identification of Classes of Claims and
### Interests Impaired and Unimpaired Under the Plan

7.1    Classes of Claims Impaired by the Plan and Entitled to Vote.  The Allowed Class 3 Claim, Allowed Class 4 Claims, and Allowed Class 5 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

7.2    Acceptance by an Impaired Class of Claims.  Consistent with Section 1126(c) of the Bankruptcy Code, and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan. The Allowed Class 3 Claim, Allowed Class 4 Claims, and Allowed Class 5 Claims are Impaired under the Plan, and the acceptances of holders of such Allowed Claims shall be solicited.

7.3    Classes of Claims and Interests Unimpaired and Conclusively Presumed to Accept this Plan.  Holders of Allowed Class 1(a)-(d) Claims, Allowed Class 2 Claims and Allowed Class 6 Interests are Unimpaired by the Plan.  Under Section 1126(f) of the Bankruptcy

Code, the holders of these Claims are conclusively presumed to accept the Plan, and the acceptances of holders of such Allowed Claims shall not be solicited.

7.4    <u>Confirmation Pursuant to Section 1191 of the Bankruptcy Code ("Cram Down").</u> With respect to any Impaired Class that does not accept the Plan or is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code, the Debtor intends to request that the Bankruptcy Court "cram down" any such Class(es) and confirm the Plan in accordance with Section 1191(b) of the Bankruptcy Code.

## ARTICLE VIII

### Controversy with Respect to Impairment

8.1    In the event of a controversy as to whether a Class of Claims or Interests is Impaired, the Bankruptcy Court shall determine such controversy.

## ARTICLE IX

### Unexpired Leases and Executory Contracts

9.1    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases.</u> All executory contracts and unexpired leases of the Debtor shall be assumed as of the Effective Date, unless a particular executory contract or unexpired lease (i) has previously been assumed or rejected pursuant to order of the Bankruptcy Court or applicable provisions of the Bankruptcy Code, (ii) a specific agreement has been reached between the Debtor and the counterparty to the lease or executory contract, or (iii) has expired or otherwise terminated pursuant to its terms. For the avoidance of doubt, the Lease is not subject to the provisions of this Section 9.1 and shall be treated as set forth in the Lease Decision. The Plan shall constitute due and sufficient notice of the Debtor's intention to assume all such executory contracts and unexpired leases, and the Confirmation Order shall be deemed an order under Section 365(a) of the Bankruptcy Code assuming all such executory contracts and unexpired leases. For the avoidance of doubt, the Debtor's Medicare Provider Agreement shall be assumed as of the Effective Date, and the Confirmation Order shall be deemed an order under Section 365(a) of the Bankruptcy Code assuming such Medicare Provider Agreement. ***<u>The Debtor believes that it is current on all executory contracts and unexpired leases intended to be assumed hereunder. Any counterparty to an executory contract or unexpired lease that has an objection to the assumption of such executory contract or unexpired lease or the proposed cure amount of $0 shall file an objection to the proposed assumption and cure no later than seven (7) days prior to the Confirmation Hearing, as scheduled by the Bankruptcy Court.</u>*** While the Debtor believes it is current on all obligations under its Medicare Provider Agreement, for the avoidance of doubt, the Debtor will cure any defaults under its Medicare Provider Agreement (the "<u>Medicare Cure</u>") on or before the Effective Date to the satisfaction of CMS, including satisfaction of any monetary defaults. "Medicare Cure," for purposes of assumption of the Medicare Provider Agreement, means being governed by and subject to the terms and conditions thereof (including the incorporated statutes, rules and regulations), and remaining liable for any debt to CMS as if the Chapter 11 Case had not occurred.

9.2    Bar Date for Rejection Damage Claims.    Unless otherwise provided for by an order of the Bankruptcy Court entered on or prior to the Confirmation Date, any Rejection Damage Claim with respect to an executory contract or unexpired lease rejected by the Debtor, if any, must be filed with the Bankruptcy Court on or before the Rejection Damages Bar Date and served upon (a) counsel to the Debtor, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, Attn: Tracy L. Klestadt (tklestadt@klestadt.com); and (b) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn.: Andrea Schwartz, Esq.    Any Entity or Person that fails to file and serve its Rejection Damage Claim within the period set forth above shall be forever barred from asserting a Claim against the Debtor, its estate, Reorganized HBL, or any property or interests in property of the Debtor or its estate or Reorganized HBL. All Rejection Damage Claims shall be subject to any defenses of the Debtor. Any Allowed Rejection Damage Claims shall be classified as Class 4 Claims under the Plan.

## ARTICLE X

## Means of Implementing the Plan

10.1    Continuation of Reorganized HBL.    The filing of the Plan shall constitute a motion for an order of the Bankruptcy Court approving, and the Confirmation Order shall constitute the Bankruptcy Court's approval of, the continuation of HBL SNF, LLC as Reorganized HBL, successor by merger to the Debtor. Reorganized HBL shall retain the same tax identification number as the Debtor and shall continue to operate the business of the Debtor in the ordinary course following the Effective Date and emergence from the bankruptcy proceedings and shall continue to make the Distributions and otherwise fulfill the Debtor's obligations under this Plan. Except as otherwise provided in the Plan or Confirmation Order, as of the Effective Date, all property of the Debtor's estate (including Causes of Action) shall vest in Reorganized HBL, free and clear of all Liens, Claims, charges or other encumbrances or interests. For the avoidance of doubt, nothing herein or in the Confirmation Order shall relieve the Debtor or Reorganized HBL from its obligations under or in connection with the Medicare Provider Agreement or shall affect CMS' rights of setoff or recoupment under the Medicare Act and regulations. Reorganized HBL may operate its business and may use, acquire and dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Rules. Notwithstanding any other provision of this Plan or the Confirmation Order, after the Effective Date, all agreements, issues, and disputes arising under the Medicare Act shall be governed exclusively by the Medicare statute and regulations, without regard to the Bankruptcy Code or Bankruptcy Rules.

10.2    Approval of the Settlement Transactions and the Documentation in Respect Thereof. In accordance with Section 1123(b) of the Bankruptcy Code and Rule 9019, the filing of the Plan shall constitute a motion for an order of the Bankruptcy Court approving, and the Confirmation Order shall constitute the Bankruptcy Court's approval of, the Settlement Transactions and all documentation in respect thereof, including the New Lease Agreement, and the Debtor's and/or Reorganized HBL's entry into all documents contemplated hereby or

thereby, and all actions necessary or appropriate to consummate the Settlement Transactions and the other transactions contemplated hereby, as fair and equitable and in the best interests of the Debtor's estate. Pending and at all times after the consummation of the Settlement Transactions, the Debtor and Reorganized HBL shall be authorized to continue to operate, maintain and preserve the Premises.

10.4    Satisfaction of DIP Loan and Exit Financing. The Debtor and/or Reorganized HBL, and the DIP Lender, intend to enter into a new financing agreement (the "Exit Financing"), to be effective on the Effective Date of the Plan to the date that is thirty-six (36) months from the Effective Date, on terms generally similar to those of the DIP Credit Agreement, as set forth on the term sheet attached hereto as **Exhibit E** (the "Exit Loan Term Sheet"), and as otherwise agreeable to the Debtor and/or Reorganized HBL and the DIP Lender, as necessary to effectuate the transactions contemplated by the Plan, including satisfaction of any and all obligations due to the DIP Lender under the DIP Credit Agreement. The filing of the Plan shall constitute a motion for an order of the Bankruptcy Court approving, and the Confirmation Order shall constitute the Bankruptcy Court's approval of, the Exit Financing. The Debtor and/or Reorganized HBL is hereby authorized to obtain the Exit Financing, and the Debtor and/or Reorganized HBL and the DIP Lender are hereby authorized to enter into such agreements, execute such documents and take such other actions as are necessary or appropriate to give effect to the foregoing, without further order or approval of the Bankruptcy Court. Except as expressly modified hereby, the DIP Credit Agreement shall remain in full force and effect between the DIP Lender and the Debtor, in accordance with its terms, until the Effective Date of the Plan.

10.5    Funding. Unless otherwise indicated herein, the funds necessary to finance the transactions contemplated hereby and make the Distributions and other payments required by this Plan shall be paid from the Debtor's or Reorganized HBL's "disposable income" as defined in Section 1191(d) of the Bankruptcy Code. Projections with respect to the ability of the Debtor to make such payments under the Plan are attached hereto as **Exhibit C**.   A comparative liquidation analysis is attached hereto as **Exhibit D.**

10.6    Execution of Documents.  The Debtor and/or Reorganized HBL is authorized to execute, release and deliver all documents reasonably necessary to consummate the transactions contemplated by the terms and conditions of this Plan, the New Lease Agreement, the documentation in respect of the Settlement Transactions, and all documents ancillary thereto or executed in connection therewith, without further order or approval of the Bankruptcy Court. Pursuant to the Confirmation Order and upon confirmation of the Plan, the Debtor and/or Reorganized HBL shall be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and provisions of the Plan and the Settlement Transactions.  On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate or further evidence the terms and provisions of the Plan and the other agreements referred to herein. Upon or as promptly after the Effective Date as possible, the Debtor and Landlord shall make such filings and take or cause to be taken such actions as are necessary or appropriate to effectuate the releases and dismissal of the Landlord Litigation and State Court Action as contemplated hereby.

10.7     Transfer Taxes. The New Lease Agreement is necessary to the consummation of the Plan and shall be deemed a transfer under, pursuant to, in connection with and in furtherance of the Plan, and such transfer and delivery of any and all instruments of transfer in connection therewith shall not be subject to any Transfer Taxes pursuant to Section 1146(a) of the Bankruptcy Code, as interpreted by the Supreme Court in *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S.Ct. 2326 (2008).

10.8     Recording of Documents.     Pursuant to Sections 105, 1141(c), 1142(b) and 1146(a) of the Bankruptcy Code, each and every federal, state and local governmental agency or department, shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

10.9     Transactions on Business Days.     If the Effective Date or any other date on which a transaction or Distribution may occur under the Plan shall occur on a day that is not a Business Day, the transaction or Distribution contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

10.10     Preservation and Vesting of Claims, Rights, Demands and Causes of Action. Pursuant to Section 1123 of the Bankruptcy Code, the Debtor by and through Reorganized HBL shall be vested with, shall retain, and shall have the authority to prosecute and enforce any and all claims, controversies, agreements, promises, accounts, rights to legal remedies, rights to equitable remedies, rights, demands and Causes of Action of any kind or nature whatsoever held by, through or on behalf of the Debtor or its estate, including, without limitation, all Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code, including, without limitation, under Sections 544, 545, 547, 548, and 549 of the Bankruptcy Code and New York Debtor and Creditor Law, or other applicable law, against any other Entity or Person arising before or after the Effective Date that have not been fully resolved or disposed of prior to the Effective Date, whether or not litigation with respect to same has been commenced prior to the Effective Date.

## ARTICLE XI

## Distributions; Disputed Claims Reserve

11.1     Timing of Distributions Due Under Plan.     All Distributions and payments required under the Plan to holders of Allowed Claims shall be paid as and when provided in Article VI of the Plan.  If the Plan is confirmed as a non-consensual plan, then the Subchapter V Trustee may, as necessary, control the Distributions due under the Plan.

11.2     Manner of Distributions.     At the option of the Debtor and/or Reorganized HBL, Distributions may be made by check or such other method as the Debtor and/or Reorganized HBL deem appropriate under the circumstances.  No Distributions shall be required to be made

18

to any holder of an Allowed Claim in an amount less than fifty ($50.00) dollars unless request is made in writing to the Debtor and/or Reorganized HBL.

11.3   <u>Cash Payments.</u>   Cash payments made pursuant to the Plan shall be in U.S. dollars. Cash payments made pursuant to the Plan in the form of checks issued by the Debtor and/or Reorganized HBL shall be void if not cashed within one hundred twenty (120) days of the date of the issuance. Requests for reissuance of any check shall be made directly to the Debtor and/or Reorganized HBL.

11.4   <u>Disputed Claims Reserve.</u>

(a) The Debtor shall reserve for each Disputed Claim at the Maximum Amount.  On the date of any Distribution, the Debtor and/or Reorganized HBL shall deposit into the Disputed Claims Reserve Cash equal to the amount that would be distributable to all holders of Disputed Claims in respect of all Distributions made on that date, if such Disputed Claims were Allowed in the respective Maximum Amounts. The Debtor and/or Reorganized HBL shall maintain the Disputed Claims Reserve in a segregated account and shall keep records as to the applicable amounts reserved in respect of each Disputed Claim. The Debtor and/or Reorganized HBL shall pay any taxes due and owing with respect to the Disputed Claims Reserve, and reserve all Distributions on account of the Disputed Claims, net of such taxes; provided, however, that the Debtor and/or Reorganized HBL may contest in good faith any tax that any taxing authority determines is owed by the Debtor.

(b)   In the event any Disputed Claim becomes an Allowed Claim, the amount of such Allowed Claim shall never exceed the Maximum Amount, and the Debtor and/or Reorganized HBL shall distribute to the holder of such Allowed Claim from the Disputed Claims Reserve the aggregate amount of Cash that such holder would have received through the date of such Distribution in respect of such Disputed Claim as if such Claim has been an Allowed Claim as of the Effective Date.

(c)   From time to time as Disputed Claims are disallowed or Allowed in amounts less than their respective Maximum Amounts, the Cash deposited in the Disputed Claims Reserve that otherwise would have been distributed to the holders of such Disputed Claims if such Disputed Claims had become Allowed in their respective Maximum Amounts shall be released from and no longer held in the Disputed Claims Reserve and shall be distributed to the extent required in accordance with this Plan.

11.5   <u>No Interest</u>.   Except with respect to holders of Unimpaired Claims entitled to interest under applicable non-bankruptcy law or as otherwise expressly provided herein, no holder of an Allowed Claim shall receive interest on any Distribution to which such holder is entitled hereunder, regardless of whether such Distribution is made on the Effective Date or thereafter.

11.6   <u>Withholding of Taxes.</u>

(a) The Debtor and/or Reorganized HBL may withhold from any property to be distributed under the Plan any property which must be withheld for taxes payable by the

Entity or Person entitled to such Distribution to the extent required by applicable law. As a condition to making any Distribution under the Plan, the Debtor may request that the holder of any Allowed Claim provide such holder's taxpayer identification number and such other certification or documentation as may be deemed necessary to comply with applicable tax reporting and withholding laws.

       (b)   Notwithstanding any other provision of the Plan, each Entity or Person receiving a Distribution of Cash pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other tax obligations.

     11.7   <u>Undeliverable or Unclaimed Distributions.</u>

       (a)  All Distributions under the Plan to any holder of an Allowed Claim shall be made at the address of such holder according to the Debtor's records, unless the Debtor have been notified in writing after the Effective Date of a change of address. Any Entity or Person that is entitled to receive a Cash Distribution under the Plan but that fails to cash a check within one hundred twenty (120) days of its issuance shall be entitled to receive a reissued check from the Debtor for the amount of the original check, without any interest, if such Entity or Person (i) requests, in writing, the Debtor to reissue such check, and (ii) provides the Debtor with such documentation as the Debtor request to verify that such Entity or Person is entitled to such check. If an Entity or Person fails to cash any check within one hundred twenty (120) days of its issuance or fails to request re-issuance of such check within one hundred twenty (120) days of its issuance, such Entity or Person shall be deemed to have forfeited the amount of the Distribution provided for in such check. Any such forfeited Distributions shall revert to the Debtor's estate and/or Reorganized HBL, and the Claim of any holder or successor to such holder with respect to such forfeited Distributions shall be discharged and forever barred, notwithstanding any other provisions in the Plan or any federal or state escheat laws to the contrary.

       (b)   In the event that any Distribution to any holder of an Allowed Claim is returned to the Debtor and/or Reorganized HBL as undeliverable, no further Distributions shall be made to such holder unless and until the Debtor are notified in writing of such holder's then- current address. All claims for undeliverable Distributions for which no check is issued must be made within one hundred twenty (120) days of the issuance of the original check. After such date, all unclaimed Distributions shall revert to the Debtor's estate and/or Reorganized HBL and the claim of any holder or successor to such holder with respect to such Distribution shall be forfeited, discharged and forever barred, notwithstanding any provisions in the Plan or any federal or state escheat laws to the contrary. Upon such forfeiture of Cash, such Cash shall be the property of the Debtor's estate and/or Reorganized HBL.

     11.8   <u>Post-Effective Date Services by the Debtor's Professionals.</u>   The reasonable fees and expenses of the Debtor and its retained Professionals incurred after the Confirmation Date shall constitute operating expenses of Reorganized HBL and shall be payable upon presentment of a monthly statement for services rendered and for reimbursement of expenses

to Reorganized HBL and counsel to any claimed holder of an Interest at the addresses listed for such counsel in a Notice of Appearance filed in the Chapter 11 Case. The Debtor and holders of Interests shall have ten (10) days from the receipt of any such fee and expense statements to dispute all or part of such statement. Upon the expiration of said ten (10) days, Reorganized HBL shall pay the Professionals the undisputed portion of such Professional Fees. Any disputes shall be submitted by the objecting party in a motion to the Bankruptcy Court for determination within forty (40) days of receipt of the statement. In the event no submission is made to the Bankruptcy Court, the objection shall be deemed withdrawn.

## ARTICLE XII

## Procedures for Resolving Disputed Claims

12.1.  Objections to Claims.   Only the Debtor or Reorganized HBL shall have the authority to file or litigate to judgment objections to Claims, settle and compromise claims pursuant to Rule 9019, and withdraw objections to Claims. Subject to an order of the Bankruptcy Court providing otherwise, the Debtor or Reorganized HBL may object to a Claim by filing an objection with the Bankruptcy Court and serving such objection upon the holder of such Claim at any time up to sixty (60) days after the Effective Date or one hundred twenty (120) days after the filing of the proof of such Claim, whichever is later, or such other date fixed by the Bankruptcy Court, and to initiate contested matters and such other proceedings as may be necessary and appropriate for a determination of the Allowed amount of such Claims. The Debtor shall be authorized to challenge, object to and/or settle such disputed Claims without having to seek approval from the Bankruptcy Court if such challenge, objection or settlement results in an Allowed Claim which is less than $75,000.

12.2.  Payments and Distributions with Respect to Disputed Claims.  No payments or Distributions shall be made in respect of any Disputed Claim until such Disputed Claim becomes an Allowed Claim.

12.3.  Claims Reserve - Estimation.   For purposes of effectuating the reserve provisions of the Plan, and the allocations and Distributions to holders of Allowed Claims, the Bankruptcy Court may, on or prior to the Effective Date, or such later date as may be established by the Bankruptcy Court pursuant to Section 502 of the Bankruptcy Code, fix or liquidate the amount of any contingent or unliquidated Claim, in which event the amount so fixed shall be deemed the Allowed amount of such Claim for purposes of the Plan or, in lieu thereof, the Bankruptcy Court shall determine the maximum contingent or unliquidated amount for such Claim, which amount shall be the Maximum Amount in which such Claim ultimately may be Allowed under the Plan, if such Claim is Allowed in whole or in part. The Bankruptcy Court's entry of the Confirmation Order or any such estimation order may limit the Distribution to be made on individual Disputed Claims, regardless of the amount finally Allowed on account of such Disputed Claims, and no holder shall have recourse against the Debtor's estate, the Debtor, Reorganized HBL, or their professionals, professional consultants, attorneys, advisors, officers, directors, employees, members or their successors or assigns, or any of their property, as such holder's sole recovery shall be from the Distributions to be made to holders of Allowed Claims.

21

12.4.   <u>Distributions After Allowance of Disputed Claims</u>.   Distributions to each holder of a Disputed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan.

12.5.   <u>Distributions After Disallowance of Disputed Claims</u>.   Holders of Allowed Claims under the Plan that receive Distributions after Allowance of such holders' Claims may receive subsequent Distributions if and to the extent that other Claims are disallowed or expunged or as property of the Debtor is converted to Cash. Such subsequent Distributions shall be included with the next Distributions due to be paid to holders of Allowed Claims pursuant to and in accordance with Article V of the Plan.

12.6.   <u>Setoffs and Recoupments</u>.   Except with respect to Causes of Action of any nature released or allowed pursuant to the Plan or Confirmation Order, the Debtor, Reorganized HBL or their designee as instructed by the Debtor, may, pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off or recoup against any Allowed Claim or the Distributions to be made pursuant to the Plan on account of such Claim, any Causes of Action of any nature that the Debtor may hold against the holder of such Allowed Claim; provided that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, Reorganized HBL or their respective successors, of any Causes of Action that the Debtor, Reorganized HBL or their respective successors may possess against such holder.

12.7.  <u>Provider Relief Fund</u>.   The Debtor has received prepetition and postpetition funds under the Provider Relief Fund ("<u>PRF</u>") from the Health Resources Services Administration ("<u>HRSA</u>"), a branch of HHS, to reimburse it for health care related expenses or lost revenues attributable to COVID-19, which funds may be audited and result in a debt.  The Debtor is currently in compliance with all associated reporting requirements. Notwithstanding anything in the Plan or Confirmation Order to the contrary, any prepetition or postpetition PRF debt which may be determined in the future will not be discharged or released and will be resolved consistent with the treatment of similar debts under the Plan.  The Debtor, Reorganized HBL or any successor thereof retain all applicable appeal rights and defenses related to the determination or recovery of any such debt, and HRSA shall retain all rights of recovery consistent with federal law.  Notwithstanding anything in the Plan or a bankruptcy order to the contrary, HHS shall not be required to file a proof of claim or administrative claim with respect to any such PRF debt that HRSA determines is owed by the Debtor, subject to appropriate written notice thereof to, and all rights and defenses of, the Debtor, Reorganized HBL or any successor thereof, as applicable.

**ARTICLE XIII**

**<u>General Compromise and Settlement; Injunction, Release and Exculpation</u>**

13.1  <u>General Compromise and Settlement</u>.   Pursuant to Section 1123 of the Bankruptcy Code and Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, Causes of Action, and controversies released, settled, compromised,

22

discharged, or otherwise resolved pursuant to the Plan, including the compromises represented by the Settlement Transactions. This Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Rule 9019. Unless otherwise set forth herein, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromises or settlements contained herein, including in the Settlement Transactions and the documentation in respect thereof, including the New Lease Agreement, as well as a finding by the Bankruptcy Court that such compromises or settlements are fair, equitable, reasonable and in the best interests of the Debtor and its estate.

13.2    <u>Injunction.</u>    Except as otherwise provided in or to enforce the Plan or Confirmation Order, on or after the Effective Date all Entities that have held, currently hold, or may hold, a Claim, Lien, Interest or other liability against or in the Debtor that would be discharged or satisfied under Section 1192 of the Bankruptcy Code are permanently enjoined from taking any of the following actions on account of such Claim, Lien, Interest or right: (a) commencing  or continuing in any manner any action or other proceeding on account of such Claim, Lien, Interest, or right against the Debtor, Reorganized HBL, their successors, their respective property or any other property that is to be distributed under the Plan or otherwise by the Debtor; or (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Debtor, Reorganized HBL, their successors, their respective property or any other property to be distributed under the Plan or otherwise by the Debtor. On and after the Effective Date, each holder of an Interest in the Debtor is permanently enjoined from taking or participating in any action that would interfere with or otherwise hinder the Debtor from implementing the Plan or the Confirmation Order.

13.3    <u>Release.</u>  Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date all creditors of, Claim holders against, Interest holders of, and Entities having or claiming an interest of any nature in the Debtor or its estate are hereby permanently enjoined and stayed from pursuing or attempting to pursue any action, commencing or continuing any action, employing any process, or any act against the Debtor, Reorganized HBL, their successors, their respective property or any other property that is to be distributed under the Plan, on account of or based upon any right, claim or interest which any such creditor, Claimant, Interest holder, or other Entity or Person may have had prior to the entry of the Confirmation Order.

13.4    <u>Exculpation</u>.  Notwithstanding any other provision of the Plan, neither the Debtor nor its officers, directors, members, employees or other agents, financial advisors, attorneys, accountants or Professionals, shall have any liability to any holder of any Claim or Interest for any act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, the Chapter 11 Case, the property to be distributed under the Plan, or any of the transactions contemplated under the Plan, except for liability resulting from conduct constituting gross negligence, willful misconduct or breach of fiduciary duty as determined by a Final Order of the Bankruptcy Court.

**ARTICLE XIV**

23

**Conditions Precedent to Confirmation and the Effective Date**

14.1    Conditions Precedent to Confirmation of the Plan. The following conditions must be fully satisfied or waived, if subject to waiver, on or before the Confirmation Date:

      (a)    the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to the Debtor and shall contain provisions that, among other things, (i) authorize the implementation of the Plan in accordance with its terms, (ii) approve in all respects the transactions and agreements effected pursuant to the Plan, including the New Lease Agreement and the documentation in respect of the other Settlement Transactions and the transactions contemplated thereby; (iii) provide for the Bankruptcy Court's continuing jurisdiction after the Effective Date of the Plan over enforcement of the Settlement Transactions and any disputes arising in connection herewith or therewith, and (iv) find that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud

14.2    Conditions Precedent to the Effective Date.   The following conditions must be fully satisfied or waived, if subject to waiver, on or before the Effective Date for the Plan to become effective:

      (a)    the Confirmation Order shall have been entered by the Bankruptcy Court and shall have become a Final Order; and

      (d)    the Settlement Transactions shall have been consummated; and

      (e)    the obligations under the DIP Credit Agreement shall have been satisfied.

**ARTICLE XV**
**Discharge of Debt; Termination of Subchapter V Trustee Services; Discharge of Patient Care Ombudsman; Continuation of Stays**

15.1    Discharge of Debt and Termination of Subchapter V Trustee Services.

(a) If this Plan is confirmed under Section 1191(a) of the Bankruptcy Code, on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before Confirmation of this Plan, to the extent specified in Section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor will not be discharged of any debt:

      i.    imposed by this Plan; or
      ii.    to the extent provided in Section 1141(d)(6).

(b) If this Plan is confirmed under Section 1191(b) of the Bankruptcy Code, confirmation of this Plan does not discharge any debt provided for in this Plan until the Bankruptcy Court grants a discharge upon completion of all payments due within the first four (4) years of this Plan, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, as otherwise provided in Section 1192 of the Bankruptcy Code.  The Debtor will not be discharged of any debt:

 i.   on which the last payment is due after the first four (4) years of this Plan, or such other time not to exceed five (5) years as fixed by the Bankruptcy Court, as otherwise provided in Section 1192 of the Bankruptcy Code; or
 ii.  excepted from discharge under Section 523(a) of the Bankruptcy Code, except as provided in Rule 4007(c).

(c) Pursuant to Section 1183(c) of the Bankruptcy Code, not later than fourteen (14) days after this Plan is substantially consummated, the Debtor shall file with the Bankruptcy Court and serve upon the Subchapter V Trustee, the Office of the United States Trustee, and all parties in interest in the Chapter 11 Case notice of such substantial consummation. If this Plan is confirmed under Section 1191(a) of the Bankruptcy Code, the services of the Subchapter V Trustee shall terminate upon such substantial consummation.

15.2   Continuation of Stays.  All stays provided for in the Chapter 11 Case under Section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the completion of all payments required under the Plan.

15.3   Discharge of Patient Care Ombudsman. The filing of the Plan shall constitute a motion for an order of the Bankruptcy Court approving, and the Confirmation Order shall constitute the Bankruptcy Court's approval of, termination of the services of the Patient Care Ombudsman effective as of the Effective Date.

## ARTICLE XVI

## Miscellaneous Provisions

16.1   Bankruptcy Court to Retain Jurisdiction.  Notwithstanding entry of the Confirmation Order, the occurrence of the Effective Date, consummation of the Plan, the Chapter 11 Case having been closed, or a Final Decree having been entered, the Bankruptcy Court shall have and retain jurisdiction of matters arising in or related to the Chapter 11 Case and the Plan, including the Settlement Transactions and the documentation in respect thereof, under, and for the purposes of, Sections 105(a), 1127, 1142 and 1144 of the Bankruptcy Code and for, among other things, the following purposes, and the parties to the Settlement Transactions submit to the jurisdiction of the Bankruptcy Court for such purposes:

(a) To consider any modification of the Plan under Section 1127 of the

25

Bankruptcy Code and/or modification of the Plan before "substantial consummation" as defined in Section 1101(2) of the Bankruptcy Code, and to consider any modification of the Plan to cure any defect or omission, or reconcile any inconsistency in the Plan or in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order.

(b) To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, if any, and allowance of Claims resulting therefrom.

(c) To (i) hear and determine any Claim or Cause of Action arising in or related to the Chapter 11 Case; and (ii) to adjudicate any Causes of Action or other proceedings currently pending or which may be commenced by the Debtor or Reorganized HBL or otherwise referenced herein or elsewhere in the Plan, including, but not limited to, the adjudication of any Causes of Action and any and all "core proceedings" under 28 U.S.C. § 157(b), which are or may be pertinent to the Chapter 11 Case and which the Debtor or Reorganized HBL may deem appropriate to commence and prosecute in support of implementation of the Plan.

(d) To determine any and all adversary proceedings, applications, and contested matters filed or commenced by the Debtor or Reorganized HBL, including, without limitation, any Causes of Action.

(e) To ensure that Distributions are accomplished as provided in the Plan.

(f) To hear and determine any objections to Administrative Claims, to proofs of Claim, or to Claims and Interests filed and/or asserted both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any disputed Administrative Claim, Claim or Interest, in whole or in part, and any request for estimation of Claims.

(g) To protect the Debtor's estate and Reorganized HBL from adverse Claims or interference inconsistent with the Plan, including to hear actions to quiet or otherwise clear title to such property of the Debtor's estate or Reorganized HBL based upon the terms and provisions of the Plan.

(h) To (i) enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated; (ii) to issue such orders in aid of execution of the Plan or other transactions contemplated hereunder as may be necessary and appropriate, to the extent authorized by Section 1142 of the Bankruptcy Code; and (iii) to interpret and enforce any Orders previously entered in the Chapter 11 Case to the extent such Orders are not superseded or inconsistent with the Plan.

(i) To hear and determine all applications for compensation and reimbursement of Professional Fees under Sections 330, 331, and 503(b) of the Bankruptcy Code for services rendered and expenses incurred prior or subsequent to the Confirmation Date.

(j) To hear and determine all litigation, Causes of Action and all controversies, suits and disputes that may arise in connection with the interpretation, implementation or enforcement of the Plan or the Settlement Transactions or the documentation in respect thereof, including but not limited to, any and all litigation and/or Causes of Action brought by the Debtor, Reorganized HBL or any other party in interest, whether such litigation and/or Causes of Action is/are commenced either prior to or after the Effective Date.

(k)  To hear and determine matters concerning state, local, and federal taxes in accordance with Sections 345, 505, and 1146 of the Bankruptcy Code.

(l)   To enter a Final Decree closing the Chapter 11 Case.

(m) To consider and act on the compromise and settlement of any litigation, Claim against or Cause of Action asserted in connection with the Chapter 11 Case.

(n) Without limiting the generality of the foregoing and notwithstanding the Effective Date and to the fullest extent permitted by law, the Bankruptcy Court shall retain exclusive jurisdiction over the Plan and administration of the Debtor's estate after the Effective Date, including, without limitation, jurisdiction to resolve any and all controversies, suits and issues that may arise in connection with this Plan or the Settlement Transactions or any of the documents or agreements entered into in connection herewith or therewith including the New Lease Agreement, and any Entities' obligations incurred in connection herewith or therewith, including without limitation, any action against the Debtor, Reorganized HBL, or the Debtor's professionals, and any action seeking turnover or recovery of assets included in the Debtor's estate.

16.2    Binding Effect of the Plan.    Nothing contained in the Plan shall limit the effect of confirmation as set forth in Section 1141 of the Bankruptcy Code. The provisions of the Plan shall be binding upon and inure to the benefit of the Debtor, Reorganized HBL, any holder of a Claim or Interest, the parties to the New Lease Agreement and the documentation in respect of the other Settlement Transactions, and their respective predecessors, successors, assigns, agents, officers, managers, members and directors and any other Entity or Person affected by the Plan.

16.3    Fractional Cents.    Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

16.4    Successors and Assigns.    The rights and obligations of any Entity or Person named  or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity or Person.

16.5    Blank Ballots.  Any Ballot which is executed by the holder of an Allowed Claim, but which does not indicate an acceptance or rejection of the Plan shall be deemed to be

27

an acceptance of the Plan.  Any Ballot not filed in accordance with the filing instructions on the ballot pertaining to the Plan shall not be counted for voting purposes.

16.6    <u>Authorization of Corporate Action.</u>  Upon the entry of the Confirmation Order, all actions contemplated by the Plan shall be deemed authorized and approved in all respects (subject to the provisions of the Plan).  On the Confirmation Date, appropriate members or authorized signatories of the Debtor are authorized and directed to execute and to deliver any and all agreements, documents and instruments contemplated by the Plan or necessary for the consummation of the Plan, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without the need for any additional authorizations, approvals or consents.

16.7    <u>Withdrawal of the Plan.</u>  If the Confirmation Date does not occur, or if the Effective Date does not occur, then the Plan shall be deemed null and void and shall be of no effect and shall be deemed vacated, and the Chapter 11 Case shall continue as if the Plan had never been filed and, in such event, the rights of any holder of a Claim or Interest shall not be affected nor shall such holder be bound by, for purposes of illustration only, and without limitation, the Plan, any statement, admission, commitment, valuation or representation contained in the Plan, or the classification and proposed treatment (including any allowance) of any Claim in the Plan.

16.8    <u>Captions.</u>  Article and Section captions used in the Plan are for convenience only and shall not affect the construction of the Plan.

16.9    <u>Method of Notice.</u>  Unless expressly specified otherwise, any notice or other communication hereunder to the Debtor, Reorganized HBL or their professionals shall be in writing (including by facsimile transmission or by e-mail) and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box (or, in the case of notice by facsimile transmission or e-mail, when received and telephonically or electronically confirmed), addressed to counsel to the Debtor as follows:

> Klestadt Winters Jureller Southard & Stevens, LLP
> Attention: Tracy L. Klestadt, Esq.
> 200 West 41st Street, 17th Floor
> New York, New York 10036
> Email: tklestadt@klestadt.com

16.10    <u>Amendments and Modifications to Plan.</u>  The Plan may be altered, amended or modified from time to time by the Debtor, before or after the Confirmation Date, as provided in Section 1127 of the Bankruptcy Code.  The Debtor may also seek to modify the Plan at any time after confirmation so long as (a) the Plan has not been substantially consummated, and (b) the Bankruptcy Court authorizes the proposed modification after notice and a hearing.

16.11    <u>Section 1125(e) of the Bankruptcy Code.</u>  Confirmation of the Plan shall constitute a finding that no Class of Claims is Impaired or that the Debtor proposed and solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

Dated:  New York, New York
        April 10, 2025

        HBL SNF, LLC

By:  _/s/ Lizer Jozefovic_____
     Lizer Jozefovic
     Chief Executive Officer

Dated:  New York, New York
        April 10, 2025

        KLESTADT WINTERS JURELLER
          SOUTHARD & STEVENS, LLP

By:  _/s/ Tracy L. Klestadt_____
     Tracy L. Klestadt
     Stephanie R. Sweeney
     Christopher Reilly
     200 West 41st Street, 17th Floor
     New York, New York 10036-7203
     Tel: (212) 972-3000
     Fax: (212) 972-2245
     Email: tklestadt@klestadt.com
            ssweeney@klestadt.com
            creilly@klestadt.com

     _Counsel to the Debtor_

# Exhibit A

FILED: WESTCHESTER COUNTY CLERK 01/31/2025 11:59 AM
NYSCEF DOC. NO. 335

21-22623shf    Doc 455    Filed 04/10/25    Entered 04/10/25 17:19:56    Main Document

INDEX NO. 60278/2020
RECEIVED NYSCEF: 01/31/2025

Pg 37 of 183

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

| | |
|---|---|
| WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,<br><br>Plaintiff,<br><br>– against –<br><br>HBL SNF, LLC, LIZER JOZEFOVIC A/K/A LIZER JOZOFOVIC and MARK NEUMAN,<br><br>Defendants and Third-Party Plaintiff,<br><br>– against –<br><br>CCC EQUITIES, LLC, PROJECT EQUITY CONSULTING, THE CONGRESS COMPANIES, HOWARD FENSTERMAN, and WILLIAM NICHOLSON,<br><br>Third-Party Defendants. | Index No. 60278/2020<br><br>**STIPULATION OF DISCONTINUANCE <u>WITHOUT PREJUDICE</u>** |
| LIZER JOZEFOVIC,<br><br>Plaintiff,<br><br>– against –<br><br>WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, HOWARD FENSTERMAN, and METROPOLITAN COMMERCIAL BANK,<br><br>Defendants. | New York County Index No. 655549/2020<br><br>Consolidated under Westchester County Index No. as per April 8, 2021 Decision and Order. |

IT IS HEREBY STIPULATED AND AGREED, pursuant to CPLR § 3217(a)(2), by and among Plaintiff White Plains Healthcare Properties I, LLC, Defendants and Third-Party Plaintiff HBL SNF, LLC, Lizer Jozefovic a/k/a Lizer Jozofovic and Mark Newman, Third-Party Defendants CCC Equities, LLC, Project Equity Consulting, The Congress Companies, Howard Fensterman, and William Nicholson, and Defendant Metropolitan Commercial Bank, by and through their respective counsel, that whereas no party to this Stipulation is an infant, incompetent person for whom a committee has been appointed or conservatee, and no person not a party has an

FILED: WESTCHESTER COUNTY CLERK 01/31/2025 11:59 AM INDEX NO. 60278/2020
NYSCEF DOC. NO: 335                                                      RECEIVED NYSCEF: 01/31/2025

21-22623-shl    Doc 455    Filed 04/10/25    Entered 04/10/25 17:19:56    Main Document
                                    Pg 38 of 183

interest in the subject matter of the action, the above-captioned action and all claims and counterclaims herein asserted are hereby discontinued without prejudice and without costs to any party.

IT IS HEREBY FURTHER STIPULATED AND AGREED that this Stipulation may be executed in counterparts and electronic of facsimile signatures shall be deemed as originals for purposes of this Stipulation.

Dated:   January 30, 2025

**DELBELLO DONNELLAN WEINGARTEN WISE & WIEDERKEHR, LLP**

By: /s/ *Alfred E. Donnellan*
     Alfred E. Donnellan, Esq.
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
Phone: (914) 681-0200

*Attorneys for Plaintiff White Plains Healthcare Properties I, LLC and Third-Party Defendants CCC Equities, LLC, Project Equity Consulting, The Congress Companies, Howard Fensterman and William Nicholson*

**PRYOR CASHMAN, LLP**

By: _____
     John Giardino, Esq.
7 Times Square
New York, New York 10036
Phone: (212) 326-0829

*Attorneys for Defendants and Third-Party Plaintiffs HBL SNF, LLC, Lizer Jozefovic a/k/a Lizer Jozofovic and Mark Neuman*

**WINDELS MARX LANE & MITTENDORF, LLP**

By: /s/ *Robert J. Malatak*
     Robert J. Malatak, Esq.
     James Tracy, Esq.
156 West 56th Street
New York, New York 10019
Phone: (212) 237-1000

*Attorneys for Third-Party Defendant Metropolitan Commercial Bank*

2

*Execution Version*

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Escrow Agreement") is entered into as of January 17, 2025 (the "Effective Date"), by and among WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company with its principal place of business located at 2 Bourbon Street, Suite 200, Peabody, MA 01960 ("WPHCP") or ("Landlord"), HBL SNF, LLC, a New York limited liability company having an office at 1278 Albany Post Road, Croton on Hudson, New York 10520 ( "Tenant"), LIZER JOZEFOVIC, an individual ("Jozefovic"), HOWARD FENSTERMAN, an individual ("Fensterman"), WILLIAM A. NICHOLSON, an individual ("Nicholson"), GARFIELD PARK, LLC, a Kansas limited liability company ("Mortgage Lender"), WHITE PLAINS MEZZANINE, LLC, a Massachusetts limited liability company ("Mezzanine Borrower"), and BRADFORD ALLEN FUNDING COMPANY LLC, a Delaware limited liability company ("Mezzanine Lender"). WPHCP, Tenant, Jozefovic, Fensterman, Nicholson, Mortgage Lender, Mezzanine Lender and Mezzanine Borrower shall also be referred to herein collectively as the "Parties" and individually as a "Party".

## RECITALS

A.     WHEREAS, Landlord is the owner of the real property, improvements, and personal property constituting the long-term care facility commonly known as 116-120 Church Street, White Plains, New York and more particularly described on Exhibit A, attached hereto and made a part hereof, (the "Real Property") or (the "Facility"); and

B.     WHEREAS, Landlord is a defendant in those proceedings under caption *Garfield Park, LLC v. White Plains Healthcare Properties I, LLC, et al*., Index No. 57012/2022, (hereafter referred to as the "Foreclosure Action"); and

C.     WHEREAS, Tenant is a defendant in those proceedings in New York State Supreme Court, Westchester County (the "State Court") under caption *White Plains Healthcare Properties I, LLC, Plaintiff v. HBL SNF, LLC, Lizer Jozefovic a/k/a Lizer Jozefovic and Mark Neuman, Defendants and Third-Party Plaintiff -vs- CCC Equities, LLC, Project Equity Consulting, et al., Third-Party Defendants* (Index No. 60278/2020) (hereafter referred to as the "State Court Proceedings"); and

D.     WHEREAS, Tenant is a debtor and debtor-in-possession in those proceedings pending in United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under captions *HBL SNF, LLC d/b/a Epic Rehabilitation and Nursing at White Plains* (Case No. 21-22623) (collectively, hereafter referred to as the "Bankruptcy Proceedings"); and

E.     WHEREAS, on August 20, 2024, Tenant filed the *Debtor's Second Amended Chapter 11 Subchapter V Plan of Reorganization* [Dkt. No. 376] (as may be amended from time to time, the "Plan") (the "Debtor's Second Amended Plan") that provides for the purchase by Tenant of the Real Property; and

1

*Execution Version*

F.      WHEREAS, Landlord and Tenant desire to enter into a lease agreement for the Real Property dated of even date herewith in the form attached hereto as Exhibit "A" (hereafter the "Lease Agreement"), with such Lease Agreement to be effective upon the conditions set forth in this Escrow Agreement, in the event (i) Tenant's Plan is not confirmed by the Bankruptcy Court on or before March 31, 2025 or (ii) the Bankruptcy Proceedings are dismissed or Tenant has received a discharge thereunder prior to the closing of any such acquisition; and

G.      WHEREAS the Parties have each approved and accepted the Lease Agreement and have caused the Lease Agreement to be executed and held in escrow by counsel to Landlord subject to the terms of this Escrow Agreement.

NOW THEREFORE THE PARTIES AGREE AS FOLLOWS:

## ARTICLE I

## LEASE OF REAL PROPERTY

Subject to the terms of this Escrow Agreement, Landlord has agreed to lease to Tenant and Tenant has agreed to lease from Landlord the Real Property on the terms and conditions set forth in the Lease Agreement which is attached to this Escrow Agreement as Exhibit "A."

## ARTICLE II

## EXECUTION AND ESCROW

Landlord and Tenant have executed the Lease Agreement and such executed Lease shall be delivered to and held in escrow by Abrams Fensterman, LLP, counsel to Landlord ("Escrow Agent") subject to the terms of this Escrow Agreement. The Parties acknowledge that Escrow Agent is acting solely as a stakeholder at the request and for the convenience of the Parties and that Escrow Agent shall not be liable to any Party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this Agreement or involving gross negligence, willful misconduct or fraud on the part of Escrow Agent. The Parties jointly and severally agree to defend, indemnify and hold Escrow Agent harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of this contract or involving gross negligence, willful misconduct or fraud on the part of Escrow Agent. Escrow Agent may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel, at Escrow Agent's own expense, which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel. Escrow Agent shall be permitted to act as counsel for Landlord in any dispute as to this Agreement or the Lease Agreement or any other dispute between the Parties whether or not Escrow Agent is in possession of the Lease Agreement and continues to act as Escrow Agent.

1615920710.14
1695321_2

*Execution Version*

## ARTICLE III

## CONFIRMATION OF SECOND AMENDED PLAN AND
## CLOSING OF SALE OF REAL PROPERTY

In the event the Debtor's Second Amended Plan is confirmed on or before March 31, 2025 (or such later date as Mortgage Lender and Mezzanine Lender may agree in their sole and absolute discretion, the "Confirmation Deadline") and the acquisition of the Real Property by Tenant from Landlord has closed within forty-five (45) days following the date upon which Debtor's Second Amended Plan is confirmed (or such later date as Mortgage Lender and Mezzanine Lender may agree in their sole and absolute discretion, the "Sale Deadline"), the Lease Agreement shall be deemed terminated for all purposes and shall not come into effect for any purpose. Proceeds from such sale shall be applied by Landlord to repay all indebtedness and other amounts due and owing by the Landlord to Mortgage Lender and by the Mezzanine Borrower to Mezzanine Lender pursuant to the loan documents then in effect.

## ARTICLE IV

## FAILURE OF SECOND AMENDED PLAN TO BE TIMELY CONFIRMED OR
## REAL PROPERTY SALE TO TIMELY CLOSE; AMENDMENT OF TENANT'S PLAN
## OF REORGANIZATION OR MOTION APPROVING LEASE

In the event (i) Debtor's Second Amended Plan is not confirmed on or before the Confirmation Deadline or (ii) the acquisition of the Real Property by Tenant from Landlord has not closed on or before the Sale Deadline, Tenant agrees to (and Jozefovic agrees to cause Tenant to) file an amended plan of reorganization and/or standalone motion with the Bankruptcy Court, in either which case, no later than fifteen (15) days following the failure to fulfill either condition set forth in clauses (i) or (ii) hereof, pursuant to which Tenant shall seek Bankruptcy Court approval for Tenant to enter into the Lease Agreement with Landlord. The provisions, form and substance of such motion and/or amended plan of reorganization, and the proposed order approving the same (whether a confirmation order approving such amended plan or an order approving such motion), shall be on terms reasonably satisfactory to the Parties, and Tenant shall request (and Jozefovic agrees to cause Tenant to request) the Bankruptcy Court to enter such order within fifteen (15) days following the filing of such motion and/or amended plan of reorganization and further provide that the Lease Agreement become effective immediately upon the entry of such order. Upon the confirmation of such amended plan of reorganization pursuant to a confirmation order entered by the Bankruptcy Court and/or Bankruptcy Court order approving such motion authorizing Tenant to enter into the Lease Agreement on terms agreed between the Parties ("Bankruptcy Court Lease Approval"), the Lease Agreement shall be released from escrow subject to the procedures set forth in ARTICLE VI.

1615920710.14
1695321_2

*Execution Version*

## ARTICLE V

## DISMISSAL OF BANKRUPTCY PROCEEDINGS

In the event the Bankruptcy Proceedings are dismissed or Tenant has been discharged thereunder in either case before the closing of any sale of the Real Property to Tenant as contemplated in ARTICLE III or Bankruptcy Court Lease Approval as contemplated in ARTICLE IV ("Bankruptcy Proceedings Dismissal"), the Lease Agreement shall be released from escrow subject to the procedures set forth in ARTICLE VI.

## ARTICLE VI

## ESCROW RELEASE PROCEDURES

Provided (i) all conditions to the effectiveness of the Lease Agreement have been met (each of which Landlord and Tenant shall exercise commercially reasonable efforts (and Jozefovic has caused Tenant to exercise commercially reasonable efforts) to fulfill), (ii) Tenant has delivered (and Jozefovic has caused Tenant to deliver) all security required under the Lease Agreement (including the letter of credit in the amount of $1,150,000 referenced therein), (iii) Landlord and Tenant have executed and delivered (and Jozefovic has caused Tenant to execute and deliver) a subordination, non-disturbance and attornment (an "SNDA") in substantially the form required by the Lease Agreement in favor of Mortgage Lender as referenced therein, and (iv) Tenant has obtained (and Jozefovic has caused Tenant to obtain) Bankruptcy Court Lease Approval as described in ARTICLE IV or a Bankruptcy Proceedings Dismissal has occurred as described in ARTICLE V, the Lease Agreement shall be released from escrow five (5) business days following the fulfilment of each of the conditions (i) through (iv) of this sentence (the "Lease Effective Date").  Upon the Lease Effective Date, counsel to Landlord shall distribute fully executed versions of the same to the Parties, and the Lease Agreement shall be deemed released from escrow and in full force and effect without further notice to or action by any Party.

## ARTICLE VII

## DISCONTINUANCE OF PENDING STATE COURT LITIGATION

Upon delivery of the executed Lease Agreement in escrow as provided in this Escrow Agreement, Landlord and Tenant shall file a stipulation of discontinuance with the State Court discontinuing without prejudice the State Court Proceedings. Landlord expressly reserves the right to refile any such action discontinued without prejudice only in the event that either Tenant or Jozefovic breaches its obligations under this Escrow Agreement including failing to meet each of the conditions for the Lease Effective Date within Tenant's or Jozefovic's control or the Lease Agreement does not become effective provided that Tenant and Jozefovic shall not be in breach if Landlord's actions prevent the Lease Agreement from becoming effective.  In the event Tenant or Jozefovic breaches its obligations under this Escrow Agreement including failing to meet each of the conditions for the Lease Effective Date within Tenant's or Jozefovic's control or the Lease

4

*Execution Version*

Agreement does not otherwise become effective provided that Tenant and Jozefovic shall not be in breach if Landlord's actions prevent the Lease Agreement from becoming effective, Landlord shall refile the State Court Proceedings by no later than June 15, 2025.    Notwithstanding anything to the contrary, Landlord also reserves the right to recommence the State Court Proceeding against Mark Neuman only, in the event the Lease Agreement becomes effective and Landlord and Mark Neuman have not reached an agreement regarding delivery of guaranty of payment by Mark Neuman. The statute of limitations relating to all claims asserted by Landlord in the State Court Proceedings shall be tolled from the original filing of the State Court Proceedings until July 15, 2025. Upon the Lease Effective Date, Landlord and Tenant shall immediately file a further stipulation of discontinuance of the State Court Action with prejudice as to all parties but except as to Mark Neuman as provided herein.

## ARTICLE VIII

## MISCELLANEOUS

This Escrow Agreement shall inure to the benefit of, and be binding on, the Parties hereto and their respective successors and assigns, and shall be governed by, and interpreted in accordance with the laws of the State of New York applicable to agreements made and to be performed in New York, without regard to conflicts of laws principles.  In the event of any default in the performance of the obligations of any Party under this Escrow Agreement, the non-defaulting Parties shall have all rights and remedies available at law and under equity, including the right to commence an action for specific performance of this Escrow Agreement and the Lease Agreement as a third party beneficiary thereof and Landlord shall have the right to re-commence the State Court Proceedings.  This Escrow Agreement may not be modified except by the written agreement of the Parties.  If any provision of this Escrow Agreement is determined by any court of competent jurisdiction to be invalid or unenforceable in any jurisdiction, or invalid or unenforceable as to any Party thereto, the remaining provisions of this Escrow Agreement or the rights and obligations of any other Party shall not be affected thereby and, and, the invalidity or unenforceability in any jurisdiction or as to any Party shall not invalidate or render unenforceable that provision in any other jurisdiction or the rights and obligations of the other Parties hereto.  This Escrow Agreement may be executed by PDF or by original signature in any number of counterparts, each of which when executed and delivered, will be deemed an original, and all of which taken together will be deemed one and the same agreement.

1615920710.14
1695321_2

IN WITNESS WHEREOF, the Parties have executed or caused the execution of this Escrow Agreement by their respective officers duly authorized as of the day and year first above written.

**LANDLORD:**

White Plains Healthcare Properties I, LLC,
a Massachusetts limited liability company

By: _____
      Howard Fensterman, Manager

*(Signature Page to Escrow Agreement)*

**TENANT:**

HBL SNF, LLC,
a New York limited liability company


By: _____
Name: _____
Its: _____


**JOZEFOVIC:**


_____
LIZER JOZEFOVIC, an individual

*(Signature Page to Escrow Agreement)*

**FENSTERMAN:**

_____

HOWARD FENSTERMAN, an individual

**NICHOLSON:**

_____

WILLIAM A. NICHOLSON, an individual

*(Signature Page to Escrow Agreement)*

**MORTGAGE LENDER:**

GARFIELD PARK, LLC,
a Kansas limited liability company


By: _____
Name: Blaine Hirsch
Title:  Vice President

*(Signature Page to Escrow Agreement)*

1615920710.14
1695321_2

**MEZZANINE LENDER:**

BRADFORD ALLEN FUNDING COMPANY LLC,
a Delaware limited liability company


By: _____
Name:
Title:

*(Signature Page to Escrow Agreement)*

**MEZZANINE BORROWER:**

WHITE PLAINS MEZZANINE, LLC,
a Massachusetts limited liability company


By: _____

Name:

Title:

*(Signature Page to Escrow Agreement)*

# EXHIBIT A

# Exhibit B

OPERATING LEASE


By and Between


WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company
("Landlord")


and


HBL SNF, LLC,
a New York limited liability company ("Tenant")


Dated as of January 17, 2025

TABLE OF CONTENTS

Page

ARTICLE I

INCORPORATION OF RECITALS; PRINCIPLES OF CONSTRUCTION, DEFINITIONS

Section 1.1    Incorporation of Recitals.................................................................................. 2
Section 1.2    Principles of Construction................................................................................ 2
Section 1.3    Definitions ....................................................................................................... 2

ARTICLE II

LEASED PREMISES

Section 2.1    Leased Premises............................................................................................... 4

ARTICLE III

TERM AND RENT

Section 3.1    Term of Lease. .................................................................................................. 4
Section 3.2    Rent.................................................................................................................. 6
Section 3.3    Net Lease Provisions. .......................................................**Error! Bookmark not defined.**
Section 3.4    Rent Tax........................................................................................................... 7
Section 3.5    Assignment of Lease to Mortgagee.  ............................................................... 7
Section 3.6    True Lease.  ...................................................................................................... 8
Section 3.7    Option to Purchase.......................................................................................... 8

## ARTICLE IV

### UTILITIES AND TAXES

Section 4.1    Utilities.................................................................................................................. 9
Section 4.2    Taxes..................................................................................................................... 9
Section 4.3    Escrow Deposits. .................................................................................................. 10

## ARTICLE V

### LANDLORD'S WORK, MAINTENANCE AND REPAIR; IMPROVEMENTS

Section 5.1    Landlord's Work ................................................................................................ 10
Section 5.2    Maintenance and Repair. .................................................................................... 12
Section 5.3    Improvements, Renovation, Alterations and Additions........................................ 13
Section 5.4    Signage.............................................................................................................. 14
Section 5.5    Surrender...................................................................**Error! Bookmark not defined.**
Section 5.6    Condition of Leased Premises. ........................................................................... 16

## ARTICLE VI

### INSURANCE

Section 6.1    Insurance.  .......................................................................................................... 17
Section 6.2    Certificates of Insurance. .................................................................................... 21
Section 6.3    Waiver of Subrogation......................................................................................... 21

## ARTICLE VII

## SECURITY, ACCESS AND REPORTING OBLIGATIONS

Section 7.1    Security Deposit/Guaranty................................................................. 22
Section 7.2    Access to Leased Premises. ............................................................ 24
Section 7.3    Changes in Licensure and Certification Status. ............................... 25
Section 7.4    Reporting and Other Obligations. ................................................... 25
Section 7.6    Security Agreement. ...................................................................... 28

## ARTICLE VIII

## PERSONAL PROPERTY

Section 8.1    Landlord's Personal Property. ........................................................ 30
Section 8.2    Tenant's Personal Property............................................................. 30

## ARTICLE IX

## INDEMNIFICATION

Section 9.1    Tenant's Indemnification ............................................................... 30

## ARTICLE X

## USE OF LEASED PREMISES

Section 10.1    Compliance with Laws and Regulations........................................ 31
Section 10.2    No Waste...................................................................................... 32
Section 10.3    Hazardous Materials and Hazardous Waste. ................................ 32

## ARTICLE XI

## DAMAGE OR DESTRUCTION

Section 11.1    Damage or Destruction. ................................................................................. 34
Section 11.2    Precedence of Rights of Mortgagee. .................................**Error! Bookmark not defined.**

## ARTICLE XII

## EMINENT DOMAIN

Section 12.1    Eminent Domain. .......................................................................................... 35

## ARTICLE XIII

## NOTICES

Section 13.1    Notices. ........................................................................................................ 36
Section 13.2    Notices to Mortgagee. .................................................................................. 37

## ARTICLE XIV

## QUIET ENJOYMENT

Section 14.1    Quiet Enjoyment. .......................................................................................... 38

## ARTICLE XV

## SUBLETTING AND ASSIGNMENT

Section 15.1    Subletting and Assignment ........................................................................... 38

1612423165.4

Section 15.2    Attornment and Related Matters. ...................................................................... 39
Section 15.3    Assignment of Subleases. ................................................................................. 39
Section 15.4    Additional Sublease Requirements. .................................................................. 40
Section 15.5    Transfers In Bankruptcy.. ................................................................................. 40
Section 15.6  Management Agreement. ..................................................................................... 42
Section 15.7  Memorandum of Lease. ........................................................................................ 42

## ARTICLE XVI

### DEFAULT

Section 16.1    Default by Tenant and Remedies of Landlord. .................................................. 42
Section 16.2    Facility Operating Deficiencies. ....................................................................... 47

## ARTICLE XVII

### ENTRY AND REIMBURSEMENT RIGHTS OF LANDLORD

Section 17.1    Entry and Reimbursement Rights of Landlord. ................................................. 49

## ARTICLE XVIII

### REPRESENTATIONS AND WARRANTIES

Section 18.1    Tenant's Representations, Warranties and Covenants. ....................................... 49
Section 18.2    Representation and Warranties. ......................................................................... 51

# ARTICLE XIX

## OPERATION, MERGER AND CONSOLIDATION RESTRICTIONS

Section 19.2   SPE Provisions........................................................................................... 51
Section 19.3   Injunctive Relief. ....................................................................................... 52
Section 19.4   Equity Interests. ......................................................................................... 52
Section 19.5   No Merger or Consolidation. ..................................................................... 52

# ARTICLE XX

## MISCELLANEOUS

Section 20.1   **GOVERNING LAW.**............................................................................ 52
Section 20.2   Waiver of Breach. ............................................................**Error! Bookmark not defined.**
Section 20.3   Delay Not a Waiver. ........................................................**Error! Bookmark not defined.**
Section 20.4   Force Majeure. .................................................................**Error! Bookmark not defined.**
Section 20.5   Severability. .....................................................................**Error! Bookmark not defined.**
Section 20.6   Entire Agreement; Amendments.......................................**Error! Bookmark not defined.**
Section 20.7   Counterpart Execution; Facsimile Execution. ..................**Error! Bookmark not defined.**
Section 20.8   Survival of Representations and Warranties.....................**Error! Bookmark not defined.**
Section 20.9   Use of Brokers. ................................................................**Error! Bookmark not defined.**
Section 20.10  Owner for Federal Tax Purposes. ....................................**Error! Bookmark not defined.**
Section 20.11  Estoppel Certificates.........................................................**Error! Bookmark not defined.**
Section 20.12  Confidentiality. ................................................................**Error! Bookmark not defined.**
Section 20.13  Holdover. ................................................................................................. 56
Section 20.14  Tenant's Waiver of Claim for Physical Injury........................................... 56
Section 20.15  Binding Effect............................................................................................ 57
Section 20.16  Default by Landlord.................................................................................... 57
Section 20.17  Liens. .......................................................................................................... 57
Section 20.18  Publicity...................................................................................................... 57
Section 20.19  Trial by Jury............................................................................................... 57

Section 20.20    Construction and Interpretation. .................................................................... 58
Section 20.21    Accord and Satisfaction. .............................................................................. 58
Section 20.22    Captions and Headings. ............................................................................... 58
Section 20.23    Time is of the Essence. ................................................................................ 58
Section 20.24    Successors and Assigns. .............................................................................. 58
Section 20.25    No Third Party Beneficiaries ...................................................................... 58
Section 20.26    Licenses and Transfer of Operations. ..............................**Error! Bookmark not defined.**
Section 20.27    Subdivision. ................................................................................................. 59
Section 20.28    Landlord Not in Control; No Partnership. ................................................... 59

## ARTICLE XXI

## REMEDIES CUMULATIVE

Section 21.1    Cumulative Remedies. .......................................................**Error! Bookmark not defined.**

## ARTICLE XXII

## LIMITATION OF LIABILITY

Section 22.1    Liability......................................................................................................... 60
Section 22.2    Consequential Damages................................................................................. 60

## ARTICLE XXIII

## REGULATORY ACTIONS

Section 23.1    Notice of Litigation....................................................................................... 61

1612423165.4

**ARTICLE XXIV**

**ANTI-TERRORISM AND ANTI-MONEY LAUNDERING COMPLIANCE**

Section 24.1    Compliance with Anti-Terrorism Laws ............................................................ 61
Section 24.2    Funds Invested in Tenant................................................................................... 62
Section 24.3    No Violation of Anti-Money Laundering Laws. ............................................... 62
Section 24.4    Tenant Compliance with Anti-Money Laundering Laws. ................................. 62

1612423165.4

# OPERATING LEASE

THIS OPERATING LEASE ("Lease") is entered into as of January 17, 2025 (the "Execution Date"), by and between WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company with its principal place of business located at 168 Centre Street, Suite 200, Danvers, MA 01923 ("WPHCP") or (the "Landlord") and HBL SNF, LLC a New York limited liability company having an office at 1278 Albany Post Road, Croton on Hudson, New York, NY 10520 he "Tenant"). This Lease replaces and supersedes in its entirety that certain Amended and Restated Lease by and between Landlord and Tenant, dated as of November 19, 2015, which lease was lawfully terminated and is of no further force and effect (the "Terminated Lease").

## RECITALS

A.      WHEREAS, Landlord is the owner of the real property, buildings and improvements constituting the long-term care facility commonly known as 116-120 Church Street, White Plains, New York (the "Facility") and more particularly described on Exhibit A, attached hereto and made a part hereof, (the "Real Property");

B.      WHEREAS, Garfield Park, LLC, a Kansas limited liability company, as successor in interest to Security Benefit Corporation, a Kansas corporation ("Mortgagee"), has extended a building loan and project loan to Landlord in the aggregate principal amount of $38,500,000 (the "Mortgage Debt"), secured by a security interest in the Real Property and Facility pursuant to a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of August 18, 2017, and duly recorded in the Westchester County Clerk's office on August 18, 2017, at Control No. 572363745 (as amended, restated, extended or replaced from time to time, the "Mortgage");

C.      WHEREAS, White Plains Mezzanine, LLC, a Massachusetts limited liability company, the sole member of Landlord ("Landlord Member"), has borrowed a loan from Bradford Allen Funding Company LLC, a Delaware limited liability company ("Mezzanine Lender"), in the principal amount of $9,500,000 (the "Mezzanine Debt"), secured by a security interest in Landlord Member's ownership interests in Landlord;

D.      WHEREAS, Landlord and Tenant have been negotiating and are finalizing a Purchase and Sale Agreement (the "Purchase and Sale Agreement") pursuant to which Tenant will be the Purchaser of the Real Property;

E.      WHEREAS, it is the intention of the Parties to close on the Purchase and Sale Agreement such that Tenant hereunder becomes the owner of the Real Property;

F.      WHEREAS, in the event such closing on the Purchase and Sale Agreement does not occur on or before March 31, 2025, or such extension of time beyond such date as the Parties herein may mutually agree to, the Parties hereby agree to make this Lease effective as between them subject to the condition precedent set forth herein;

G.      WHEREAS, the Parties acknowledge that this Lease requires approval by the New York Department of Health (the "DOH") and the United States Bankruptcy Court, Southern District of New York, in proceedings under caption *White Plains Healthcare Properties I, LLC v. HBL SNF, LLC, et al.* and shall have no force and effect unless such approvals are granted;

1

H.    WHEREAS, Landlord desires to lease the entire Leased Premises (defined herein) to Tenant and Tenant desires to lease the entire Leased Premises from Landlord pursuant to the terms, conditions and covenants set forth herein. and

I.    WHEREAS, Tenant has been and continues to be in possession of the Real Property.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, promises, representations and warranties set forth herein and for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by the Parties, the Parties hereby agree as follows:

# ARTICLE I

## INCORPORATION OF RECITALS; PRINCIPLES OF CONSTRUCTION, DEFINITIONS

Section 1.1    Incorporation of Recitals. The aforesaid Recitals A through D are hereby incorporated into this Lease as if fully set forth herein.  Landlord and Tenant are hereinafter sometimes individually referred to as a "Party" and collectively referred to as "Parties".

Section 1.2  Principles of Construction.  All references to articles, sections, schedules and exhibits are to articles, sections, schedules and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.  Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, the word "Landlord" shall mean "Landlord and its successors and assigns"; the words "Leased Premises" shall include any portion of the Leased Premises and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all reasonable attorneys', paralegal, legal assistant and law clerk fees and disbursements, whether retained firms, the reimbursement for the expenses of in-house staff or otherwise, and, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Landlord in protecting its interest in the Leased Premises and its rights hereunder.  Wherever pursuant to this Lease it is provided that Landlord shall pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees as defined above. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.  The words "includes", "including" and similar terms shall be construed as if followed by the words "without limitation".  Whenever in this Lease any consent, approval, determination or decision of Landlord is to be made by Landlord, or any matter is to be satisfactory to Landlord, then unless expressly provided to the contrary, such provision shall be deemed to mean that such consent, approval, determination or decision of Landlord or determination whether a matter is satisfactory shall be made by Landlord in its sole and absolute discretion for any or no reason and shall be final and conclusive. Whenever in this Lease any consent, approval, determination or decision of Mortgagee or Mezzanine Lender is to be made by Mortgagee or Mezzanine Lender, or any matter is to be satisfactory to Mortgagee or Mezzanine Lender, then unless expressly provided to the contrary, such provision shall be deemed to mean that such consent, approval, determination or decision of Mortgagee or Mezzanine Lender or determination whether a matter is satisfactory shall be made by Mortgagee or Mezzanine Lender, as applicable, in its sole and absolute discretion for any or no reason and shall be final and conclusive.  Any

2

reference in this Lease shall be deemed to include references to such documents as the same may hereafter be amended, modified, supplemented, extended, consolidated, replaced and/or restated from time to time. Any reference in this Lease shall be deemed to be a reference to this Lease (as defined herein), as the same may hereafter be amended, modified, supplemented, extended, consolidated, replaced and/or restated from time to time. Any reference in this Lease or in the Guaranty shall be deemed to be a reference to the Guaranty (as defined herein), as the same may hereafter be amended, modified, supplemented, extended, consolidated, replaced and/or restated from time to time.

Section 1.3    Definitions.

"**Commissione**r" means the Federal Housing Commissioner also called the Assistant Secretary for Housing in the United States Department of Housing and Urban Development.

"**DOH**" means New York State Department of Health.

"**Effective Date**" means the date that this Lease is approved by Order of the United States Bankruptcy Court, Southern District of New York or such other date as agreed to by the Parties if such approval is not required.

"**Health Care Authority or Authorities**" means any Governmental Authority (including HUD) having responsibility for the approval, licensing, certification, payment, issuance of guaranties and insurance for, and/or otherwise setting standards for the operation and occupancy of skilled nursing facilities.

"**Health Care Licenses**" means all Medicare and Medicaid certifications and provider agreements, all public third party payor certifications and provider agreements, and all certifications, permits, regulatory agreements or other agreements and approvals, including certificates of operation, completion and occupancy, and state nursing facility licenses or other licenses and certificates of need required by Health Care Authorities for the legal use, occupancy and operation of the Facility.

"**HUD**" means the United States Department of Housing and Urban Development.

"**Initial Term**" means the first 20 years of the Term of the Lease.

"**Mezzanine Loan Documents**" means the documents evidencing, securing or guaranteeing the Mezzanine Debt, including that certain Mezzanine Loan Agreement, dated as of August 1, 2017, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, including without limitation the Mezzanine Loan Forbearance and Modification Agreement dated January 17, 2025.

"**Mortgage Loan Documents**" means the documents evidencing, securing or guaranteeing the Mortgage Debt, including the Mortgage and that certain Construction Loan Agreement, dated as of August 18, 2017, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, including without limitation the Forbearance and Loan Modification Agreement dated January 17, 2025

"**Primary Market of the Facility**" means a fifteen mile radius of the Leased Premises.

"**Prospective Mortgagee**" means any Person chosen by Landlord as a Mortgagee prior to a closing of a Mortgage to be held by such Person.

3

"**Refinance**" means the replacement or refinance of the Mortgage Debt or the Mezzanine Debt, or any debt in replacement thereof, in whole or part.

"**Tenant's Lease Coverage Ratio**" means EBITDAR divided by Fixed Rent.

## ARTICLE II

## LEASED PREMISES

Section 2.1    <u>Leased Premises.</u>   Landlord hereby leases and demises to Tenant, and Tenant hereby leases from Landlord, on the terms and conditions set forth in this Lease, the following assets (collectively, the "leased Premises":

(a)    all of Landlord's right, title, and interest in and to the Real Property, including, without limitation, all buildings, structures, erections, improvements, appurtenances, easements and fixtures, including fixed machinery and fixed equipment situated thereon or forming a part thereof; and

Section 2.2    <u>Tenant's Property</u>. The parties acknowledge that all machinery, trade equipment, trade fixtures, furniture, furnishings, beds, and accessories of all kinds used in connection with the Facility located on the Real Property is the property of Tenant and Landlord has no right or interest in any said property but such property shall be subject to the security interest granted to Landlord and to any Uniform Commercial Code Financing Statement filed by Landlord pursuant to Section 7.6 of this Lease.

Landlord and Tenant acknowledge and understand that, subject to Sections 5.5 and 11.1 herein, all of the items which comprise the Leased Premises, as repaired, rebuilt, replaced, restored, altered or added to as permitted or required by provisions of this Lease, shall be transferred back to Landlord in accordance with the terms and conditions set forth herein upon the expiration or earlier termination of this Lease.

Section 2.3    In connection with any assignment of Landlord's interest under this Lease and the assumption of this Lease by a new landlord, the original Landlord named herein, and each successor in interest, shall have the right to transfer all amounts deposited pursuant to <u>Section 4.3</u> with respect to the Facility, less any amount used pursuant to <u>Section 4.3</u>, to such assignee (as the subsequent holder of Landlord's interest in this Lease) and upon such transfer, Landlord or the applicable successor in interest transferring the deposits shall thereupon be completely released from all liability with respect to such deposits so transferred and Tenant shall look solely to said assignee, as the subsequent holder of Landlord's interest under this Lease, in reference thereto. If Landlord's interest in the Leased Premises is sold or conveyed as provided above or otherwise or by operation of law: (i) at the new owner's option, Tenant shall attorn to and recognize the new owner as Tenant's Landlord under and pursuant to the executory terms of this Lease and Tenant shall take such actions, at no cost to the Tenant, to confirm the foregoing within ten (10) days after request.

## ARTICLE III

## TERM AND RENT

Section 3.1    <u>Term of Lease.</u>

4

a)       The term (the "Term") of this Lease shall be for a period of twenty (20) years commencing on the 1st day of the month following the date this Lease is approved by Order of the United States Bankruptcy Court, Southern District of New York, or such other date as agreed to by the Parties if such approval is not required (the "Commencement Date"), and ending at 11:59:59 P.M. on the day preceding the twentieth (20th)  anniversary of the Commencement Date (the "Expiration Date") and shall include the Renewal Term, if timely exercised.

b)       The parties acknowledge that Tenant is currently in possession of the Premises and is operating the facility located thereon and notwithstanding  the Commencement Date, certain of the rights and obligations of the parties shall commence on the Effective Date, but not including Tenant's obligations to pay Fixed Rent and Impositions prior to the Commencement Date, or to maintain the Leased Premises, insure the Leased Premises or restore the Leased Premises after a casualty or condemnation prior to the Commencement Date, or any other rights and obligations, which by their terms are intended to commence as of the Commence Date, which rights and obligations shall commence on the Commencement Date.

c)       As used herein with respect to the Term and the periods for payment of Rent (unless the context otherwise requires) the term "Lease Year" shall mean a 365 day period (or 366 day period in the case of a leap year), first commencing on the Commencement Date and thereafter on successive anniversaries thereof, and ending on the day prior to the next succeeding anniversary of the Commencement Date.

d)       Landlord and Tenant hereby acknowledge that the Commencement Date is presently indeterminate and shall occur only as hereinabove provided in Subsection (a) hereof.  Except for the rights of Tenant expressly stated herein, Tenant hereby waives any right to rescind this Lease under the provisions of Section 223-a of the Real Property Law of the State of New York, and agrees that the provisions of this Article are intended to constitute "an express provision to the contrary" within the meaning of said Section 223-a.   Landlord and Tenant shall execute a memo specifying the Commencement Date immediately following its occurrence.

e)   Option to Extend the Initial Term.

(i)       Subject to and in accordance with the provisions of this Article, , Tenant shall have the right ("Tenant's Renewal Right") to extend the Initial Term for a period of ten (10) years (the "Renewal Term").  Tenant's Renewal Right shall apply and be exercisable only if no Lease Default by Tenant has occurred and is continuing, at the time of exercise of Tenant's option under this Article or on the expiration date of the Initial Term, and

(ii)       Subject to the provisions of this Article, the Renewal Term shall commence on the date immediately following the expiration of the Initial Term (the "Renewal Term Commencement Date") and shall expire on the day preceding the ten (10) year anniversary of the Renewal Term Commencement Date (the "Renewal Term Expiration Date"), unless the Renewal Term shall sooner end pursuant to any of the terms, covenants or conditions of this Lease or pursuant to law.  Tenant must give Landlord written notice (a "Renewal Notice") of Tenant's intention to exercise Tenant's Renewal Right to extend the Term for the period of the Renewal Term  no later than twelve (12) months prior to expiration of the Initial Term (the "Renewal Term Notice Date"), **as to which date time is of the essence**.  Upon the giving of the Renewal Term Notice, subject to the provisions of this Article, the Term of the Lease shall be extended

5

without execution or delivery of any other or further document, with the same force and effect as if the Renewal Term had originally been included in the Initial Term. Notwithstanding the foregoing, Tenant shall within ten (10) days of Landlord's written request, execute and deliver to Landlord any instruments or agreements reasonably requested by Landlord evidencing such renewal. All of the terms, covenants and conditions of the Lease shall continue in full force and effect during the Renewal Term, except as herein specifically set forth.

Section 3.2    Rent.

(a)    Beginning on the Commencement Date, and for each year of the first three (3) years of the Term hereof, Tenant shall pay Landlord an annual amount of Six Million Nine Hundred Thousand ($6,900,000.00) Dollars ("Fixed Rent") in monthly installments of $575,000.00 per month.

(i)    Commencing on the third (3rd) anniversary date of the Commencement Date of the Lease (4th Lease Year) and on each succeeding annual anniversary date of the Commencement Date thereafter, the Fixed Rent shall increase in the amount of two percent (2.0%) over the Fixed Rent then in effect (rounded down to the nearest $5.00). Landlord shall have no duty of notice to advise the Tenant of such increases in Fixed Rent.

(ii)    If Tenant exercises its right to extend the Lease in accordance with Section 3.1(e) above, then commencing on Renewal Term Commencement Date (21st Lease Year) and on each succeeding annual anniversary date of the Renewal Term Commencement Date thereafter, the Fixed Rent shall increase in the amount of two percent (2.0%) over the Fixed Rent then in effect (rounded down to the nearest $5.00). Landlord shall have no duty of notice to advise the Tenant of such increases in Fixed Rent.

(b)    Tenant shall pay the Rent to Landlord during the term without deduction or setoff and without demand.

(c)    The terms "Additional Rent" or "additional rent" means all sums, amounts, fees, expenses and costs (including, without limitation, legal fees and disbursements) payable or reimbursable to Landlord under this Lease other than Fixed Rent, and all of same shall be and constitute Additional Rent hereunder. The terms "Fixed Rent" and "Additional Rent" shall be collectively referred to as "Rent." Landlord shall have the same rights and remedies hereunder consequent upon a failure of Tenant to pay any item of Additional Rent as upon a failure of Tenant to pay any item of Fixed Rent.

(d)    Rent shall be due and payable in advance in equal monthly installments during each year on the first (1st) day of each calendar month thereof (or in the event the first day of the calendar month is not a business day, on the first business day following the first day of each calendar month) throughout the Term,. Rent for any period which is less than a full calendar month or full year, as the case may be, during the Term, shall be prorated on a daily basis. Rent shall not be paid more than one (1) month in advance. Rent shall be paid to Landlord at Landlord's address set forth in Section 13.1 or at such other place as Landlord designates from time to time by written notice to Tenant. Tenant agrees to pay Rent, at Landlord's direction, by electronic transfer or wire, as directed by Mortgagee in writing.

(e)    TENANT HEREBY ACKNOWLEDGES THAT LATE PAYMENT BY TENANT TO LANDLORD OF RENT WILL CAUSE LANDLORD TO INCUR COSTS NOT CONTEMPLATED HEREUNDER, THE EXACT AMOUNT OF WHICH IS PRESENTLY ANTICIPATED TO BE EXTREMELY DIFFICULT TO ASCERTAIN. SUCH COSTS MAY

6

INCLUDE PROCESSING AND ACCOUNTING CHARGES AND LATE CHARGES WHICH MAY BE IMPOSED ON LANDLORD BY THE TERMS OF ANY LOAN AGREEMENT AND OTHER EXPENSES OF A SIMILAR OR DISSIMILAR NATURE.    ACCORDINGLY, IF ANY INSTALLMENT OF RENT THAT IS PAYABLE TO LANDLORD OR ITS DESIGNEE SHALL NOT BE PAID WITHIN THREE (3) DAYS OF THE DATE WHEN DUE, TENANT WILL PAY LANDLORD ON DEMAND A LATE CHARGE EQUAL TO FIVE PERCENT (5%) OF THE UNPAID PORTION OF THE AMOUNT OF SUCH INSTALLMENT.  THE PARTIES AGREE THAT THIS LATE CHARGE REPRESENTS A FAIR AND REASONABLE ESTIMATE OF THE COSTS THAT LANDLORD WILL INCUR BY REASON OF LATE PAYMENT BY TENANT.    THE PARTIES FURTHER AGREE THAT SUCH LATE CHARGE IS RENT AND NOT INTEREST AND SUCH ASSESSMENT DOES NOT CONSTITUTE A LENDER OR BORROWER/CREDITOR RELATIONSHIP BETWEEN LANDLORD AND TENANT.    IN ADDITION, THE AMOUNT UNPAID, INCLUDING ANY LATE CHARGES, SHALL BEAR INTEREST AT THE OVERDUE RATE FROM THE DUE DATE OF SUCH INTEREST TO LANDLORD ON DEMAND.    THE PAYMENT OF SUCH LATE CHARGE AND/OR SUCH INTEREST SHALL NOT CONTITUTE A WAIVER OF, NOR EXCUSE OR CURE, ANY DEFAULT UNDER THIS LEASE, NOR PREVENT LANDLORD FROM EXERCISING ANY OTHER RIGHTS AND/OR REMEDIES AVAILABLE TO LANDLORD.

Section 3.3    Net Lease Provisions. Landlord and Tenant intend that the Rent herein specified shall be net to Landlord in each year during the Term, and that all costs, expenses and obligations of every kind and nature, (known or unknown, general or special, ordinary or extraordinary, foreseen or unforeseen, direct or indirect, contingent or otherwise) relating to the operation, repair and maintenance of the Leased Premises (except Landlord's income taxes) which may arise or become due during the Term shall be timely paid by Tenant and that Landlord shall be indemnified by Tenant against such costs, expenses and obligations.  Tenant's obligation to pay Rent is independent of all, and is in no manner conditioned upon any other covenants, conditions and obligations of Landlord or Tenant under this Lease.  There shall be no abatement of Rent payments for any reason nor shall Tenant be entitled to any offsets or deductions from Rent payments due hereunder.

Section 3.4    Rent Tax.  If any governmental taxing authority levies, assesses, or imposes any tax, sales or use tax, privilege tax, excise or assessment (other than income or franchise taxes) upon or against the Rent payable by Tenant to Landlord, either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, then Tenant shall be responsible for and shall pay such tax, excise or assessment, or, if Landlord pays same, Tenant shall reimburse Landlord for the amount thereof within ten (10) days after written demand by Landlord.

It is the intent of this Section 3.4 and all other provisions of this Lease to insure that the Rent (including Additional Rent) paid to Landlord by Tenant will be received by Landlord without diminution by any tax, assessment, charge or levy of any nature whatsoever, except United States, State of New York and local net income taxes, and the terms and conditions of this Lease shall be liberally construed to effect such purpose.  Without limiting the generality of the foregoing, if any tax is assessed or based on gross income actually or constructively received by Landlord pursuant to this Lease, Tenant shall pay such amount which, when added to said gross income, shall yield to Landlord, after deduction of all such tax payable by Landlord with respect thereto, a net amount equal to that which Landlord would have realized therefrom had no such tax been imposed.

Section 3.5    Assignment of Lease to Mortgagee.  Tenant acknowledges that all of the interest of Landlord in and to this Lease has been or will be assigned to Mortgagee pursuant to the Mortgage Loan Documents.

7

In connection with the Terminated Lease, Tenant, Landlord, and Mortgagee's predecessor in interest entered into that certain Subordination, Non-Disturbance and Attornment Agreement, dated as of August 1, 2017 (the "Prior SNDA"). Tenant agrees to promptly execute and deliver to Landlord from time to time any and all documents required by a Mortgagee, Prospective Mortgage, HUD and/or HUD's Approved Lender, or any successor, commercial, agency or private lender, including, without limitation, a lease addendum, regulatory agreement, subordination agreement, non-disturbance and attornment agreement, and/or estoppel certificate, in order to finance or refinance the Facility or otherwise, and including a subordination, non-disturbance and attornment agreement on the same terms as the Prior SNDA.

Upon request at any time or from time to time by Landlord or any Mortgagee or Prospective Mortgagee, Tenant will subordinate this lease and all of Tenant's rights and estate hereunder to such Person's Mortgage and to any renewals, extensions, substitutions, refinancings, modifications or amendments thereof, or declare such Mortgage to be prior to this lease and to any renewals, extensions, substitutions, refinancings, modifications or amendments thereof, and agree with such holder that Tenant will attorn thereto in the event of foreclosure. Landlord shall obtain a written agreement from any such holder in the form typically used by such holder which consents to this lease and provides that, notwithstanding such mortgage or any default, expiration, termination, foreclosure, sale, entry or other act or omission under, pursuant to or affecting said Mortgage, Tenant shall not be disturbed in peaceful enjoyment of the Leased Premises or this lease terminated or canceled at any time, except in the event Landlord shall have the right to terminate this lease under the terms and provisions set forth herein.

Section 3.6    True Lease. It is the intent of Landlord and Tenant and the parties agree that this Lease is a true lease and that this Lease does not represent a financing agreement. Each party shall reflect the transaction represented hereby in all applicable books, records and reports (including income tax filings) in a manner consistent with "true lease" treatment rather than "financing" treatment.

Section 3.7    Option to Purchase. Provided that no Lease Default by Tenant has occurred and is continuing, at the time of exercise of Tenant's Option to Purchase, and further provided that Tenant has timely delivered the executed Estoppel Certificate in accordance with Section 20.11B, and further provided that not more than three (3) cured Lease Defaults have occurred, commencing as of the end of the first (1st) month of this Lease and terminating on the last day of the Initial Term of this Lease, Tenant shall have the option to purchase the Leased Premises from Landlord by giving written notice to Landlord, not less than 120 days prior to the proposed Closing Date set forth in such notice, of its exercise of this Option to Purchase, accompanied by a non-refundable deposit in the amount of $250,000 (but shall be applied to the Purchase Price) if and further provided that within 30 days of the giving of such notice, the parties shall enter into a written Purchase Sale Agreement in substantially the same form as annexed hereto as Exhibit "D", requiring Tenant upon execution to pay the balance of a PSA deposit of 5% of the Option to Purchase Price (5% of the Option Purchase Price less the $250,000 deposit), which PSA deposit shall be non-refundable except if the Seller fails to close and further providing that the Closing shall occur on or before 60 days from the date of the fully executed Purchase Sale Agreement. The Option Purchase Price shall be $77,000,000 provided the Closing occurs on or before the expiration of the thirty-sixth (36th) month of the Term. Commencing with the 37th month of the Term and each month thereafter up to and including the last day of the Initial Term of this Lease, the Option Purchase price shall increase by .0833% each month (based on a 1% increase for each 12 month period). The Option Purchase Price shall be determined by the actual date of Closing without regard to the date on which Tenant provides Landlord with Tenant's Notice exercising such Option. Tenant's Option to Purchase shall terminate if no closing has occurred on or before the expiration of the Initial Term of this Lease.

Notwithstanding anything herein to the contrary, Tenant will only be permitted to exercise the Option to

8

Purchase one time and in the event that Tenant exercises its Option to Purchase but fails to close for any reason, except (i) due to the willful default of Landlord, as seller, or (ii) Tenant, as purchaser, is unable to obtain or close a mortgage loan to purchase the Leased Premises solely due to the appraised value of the Leased Premises, as determined by Tenant's lender, is unsatisfactory to such lender (the "Unsatisfactory Appraisal"), then such Option to Purchase shall lapse and be of no further force and effect. The consummation of the Option to Purchase by Tenant shall require that the Mortgage Debt be satisfied in full by Landlord at closing.

Section 3.8    Landlord Incurred Refinance/Sale  Expenses.  In the event that Tenant does not exercise its Option to Purchase and/or consummate the closing on or before the date that Landlord must satisfy its Mortgage Debt with Security Benefit Corporation, including its successors and assigns, and as a result Landlord refinances the Mortgage Debt, or Tenant exercises its option but fails to close, except due to a willful default of Landlord as seller, and Landlord incurs costs and expenses in connection therewith, then Tenant agrees to reimburse Landlord for the usual and customary costs of such a refinance or for such non-consummated closing, incurred by Landlord, including but not limited to application fees, appraisal fees, environmental and engineering fees, lender's legal fees, Landlord's legal fees, points, mortgage recording tax and title policy premiums, search and recording fees, and non-refundable defeasance, prepayment and breakage fees. The aggregate of such fees shall be amortized over the balance of the Initial Lease Term and paid to Landlord monthly as Additional Rent on the 1st day of each month. In the event that Tenant subsequently exercises its Option to Purchase, the balance of such unpaid expenses shall be added to the Option Purchase Price.

## ARTICLE IV

## UTILITIES AND TAXES

Section 4.1    Utilities.  From and after the Commencement Date, Tenant shall pay or cause to be paid all charges next coming due and payable for electricity, steam, telephone, cable, gas, oil, water, sewer and all other services or utilities used on or related to the Leased Premises (the "Utilities") during the Term.  Tenant covenants to place all Utilities in Tenant's name as of the Commencement Date. Adjustment shall be made for Utilities applicable to any period prior to the Commencement Date.  In the event Landlord is billed directly by any service provider or utility company for any Utilities or services supplied to Tenant during the Term, Landlord shall send Tenant the bill and Tenant shall promptly pay the same.  Landlord shall have no obligation or liability with respect to any interruption or failure in the supply of such Utilities.  If Landlord elects to or shall be required to pay for any Utilities to preserve and/or protect the Leased Premises, Tenant shall reimburse Landlord for the cost and expense thereof plus interest at the Prime Rate.

Section 4.2    Taxes.  Tenant shall be solely responsible for the payment, prior to the date when penalties would attach, of all general and special real estate taxes and assessments (together with any excise taxes on such real estate taxes and assessments levied or imposed by any governmental taxing authority), fire district taxes, liens, impositions, including capital stock, franchise, ad valorem, sales, use, single business, gross receipts, transaction privilege, rent or similar taxes; personal property taxes, assessments including assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Term; ground rents; water, sewer and other utility levies and charges; excise tax levies; fees including license, permit, inspection, authorization and similar fees; and all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Leased Premises, and all interest and penalties thereon attributable to any failure in payment by Tenant  which at any time prior to, during or in respect of the Term hereof may be assessed or

9

imposed on or in respect of or be a lien upon the Leased Premises (collectively, the "Impositions") that accrue from the Commencement Date through the Term.  Adjustment shall be made for Impositions applicable to any period prior to the Commencement Date.  Tenant shall pay all of the Impositions directly to the applicable taxing authorities and Tenant shall promptly forward proof of payment to Landlord in such form as shall be reasonably acceptable to Landlord unless Landlord elects to require escrow deposits in accordance with Section 4.3 hereof.  Landlord shall promptly forward any tax bills which it may receive to Tenant.  Landlord shall only bill Tenant for any of the Impositions if Tenant does not pay any of the Impositions before delinquency and Landlord is obligated or elects (in Landlord's sole and absolute discretion) to pay any of the Impositions directly to remain current with all taxing authorities.  Tenant shall pay the full amount of any increases in any of the Impositions resulting from alterations or improvements made by or for the benefit of Tenant.  After the expiration or termination of this Lease, Tenant shall pay all bills for any of the Impositions which become due and payable after the expiration or termination of the Lease covering any period through the expiration or earlier termination of the Lease.  If any governmental taxing authority acting under any present or future ordinance or regulation, shall levy, assess or impose a tax, excise and/or assessment (other than any net income or franchise tax) upon Landlord or Tenant for rental payable by Tenant to Landlord, either by way of substitution for or in addition to any existing tax on land, buildings or otherwise, then Tenant shall be responsible for and shall pay such tax, excise and/or assessment or shall reimburse Landlord for the cost and expense thereof, as the case may be.  Provided that Tenant shall have deposited a sufficient amount of funds to pay the Impositions pursuant to Section 4.3 and Tenant has done nothing to prevent payment by Landlord or its lender of the Impositions, then Tenant shall not be responsible for any and all late payment fees and/or penalties, including interest, imposed by any applicable taxing authorities with respect to the untimely payment of Impositions.

Section 4.3    Escrow Deposits.

(a)    Escrow.  In the event of a default in payment by Tenant under this Section 4, which after notice by the Landlord remains uncured for a period of thirty (30) days, at the option of Landlord, Tenant shall, on the first day of the first calendar month commencing after notice from Landlord, and on the first day of each calendar month thereafter during the Term (each of which dates is referred to as a "Monthly Deposit Date"), pay to and deposit with Landlord a sum equal to one-twelfth (1/12th) of the Impositions to be levied, charged, filed, assessed or imposed upon or against the Leased Premises within one (1) year after said Monthly Deposit Date and a sum equal to one-twelfth (1/12th) of the premiums for the property insurance policies required pursuant to Article VI which are payable within one (1) year after said Monthly Deposit Date.  If the amount of the Impositions to be levied, charged, assessed or imposed or insurance premiums to be paid within the ensuing one (1) year period shall not be fixed upon any Monthly Deposit Date, such amount for the purpose of computing the deposit to be made by Tenant hereunder shall be reasonably estimated by Landlord with an appropriate adjustment to be promptly made between Landlord and Tenant as soon as such amount becomes determinable.  In addition, Landlord may, at its option, from time to time require that any particular deposit be greater than one-twelfth (1/12th) of the estimated amount payable within one (1) year after said Monthly Deposit Date, if such additional deposit is required in order to provide to Landlord sufficient funds from which to make payment of all Impositions on or before the next due date of any installment thereof, or to make payment of any required insurance premiums not later than the due date thereof.  If any Mortgagee or the Mezzanine Lender or the Commissioner requires Landlord to impound insurance premiums on a periodic basis during the term, Tenant, on notice from Landlord indicating this requirement, shall pay a sum of money towards its liability under this Lease to Landlord on a periodic basis in accordance with Landlord's requirements.  Landlord shall impound the premium payments received from Tenant in accordance with the requirements of Mortgagee and the Mezzanine Lender and shall utilize such funds to timely pay insurance premiums.  Any such sums paid or deposited with Landlord hereunder shall be held

10

in an account subject to the control of the Mezzanine Lender and any use of such funds shall be subject to the terms of the Mortgage Loan Documents and Mezzanine Loan Documents.

        (b)    <u>Use of Deposits</u>.  The sums deposited by Tenant under this <u>Section 4.3</u> shall be held by Landlord or Mortgagee or Mezzanine Lender and shall be applied in payment of the Impositions or insurance premiums, as the case may be, when due.  Any such deposits may be commingled with other assets of Landlord or such Mortgagee or Mezzanine Lender, and shall be deposited by Landlord or such Mortgagee or Mezzanine Lender in an Eligible Institution or in such account or accounts as Landlord or the Mortgagee or Mezzanine Lender may, from time to time select, and Landlord shall not be liable to Tenant or any other person (i) based on Landlord's or the Mortgagee's or Mezzanine Lender's (or any bank's) choice of investment vehicles, (ii) for any consequent loss of principal or interest or (iii) for any unavailability of funds based on such choice of investment.  Furthermore, subject to the foregoing regarding the use of depositories and accounts, Landlord and its Mortgagee and Mezzanine Lender shall bear no responsibility for the financial condition of, nor any act or omission by the depository bank.  No income, if any, from such investment or interest on such deposits shall be paid to Tenant.  To the extent that Landlord does not have an invoice or bill specifying the due date for payment, Tenant shall give not less than thirty (30) days prior written notice to Landlord in each instance when an Imposition or insurance premium is due, specifying the Imposition or premium to be paid and the amount thereof, the place of payment, and the last day on which the same may be paid in order to comply with the requirements of this Lease.  If Landlord, in violation of its obligations under this Lease, does not pay any Imposition or insurance premium when due, for which a sufficient deposit exists, Tenant shall not be in default hereunder by virtue of the failure to pay such Imposition or such insurance premium and Tenant shall not be liable for any late payment fees and/or penalties, including interest imposed as a result of such failure to pay.  The term "<u>Eligible Institution</u>" shall mean a depository institution or trust company, the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P, "P-1" by Moody's and "F-1+" by Fitch in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's).

        (c)    <u>Deficits</u>.  If for any reason any deposit made by Tenant or held by Landlord or Mortgagee or Mezzanine Lender under this <u>Section 4.3</u> shall not be sufficient to pay any Imposition or insurance premium within the time specified therefor in this Lease, then, within ten (10) days after demand by Landlord, Tenant shall deposit an additional amount with Landlord (to be held in an account controlled by Mezzanine Lender pursuant to the terms of the Mortgage Loan Documents and the Mezzanine Loan Documents), increasing the deposit held by Landlord so that Landlord holds sufficient funds to pay such Imposition or premium in full (or in installments as otherwise provided for herein), together with any penalty or interest thereon.  Landlord may change its estimate of any Imposition or insurance premium for any period on the basis of a change in an assessment or tax rate or on the basis of a prior miscalculation or for any other good faith reason, in which event, within ten (10) days after demand by Landlord, Tenant shall deposit with Landlord the amount in excess of the sums previously deposited with Landlord for the applicable period which would theretofore have been payable under the revised estimate.

        (d)    <u>Transfers</u>.  Consistent with <u>Section 2.2</u>, but subject to the terms of the Mortgage Loan Documents and the Mezzanine Loan Documents, in connection with any assignment of Landlord's interest under this Lease and the assumption of this Lease by a new landlord, the original Landlord named herein and each successor in interest shall have the right to transfer all amounts deposited pursuant to the provisions of this <u>Section 4.3</u> and not used pursuant to this <u>Section 4.3</u> to such assignee (as the subsequent holder of Landlord's interest in this Lease) and upon such transfer, the original Landlord named herein or the applicable successor in interest transferring the deposits shall thereupon be completely released from

11

all liability with respect to such deposits so transferred and Tenant shall look solely to said assignee, as the subsequent holder of Landlord's interest under this Lease, in reference thereto.

(e)   <u>Security</u>.   Subject to the terms of the Mortgage Loan Documents and the Mezzanine Loan Documents, all amounts deposited with Landlord pursuant to the provisions of this <u>Section 4.3</u> shall be held in an account subject to the control of the Mezzanine Lender as additional security for the payment and performance of Tenant's obligations under this Lease and, upon the occurrence and during the continuance of any Lease Default, Landlord may, in its sole and absolute discretion, but subject to the terms of the Mortgage Loan Documents and the Mezzanine Loan Documents, apply such amounts towards payment or performance of such obligations.

(f)   <u>Return</u>.   Upon the expiration or earlier termination of this Lease, as long as all of the Rent and any and all other obligations due under this Lease have been fully paid and performed, any sums then held by Landlord under this <u>Section 4.3</u> shall be refunded to Tenant within thirty (30) days, and subject to the rights of Mortgagee and the Mezzanine Lender pursuant to the Mortgage Loan Documents and Mezzanine Loan Documents, together with all interest, if any, earned thereon and all income, if any, earned therefrom; <u>provided</u>, <u>however</u>, that if a Lease Default has occurred and is continuing, all of such sums may be applied by Landlord towards any amounts owed to Landlord pursuant to this Lease.

(f)   <u>Receipts</u>.   Tenant shall deliver to Landlord copies of all claims and bills in relation to the Impositions and insurance premiums promptly upon receipt thereof by Tenant.

This Article and the obligations herein shall survive expiration or earlier termination of this Lease.

## ARTICLE V

## MAINTENANCE AND REPAIR; IMPROVEMENTS

Section 5.1   Intentionally Deleted.

Section 5.2   <u>Maintenance and Repair.</u>   Tenant, at Tenant's sole cost and expense, shall keep the Leased Premises, including all buildings, fixtures, trade equipment, trade fixtures, furniture, beds and other personal property leased to Tenant pursuant to this Lease, including, without limitation, all structural and non-structural components, the roof, foundation, all outer walls, plumbing, sprinklers, electrical, mechanical, heating, ventilation, utility service, air conditioning, vertical transport, telephone, communications, cable, computer, fire-life-safety, nursing call, and all other systems of the Leased Premises in good condition and repair and in compliance with all Laws.   Landlord shall not be responsible to make any improvements, repairs, maintenance or replacements whether occasioned by the act, omission, active negligence, or passive negligence of Landlord or Tenant and/or its agents, employees, invitees or licensees or otherwise, and Tenant shall pay for all improvements, repairs, replacements, maintenance and expenditures relating to the Leased Premises, whether interior or exterior, structural or non-structural, ordinary or extraordinary, foreseen or unforeseen or arising by reason of a condition existing prior to the commencement of the Lease, by Tenant's use or by a change in applicable Laws.   The Leased Premises and its appurtenances shall at all times be kept clean, safe and sanitary and in good order, condition, replacement and repair by Tenant, at Tenant's sole cost and expense, except for ordinary wear and tear (<u>provided</u>, <u>however</u>, that, without limiting the generality of this <u>Section 5.2</u>, Tenant shall be obligated to replace any portion of the Leased Premises upon any obsolescence thereof or if proper repair is impractical).   Tenant shall provide (if not currently a part of the Leased Premises) and maintain, repair and replace, as necessary, all furniture, fixtures, equipment and/or other personal property required by any Governmental Authority (other than furniture, fixtures, equipment and/or other personal

12

property owned by contractors providing ancillary services at the Facility) necessary for the operation of the Facility and to comply with all Laws. All such property provided by Tenant shall immediately become the property of Landlord and Tenant shall execute such documentation as Landlord may reasonably require vesting title in such property in Landlord. Landlord shall have no liability or obligation with respect to such property or any of Tenant's operations relating thereto. All replacements made by Tenant hereunder shall be made in a good and workmanlike manner in accordance with Laws using the same, similar or better quality of materials as being replaced and shall immediately become the property of Landlord. Tenant acknowledges that title and ownership of all repaired and replaced furniture, fixtures, equipment and/or other personal property made hereunder shall belong to and is for the benefit of Landlord. Tenant shall not enter into any equipment leases or conditional sales contracts for any furniture, fixtures, equipment and/or other personal property relating to the Facility without Landlord's consent which it may grant or withhold in its sole discretion. The term "Laws" means, all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting any Leased Premises or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Tenant, at any time in force affecting the Leased Premises or any part thereof. The term "Governmental Authority" means any court, board, agency, arbitrator, commission, office or other authority of any nature whatsoever for any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

Section 5.3        Improvements, Renovation, Alterations and Additions. Tenant shall have the right during the Term to make such non-structural interior alterations, changes and improvements to the Leased Premises as may be proper and necessary for the conduct of Tenant's business, to cause the Leased Premises to conform to all Laws, for patient comfort and safety, or for the full beneficial use of the Leased Premises, so long as such improvements do not  () interfere with any of the purposes for which the Facility was leased or affect the roof or structure, (ii) decrease the value of the Leased Premises, (iii) affect any building system, including, heating, ventilation, air conditioning, mechanical, electrical, plumbing or vertical transport systems, or (iv) affect the exterior appearance of the Leased Premises. Furthermore, Tenant may make all repairs or replacements required by a Governmental Authority without obtaining Landlord's consent, provided, however, Tenant shall give Landlord no less than ten (10) days prior written notice of such government mandated repairs or replacements prior to making or implementing same, unless emergency factors necessitate the making of such repairs before Tenant can reasonable give notice to Landlord, in which event Tenant shall give notice to Landlord as soon as reasonably possible. Tenant shall pay for all costs, fees and penalties imposed by the applicable state agencies or the Center for Medicare and Medicaid Services ("CMS") or other Governmental Authority in connection with any survey or the Change of Ownership. Tenant shall notify Landlord of any alterations, changes or improvements required and/or permitted by the applicable state agencies or the CMS or other Governmental Authority prior to the commencement thereof. Tenant shall pay all costs and expenses of any required and/or permitted alterations, changes, and improvements, shall make the same in a good and workmanlike manner, and in accordance with all Laws, having obtained all necessary permits and approvals from Governmental Authorities having jurisdiction over the Facility and work performed thereon or therein, and shall assure Landlord, in form reasonably satisfactory to Landlord, all necessary permits and authorizations have been received and that payment for the work and materials will be made by Tenant. Tenant hereby completely and fully indemnifies Landlord against any mechanic's liens or other liens or claims in connection with the making of any alterations, changes, and/or improvements. Any liens arising out of any required and/or permitted alterations, changes, and/or improvements shall be discharged of record by Tenant within the earlier of thirty (30) days after the same have been filed by payment, bonding or otherwise, as permitted by law, or five (5) days after commencement of a foreclosure or enforcement action.  .

13

Section 5.4      Signage.  All signs installed by Tenant at the Facility shall comply with all Laws, and all necessary permits or licenses shall be obtained by Tenant.  Tenant shall maintain all signs in good condition and repair, and/or replace as may be required by applicable law, at all times at Tenant's sole cost and expense.  Upon vacating the Leased Premises, Tenant shall remove all signs and supporting material or installations so installed by Tenant, but only if Landlord shall request such removal, and Tenant shall repair all damage caused by such removal.  Landlord acknowledges and agrees that neither Landlord nor any subsequent tenant of Landlord shall be authorized to us any company or registered trade name of Tenant or any of Tenant's affiliates or subtenants.

Section 5.5  Surrender.  (a) Subject to applicable law and to receipt of any necessary DOH approval, Tenant shall deliver up and surrender to Landlord (or, subject to the terms of the Mortgage Loan Documents, Mezzanine Loan Documents, Mortgagee, Mezzanine Lender, or their designee), and Section hereof 11.1    possession of the Leased Premises and all improvements and replacements thereof, including all of Tenant's alterations, improvements work (and all replacements thereof) and all fixtures permanently attached to the Leased Premises by Tenant during the Term, upon the expiration of this Lease or its termination in any manner whatsoever, in as good condition and repair and in substantially similar form, character and manner as the same shall be on the Commencement Date, reasonable wear and tear excepted (without compensation to Tenant), with permitted changes, improvements and additions made during the Term as authorized herein, subject to no liens, encumbrances, charges, restrictions, conditions, limitations or claims whatsoever to the extent not encumbering the Leased Premises as of the Commencement Date, and deliver the keys and/or operational security cards to the Leased Premises to such transferee or their designated agent.

(b) Licenses and Transfer of Operations.  Upon the expiration of the Term or earlier termination of the Lease, Tenant shall and shall cause its subtenants to, (i) transfer to Landlord or Landlord's nominee (or, subject to the terms of the Mortgage Loan Documents and Mezzanine Loan Documents, Mortgagee, Mezzanine Lender, or their nominee) a fully operational, licensed and certified, and staffed facility and shall cooperate with such transferee or their designee or nominee in connection with the processing by such transferee or their designee or nominee of any applications for all licenses, operating permits and other governmental authorization, all contracts, including contracts with all Governmental Authorities or quasi-governmental entities (provided that except following a Lease Default, the reasonable costs and expenses of the processing of any such application shall be paid by such transferee or their designee or nominee), (ii) transfer to Landlord or Landlord's nominee (or, subject to the terms of the Mortgage Loan Documents and Mezzanine Loan Documents, Mortgagee, Mezzanine Lender, or their nominee) all tangible personal property of Tenant, including financial and accounting records, business records, data, employee and/or personnel records, patient and resident records, and all records held in electronic form, (all subject to the Laws requiring confidentiality), all equipment and small ware and all inventory used in connection with the Facility, (iii) transfer to Landlord or Landlord's nominee (or, subject to the terms of the Mortgage Loan Documents and Mezzanine Loan Documents, Mortgagee, Mezzanine Lender, or their nominee) all intangible property except accounts receivable of Tenant, and (iv) transfer to Landlord or Landlord's nominee (or, subject to the terms of the Mortgage Loan Documents and Mezzanine Loan Documents, Mortgagee, Mezzanine Lender, or their nominee) all residents in the Facility.  With respect to resident funds, Tenant shall transfer to Landlord or its designee (or, subject to the terms of the Mortgage Loan Documents and Mezzanine Loan Documents, Mortgagee, Mezzanine Lender, or their nominee), all patient and resident trust accounts, and shall cause its subtenant to prepare and submit to such transferee or its designee a true, correct, and complete accounting and inventory (properly reconciled) of any patient trust funds and resident property to be transferred to such transferee, or its designee.  Tenant shall, and shall cause its subtenant, not to commit any act or be remiss in the undertaking of any act that would jeopardize the licensure or certification of the Facility, and Tenant shall and shall cause its subtenant to comply with all requests for an orderly transfer of the same upon the expiration or early termination of the Term, including, but not limited to, upon the request of

14

Landlord or its designee (or, subject to the terms of the Mortgage Loan Documents and Mezzanine Loan Documents, Mortgagee, Mezzanine Lender, or their nominee), the transitioning of employees in compliance with applicable laws.  Without limiting the generality of the foregoing, if requested by Landlord (or, subject to the terms of the Mortgage Loan Documents and Mezzanine Loan Documents, Mortgage Lender, Mezzanine Lender, or their nominee) or a proposed replacement operator for the Facility, Tenant hereby agrees to enter into a reasonable operations transfer agreement with such replacement operator.  Tenant shall not unreasonably withhold, condition or delay its consent to entering into any interim subleases or management agreements as may be necessary to effectuate an early transfer of the operations of the Facility prior to the time that such replacement operator holds all licenses and permits from all applicable Governmental Authorities with jurisdiction necessary to operate the Facility for its intended use.  In addition, upon request, Tenant shall and shall cause subtenants, to promptly deliver copies to Landlord or Landlord's designee (including, upon request, Mortgage Lender and Mezzanine Lender) of all books and records relating to the Leased Premises and operations thereon (including inventories, employee lists and personnel records, and policies and procedures manuals). Tenant shall allow Landlord or a proposed replacement operator for the Facility to utilize Tenant's, subtenants' computer hardware and software for a minimum of ninety (90) days to facilitate the transfer of operations, the collection of accounts receivables, the billing of providers, and the provision of patient care.  Tenant shall indemnify, defend, protect and hold harmless any such transferee from and against any loss, damage, cost or expense incurred by such transferee or its designee or nominee in connection with the correction of any and all deficiencies of a physical nature identified by any Governmental Authority responsible for licensing the Leased Premises in the course of any change of ownership inspection and audit. Tenant shall be responsible for any alterations or renovations necessitated by, or imposed in connection with, a change of ownership inspection survey for the transfer of operation of the Leased Premises. Tenant shall not commence to wind up and terminate the operations of the Facility or relocate the patients or occupants of the Facility to any other health care facility.  In addition, Tenant shall not terminate the employees of the Facility except in connection with and upon the transfer of operations of the Facility pursuant to this section.

(c)    If Landlord notifies Tenant in writing that it intends to transfer the operations of the Facility to a new operator and desires to have Tenant continue to operate the Facility after the Expiration Date or earlier termination of the Lease, then Tenant shall continue to operate the Facility until the earliest to occur of (i) the date on which such successor operator shall assume operation of the Facility, or (ii) the date that is 180 days after the applicable Expiration Date or termination date (the "Reimbursement Period").  During the Reimbursement Period (x) Landlord shall provide Tenant with an operating budget, (y) Landlord shall include in the aforesaid operating budget, and Tenant shall continue to pay during the Reimbursement Period, all Rent that would have been owing under this Lease as to the Leased Premises if this Lease had not expired or terminated as to, and/or Tenant had not been dispossessed from, such Leased Premises, and (z) provided that this Lease was not terminated with respect to, and Tenant was not dispossessed from, such Lease Premises due to a Lease Default, Landlord shall reimburse Tenant for any operating deficits with respect to the Facility that Tenant may be required to fund out-of-pocket on account of operating losses and expenses incurred by Tenant by reason of, or arising out of compliance with, such budget with respect to the Reimbursement Period. Any such reimbursement shall be due from Landlord to Tenant within 60 days after request by Tenant, provided that Tenant shall furnish such documentation of any operating deficits, losses and expenses as Landlord may reasonably request.  The terms of this Section 5.5(c) shall survive the expiration or earlier termination of this Lease and/or any dispossession of Tenant from the Lease Premises.

(d)    Use of Legacy Tradename.  Without limitation of the other provisions of this Section 5.5 and notwithstanding anything to the contrary contained in this Lease, Tenant agrees to allow Landlord or its designee operator, at its option and at no cost to Landlord or any such designee, to continue to use, in its signage, marketing and advertising materials, operations and otherwise, any or all

15

name(s) (including tradenames) associated with the operation of the Facility as a going concern for up to 180 days following (i) the expiration or termination of this Lease and (ii) the vacation from, and surrender of, the Leased Premises and Facility by Tenant.  At the end of such 180 day period, or upon sooner written notice from Landlord to Tenant, Tenant shall, promptly and at its expense, remove its aforesaid name(s) from all signs on the Facility and repair any damage to such signs caused by such removal.  Landlord acknowledges and agrees that Tenant, not Landlord, owns the aforesaid names and that neither Landlord nor any designee of Landlord may use the same except as described in this Section 5.5(d) or as otherwise agreed in writing by Tenant.

(e)     Management of Terminated/Dispossessed Premises.  Commencing on the applicable Termination/Dispossession Date as to any Terminated/Dispossessed Premises, Landlord or its designee, upon notice to Tenant, may elect to assume the responsibilities and obligations for the management and operation of the Business at such Terminated/Dispossessed Premises, and Tenant agrees to cooperate fully to accomplish the transfer of such management and operation without interrupting the operation of such Business to the extent allowable by Laws. Tenant shall not commit any act or be remiss in the undertaking of any act that would jeopardize any licenses, certifications and other authorizations related to the Facility, and Tenant shall comply with all requests for an orderly transfer of all licenses, certifications and other authorizations related to the Facility and any payor's certifications.

(f)      In addition, upon any expiration or termination of this Lease, Tenant covenants and agrees to do such things and to take such action as may, from time to time, be necessary or appropriate to permanently surrender and withdraw from possession and operation (including but not limited to licensure and certification) of the Leased Premises, and shall thereafter be fully and permanently relieved of all powers, duties, responsibilities and obligations that are conferred or imposed upon Tenant under this Lease (except those continuing obligations, including but not limited to the obligation to pay all Rent due and owing under this Lease, and the obligation to pay all amounts owed by Tenant to the Medicare, Medicaid, third party payor programs and residents for the period of the Term, which survive the termination hereof as provided herein) and to restore and place Landlord or its designee in possession and operation of the Leased Premises, or any portion thereof, and Tenant covenants and agrees to execute and deliver to Landlord or Landlord's designee (each subject to the approval of DOH) all assignments, operation transfer agreements, consents, consents to assignments (including Medicare and Medicaid provider agreements, if requested by Landlord) documents and other instruments, to the reasonable satisfaction of Landlord in order to effectuate the provisions hereof.

Section 5.6 Condition of Leased Premises. Tenant is in possession of the Leased Premises in its "AS IS," "WHERE IS" condition, and Tenant's prior acceptance of possession of the Leased Premises on the Commencement Date shall be deemed an acknowledgment by Tenant of Tenant's acceptance of the condition of the Leased Premises.  Tenant acknowledges and agrees that Landlord is not making any representation, warranty or covenant whatsoever with respect to the condition of the Leased Premises, or any portion thereof, or its suitability for any particular purpose, and Tenant shall be relying solely on its inspection of the Leased Premises and due diligence investigations with respect thereto.

(b)     LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, IN RESPECT OF THE LEASED PREMISES OR ANY PART THEREOF, EITHER AS TO ITS FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE OR OTHERWISE, OR AS TO THE NATURE OR QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, OR THE EXISTENCE OF ANY HAZARDOUS SUBSTANCE, IT BEING AGREED THAT ALL SUCH RISKS, LATENT OR PATENT, ARE TO BE BORNE SOLELY BY TENANT, INCLUDING ALL RESPONSIBILITY AND LIABILITY FOR ANY ENVIRONMENTAL REMEDIATION AND FOR COMPLIANCE WITH ALL ENVIRONMENTAL LAWS.   AS OF THE EFFECTIVE DATE OF THIS LEASE, TENANT SHALL RELEASE

16

LANDLORD FROM ALL CLAIMS WHICH TENANT OR ANY AGENT, REPRESENTATIVE, AFFILIATE, EMPLOYEE, DIRECTOR, OFFICER, PARTNER, MANAGER, MEMBER, SERVANT, SHAREHOLDER, TRUSTEE OR OTHER PERSON OR ENTITY ACTING ON TENANT'S BEHALF OR OTHERWISE RELATED TO OR AFFILIATED WITH TENANT ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO OR IN CONNECTION WITH THE LEASED PREMISES, INCLUDING THE INFORMATION AND ANY PHYSICAL OR ENVIRONMENTAL CONDITIONS, AND TENANT SHALL NOT LOOK TO LANDLORD IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF.  THIS RELEASE SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH OF ITS EXPRESSED TERMS AND PROVISIONS, INCLUDING THOSE RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, DAMAGES AND CAUSES OF ACTION.  EXCEPT AS TO MATTERS SPECIFICALLY SET FORTH IN THIS LEASE:  (A) TENANT WILL ACQUIRE THE LEASED PREMISES SOLELY ON THE BASIS OF ITS OWN PHYSICAL AND FINANCIAL EXAMINATIONS, REVIEWS AND INSPECTIONS, AND (B) WITHOUT LIMITING THE FOREGOING, WAIVES ANY RIGHT IT OTHERWISE MAY HAVE AT LAW OR IN EQUITY AGAINST LANDLORD WITH RESPECT TO ANY ASPECT OF LEASED PREMISES.

## ARTICLE VI

### INSURANCE

Section 6.1   <u>Insurance</u>.  (a)  Tenant shall obtain and maintain, or cause to be maintained, insurance for Tenant and the Facility providing at least the following coverages or as required from time to time by any Mortgagee or Mezzanine Lender which requirements shall be consistent with those contained in the Terminated Lease:

(i)   comprehensive "all risk" insurance on the Facility and the Personal Property, including Building Ordinance Coverage from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case (A) IN AN AMOUNT EQUAL TO ONE HUNDRED PERCENT (100%) OF THE "FULL REPLACEMENT COST," WHICH FOR PURPOSES OF THIS LEASE SHALL MEAN ACTUAL REPLACEMENT VALUE (EXCLUSIVE OF COSTS OF EXCAVATIONS, FOUNDATIONS, UNDERGROUND UTILITIES AND FOOTINGS) WITH A WAIVER OF DEPRECIATION (EXCEPT WITH RESPECT TO THE INSURANCE PURSUANT TO CLAUSES (D), (x), (y) and (z) below); (B) containing an agreed amount endorsement with respect to the Facility and Personal Property waiving all co-insurance provisions; (C) providing for no deductible in excess of Ten Thousand Dollars ($10,000.00) for all such insurance coverage (except as stated in the penultimate sentence of this subsection); and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if the Facility or the use of the Facility shall at any time constitute legal non-conforming structures or uses and covering the increased cost of construction, demolition cost, value of the undamaged portion of the structure and any increased expenses to rebuild due to the enforcement of building or zoning laws or requirements following a covered loss of the Leased Premises.  In addition, Tenant shall obtain:  (x) if any portion of any of the Leased Premises is currently or at any time in the future located in a federally designated "special flood hazard area," flood hazard insurance in an amount equal to the lesser of (1) the outstanding principal balance of any loan encumbering the Leased Premises or (2) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each

17

may be amended, or successor legislation, or such greater amount as Landlord and/or Mortgagee shall require; (y) earthquake insurance in amounts and in form and substance satisfactory to Landlord and Mortgagee and Mezzanine Lender in the event the Facility is located in an area with a high degree of seismic activity and (z) coastal windstorm insurance in amounts and in form and substance satisfactory to Landlord and Mortgagee and Mezzanine Lender in the event the Facility is located in a coastal region; provided that the insurance pursuant to clauses (x), (y) and (z) hereof shall be on terms consistent with the comprehensive insurance policy required under this Subsection (i); and further provided that the earthquake insurance pursuant to clause (y) may provide for a deductible of up to the greater of One Hundred Thousand Dollars ($100,000.00) and two percent (2%) of the amount of such coverage, (III) the flood insurance pursuant to clause (x) may provide for a deductible of up to One Hundred Thousand Dollars ($100,000.00), and (IV) the ordinance and law coverage pursuant to clause (D) may have a sub-limit of Two Million Five Hundred Thousand Dollars ($2,500,000.00);

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Facility, such insurance (A) with a combined limit of not less than Five Million Dollars ($5,000,000.00) in the aggregate and Two Million Dollars ($2,000,000.00) per claim (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (B) to continue at not less than the aforesaid limit until required to be changed by Landlord and Mortgagee and Mezzanine Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards:   (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability; and (5) contractual liability covering the indemnities contained in Section 9.1 of the Lease to the extent the same is available;

(iii) business income with extra expense insurance (A) with loss payable to Landlord and Mortgagee; (B) covering all risks required to be covered by the insurance provided for in Subsection (i) above; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Facility and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twenty-four (24)  months from the date that the Facility is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected net profit and extra expense with respect to the Facility for a period of twenty-four (24)  months from the date of such Casualty (assuming such Casualty had not occurred) and notwithstanding that the policy may expire at the end of such period.  The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Tenant's reasonable estimate of the gross income from the Facility for the succeeding twelve (12) month period, but in no event shall the amount of such insurance be less than the Rent, plus the Insurances, and Taxes costs in effect at the time.  Nothing herein contained shall be deemed to relieve Tenant of its obligations to pay the Rent when due except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)  at all times during which structural construction, repairs or alterations are being made with respect to the Facility, and only if the Facility coverage form does not otherwise

18

apply, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above and (3) with an agreed amount endorsement waiving co-insurance provisions;

(v)   worker's compensation insurance with respect to any employees of Tenant, as required by any Governmental Authority, Health Care Authority, Legal Requirement or Health Care Requirement;

(vi)  boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Landlord and Mortgagee and Mezzanine Lender on terms consistent with the commercial property insurance policy required under Subsection (i) above;

(vii)  intentionally omitted;

(viii)  motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million Dollars ($1,000,000.00);

(ix)  if the Facility is or becomes a legal "non-conforming" use, ordinance or law coverage and insurance coverage to compensate for the cost of (upon a Casualty) demolition or rebuilding of the undamaged portion of the Facility along with any reduced value and the increased cost of construction in amounts as requested by Landlord and Mortgagee and Mezzanine Lender;

(x)  the commercial property and business income insurance required under Sections 6.1(a)(i) and (iii) above shall cover perils of terrorism and acts of terrorism and Tenant shall maintain commercial property and business income insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required under Sections 6.1(a)(i) and (iii) above at all times during the Term;

(xi)  professional liability and malpractice insurance with limits of at least Two Million Dollars ($2,000,000.00) per claim / Five Million Dollars ($5,000,000.00) in the aggregate.  Tenant shall also require each medical director for the Facility and the associated nurse practitioner at the Facility to carry professional liability and malpractice insurance with limits of not less than Two Million Dollars ($2,000,000.00) per claim / Five Million Dollars ($5,000,000.00) in the aggregate; and

(xii) notwithstanding anything to the contrary in the foregoing, all insurance coverage required by any mortgagee of Landlord shall be met by Tenant, from time to time as necessary;

(xiii)  upon sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Landlord and/or Mortgagee and Mezzanine Lender from time to time may reasonably request against such other insurable hazards which at the time are

19

commonly insured against for property similar to the Facility located in or around the region in which the Facility is located.

(b)    All insurance provided for in <u>Section 6.1(a)</u> shall be obtained under valid and enforceable policies (collectively, the "<u>Policies</u>" or, in the singular, the "<u>Policy</u>"), and shall be subject to the approval of Landlord and Mortgagee and Mezzanine Lender as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State of New York and having a claims paying ability rating of "A" or better (and the equivalent thereof) by at least two (2) of the Rating Agencies rating the companies (one of which shall be S&P if they are rating the securities and one of which will be Moody's if they are rating the companies), or if only one Rating Agency is rating the companies, then only by such Rating Agency and shall specifically name Landlord and Mortgagee as loss payees and additional insureds, as applicable. Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Landlord and Mortgagee and Mezzanine Lender, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Landlord and Mortgagee of payment of the premiums due thereunder (the "<u>Insurance Premiums</u>"), shall be delivered by Tenant to Landlord and Mortgagee and Mezzanine Lender.

(c)    Any blanket insurance Policy shall specifically allocate to the Facility the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Facility in compliance with the provisions of <u>Section 6.1(a)</u>.

(d)    All Policies provided for or contemplated by <u>Section 6.1(a)</u>, except for the Policy referenced in <u>Section 6.1(a)(v)</u>, shall name Tenant as the insured and Landlord and Mortgagee as the additional insured, as their interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called lender's loss payee endorsement in favor of Mortgagee providing that the loss thereunder shall be payable to Mortgagee.

(e)    All Policies provided for in <u>Section 6.1</u> shall contain clauses or endorsements to the effect that:

no act or negligence of Tenant, or anyone acting for Tenant, or of any tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Landlord and Mortgagee and Mezzanine Lender are concerned;

the Policies shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' written notice to Landlord and Mortgagee and Mezzanine Lender and any other party named therein as an additional insured;

the issuers thereof shall give notice to Landlord and Mortgagee and Mezzanine Lender if the Policies have not been renewed fifteen (15) days prior to its expiration; and

Neither Landlord nor Mortgagee nor Mezzanine Lender shall be liable for any insurance premiums thereon or subject to any assessments due thereunder.

(f)    If at any time Landlord and Mortgagee and Mezzanine Lender is not in receipt of written evidence that all Policies are in full force and effect, either shall have the right, without notice to Tenant, to take such action as either deems necessary to protect its interest in the Leased Premises, including, without limitation, the obtaining of such insurance coverage as either in its sole discretion deems appropriate.  All premiums incurred by Landlord and/or Mortgagee and/or Mezzanine Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Tenant to Landlord and/or Mortgagee and/or Mezzanine Lender, as the case may be, upon demand and, until paid, shall be secured by the Mortgages and shall bear interest at the Overdue Rate.

(g)    Tail Insurance.  If Tenant has claims made insurance coverage of any type, upon expiration or earlier termination of this Lease, Tenant shall purchase so-called "tail" insurance for a period of three years in an amount not less than its existing coverages in order to assure Tenant is covered by insurance after the expiration or earlier termination of this Lease for all claims arising or relating to the period prior to the expiration or earlier termination of this Lease, and Landlord and Mortgagee shall be named as additional insured thereunder.

Section 6.2    Insurance Policies and Certificates of Insurance.  On or before the Commencement Date of this Lease, and annually thereafter no later than ten (10) Business Days prior to the Policies' expiration date, Tenant shall furnish Landlord, Mortgagee and Mezzanine Lender and other third parties which Landlord shall designate with complete copies of all Insurance Policies required under this Lease, with  appropriate certificates of insurance on acceptable Acord forms, together with an additional insurance endorsement showing that each type of insurance required under this Article VI is in full force and effect and not cancelable or modifiable without thirty (30) days prior written notice to Landlord, and upon request of Landlord or one or more of such additional insureds, deliver copies of such insurance policies. Tenant will provide Landlord with acceptable certificates of insurance pursuant to this Section 6.2 evidencing the renewal of such Policies ten (10) Business Days prior to the Policies' expiration date.   Tenant acknowledges that all such certificates shall name Landlord, its successors and assigns, and Mortgagee, its successors and assigns, as additional insureds on the general liability and umbrella policies and as a loss payee/mortgagee, as their interests may appear, on the property and boiler and machinery policies.

Section 6.3    Waiver of Subrogation.  Landlord and Tenant hereby waive all rights of recovery for causes of action which either has or may have or which may arise hereafter against the other for any damage to the Leased Premises or the property or business of either of them or of anyone claiming through either of them, by way of subrogation or otherwise, caused by any of the perils covered by a special form policy of property insurance or contents insurance or by any other insurance for damage to property carried by the party whose property was damaged; provided, however, that the foregoing waiver shall apply only if and to the extent that a waiver of subrogation for property damage is not prohibited in the State of New York, has been consented to by the applicable insurance carrier, and only to the extent of such insurance coverage.

21

# ARTICLE VII

## SECURITY, ACCESS AND REPORTING OBLIGATIONS, WORKING CAPITAL

Section 7.1                    Security Deposit/Guaranty.

(a)     Contemporaneously with the execution of this Lease, Tenant, shall deliver a guarantee of this Lease (the "Individual Guaranty") from Lizer Jozefovic (the "Individual Guarantor") in the form of Exhibit "B" attached hereto, and the guaranty of monetary and payment obligations of Tenant (the "Entity Guaranty" and together with the Individual Guaranty, the "Guaranty") from Epic Healthcare Management, LLC, a New York limited liability company (the "Entity Guarantor' and together with the Individual Guarantor, the "Guarantors") in the form of Exhibit "B-1" attached hereto, or in form and amounts as may be otherwise required by the Landlord, Mortgagee and Mezzanine Lender.  The Guaranty shall set forth that the Guarantors will be required to cooperate in turning the license over to the Landlord's designee or be personally liable for all costs, expenses and damages or deficiencies.  ON OR PRIOR TO THE COMMENCEMENT DATE, THE GUARANTORS SHALL ENSURE THAT THE TENANT SHALL HAVE DELIVERED ALL OF THE DOCUMENTS REQUIRED TO TRANSFER THE LICENSE IN ESCROW TO MORTGAGEE, OR, FOLLOWING THE REPAYMENT IN FULL OF THE MORTGAGE DEBT AND THE MEZZANINE DEBT, SUCH OTHER PARTY AS LANDLORD DESIGNATES. As further security for the Tenants performance under the Lease, the Tenant hereby agrees as follows:

(i)          Intentionally Deleted.

(ii)Tenant shall deliver to Landlord, not less than fifteen (15) days prior to the anticipated Commencement Date, a Letter of Credit (as hereinafter defined) in the amount of $1,150,000.00, as and for the Security Deposit, for the faithful performance and observance by Tenant of the terms, covenants and conditions of this Lease.  The letter of credit shall be in the form of a clean, irrevocable, non-documentary and unconditional letter of credit (the "**Letter of Credit**") issued by and drawable upon any federally-chartered commercial bank, trust company, or national banking association with offices for banking purposes in the City of New York (the "**Issuing Bank**") that is then rated, without regard to qualification of such rating by symbols such as "+" or "-" or numerical notation, "A" or better by Moody's Investors Service and Standard & Poor's Rating Service.  The Letter of Credit shall (a) name Landlord as beneficiary, (b) have a term of not less than one year, (c) permit multiple drawings, (d) be fully transferable by Landlord without the payment of any fees or charges by Landlord, and (e) otherwise be in form and content satisfactory to Landlord.  If upon any transfer of the Letter of Credit, any fees or charges shall be so imposed, then such fees or charges shall be payable solely by Tenant and the Letter of Credit shall specify that it is transferable without charge to Landlord and that payment shall not be a condition to the transfer.  If Landlord pays any such fees or charges, Tenant shall reimburse Landlord therefor upon demand.  The Letter of Credit shall provide that it shall be automatically renewed, without amendment, for consecutive periods of one year each thereafter during the Term (and in no event shall the Letter of Credit expire prior to the 45th day following the Expiration Date) unless the Issuing Bank sends a notice (the "**Non-Renewal Notices**") to Landlord, not less than 60 days next preceding the then expiration date of the Letter of Credit stating that the Issuing Bank has elected not to renew the Letter of Credit.  The Issuing Bank shall agree with all drawers, endorsers and bona fide holders that drafts drawn under and in compliance with the terms of the Letter of Credit will be duly honored upon presentation to the Issuing Bank at an office location in New York, New York.  The Letter of Credit shall be subject in all respects to the International Standby Practices 1998,

22

International Chamber of Commerce Publication No. 590.  If Tenant exercises its option to extend the Term pursuant to Sectio. 3.1 e) of this Lease then, not later than 90 days prior to the Renewal Term Commencement Date, Tenant shall deliver to Landlord a new Letter of Credit or an amendment to the existing Letter of Credit evidencing that the expiration date of the Letter of Credit is at least 45 days after the expiration of the Renewal Term.

(b)Additional Security. Tenant, as additional security for the obligations of Tenant under this Lease, shall cause to be delivered to Landlord on or before the Commencement Date, (i) an assignment of management fees, up to the extent of all monetary obligations of Tenant under this Lease, from  Epic Healthcare Management, LLC, a New York limited liability company ("Epic") to Landlord, and (ii) a Pledge of Membership Interest (the "Pledge"), in form and substance reasonably acceptable to Landlord, from Lizer Jozefovic and Mark Neuman granting Landlord a security interest in their membership interests in Epic, and further authorizing Landlord to file UCC-1 Financing Statements to perfect such security interests being granted. The Pledge shall require that each such pledgor shall deliver to Landlord an undated executed Assignment of Membership Interest with the assignee left blank and such other instruments as reasonably required by Landlord, which will be held in escrow by Landlord who will be authorized to release and complete such Assignment of Membership Interest and other instruments in the event of a Lease Default or a default under the Guaranty. Tenant acknowledges that such Additional Security may be collaterally pledged by Landlord to any mortgagee of the Leased Premises.

(c)        If (a) a Lease Default by Tenant occurs or (b) Landlord receives a Non-Renewal Notice or (c) the credit rating of the Issuing Bank has been downgraded below the rating specified above and in connection with clauses (b) and (c)  above, Tenant has failed to deliver a new Letter of Credit from a bank with a credit rating meeting the standard specified above and otherwise meeting the requirements set forth in this **Article 7** within 30 days following notice from Landlord, Landlord shall have the right, but subject to the terms of the Mortgage Loan Documents and Mezzanine Loan Documents, by sight draft to draw, at its election, all or a portion of the proceeds of the Letter of Credit and thereafter hold, use, apply, or retain the whole or any part of such proceeds, (x) to the extent required for the payment of any Fixed Rent or any other sum as to which Tenant is in default including (i) any sum which Landlord may expend or may be required to expend by reason of Tenant's default, and/or (ii) any damages to which Landlord is entitled pursuant to this Lease, whether such damages accrue before or after summary proceedings or other reentry by Landlord and/or (y) as cash proceeds to guaranty Tenant's obligations hereunder, unless and until Tenant delivers to Landlord a substitute Letter of Credit which meets the requirements of this **Article 7**, provided at such time no default or Lease Default by Tenant has occurred and is continuing, in which event Landlord shall have no obligation to accept such substitute Letter of Credit and shall have the right to retain the cash proceeds.  Notwithstanding anything contained herein to the contrary, upon a Lease Default under clause (a) above, Landlord shall have the immediate right, without notice of any kind to Tenant, but subject to the terms of the Mortgage Loan Documents and Mezzanine Loan Documents, to draw upon the Letter of Credit and apply some or all of the funds to remedy such Lease Default and to compensate Landlord for any loss or damages resulting therefrom, without prejudice to any other rights or remedies of Landlord under this Lease or at law or in equity. If Landlord applies any part of the cash proceeds of the Letter of Credit, Tenant shall promptly thereafter amend the Letter of Credit to increase the amount thereof by the amount so applied or provide Landlord with an additional Letter of Credit in the amount so applied so that Landlord shall have the full amount thereof on hand at all time during the Term.  If Tenant shall comply with all of the terms, covenants and conditions of this Lease, the Letter of Credit or the cash proceeds thereof, as the case may be, shall be returned to Tenant after the Expiration Date and after delivery of possession of the Premises to Landlord in the manner required by this Lease.

23

(d)        Upon a sale or other transfer of the Real Property or the Leased Premises, Landlord shall have the right to transfer the Letter of Credit or cash proceeds thereof to its transferee. With respect to the Letter of Credit, within 5 days after notice of such transfer, Tenant, at its sole cost, shall arrange for the transfer of the Letter of Credit to the new landlord, as designated by Landlord in the foregoing notice or have the Letter of Credit reissued in the name of the new landlord.  Upon such transfer, Tenant shall look solely to the new landlord for the return of the Letter of Credit or cash proceeds thereof, and thereupon Landlord shall without any further agreement between the parties be released by Tenant from all liability therefor, and it is agreed that the provision hereof shall apply to every transfer or assignment made of the Letter of Credit or cash proceeds thereof to a new landlord.  Tenant shall not assign or encumber or attempt to assign or encumber the Letter of Credit or cash proceeds thereof and neither Landlord nor its successors or assigns shall be bound by any such action or attempted assignment or encumbrance.

Section 7.2 <u>Access to Leased Premises</u>.  Tenant shall permit Landlord, Mortgagee, Mezzanine Lender and their agents (an "Inspecting Party") to enter upon the Leased Premises at all reasonable times during ordinary business hours and upon at least twenty-four (24) hours advance oral notice (except that in the case of emergency, such Inspecting Party may enter at any time and without prior notice) to inspect and examine the Leased Premises, to perform repairs and to inspect and copy any operating manuals, procedures manuals, training manuals, and other books and records concerning unemployment, workers' compensation, insurance, tax, and any other business issues pertaining to the Leased Premises (subject to applicable laws and regulations governing patient confidentiality and privacy and the confidentiality of medical records) and any information necessary for audit relating to cost reimbursement, collections, general financial matters, litigation, inquiries and related activities (as may be necessary in connection with the Lease or the Leased Premises or any matters relating to periods prior to the Commencement Date).  Any access by an Inspecting Party to patient records or medical records shall be strictly governed by Laws governing patient confidentiality and privacy and the confidentiality of medical records and all appropriate consents and/or waivers from residents or their guardians or representatives shall have been obtained before access to such records shall be granted.  An Inspecting Party shall make reasonable efforts not to materially interfere with or materially disrupt Tenant's business and use and enjoyment of the Leased Premises during any such inspection or examination.  An Inspecting Party shall also have the right but not the obligation to conduct a physical inspection of the Facility and from time to time and within ninety (90) days prior to the expiration of the Term or earlier termination of the Lease, upon twenty-four (24) hours advance oral notice.  If an Inspecting Party reasonably determines based on this inspection that the Facility, or any portion of the Facility, requires repairs or maintenance so that the condition of the Facility is in compliance with this Lease and all Laws, then within thirty (30) days of notification by Landlord, Tenant shall commence making said repairs and diligently pursue such repairs to completion.  Should Tenant fail to do so, within thirty (30) days of notification by Landlord, Tenant shall pay to Landlord a deposit of funds (to be held subject to the terms of the Mortgage Loan Documents and Mezzanine Laon Documents) in an amount equal to Landlord's reasonable estimate of the costs of such repairs or maintenance, which funds shall be released to Tenant from time to time during the progress of such repairs and maintenance based on submission by Tenant of evidence reasonably satisfactory to Landlord that such work is complete and all costs and expenses incurred to date have been paid in full.  Tenant and Landlord acknowledge that the operations of the Facility and its maintenance are the sole and absolute responsibility of Tenant.  No Inspecting Party shall have any liabilities or obligations with respect to the Facility, including no liabilities or obligations with respect to inspections of the Facility or the failure by any Inspecting Party to inspect the Facility.

Notwithstanding anything to the contrary in this in this Lease, Landlord and Tenant agree that all information, records and data collected or maintained regarding Facility residents shall be confidential. Landlord, Tenant, and their respective employees and agents shall maintain the confidentiality of all Facility resident information received in accordance with applicable New York and federal laws,

24

including the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-91) and the regulations issued in connection therewith (collectively, "HIPAA"). No employee or agent of Landlord or Tenant shall discuss, transmit or narrate in any manner the Facility resident information of a personal, medical, or other nature except as a necessary part of providing services to the resident, effectuating a transfer of the Facility's assets, or otherwise fulfilling its obligations under this Lease or under law. The obligations under this Section 7.2 shall survive the termination of this Lease, whether by rescission or otherwise.

Section 7.3    Changes in Licensure and Certification Status.   As of the Commencement Date, Tenant represents and warrants that the number of beds licensed or certified for the Facility is one hundred sixty (160). Tenant shall not increase or decrease the licensed or certified number of beds, or change the license or certification thereof, without the consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion; Tenant may increase the number of licensed or certified beds of the Facility upon thirty (30) days prior written notice to Landlord, but without the prior written consent of Landlord. If required, Tenant shall not increase the number of beds without the consent of the Commissioner and/or the DOH and Tenant agrees to return to Landlord upon the expiration of the Lease, the Leased Premises. Should Tenant increase the number of licensed beds at the Facility, the Fixed Rent payable for the Facility shall be increased proportionately for such additional beds. In no event shall the Fixed Rent be reduced in the event the number of Licensed Beds at the Facility is reduced. Landlord and Tenant acknowledge that the Leased Premises are, and at all times under the Term of this Lease are, the sole and absolute property of Landlord. Upon any termination of this Lease or any Lease Default by Tenant hereunder (which breach or default is not cured within any applicable grace period), and subject to the approval of the DOH, Landlord shall have the right to cause the Facility's licenses to be reissued in Landlord's name or in the name of Landlord's designee upon application therefor to, and the receipt of approval from, the DOH and to further have the right to have any and all Medicare, Medicaid and any other provider and/or third party payor agreements issued in Landlord's name or in the name of Landlord's designee. In the event Landlord exercises its rights pursuant to this Section 7.3, Tenant and Guarantors shall cooperate with Landlord in transferring the aforementioned items to Landlord's name or for the benefit of Landlord or as Landlord may direct pursuant to the terms of this Lease.

Section 7.4    Reporting and Other Obligations.

(a)    During the Term, Tenant shall and shall cause all Subtenants, sub-subtenants and any operators of the Facility to provide (without duplication) Landlord and Mortgagor with the following reports, statements, and inspections:

(i)    Intentionally deleted.

(ii)    Financial Reporting.   Tenant will keep and maintain or will cause to be kept and maintained on a calendar year basis, in accordance with GAAP, proper and accurate books, records and accounts reflecting all of the financial affairs of Tenant and all items of income and expense in connection with the operation on an individual basis of the Facility. Notwithstanding the foregoing, Tenant's interim unaudited financial statements shall be prepared in accordance GAAP for interim financial information, but may not include all information or notes required by GAAP for a complete set of financial statements; such financial statements shall include all adjustments and reclassifications of a normal recurring nature considered necessary for a fair and comparable presentation; all such interim financial statements shall be read in conjunction with most recent audited financial statements. Landlord and Mortgagee and Mezzanine Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Tenant or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Landlord and/or Mortgagee and/or Mezzanine Lender shall desire. After the

25

occurrence of a Lease Default, Tenant shall pay any costs and expenses incurred by Landlord and/or Mortgagee and/or Mezzanine Lender to examine Tenant's accounting records with respect to the Facility, as Landlord and/or Mortgagee and/or Mezzanine Lender shall reasonably determine to be necessary or appropriate in the protection of Landlord and/or Mortgagee's interest.

(iii) Tenant, at its expense, shall submit to Landlord and, to Mortgagee and to Mezzanine Lender, as soon as available, and in any event (A) within thirty (30) days after each calendar quarter's end, unaudited monthly financial statements (which include income statements, balance sheets, statements of cash flows, occupancy and payor mixes) of Tenant for the quarter then-ended and year to date, prepared on a basis consistent with the annual statements; quarterly census and revenue information of the Facility as of the end of such month and year to date in sufficient detail to show by patient-mix and revenue-mix (i.e., private, Medicare, Medicaid and V.A. and managed care (by program)) the average monthly census of the Facility and year to date; an aged accounts receivable report from the Facility in sufficient detail to show amounts due from each class of patient-mix by the account age classifications of 30 days, 60 days, 90 days, 120 days, and over 120 days; (B) within forty-five (45) days after the end of each calendar quarter, unaudited quarterly financial statements (which include income statements, balance sheets, statements of cash flows, occupancy and payor mixes) of Tenant for the quarter then-ended, prepared on a basis consistent with the annual statements; quarterly census and revenue information of the Facility as of the end of such quarter in sufficient detail to show by patient-mix and revenue-mix (i.e., private, Medicare, Medicaid and V.A. and managed care (by program)) the average quarterly census of the Facility; (C) no later than 120 days after the end of each calendar year of Tenant, audited annual financial   statements of Tenant, prepared by an independent certified public accounting firm reasonably acceptable to Landlord, prepared in accordance with generally accepted accounting principles, with an unqualified opinion, and including a balance sheet, a statement of income and expenses for the year then ended, a statement of cash flow, and a schedule audited by such independent certified public accountant reconciling Tenant's net operating income to net cash flow, which shall itemize all adjustments made to net operating income to arrive at net cash flow deeded material by such independent certified public accountant.

(iv)    Tenant, at its expense, shall submit to Landlord and, upon the request of Landlord, to Mortgagee, any other reports and certificates reasonably requested by Landlord or Mortgagee from time to time.

(v)    In addition, Tenant shall prepare and deliver to Landlord, and to Mortgagee and Mezzanine Lender, a written report providing an operational overview of significant events and circumstances at the Facility during the prior month, during the first six months of the Term and then quarterly thereafter, including, but not limited to, clinical events, employee relations and staffing matters and provide such other information as Mortgagee or Mezzanine Lender may require from time to time.

(vi)    Tenant shall provide Landlord, and to Mortgagee and to Mezzanine Lender, with a copy of all federal income tax returns of Tenant and its Subtenants within fifteen (15) days after filing thereof.  Whenever practicable, all reports shall be delivered to Landlord electronically in a format usable by Landlord.

(b)    All unaudited financial reports from Tenant shall include an Officer's Certificate certifying that such financial statements present fairly the financial condition and the results of the operations of Tenant  and the properties being reported upon and that such financial statements have been prepared in accordance with the Tenant's customary accounting procedures.  The Officer's Certificate accompanying the annual audited financial statements of Tenant shall also include a statement that they have been prepared in accordance with GAAP.

26

(c)         Tenant shall furnish Landlord and Mortgagee and Mezzanine Lender, within five (5) business  days of the receipt by Tenant, any and all notices (regardless of form) from any Health Care Authority that Tenant's license, Medicare or Medicaid certification, or VA or other governmental program participation is being, or could be revoked or suspended, that action is pending, being considered or being taken to revoke or suspend the Tenant's license or certification or to fine or penalize the Tenant, or that action is pending, being considered, or being taken, to discontinue, suspend, deny, decrease or recoup any payments due, made or coming due to Tenant or related to the operating of the Facility other than in the ordinary course of business related to billing adjustment.

(d)         Tenant shall furnish Landlord and Mortgagee and Mezzanine Lender, within five (5) business days of the receipt by Tenant, any and all notices (regardless of form) from any Governmental Authority or third party payor (i) alleging that the Facility has three or more deficiency(ies) of a scope and severity of "G" or hire, or one or more deficiency(ies) of a scope and severity of "J" or higher, (ii) alleging that the residents of the Facility are in jeopardy, (iii) freezing admissions to the Facility or (iv) denying reimbursement for any class of residents by any third party payor.

(e)         Tenant shall furnish Landlord and Mortgagee and Mezzanine Lender, within five (5) days of the sending or receipt by Tenant of any communication copies thereof, including a plan of correction, with respect to the matters referenced in Section 7.4(d).

(f)         Tenant shall furnish Landlord and Mortgagee and Mezzanine Lender, within ten (10) days of receipt but at least five (5) days prior to the earliest date on which Tenant is required to take any action with respect thereto or would suffer any adverse consequence, a copy of any Medicare, Medicaid or other licensing or accreditation or rating agency or entity survey, report, warning letter, or notice, and any statement of deficiencies, and within the time period required by the particular agency for furnishing a plan of correction also furnish or cause to be furnished to Landlord and Mortgagee and Mezzanine Lender a copy of the plan of correction generated from such survey, report, warning letter, or notice to Tenant and any subsequent correspondence related thereto, and correct or cause to be corrected any deficiency, the curing of which is a condition of continued licensure or of full participation in Medicare or Medicaid or a care program offered by an insurance company, managed care company, or other third-party payor by the date required for cure by such agency or entity (plus extensions granted by such agency or entity).

(g)         Tenant shall furnish Landlord and Mortgagee and Mezzanine Lender, within five (5)   days of receipt by Tenant, any other notices or charges issued relating to the non-compliance by Tenant  with any Governmental Authority, insurance company, managed care company, or other third-party payor laws, regulations, requirements, licenses, permits, certificates, authorizations or approvals, but only such matters which could reasonably be expected to have a material adverse effect on the financial condition of such Person or the operation of the Facility.

(h)         Tenant shall notify Landlord within seven (7) days after receipt of any formal or informal written notice or advice from its insurance carrier, reinsurance provider, accountants, actuary, any Governmental Authority, or any third party payor program provider of any actual, pending, threatened or contemplated increase in Tenant's reserves for expenses relating to malpractice or professional liability claims or any material increase in the premium costs for malpractice or professional liability insurance.

(i)         To the extent performed, Tenant shall furnish Landlord and Mortgagee and Mezzanine Lender, a copy of written external consultant reports related to environmental, , physical plant, or property inspection, which shall be delivered promptly upon receipt from the consultant).

27

(j)        Any supporting documents or data requested by Landlord in connection with the items in this Section 7.4.

(k)        The receipt by Landlord of any reports, statements, financial information, surveys or otherwise from Tenant or its Affiliates  shall not in any way impose any obligation or liability upon Landlord to act or take any action upon any information, facts or circumstances which may be disclosed or shown therein and Landlord shall have no liability for its failure to act thereon or as a result thereof.

(l)        Financial Covenants.  Tenant covenants and agrees to the following, as may be amended time to time as required by Mortgagee or Mezzanine Lender:

(i)        Commencing the third full quarter of the Term Tenant's Current Ratio shall not be less than 1.1 to 1.0.  The term "Current Ratio" means the current assets of Tenant divided by the current liabilities of Tenant determined in accordance with GAAP.

(ii)        For each quarter of the Lease Term commencing the third full quarter following the Commencement Date, Tenant's Lease Coverage Ratio shall be not less than 1.25 to 1.0.

(iii)        For each quarter of the Lease Term commencing the second full quarter following the Commencement Date, the Facility shall have achieved the EBITDAR benchmarks as described on Schedule 7.4, attached hereto. The term "EBITDAR" is defined in Schedule 7.4.

Section 7.5        Payment in the Ordinary Course.  Tenant shall pay in full:  (a) prior in each case to the date when penalties would attach, all Impositions (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate reserves have been established in accordance with GAAP), provided that (i) Landlord has given its prior written consent to such contest, which consent shall not be unreasonably withheld or delayed) for which Tenant may be or become liable; (ii) no Lease Default has occurred and remains uncured, (iii) such proceeding shall suspend the collection of such Impositions or the Impositions shall have been paid, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Tenant is subject and shall not constitute a default thereunder, (v) no part of or interest in the Leased Premises will be in danger of being sold, forfeited, terminated, canceled or lost, (vi) Tenant shall have furnished such security as may be required in the proceeding, or as may be requested by Landlord or Mortgagee or Mezzanine Lender, to insure the payment of any such Impositions, together with all interest and penalties thereon, which shall not be less than 125% of the unpaid Impositions being contested and (vii) Tenant shall promptly upon final determination thereof pay the amount of such Impositions, together with all costs, interest and penalties; (b) all of Tenant's wage obligations to Tenant's employees in compliance with the Fair Labor Standards Act (29 U.S.C. §§ 206-207) or any comparable provisions under federal, state or local law; (c) all obligations owed in connection with any claim, demand or notice of any overpayment received from Medicare, Medicaid or other third party payor; and (d) all of Tenant's obligations calling for the payment of money (except only those so long as and to the extent that the same shall be contested in good faith and for which adequate reserves have been established in accordance with GAAP, provided that Landlord has given its prior written consent to such contest, which consent shall not be unreasonably withheld or delayed) before such payment becomes overdue.

Section 7.6        Security Agreement.  In order to secure the payment and performance of all of Tenant's obligations under this Lease and all of Tenant's obligations to Landlord, and all and all other documents contemplated thereby, Tenant hereby grants to Landlord a security interest in and lien upon, all of the assets of Tenant including, without limitation, (i) all trade fixtures, equipment, furniture,

merchandise, inventory and other personal property located from time to time in or upon the Leased Premises (including the proceeds thereof), and (ii) to the fullest extent permitted by applicable law, all accounts, accounts receivable, licenses, certifications, certificates, accreditations, approvals, permits, variances, waivers, provider agreements, certificates of need, and other authorizations issued to or held by Tenant with respect to the operation of the Facility skilled nursing facility and Tenant's interest in and rights under all third party payor provider agreements with respect to the Facility (the items listed in clauses (i) and (ii), together with the proceeds of same, are collectively, "Collateral").   The security interest granted to Landlord with respect to Tenant's tangible personal property is intended to be subordinate to any line of credit, purchase money security interest or capital lease on any of Tenant's tangible personal property provided that Tenant has notified Landlord of the creation of such security interest or capital lease prior to the creation thereof and Landlord has approved same.   Landlord agrees to subordinate its lien on Tenant's accounts receivable in favor of Tenant's accounts receivable lender, should Mortgagee require a subordination of the priority of Landlord's security interest in the Collateral, Landlord and Tenant shall execute such documents as Mortgagee may request to subordinate Landlord's lien to the Mortgagee's security interest in the collateral.   In addition, Tenant's members shall grant to Landlord a first lien pledge (subject to the following sentence) of the membership interests of Tenant. To the extent required by Tenant's accounts receivable lender, Landlord agrees to subordinate its lien on Tenant's membership interests to a lien in favor of such lender On or before the Commencement Date, Tenant shall provide Landlord with a detailed list and description of all the Collateral.   Upon a Lease Default by Tenant, Landlord shall have all the rights and remedies of a secured party under the laws of the State of New York, including without limitation the New York Uniform Commercial Code.   Tenant, as debtor, shall cause to be executed (if appropriate or necessary) and delivered to Landlord, as the secured party, upon execution of this Lease by Tenant, UCC-1 Financing Statements in proper form for filing, and thereafter, from time to time, deliver to Landlord such extensions and/or updates of such financing statements as are required for the purpose of perfecting and maintaining the priority of the security interest granted to Landlord herein, and to perform any other acts reasonably necessary to the perfection of such security interest.   Tenant and Tenant's members consent to Landlord's preparation of and the filing of such financing statements by Landlord and agrees that the provisions of this Section 7.6 shall constitute a security agreement for the purposes contemplated hereby.   The security interest granted by this Section 7.6 shall be in addition to any lien of Landlord that may now or at any time hereafter be provided by law.   In the event Landlord exercises its remedies to foreclose the security interest created under this Section 7.6, or elsewhere in this Lease, Tenant shall cooperate with Landlord in transferring all of the aforementioned items promptly as requested by Landlord in Landlord's or its designee's name or for the benefit of Landlord.   Tenant covenants and agrees that it shall not sell, move, surrender, cancel, modify, transfer, assign, relocate, pledge, grant a security interest in, convey or in any other manner encumber any assets of Tenant including, without limitation, the personal property, the certificate of need approval or any of the licensed or Medicare- and/or Medicaid-certified beds at the Facility, or any licenses for the Facility, or attempt at any time to do same, except as expressly provided hereunder and with the written consent of Landlord.   Tenant covenants and agrees that it shall not make any distributions, or make any repayments for any loans or advances from any Affiliates or related parties, or any other liability to any related party until such time as the Landlord has repaid in full the Mortgage Debt and Mezzanine Debt from the proceeds of a refinance or sale of the Leased Premises. Tenant covenants and agrees that in no event will the Tenant make any payments under the Management Agreement, if any, to any management company to which Tenant is a party if there is a declared default under the Leas which other than a payment default remains uncured for a period of ten (10) business  days This Section 7.6 and Landlord's rights and remedies hereunder shall survive the termination of the Lease.

Section 7.7        Intentionally Deleted.

Section 7.8   Refinance.   Tenant shall fully and timely cooperate with Landlord in its efforts to Refinance from time to time, including without limitation, providing all information and

executing all documents required by Landlord or its lender(s), including Mortgagee or Mezzanine Lender, and their respective successors and/or assigns.. FAILURE BY THE TENANT TO FULLY COOPERATE OR TO PROVIDE ANY SUCH DOCUMENTS, REPORTING, INFORMATION, ACCOUNTINGS, ESTOPPEL CERTIFICATES OR OTHER REQUIRED COOPERATION OF ANY KIND SHALL CONSTITUUTE A LEASE DEFAULT UNDER THIS LEASE.

## ARTICLE VIII

## PERSONAL PROPERTY

Section 8.1 <u>Landlord's Personal Property.</u>  Upon the expiration or termination of this Lease, Tenant shall leave all personal property leased to Tenant hereunder, if any, as repaired, rebuilt, replaced, restored, altered or added to as permitted or required by provisions of this Lease, in or on the Leased Premises, except for ordinary wear and tear. Any and all restorations, alterations or replacements of, or repairs, reconstructions or additions to, the personal property at the Facility made by Tenant shall become part of Landlord's personal property, and any and all security interests (except in favor of Landlord) in Tenant's personal property and financing statements shall be cleared, terminated and/or released to the satisfaction of Landlord at Tenant's expense. Any of Tenant's software, software licenses, proprietary information,  and policies, and procedures of Tenant ("<u>Retained Assets</u>") shall not become part of Landlord's personal property except in the event of the termination of this Lease as a result of a Lease Default, in which case the Retained Assets shall become the personal property of Landlord; provided, however, upon request of Landlord, in consideration of a payment by Landlord or its designee of Ten Dollars ($10.00) and any applicable lease, rent, or license fees owed to any third parties during the Transition Period (hereinafter defined), Tenant shall license Landlord or its designee(s) (at Tenant's cost with no mark-up) to utilize the Retained Assets for a period of one hundred twenty  (120) days (the "<u>Transition Period</u>") in connection with the transition of operations from Tenant and Landlord's new operator(s).  To the extent Tenant or any Subtenants are obligated under license agreements with third party vendors supplying software (and/or computer hardware which Tenant does not own or lease) to such Tenant, Tenant shall use its best efforts to arrange for Landlord or Landlord to enter into licensing agreements with such third party vendors to allow Landlord or its designee to utilize such software and computer hardware supplied by such third party vendors for the duration of the Transition Period.

Section 8.2 <u>Tenant's Retained Assets.</u>  At the termination of the Lease, Landlord shall have the right to purchase all or a portion of Tenant's Retained Assets located at the Facility at the lower of its fair market value or book value.  To the extent any of Tenant's Retained Assets is subject to a license, Landlord shall have the right but not the obligation to assume some or all of such license Landlord's sole cost and expense and at no additional liability to Tenant.

## ARTICLE IX

## INDEMNIFICATION

Section 9.1    <u>Tenant's Indemnification</u> (a) During the Term of this Lease and after the surrender of the Leased Premises in accordance with <u>Section 5.5</u> of this Lease, Tenant shall protect, defend (at Landlord's request), indemnify and hold harmless Landlord, Landlord's members, managers, officers, owners, directors, employees, agents, representatives, and Mortgagee and Mezzanine Lender and their respective agents, executors, heirs, representatives and assigns, and any entity providing financing which is secured by the Leased Premises (collectively the "<u>Landlord's Indemnitees</u>"), from and against any claims, losses, costs, penalties, damages, charges and/or expenses (including reasonable attorneys'

30

and consultants' fees and expenses) imposed or resulting from, arising out of or attributable in whole or in part to any of the following:  (i) any violation of any Law, order of Governmental Authority, whether occasioned by the intentional act, omission, or negligence of Tenant or those holding under Tenant, (ii) any accident or other occurrence on or about the Leased Premises on or after the Commencement Date causing injury to any person or property whomsoever or whatsoever, including but not limited to patient care claims or elder abuse, (iii) any failure of Tenant in any respect to comply with or perform any term, condition, covenant, requirement and/or provision of this Lease, or a breach of this Lease by Tenant, including, but not limited to, a breach of any of Tenant's representations and warranties under Section 19.1 of this Lease, (iv) in any way relating to Tenant's use, operation and/or maintenance of the Facility (including, without limitation, third-party claims, whether by the State of New York, the United States, private insurers, private parties, for recoupment, false claims, or any other claims, assumption of and use by Tenant of Landlord's permits, variances, waivers, and certificate of need approval or its possession of the Leased Premises and/or (v) any liability under Section 20.14. The indemnity provided for herein shall survive the expiration of this Lease or the surrender of the Leased Premises for the period of the relevant statute of limitations.

        (b)            Any amounts which become payable by Tenant under this Article IX shall be paid within thirty (30 days after liability therefor is determined by litigation or otherwise, and if not timely paid shall bear interest at the Prime Rate plus 5% (the "Overdue Rate") from the date of such determination to the date of payment.  Tenant, at its sole cost and expense, shall contest, resist and defend any such claim, action or proceeding asserted or instituted against Landlord or may compromise or otherwise dispose of the same as Tenant sees fit provided that Landlord receives a full and complete release with respect to such claim, action or proceeding.   Any legal counsel selected by Tenant to defend Landlord shall be reasonably satisfactory to Landlord.   All indemnification covenants are intended to apply to losses, damages, injuries, claims, costs, penalties, charges and/or expenses (including reasonable attorneys' and consultants' fees and expenses) incurred directly or indirectly by the indemnified parties and their property, as well as by the indemnifying party or third party, and their property.  For purposes of this Article IX, any acts or omissions of Tenant, or by employees, agents, assignees, contractors, subcontractors or others acting for or on behalf of Tenant (whether or not they are negligent, intentional, willful or unlawful), shall be strictly attributable to Tenant.  It is understood and agreed that payment shall not be a condition precedent to enforcement of the foregoing indemnification obligations.  The "Prime Rate" shall mean on any date, a rate equal to the annual rate on such date publicly announced by Citibank, N.A., as its prime, base or reference rate.  Such rate need not be the lowest rate charged by Citibank, N.A. If Citibank, N.A. discontinues its use of such prime, base or reference rate or ceases to exist, Landlord shall designate the prime, base or reference rate of another state or federally chartered bank with offices in New York, N.Y. to be used for the purpose of calculating the Prime Rate hereunder.

        .


# ARTICLE X

## USE OF LEASED PREMISES

        Section 10.1            Compliance with Laws and Regulations.  Tenant shall use the Leased Premises solely as a licensed Medicare- and Medicaid-certified skilled nursing facility with at least the number of licensed and certified beds existing at the Facility on the Commencement Date, and for no other purpose (the "Intended Use").  On or before the Commencement Date, Tenant shall have acquired, and thereafter Tenant shall maintain all licenses, certificates, accreditations, approvals, permits, variances, waivers, provider agreements and other authorizations needed to operate the Leased Premises as a licensed, Medicare and Medicaid certified skilled nursing facility.  Tenant hereby covenants, warrants and

31

represents to Landlord that as of the Commencement Date and throughout the Term:  (a) Tenant (and any subtenant, operator or manager of Tenant) shall be, and shall continue to be validly licensed and Medicare and Medicaid certified to operate a skilled nursing facility in accordance with the applicable rules and regulations of the DOH, federal governmental authorities and accrediting bodies, including, but not limited to, the United States Department of Health and Human Services ("DHHS"), CMS, and the DOH; (b) Tenant (and any subtenant, operator or manager of Tenant) shall be, and shall continue to be, certified by and the holder of valid provider agreements with Medicare and Medicaid issued by DHHS, DOH and/or CMS and shall remain so certified and shall remain such a holder in connection with its operation of the Leased Premises as a licensed and Medicare and Medicaid certified skilled nursing facility; (c) Tenant (and any subtenant, operator or manager of Tenant) shall be, and shall continue to be in compliance with and shall remain in compliance with all applicable Laws with regard to the operation of the Facility, including, without limitation, compliance under Laws governing patient confidentiality and privacy and the confidentiality of medical records; (d) Tenant (and any subtenant, operator or manager of Tenant) shall operate the Facility in a manner consistent with high quality skilled nursing services and sound reimbursement principles under the Medicare and Medicaid programs and as required under Laws; and (e) Tenant (and any subtenant, operator or manager of Tenant) shall not abandon, terminate, vacate or fail to renew any licenses, certifications, accreditations, certificates, approvals, permits, variances, waivers, provider agreements or any other authorization which relates to the operation of the skilled nursing facility business or other permitted operations on the Leased Premises or in any way commit any act which will or may cause any such licenses, certifications, accreditations, certificates, approvals, permits, variances, waivers, provider agreements or other authorization to be revoked by any Government Authority or accrediting body having jurisdiction thereof.

Section 10.2    No Waste.  Tenant shall not commit or suffer to be committed any waste on the Leased Premises nor shall Tenant cause or permit any nuisance thereon.

Section 10.3    Hazardous Materials and Hazardous Waste.  (a) Tenant shall not place or hold any Hazardous Materials on or at the Leased Premises, except as is necessary for the ordinary course of its business as a skilled nursing facility in compliance with Section 10.1.  If Tenant's business requires the use of any Hazardous Materials, other than such cleaning materials as are typically found in skilled nursing facilities in compliance with Section 10.1, Tenant shall notify Landlord in writing and shall comply with hazard communication and notification requirements of the Occupational Safety and Health Act ("OSHA") and all Laws which require notification of employees, the community or any governmental agency of the hazardous properties of such Hazardous Materials.  For purposes of this Lease, "Hazardous Materials" means and includes any hazardous substance defined as such in OSHA, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the Toxic Substances Control Act ("TSCA"), or any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any hazardous substance or material, as now or at any time hereafter in effect.

(b)    Tenant shall not cause or allow any asbestos or any asbestos containing materials to be incorporated into any improvements or alterations which it makes or causes to be made on or to the Leased Premises.  Tenant shall obtain and maintain O&M Programs for the Facility is if the Facility is determined to contain asbestos or asbestos containing materials and upon Landlord's request, shall furnish copies of same to Landlord, Mortgagee, Mezzanine Lender or their designee(s).

(c)    Tenant shall not place, hold or dispose of any Hazardous Waste on, under or at the Leased Premises except as specifically allowed in this Section 10.3.  Tenant further agrees that it shall not use the Leased Premises as a treatment, storage, or disposal (whether permanent or temporary) facility for Hazardous Waste.  If Tenant, in the ordinary course of its business as a skilled nursing facility generates Hazardous Waste, then Tenant shall comply with all applicable federal, state and local laws, statutes,

32

ordinances, codes, rules, regulations, orders or decrees relating to the appropriate use, storage, transportation and disposal of Hazardous Waste. For the purposes of this Lease, "Hazardous Waste" means and includes any hazardous material that has entered the waste stream or any contaminant or pollutant as defined as such in the Resource Conservation and Recovery Act, CERCLA, as amended, any so-called "Superfund" or "Superlien" law, the TSCA, or any other Law, relating to or imposing liability or standards of conduct concerning, any hazardous, toxic or dangerous waste. Tenant further agrees that it shall properly dispose in accordance with Laws of all "infectious waste" such as laboratory waste, pathological waste, blood specimens or products, patient or resident waste including, without limitation, bandages and disposable gowns, sharp waste and any material generated by the production or testing of biological agents. Immediately upon receipt of any Environmental Notice (as hereinafter defined) from any Person, Tenant shall deliver to Landlord a true, correct and complete copy of same. "Environmental Notice" shall mean any note, notice, or report of any suit, proceeding, investigation, order, consent order, injunction, writ, award, or action related to or affecting or indicating the treatment, storage, handling, disposal, generation, spill, release or discharge of any Hazardous Waste or Hazardous Materials in upon, under, from or affecting the Leased Premises. All of the terms, covenants, warranties and indemnifications contained in this Section 10.3 shall survive the expiration or termination of this Lease.

(d)    Without in any way limiting Tenant's obligation to indemnify Landlord and Landlord's Indemnitees under Section 9.1 of this Lease, Tenant shall indemnify, defend (at Landlord's request) and hold harmless Landlord and Landlord's Indemnitees from and against any claims, losses, costs, damages or expenses of any and every kind whatsoever (including reasonable attorney's fees and expenses and consultant's and expert's fees and expenses) which at any time or from time to time may be paid, incurred or suffered by, or asserted against Landlord and/or Landlord's Indemnitees for, with respect to, or as a direct or indirect result of:  (a) a breach by Tenant of the covenants set forth in Section 10.3 or, (b) caused, permitted or allowed by Tenant or any agent, employee, invitee, or licensee of Tenant, the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission, or release from, onto, or into the Leased Premises, the atmosphere, or any watercourse, body of water, or groundwater, of any Hazardous Material (including, without limitation, any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under CERCLA, as amended, any so-called "Superfund" or "Superlien" law, or any other Law, relating to or imposing liability or standards of conduct concerning, any Hazardous Material) occurring from and after the Commencement Date; and the provisions of and undertakings and indemnification set out in this Section 10.3(d) shall survive the termination of this Lease, and shall continue to be the personal liability, obligation and indemnification of Tenant, binding upon Tenant, forever. If required by Mortgagee or Mezzanine Lender, Tenant shall enter into an agreement to indemnify, defend and hold harmless Mortgagee and Mezzanine Lender with respect to matters contained in this Section 10.3 and other similar matters pursuant to a form of agreement reasonably acceptable to Mortgagee and Mezzanine Lender. In no event however shall Tenant have any liability to Landlord or Landlord's Indemnitees for Hazardous Materials located at or under the Leased Premises prior to the Commencement Date or for the remediation of same.

(e)    If Tenant or its employees, agents, or contractors violate the provisions of this Section 10.3, then, in addition to any other duty or obligation of Tenant hereunder, at law or in equity, Tenant shall be obligated to clean up, remove, and dispose of the material causing the violation, in compliance with all applicable environmental laws and repair any damage to and remediate the Leased Premises within such period of time as may be reasonable under the circumstances after written notice by Landlord; provided that such work shall commence no later than thirty (30) days from the date of such notice and be diligently and continuously carried to completion by Tenant or Tenant's designated contractors. Tenant shall notify Landlord of its method, time and procedure for any clean-up, remediation or removal of material causing the violation under this provision, and Landlord shall have the right to require reasonable changes in such method, time or procedure.

(f)            Landlord reserves the right from time to time, but not more than once a year, except in the event of an emergency or during the occurrence and continuation of an uncured Lease Default during the Term hereof, at Landlord's cost and expense (except that, in the event of a continuing and uncured Lease Default, at Tenant's sole cost and expense), to have the Leased Premises inspected by environmental engineers and/or specialists for the purpose of determining compliance by Tenant with any environmental laws, rules and regulations applicable to Tenant's operations in or about the Leased Premises and with the terms and conditions of this Lease dealing with environmental matters, including without limitation, the provisions of this Section 10.3. If the environmental assessment or report resulting from such inspection discloses any non-compliance with Laws, Tenant shall immediately, following receipt of the environmental assessment, take all such steps as are necessary to put the Leased Premises into compliance, including without limitation, cleaning up any spills or other emissions of Hazardous Wastes or Hazardous Materials, and reimburse Landlord for the costs of its inspection.

(g)            Upon the expiration of the Term, or the earlier termination thereof, subject to the last sentence of Section 10.3(d) above, Tenant shall forthwith remove all Hazardous Materials and Hazardous Waste from the Leased Premises or any portion thereof in accordance with applicable Law. Landlord shall have the right to inspect the Leased Premises with regard to the management and disposal of Hazardous Materials and Hazardous Waste at all reasonable times during the Term.


# ARTICLE XI

## DAMAGE OR DESTRUCTION

Section 11.1        Damage or Destruction.  Tenant shall immediately notify Landlord of any casualty, fire, damage, destruction or injury ("Casualty") affecting the Facility, including a description of the Casualty, and whether the Casualty is such as to cause the Leased Premises to be unsuitable, in whole or in part, for the Intended Use.  Tenant shall proceed with reasonable diligence to repair or reconstruct the Leased Premises and Tenant shall be liable for any costs of repair or replacement to the Leased Premises, whether or not such Casualty, or the costs of repairing such Casualty, are fully covered by the proceeds of Tenant's insurance required to be carried hereunder.  If such Casualty renders the Facility unsuitable for the purpose of this Lease and if Landlord's Mortgagee so requires, Landlord, upon notice to Tenant, Landlord may terminate this Lease and Landlord and Tenant shall be released from any further liability hereunder thereafter accruing with respect to the Facility, except that Tenant shall be responsible and shall pay Landlord an amount equal to the difference between the fair market value of the Leased Premises immediately prior to such Casualty and the proceeds of Tenant's insurance to the extent such difference results from Tenant's breach of Article VI.  Notwithstanding the foregoing, if Landlord's obligations to its Mortgagee have been satisfied in full and the DOH approves and agrees to reimburse the costs of rebuilding the Facility, Landlord shall not so terminate this Lease with respect to the Facility, and Tenant shall repair or reconstruct the Leased Premises in substantially the same condition as just prior to the incident with the proceeds of the property casualty insurance carried by Tenant, as required hereunder (if not otherwise paid to the Mortgagee), and/or with funds of Tenant.  Regardless of any Casualty, except as provided above, this Lease shall continue in full force and effect without any abatement of Rent, and Tenant shall not be entitled to surrender possession of the Leased Premises as a result of such casualty.  Landlord's receipt of Rent from Tenant's rental interruption insurance shall be credited against Rent payments due from Tenant hereunder.  If Tenant fails to commence such repair or reconstruction within thirty (30) days of the Casualty, Landlord shall have the option, subject to the approval of the DOH if required by Laws, to either terminate this Lease upon written notice to Tenant or repair and reconstruct the Leased Premises in substantially the same condition just prior to the incident

34

and costs and expenses incurred as a result thereof shall be deemed Additional Rent hereunder and shall be payable to Landlord by Tenant, upon demand.  Upon payment of all such sums demanded by Landlord, Tenant may re-enter and resume possession of the Leased Premises pursuant to the terms of this Lease.  All insurance proceeds collected under the Policies shall be paid to Landlord, and made available to Tenant to pay for or reimburse Tenant for the costs and expenses for such repairs and reconstruction subject to the terms, conditions and provisions of any mortgage or other loan documents encumbering the Leased Premises.  If Mortgagee does not make the insurance proceeds available to Landlord, then Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, and Landlord and Tenant shall be released from any further liability hereunder thereafter accruing with respect to the Facility, except that Tenant shall be responsible and shall pay Landlord an amount equal to the difference between the fair market value of the Leased Premises immediately prior to such Casualty and the proceeds of Tenant's insurance.

Section 11.2    Tenant hereby waives the provisions of Section 227 of the Real Property Law of the State of New York and acknowledges that the terms of this Article XI shall govern in lieu thereof.

## ARTICLE XII

## EMINENT DOMAIN

Section 12.1    Eminent Domain. (a) In the event that all or substantially all of the Leased Premises, or such portion of the Real Property which renders the balance of the Facility unsuitable for the purpose of this Lease, shall be taken by condemnation or right of eminent domain, this Lease shall terminate as of the day the taking authority takes possession of the Leased Premises, and Landlord and Tenant shall be released from any further liability hereunder thereafter accruing with respect to the Facility, except as otherwise expressly provided in this Lease.   In the event only a portion (and less than substantially all) of the Leased Premises is taken by condemnation or right of eminent domain and the portion so taken does not render the balance of the Leased Premises unsuitable for the purposes of this Lease, as determined by Landlord, this Lease shall not terminate.  In such an event, Tenant shall restore the Leased Premises with reasonable diligence with its own funds and with the proceeds of any award from the applicable public or quasi-public authority, or private corporation or individual having the power of condemnation ("Award") to an architectural unit as nearly like its condition prior to such taking as shall be practicable.  Notwithstanding anything to the contrary herein, this Section 12.1(a) is subject to the terms, conditions and provisions of any mortgage and other loan documents encumbering the Leased Premises.

(b)    Notwithstanding anything to the contrary contained in Section 12.1(a), Landlord may cancel this Lease with no further liability to Tenant, in the event that following a taking by condemnation or right of eminent domain, Mortgagee elects to require Landlord to repay the mortgage on the Leased Premises.

(c)    Tenant shall not be entitled to any part of any award or settlement of damages representing the value of land and buildings appropriated, the value of this Lease or any estate therein, or damage to the residue of the Leased Premises or other property of Landlord; it being agreed as between Landlord and Tenant any such award shall be the sole property of Landlord.  No appropriation of part or all of the Leased Premises or cancellation of this Lease pursuant to this Article XII shall be deemed an eviction of Tenant or a breach of any covenants of Landlord hereunder.

# ARTICLE XIII

## NOTICES

Section 13.1    <u>Notices.</u>    All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if (a) hand delivered or sent by (b) certified or registered United States mail, postage prepaid, return receipt requested or (c) Federal Express or other nationally recognized overnight next business day courier service at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a notice to the other parties hereto in the manner provided for in this <u>Section 13.1</u>):

<u>If to Tenant:</u>

HBL SNF, LLC
1278 Albany Post Road
Croton-on-Hudson, New York 10520

<u>with a copy to:</u>
Pryor Cashman LLP
7 Times Square
New York, New York 10036-6569
Attn: John Giardino, Esq.
Telephone:  212.326-0829
Email: jgiardino@pryorcashman.com

<u>If to Landlord:</u>
White Plains Healthcare Properties I, LLC,
168 Centre  Street, Suite 200
Danvers,  Ma 01923

<u>with a copy to:</u>

Abrams Fensterman, LLP
3 Dakota Drive, Suite 300
Lake Success, New York 11042
Attention: Mark Frimmel, Esq.
mfrimmel@abramslaw.com

If to Mortgagee:
Garfield Park, LLC
One Security Benefit Place
Topeka, Kansas 66636-0001
Attn: Legal Department, Investments
E-mail: <u>invlegal@securitybenefit.com</u>; legalnotice@securitybenefit.com

If to Mezzanine Lender:
Bradford Allen
300 S. Wacker Drive, Suite 3500
Chicago, IL 60606

Attn: Chuck Hoag, Executive Managing Director
with a copy to:

Buchalter
180 North LaSalle Street, Suite 3300
Chicago, IL 60601
Attention: David P. Resnick, Esq.
dresnick@buchalter.com

The effective date of such notices shall be as follows:  (a) upon delivery or refusal of delivery if sent by personal delivery, (b) two (2) Business Days after mailing (or upon actual receipt, if earlier), if sent by certified or registered mail, (c) one (1) Business Day after deposit with the courier for next business day delivery, if sent by overnight courier.  The term "Business Day" means any day other than (i) a Saturday or a Sunday, and (ii) a day on which federally insured depository institutions in New York, New York are authorized or obligated by law, regulation, governmental decree or executive order to be closed. Any notice required to be given herein may be signed and sent by the attorneys for the party giving such notice.

Section 13.2      Notices to Mortgagee and Mezzanine Lender.  (a) Tenant hereby agrees to give to Mortgagee and Mezzanine Lender copies of all notices given by Tenant of default by Landlord under this Lease at the same time and in the same manner as, and whenever, Tenant shall give any such notice of default to Landlord.  Mortgagee and Mezzanine Lender shall have the right to remedy any default under this Lease, or to cause any default of Landlord under this Lease to be remedied, and for such purpose Tenant hereby grants such Mortgagee and Mezzanine Lender such period of time as may be reasonable to enable such Mortgagee or Mezzanine Lender to remedy, or cause to be remedied, any such default in addition to the period given to Landlord for remedying, or causing to be remedied, any such default which is a default.  Tenant shall accept performance by such Mortgagee or Mezzanine Lender of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord.  No default by Landlord under the Lease shall exist or shall be deemed to exist (i) as long as such Mortgagee or Mezzanine Lender, in good faith, shall have commenced to cure such default and shall be prosecuting the same to completion with reasonable diligence, subject to Force Majeure, or (ii) if possession of the Leased Premises is required in order to cure such default, or if such default is not susceptible of being cured by such Mortgagee or Mezzanine Lender, as long as such Mortgagee or Mezzanine Lender, in good faith, shall have notified Tenant that such Mortgagee or Mezzanine Lender intends to institute proceedings under the mortgage and, thereafter, as long as such proceedings shall have been instituted and shall prosecute the same with reasonable diligence and, after having obtained possession, prosecutes the cure to completion with reasonable diligence.  This Lease shall not be assigned by Tenant or modified, amended or terminated without Mortgagee's and Mezzanine Lender's prior written consent in each instance, which consent shall not be unreasonably withheld or delayed.  In the event of the termination of this Lease by reason of any default thereunder or for any other reason whatsoever except the expiration thereof, upon such Mortgagee's or Mezzanine Lender's written request, given within thirty (30) days after any such termination, Tenant, within fifteen (15) days after receipt of such request, shall execute and deliver to such Mortgagee or Mezzanine Lender or its designee or nominee a new lease of the Leased Premises for the remainder of the Term of the Lease upon, at a minimum, all of the terms, covenants and conditions of this Lease.  Neither such Mortgagee or Mezzanine Lender or its designee or nominee shall become liable under this Lease unless and until such Mortgagee or its designee or nominee becomes, and then only for so long as such Mortgagee or Mezzanine Lender or its designee or nominee remains, the fee owner of the Leased Premises or the owner of the leasehold interest of Landlord under this Lease.  Mortgagee shall have the right, without Tenant's consent, to, as the case may be, foreclose its mortgage or to accept a deed in lieu

37

of foreclosure of such mortgage.  Mezzanine Lender shall have the right, without Tenant's consent, to foreclose its pledge over the membership interests in Landlord.

(b)        In the event of any act or omission of Landlord which would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease, or to claim a partial or total eviction, Tenant shall not exercise such right (i) until it has given written notice of such act or omission to Mortgagee and Mezzanine Lender, and (ii) unless such act or omission shall be one which is not capable of being remedied by Landlord or such Mortgagee or Mezzanine Lender within a reasonable period of time, until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice and following the time when such Mortgagee or Mezzanine Lender shall have become entitled under its loan documents with Landlord or Landlord Member in connection therewith, as the case may be, to remedy the same (which reasonable period shall in no event be less than the period to which Landlord would be entitled under this Lease or otherwise, after similar notice, to effect such remedy).

## ARTICLE XIV

## QUIET ENJOYMENT

Section 14.1        Quiet Enjoyment. Landlord covenants, warrants and represents to Tenant that for so long as this lease remains in effect, provided no Lease Default exists under this Lease, Tenant shall at all times during the Term peaceably and quietly have, hold, occupy and enjoy the Leased Premises, subject to the terms and conditions of this Lease, without any hindrance, interference or molestation by Landlord or by, under or through Landlord.

## ARTICLE XV

## SUBLETTING AND ASSIGNMENT

Section 15.1        Subletting and Assignment (a) Tenant shall not, without the prior written consent of Landlord, Mortgagee and Mezzanine Lender, which consent may be not be unreasonably withheld (and, if required by law, without the prior written consent of the Commissioner), transfer or assign this Lease or Tenant's interest in the Leased Premises or any part thereof or sublease all or any part of the Leased Premises.  In all events of assignment, transfers or subletting, the prior approval of the DOH shall be required.  Tenant shall not at any time, without the prior written consent of Landlord, which consent may not be unreasonably withheld pledge, mortgage, or hypothecate the leasehold estate hereby created or any interest of Tenant therein.  The issuance of or a transfer or series of transfers (including transfers caused by mergers, acquisitions or consolidations of any direct or indirect interests in the equity ownership interests in Tenant or any subtenant aggregating to forty-nine percent (49%) or more of the stock, membership or ownership interest in Tenant or any subtenant shall constitute an assignment for purposes of this Lease, requiring Landlord's consent thereof; notwithstanding anything to the contrary, any change in the management or control of Tenant such that Lizer Jozefovic does not control all of the decisions of Tenant shall constitute an assignment for purposes of this Lease, requiring Landlord's consent thereof.  The consent by Landlord to any transfer shall not constitute consent to any subsequent transfer or to any successive transfer.  Further, subject to the provisions of Section 2.3, and without in any way limiting or otherwise affecting the provisions of this Lease, Landlord shall be permitted to assign this Lease and all agreements, duties, obligations and rights incidental thereto to any entity related to, or affiliated with Landlord, without any consent from Tenant.  The term "transfer" shall mean any direct or

38

indirect sale, conveyance, transfer, lease (including any amendment, extension, modification, waiver or renewal thereof), sublease, sub-sublease, assignment, mortgage, pledge, grant of a security interest or hypothecation, whether by operation of law or otherwise, whether voluntary or not, of or in (i) all or part of the Leased Premises (including any legal or beneficial direct or indirect interest therein) or (ii) any direct or indirect interest in Tenant.    Notwithstanding the foregoing and any other provision contained herein to the contrary, no transfer or series of transfers of legal, economic, beneficial or equitable (direct or indirect) interest in the Lease or in Tenant's membership interest that requires DOH's approval shall occur without such DOH approval and the prior written consent of Landlord which shall not be unreasonably withheld..  Tenant shall enter into such subordination  agreements or subordination, non-disturbance agreements ("SNDAs") as Mortgagee may request from time to time, and Tenant agrees to enter into an SNDA provided that such SNDA is in the same form and content as the Prior SNDA.

Section 15.2    Attornment and Related Matters.    Any sublease shall be expressly subject and subordinate to all applicable terms and conditions of this Lease and provide that upon the expiration or earlier termination of this Lease, Landlord, at its option and without any obligation to do so, may require any subtenant to attorn to Landlord, its successors and assigns, in which event Landlord shall undertake the obligations of Tenant, under such sublease from the time of the exercise of such option to the termination of such sublease; provided, however, that in such case Landlord shall not be liable for any prepaid rents, fees or other charges or for any prepaid security deposits paid by such subtenant to Tenant or for any other prior defaults of Tenant under such sublease.  In the event that Landlord shall not require such attornment with respect to any sublease, then such sublease shall automatically terminate upon the expiration or earlier termination of this Lease, including any early termination by mutual agreement of Landlord and Tenant.  In addition, any such sublease shall provide that in the event that the subtenant or other transferee receives a written notice from Landlord stating that a Lease Default has occurred or that an event or circumstance has occurred which with notice and/or passage of time would constitute a Lease Default, such subtenant or other transferee thereafter shall without further consent or instruction of Tenant pay all rentals accruing under such sublease directly to Landlord or as Landlord may direct; provided, however, that (a) as and to the extent that the amounts so paid to Landlord, together with other amounts paid to or received by Landlord on account of this Lease, exceed the amounts then due Landlord from Tenant under this Lease, the excess shall be promptly remitted to Tenant, and (b) at such time as the Lease Default has been cured and this Lease reinstated (if ever), Landlord shall notify and direct the subtenant(s) in writing to resume making payments of rentals under their sublease(s) directly to Tenant, or as Tenant may direct.  Any such rentals collected from such subtenant or other transferee by Landlord shall be credited against the amounts owing by Tenant under this Lease in such order of priority as Landlord shall reasonably determine.  Furthermore, any sublease or other agreement regarding a transfer shall expressly provide that the subtenant, assignee, manager or other transferee shall furnish Landlord, its lender, the Mortgagee, the Mezzanine Lender, if applicable, the HUD Mortgagee, and/or the Commissioner, and /or DOH, if applicable,  with such financial, operational and other information about the Facility and subtenant, etc., as Landlord may request from time to time.

Section 15.3    Assignment of Subleases.  To secure the prompt and full payment by Tenant of the Rent and the faithful performance by Tenant of all the other terms and conditions herein contained on its part to be kept and performed, Tenant hereby assigns, transfers and sets over unto Landlord, subject to the conditions hereinafter set forth and any required consent(s) from DOH, all of Tenant's right, title and interest in and to all permitted subleases, assignments, licenses and occupancy agreements, to the extent permitted by law, involving the Facility, as set forth on Schedule 15.3 attached hereto(the "Sublease", and the subtenant under a Sublease herein referred to as a "Subtenant") and hereby confers upon Landlord, its agents and representatives, a right of entry (subject to prior notice) in, and sufficient possession of, the Leased Premises to permit and insure the collection by Landlord of the rentals and other sums payable under the Sublease, and further agrees that the exercise of said right of entry and qualified possession by Landlord shall not constitute an eviction of Tenant from the Leased

Premises or any portion thereof and that should said right of entry and possession be denied Landlord, its agent or representative, Landlord, in the exercise of said right, may use all requisite force to gain and enjoy the same without responsibility or liability to Tenant, its servants, employees, guests or invitees, or any Person whomsoever; provided, however, that such assignment shall become operative and effective only if (a) a Lease Default shall occur and be continuing or (b) this Lease and the Term shall be cancelled or terminated pursuant to the terms, covenants and conditions hereof or (c) there occurs a repossession under a dispossessory warrant or other re-entry or repossession by Landlord under the provisions hereof or (d) a receiver for all or a portion of the Leased Premises is appointed, and then only as to such of the subleases that Landlord may elect to take over and assume. At any time and from time to time within ten (10) days after Landlord's written demand, Tenant promptly shall deliver to Landlord a schedule of all Subleases, setting forth the names of all Subtenants, with a photostatic copy of each of the Subleases. Upon request of Landlord, Tenant shall permit Landlord and its agents and representatives, and Mortgagee, its agents and representatives, and Mezzanine Lender, its agents and representatives, to inspect all Subleases affecting the Leased Premises. Tenant covenants that each Sublease shall provide that the Subtenant thereunder shall be required from time to time, upon request of Landlord or Tenant, to execute, acknowledge and deliver, to and for the benefit of Landlord, an estoppel certificate confirming with respect to such Sublease the information set forth in <u>Section 20.11</u> hereof.

Section 15.4    <u>Additional Sublease Requirements.</u>    Tenant covenants and agrees that all Subleases hereafter entered into affecting the Leased Premises shall provide that (a) they are subject to this Lease and that the principals of the Subtenant acknowledge that they have read this Lease and accept the terms hereof, (b) the term thereof shall not end less than one (1) day prior to the Expiration Date hereof, unless Landlord shall consent otherwise, which consent may be withheld in Landlord's sole and absolute discretion, (c) the Subtenants will not do, authorize or execute any act, deed or thing whatsoever or fail to take any such action which will or may cause Tenant to be in violation of any of its obligations under this Lease, (d) the Subtenants will not pay rent or other sums under the Subleases with Tenant for more than one (1) month in advance, (e) the Subtenants shall give to Landlord at the address and otherwise in the manner specified in <u>Section 13.1</u> hereof, a copy of any notice of default by Tenant as the landlord under the Subleases at the same time as, and whenever, any such notice of default shall be given by the Subtenants to Tenant; and (f) all of the representations, warranties and covenants given by Tenant to Landlord in this Lease, including but not limited to all reporting requirements and covenants set forth in Section 7.4 above, shall be made and given by each Subtenant for the benefit of Landlord, Mortgagee, Mezzanine Lender and their respective successors and assigns.

Section 15.5    <u>Transfers In Bankruptcy.</u>    (a)    In the event of a transfer pursuant to the provisions of Title 11 of the United States Code or any statute of similar purpose or nature (the "<u>Bankruptcy Code</u>"), all consideration payable or otherwise to be delivered in connection with such transfer shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any consideration constituting Landlord's property pursuant to the immediately preceding sentence and not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and be promptly paid or delivered to Landlord. For purposes of this <u>Section 15.5</u>, the term "consideration" shall mean and include money, services, property and any other thing of value such as payment of costs, cancellation or forgiveness of indebtedness, discounts, rebates, barter and the like. If any such consideration is in a form other than cash (such as in kind, equity interests, indebtedness earn-outs, or other deferred payments, consulting or management fees, etc.), Landlord shall be entitled to receive in cash the then present fair market value of such consideration. If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of the Bankruptcy Code to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to Tenant, then notice of such proposed assignment shall be given to Landlord by Tenant no later than fifteen (15) days after receipt of such offer by Tenant, but in any event no later than ten (10) days prior to the date that

40

Tenant shall file any application or motion with a court of competent jurisdiction for authority and approval to enter into such assumption and assignment.  Such notice shall set forth (a) the name and address of the assignee, (b) all of the terms and conditions of such offer, and (c) the proposal for providing adequate assurance of future performance by such person under the Lease, including, without limitation, the assurance referred to in Section 365 of the Bankruptcy Code.  Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease from and after the date of such assignment.  Any such assignee shall execute and deliver to Landlord upon demand an instrument confirming such assumption.

(b)	The term "adequate assurance of future performance" as used in this Lease shall mean (in addition to the assurances called for in Bankruptcy Code Section 365(1)) that any proposed assignee shall, among other things, (i) deposit with Landlord on the assumption of this Lease an amount equal to the greater of (x) two (2) times the then monthly Fixed Rent and Additional Rent or (y) such other amount deemed by the Bankruptcy Court to be reasonably necessary for the adequate protection of Landlord under the circumstances, as security for the faithful performance and observance by such assignee of the terms and obligations of this Lease, (ii) furnish Landlord with financial statements of such assignee for the prior three (3) calendar years, as finally determined after an audit and certified as correct by a certified public accountant, which financial statements shall show a net worth at least equal to the amount of the deposit referenced in (i) above, (iii) if determined by the Bankruptcy Court to be appropriate under the circumstances, grant to Landlord a security interest in such property of the proposed assignee as Landlord shall deem necessary to secure such assignee's future performance under this Lease, and (iv) provide such other information or take such action as Landlord, in its reasonable judgment, shall determine if necessary to provide adequate assurance of the performance by such assignee of its obligations under the Lease.

(c)	If, at any time after Tenant may have assigned Tenant's interest in this Lease in a proceeding of the type described in Section 16.1 (iv) through (vii), this Lease shall be disaffirmed or rejected in any proceeding of the types described in Section 16.1 (iv) through (vii) hereof, or in any similar proceeding, or in the event of termination of this Lease by reason of any such proceeding or by reason of lapse of time following notice of termination given pursuant to Article XVI based upon any of the Lease Defaults set forth in said Section 16.1 (iv) through (vii) Tenant, upon request of Landlord given within thirty (30) days next following any such disaffirmance, rejection or termination (and actual notice thereof to Landlord in the event of a disaffirmance or rejection or in the event of termination other than by act of Landlord), shall (a) pay to Landlord all Rent due and owing by the assignee to Landlord under this Lease to and including the date of such disaffirmance, rejection or termination, and (b) as "tenant", enter into a new lease with Landlord for a term commencing on the effective date of such disaffirmance, rejection or termination and ending on the expiration date of the term, unless sooner terminated as in such lease provided, at the same Fixed Rent and Additional Rent upon the then executory terms, covenants and conditions as are contained in this Lease, except that (i) Tenant's rights under the new lease shall be subject to the possessory rights, if any, of the assignee under this Lease and the possessory rights of any person claiming through or under such assignee or by virtue of any applicable Law, (ii) such new lease shall require all defaults existing under this Lease to be cured by Tenant with due diligence, and (iii) such new lease shall require Tenant to pay all Rent reserved in this Lease which, had this Lease not been so disaffirmed, rejected or terminated, would have accrued under the provisions of this Lease after the date of such disaffirmance, rejection or termination with respect to any period prior thereto.  If Tenant shall default in its obligation to enter into said new lease for a period of ten (10) days next following Landlord's request therefor, then in addition to all other rights and remedies by reason of such default, either at law or in equity, Landlord shall have the same rights and remedies against Tenant as if Tenant had entered into such new lease and such new lease had thereafter been terminated as of the commencement date thereof by reasons of Tenant's default thereunder.

41

Section 15.6    <u>Management Agreement</u>.    Tenant agrees and acknowledges that it will not enter into any management agreements during the Term with regard to the Facility except with an entity (i) owned wholly by    an individual principal of Tenant which entity has been received establishment approval from the New York State Department of Health Public Health and Health Planning Council in compliance with 10 NYCRR 600.9(d)(1) and (ii) approved by HUD if the Facility is, or is about to be financed by a HUD program, and/or Mortgagee and/or Mezzanine Lender.    Any such management agreement shall be subordinate to Landlord's rights hereunder, to the rights of Mortgagee and Mezzanine Lender and to the rights of the Commissioner.    Tenant shall cause such manager to execute such documents as are required by Landlord or Mortgagee or Mezzanine Lender or by the Commissioner to effect such subordination. In no event will the Tenant make any payments under such Management Agreement if there is a default under the Lease, notwithstanding whether or not a Lease Default has been declared and notice thereof provided to Tenant by the Landlord.

Section 15.7    <u>Memorandum of Lease</u>.    This Lease shall not be recorded, but either party may record a memorandum of lease in which shall describe the parties to this Lease, a description of the Leased Premises and a recitation of the Term.    The party requesting that the memorandum of lease be recorded shall prepare and pay all costs of recording the memorandum of lease, and the other party agrees to execute at any and all times such instruments as may be reasonably required for such recording.    Upon the expiration or earlier termination of this Lease, Landlord may release the memorandum of lease.    For this purpose, Tenant constitutes and appoints Landlord its true and lawful attorney-in-fact with full power of substitution to execute a release of such memoranda in the name of Tenant.    Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.    To the extent any transfer tax, conveyance tax, excise tax, or similar tax is imposed by any Governmental Authority as a result of the recording of such Memorandum of Lease, or is otherwise due and payable as to Tenant's leasehold interest granted pursuant to this Lease, Tenant shall pay same to the applicable Governmental Authority.

## ARTICLE XVI

## DEFAULT

Section 16.1    <u>Default by Tenant and Remedies of Landlord.</u>    (a) Tenant shall be in default under this Lease upon the occurrence of any of the following events referred to herein individually or collectively as a "<u>Lease Default</u>" (any reference to such event occurring or involving Tenant shall be deemed to include any such event occurring or involving any of Tenant's Subtenants):

(i)    if Tenant fails to pay any installment of Rent (including Additional Rent) within two (2) days after the date when due, TIME BEING OF THE ESSENCE.

(ii)    if Tenant defaults in the prompt and full performance of any other of Tenant's covenants, obligations or agreements hereunder which are not specifically enumerated herein as a Lease Default and fails to correct such failure within thirty (30) days of receipt of written notice from Landlord of such default (unless such default cannot reasonably be cured within thirty (30) days, in which event such period shall be extended, <u>provided</u> Tenant shall have commenced in good faith to cure such default within the first such thirty (30) day period and shall proceed with all due diligence to correct such default thereafter but in no event more than ninety (90) days of receipt of such written notice);

(iii)    if the leasehold interest of Tenant shall be levied upon under execution or be liened or attached and such levy, lien or attachment is not removed within sixty (60) days of the date Tenant receives notice of it;

42

(iv)        in the event of a filing by or against Tenant of a petition under federal or state law pertaining to bankruptcy or insolvency or for a reorganization or other relief;

(v)        if Tenant shall admit in writing its inability to pay its debts generally as they become due;

(vi)        if Tenant is adjudicated as bankrupt or a court of competent jurisdiction shall enter an order or decree appointing, with or without the consent of Tenant, a receiver or trustee of Tenant or of the whole or substantially all of its property;

(vii)        if Tenant makes any general assignment for the benefit of creditors;

(viii) if Tenant abandons the Leased Premises or if, except as a result of damage, destruction or a partial or complete condemnation, Tenant ceases operations of the Facility, or Tenant closes any portion of the Facility;

(ix)        if Tenant receives a state or federal notice of termination of license or de-certification and such notice has not been suspended, extended, withdrawn or terminated prior to 30 days before the effective date of such termination or decertification by any Governmental Authority;

(x)        if Tenant fails to maintain its qualifications for licensure as required by this Lease if failure to do so would result in an inability to operate the Facility or would result in the appointment of a receiver with respect to the Facility;

(xi)        if any transfer or assignment of this Lease or Tenant's direct or indirect interest therein or a transfer of Tenant's direct or indirect equity ownership interests occurs in violation of this Lease;

(xii)        if any malpractice award or judgment exceeding any applicable malpractice insurance coverage and any applicable umbrella coverage by more than One Million Dollars ($1,000,000.00) shall be rendered against Tenant or any subtenant, and either (A) enforcement proceedings shall have been commenced by any creditor upon such award or judgment or (B) such award or judgment shall continue unsatisfied and in effect for a period of sixty (60) consecutive days without an insurance company reasonably satisfactory to Landlord having agreed to fund such award or judgment in a manner reasonably satisfactory to Landlord, or (C) such award or judgment has been appealed and without a bond having been posted to cover such amount that exceeds any insurance coverage, and in any case such award or judgment shall, in the reasonable opinion of Landlord, have a material adverse affect on the ability of Tenant or any subtenant to operate the Facility;

(xiii)        Landlord having agreed to fund such award or judgment in a manner reasonably satisfactory to Landlord, or (C) such award or judgment has been appealed and without a bond having been posted to cover such amount that exceeds any insurance coverage, and in any case such award or judgment shall, in the reasonable opinion of Landlord, have a material adverse affect on the ability of Tenant or any subtenant to operate the Facility;

(xiv)        opinion of Landlord, have a material adverse affect on the ability of Tenant or any subtenant to operate the Facility;

(xv)        upon the denial, refusal to issue, or loss of any licenses, certifications, certificates, approvals, permits, variances, waivers, provider agreements and other authorizations

43

necessary or required for Tenant to operate the Facility which prohibit Tenant from continuing such operations in accordance with the requirements of this Lease;

(xvi)    if any of the representations or warranties made by Tenant under this Lease or any subtenant under its Sublease or otherwise proves to be untrue when made in any material respect;

(xvii)    if any Governmental Authority having jurisdiction over the operation of the Facility removes ten percent (10%) or more of the patients or residents who reside in the Facility for violations of standards of care;

(xviii)   Tenant fails to give Landlord and Mortgagee and Mezzanine Lender timely notice or timely deliver copies of documents within the times required under Section 7.4 (c) through (o);

(xix)    Tenant's receipt of notice of an allegation or determination of "Immediate Jeopardy" (as such term is customarily used) or equivalent notice from any Governmental Authority or officer, acting on behalf thereof relating to the Facility;

(xx)    Tenant's receipt of notice of the freeze on admissions or the imposition of a denial of payment for new admissions or equivalent notice from any Governmental Authority or officer acting on behalf thereof relating to the Facility;

(xxi)    Tenant's breach of its obligations under Section 3.5 including Tenant's failure to execute and deliver to Landlord within ten (10) days of its request therefore any and all documents,  certificate or agreement required or reasonably requested by Landlord, a Mortgagee, Mezzanine Lender, Prospective Mortgagee, HUD and/or HUD's Approved Lender or the Commissioner, including confirming the subordination required hereunder;

(xxii)    Tenant's breach of its obligations under Section 7.6 Security Agreement;

(xxiii)    Tenant fails to notify Landlord within three (3) business days after receipt of any notice from any Governmental Authority, terminating or suspending or threatening termination or suspension of any material license or certification relating to the Facility;

(xxiv)    default or breach by Guarantor under the Guaranty beyond the expiration of any applicable cure period contained therein;

(xxv)    failure by Tenant to deposit all or any portion of the Security Deposit or Letter of Credit, as applicable, or to replace any portion of the Security Deposit or Letter of Credit, as applicable, utilized by Landlord;

(xxvi)    a default or breach of any of the provisions set forth in Article XIX;

(xxvii)    Tenant violates any term, covenant or condition of Tenant's Regulatory Agreement (with respect to a HUD financing) which violation is not cured within thirty (30) days of written notice to Tenant;

(xxviii)   any act or omission by Tenant or any Subtenant referenced in Section 7.4 that constitutes a default by Landlord under its Mortgage Loan Documents with Mortgagee or a default by Landlord Member under its Mezzanine Loan Documents with Mezzanine Lender;

(xxix)    Tenant's failure to meet the covenants provided in Section 7.4 (q)

44

(xxx)      the sale or transfer or attempted sale or transfer of all or any portion of any certificate of need, bed or unit right or other similar authorization relating to any portion of the Facility or the Leased Premises. assignment or subletting in violation of the provisions of Section 15.1;

(xxxi)      the use of any portion of the Premises other than for the Intended Use;

(xxxii)      the Facility appears on the Special Focus Facility List, or similar list established by CMS;

(xxxiii)      Tenant fails to procure the insurance coverage, or loss of the insurance coverage, required by this Lease;

(xxxiv)      Tenant enters into any corporate integrity agreement, settlement or consent decree, or deferred prosecution agreement with any Governmental Authority;

(xxxv)      Any Governmental Authority assesses a fine or penalty against, or with, Tenant that imposes a payment or fine upon Tenant in excess of $150,;

(xxxvi)      The conviction of, or plea of no contest or nolo contendere by, Tenant or any member or beneficial owner of Tenant with respect to (1) any felony or (2) any misdemeanor that involves any act of fraud, embezzlement, theft or misappropriation;

(xl)      Tenant or any Subtenant fails or refuses to execute estoppel certificate required pursuant to Section 20.11, or otherwise complying with the requirements of Section 23 within ten (10) days after Tenant's receipt thereof; or

(xli)      The occurrence of any other event that expressly provides that such occurrence shall constitute a Lease Default.

Upon the occurrence of a Lease Default, Landlord, may, if Landlord so elects, upon twenty (20)days written notice of such election, forthwith terminate this Lease and Tenant's right to possession of the Leased Premises and, at Landlord's sole and absolute discretion, accelerate the payment of all Rent for the balance of the Term and declare the same presently due and payable in full provided, however, that with respect to a Lease Default under Section 16.1(a)(iv), this Lease shall automatically terminate. In the event of such Lease termination, Tenant shall immediately pay Landlord the then present value of all such accelerated Rent. Any such sums paid to Landlord hereunder shall be held in an account subject to the control of the Mezzanine Lender and shall be subject to the terms of the Mortgage Loan Documents and Mezzanine Loan Documents. Landlord, in addition to all other remedies given to Landlord at law or in equity, may by written notice to Tenant, without terminating this Lease, cause Tenant to apply to the DOH to install a manager and/or management consultant and/or a receiver having the necessary approvals from Governmental Authorities, of Landlord's choice, at Tenant's sole cost and expense or to the extent permitted by applicable law, reenter the Leased Premises by summary proceedings or otherwise. In any event, upon a Lease Default, Landlord may require Tenant to consent to a so-called "Change of Ownership" and Landlord may dispossess Tenant upon approval of the Change of Ownership or Certificate of Need by DOH, it being the understanding that under no circumstances is this Lease to be an asset for Tenant's creditors by operation of law or otherwise. In the event of such reentry, Landlord may relet the Leased Premises without being obligated so to do, and in the event of a reletting may apply the Rent therefrom first to the payment of Landlord's cost and expenses, including consultant and/or expert and attorneys' fees and expenses incurred by reason of such Lease Default, and the cost and expense of reletting including, but not limited to, repairs, renovation, or alteration of the Leased Premises and then to the amount of Rent and all other sums due from or payable by Tenant hereunder, Tenant remaining liable

for all other sums due from or payable by Tenant hereunder and for any deficiency. Tenant shall also be liable for and indemnify Landlord against all amounts owed to Medicare, Medicaid, all applicable third-party payor programs, third party payors, or residents, including, but not limited to, any overpayments received by Tenant, relating to the Term. Any and all such deficiencies shall constitute Additional Rent hereunder and shall be payable by Tenant monthly on the date herein provided for the payment of Rent. In addition to the foregoing remedies, Landlord shall immediately be entitled to retain the Security Deposit and draw on and retain proceeds of the Letter of Credit, and thereafter Tenant shall have no further claim, right, title or interest therein to the extent of Landlord's claims only.

Landlord acknowledges that its rights of reentry onto the Leased Premises set forth in this Lease do not confer on Landlord the authority to operate a nursing facility as defined in Article 28 of the Public Health Law on the Leased Premises and agrees that except in the event of a Lease Default Landlord will give the DOH, Tower Building, Empire State Plaza, Albany, NY 12237, notification by certified mail of its intent to reenter the Leased Premises or to initiate dispossessory proceedings or that the Lease is due to expire at least thirty (30) days prior to the date on which Landlord intents to exercise a right to reentry or to initiate such proceedings or at least sixty (60) days before expiration of the Lease.

Upon receipt of notice from Landlord of its intent to exercise its right of reentry or upon the service of process in dispossessory proceedings and sixty (60) days prior to the expiration of the Lease, Tenant shall immediately notify by certified mail the DOH, Tower Building, Empire State Plaza, Albany NY 12237 (or its then current address), of the receipt of such notice or service of such process or that the Lease is about to expire.

(b)        Except as provided in this Lease to the contrary, Rent and other sums not paid when due (unless paid within any applicable grace period) shall bear interest from the date when the same are first payable under the terms of this Lease until the same shall be paid at an annual rate of interest equal to the Overdue Rate.

(c)        Upon the filing of a petition by or against Tenant pursuant to the Bankruptcy Code, Tenant, as debtor and as debtor-in-possession, and any trustee who may be appointed shall: (i) timely perform each and every obligation of Tenant under this Lease until such time as this Lease is either rejected or assumed by order of the United States Bankruptcy Court; (ii) pay monthly in advance on the first day of each month as reasonable compensation for use and occupancy of the Leased Premises an amount equal to the Rent and other charges otherwise due pursuant to this Lease; and (iii) reject or assume this Lease within one hundred twenty (120) days after the filing of such petition under the Bankruptcy Code or within such time period as the Bankruptcy Code may allow. Tenant, as debtor and as debtor-in-possession and any trustee shall be deemed to have rejected this Lease in the event of the failure to comply with any of the above. Included within and in addition to any other conditions or obligations imposed upon Tenant or its successors, in the event of assumption and/or assignment is the prior written consent of any mortgagee to which this Lease has been assigned as collateral security.

(d)        In the event of termination of this Lease by reason of any Lease Default by Tenant, or upon the expiration of the Term, then, and in any of such events, Tenant, upon Landlord's written request, shall to the greatest extent permitted by law, transfer to Landlord or its designees or assigns, or cause its Subtenants and/or Affiliates, to transfer to Landlord or its designees or assigns, the following: (i) all federal, state or municipal licenses, certifications, certificates, accreditations, approvals, permits, variances, waivers, provider agreements (including non-governmental) and other authorizations which relate to the operation of the Facility; and (ii) the name of the Facility as then commonly known to the general public. Tenant shall also prepare and file all notices required by applicable law in connection with such termination and shall also prepare and timely file all final Medicare and Medicaid cost reports.

46

In the event Tenant fails or refuses to transfer any such licenses, certifications, certificates, accreditations, approvals, permits, variances, waivers, provider agreements, other authorization or trade name, then this provision shall constitute an act of assignment by Tenant to Landlord or its assigns without the necessity of any further written instrument. For this purpose, Tenant constitutes and appoints Landlord its true and lawful attorney-in-fact with full power of substitution to complete or undertake such replacements in the name of Tenant. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

(e)        Landlord shall have the option of taking over the operation of the Facility, or having the operation of the Facility taken over by a designee, in the event of a termination of this Lease for any reason, without Landlord or designee assuming any of Tenant's liabilities or obligations, including Tenant's liabilities and obligations with respect to employees, such as vacation, sick leave, health insurance and pension liabilities and Tenant's obligations under applicable law to offer and provide group health continuation coverage. Landlord shall give Tenant written notice of Landlord's intent to exercise the right set forth above, in which event, upon the approval of the DOH of the Change of Ownership, Tenant shall and shall cause the Subtenant to immediately turn over possession and control of the Facility without any further action having to be taken on the part of Landlord. At the request of Landlord, Tenant shall and shall cause the Subtenant to turn over any or all of inventories, personal property (including computer and telecommunications equipment but excluding any leased equipment), vehicles, and material contracts (including hospital, transfer, vendor, and managed care contracts).

(f)        No failure of Landlord to enforce any rights or remedies upon default of Tenant shall prejudice or affect the rights of Landlord upon any subsequent or similar default.

(g)        In the event of a Lease Default by Tenant of any of the terms, covenants, conditions or provisions of this Lease, which Lease Default is not cured within any applicable grace or cure period, Landlord shall have the right to invoke any remedy permitted to Landlord at law, in equity or otherwise. All remedies available to Landlord are declared to be cumulative and concurrent and the exercise of one shall not preclude or waive the right to exercise any other. No termination of this Lease and no taking or recovering of possession of the Leased Premises shall deprive Landlord of any of its remedies or actions against Tenant and Tenant shall remain liable for all past or future Rent, including all taxes, insurance premiums and all other charges and Rent payable by Tenant under this Lease, during and for the balance of the Term hereof. The bringing of any action for Rent or other default shall not be construed as a waiver of the right to obtain possession of the Premises.

(h)        If suit shall be brought for recovery of possession of the Leased Premises, for the recovery of Rent, or any other amount due under the provisions of this Lease, or because of the breach of any other covenant herein contained on the part of Tenant to be kept or performed, and breach shall be established, Tenant shall pay to Landlord all expenses, including reasonable attorney fees, incurred therefor. This subjection shall survive termination of this Lease.

Section 16.2        Facility Operating Deficiencies. On written notice of a request therefor by Landlord to Tenant, upon a Lease Default and for a period of time necessary to fully remedy the Lease Default, Tenant shall engage the services of a consultant, unaffiliated with Tenant and approved by Landlord, which approval shall not be unreasonably withheld, to review the management of the facility for the purpose of making recommendations to remedy the Lease Default. Subject to applicable legal requirements governing confidentiality of patient records, the consultant shall have complete access to the Facility, its records, offices and facilities, in order that it may carry out its duties. Tenant shall cause such consultant to prepare and deliver to Landlord and Tenant a written report of its recommendations within thirty (30) \ days after its engagement. If Tenant shall fail to designate a consultant approved by Landlord as provided above within five (5) days after Tenant's receipt of Landlord's notice, Landlord may

47

designate such consultant by further notice to Tenant.  Tenant shall be responsible for payment of all fees and expenses reasonably charged and incurred by the consultant in carrying out its duties.  Tenant shall promptly implement any and all reasonable recommendations made by such consultant in order to promptly correct or cure the Lease Default; provided, however, that in no event shall Tenant implement any such recommendations if the same would constitute a violation of applicable legal requirements, violate any rule or regulation of the DOH, or would otherwise cause a Lease Default hereunder (e.g., a transfer or change in use of the Leased Premises), unless Landlord consents in writing to such Lease Default, which consent may be given or withheld in Landlord's sole and absolute discretion.  Nothing herein shall impose any liability or obligation on Landlord to (a) request the appointment of a consultant or (b) otherwise remedy the Facility Operating Deficiency(ies) nor shall it deem Landlord an operator of the Facility.

        Section 16.3     Receivership.  Tenant acknowledges that one of the rights and remedies available under applicable law for nursing facilities which fail to comply with the conditions of participation for Medicare or Medicaid is to apply to a court of competent jurisdiction for the appointment of a receiver to take possession of the Facility, to collect the rents, issues, profits and income of the Facility and to manage the operation of the Facility.  Tenant further acknowledges that the revocation, suspension or material limitation of the certification of the Facility for provider status under Medicare or Medicaid (or successor programs) and/or the revocation, suspension or material limitation of a license relating to the operation of the Facility for its intended use under the laws of the State of New York will materially and irreparably impair the value of Landlord's investment in the Facility.  Therefore, in the event of a Lease Default, and in addition to any other right or remedy of Landlord under this Lease, at the request of Landlord but subject to the prior written consent of the Mortgagee and Mezzanine Lender, Tenant shall request DOH to, or to the extent permissible under law, Tenant shall, petition any appropriate court, for the appointment of a receiver to take possession of the Facility, to manage the operation of the Facility under Tenant's licenses and certifications, to collect and disburse all rents, issues, profits and income generated thereby and to preserve or replace to the extent possible any such license and provider certification for the Facility or to otherwise substitute the licensee or provider thereof.  The receiver shall be entitled to a reasonable fee for its services as a receiver.  All such fees and other expenses of the receivership estate shall be added to the monthly Rent due to Landlord under this Lease as Additional Rent.  Tenant hereby irrevocably stipulates to the voluntary appointment of a receiver under such circumstances and for such purposes and agrees not to contest such appointment.

        Section 16.4     Tenant's Waiver; Mitigation.  In connection with the exercise by Landlord of any of its remedies under this Section 16, including the termination of this Lease, in whole or in part, Tenant waives, to the maximum extent permitted by applicable Laws, (1) any right of redemption, re-entry or repossession, (2) the benefit of any moratorium laws or any laws now or hereafter in force exempting property from liability for rent or for debt, (3) any duty on the part of Landlord to mitigate the damages recoverable from Tenant on account of any Lease Default by Tenant, except that, notwithstanding the foregoing or anything in this Lease to the contrary, Landlord agrees to comply with any duty to mitigate damages where applicable Laws do not allow Tenant to waive such right, (4) the right to interpose any counterclaim (other than compulsory counterclaims) in any summary proceeding instituted by Landlord against Tenant in any court or in any action instituted by Landlord in any court for unpaid Rent under this Lease, and (5) any other right provided to Tenant under applicable Laws relating to a breach of or Lease Default under this Lease, including any rights to cure such breach or Lease Default.

## ARTICLE XVII

## ENTRY AND REIMBURSEMENT RIGHTS OF LANDLORD

Section 17.1        Entry and Reimbursement Rights of Landlord.  In addition to those rights set forth in Section 7.2 of this Lease, Landlord reserves the right at all reasonable times during business hours and upon at least forty eight (48) ) hours' advance oral notice to Tenant's designated representative to receive such notice to go upon and inspect the Facility and every part thereof (subject to applicable Laws pertaining to patient confidentiality and privacy and the confidentiality of medical records).  If Landlord shall make any payments or perform any repairs on behalf of Tenant which are Tenant's obligation and which Tenant has failed to make after applicable notice from Landlord, then any reasonable amounts so paid by Landlord are agreed and declared to be Additional Rent, and shall be due and payable to Landlord by Tenant upon submission to Tenant of an invoice, bill, or statement therefor, together with interest charged at the Overdue Rate commencing on the date of such invoice, bill, or statement.  Nothing in this Section 17.1 shall impose any liability or obligation upon Landlord.

## ARTICLE XVIII

## REPRESENTATIONS AND WARRANTIES

Section 18.1        Tenant's Representations, Warranties and Additional Covenants.  Tenant represents, warrants and covenants to Landlord and agrees (all of which shall survive the delivery and execution of this Lease) as follows (all of Tenant's representations, warranties, and covenants shall be deemed to include, in addition to that specified herein, the identical warranties, representations, and covenants of all Subtenants, which Tenant agrees to set forth in any Sublease and which are hereby incorporated herein by reference as if set forth in full herein):

(a)        Corporate.  Tenant is a limited liability company duly formed and validly existing and in good standing under the laws of the State of New York, and has the limited liability company power and authority to own its property and assets and to carry on its business as now being conducted or as will be conducted on and after the Commencement Date.

(b)        No Breach of Statute or Contract.   The execution, delivery and performance of this Lease by Tenant and any Sublease by a subtenant will not breach any statute or regulation of any Governmental Authority, and will not as of the Commencement Date conflict with or result in a breach of or default under any of the terms, conditions or provisions of Tenant's articles of organization, operating agreement, other material agreements, or any order, writ, injunction, decree, agreement or instrument to which Tenant is a party, or by which it or its property, may be bound.

(c)        Authorization of Lease.  The execution, delivery and performance of this Lease, and all Subleases, has been duly authorized by all necessary individuals, shareholders, members, officers, directors, managers and/or owners of Tenant and this Lease constitutes the valid and binding obligation of Tenant, fully enforceable in accordance with its terms.

(d)        No Litigation or Adverse Events.  Except for the Litigations and as set forth on Schedule 18.1(d) attached hereto and incorporated herein, there is no suit, claim, action or legal, administrative, arbitration, or other proceeding or governmental investigation pending or threatened, by or against Tenant, and there exists no event or condition of any character, which could prevent the consummation of the transactions contemplated by this Lease or materially adversely affect Tenant's performance of the terms and conditions hereunder.

49

(e)         Conduct of Business.  Subject to the express provisions herein, at all times after the Effective Date, Tenant shall, and cause its subtenants to (i) operate the Leased Premises (after the Commencement Date) and otherwise conduct its/their business in the ordinary course, and in compliance with all statutory and regulatory requirements of any federal, state or local authority, (ii) continue to operate the Leased Premises after the Commencement Date and maintain it  in substantially its condition as of the Commencement Date, reasonable wear and tear excepted, including but not limited to repairs and replacements permitted or required under this Lease, and in a lawful manner, (iii) not encumber all or any portion of its assets or properties or the Leased Premises, including without limitation, certificates of need, bed rights, or provider agreements, (iv) preserve the goodwill of the Facility, (v) not take any action from an accounting perspective which would materially adversely affect the reimbursement formula or tax benefits with respect to the Leased Premises or any portion thereof, (vi) utilize the Leased Facility only for the Intended Purpose, (vii) not relinquish or attempt to transfer the location of or sell the skilled nursing facility license, certificate of need approval, Medicare or Medicaid certification or any other licenses, certifications, certificates, accreditations, approvals, permits, variances, waivers, provider agreements or other authorizations, (viii) not refuse to admit patients without 30 days written notice of intent to, and prior written consent of Landlord, (ix) not dissolve, merge or consolidate with or into any other person or entity, or otherwise change its identity or company or capital structure, or (x) not change its name or business address.

(f)         Continued Existence.  At all times on and after the Effective Date, Tenant shall cause to be done all things needed to preserve its rights and franchises and comply with all Laws applicable to it, and to continue to conduct its business in the ordinary course.

(g)         Payment of Obligations.  At all times on and after the Effective Date, Tenant shall timely pay, and cause its subtenants to timely pay, all of its/their obligations, indebtedness, taxes, charges and impositions, whether or not relating to the Leased Premises or this Lease, as they become due unless contested in good faith and diligently pursued only if permitted under and subject to the terms and conditions of this Lease.

(h)         Notice of Default.  At all times on and after the Effective Date, Tenant shall promptly notify Landlord of (i) any material default by Tenant relating to any indebtedness or obligation of Tenant, whether or not relating to the Leased Premises or this Lease, and (ii) any material violations by the Facility of any applicable Law.

(i)         Compliance with Law.  At all times on and after the Effective Date, Tenant shall comply in all respects, and cause its subtenants to comply in all respects, with all applicable Laws, including Medicare and Medicaid conditions of participation, to which it is subject or which are applicable to the Leased Premises and to Tenant's operation of the Leased Premises as a licensed, Medicare and Medicaid certified skilled nursing facility.

(j)         Beds and CON.  Tenant has been awarded a CON for construction and operation of 160 skilled nursing facility beds for use at the Lease Premises by DOH and such CON may be used in connection with this Lease.

(k)         Tenant, on behalf of itself and its Subtenants, makes the Health Care warranties and representations set forth in Schedule 18(k) attached hereto and incorporated herein, to Landlord, it's successors and assigns, which warranties and representations shall be true and correct as of Commencement Date and at all times during the Term.

50

(l)    Except for the Subleases of the Leased Premises to the Operators, there are no subleases or sub-subleases or occupancy agreements (other than residence agreements with patients or residents) for any portion of the Leased Premises.

(m)    Tenant shall maintain and comply at all times with all O&M Plans (Operation and Maintenance Plans covering the handling, treatment or maintenance of asbestos or Hazardous Materials) relating to the Leased Premises, or that shall be required in the future by Mortgagee, Mezzanine Lender or any HUD mortgagee or, where applicable, the Commissioner.

Section 18.2    Representation and Warranties.  Landlord hereby represents and warrants to Tenant, all of which shall survive the delivery and execution of this Lease, and agrees, as follows:

(a)    No Breach of Statute or Contract.  The execution, delivery, and performance of this Lease will not violate any provision of law, any order of any court or other agency of federal or state government or any provision of any indenture, agreement, or other instrument to which Landlord is a party or by which it or any of its properties or assets are bound; conflict with, result in a breach of, or constitute (with passage of time or delivery of notice, or both), a default under any such indenture, agreements or other instrument; or result in the creation or imposition of any lien or other encumbrance of any nature whatsoever upon any of the properties or assets of Landlord.

(b)    Authorization of Lease.  This Lease has been duly authorized by all necessary individuals, shareholders, members, officers, directors, managers and/or owners of Landlord and this Lease constitutes the valid and binding obligation of Landlord, fully enforceable in accordance with its terms.

(c)    No Litigation or Adverse Events.  There is no action, suit, examination, review, or proceeding by or before any governmental instrumentality or agency now pending or, to the knowledge of Landlord, threatened against Landlord, which, if adversely determined, would materially impair the right of Landlord to carry on the business as contemplated under this Lease.

(d)    No Default.  Landlord is not in default in the performance, observation, or fulfillment of any of the obligations, covenants, or conditions contained in any agreement or instrument to which it is a party relating to the Leased Premises and which default would have a material adverse affect on the Leased Premises; and

(e)    Corporate.  Landlord is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of Massachusetts  and is qualified to do business in the State of New York, and has the limited liability company power and authority to own its properties and assets and to carry on its business as now being conducted.

## ARTICLE XIX

### OPERATION, MERGER AND CONSOLIDATION RESTRICTIONS

Section 19.1    Intentionally Omitted

Section 19.2    SPE Provisions.  At all times during the term of this Lease, Tenant represents, warrants and covenants that Tenant and each Subtenant, and all successors and assigns of Tenant and Subtenants, is, shall be and shall continue to be a "**Special Purpose Entity**" as defined in Schedule 19.2.  The Operating Agreement of Tenant and each subtenant shall include the Special Purpose Entity provisions set forth in Schedule 19.2.

51

Section 19.3      Injunctive Relief.  Notwithstanding anything to the contrary set forth in this Lease, the Parties hereto understand and agree that:  (a) each term of Article XIX of this Lease is fully required to protect Landlord's interests, and that no such term confers a benefit on Landlord that is disproportionate to the detriment imposed on Tenant, if any; (b) the remedy at law for any breach by Tenant of Article XIX would be inadequate; (c) the damages flowing from such breach are not readily susceptible to measurement in monetary terms; and (d) Landlord shall be entitled to immediate injunctive relief restraining any breach thereof.  Nothing in this Agreement shall be deemed to limit Landlord's remedies at law or in equity for any such breach by Tenant of any term or provision of Article XIX of this Lease.

Section 19.4      Equity Interests.  In the event that Tenant or any constituent entity under this Lease is ever a form of entity other than a limited liability company, the term "**membership interest**" as used in Articles XIX and XX hereof shall be deemed to mean the analogous form of equity ownership interest in such other type of entity, such as capital stock, partnership interest, beneficial interest or the like.

Section 19.5      No Merger or Consolidation.  Except as expressly provided elsewhere in this Lease, Tenant shall not sell, or offer for sale, its assets or otherwise merge, consolidate, amalgamate or otherwise combine with any other entity other than selling non-material assets in the ordinary course of business, to any other entity, business or activity involving any of Tenant's officers, directors, members, managers, owners, representatives, agents, successors and assigns, and their respective successors, assigns, agents and representatives.  Except as expressly provided elsewhere in this Lease, Tenant, Subtenants,  Guarantor(s) and their Affiliates, shall not sell or offer to sell, assign, transfer, convey, pledge, or encumber its/their membership interests to, or otherwise attempt to merge with or otherwise merge, consolidate, amalgamate or otherwise combine with any other entity, business or activity, whether involving any of Tenant's officers, directors, members, managers, owners, representatives, agents, successors and assigns, and their respective successors, assigns, agents and representatives, or otherwise.

# ARTICLE XX

## MISCELLANEOUS

Section 20.1      **GOVERNING LAW.ALL MATTERS PERTAINING TO THIS LEASE OR THE LEASED PREMISES SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAWS OF THE STATE OF NEW YORK AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, TENANT HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS LEASE, AND THIS LEASE SHLL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS).**

**ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LANDLORD OR TENANT ARISING OUT OF OR RELATING TO THIS LEASE MAY AT LANDLORD'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF WHITE PLAINS, COUNTY OF WESTCHESTER, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND TENANT WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR *FORUM NON CONVENIENS* OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND TENANT HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  TENANT DOES HEREBY DESIGNATE AND APPOINT:**

Lizer Jozefovic
**HBL SNF, LLC**
**1278 Albany Post Road**
**Croton-on-Hudson, New York 10520**

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO TENANT IN THE MANNER PROVIDED IN ARTICLE XIII OF THIS LEASE SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON TENANT IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  TENANT (A) SHALL GIVE PROMPT WRITTEN NOTICE TO LANDLORD OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (B) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE, IN THE FORM OF A WRITTEN NOTICE TO LANDLORD, A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN WHITE PLAINS, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (C) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR AND NOTIFY LANDLORD IN WRITING OF SUCH SUBSTITUTION.**

Section 20.2   <u>Waiver of Breach.</u>  The waiver by either party of a breach or violation of any provision of this Lease shall not operate as, or be construed to be a waiver of, any subsequent breach of the same or other provision hereof.  No waiver shall be effective unless set forth in writing and signed by the party against whom such waiver is asserted.

Section 20.3 <u>Delay Not a Waiver</u>.  Neither any failure nor any delay on the part of any party hereto in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or any other document or instrument entered into or delivered in connection herewith or pursuant hereto, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  A waiver of one default with respect to any Person shall not be construed to be a waiver of any subsequent default with respect to such Person or any other Person or impair any remedy, right or power consequent thereon.

Section 20.4 <u>Force Majeure</u>.  If Tenant or Landlord is delayed or prevented from performing any of their respective non-monetary obligations under this Lease, and such delay is by reason of strike, lockout, labor troubles, material shortages, adjustment of any insurance claim, failure of power, riots, civil commotion, insurrection, war (whether declared or undeclared), warlike operations, acts of terrorism, cyber-attacks, acts of public enemy, acts of bioterrorism, plagues, epidemics, pandemics, outbreak of a communicable disease leading to extraordinary restrictions including quarantine or movement of people or goods, invasion, rebellion, hostilities, military or usurped power, sabotage, government action, rain and other inclement weather, acts of God, power outages, inability to obtain any material, utility, or service because of governmental restrictions, inability to obtain building permits, hurricanes, floods, earthquakes, tornadoes, or other natural disasters, accident, emergency, mechanical breakdown, municipal delays (including delays in reviewing materials submitted by a party or issuing permits or approvals following such submittals), the act or failure to act of the other party, the default under this Lease by the other party, governmental preemption in connection with a national emergency,

53

any rule, order or regulation of any department or subdivision of any government agency, or any other cause reasonably beyond such party's control (where lack of funds, inability to obtain financing, and/or changes in economic condition shall not be a basis for delay or prevention of any obligation under this Lease) (any such event, a "Force Majeure"), then performance of such act shall be excused for the period of the delay or prevention, and the period of such delay or prevention shall be deemed added to the time period herein provided for the performance of any such obligation by the party so delayed or prevented, provided that this subsection will not excuse or delay the payment of money by either party.

Section 20.5    Severability.    In the event any provision of this Lease is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Lease so long as the intent of the parties under this Lease can still be effected, which shall remain in full force and effect and enforceable in accordance with its terms.

Section 20.6    Entire Agreement; Amendments.    This instrument contains the entire agreement between the Parties hereto with respect to the subject matter hereof.    All representations, promises and prior or contemporaneous undertakings between such Parties are merged into and expressed in this instrument, and any and all prior agreements between such Parties are hereby canceled.    The agreements contained in this instrument shall not be amended, modified, or supplemented except by a written agreement duly executed by both Landlord and Tenant.

Section 20.7    Counterpart Execution; Electronic Execution.    This Lease may be executed in any number of counterparts with the same effect as if the Parties hereto had signed the same document.    All counterparts will be construed together and shall constitute one lease.    Signatures transmitted by email as PDFs shall have the same effect as original signatures.

Section 20.8    Survival of Representations and Warranties.    Except as specifically provided otherwise in this Lease, all representations and warranties of Landlord and Tenant shall survive the Term of this Lease.

Section 20.9    Use of Brokers.    Landlord and Tenant each represent and warrant to the other that no broker, finder or other person has been involved in regard to this Lease.    Landlord and Tenant hereby agree to indemnify, defend and hold the other harmless from and against any and all claims, liabilities, costs and expenses of any kind (including the injured party's reasonable attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of a party to this Lease in connection with the transactions contemplated herein.    The provisions of this Section 20.9 shall survive the expiration and termination of this Lease.

Section 20.10    Owner for Federal Tax Purposes.    It is hereby agreed between Landlord and Tenant that for federal, state and local income tax purposes Landlord will be the owner of the Leased Premises and Tenant will be the lessee thereof, and each party hereto agrees to characterize this Lease as a lease for federal, state and local income tax purposes and to file all tax returns consistent therewith.

Section 20.11    Estoppel Certificates.    Tenant shall, without charge, at any time and from time to time, within ten (10) days after written request by Landlord or Mortgagee, or Mezzanine Lender, deliver a written instrument to Landlord or any other person specified by Landlord, duly executed and acknowledged, certifying the following and such other matters as may be reasonably required by Landlord, including without limitation, current financial information relating to Tenant:

(i)    That Tenant has accepted and is in possession of the Leased Premises;

54

(ii)    That this Lease is unmodified and in full force and effect or, if there has been any modification, that the same is in full force and effect as so modified, and identifying any such modification;

(iii)    Whether or not there are then existing any setoffs or defenses in favor of Tenant against the enforcement of any of the terms, covenants, and conditions of this Lease by Landlord and, if so, specifying the same, and also whether or not Landlord has observed and performed all of the terms, covenants, and conditions on the part of Landlord to be observed and performed and, if not, specifying same;

(iv)    That no Lease Defaults exist or are continuing; and

(v)    The dates to which Rent and all other charges hereunder have been paid.

Tenant's failure to timely comply with the requirements set forth above shall constitute a Lease Default.

B.    In consideration of Landlord granting to Tenant, the Option to Purchase set forth in Section 3.7 of this Lease, the Parties agree as follows:

Annexed hereto as Exhibit C is a "pro forma" estoppel certificate that Tenant shall execute and deliver to Landlord on or before the Execution Date of this Lease. The Parties expressly agree that Landlord shall retain the executed estoppel certificate and shall have the absolute right, without any consent from or notice to Tenant, to complete and date the estoppel certificate and deliver same to any lender requiring an estoppel certificate from the Tenant. It is further expressly agreed that Landlord shall in its sole and absolute discretion, and without any consent from or notice to Tenant, have the right, without limitation, to complete, date, revise, edit or without limitation, otherwise modify the estoppel certificate as Landlord deems necessary. Landlord's rights provided for in this section 20.11B. shall be in addition to and not in limitation of any other rights Landlord has in this Lease with respect to Tenant's obligations to timely provide an estoppel certificate.

Section 20.12 Confidentiality.  (a) Landlord and Tenant agree to keep all aspects of (but not the existence of) this Lease confidential, and shall not disclose to any person other than the members, managers, owners, directors, officers, employees, agents, advisors, affiliates, brokers, lenders, attorneys or accountants (collectively the "Representatives") of the Parties hereto on a need-to-know basis, or to any Governmental Authority pursuant to regulatory authority, any confidential or proprietary information, knowledge or data concerning the business, affairs, operations, secrets, dealings or finances of the other party furnished directly or indirectly by such other party (collectively referred to as the "Confidential Information").    As used in this Lease, the term "Confidential Information" does not include any information which:  (i) at the time of disclosure is generally available to and known by the public (other than as a result of a disclosure directly or indirectly by either party or their Representatives); (ii) was available to either party on a non-confidential basis from a source other than a party to this Lease or its Representatives, provided that such source is not and was not bound by a confidentiality agreement with the party hereto;  (iii) has been independently acquired or developed by either party or their Representatives without violating any of the obligations hereunder; (iv) is required by law to be disclosed; or (v) relates to the tax structure, tax strategy or tax planning of this transaction.

(b)    In the event that either party or any of the Representatives receives notice of a legal request for disclosure of any of the Confidential Information (by deposition, interrogatory, request for

55

documents, subpoena, civil investigative demand or similar process), the party receiving such notice ("Receiving Party") shall promptly notify the other party ("Notified Party") so that the Notified Party may seek a protective order or other appropriate remedy if it chooses to do so. Failure by the Notified Party to take action to seek a protective order or other remedy and to notify the Receiving Party of such action prior to the required disclosure date, shall be deemed a waiver of the provisions of this section. In the event that a protective order or other remedy is not obtained or that the Notified Party waives compliance with the provisions hereof, the Receiving Party shall exercise its best efforts to obtain a confidentiality agreement or protective order concerning the Confidential Information, and in the absence thereof, shall disclose only that portion of the Confidential Information which it is advised by written opinion of counsel is legally required to be disclosed, or which is compelled by court order.

(c) In the event of any breach or threatened breach hereof, Landlord or Tenant shall be entitled to equitable relief, including a temporary preliminary and permanent injunction and specific performance, in addition to all other remedies available to them at law or in equity.

(d) Notwithstanding anything herein to the contrary, Landlord (and each employee, agent, or other Representative of Landlord) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of this Lease, related documents and all materials of any kind (including opinions or other tax analyses) that are provided to Landlord relating to such tax treatment and tax structure. For this purpose, the tax treatment of a transaction is the purported or claimed U.S. federal income tax treatment of the transaction and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of the transaction.

Section 20.13  Holdover.  If, at the expiration of the Term, or earlier termination of the Lease, Tenant continues to occupy the Leased Premises except during a Reimbursement Period, with Landlord's consent, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a Tenant from month-to-month at 200% of the most recent Rent payable by Tenant hereunder, at Landlord's sufferance, and under the same terms and conditions as were in force and effect at the expiration of the Term (except only as to the Term), and except that in the event Tenant shall continue to occupy the Leased Premises after the expiration of the Term, without a duly executed extension agreement in writing having been entered into by and between Landlord and Tenant, then if Landlord shall suffer any damage, loss, cost or expense as a result of such holdover, then Tenant, in addition to such increased Rent, shall pay the amount thereof to Landlord immediately on demand. The provisions of this Section shall be deemed to be "an agreement expressly provided" otherwise as provided in Section 232-C of the Real Property Law of the State of New York. Holding Over.  Nothing contained herein shall constitute the consent, express or implied, of Landlord to the holding over of Tenant after the Expiration Date or earlier termination of this Lease, nor shall anything contained herein be deemed to limit Landlord's remedies.

Section 20.14  Tenant's Waiver of Claim for Physical Injury.  Landlord and Landlord's Indemnitees shall not be liable for, and Tenant waives and indemnifies Landlord and Landlord's Indemnitees against all claims for, damage or injury to person or property sustained by Tenant or any person claiming through Tenant, or otherwise, resulting from any accident or occurrence in, about, or upon the Leased Premises, whether occurring as a result of Landlord's active or passive negligence, or otherwise.

Such waiver shall include, but not be limited to, claims for damage resulting from: (i) any equipment or appurtenances becoming out of repair or any other capital improvement, replacement, repair or maintenance; (ii) injury done or occasioned by wind; (iii) any defect in or failure of plumbing, heating, or air conditioning equipment, electric wiring, gas, water and steam pipes, stairs,

56

rail or walks; (iv) broken glass; (v) the backing up of any sewer pipe or washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Leased Premises: (iv) the escape of steam or hot water: (vii) water, snow or ice being upon, falling from or coming through the roof, skylight, trap door, stairs, walks or any other place upon or near the Leased Premises; (viii) the falling of any fixture, plaster, drywall or stucco; and (ix) any act, omission or negligence of trespassers.

Section 20.15  Binding Effect.  This Lease does not constitute an offer to lease and shall not bind Landlord or Tenant unless and until each such party elects to be bound hereby by executing and delivering to the other party an executed original counterpart hereof.

Section 20.16  Default by Landlord.  Landlord shall in no event be charged with default in the performance of any of its obligations hereunder unless and until Landlord shall have failed to perform such obligations within sixty (60) days of when they are due to be performed, except in cases when documents are required or consents needed in less than sixty (60) days in which case failure to render timely shall be deemed to be approval or consent of Landlord (or such additional time as is reasonably required to correct any such default) except for Landlord's default in making timely payment of taxes and interest, in which case Landlord shall be in default when such payments are delinquent or past due.  Tenant agrees to give to the holder of record of any mortgage covering the Leased Premises notice simultaneously with any notice given to Landlord to correct any default of Landlord as hereinabove provided and agrees that the holder of record of any mortgage shall have the right, after receipt of notice of such default, within sixty (60) days after the expiration of Tenant's appliable cure period with respect thereto, to correct or remedy such default before Tenant may take any action under this Lease by reasons of such default.  Landlord shall also give to the holder of any mortgage copies of any notices of default which it may give or send to Tenant.

Section 20.17  Liens.  Tenant shall not do or suffer anything to be done whereby the Leased Premises, or any portion thereof, or any interest therein, may be encumbered by any liens of mechanics, laborers, or materialmen, chattel mortgages or any other liens.  Tenant shall, whenever and as often as any such liens are filed against the Leased Premises, or any portion thereof, purporting to be for labor or material furnished or to be furnished to Tenant, discharge the same of record within thirty (30) days after the date of filing by payment, bonding or otherwise, as provided by law.  In the event of the default of Tenant in procuring the discharge, as aforesaid, of any such lien, Landlord may, with five (5) days prior notice, procure such discharge and the expenses incurred by Landlord in obtaining such discharge shall be paid by Tenant as Additional Rent within ten (10) days after notice from Landlord of the amount thereof.

Section 20.18  Publicity.  All news releases, publicity or advertising by Tenant or their Affiliates through any media intended to reach the general public which refers to Landlord, or its Affiliates, this Lease or the purchase of the Real Property shall be subject to the prior written approval of Landlord.

Section 20.19  Trial by Jury.  **TENANT HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS LEASE, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY TENANT, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LANDLORD IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY TENANT.**

57

Section 20.20   Construction and Interpretation.   The Parties have each negotiated the terms and conditions hereof and reviewed this Lease carefully.  It is the intent of the Parties that each word, phrase, sentence and other part hereof shall be given its plain meaning, and that rules of interpretation or construction of contracts that would construe any ambiguity of any part hereof against the draftsman, by virtue of being the draftsman, shall not apply.

Section 20.21   Accord and Satisfaction.   No payment by Tenant or receipt by Landlord of a lesser amount than shall be due hereunder, shall be deemed to be other than a payment on account nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be given any effect or be deemed an accord and satisfaction, and Landlord may accept such checks without prejudice to any other rights or remedies which Landlord may have.

Section 20.22   Captions and Headings.   The captions and headings set forth in this Lease are included for convenience and reference only, and the words obtained therein shall in no way be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of, or the scope or intent of, this Lease, or any parts hereof or thereof.

Section 20.23   Time is of the Essence.   **Time is of the essence of each and every term, condition, covenant and warranty set forth herein or in any of the other Lease Documents.**

Section 20.24   Successors and Assigns.   This Lease and the other Lease Documents shall (a) be binding upon Tenant and Tenant's legal representatives and permitted successors and permitted assigns, and (b) inure to the benefit of Landlord and any other person or entity who may now or hereafter hold the interest of Landlord under this Lease and their respective successors and assigns.

Section 20.25   No Third Party Beneficiaries.  This Lease is solely for the benefit of Landlord, its successors and assigns, and Tenant, and nothing contained herein shall confer upon any person other than Tenant or Landlord or their respective successors and assigns, any right to insist upon or to enforce the performance or observance of any of the obligations contained herein, except only as may be otherwise specifically provided for in this Lease.  All conditions to the obligations of Landlord to advance or make available proceeds of insurance or condemnation are imposed solely and exclusively for the benefit of Landlord, its successors and assigns.  No other person or entity shall have standing to require satisfaction of such conditions in accordance with their terms, and no other person or entity shall, under any circumstances, be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Landlord at any time, if in Landlord's sole and absolute discretion, Landlord deems it advisable or desirable to do so.  Notwithstanding the foregoing, Mortgagee and Mezzanine Lender are intended third-party beneficiaries of this Lease and may enforce any of the provisions hereunder on behalf of Landlord or on their own behalf, subject to the terms of the Mortgage Loan Documents and the Mezzanine Loan Documents.

Section 20.26   Non Competition and Non Solicitation.   Tenant agrees to the following restrictive covenants and agreements which covenants are not severable from this Lease and which are included to protect the value of the Leased Premises.  Accordingly, Tenant agrees that it and their Affiliates will not, during the Term of this Lease at any time for a period of two (2) years after the expiration or early termination of this Lease, directly or indirectly, together alone or in conjunction with any others, engage in the following:

(i)    compete with the business conducted at the Facility, and for these purposes will not own, manage, operate, join, control or participate in, or be connected as an officer, employee, partner, director, trustee or otherwise in any manner with a company which owns or operates (or provides consulting and/or management services to any skilled nursing facility located within the

58

Primary Market of the Facility or (ii) any company providing hospice services in the State of New York , or,  otherwise lend credit to a person, firm or entity of a type which they prohibited from owning,

(ii)      solicit or hire any then current or former (having provided services during the period commencing one year prior to such date of solicitation or hire) employees of the Facility (except for employment at the Facility),

(iii)      solicit or cause any then current resident of the Facility to move to another nursing facility unless, except during the Term of this Lease the Facility can no longer provide adequate care for such resident.

Tenant acknowledges and agrees that the remedy at law for any breach or threat of breach of the foregoing agreements will be inadequate and that Landlord shall be entitled to in-junctive relief in addition to any rights or remedies available to it for any breach or threat of breach hereof.  The foregoing covenants shall be deemed to be severable and if the same be held invalid by reason of length of time or area covered, or both, the Tenant agrees that such length of time or area covered, or either of them, shall be reduced to the extent necessary to cure such invalidity and the provisions hereof shall be enforceable to the fullest extent permitted by law.

Section 20.27  Intentionally Deleted.

Section 20.28  Landlord Not in Control; No Partnership.  None of the covenants or other provisions contained in this Lease shall, or shall be deemed to, give Landlord the right or power to exercise control over the affairs or management of Tenant, the power of Landlord being limited to the rights to exercise the remedies referred to in this Lease.  The relationship between Tenant, on the one hand, and Landlord, on the other hand, is, and at all times shall remain, solely that of landlord and tenant. No covenant or provision of this Lease is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest in profits or income between Landlord, on the one hand, and Tenant, on the other hand.  Landlord undertakes or assumes no responsibility or duty to Tenant or to any other person with respect to the Facility or this Lease, except as expressly provided in this Lease; and notwithstanding any other provision of this Lease (a) Landlord shall not be construed as, a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Tenant or its stockholders, members, or partners and Landlord never intends to ever assume such status; (b)  Landlord shall not in any event be liable for any debts, expenses or losses incurred or sustained by Tenant; and (c)  Landlord shall not be deemed responsible for or a participant in any acts, omissions or decisions of Tenant or their stockholders, members, or partners.  Landlord, on the one hand, and Tenant, on the other hand, disclaim any intention to create any partnership, joint venture, agency or common interest in profits or income between Landlord, on the one hand, and Tenant, on the other hand, or any sharing of liabilities, losses, costs or expenses.  The foregoing provisions as they relate to Landlord, shall apply equally to Mortgagee and Mezzanine Lender.

Section 20.29  Tenant Cooperation.  Tenant agrees to cooperate with Landlord in providing, and upon request by Landlord or its lender, Tenant shall provide or cause its subtenants to provide, such documents, information, financial reports, and such other items as may be required by Mortgagee or Mezzanine Lender in connection with Landlord's or Landlord Member's loan or loans to acquire the Leased Premises.  Tenant agrees to cause its outside counsel to provide updated healthcare opinions required by Mortgagee or Mezzanine Lender in connection with the healthcare operations by Tenant or its subtenants at the Facility, and if required by Mortgagee or Mezzanine Lender, an opinion of counsel as to the due formation of Tenant and its subtenants and due execution by said parties, and Tenant Affiliates, of the Lease, all subleases, all guaranties of the Lease, and any other documents executed by such parties in connection with the loan(s) from Mortgagee or Mezzanine Lender to Landlord or Landlord

59

Member.  Tenant agrees to execute, and cause the subtenants to execute, SNDAs in form and substance required by Mortgagee and by its prospective lender who will be making HUD-insured loans to Landlords.  Tenant further agrees to cooperate with Landlord and with its lenders who are processing and will be making HUD Loans to Landlords.

Section 20.30   <u>Capitalized Terms</u>.  To the extent capitalized terms used herein are not defined, they shall have the same meaning as capitalized terms in the Mortgage Loan Documents.

Section 20.31   <u>Affiliate</u>.  The term "<u>Affiliate</u>" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

Section 20.32   <u>Mezzanine Lender</u>.   Upon the repayment in full by Landlord of the Mezzanine Debt to the Mezzanine Lender, or it successors and/or assigns, this Lease shall be deemed automatically amended and modified without need of any further written instrument to delete all references to the Mezzanine Debt, including without limitation the Mezzanine Lender, Mezzanine Loan Documents and the Mezzanine Loan Agreement, it being expressly agreed by the Parties that in such case all such references and requirements related thereto shall be of no further force and effect. If requested by Landlord, Tenant shall execute and return within ten (10) days of written request from Landlord, a written instrument confirming such amendment and modification and failure to do so shall constitute a Lease Default.

## ARTICLE XXI

## REMEDIES CUMULATIVE

Section 21.1     The rights and remedies set forth under this Lease are in addition to all other rights and remedies afforded to Landlord under any of the other documents contemplated under this Lease ("<u>Lease Documents</u>") or at law or in equity, all of which are hereby reserved by Landlord, and this Lease is made and accepted without prejudice to any such rights and remedies.  All of the rights and remedies of Landlord under each of the Lease Documents shall be separate and cumulative and may be exercised concurrently or successively in Landlord's sole and absolute discretion.

## ARTICLE XXII

## LIMITATION OF LIABILITY

Section 22.1     <u>Liability</u>.  No member, manager, officer, shareholder, employee or agent of Landlord or its respective affiliates shall be held to any personal liability, jointly, or severally, for any obligation of, or claim against Landlord under this Lease.  All persons dealing with Landlord, in any way, shall look only to the assets of Landlord for the payment of any sum or the performance of any obligations.

Section 22.2     <u>Consequential Damages</u>.  Under no circumstances shall Landlord be liable to Tenant or any subtenant or Affiliate of Tenant or shall Tenant or any subtenant be liable to Landlord for any consequential, specified, exemplary or permitted damages.

Section 22.3     <u>Liability Limited to Interest in Premises</u>.  Tenant shall look solely to Landlord's interest in the Leased Premises owned by Landlord to satisfy any liability arising under this Lease.  It is specifically agreed that no constituent partner in Landlord or officer, director, member,

60

manager or employee of Landlord shall ever be personally liable for any such judgment or for the payment of any monetary obligation to Tenant.  Except as otherwise expressly provided herein, in no event shall Landlord ever be liable to Tenant for any indirect or consequential damages suffered by Tenant from whatever cause.

## ARTICLE XXIII

## REGULATORY ACTIONS

Section 23.1          Notice of Litigation.  (a)  Promptly after receipt by Tenant or its Affiliates of notice of the commencement thereof, Tenant shall provide Landlord with notice of all actions, suits, and proceedings before any Governmental Authority affecting Tenant, or its Affiliates or its Subtenants, which, if determined adversely to Tenant, its Affiliates or its Subtenants, could result in a judgment equal to or greater than Fifty Thousand Dollars ($50,000.00).

(b)          Notice of Regulatory Actions.  Promptly after receipt by Tenant or its Affiliates of the notice of commencement thereof, Tenant shall provide Landlord with notice of (i) any audit, investigation, claim (excluding adjustments, complaints, and corrective activity in the ordinary course of business), proceeding, settlement, judgment, consent order, or corporate integrity agreement by or imposed by any Governmental Authority, (ii) any suspension, debarment or disqualification of Tenant, its officers and members, or its Affiliates from being a health care provider, government contractor, holder of any health care license or recipient of reimbursement from any third party payor, (iii) any suspension, termination, or revocation of any health care license of Tenant any of Tenant's Affiliates or (iv) any self or voluntary disclosure of any overpayment to a third party payor by Tenant or any of Tenant's Affiliates.

(c)          Notice of Settlement Negotiations.  Tenant shall provide Landlord with reasonable notice of any and all settlement discussions and/or negotiations (excluding adjustments, complaints and corrective activity in the ordinary course of business) between representatives of Tenant and/or its Subtenants and any Governmental Authority, including without limitation negotiations with respect to any claim, settlement agreement, consent order or corporate integrity agreement between Tenant and its Affiliates and any Governmental Authority ("Settlement Discussions").  In connection with Settlement Discussions, (i) Tenant shall timely provide Landlord with copies of any and all documents that Tenant and/or its Subtenants intends to submit, or that Tenant and/or its Subtenants receives, in connection with any Settlement Discussions, and (ii) Tenant shall advise Landlord as to the status of the Settlement Discussions.

No receipt of any such notice under subsections (a), (b) and (c) shall impose any obligation on Landlord to take any action or to enforce its rights hereunder or otherwise remedy the circumstances leading to such notice.

## ARTICLE XXIV

## ANTI-TERRORISM AND ANTI-MONEY LAUNDERING COMPLIANCE

Section 24.1          Compliance with Anti-Terrorism Laws. Tenant represents and warrants to Landlord that it is not, and, after making due inquiry, that no person who owns a controlling interest in or otherwise controls Tenant is, (i) listed on the Specially Designated Nationals and Blocked persons List

61

(the "SDN List") maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or on any other similar list ("Other Lists" and, collectively with the SDN List, the "Lists") maintained by the OFAC pursuant to any authorizing statute, Executive Order or regulation (collectively, "OFAC Laws and Regulations"); or (ii) a person (a "Designated Person") either (A) included within the term "designated national" as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (B) designated under Sections 1(a), 1(b), 1(c) or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or similarly designated under any related enabling legislation or any other similar Executive Orders (collectively, the "Executive Orders").  The OFAC Laws and Regulations and the Executive Orders are collectively referred to in this Agreement as the "Anti-Terrorism Laws".  Tenant represents and warrants that it requires, and has taken reasonable measures to ensure compliance with the requirement, that no person who owns any other direct interest in Tenant is or shall be listed on any of the Lists or is or shall be a Designated Person.  This Section 24.1 shall not apply to any person to the extent that such person's interest in Tenant is through a U.S. Publicly-Traded Entity.  As used in this Lease, "U.S. Publicly-Traded Entity" means a person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a person.

Section 24.2       Funds Invested in Tenant.  Tenant represents and warrants that it has taken reasonable measures appropriate to the circumstances (and in any event as required by law), with respect to each holder of a direct or indirect interest in Tenant, to assure that funds invested by such holders in Tenant are derived from legal sources ("Anti-Money Laundering Measures").  The Anti-Money Laundering Measures have been undertaken in accordance with the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq. ("BSA"), and all applicable laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations under 18 U.S.C. §§ 1956 and 1957 (collectively with the BSA, "Anti-Money Laundering Laws").

Section 24.3       No Violation of Anti-Money Laundering Laws.  Tenant represents and warrants to Landlord, to its actual knowledge after making due inquiry, that neither Tenant nor any holder of a direct or indirect interest in Tenant (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering under 18 U.S.C. §§ 1956 and 1957, drug trafficking, terrorist-related activities or other money laundering predicate crimes, or any violation of the BSA, (ii) has been assessed civil penalties under any Anti-Money Laundering Laws, or (iii) has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws.

Section 24.4       Tenant Compliance with Anti-Money Laundering Laws.  Tenant represents and warrants to Landlord that it has taken reasonable measures appropriate to the circumstances (in any event as required by law), to ensure that Tenant is in compliance with all current and future Anti-Money Laundering Laws and laws, regulations and government guidance for the prevention of terrorism, terrorist financing and drug trafficking.

**[SEE ATTACHED SIGNATURE PAGES]**

62

IN WITNESS WHEREOF, the Parties have executed or caused the execution of this Lease by their respective officers duly authorized as of the day and year first above written.

**LANDLORD:**

White Plains Healthcare Properties I, LLC,
a Massachusetts limited liability company

By:

William Nicoletti, Manager

**TENANT:**

HBL SNF, LLC,
a New York limited liability company

By:
Name:
Its:   Manager

63

STATE OF _New York_ )
) ss.
COUNTY OF _Westchester_ )

On _December 31_, 2024, before me, the undersigned, a Notary Public, personally
appeared _Lizer Jozefovic_, personally known to me (or proved to me on the
basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and
acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her
signature on the instrument the person, or the entity upon behalf of which the person acted, executed the
instrument.

WITNESS my hand and official seal.

Danielle Feminella
Notary Public, State of New York
Registration No. 01FE5084689
Qualified in Westchester County
Commission Expires 09/08/2025

Signature _Danielle Feminella_ (Seal)


STATE OF _Massachusetts_ )
) ss.
COUNTY OF _Essex_ )

On _January 28_, 2024, before me, the undersigned, a Notary Public, personally appeared
_William Nicholson_, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person whose name is subscribed to the within instrument and
acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her
signature on the instrument the person, or the entity upon behalf of which the person acted, executed the
instrument.

WITNESS my hand and official seal.

Signature _Kimberly B Jackson_ (Seal)

KIMBERLY B. JACKSON
MY COMMISSION EXPIRES
NOV 10 2028
COMMONWEALTH OF MASSACHUSETTS
NOTARY PUBLIC

1612423165.4

## LIST OF EXHIBITS AND SCHEDULES

| | | |
|---|---|---|
| EXHIBIT "A" | Legal Description | |
| EXHIBIT "B" | Individual | Guaranty |
| EXHIBIT "B-1" | Entity Guaranty | |
| EXHIBIT "C" | Estoppel | Certificate |
| EXHIBIT "D" | Purchase Sale Agreement | |

| | |
|---|---|
| SCHEDULE 4.3(b) | Permitted Investments |
| SCHEDULE 7.4 | EBITDAR |
| SCHEDULE 18.1(d) | Litigation/Adverse Events |
| SCHEDULE 18(k) | Health Care Warranties and Representations |
| SCHEDULE 19.2 | Special Purpose Entity Provisions |

**EXHIBIT "A"**

**Legal Description**

ALL that certain plot, piece or parcel of land, situate, lying and being in the City of White Plains, County of Westchester and State of New York.  Said parcel being more particularly described as follows:

BEGINNING at a point in the easterly line of Church Street where the same is intersected by the southerly line of Barker Avenue;

THENCE from said point North 70 degrees 40 minutes 10 seconds East a distance of 173.57 feet along the southerly line of Barker Avenue to a point where the same is intersected by the division line herein described parcel on the West and lands now or formerly of Koeppel & Mohr Equities on the East;

THENCE from said point and along said division line South 17 degrees 59 minutes 50 seconds East a distance of 200.51 feet to a point in the division line between the herein described parcel on the north and lands now or formerly of Hamilton Plaza Company, Inc. on the south:

THENCE from said point and along said line South 71 degrees 01 minutes 50 seconds West a distance of 173.24 feet to the easterly line of Church Street; and

THENCE from said point and along said line North 18 degrees 05 minutes 04 seconds West a distance of 199.41 feet to the point and place of BEGINNING.

EXHIBIT A-11

**EXHIBIT "B"**

**INDIVIDUAL GUARANTY**

See Attached

<u>INDIVIDUAL GUARANTY OF LEASE</u>

THIS **INDIVIDUAL GUARANTY OF LEASE** (this "**Guaranty**") is made as of January 17, 2025, by **LIZER JOZEFOVIC** (the "**Guarantor**"), to **WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,** a Massachusetts limited liability company ("**Landlord**").

# <u>RECITALS</u>

A.   Landlord has been requested by HBL SNF, LLC a New York Limited Liability Company ("**Tenant**") to enter into an Operating Lease dated as of January 17, 2025 (the "**Lease**"), whereby Landlord would lease to Tenant, and Tenant would lease from Landlord, certain leased premises located at and known as 116-120 Church Street, White Plains, New York, as more particularly described in the Lease (the "**Leased Premises**").

B.   Tenant is owned by Guarantor, and Guarantor will derive substantial economic benefit from the execution and delivery of the Lease.

C.   Guarantor acknowledges that Landlord would not enter into the Lease unless this Guaranty accompanied the execution and delivery of the Lease.

D.   Guarantor hereby acknowledges receipt of a copy of the Lease.

**NOW, THEREFORE,** in consideration of the execution and delivery of the Lease and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.   <u>**DEFINITIONS.**</u> Defined terms used in this Guaranty and not otherwise defined herein have the meanings assigned to them in the Lease.

2.   <u>**COVENANTS OF GUARANTOR.**</u>

2.1   Guarantor absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not merely as a surety: (i) the full and prompt payment of all Fixed Rent and Additional Rent and all other rent, sums and charges of every type and nature payable by Tenant under the Lease, whether due by acceleration or otherwise including costs and expenses of collection (collectively, the "**Monetary Obligations**"), and (ii) the full timely and complete performance of all covenants terms, conditions obligations, indemnities and agreements to be performed by Tenant under the Lease, including any indemnities or other obligations of Tenant that survive the expiration or earlier termination of the Lease (all of the obligations described in clauses (i) and (ii), are collectively referred to herein as the "**Obligations**").

2.2   Guarantor agrees with Landlord that (i) any action, suit or proceeding of any kind or nature whatsoever (an "**Action**") commenced by Landlord against Tenant Guarantor or any Other Guarantor of the Lease ("**Other Guarantor**") to enforce the Obligations shall not prejudice in any way Landlord's rights to enforce the Obligations in any subsequent Action against Tenant Guarantor or any other Guarantor (ii) Landlord may, at its option join Guarantor in any Action against Tenant or any Other Guarantor or seek recovery against Guarantor without Landlord first

3

asserting, prosecuting, or exhausting any remedy or claim against Tenant or any Other Guarantor and (iii) Guarantor will be conclusively bound by a judgment entered in any Action in favor of Landlord against Tenant whether or not Guarantor is entered as a party or participates in such Action.

**2.3**    If Landlord proposes to grant a mortgage on or refinance any mortgage encumbering the Leased Premises or any portion thereof, Guarantor shall cooperate in the process, and shall permit Landlord and the proposed mortgagee to meet with Guarantor or, if applicable officers of Guarantor and to discuss Guarantor's business and finances. On request of Landlord Guarantor agrees to provide any such prospective mortgagee the information to which Landlord is entitled hereunder, provided that if any such information is not publicly available, such nonpublic information shall be made available on a confidential basis. Guarantor agrees to execute, acknowledge and deliver documents requested by the prospective mortgagee (such as a consent to the financing without encumbering Guarantor's or Tenant's assets, a consent to a collateral assignment of the Lease and of this Guaranty, estoppel certificate, and a subordination non-disturbance and attornment agreement), customary for tenants and their guarantors to sign in connection with mortgage loans to landlords, so long as such documents are in form then customary among institutional lenders (provided the same do not materially and adversely change Tenant's rights or obligations under the Lease or materially and adversely change Guarantor's rights and obligations under this Guaranty).

## 3.    <u>GUARANTOR'S OBLIGATIONS UNCONDITIONAL.</u>

**3.1**    This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection, and shall be enforceable against Guarantor without the necessity of the commencement by Landlord of any Action against Tenant, and without the necessity of any notice of nonpayment, nonperformance or nonobservance, or any notice of acceptance of this Guaranty, or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives in advance. The obligations of Guarantor hereunder are independent of, and may exceed, the obligations of Tenant.

**3.2**    This Guaranty shall apply notwithstanding any extension or renewal of the Lease, or any holdover following the expiration or termination of the Lease Term or any renewal or extension of the Lease Term.

**3.3**    This Guaranty is a continuing guarantee and will remain in full force and effect notwithstanding, and the liability of Guarantor hereunder shall be absolute and unconditional irrespective of any or all of the following: (i) any renewals, extensions, modifications, alterations or amendments of the Lease (regardless of whether Guarantor consented to or had notice of same); (ii) any releases or discharges of Tenant or any Other Guarantor other than the full release and complete discharge of all of the Obligations;
(iii) Landlord's failure or delay to assert any claim or demand or to enforce any of its rights against Tenant or any Other Guarantor; (iv) any extension of time that may be granted by

4

Landlord to Tenant or any Other Guarantor; (v) any assignment or transfer of all of any part of Tenant's interest under the Lease (whether by Tenant b y operation of law   or otherwise); (vi) any subletting, concession, franchising, licensing or permitting of the L e a s e d   P r e m i s e s   o r any portion thereof; (vii) any changed or different use of the Leased Premises (or any portion thereof); (viii) any other dealings or matters occurring between Landlord and Tenant or any Other Guarantor; (ix) the taking by Landlord of any additional guarantees, or the receipt by Landlord of any collateral from Tenant, any Other Guarantor or any other persons or entities· (x) the release by Landlord of any Other Guarantor; (xi) Landlord's release of any security provided under the Lease or any other guaranty; (xii) Landlord's failure to perfect any Landlord's lien or other lien or security interest available under applicable Law; (xiii) any assumption by any person of any or all of Tenant's obligations under the Lease or any Other Guarantor's obligations under any other guaranty, or Tenant's assignment of any or all of its rights and interests under the Lease, (xiv) the power or authority or lack thereof of Tenant to execute  acknowledge or deliver the Lease· (xv) the existence, non-existence or lapse at any time of Tenant as a legal entity or the existence, non-existence or termination of any corporate, ownership business or other relationship between Tenant and Guarantor; (xvi) any sale or assignment by Landlord of any or all of this Guaranty, any other guaranty and the Lease (including any direct or collateral assignment by Landlord to any mortgagee); (xvii) the solvency or lack of solvency of Tenant or any Other Guarantor at any time or from time to time; or (xviii) any other cause  whether similar or dissimilar to any of the foregoing, that might **constitute a legal or equitable discharge of Guarantor (whether or not Guarantor shall have knowledge or notice thereof) other than payment and performance in full of the Obligations; (xix) the release or** discharge of Tenant in any state or federal creditors' proceedings, receivership, bankruptcy or other proceeding; (xx) the impairment  limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code (11 U.S.C. § 101 et seq.  as amended) or from other  s tatute, or from the order of any court; (xi) the rejection, disaffirmance or other termination of the Lease in any such proceeding; (xxii) the assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease; or (xxiii) if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason, in such event  Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned. This Guaranty shall continue to be effective if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason without in any way limiting the generality of the foregoing, Guarantor specifically agrees that (A) if Tenant's obligations under the Lease are modified or amended with the express written consent of Landlord, this Guaranty shall extend to such obligations as so amended or modified without notice to, consideration to, or the consent of, Guarantor, and (B) this Guaranty shall be applicable to any obligations of Tenant arising in connection with a termination of the Lease, whether voluntary or otherwise. Guarantor hereby consents, prospectively, to Landlord's taking or entering into any or all of the foregoing actions or omissions. For purposes of this Guaranty and the obligations and liabilities of Guarantor hereunder, " **Tenant"** shall be deemed to include any and all concessionaires, licensees, franchisees, department operators, assignees, subtenants, permittees or others directly or

5

indirectly operating or conducting a business in or from the Leased Premises or any portion thereof, as fully as if any of the same were the named Tenant under the Lease.

4.   WAIVERS OF GUARANTOR.

**4.1**   Without limitation of the foregoing Guarantor waives (i) notice of acceptance of this Guaranty, protest, demand and dishonor, presentment, and demands of any kind now or hereafter provided for by any statute or rule of law  (ii) notice of any actions taken by Landlord or Tenant under the Lease or any other agreement or instrument relating thereto (iii) notice of any and all defaults by Tenant in the payment of F i x e d  Rent and Additional Rent or other rent, charges or amounts, or of any other defaults by Tenant under  the  Lease (iv) all other notices, demands and protests and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which  but for the provisions of this **Section 4,** might constitute grounds for relieving Guarantor of its obligations hereunder (v) any requirement that Landlord protect, secure, perfect, insure or proceed against any security interest or lien, or any property subject thereto, or exhaust any right or take any action against Tenant, any Other Guarantor or any other person or entity (including any additional guarantor or Guarantor) or against any collateral, and (vi) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

**4.2**   GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PERSON OR ENTITY WITH RESPECT TO ANY MATTER WHATSOEVER ARIS ING OUT OF OR IN ANY WAY CONNECTED WITH: THIS GUARANTY; THE LEASE; AN Y LIABILITY OR OBLIGATION OF TENANT IN ANY MANNER RELATED TO THE LEASED PREMISES OR ANY PORTION THEREOF; ANY CLAIM OF INJURY OR DAMAGE IN ANYWAY RELATED TO THE LEASE AND/OR THE LEASED PREMISES (OR ANY PORTION THEREOF); ANY ACT OR OMISSION OF TENANT, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUPPLIERS, SERVANTS, CUSTOMERS, CONCESSIONAIRES, FRANCHISEES, PERMITTEES OR LICENSEES; OR ANY ASPECT OF THE USE OR OCCUPANCY OF, OR THE CONDUCT OF BUSINESS IN, ON OR FROM THE LEASED PREMISES (OR ANY PORTION THEREOF). GUARANTOR SHALL NOT INTERPOSE ANY COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION BROUGHT BY LANDLORD AGAINST GUARANTOR UNDER THIS GUARANTY. GUARANTOR SHALL NOT BE ENTITLED TO MAKE, AND HEREBY WAIVES, ANY AND ALL DEFENSES AGAINST ANY CLAIM ASSERTED BY LANDLORD OR IN ANY SUIT OR ACTION INSTITUTED BY LANDLORD TO ENFORCE THIS GUARANTY OR THE LEASE. IN ADDITION, THE GUARANTOR HEREBY WAIVES, BOTH WITH RESPECT TO THE LEASE AND WITH RESPECT TO THIS GUARANTY, ANY AND ALL RIGHTS WHICH ARE WAIVED BY TENANT UNDER THE LEASE, IN THE SAME MANNER AS IF ALL SUCH WAIVERS WERE FULLY RESTATED HEREIN. THE LIABILITY OF A GUARANTOR UNDER THIS GUARANTY IS PRIMARY AND UNCONDITIONAL.

**4.3**   Guarantor expressly waives any and all rights to defenses arising by reason of (i) any "one-action" or "anti-deficiency" law or any other law that may prevent Landlord from bringing any action, including a claim for deficiency, against Guarantor before or

6

after Landlord's commencement or completion of any action against Tenant or any Other Guarantor; (ii) ANY ELECTION OF REMEDIES BY LANDLORD (INCLUDING ANY TERMINATION OF THE LEASE) THAT DESTROYS OR OTHERWISE ADVERSELY AFFECTS GUARANTOR'S SUBROGATION RIGHTS OR GUARANTOR'S RIGHTS TO PROCEED AGAINST TENANT FOR REIMBURSEMENT; (iii) any disability, insolvency, bankruptcy, lack of authority or power, death, insanity, minority dissolution or other defense of Tenant of any other guarantor (or any other Guarantor), or of any other person or entity or by reason of cessation of Tenant's liability from any cause whatsoever, other than full and final payment in legal tender and performance of the Obligations; (iv) any right to claim discharge of any or all of the Obligations on the basis of unjustified impairment of any collateral for the Obligations; (v) any change in the relationship between Guarantor and Tenant or any Other Guarantor or any termination of such relationship; (vi) any irregularity defect or unauthorized action by any or all of Landlord, Tenant, any Other Guarantor or surety or any of their respective officers directors or other agents in executing and delivering any instrument or agreements relating to the Obligations or in carrying out or attempting to carry out the terms of any such agreements; (vii) any assignment, endorsement or transfer in whole or in part of the Obligations whether made with or without notice to or consent of Guarantor; (viii) if the recovery from Tenant or any other Person (including any Other Guarantor) becomes barred by any statute of limitations or is otherwise prevented; (ix) the benefits of any and all statutes, laws, rules or regulations applicable in the State of New York which may require the prior or concurrent joinder of any other party to any action on this Guaranty; (x) any release or other reduction of the Obligations arising as a result of the expansion, release, substitution, deletion, addition, or replacement (whether or not in accordance with the terms of the Lease) of the Leased Premises or any portion thereof; or (xi) any neglect, delay omission, failure or refusal of Landlord to take or prosecute any action for the collection or enforcement of any of the Obligations or to foreclose or take or prosecute any action in connection with any lien or right of security (including perfection thereof) existing or to exist in connection with, or as security for, any of the Obligations, it being the intention hereof that Guarantor shall remain liable as a principal on the Obligations notwithstanding any act, omission or event that might, but for the provisions hereof otherwise operate as a legal or equitable discharge of Guarantor. Guarantor hereby waives all defenses of a surety to which it may be entitled by statute or otherwise.

     **5.**     SUBORDINATION; SUBROGATION.

     **5.1**     Guarantor subordinates to and postpones in favor of the Obligations (i) any present and future debts and obligations of Tenant or any Other Guarantor to Guarantor (the "**Indebtedness**"), including: (A) salary, bonuses, and other payments pursuant to any employment arrangement; (B) fees, reimbursement of expenses and other payments pursuant to any independent contractor arrangement; (C) principal and interest pursuant to any Indebtedness; (D) distributions payable to any partners members or shareholders of Guarantor or Affiliates of Guarantor; (E) lease payments pursuant to any leasing arrangement; (F) any management fees; and (G) all rights, liens and security interests of Guarantor, whether now or hereafter arising, in any assets of the Tenant or any Other Guarantor, and (ii) any liens or security interests securing payment of the Indebtedness. Guarantor shall have no right to possession of any assets of Tenant or any Other Guarantor or to foreclose upon any such asset whether by judicial action or otherwise, unless and until the Obligations have been paid and performed in full. Guarantor agrees that Landlord shall be subrogated to Guarantor with respect to Guarantor's claims against Tenant or any Other Guarantor and Guarantor's rights, liens and

security interest, if any, in any of Tenant's or any Other Guarantor's assets and proceeds thereof until all of the Obligations have been paid and performed in full.

**5.2** After the occurrence of a Lease Default and until such L e a s e Default is cured or after the commencement of any bankruptcy or insolvency proceeding by or against Tenant and until such proceeding is dismissed, Guarantor shall not: (i) make any distributions or other payments to any partners, parent entities, or Affiliates of Guarantor (other than to Tenant); or (ii) ask for, sue for, demand, take or receive any payment, by setoff or in any other manner, including the receipt of a negotiable instrument, for all or any part of the Indebtedness owed by Tenant, or any successor or assign of Tenant, including a receiver, trustee or debtor in possession (the term **"Tenant"** shall include any such successor or assign of Tenant) until the Obligations have been paid in full; however, if Guarantor receives such a payment, Guarantor shall immediately deliver the payment to Landlord for credit against the then outstanding balance of the Obligations, whether matured or unmatured. Notwithstanding anything in **Section 5** to the contrary, after a Lease Default has occurred and is outstanding, Guarantor may make cash contributions to Tenant.

**5.3** Guarantor shall not be subrogated and hereby waives and disclaims any claim or right against Tenant by way of subrogation or otherwise, to any of the rights of Landlord under the Lease or otherwise, or in the L e a s e d P r e m i s e s (or any portion thereof), which may arise by any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its Obligations hereunder. Guarantor shall look solely to Tenant for any recoupment of any payments made or costs or expenses incurred by Guarantor pursuant to this Guaranty. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and performed in full, Guarantor shall immediately deliver the payment to Landlord for credit against the then outstanding balance of the Obligations, whether matured or unmatured.

6. <u>REPRESENTATION AND WARRANTIES OF GUARANTOR.</u> Guarantor represents and warrants that:

**6.1** This Guaranty is valid and binding upon and enforceable against Guarantor without the requirement of further action or condition.

**6.2** The execution, delivery and performance by Guarantor of this Guaranty does not and will not (i) contravene any applicable Laws or legal requirements, the organizational documents of Guarantor, if applicable, any order, writ, injunction, decree applicable to Guarantor, or any contractual restriction binding on or affecting Guarantor or any of its properties or assets, or (ii) result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties or assets.

**6.3** No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any governmental authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Guarantor of this Guaranty or any other instrument or agreement required hereunder.

**6.4** There is no action, suit or proceeding pending or threatened against or

8

otherwise affecting Guarantor before any court or other governmental authority or any arbitrator that may materially adversely affect Guarantor's ability to perform its obligations under this Guaranty.

      **6.5**     Tenant is directly or indirectly owned and controlled by Guarantor.

      **6.6**     Guarantor has derived or expects to derive financial and other advantages and benefits directly or indirectly, from the making of the Lease and the payment and performance of the Obligations. Guarantor hereby acknowledges that Landlord will be relying upon Guarantor's guarantee, representations, warranties and covenants contained herein.

      **6.7**     All reports, statements (financial or otherwise), certificates and other data furnished by or on behalf of Guarantor to Landlord in connection with this Guaranty or the Lease are: true and correct, in all material respects, as of the applicable date or period provided therein; do not omit to state any material fact or circumstance necessary to make the statements contained therein not misleading; and fairly represent the financial condition of Guarantor as of the respective date thereof; and no material adverse change has occurred in the financial condition of Guarantor since the date of the most recent of such financial statements.

      **7.**    **NOTICES.**  Any consents, notices, demands, requests, approvals or other communications given under this Guaranty shall be in writing and shall be given as provided in the Lease, as follows or to such other addresses as either Landlord or Guarantor may designate by notice given to the other in accordance with the provisions of this **Section 7:**

If to Landlord:

White Plains Healthcare Properties I,
LLC c/o The Congress Companies
2 Bourbon Street, Suite 200
Peabody, Ma 01960
Attn: William
Nicholson

With a copy to:

Abrams Fensterman, LLP
3 Dakota Drive
Suite Suite 300
Lake Success, NY 11042
Attn: Mark Frimmel, Esq.

If to Guarantor:

Lizer Jozefovic
1278 Albany Post Road
Croton-on-Hudson

9

New York, NY 10520

With a copy to:

Pryor Cashman
7 Times Square, 40th Floor
New York, New York 10036
Attn.: John Giardino, Esq.

       8.   **CONSENT TO JURISDICTION.** Guarantor hereby (a) consents and submits to the jurisdiction  of state courts of the State of New York with venue in Westchester County and the federal courts of the United States with venue in the Southern District of New York, with respect to any dispute arising, directly or indirectly, out of this Guaranty, (b) waives any objections which the undersigned may have to the laying of venue in any such suit, action or proceeding in either such court, (c) agrees to join Landlord in any petition for removal to either such court, and (d) irrevocably designates and appoints Tenant as its authorized agent to accept and acknowledge on its behalf service of process with respect to any disputes arising, directly or indirectly, out of this Guaranty. The undersigned hereby acknowledges and agrees that Landlord may obtain personal jurisdiction and perfect service of process through Tenant as the undersigned agent  or by any other means now or hereafter permitted by applicable law.  Nothing above shall limit Landlord's choice of forum for purposes of enforcing this  Guaranty.

       9.   **CERTAIN ADDITIONAL COVENANTS.**

       9.1   **Financial Deliveries.** Guarantor shall deliver the following information

       **9.1.1**   As soon as available, and in any event within 120 days after the close of each calendar year, in hard copy and electronic format, in form satisfactory to Landlord, and presented on a consolidated as well as a property-by-property basis, complete financial statements prepared for such year with respect to Guarantor including a balance sheet as of the end of  such year, together with related statements of operations, cash flows and changes in equity for such calendar year, prepared  in accordance with GAAP applied on a consistent basis.

       Upon the delivery of any financial information by or on behalf of Guarantor pursuant to this **Section 9** from time to time during the Lease Term, Guarantor shall be deemed (unless Guarantor specifically states otherwise in writing) to automatically represent and warrant to Landlord that the financial information delivered to Landlord is true  accurate and complete, presents fairly the results of operations of Guarantor for the respective periods covered thereby, reflects accurately the books and records of account of Guarantor as of such dates and for such periods, and that there has been no adverse change in the financial condition of Guarantor since the date of the then applicable financial  information.

       9.2   **Assignment: Sale of Assets: Change in Control.** Without the prior consent of Landlord, which consent may be withheld or granted in Landlord's sole and absolute discretion, Guarantor shall not assign (whether directly or indirectly), in whole or in part, this Guaranty or any obligation hereunder or, through one or more step transactions or tiered transactions, do, or permit  to

10

be done, any activity, transaction or Transfer prohibited under **Section 15.1** of the Lease.

   **9.3**  **Payment Method: Default Interest.** Guarantor shall make any payments due hereunder in immediately available funds by wire transfer to Landlord's bank account as notified by Landlord, unless Landlord agrees to another method of payment of immediately available funds. If Guarantor does not pay an amount due hereunder on its due date, Guarantor shall pay, on demand, interest at a rate equal to 18% per annum, but in no event greater than the maximum permitted rate by applicable law, on the amount due for a period commencing with the due date and ending on the full payment of such amount, including the day of repayment, whether before or after any judgment or award, to the extent permitted under applicable law.

   **10.**  **MISCELLANEOUS.**

   **10.1**  Guarantor further agrees that Landlord may, without notice, assign this Guaranty in whole or in part. If Landlord disposes of its interest in the Lease, "**Landlord,**" as used in this Guaranty, shall mean Landlord's successors and assigns.

   **10.2**  Guarantor promises to pay all costs of collection or enforcement incurred by Landlord in exercising any remedies provided for in the Lease or this Guaranty whether at law or in equity. If any legal action or proceeding is commenced to interpret or enforce the terms of, or obligations arising out of, this Guaranty, or to recover damages for the breach thereof, the party prevailing in any such action or proceedings shall be entitled to recover from the non-prevailing party all attorneys' fees and reasonable costs and expenses incurred by the prevailing party. As used herein, "attorneys' fees" shall mean the fees and expenses of counsel to the parties hereto which may include printing, photocopying, duplicating and other expenses air freight charges, and fees billed for law clerks, paralegals, librarians and others not admitted to the bar but performing services under the supervision of an attorney. The term "attorneys' fees" shall also include all such fees and expenses incurred with respect to appeals, arbitrations and bankruptcy proceedings.

   **10.3**  Guarantor shall, from time to time within 10 days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating such modifications), and setting forth such other information as Landlord may reasonably request. Such certificate may be relied upon by any prospective purchaser, lessor or lender of all or a portion of the Leased Premises (or any portion thereof).

   **10.4**  If any portion of this Guaranty shall be deemed invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty, which shall remain in full force and effect to the maximum permitted extent.

   **10.5**  The provisions, covenants and guaranties of this Guaranty shall be binding upon Guarantor and its heirs, successors, legal representatives and assigns, and shall inure to the benefit of Landlord and its successors and assigns, and shall not be deemed waived or modified unless such waiver or modification is specifically set forth in writing, executed by Landlord or its successors and assigns, and delivered to Guarantor.

**10.6**    Whenever the words "include", "includes", or "including" are used in this Guaranty, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa. This Guaranty shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

**10.7**    Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty.

**10.8**    The provisions of this Guaranty shall be governed by and interpreted solely in accordance with the internal laws of the State of New York, without giving effect to the principles of conflicts of law.

**10.9**    The execution of this Guaranty after the execution of the Lease shall not invalidate this Guaranty or lessen the Obligations of Guarantor hereunder.

**10.10**    This Guaranty may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute but one instrument. The signature page of any counterpart may be detached therefrom and reattached to any other counterpart to physically form a single document.

**10.11**    If more than one person has signed this Guaranty, the term "Guarantor" shall be read as "Guarantors." The use of the singular shall be deemed to refer to the plural whenever the context so requires. The use of the masculine, feminine, or neuter genders shall be deemed to refer to another gender wherever the context so requires.

**10.12**    If more than one person or entity has signed this Guaranty, each of the undersigned shall be jointly and severally liable for all of the Obligations hereunder. Any notice by the Landlord to any one of the undersigned Guarantors shall be deemed given to all of the Guarantors and shall have the same force and effect as though given to all persons constituting the Guarantor.

**10.13**    The Recitals set forth above are hereby incorporated by this reference and made a part of this Guaranty. Guarantor hereby represents and warrants that the Recitals are true and correct.

**10.14    This Guaranty is being executed simultaneously with that certain Entity Guaranty of even date herewith from Epic Healthcare Management, LLC, as Guarantor, in favor of White Plains Healthcare Properties I, LLC, as Landlord.**

**(Balance of page intentionally left blank)**
**(Signature page follows)**

12

IN WITNESS WHEREOF, Guarantor has executed this Guaranty under seal as of the day and year first above written.


GUARANTOR:


_____
**LIZER JOZEFOVIC**

State of New York     )
                          ) ss.:
County of                )

       On the _____ day of January, in the year 2025 before me, the undersigned, a Notary Public in and for said State, personally appeared **LIZER JOZEFOVIC**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

14

**EXHIBIT "B-1"**
**ENTITY GUARANTY**

(see attached)

ENTITY GUARANTY OF LEASE

THIS ENTITY **GUARANTY OF LEASE** (this "**Guaranty**") is made as of January 17, 2025, by **EPIC HEALTHCARE MANAGEMENT, LLC**, a New York limited liability (the "**Guarantor**"), to **WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,** a Massachusetts limited liability company ("**Landlord**").

# RECITALS

A. Landlord has been requested by HBL SNF, LLC a New York Limited Liability Company ("**Tenant**") to enter into an Operating Lease dated as of January 17, 2025 (the "**Lease**"), whereby Landlord would lease to Tenant, and Tenant would lease from Landlord, certain leased premises located at and known as 116-120 Church Street, White Plains, New York, as more particularly described in the Lease (the "**Leased Premises**").

B. Tenant is an affiliate of Guarantor, which Guarantor manages the business operations of Tenant and Guarantor will derive substantial economic benefit from the execution and delivery of the Lease.

C. Guarantor acknowledges that Landlord would not enter into the Lease unless this Guaranty accompanied the execution and delivery of the Lease.

D. Guarantor hereby acknowledges receipt of a copy of the Lease.

**NOW, THEREFORE,** in consideration of the execution and delivery of the Lease and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1. **DEFINITIONS.** Defined terms used in this Guaranty and not otherwise defined herein have the meanings assigned to them in the Lease.

2. **COVENANTS OF GUARANTOR.**

2.1    Guarantor absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not merely as a surety, the full and prompt payment of all Fixed Rent and Additional Rent and all other rent, sums and monetary charges of every type and nature payable by Tenant under the Lease, whether due by acceleration or otherwise including costs and expenses of collection (collectively, the "**Obligations**").

2.2    Guarantor agrees with Landlord that (i) any action, suit or proceeding of any kind or nature whatsoever (an "**Action**") commenced by Landlord against Tenant, Guarantor or any Other Guarantor of the Lease ("**Other Guarantor**") to enforce the Obligations shall not prejudice in any way Landlord's rights to enforce the Obligations in any subsequent Action against Tenant, Guarantor or any other Guarantor (ii) Landlord may, at its option join Guarantor in any Action against Tenant or any Other Guarantor or seek recovery against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant or any Other Guarantor and (iii) Guarantor will be conclusively bound by a judgment entered in any Action

16

in favor of Landlord against Tenant  whether or not Guarantor is entered as a party or participates in such Action.

2.3    If Landlord proposes to grant a mortgage on  or refinance any mortgage encumbering  the Leased Premises or any portion thereof, Guarantor shall cooperate in the process, and shall permit Landlord and the proposed mortgagee to meet with Guarantor or, if applicable officers of Guarantor and to discuss Guarantor's business and finances. On request of Landlord, Guarantor agrees to provide any such prospective mortgagee the information to which Landlord is entitled hereunder, provided that if any such information is not publicly available, such nonpublic information shall be made available on a confidential basis. Guarantor agrees to execute, acknowledge and deliver documents requested by the prospective mortgagee (such as a consent to the financing without encumbering Guarantor's or Tenant's assets, a consent to a collateral assignment of the Lease and of this Guaranty, estoppel certificate, and a subordination non-disturbance and attornment agreement), customary for tenants and their guarantors to sign in connection with mortgage loans to landlords, so long as such documents are in form then customary among institutional lenders (provided the same do not materially and adversely change Tenant's rights or obligations under the Lease or materially and adversely change Guarantor's rights and obligations under this Guaranty).

3.    **GUARANTOR'S OBLIGATIONS UNCONDITIONAL.**

3.1    This Guaranty is an absolute and unconditional guaranty of payment and not of collection, and shall be enforceable against Guarantor without the necessity of the commencement by Landlord of any Action against Tenant, and without the necessity of any notice of nonpayment, nonperformance or nonobservance, or any notice of acceptance of this Guaranty, or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives in advance. The obligations of Guarantor hereunder are independent of, and may exceed, the obligations of Tenant.

3.2    This Guaranty shall apply notwithstanding any extension or renewal of the Lease, or any holdover following the expiration or termination of the Lease Term or any renewal or extension of the Lease Term.

3.3    This Guaranty is a continuing guarantee and will remain in full force and effect notwithstanding, and the liability of Guarantor hereunder shall be absolute and unconditional irrespective of any or all of the following: (i) any renewals, extensions, modifications, alterations or amendments of the Lease (regardless of whether Guarantor consented to or had notice of same); (ii) any releases or discharges of Tenant or any Other Guarantor other than the full release and complete discharge of all of the Obligations; (iii) Landlord's failure or delay to assert any claim or demand or to enforce any of its rights against Tenant or any Other Guarantor; (iv) any extension of time that may be granted by Landlord to Tenant or any Other Guarantor; (v) any assignment or transfer of all of any part of Tenant's interest under the Lease (whether by Tenant by operation of law or otherwise); (vi) any subletting, concession, franchising, licensing or permitting of the Leased Premises or any portion thereof; (vii) any changed or different use of the

17

Leased Premises (or any portion thereof); (viii) any other dealings or matters occurring between Landlord and Tenant or any Other Guarantor; (ix) the taking by Landlord of any additional guarantees, or the receipt by Landlord of any collateral from Tenant, any Other Guarantor or any other persons or entities· (x) the release by Landlord of any Other Guarantor; (xi) Landlord's release of any security provided under the Lease or any other guaranty; (xii) Landlord's failure to perfect any Landlord's lien or other lien or security interest available under applicable Law; (xiii) any assumption by any person of any or all of Tenant's obligations under the Lease or any Other Guarantor's obligations under any other guaranty, or Tenant's assignment of any or all of its rights and interests under the Lease, (xiv) the power or authority or lack thereof of Tenant to execute acknowledge or deliver the Lease· (xv) the existence, non-existence or lapse at any time of Tenant as a legal entity or the existence, non-existence or termination of any corporate, ownership business or other relationship between Tenant and Guarantor; (xvi) any sale or assignment by Landlord of any or all of this Guaranty, any other guaranty and the Lease (including any direct or collateral assignment by Landlord to any mortgagee); (xvii) the solvency or lack of solvency of Tenant or any Other Guarantor at any time or from time to time; or (xviii) any other cause whether similar or dissimilar to any of the foregoing, that might **constitute a legal or equitable discharge of Guarantor (whether or not Guarantor s h a l l have knowledge or notice thereof) other than payment in full of the Obligations; (xix) the release or** discharge of Tenant in any state or federal creditors' proceedings, receivership, bankruptcy or other proceeding; (xx) the impairment limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code (11 U.S.C. § 101 et seq. as amended) or from other statue, or from the order of any court; (xi) the rejection, disaffirmance or other termination of the Lease in any such proceeding; (xxii) the assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease; or (xxiii) if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason, in such event Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned. This Guaranty shall continue to be effective if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason without in any way limiting the generality of the foregoing, Guarantor specifically agrees that (A) if Tenant's monetary obligations under the Lease are modified or amended with the express written consent of Landlord, this Guaranty shall extend to such monetary obligations as so amended or modified without notice to, consideration to, or the consent of, Guarantor, and (B) this Guaranty shall be applicable to any monetary obligations of Tenant arising in connection with a termination of the Lease, whether voluntary or otherwise. Guarantor hereby consents, prospectively, to Landlord's taking or entering into any or all of the foregoing actions or omissions. For purposes of this Guaranty and the obligations and liabilities of Guarantor hereunder, " **Tenant"** shall be deemed to include any and all concessionaires, licensees, franchisees, department operators, assignees, subtenants, permittees or others directly or indirectly operating or conducting a business in or from the Leased Premises or any portion thereof, as fully as if any of the same were the named Tenant under the Lease.

4.   WAIVERS OF GUARANTOR.

18

   **4.1**   Without limitation of the foregoing Guarantor waives (i) notice of acceptance of this Guaranty, protest, demand and dishonor, presentment, and demands of any kind now or hereafter provided for by any statute or rule of law (ii) notice of any actions taken by Landlord or Tenant under the Lease or any other agreement or instrument relating thereto (iii) notice of any and all defaults by Tenant in the payment of F i x e d Rent and Additional Rent or other rent, charges or amounts, or of any other defaults by Tenant under the Lease (iv) all other notices, demands and protests and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which but for the provisions of this **Section 4,** might constitute grounds for relieving Guarantor of its obligations hereunder (v) any requirement that Landlord protect, secure, perfect, insure or proceed against any security interest or lien, or any property subject thereto, or exhaust any right or take any action against Tenant, any Other Guarantor or any other person or entity (including any additional guarantor or Guarantor) or against any collateral, and (vi) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

   **4.2**   GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PERSON OR ENTITY WITH RESPECT TO ANY MATTER WHATSOEVER ARIS ING OUT OF OR IN ANY WAY CONNECTED WITH: THIS GUARANTY; THE LEASE; AN Y LIABILITY OR OBLIGATION OF TENANT IN ANY MANNER RELATED TO THE LEASED PREMISES OR ANY PORTION THEREOF; ANY CLAIM OF INJURY OR DAMAGE IN ANYWAY RELATED TO THE LEASE AND/OR THE LEASED PREMISES (OR ANY PORTION THEREOF); ANY ACT OR OMISSION OF TENANT, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUPPLIERS, SERVANTS, CUSTOMERS, CONCESSIONAIRES, FRANCHISEES, PERMITTEES OR LICENSEES; OR ANY ASPECT OF THE USE OR OCCUPANCY OF, OR THE CONDUCT OF BUSINESS IN, ON OR FROM THE LEASED PREMISES (OR ANY PORTION THEREOF). GUARANTOR SHALL NOT INTERPOSE ANY COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION BROUGHT BY LANDLORD AGAINST GUARANTOR UNDER THIS GUARANTY. GUARANTOR SHALL NOT BE ENTITLED TO MAKE, AND HEREBY WAIVES, ANY AND ALL DEFENSES AGAINST ANY CLAIM ASSERTED BY LANDLORD OR IN ANY SUIT OR ACTION INSTITUTED BY LANDLORD TO ENFORCE THIS GUARANTY OR THE LEASE. IN ADDITION, THE GUARANTOR HEREBY WAIVES, BOTH WITH RESPECT TO THE LEASE AND WITH RESPECT TO THIS GUARANTY, ANY AND ALL RIGHTS WHICH ARE WAIVED BY TENANT UNDER THE LEASE, IN THE SAME MANNER AS IF ALL SUCH WAIVERS WERE FULLY RESTATED HEREIN. THE LIABILITY OF A GUARANTOR UNDER THIS GUARANTY IS PRIMARY AND UNCONDITIONAL.

   **4.3**   Guarantor expressly waives any and all rights to defenses arising by reason of (i) any "one-action" or "anti-deficiency" law or any other law that may prevent Landlord from bringing any action, including a claim for deficiency, against Guarantor before or after Landlord's commencement or completion of any action against Tenant or any Other Guarantor; (ii) ANY ELECTION OF REMEDIES BY LANDLORD (INCLUDING ANY TERMINATION OF THE LEASE) THAT DESTROYS OR OTHERWISE ADVERSELY AFFECTS GUARANTOR'S SUBROGATION RIGHTS OR GUARANTOR'S RIGHTS TO PROCEED AGAINST TENANT FOR REIMBURSEMENT; (iii) any disability, insolvency, bankruptcy, lack of authority or power,

death, insanity, minority dissolution or other defense of Tenant of any other guarantor (or any other Guarantor), or of any other person or entity or by reason of cessation of Tenant's liability from any cause whatsoever, other than full and final payment in legal tender and performance of the Obligations; (iv) any right to claim discharge of any or all of the Obligations on the basis of unjustified impairment of any collateral for the Obligations; (v) any change in the relationship between Guarantor and Tenant or any Other Guarantor or any termination of such relationship; (vi) any irregularity defect or unauthorized action by any or all of Landlord, Tenant, any Other Guarantor or surety or any of their respective officers directors or other agents in executing and delivering any instrument or agreements relating to the Obligations or in carrying out or attempting to carry out the terms of any such agreements; (vii) any assignment, endorsement or transfer in whole or in part of the Obligations whether made with or without notice to or consent of Guarantor; (viii) if the recovery from Tenant or any other Person (including any Other Guarantor) becomes barred by any statute of limitations or is otherwise prevented; (ix) the benefits of any and all statutes, laws, rules or regulations applicable in the State of New York which may require the prior or concurrent joinder of any other party to any action on this Guaranty; (x) any release or other reduction of the Obligations arising as a result of the expansion, release, substitution, deletion, addition, or replacement (whether or not in accordance with the terms of the Lease) of the Leased Premises or any portion thereof; or (xi) any neglect, delay omission, failure or refusal of Landlord to take or prosecute any action for the collection or enforcement of any of the Obligations or to foreclose or take or prosecute any action in connection with any lien or right of security (including perfection thereof) existing or to exist in connection with, or as security for, any of the Obligations, it being the intention hereof that Guarantor shall remain liable as a principal on the Obligations notwithstanding any act, omission or event that might, but for the provisions hereof otherwise operate as a legal or equitable discharge of Guarantor. Guarantor hereby waives all defenses of a surety to which it may be entitled by statute or otherwise.

## 5.   SUBORDINATION; SUBROGATION.

**5.1**   Guarantor subordinates to and postpones in favor of the Obligations (i) any present and future debts and obligations of Tenant or any Other Guarantor to Guarantor (the "**Indebtedness**"), including: (A) salary, bonuses, and other payments pursuant to any employment arrangement; (B) fees, reimbursement of expenses and other payments pursuant to any independent contractor arrangement; (C) principal and interest pursuant to any Indebtedness; (D) distributions payable to any partners members or shareholders of Guarantor or Affiliates of Guarantor; (E) lease payments pursuant to any leasing arrangement; (F) any management fees; and (G) all rights, liens and security interests of Guarantor, whether now or hereafter arising, in any assets of the Tenant or any Other Guarantor, and (ii) any liens or s e c u r i t y interests securing payment of the Indebtedness. Guarantor shall have no right to possession of any assets of Tenant or any Other Guarantor or to foreclose upon any such asset whether by judicial action or otherwise, unless and until the Obligations have been paid and performed in full. Guarantor agrees that Landlord shall be subrogated to Guarantor with respect to Guarantor's claims against Tenant or any Other Guarantor and Guarantor's rights, liens and security interest, if any, in any of Tenant's or any Other Guarantor's assets and proceeds thereof until all of the Obligations have been paid and performed in full.

**5.2**   After the occurrence of a Lease Default and until such L e a s e  Default is cured or after the commencement of any bankruptcy or insolvency proceeding by or against

20

Tenant and until such proceeding is dismissed, Guarantor shall not: (i) make any distributions or other payments to any partners, parent entities, or Affiliates of Guarantor (other than to Tenant); or (ii) ask for, sue for, demand, take or receive any payment, by setoff or in any other manner, including the receipt of a negotiable instrument, for all or any part of the Indebtedness owed by Tenant, or any successor or assign of Tenant, including a receiver, trustee or debtor in possession (the term **"Tenant"** shall include any such successor or assign of Tenant) until the Obligations have been paid in full; however, if Guarantor receives such a payment, Guarantor shall immediately deliver the payment to Landlord for credit against the then outstanding balance of the Obligations, whether matured or unmatured. Notwithstanding anything in **Section 5** to the contrary, after a Lease Default has occurred and is outstanding, Guarantor may make cash contributions to Tenant.

      **5.3**    Guarantor shall not be subrogated and hereby waives and disclaims any claim or right against Tenant by way of subrogation or otherwise, to any of the rights of Landlord under the Lease or otherwise, or in the Leased Premises (or any portion thereof), which may arise by any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its Obligations hereunder. Guarantor shall look solely to Tenant for any recoupment of any payments made or costs or expenses incurred by Guarantor pursuant to this Guaranty. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and performed in full, Guarantor shall immediately deliver the payment to Landlord for credit against the then outstanding balance of the Obligations, whether matured or unmatured.

      6.    <u>REPRESENTATION AND WARRANTIES OF GUARANTOR.</u>  Guarantor represents and warrants that:

      **6.1**    This Guaranty is valid and binding upon and enforceable against Guarantor without the requirement of further action or condition.

      **6.2**    The execution, delivery and performance by Guarantor of this Guaranty does not and will not (i) contravene any applicable Laws or legal requirements, the organizational documents of Guarantor, if applicable, any order, writ, injunction, decree applicable to Guarantor, or any contractual restriction binding on or affecting Guarantor or any of its properties or assets, or (ii) result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties or assets.

      **6.3**    No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any governmental authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Guarantor of this Guaranty or any other instrument or agreement required hereunder.

      **6.4**    There is no action, suit or proceeding pending or threatened against or otherwise affecting Guarantor before any court or other governmental authority or any arbitrator that may materially adversely affect Guarantor's ability to perform its obligations under this Guaranty.

      **6.5**    Tenant is an affiliate of Guarantor and directly or indirectly owned and

21

controlled by the principals of Guarantor.

    **6.6**  Guarantor has derived or expects to derive financial and other advantages and benefits directly or indirectly, from the making of the Lease and the payment and performance of the Obligations. Guarantor hereby acknowledges that Landlord will be relying upon Guarantor's guarantee, representations, warranties and covenants contained herein.

    **6.7**  All reports, statements (financial or otherwise), certificates and other data furnished by or on behalf of Guarantor to Landlord in connection with this Guaranty or the Lease are: true and correct, in all material respects, as of the applicable date or period provided therein; do not omit to state any material fact or circumstance necessary to make the statements contained therein not misleading; and fairly represent the financial condition of Guarantor as of the respective date thereof; and no material adverse change has occurred in the financial condition of Guarantor since the date of the most recent of such financial statements.

   **7.**  **NOTICES.** Any consents, notices, demands, requests, approvals or other communications given under this Guaranty shall be in writing and shall be given as provided in the Lease, as follows or to such other addresses as either Landlord or Guarantor may designate by notice given to the other in accordance with the provisions of this **Section 7:**

If to Landlord:

White Plains Healthcare Properties I,
LLC c/o The Congress Companies
2 Bourbon Street, Suite 200
Peabody, Ma 01960
Attn: William
Nicholson


With a copy to:

Abrams Fensterman, LLP
3 Dakota Drive,
Suite Suite 300
Lake Success, NY 11042
Attn: Mark Frimmel, Esq.


If to Guarantor:

Epic Healthcare Management, LLC
1278 Albany Post Road
Croton-on-Hudson, New York, New York 10520
Attention: Lizer Jozefovic

With a copy to:

22

Pryor Cashman
7 Times Square, 40th Floor
New York, New York 10036
Attn.: John Giardino, Esq.

**8.**  **CONSENT TO JURISDICTION.** Guarantor hereby (a) consents and submits to the jurisdiction of state courts of the State of New York with venue in Westchester County and the federal courts of the United States with venue in the Southern District of New York, with respect to any dispute arising, directly or indirectly, out of this Guaranty,

(b) waives any objections which the undersigned may have to the laying of venue in any such suit, action or proceeding in either such court,

(c) agrees to join Landlord in any petition for removal to either such court, and

(d) irrevocably designates and appoints Tenant as its authorized agent to accept and acknowledge on its behalf service of process with respect to any disputes arising, directly or indirectly, out of this Guaranty. The undersigned hereby acknowledges and agrees that Landlord may obtain personal jurisdiction and perfect service of process through Tenant as the undersigned agent or by any other means now or hereafter permitted by applicable law. Nothing above shall limit Landlord's choice of forum for purposes of enforcing this Guaranty.

**9.**  **CERTAIN ADDITIONAL COVENANTS.**

**9.1**  **Financial Deliveries.** Guarantor shall deliver the following information

**9.1.1**  As soon as available, and in any event within 120 days after the close of each calendar year, in hard copy and electronic format, in form satisfactory to Landlord, and presented on a consolidated as well as a property-by-property basis, complete financial statements prepared for such year with respect to Guarantor including a balance sheet as of the end of such year, together with related statements of operations, cash flows and changes in equity for such calendar year, prepared in accordance with GAAP applied on a consistent basis.

Upon the delivery of any financial information by or on behalf of Guarantor pursuant to this **Section 9** from time to time during the Lease Term, Guarantor shall be deemed (unless Guarantor specifically states otherwise in writing) to automatically represent and warrant to Landlord that the financial information delivered to Landlord is true accurate and complete, presents fairly the results of operations of Guarantor for the respective periods covered thereby, reflects accurately the books and records of account of Guarantor as of such dates and for such periods, and that there has been no adverse change in the financial condition of Guarantor since the date of the then applicable financial information.

**9.2**  **Assignment; Sale of Assets; Change in Control.** Without the prior consent of Landlord, which consent may be withheld or granted in Landlord's sole and absolute discretion, Guarantor shall not assign (whether directly or indirectly), in whole or in part, this Guaranty or any

23

obligation hereunder or, through one or more step transactions or tiered transactions, do, or permit to be done, any activity, transaction or Transfer prohibited under **Section 15.1** of the Lease.

        **9.3**    <u>**Payment Method: Default Interest.**</u>  Guarantor shall make any payments due hereunder in immediately available funds by wire transfer to Landlord's bank account as notified by Landlord, unless Landlord agrees to another method of payment of immediately available funds. If Guarantor does not pay an amount due hereunder on its due date, Guarantor shall pay, on demand, interest at a rate equal to 18% per annum, but in no event greater than the maximum permitted rate by applicable law, on the amount due for a period commencing with the due date and ending on the full payment of such amount, including the day of repayment, whether before or after any judgment or award, to the extent permitted under applicable law.

## 10.    <u>MISCELLANEOUS</u>.

        **10.1**    Guarantor further agrees that Landlord may, without notice, assign this Guaranty in whole or in part. If Landlord disposes of its interest in the Lease, "**Landlord**," as used in this Guaranty, shall mean Landlord's successors and assigns.

        **10.2**    Guarantor promises to pay all costs of collection or enforcement incurred by Landlord in exercising any remedies provided for in the Lease or this Guaranty whether at law or in equity. If any legal action or proceeding is commenced to interpret or enforce the terms of, or obligations arising out of, this Guaranty, or to recover damages for the breach thereof, the party prevailing in any such action or proceedings shall be entitled to recover from the non-prevailing party all attorneys' fees and reasonable costs and expenses incurred by the prevailing party. As used herein, "attorneys' fees" shall mean the fees and expenses of counsel to the parties hereto which may include printing, photocopying, duplicating and other expenses air freight charges, and fees billed for law clerks, paralegals, librarians and others not admitted to the bar but performing services under the supervision of an attorney. The term "attorneys' fees" shall also include all such fees and expenses incurred with respect to appeals, arbitrations and bankruptcy proceedings.

        **10.3**    Guarantor shall, from time to time within 10 days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating such modifications), and setting forth such other information as Landlord may reasonably request. Such certificate may be relied upon by any prospective purchaser, lessor or lender of all or a portion of the Leased Premises (or any portion thereof).

        **10.4**    If any portion of this Guaranty shall be deemed invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty, which shall remain in full force and effect to the maximum permitted extent.

        **10.5**    The provisions, covenants and guaranties of this Guaranty shall be binding upon Guarantor and its heirs, successors, legal representatives and assigns, and shall inure to the benefit of Landlord and its successors and assigns, and shall not be deemed waived or modified unless such waiver or modification is specifically set forth in writing, executed by

24

Landlord or its successors and assigns, and delivered to Guarantor.

**10.6**    Whenever the words "include", "includes", or "including" are used in this Guaranty, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa. This Guaranty shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

**10.7**    Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty.

**10.8**    The provisions of this Guaranty shall be governed by and interpreted solely in accordance with the internal laws of the State of New York, without giving effect to the principles of conflicts of law.

**10.9**    The execution of this Guaranty after the execution of the Lease shall not invalidate this Guaranty or lessen the Obligations of Guarantor hereunder.

**10.10**    This Guaranty may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute but one instrument. The signature page of any counterpart may be detached therefrom and reattached to any other counterpart to physically form a single document.

**10.11**    If more than one person has signed this Guaranty, the term "Guarantor" shall be read as "Guarantors." The use of the singular shall be deemed to refer to the plural whenever the context so requires. The use of the masculine, feminine, or neuter genders shall be deemed to refer to another gender wherever the context so requires.

**10.12**    If more than one person or entity has signed this Guaranty, each of the undersigned shall be jointly and severally liable for all of the Obligations hereunder. Any notice by the Landlord to any one of the undersigned Guarantors shall be deemed given to all of the Guarantors and shall have the same force and effect as though given to all persons constituting the Guarantor.

**10.13**    The Recitals set forth above are hereby incorporated by this reference and made a part of this Guaranty. Guarantor hereby represents and warrants that the Recitals are true and correct.

**10.14**    This Guaranty is being executed simultaneously with that certain Individual Guaranty of even date herewith from Lizer Jozefovic, as Guarantor, in favor of White Plains Healthcare Properties I, LLC, as Landlord.

[NO FURTHER TEXT ON THIS PAGE]

25

IN WITNESS WHEREOF, Guarantor has executed this Guaranty under seal as of the day and year first above written.


GUARANTOR:

**EPIC HEALTCARE MANAGEMENT, LLC,**
a New York Limited liability company


By: _____
Lizer Jozefovic
Manager


State of New York        )
                                       ) ss.:
County of                     )

On the _____ day of January, in the year 2025, before me, the undersigned, a Notary Public in and for said State, personally appeared **LIZER JOZEFOVIC**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

26

**EXHIBIT C**

**<u>ESTOPPEL CERTIFICATE</u>**

## TENANT ESTOPPEL

Dated: _____

_____
_____
_____
_____

*Re:*     *116-120 Church Street, White Plains, New York 10601 (the "Property")*

Dear Sirs:

HBL SNF, LLC, ("**Tenant**") acknowledges that _____ ("**Lender**") will rely upon this Tenant Estoppel (i) in making a loan or providing credit or other financial accommodations (such loan, credit, and other financial accommodations being called, the "**Loan**") to White Plains Healthcare Properties I, LLC ("**Landlord**"), and (ii) in accepting an assignment by the Landlord to the Lender of the Landlord's interest in the lease which is further described in **Exhibit A** to this Tenant Estoppel (such lease, as amended to date, being called, the "**Lease**"). The Tenant therefore certifies, represents, and warrants that each of the following statements in this Tenant Estoppel is true and complete, and the Tenant further agrees to perform all of its agreements set forth in this Tenant Estoppel:

1.    **Rent.** Rent first began to accrue under the Lease on _____. The Tenant has paid rent and all other charges due under the Lease through _____. The current annual base or fixed rent payable by the Tenant under the Lease is $_____ per year. In addition to such annual base or fixed rent, the Tenant also pays rent as follows:_____. No rent under the Lease has been or will be paid more than thirty (30) days in advance of its due date. The Tenant has no agreement with Landlord concerning free rent, partial rent, rebate of rental payments or any other type of rental concession.

2.    **Security.** The aggregate amount of all security deposits paid by the Tenant, including any letters of credit, to the Landlord under the Lease to secure the payment and performance of the obligations of the Tenant under the Lease is $_____.

3.    **Term.** The current term of the Lease commenced on _____, and will expire on _____. The Tenant has no right to renew or extend the Lease term or to terminate the Lease except as follows: <u>One (1) right to renew the Lease for an additional term of ten (10) years.</u>

4.    **No Special Rights of Tenant.** The Tenant has no exclusive business right, and no right of first refusal, right of first offer or other right to expand or purchase the Property (or any part thereof or interest therein), except as follows: <u>option to purchase the Property exercisable during the Initial Term of the Lease.</u>

28

5.      **Tenant in Possession and Work Completed.**  The Tenant has accepted and is in actual possession of, the premises demised under the Lease, and all work which is required to be completed pursuant to the Lease has been satisfactorily completed.

6.      **No Default; No Defense of Tenant.**    As of the date of this Tenant Estoppel (a) neither the Tenant nor Landlord is in default under any of the terms of the Lease, (b) all obligations and conditions under the Lease to be performed to date by Landlord have been satisfied, (c) no event has occurred which, with the passage of time or the giving of notice, or both, would constitute a default or an event of default by Landlord under the Lease, and (d) the Tenant has no current defense or claim against Landlord, or right of offset against any rents payable to Landlord under the Lease or otherwise.  The Tenant has not actual knowledge of any claims by others against the Landlord relating to the Property or its use.

7.      **No Assignment, Sublease, or Mortgage By Tenant.**  The Tenant has not assigned the Lease nor sublet, licensed, mortgaged or otherwise encumbered all or any portion of the Property.

8.      **No Violation; No Hazardous Waste Contamination.**  The Tenant has received no notice by any governmental authority or person claiming a violation of, or requiring compliance with, any federal, state or local statute, ordinance, rule, regulation or other requirement of law, on account of any environmental contamination at the Property.  No hazardous, toxic or polluting substances or wastes have been generated, treated, manufactured, stored, refined, used, handled, transported, released, spilled, disposed of or deposited on, in or under the Property.  The Tenant does not use the Property (or any part thereof) for any purpose which poses a substantial risk of imminent damage to public health or safety or to the environment.

9.      **True Copy of Lease.**    A true, correct and complete copy of the Lease (together with each amendment to the Lease, if any, and each notice and other document which affects any right or obligation under the Lease), is attached to this Tenant Estoppel as **Exhibit A**.

10.      **Lease is Complete Agreement.**  The Lease contains all of the understandings and agreements between the Tenant and Landlord with respect to the Property (or any part thereof or interest therein), and is in existence and in full force and effect without modification, addition, extension or renewal on the date hereof, except as specifically noted in this Tenant Estoppel or any Exhibit to this Tenant Estoppel.

11.      **Bankruptcy.**  As of the date of this Tenant Estoppel, there are no actions, whether voluntary or otherwise, pending against the Tenant under the bankruptcy or insolvency laws of the United States of America or any state thereof.

12.      **Blanks.**  If any blank in this Tenant Estoppel is not filled in, then it shall be deemed to be deleted from this Tenant Estoppel, together with the words "except as follows" immediately preceding such blank.

13.      **Headings Have No Legal Effect.**  The headings and captions of this Tenant Estoppel are for convenience of reference only, and have no legal effect, and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions of this Tenant Estoppel.

14.      **Successors and Assigns.**  Lender's successors and/or assigns may rely on this Tenant Estoppel in making or acquiring any interest in the Loan.

29

**(Balance of page intentionally left blank)**
**(Signature page follows)**

IN WITNESS WHEREOF, the undersigned has caused this Tenant Estoppel to be duly executed and delivered as of the date set forth above.

HBL SNF, LLC,
A New York limited liability company


By:_____
Name: Lizer Jozefovic a/k/a Herbert Jozefovic
Title:   Manager

## EXHIBIT A

Lease
(To be attached)

1612423165.4

## SCHEDULE 7.4

| PERIOD | EBITDAR TARGET |
|---|---|
| Quarter 1 (_____, 201__ through _____, 201___) | $_____ |
| Quarter 2 | $_____ |
| Quarter 3 | $_____ |
| Quarter 4 | $_____ |
| Quarter 5 | $_____ |
| Quarter 6 and thereafter | $_____ |

"**EBITDAR**" means with respect to any quarterly period for the Facility an amount determined on a consolidated basis equal to the sum of the following amounts for the Facility for a trailing twelve month period: (a) earnings/(net income or net loss) (including, as an expense an actual or theoretical management expense of five percent (5%) of gross receipts) from operations before (b) interest expense, (c) income tax expense, (d) depreciation expense, (e) amortization expense, and (f) Fixed Rent, defined in accordance with GAAP for such quarterly period. EBITDAR is not considered a measure of financial performance under GAAP. In calculating earnings for the trailing twelve months that encompasses any month prior to the Commencement Date, for the months prior to the Commencement Date, revenue shall be calculated using current rates of reimbursement, meaning reimbursement rates in effect as of the start of the applicable quarterly period. The EBITDAR TARGET shall be the amount required by the Mortgagee or Mezzanine Lender and their respective successors and/or assigns, from time to time.

1612423165.4

Schedule 15.3

Permitted Subleases, Assignments, Licenses and Occupancy Agreements

None

**SCHEDULE 18.1(d)**

**Litigation/Adverse Events**

**SCHEDULE 18(k)**

**Health Care Representations**

      **Health Care Representations**.  Tenant, for itself, and for the Subtenants, do hereby represent and warrant to Landlord, its successors and assigns, as of the date of the Lease, that:

      (a)      All Medicare and Medicaid provider agreements, certificates of need, if applicable, certifications, governmental licenses, permits, regulatory agreements or other agreements and approvals, including certificates of operation, completion and occupancy, and state nursing facility licenses or other licenses required by Health Care Authorities (as defined in the Lease) for the legal use, occupancy and operation of the Facility (collectively, the "**Health Care Licenses**") for the Facility have been obtained by the party required to hold such Health Care Licenses and are in full force and effect, including approved provider status in any approved third-party payor program.  **Each Subtenant (hereinafter "Operator")** owns and/or possesses, and holds free from restrictions or conflicts with the rights of others, all such Health Care Licenses and will operate or cause the Facility to be operated in such a manner that the Health Care Licenses shall remain in full force and effect;

      (b)      The Facility is duly licensed as a skilled nursing facility as required under the applicable laws of the State of New York.  The licensed bed capacity of the Facility and the actual bed count operated at the Facility is 160.  The Tenant has not applied to reduce the number of licensed or certified beds of the Facility or to move or transfer the right to any and all of the licensed or certified beds of the Facility to any other location or to amend or otherwise change the Facility and/or the number of beds approved by the DOH or other applicable state licensing agency, and there are no proceedings or actions pending or contemplated to reduce the number of licensed or certified beds of the Facility;

      (c)      The Health Care License with respect to the Facility (i) has not been and will not be (A) transferred to any location other than the Facility or (B) pledged as collateral security (other than any pledge as collateral security to Tenant's accounts receivable lender approved by Landlord which pledge is subject to the interests of (x) Landlord under the Lease and (y) Mortgagee, including the liens and security interests of the Mortgage Loan Documents), (ii) is and will continue to be held free from restrictions or known conflicts that would materially impair the use or operation of the Facility as intended, and (iii) is not provisional, probationary, or restricted in any way, except in instances where a Governmental Authority or Health Care Authority has issued a provisional, probationary or restricted license, permit or certification in the ordinary course pending issuance of a final license, permit or certification;

      (d)      Tenant has or will take any action to rescind, withdraw, revoke, amend, modify, supplement or otherwise alter the nature, tenor or scope of any Health Care License or applicable provider payment program participation other than non-material alterations effected in the ordinary course of business;

      ll take any action to rescind, withdraw, revoke, amend, modify, supplement or otherwise alter the nature, tenor or scope of any Health Care License or applicable provider payment program participation other than non-material alterations effected in the ordinary course of business;

(e)     Tenant and the operation of the Facility are in material compliance with the applicable provisions of the Laws and all orders, standards, policies, restrictions or rules of any Health Care Authority having jurisdiction over the ownership, use, occupancy or operation of the Facility, including (i) staffing requirements, (ii) health and fire safety codes including quality and safety standards, (iii) accepted professional standards and principles that apply to the Operator's provision of services at the Facility, (iv) federal, state or local laws, rules, regulations or published interpretations or policies relating to the prevention of fraud and abuse, (v) insurance, reimbursement and cost reporting requirements, government payment program requirements and disclosure of ownership and related information requirements, (vi) requirements of applicable Health Care Authorities, including those relating to the Facility's physical structure and environment, licensing, quality and adequacy of nursing facility care, distributions of pharmaceuticals, rate setting, equipment, personnel, operating policies, and additions of Facility and services, and (vii) any other applicable laws, regulations or agreements for reimbursement for the type of care or services provided by Tenant and/ with respect to the Facility.  As used herein, "material compliance" means a level of compliance that would keep Tenant and/ (and the operation of the Facility) free from any final orders or sanctions by any Governmental Authority or Health Care Authority having jurisdiction over the operation of the Facility and would not adversely affect Tenant's and/'s operations, including, but not limited to, its right to receive reimbursement or insurance payments;

(f)     Tenant and the Facility are each in material compliance with the requirements for participation in the Medicare and Medicaid programs with respect to the Facility that currently participates in such programs and has a current provider agreement under Title XVIII and/or XIX of the Social Security Act which is in full force and effect.  Facility has not had any deficiencies on its most recent survey (standard or complaint that would result in a denial of payment for new admissions with no opportunity to correct prior to termination.   The Facility had not any deficiencies at "level G" or above on its most recent survey (standard or complaint), nor has Tenant been cited with any substandard quality of care deficiencies (as that term is defined in Part 488 of 42 C.F.R.) for the past two consecutive surveys. The Facility has not been designated as a Special Focus Facility (as such term is defined by the Centers for Medicare and Medicaid Services Special Focus Facility Program);

(g)     Neither  Tenant nor the Facility is a target of, participant in, or subject to any action, proceeding, suit, audit, investigation or sanction by any Health Care Authority or any other administrative or investigative body or entity or any other third party payor or any patient or resident (including, without limitation, whistleblower suits, or suits brought pursuant to federal or state False Claims Acts, and Medicaid/Medicare/State fraud/abuse laws, but excluding medical malpractice claims and other civil liability lawsuits for which the Facility is maintaining insurance coverage in the ordinary course of business) which may result, directly or indirectly or with the passage of time, in the imposition of a fine, penalty, alternative, interim or final sanction, a lower rate certification, recoupment, recovery, suspension or discontinuance of all or part of reimbursement from any Health Care Authority, third-party payor, insurance carrier or private payor, a lower reimbursement rate for services rendered to eligible patients, or any other civil or criminal remedy, or which could reasonably be expected to have a material adverse effect on Landlord, Tenant , or the operation of the Facility, including the Facility's ability to accept or retain residents, or which could result in the appointment of a receiver or manager, or in the modification, limitation, annulment, revocation, transfer, surrender, suspension or other impairment of a Health Care License, or affect Tenant's 's participation in the Medicare, Medicaid, or third-party payor program, as applicable, or any successor program thereto, at current rate certification, nor has any such action, proceeding, suit, investigation or audit been threatened:

(h)    There are no agreements with residents of the Facility or with any other persons or organizations that deviate in any material adverse respect from or that conflict with, any statutory or regulatory requirements.  All resident records at the Facility, including patient and/or resident accounts records, are true, complete, and correct in all material respects;

(i)    Other than the Medicare, Medicaid, and Veteran Administration programs, Tenant  is not a participant in any federal, state or local program whereby any federal, state or local government or quasi-governmental body, or any intermediary, agency, board or other authority or entity may have the right to recover funds with respect to any Individual Property by reason of the advance of federal, state or local funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.).  Tenant has received no notice, and is not aware of any violation of applicable antitrust laws;

(j)    Tenant's  private payor, Medicaid, Medicare, and/or managed care company, insurance company or other third-party insurance accounts receivable with respect to the Facility are free of any liens and Tenant has not pledged any of its receivables as collateral security for any loan or indebtedness;

(k)    Tenant is not a party to any collective bargaining agreement or other labor contract applicable to persons employed by it at the Facility and there are no threatened or pending labor disputes at the Facility;

(l)    Tenant has instituted, and the Facility is operated in material compliance with, a compliance plan which follows applicable guidelines established by Health Care Authorities;

(m)    Tenant is in compliance with the Health Care Insurance Portability and Accountability Act of 1996, and the regulations promulgated thereunder;

(n)    There is no threatened or pending revocation, suspension, termination, probation, restriction, limitation, or non-renewal affecting Tenant and/or the Facility or provider agreement with any third-party payor, Medicare or Medicaid;

(o)    All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by or on behalf of the Facility are and will continue to be materially accurate and complete and have not been and will not be misleading in any material respects;

(p)     The Facility and the use thereof complies in all material respects with all applicable local, state, and federal building codes, fire codes, and other similar regulatory requirements and no waivers of such physical plant standards exist at the Facility;

(q)    Any existing agreement relating to the management or operation of the Facility is in full force and effect and is not in default by any party.  In the event any management or operating agreement is terminated or in the event of foreclosure or other acquisition, the subsequent operator need not obtain a certificate of need prior to applying for and receiving a license to operate the Facility or prior to receiving Medicare or Medicaid payments, as applicable;

(r)    There are no actions, suits, or proceedings at law or in equity by any person or entity, including any Governmental Authority or any Health Care Authority or other agency now pending or threatened against or affecting Tenant and/or the Facility, which actions, suits or proceedings, individually or collectively, if determined against Tenant and/or the Facility, might

materially adversely affect the condition (financial or otherwise) or business of Tenant and/or the condition, ownership or operation of the Facility.

**SCHEDULE 19.2**

"**Special Purpose Entity**" shall mean a corporation, limited partnership or limited liability company (such entity sometimes referred to herein as the "**Company**") which at all times on and after the date hereof:

        (a)     is organized solely for the purpose of (i) acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Leased Premises, entering into this Lease with Landlord, subleasing the Leased Premises to affiliated subtenants; and (ii) transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

        (b)     is not engaged and will not engage, directly or indirectly, in any business unrelated to those activities required or permitted to be performed under the Lease, including pursuant to this definition of "Special Purpose Entity" and Subsection (a) above, as applicable;

        (c)     does not have and will not have any assets other than those (i) related to the Leased Premises or its partnership interest in the limited partnership or the member interest in the limited liability company that operates the Leased Premises or acts as the general partner or managing member thereof, as applicable, and (ii) incidental personal property necessary for the conduct of its business, as applicable;

        (d)     has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company) or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable) with respect to the matters set forth in this definition;

        (e)     is and will remain solvent and pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, and is maintaining and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

        (f)     has not failed and will not fail to correct any known misunderstanding regarding its separate identity;

        (g)     has maintained and will maintain its accounts, books and records separate from those of any other person, individual or entity (a "**Person**") and maintain its bank accounts separate from those of any other Person.  To the extent required by law to file a tax return, will file its own tax returns, except to the extent it is required to file consolidated tax returns by law;

        (h)     has maintained and will maintain its own records, books, resolutions and agreements;

        (i)     has not commingled and will not commingle its funds or assets with those of any other Person and has not participated and will not participate in any cash management

system with any other Person other than pursuant to its *[insert any credit facilities or accounts receivables financings]*;

(j)    has held and will hold its assets in its own name;

(k)    has conducted and will conduct its business in its name;

(l)    has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity except as required by GAAP; provided, however, that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(m)    has paid and will pay its own liabilities and expenses, including the salaries of its own employees, if any, out of its own funds and assets, and has maintained and will maintain a sufficient number of employees, if any, in light of its contemplated business operations and in accordance with all Laws:

(n)    has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(o)    has and will have no indebtedness other than (i) liabilities under this Lease or any Sublease (ii) liabilities incurred in the ordinary course of business relating to the ownership and operation of the Leased Premises and the routine administration of Tenant, and (iii) such other liabilities that are permitted under this Lesae;

(p)    has not and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

(q)    has allocated and will allocate fairly, reasonably and in accordance with all Laws, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(r)    maintains and uses and will maintain and use separate stationery, invoices and checks bearing its name.  The stationery, invoices, and checks utilized by the Tenant or utilized to collect its funds or pay its expenses shall bear its own name and shall not bear the name of any other entity;

(s)    not bear the name of any other entity;

(t)    has not pledged and will not pledge its assets for the benefit of any other Person;

(u)    has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(v)    has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(w)      has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity;

(x)      has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself and shall not identify itself as a division of any other Person;

(y)      has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except (A) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are in compliance with all Laws and no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party and (B) in connection with this Lease;

(z)      are in compliance with all Laws and no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party and (B) in connection with this Lease;

(aa)     has not and will not have any obligation to, and will not, indemnify its partners, officers, directors or members, as the case may be, unless such an obligation is fully subordinated to the Rent payable under this Lease and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Rent is insufficient to pay such obligation;

(bb)     it shall consider the interests of its creditors in connection with all limited liability company actions;

(cc)     does not and will not have any of its obligations guaranteed by any Affiliate except obligations under this Lease;

(dd)     if such entity is a limited liability company, it shall have its own board of directors or board of managers, and shall cause such board to meet at least annually or act pursuant to written consent and keep minutes of such meetings and actions and observe all other corporate formalities;

(ee)     has complied and will comply with all of the terms and provisions contained in its organizational documents.  The statement of fact contained in its organizational documents are true and correct and will remain true and correct;

(ff)     has not and will not permit any other Person independent access to its bank accounts;

(gg)     has caused and will cause all representatives of Tenant to act at all times with respect to Tenant consistently and in furtherance of the foregoing; and

(hh)     has not and will not form, acquire, or hold any subsidiary or own any equity interest in any other entity.

# Exhibit C

**Epic Nursing and Rehabilitation at White Plains**
**4 Year Operating Projections**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|---|---|---|---|
| **Occupancy- Nursing Home** | | | | | | | | |
| Medicaid | 27,029 | 27,029 | 27,029 | 27,029 | 74.05 | 74.05 | 74.05 | 74.05 |
| Medicare | 19,500 | 19,500 | 19,500 | 19,500 | 53.42 | 53.42 | 53.42 | 53.42 |
| Private | 3,817 | 3,817 | 3,817 | 3,817 | 10.46 | 10.46 | 10.46 | 10.46 |
| Insurance | 3,381 | 3,381 | 3,381 | 3,381 | 9.26 | 9.26 | 9.26 | 9.26 |
| Total Resident Days | 53,727 | 53,727 | 53,727 | 53,727 | 147.20 | 147.20 | 147.20 | 147.20 |
| Maximum Available Days | 58,400 | 58,400 | 58,400 | 58,400 | | | | |
| Occupancy % | 92.00% | 92.00% | 92.00% | 92.00% | | | | |
| | | | | | | | | |
| **Revenue** | Year 1 | Year 2 | Year 3 | Year 4 | Year 1 | Year 2 | Year 3 | Year 4 |
| Medicaid | 9,067,688 | 9,067,688 | 9,067,688 | 9,067,688 | $ 335.48 | $ 335.48 | $ 335.48 | $ 335.48 |
| Medicare | 17,257,500 | 18,031,435 | 18,572,352 | 19,129,549 | 885.00 | 924.69 | 952.43 | 981.00 |
| Private | 2,112,578 | 2,099,350 | 2,151,836 | 2,205,615 | 553.47 | 550.00 | 563.75 | 577.84 |
| Insurance | 1,999,996 | 2,050,005 | 2,101,259 | 2,153,800 | 591.54 | 606.33 | 621.49 | 637.03 |
| Ancillary (Part B) | 494,823 | 509,741 | 522,700 | 538,359 | 9.21 | 9.49 | 9.73 | 10.02 |
| Total Nursing Home Revenue | 30,932,585 | 31,758,219 | 32,415,835 | 33,095,011 | 575.74 | 591.10 | 603.34 | 615.98 |
| Bad Debt Expense Estimate | (463,988) | (476,372) | (486,240) | (496,423) | (8.64) | (8.87) | (9.05) | (9.24) |
| Revenue Assessment Add-On | 730,818 | 731,521 | 736,207 | 741,012 | 13.60 | 13.62 | 13.70 | 13.79 |
| Net Resident Revenue | 31,199,415 | 32,013,368 | 32,665,802 | 33,339,600 | 580.70 | 595.85 | 607.99 | 620.53 |
| Other Operating Revenue | 15,292 | 13,456 | 13,456 | 13,456 | 0.28 | 0.25 | 0.25 | 0.25 |
| **Total Revenue** | 31,214,707 | 32,026,824 | 32,679,258 | 33,353,056 | $ 580.98 | $ 596.10 | $ 608.24 | $ 620.78 |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| NURSING & MEDICAL | 9,285,234 | 9,535,192 | 9,791,951 | 10,055,709 | 172.82 | 177.47 | 182.25 | 187.16 |
| THERAPY & ANCILLARIES | 3,550,237 | 3,645,812 | 3,743,772 | 3,844,433 | 66.08 | 67.86 | 69.68 | 71.55 |
| SOCIAL SERVICES | 409,645 | 420,937 | 432,242 | 444,085 | 7.62 | 7.83 | 8.05 | 8.27 |
| LEISURE TIME ACTIVITIES | 409,645 | 420,937 | 432,242 | 444,085 | 7.62 | 7.83 | 8.05 | 8.27 |
| CLEANLINESS & SAFETY | 1,911,665 | 1,963,129 | 2,015,876 | 2,070,247 | 35.58 | 36.54 | 37.52 | 38.53 |
| FOOD & NUTRITION | 2,184,760 | 2,243,575 | 2,303,860 | 2,365,761 | 40.66 | 41.76 | 42.88 | 44.03 |

**Epic Nursing and Rehabilitation at White Plains**
**4 Year Operating Projections**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|---|---|---|---|
| GENERAL & ADMINISTRATION | 1,911,665 | 1,963,129 | 2,015,876 | 2,070,247 | 35.58 | 36.54 | 37.52 | 38.53 |
| PROPERTY | 1,201,619 | 1,233,753 | 1,267,123 | 1,301,037 | 22.37 | 22.96 | 23.58 | 24.22 |
| NON COMPARABLE | 361,032 | 370,876 | 381,107 | 391,334 | 6.72 | 6.90 | 7.09 | 7.28 |
| PROVIDER TAX | 909,317 | 829,060 | 834,369 | 839,814 | 16.92 | 15.43 | 15.53 | 15.63 |
| **Operating Expenses** | 22,134,819 | 22,626,400 | 23,218,418 | 23,826,752 | $ 411.97 | $ 421.12 | $ 432.15 | $ 443.47 |
| **EBITDARM** | 9,079,888 | 9,400,424 | 9,460,840 | 9,526,304 | $ 169.01 | $ 174.98 | $ 176.09 | $ 177.31 |
| **Less: Proprietary Operator Specific Costs** | | | | | | | | |
| Centralized Back Office Fee | (1,560,735) | (1,601,340) | (1,633,964) | (1,667,651) | (29.05) | (29.81) | (30.41) | (31.04) |
| Reserve for Replacement ($500/bed) | (80,004) | (80,004) | (80,004) | (80,004) | (1.49) | (1.49) | (1.49) | (1.49) |
| **EBITDAR** | **7,439,149** | **7,719,080** | **7,746,872** | **7,778,649** | **$ 138.47** | **$ 143.68** | **$ 144.19** | **$ 144.78** |
| Rent: Debt Service | (6,900,000) | (6,900,000) | (7,038,000) | (7,179,600) | (128.43) | (128.43) | (131.00) | (133.63) |
| **EBITDA** | **539,149** | **819,080** | **708,872** | **599,049** | **$ 10.04** | **$ 15.25** | **$ 13.19** | **$ 11.15** |
| Depreciation | (252,000) | (252,000) | (252,000) | (252,000) | (4.69) | (4.69) | (4.69) | (4.69) |
| **Net Income/(Loss)** | **287,149** | **567,080** | **456,872** | **347,049** | **$ 5.35** | **$ 10.56** | **$ 8.50** | **$ 6.46** |
| | | | | | $ 441.02 | $ 450.93 | $ 462.56 | $ 474.51 |
| **Valuation and Compliance Summary** | | | | | | | | |
| Rolling T-12 FCCR | 1.47 | 1.51 | 1.52 | 1.53 | | | | |
| Profit Margin % | 0.9% | 1.8% | 1.4% | 1.0% | | | | |
| EBITDAR Margin % | 23.8% | 24.1% | 23.7% | 23.3% | | | | |

**Epic Nursing and Rehabilitation at White Plains**

**5 Year Operating Projections**

**Significant Assumptions**

(1) Projections based on December 2021 T-12 Financial Results and subsequently revised to include 2022 and 2023 results.

(2) COVID staffing and supply costs normalizes. Assumes facility is able to maintain nursing staff on salary.

(3) Centralized Back Office Fee proforma at 5% of Revenue

(4) Bad Debts proforma at 1.50% of Revenue

(5) Reserve for Replacement estimated at $500 per bed

(6) Medicaid Revenue based on current approved rates.

(7) As part of the initial CON, the NYS DOH approved the facility for reimbursement on a $42.5 Million mortgage amortizing over 30 years at an interest rate deemed reasonable by the department. The current landlord's mortgage does not meet NYS DOH's guidelines for mortgage reimbursement.

(8) Projections do not include reimbursement for items discussed in #8.

(9) Once approved, the mortgage reimbursement is anticipated to be approx. $41.03 per Medicaid Day to the capital component of the rate.
This reimbursement would be subject DOH's negative capital rate adjustments
This would add almost $1mm in revenue to the facility based on projected Medicaid occupancy.

(10) Rent Assumptions:

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Monthly Rent Payments | $575,000.00 | $575,000.00 | $586,500.00 | $598,230.00 | $610,195.00 |
| Rounded Rent Payment | $575,000.00 | $575,000.00 | $586,500.00 | $598,300.00 | $610,200.00 |
|  | A/L Lease | A/L Lease | A/L Lease | A/L Lease | Rel Pty Lease |

(11) Census Assumptions

| **Average Daily Census (ADC)** | **2024 YE** | **Projection Y1** |
|---|---|---|
| Medicaid | 73.95 | 74.05 |
| Medicare | 53.41 | 53.42 |
| Private | 10.45 | 10.46 |
| Other Insurance | 9.32 | 9.26 |
| Total | 147.13 | 147.20 |
| % Occupancy | 91.95% | 92.00% |

(12) Revenue and Expense PPD estimates based on 2024 historical results and adjusted for ancitipated 2025 changes where necessary

**Epic Nursing and Rehabilitation at White Plains**
**Year 1 Projection by Month**

| | Days | # Beds | Month 1 (31) | Month 2 (28) | Month 3 (31) | Month 4 (30) | Month 5 (31) | Month 6 (30) | Month 7 (31) | Month 8 (31) | Month 9 (30) | Month 10 (31) | Month 11 (30) | Month 12 (31) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Occupancy- Nursing Home** | | | | | | | | | | | | | | |
| Medicaid | 27,029 | 74.05 | 2,296 | 2,073 | 2,296 | 2,221 | 2,296 | 2,221 | 2,296 | 2,296 | 2,221 | 2,296 | 2,221 | 2,296 |
| Medicare | 19,500 | 53.42 | 1,656 | 1,496 | 1,656 | 1,603 | 1,656 | 1,603 | 1,656 | 1,656 | 1,603 | 1,656 | 1,603 | 1,656 |
| Private | 3,817 | 10.46 | 324 | 293 | 324 | 314 | 324 | 314 | 324 | 324 | 314 | 324 | 314 | 324 |
| Insurance | 3,381 | 9.26 | 287 | 260 | 287 | 278 | 287 | 278 | 287 | 287 | 278 | 287 | 278 | 287 |
| Total Resident Days | 53,727 | 147.20 | 4,563 | 4,122 | 4,563 | 4,416 | 4,563 | 4,416 | 4,563 | 4,563 | 4,416 | 4,563 | 4,416 | 4,563 |
| Maximum Available Days | 58,400 | 160.00 | 4,960 | 4,480 | 4,960 | 4,800 | 4,960 | 4,800 | 4,960 | 4,960 | 4,800 | 4,960 | 4,800 | 4,960 |
| Occupancy % | 92.00% | | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% |
| | Gross | PPD | | | | | | | | | | | | |
| **Revenue** | | | | | | | | | | | | | | |
| Medicaid | 9,067,688 | 335.48 | 770,262 | 695,450 | 770,262 | 745,101 | 770,262 | 745,101 | 770,262 | 770,262 | 745,101 | 770,262 | 745,101 | 770,262 |
| Medicare | 17,257,500 | 885.00 | 1,465,560 | 1,323,960 | 1,465,560 | 1,418,655 | 1,465,560 | 1,418,655 | 1,465,560 | 1,465,560 | 1,418,655 | 1,465,560 | 1,418,655 | 1,465,560 |
| Private | 2,112,578 | 553.47 | 178,200 | 161,150 | 178,200 | 172,700 | 178,200 | 172,700 | 178,200 | 178,200 | 172,700 | 182,655 | 177,018 | 182,655 |
| Insurance | 1,999,996 | 591.54 | 169,772 | 153,800 | 169,772 | 164,448 | 169,772 | 164,448 | 169,772 | 169,772 | 164,448 | 169,772 | 164,448 | 169,772 |
| Ancillary (Part B) | 494,823 | 9.21 | 42,025 | 37,964 | 42,025 | 40,671 | 42,025 | 40,671 | 42,025 | 42,025 | 40,671 | 42,025 | 40,671 | 42,025 |
| Total Nursing Home Revenue | 30,932,585 | 575.74 | 2,625,819 | 2,372,324 | 2,625,819 | 2,541,575 | 2,625,819 | 2,541,575 | 2,625,819 | 2,625,819 | 2,541,575 | 2,630,274 | 2,545,893 | 2,630,274 |
| Bad Debt Expense Estimate | (463,988) | (8.64) | (39,387) | (35,585) | (39,387) | (38,124) | (39,387) | (38,124) | (39,387) | (39,387) | (38,124) | (39,454) | (38,188) | (39,454) |
| Revenue Assessment Add-On, Net | 730,818 | 13.60 | 62,001 | 56,010 | 62,001 | 60,002 | 62,001 | 60,002 | 62,001 | 62,001 | 60,002 | 62,268 | 60,261 | 62,268 |
| Net Resident Revenue | 31,199,415 | 580.70 | 2,648,433 | 2,392,749 | 2,648,433 | 2,563,453 | 2,648,433 | 2,563,453 | 2,648,433 | 2,648,433 | 2,563,453 | 2,653,088 | 2,567,966 | 2,653,088 |
| Other Operating Revenue | 15,292 | 0.28 | 1,342 | 1,200 | 1,316 | 1,274 | 1,303 | 1,249 | 1,290 | 1,290 | 1,290 | 1,290 | 1,224 | 1,290 |
| **Total Revenue** | 31,214,707 | 580.98 | 2,649,775 | 2,393,949 | 2,649,749 | 2,564,727 | 2,649,736 | 2,564,702 | 2,649,723 | 2,649,723 | 2,564,677 | 2,654,378 | 2,569,190 | 2,654,378 |
| **Expenses** | | | 5% | 4% | 3% | 3% | 2% | 1% | 1% | 1% | -1% | 1% | -1% | 1% |
| NURSING & MEDICAL | 9,285,234 | 172.82 | 814,496 | 728,770 | 798,981 | 773,242 | 791,224 | 758,227 | 783,467 | 783,467 | 743,213 | 783,467 | 743,213 | 783,467 |
| THERAPY & ANCILLARIES | 3,550,237 | 66.08 | 311,425 | 278,647 | 305,493 | 295,651 | 302,527 | 289,910 | 299,561 | 299,561 | 284,170 | 299,561 | 284,170 | 299,561 |
| SOCIAL SERVICES | 409,645 | 7.62 | 35,934 | 32,152 | 35,249 | 34,114 | 34,907 | 33,451 | 34,565 | 34,565 | 32,789 | 34,565 | 32,789 | 34,565 |
| LEISURE TIME ACTIVITIES | 409,645 | 7.62 | 35,934 | 32,152 | 35,249 | 34,114 | 34,907 | 33,451 | 34,565 | 34,565 | 32,789 | 34,565 | 32,789 | 34,565 |
| CLEANLINESS & SAFETY | 1,911,665 | 35.58 | 167,690 | 150,041 | 164,496 | 159,197 | 162,899 | 156,106 | 161,302 | 161,302 | 153,014 | 161,302 | 153,014 | 161,302 |
| FOOD & NUTRITION | 2,184,760 | 40.66 | 191,646 | 171,475 | 187,996 | 181,939 | 186,170 | 178,406 | 184,345 | 184,345 | 174,874 | 184,345 | 174,874 | 184,345 |
| GENERAL & ADMINISTRATION | 1,911,665 | 35.58 | 167,690 | 150,041 | 164,496 | 159,197 | 162,899 | 156,106 | 161,302 | 161,302 | 153,014 | 161,302 | 153,014 | 161,302 |
| PROPERTY | 1,201,619 | 22.37 | 105,405 | 94,311 | 103,398 | 100,067 | 102,394 | 98,124 | 101,390 | 101,390 | 96,180 | 101,390 | 96,180 | 101,390 |
| NON COMPARABLE | 361,032 | 6.72 | 31,670 | 28,336 | 31,066 | 30,065 | 30,765 | 29,482 | 30,463 | 30,463 | 28,898 | 30,463 | 28,898 | 30,463 |
| PROVIDER TAX | 909,317 | 15.42 | 79,916 | 71,505 | 78,394 | 75,869 | 77,633 | 74,395 | 76,872 | 76,872 | 72,922 | 76,872 | 72,922 | 75,145 |
| **Operating Expenses** | 22,134,819 | 410.47 | 1,941,806 | 1,737,430 | 1,904,818 | 1,843,455 | 1,886,325 | 1,807,658 | 1,867,832 | 1,867,832 | 1,771,863 | 1,867,832 | 1,771,863 | 1,866,105 |
| **EBITDARM** | 9,079,888 | 170.51 | 707,969 | 656,519 | 744,931 | 721,272 | 763,411 | 757,044 | 781,891 | 781,891 | 792,814 | 786,546 | 797,327 | 788,273 |
| **Less: Proprietary Operator Specific Costs** | | | | | | | | | | | | | | |
| Centralized Back Office Fee | (1,560,735) | (29.05) | (132,489) | (119,697) | (132,487) | (128,236) | (132,487) | (128,235) | (132,486) | (132,486) | (128,234) | (132,719) | (128,460) | (132,719) |
| **EBITDAR** | 7,519,153 | 141.46 | 575,480 | 536,822 | 612,444 | 593,036 | 630,924 | 628,809 | 649,405 | 649,405 | 664,580 | 653,827 | 668,867 | 655,554 |
| Rent: Debt Service | (6,900,000) | (128.43) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) |
| **EBITDA** | 619,153 | 13.03 | 480 | (38,178) | 37,444 | 18,036 | 55,924 | 53,809 | 74,405 | 74,405 | 89,580 | 78,827 | 93,867 | 80,554 |
| Depreciation | (252,000) | (4.69) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) |
| Reserve for Replacement ($500/bed) | (80,004) | (1.49) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) |

**Medicare Rates**

| | |
|---|---|
| 1/1 | 885.00 |
| 10/1 | 917.75 |

**Epic Nursing and Rehabilitation at White Plains**
**Year 1 Projection by Month**

| | Days | # Beds | 31 Month 1 | 28 Month 2 | 31 Month 3 | 30 Month 4 | 31 Month 5 | 30 Month 6 | 31 Month 7 | 31 Month 8 | 30 Month 9 | 31 Month 10 | 30 Month 11 | 31 Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income/(Loss) | 287,149 | 19.88 | (27,187) | (65,845) | 9,777 | (9,631) | 28,257 | 26,142 | 46,738 | 46,738 | 61,913 | 51,160 | 66,200 | 52,887 |

| Monthly Debt Svc (See Assumptions Tab) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 Month EBITDAR | | | | 1,724,746 | | | 1,852,769 | | | 1,963,390 | | | 1,978,248 |
| 3 Month FCCR | | | | 1.35 | | | 1.45 | | | 1.54 | | | 1.55 |
| 6 Month EBITDAR | | | | | | | 3,577,515 | | | 3,816,159 | | | 3,941,638 |
| 6 Month FCCR | | | | | | | 1.40 | | | 1.50 | | | 1.55 |
| 9 Month EBITDAR | | | | | | | | | | 5,540,905 | | | 5,794,407 |
| 9 Month FCCR | | | | | | | | | | 1.45 | | | 1.51 |
| 12 Month EBITDAR | | | | | | | | | | | | | 7,519,153 |
| 12 Month FCCR | | | | | | | | | | | | | 1.47 |

**Epic Nursing and Rehabilitation at White Plains**
**Year 2 Projection by Month**

| | Days | # Beds | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Occupancy- Nursing Home** | | | | | | | | | | | | | | |
| Medicaid | 27,029 | 74.05 | 2,296 | 2,073 | 2,296 | 2,221 | 2,296 | 2,221 | 2,296 | 2,296 | 2,221 | 2,296 | 2,221 | 2,296 |
| Medicare | 19,500 | 53.42 | 1,656 | 1,496 | 1,656 | 1,603 | 1,656 | 1,603 | 1,656 | 1,656 | 1,603 | 1,656 | 1,603 | 1,656 |
| Private | 3,817 | 10.46 | 324 | 293 | 324 | 314 | 324 | 314 | 324 | 324 | 314 | 324 | 314 | 324 |
| Insurance | 3,381 | 9.26 | 287 | 260 | 287 | 278 | 287 | 278 | 287 | 287 | 278 | 287 | 278 | 287 |
| Total Resident Days | 53,727 | 147.20 | 4,563 | 4,122 | 4,563 | 4,416 | 4,563 | 4,416 | 4,563 | 4,563 | 4,416 | 4,563 | 4,416 | 4,563 |
| Maximum Available Days | 58,400 | 160.00 | 4,960 | 4,480 | 4,960 | 4,800 | 4,960 | 4,800 | 4,960 | 4,960 | 4,800 | 4,960 | 4,800 | 4,960 |
| Occupancy % | 92.00% | | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% |
| | Gross | PPD | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
| **Revenue** | | | | | | | | | | | | | | |
| Medicaid | 9,067,688 | 335.48 | 770,262 | 695,450 | 770,262 | 745,101 | 770,262 | 745,101 | 770,262 | 770,262 | 745,101 | 770,262 | 745,101 | 770,262 |
| Medicare | 18,031,435 | 924.69 | 1,519,794 | 1,372,954 | 1,519,794 | 1,471,153 | 1,519,794 | 1,471,153 | 1,519,794 | 1,519,794 | 1,471,153 | 1,565,384 | 1,515,284 | 1,565,384 |
| Private | 2,099,350 | 550.00 | 178,200 | 161,150 | 178,200 | 172,700 | 178,200 | 172,700 | 178,200 | 178,200 | 172,700 | 178,200 | 172,700 | 178,200 |
| Insurance | 2,050,005 | 606.33 | 174,017 | 157,646 | 174,017 | 168,560 | 174,017 | 168,560 | 174,017 | 174,017 | 168,560 | 174,017 | 168,560 | 174,017 |
| Ancillary (Part B) | 509,741 | 9.49 | 43,075 | 38,912 | 43,075 | 41,687 | 43,075 | 41,687 | 43,075 | 43,075 | 41,687 | 43,936 | 42,521 | 43,936 |
| Total Nursing Home Revenue | 31,758,219 | 591.10 | 2,685,348 | 2,426,112 | 2,685,348 | 2,599,201 | 2,685,348 | 2,599,201 | 2,685,348 | 2,685,348 | 2,599,201 | 2,731,799 | 2,644,166 | 2,731,799 |
| Bad Debt Expense Estimate | (476,372) | (8.87) | (40,280) | (36,392) | (40,280) | (38,988) | (40,280) | (38,988) | (40,280) | (40,280) | (38,988) | (40,977) | (39,662) | (40,977) |
| Revenue Assessment Add-On, Net | 731,521 | 13.62 | 62,128 | 56,125 | 62,128 | 60,125 | 62,128 | 60,125 | 62,128 | 62,128 | 60,125 | 62,128 | 60,125 | 62,128 |
| Net Resident Revenue | 32,013,368 | 595.85 | 2,707,196 | 2,445,845 | 2,707,196 | 2,620,338 | 2,707,196 | 2,620,338 | 2,707,196 | 2,707,196 | 2,620,338 | 2,752,950 | 2,664,629 | 2,752,950 |
| Other Operating Revenue | 13,456 | 0.25 | 1,152 | 1,020 | 1,152 | 1,093 | 1,152 | 1,093 | 1,152 | 1,152 | 1,093 | 1,152 | 1,093 | 1,152 |
| **Total Revenue** | 32,026,824 | 596.10 | 2,708,348 | 2,446,865 | 2,708,348 | 2,621,431 | 2,708,348 | 2,621,431 | 2,708,348 | 2,708,348 | 2,621,431 | 2,754,102 | 2,665,722 | 2,754,102 |
| **Expenses** | | | | | | | | | | | | | | |
| NURSING & MEDICAL | 9,535,192 | 177.47 | 816,373 | 722,869 | 816,373 | 774,428 | 816,373 | 774,428 | 816,373 | 816,373 | 774,428 | 816,373 | 774,428 | 816,373 |
| THERAPY & ANCILLARIES | 3,645,812 | 67.86 | 312,143 | 276,391 | 312,143 | 296,105 | 312,143 | 296,105 | 312,143 | 312,143 | 296,105 | 312,143 | 296,105 | 312,143 |
| SOCIAL SERVICES | 420,937 | 7.83 | 36,039 | 31,912 | 36,039 | 34,188 | 36,039 | 34,188 | 36,039 | 36,039 | 34,188 | 36,039 | 34,188 | 36,039 |
| LEISURE TIME ACTIVITIES | 420,937 | 7.83 | 36,039 | 31,912 | 36,039 | 34,188 | 36,039 | 34,188 | 36,039 | 36,039 | 34,188 | 36,039 | 34,188 | 36,039 |
| CLEANLINESS & SAFETY | 1,963,129 | 36.54 | 168,077 | 148,826 | 168,077 | 159,441 | 168,077 | 159,441 | 168,077 | 168,077 | 159,441 | 168,077 | 159,441 | 168,077 |
| FOOD & NUTRITION | 2,243,575 | 41.76 | 192,088 | 170,087 | 192,088 | 182,218 | 192,088 | 182,218 | 192,088 | 192,088 | 182,218 | 192,088 | 182,218 | 192,088 |
| GENERAL & ADMINISTRATION | 1,963,129 | 36.54 | 168,077 | 148,826 | 168,077 | 159,441 | 168,077 | 159,441 | 168,077 | 168,077 | 159,441 | 168,077 | 159,441 | 168,077 |
| PROPERTY | 1,233,753 | 22.96 | 105,630 | 93,531 | 105,630 | 100,203 | 105,630 | 100,203 | 105,630 | 105,630 | 100,203 | 105,630 | 100,203 | 105,630 |
| NON COMPARABLE | 370,876 | 6.90 | 31,753 | 28,117 | 31,753 | 30,122 | 31,753 | 30,122 | 31,753 | 31,753 | 30,122 | 31,753 | 30,122 | 31,753 |
| PROVIDER TAX | 829,060 | 15.43 | 70,412 | 63,608 | 70,412 | 68,142 | 70,412 | 68,142 | 70,412 | 70,412 | 68,142 | 70,412 | 68,142 | 70,412 |
| **Operating Expenses** | 22,626,400 | 421.12 | 1,936,631 | 1,716,079 | 1,936,631 | 1,838,476 | 1,936,631 | 1,838,476 | 1,936,631 | 1,936,631 | 1,838,476 | 1,936,631 | 1,838,476 | 1,936,631 |
| **EBITDARM** | 9,400,424 | 174.98 | 771,717 | 730,786 | 771,717 | 782,955 | 771,717 | 782,955 | 771,717 | 771,717 | 782,955 | 817,471 | 827,246 | 817,471 |
| **Less: Proprietary Operator Specific Costs** | | | | | | | | | | | | | | |
| Centralized Back Office Fee | (1,601,340) | (29.81) | (135,417) | (122,343) | (135,417) | (131,072) | (135,417) | (131,072) | (135,417) | (135,417) | (131,072) | (137,705) | (133,286) | (137,705) |
| Reserve for Replacement ($500/bed) | (80,004) | (1.49) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) |
| **EBITDAR** | 7,719,080 | 143.68 | 629,633 | 601,776 | 629,633 | 645,216 | 629,633 | 645,216 | 629,633 | 629,633 | 645,216 | 673,099 | 687,293 | 673,099 |
| Rent: Debt Service | (6,900,000) | (128.43) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) | (575,000) |
| **EBITDA** | 819,080 | 15.25 | 54,633 | 26,776 | 54,633 | 70,216 | 54,633 | 70,216 | 54,633 | 54,633 | 70,216 | 98,099 | 112,293 | 98,099 |
| Depreciation | (252,000) | (4.69) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) |

| | | |
|---|---|---|
| Medicare Rates | | |
| 1/1 | 917.75 | |
| 10/1 | 945.28 | |

**Epic Nursing and Rehabilitation at White Plains**
**Year 2 Projection by Month**

| | Days | # Beds | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Income/(Loss)** | 567,080 | 10.56 | 33,633 | 5,776 | 33,633 | 49,216 | 33,633 | 49,216 | 33,633 | 33,633 | 49,216 | 77,099 | 91,293 | 77,099 |
| | | | | | | | | | | | | | | |
| Monthly Debt Svc (See Assumptions Tab) | $ | 425,000 | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| 3 Month EBITDAR | | | | | 1,861,042 | | | 1,920,065 | | | 1,904,482 | | | 2,033,491 |
| 3 Month FCCR | | | | | 1.46 | | | 1.51 | | | 1.49 | | | 1.59 |
| | | | | | | | | | | | | | | |
| Rolling 12 Month EBITDAR | | | | | 7,655,449 | | | 7,722,745 | | | 7,663,837 | | | 7,719,080 |
| Rolling 12 Month FCCR | | | | | 1.50 | | | 1.51 | | | 1.50 | | | 1.51 |

**Epic Nursing and Rehabilitation at White Plains**
**Year 3 Projection by Month**

| | Days | # Beds | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Occupancy- Nursing Home** | | | | | | | | | | | | | | |
| Medicaid | 27,029 | 74.05 | 2,296 | 2,073 | 2,296 | 2,221 | 2,296 | 2,221 | 2,296 | 2,296 | 2,221 | 2,296 | 2,221 | 2,296 |
| Medicare | 19,500 | 53.42 | 1,656 | 1,496 | 1,656 | 1,603 | 1,656 | 1,603 | 1,656 | 1,656 | 1,603 | 1,656 | 1,603 | 1,656 |
| Private | 3,817 | 10.46 | 324 | 293 | 324 | 314 | 324 | 314 | 324 | 324 | 314 | 324 | 314 | 324 |
| Insurance | 3,381 | 9.26 | 287 | 260 | 287 | 278 | 287 | 278 | 287 | 287 | 278 | 287 | 278 | 287 |
| Total Resident Days | 53,727 | 147.20 | 4,563 | 4,122 | 4,563 | 4,416 | 4,563 | 4,416 | 4,563 | 4,563 | 4,416 | 4,563 | 4,416 | 4,563 |
| Maximum Available Days | 58,400 | 160.00 | 4,960 | 4,480 | 4,960 | 4,800 | 4,960 | 4,800 | 4,960 | 4,960 | 4,800 | 4,960 | 4,800 | 4,960 |
| Occupancy % | 92.00% | | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% |

Medicare Rates
1/1  945.28
10/1  973.64

| | Gross | PPD | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | |
| Medicaid | 9,067,688 | 335.48 | 770,262 | 695,450 | 770,262 | 745,101 | 770,262 | 745,101 | 770,262 | 770,262 | 745,101 | 770,262 | 745,101 | 770,262 |
| Medicare | 18,572,352 | 952.43 | 1,565,384 | 1,414,139 | 1,565,384 | 1,515,284 | 1,565,384 | 1,515,284 | 1,565,384 | 1,565,384 | 1,515,284 | 1,612,348 | 1,560,745 | 1,612,348 |
| Private | 2,151,836 | 563.75 | 182,655 | 165,179 | 182,655 | 177,018 | 182,655 | 177,018 | 182,655 | 182,655 | 177,018 | 182,655 | 177,018 | 182,655 |
| Insurance | 2,101,259 | 621.49 | 178,368 | 161,587 | 178,368 | 172,774 | 178,368 | 172,774 | 178,368 | 178,368 | 172,774 | 178,368 | 172,774 | 178,368 |
| Ancillary (Part B) | 522,700 | 9.73 | 44,170 | 39,901 | 44,170 | 42,747 | 44,170 | 42,747 | 44,170 | 44,170 | 42,747 | 45,053 | 43,602 | 45,053 |
| Total Nursing Home Revenue | 32,415,835 | 603.34 | 2,740,839 | 2,476,256 | 2,740,839 | 2,652,924 | 2,740,839 | 2,652,924 | 2,740,839 | 2,740,839 | 2,652,924 | 2,788,686 | 2,699,240 | 2,788,686 |
| Bad Debt Expense Estimate | (486,240) | (9.05) | (41,113) | (37,144) | (41,113) | (39,794) | (41,113) | (39,794) | (41,113) | (41,113) | (39,794) | (41,830) | (40,489) | (41,830) |
| Revenue Assessment Add-On, Net | 736,207 | 13.70 | 62,526 | 56,485 | 62,526 | 60,510 | 62,526 | 60,510 | 62,526 | 62,526 | 60,510 | 62,526 | 60,510 | 62,526 |
| Net Resident Revenue | 32,665,802 | 608.00 | 2,762,252 | 2,495,597 | 2,762,252 | 2,673,640 | 2,762,252 | 2,673,640 | 2,762,252 | 2,762,252 | 2,673,640 | 2,809,382 | 2,719,261 | 2,809,382 |
| Other Operating Revenue | 13,456 | 0.25 | 1,152 | 1,020 | 1,152 | 1,093 | 1,152 | 1,093 | 1,152 | 1,152 | 1,093 | 1,152 | 1,093 | 1,152 |
| **Total Revenue** | 32,679,258 | 608.25 | 2,763,404 | 2,496,617 | 2,763,404 | 2,674,733 | 2,763,404 | 2,674,733 | 2,763,404 | 2,763,404 | 2,674,733 | 2,810,534 | 2,720,354 | 2,810,534 |
| | | | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | | | |
| NURSING & MEDICAL | 9,791,951 | 182.25 | 838,356 | 742,335 | 838,356 | 795,281 | 838,356 | 795,281 | 838,356 | 838,356 | 795,281 | 838,356 | 795,281 | 838,356 |
| THERAPY & ANCILLARIES | 3,743,772 | 69.68 | 320,530 | 283,818 | 320,530 | 304,061 | 320,530 | 304,061 | 320,530 | 320,530 | 304,061 | 320,530 | 304,061 | 320,530 |
| SOCIAL SERVICES | 432,242 | 8.05 | 37,007 | 32,769 | 37,007 | 35,106 | 37,007 | 35,106 | 37,007 | 37,007 | 35,106 | 37,007 | 35,106 | 37,007 |
| LEISURE TIME ACTIVITIES | 432,242 | 8.05 | 37,007 | 32,769 | 37,007 | 35,106 | 37,007 | 35,106 | 37,007 | 37,007 | 35,106 | 37,007 | 35,106 | 37,007 |
| CLEANLINESS & SAFETY | 2,015,876 | 37.52 | 172,593 | 152,825 | 172,593 | 163,725 | 172,593 | 163,725 | 172,593 | 172,593 | 163,725 | 172,593 | 163,725 | 172,593 |
| FOOD & NUTRITION | 2,303,860 | 42.88 | 197,249 | 174,657 | 197,249 | 187,115 | 197,249 | 187,115 | 197,249 | 197,249 | 187,115 | 197,249 | 187,115 | 197,249 |
| GENERAL & ADMINISTRATION | 2,015,876 | 37.52 | 172,593 | 152,825 | 172,593 | 163,725 | 172,593 | 163,725 | 172,593 | 172,593 | 163,725 | 172,593 | 163,725 | 172,593 |
| PROPERTY | 1,267,123 | 23.58 | 108,487 | 96,062 | 108,487 | 102,913 | 108,487 | 102,913 | 108,487 | 108,487 | 102,913 | 108,487 | 102,913 | 108,487 |
| NON COMPARABLE | 381,107 | 7.09 | 32,629 | 28,892 | 32,629 | 30,953 | 32,629 | 30,953 | 32,629 | 32,629 | 30,953 | 32,629 | 30,953 | 32,629 |
| PROVIDER TAX | 834,369 | 15.53 | 70,863 | 64,016 | 70,863 | 68,578 | 70,863 | 68,578 | 70,863 | 70,863 | 68,578 | 70,863 | 68,578 | 70,863 |
| **Operating Expenses** | 23,218,418 | 432.15 | 1,987,314 | 1,760,968 | 1,987,314 | 1,886,563 | 1,987,314 | 1,886,563 | 1,987,314 | 1,987,314 | 1,886,563 | 1,987,314 | 1,886,563 | 1,987,314 |
| | | | | | | | | | | | | | | |
| **EBITDARM** | 9,460,840 | 176.10 | 776,090 | 735,649 | 776,090 | 788,170 | 776,090 | 788,170 | 776,090 | 776,090 | 788,170 | 823,220 | 833,791 | 823,220 |
| | | | | | | | | | | | | | | |
| **Less: Proprietary Operator Specific Costs** | | | | | | | | | | | | | | |
| Centralized Back Office Fee | (1,633,964) | (30.41) | (138,170) | (124,831) | (138,170) | (133,737) | (138,170) | (133,737) | (138,170) | (138,170) | (133,737) | (140,527) | (136,018) | (140,527) |
| Reserve for Replacement ($500/bed) | (80,004) | (1.49) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) |
| | | | | | | | | | | | | | | |
| **EBITDAR** | 7,746,872 | 144.20 | 631,253 | 604,151 | 631,253 | 647,766 | 631,253 | 647,766 | 631,253 | 631,253 | 647,766 | 676,026 | 691,106 | 676,026 |
| | | | | | | | | | | | | | | |
| Rent: Debt Service | (7,038,000) | (131.00) | (586,500) | (586,500) | (586,500) | (586,500) | (586,500) | (586,500) | (586,500) | (586,500) | (586,500) | (586,500) | (586,500) | (586,500) |
| **EBITDA** | 708,872 | 13.20 | 44,753 | 17,651 | 44,753 | 61,266 | 44,753 | 61,266 | 44,753 | 44,753 | 61,266 | 89,526 | 104,606 | 89,526 |
| | | | | | | | | | | | | | | |
| Depreciation | (252,000) | (4.69) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) |

**Epic Nursing and Rehabilitation at White Plains**
**Year 3 Projection by Month**

| | Days | # Beds | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Income/(Loss)** | 456,872 | 8.51 | 23,753 | (3,349) | 23,753 | 40,266 | 23,753 | 40,266 | 23,753 | 23,753 | 40,266 | 68,526 | 83,606 | 68,526 |
| Monthly Debt Svc (See Assumptions Tab) | $ 425,000 | | | | | | | | | | | | | |
| 3 Month EBITDAR | | | | | 1,866,657 | | | 1,926,785 | | | 1,910,272 | | | 2,043,158 |
| 3 Month FCCR | | | | | 1.46 | | | 1.51 | | | 1.50 | | | 1.60 |
| Rolling 12 Month EBITDAR | | | | | 7,724,695 | | | 7,731,415 | | | 7,737,205 | | | 7,746,872 |
| Rolling 12 Month FCCR | | | | | 1.51 | | | 1.52 | | | 1.52 | | | 1.52 |

**Epic Nursing and Rehabilitation at White Plains**
**Year 4 Projection by Month**

| | Days | # Beds | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Occupancy- Nursing Home** | | | | | | | | | | | | | | |
| Medicaid | 27,029 | 74.05 | 2,296 | 2,073 | 2,296 | 2,221 | 2,296 | 2,221 | 2,296 | 2,296 | 2,221 | 2,296 | 2,221 | 2,296 |
| Medicare | 19,500 | 53.42 | 1,656 | 1,496 | 1,656 | 1,603 | 1,656 | 1,603 | 1,656 | 1,656 | 1,603 | 1,656 | 1,603 | 1,656 |
| Private | 3,817 | 10.46 | 324 | 293 | 324 | 314 | 324 | 314 | 324 | 324 | 314 | 324 | 314 | 324 |
| Insurance | 3,381 | 9.26 | 287 | 260 | 287 | 278 | 287 | 278 | 287 | 287 | 278 | 287 | 278 | 287 |
| Total Resident Days | 53,727 | 147.20 | 4,563 | 4,122 | 4,563 | 4,416 | 4,563 | 4,416 | 4,563 | 4,563 | 4,416 | 4,563 | 4,416 | 4,563 |
| Maximum Available Days | 58,400 | 160.00 | 4,960 | 4,480 | 4,960 | 4,800 | 4,960 | 4,800 | 4,960 | 4,960 | 4,800 | 4,960 | 4,800 | 4,960 |
| Occupancy % | 92.00% | | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% |
| | Gross | PPD | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
| **Revenue** | | | | | | | | | | | | | | |
| Medicaid | 9,067,688 | 335.48 | 770,262 | 695,450 | 770,262 | 745,101 | 770,262 | 745,101 | 770,262 | 770,262 | 745,101 | 770,262 | 745,101 | 770,262 |
| Medicare | 19,129,549 | 981.00 | 1,612,348 | 1,456,565 | 1,612,348 | 1,560,745 | 1,612,348 | 1,560,745 | 1,612,348 | 1,612,348 | 1,560,745 | 1,660,520 | 1,607,569 | 1,660,720 |
| Private | 2,205,615 | 577.84 | 187,220 | 169,307 | 187,220 | 181,442 | 187,220 | 181,442 | 187,220 | 187,220 | 181,442 | 187,220 | 181,442 | 187,220 |
| Insurance | 2,153,800 | 637.03 | 182,828 | 165,628 | 182,828 | 177,094 | 182,828 | 177,094 | 182,828 | 182,828 | 177,094 | 182,828 | 177,094 | 182,828 |
| Ancillary (Part B) | 538,359 | 10.02 | 45,493 | 41,096 | 45,493 | 44,028 | 45,493 | 44,028 | 45,493 | 45,493 | 44,028 | 46,403 | 44,908 | 46,403 |
| Total Nursing Home Revenue | 33,095,011 | 615.98 | 2,798,151 | 2,528,046 | 2,798,151 | 2,708,410 | 2,798,151 | 2,708,410 | 2,798,151 | 2,798,151 | 2,708,410 | 2,847,433 | 2,756,114 | 2,847,433 |
| Bad Debt Expense Estimate | (496,423) | (9.24) | (41,972) | (37,921) | (41,972) | (40,626) | (41,972) | (40,626) | (41,972) | (41,972) | (40,626) | (42,711) | (41,342) | (42,711) |
| Revenue Assessment Add-On, Net | 741,012 | 13.79 | 62,934 | 56,854 | 62,934 | 60,905 | 62,934 | 60,905 | 62,934 | 62,934 | 60,905 | 62,934 | 60,905 | 62,934 |
| Net Resident Revenue | 33,339,600 | 620.54 | 2,819,113 | 2,546,979 | 2,819,113 | 2,728,689 | 2,819,113 | 2,728,689 | 2,819,113 | 2,819,113 | 2,728,689 | 2,867,656 | 2,775,677 | 2,867,656 |
| Other Operating Revenue | 13,456 | 0.25 | 1,152 | 1,020 | 1,152 | 1,093 | 1,152 | 1,093 | 1,152 | 1,152 | 1,093 | 1,152 | 1,093 | 1,152 |
| **Total Revenue** | 33,353,056 | 620.79 | 2,820,265 | 2,547,999 | 2,820,265 | 2,729,782 | 2,820,265 | 2,729,782 | 2,820,265 | 2,820,265 | 2,729,782 | 2,868,808 | 2,776,770 | 2,868,808 |
| **Expenses** | | | | | | | | | | | | | | |
| NURSING & MEDICAL | 10,055,709 | 187.16 | 860,938 | 762,331 | 860,938 | 816,703 | 860,938 | 816,703 | 860,938 | 860,938 | 816,703 | 860,938 | 816,703 | 860,938 |
| THERAPY & ANCILLARIES | 3,844,433 | 71.55 | 329,148 | 291,449 | 329,148 | 312,237 | 329,148 | 312,237 | 329,148 | 329,148 | 312,237 | 329,148 | 312,237 | 329,148 |
| SOCIAL SERVICES | 444,085 | 8.27 | 38,021 | 33,666 | 38,021 | 36,068 | 38,021 | 36,068 | 38,021 | 38,021 | 36,068 | 38,021 | 36,068 | 38,021 |
| LEISURE TIME ACTIVITIES | 444,085 | 8.27 | 38,021 | 33,666 | 38,021 | 36,068 | 38,021 | 36,068 | 38,021 | 38,021 | 36,068 | 38,021 | 36,068 | 38,021 |
| CLEANLINESS & SAFETY | 2,070,247 | 38.53 | 177,248 | 156,947 | 177,248 | 168,141 | 177,248 | 168,141 | 177,248 | 177,248 | 168,141 | 177,248 | 168,141 | 177,248 |
| FOOD & NUTRITION | 2,365,761 | 44.03 | 202,549 | 179,350 | 202,549 | 192,142 | 202,549 | 192,142 | 202,549 | 202,549 | 192,142 | 202,549 | 192,142 | 202,549 |
| GENERAL & ADMINISTRATION | 2,070,247 | 38.53 | 177,248 | 156,947 | 177,248 | 168,141 | 177,248 | 168,141 | 177,248 | 177,248 | 168,141 | 177,248 | 168,141 | 177,248 |
| PROPERTY | 1,301,037 | 24.22 | 111,391 | 98,632 | 111,391 | 105,667 | 111,391 | 105,667 | 111,391 | 111,391 | 105,667 | 111,391 | 105,667 | 111,391 |
| NON COMPARABLE | 391,334 | 7.28 | 33,505 | 29,667 | 33,505 | 31,783 | 33,505 | 31,783 | 33,505 | 33,505 | 31,783 | 33,505 | 31,783 | 33,505 |
| PROVIDER TAX | 839,814 | 15.63 | 71,325 | 64,435 | 71,325 | 69,026 | 71,325 | 69,026 | 71,325 | 71,325 | 69,026 | 71,325 | 69,026 | 71,325 |
| **Operating Expenses** | 23,826,752 | 443.47 | 2,039,394 | 1,807,090 | 2,039,394 | 1,935,976 | 2,039,394 | 1,935,976 | 2,039,394 | 2,039,394 | 1,935,976 | 2,039,394 | 1,935,976 | 2,039,394 |
| **EBITDARM** | 9,526,304 | 177.32 | 780,871 | 740,909 | 780,871 | 793,806 | 780,871 | 793,806 | 780,871 | 780,871 | 793,806 | 829,414 | 840,794 | 829,414 |
| **Less: Proprietary Operator Specific Costs** | | | | | | | | | | | | | | |
| Centralized Back Office Fee | (1,667,651) | (31.04) | (141,013) | (127,400) | (141,013) | (136,489) | (141,013) | (136,489) | (141,013) | (141,013) | (136,489) | (143,440) | (138,839) | (143,440) |
| Reserve for Replacement ($500/bed) | (80,004) | (1.49) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) | (6,667) |
| **EBITDAR** | 7,778,649 | 144.79 | 633,191 | 606,842 | 633,191 | 650,650 | 633,191 | 650,650 | 633,191 | 633,191 | 650,650 | 679,307 | 695,288 | 679,307 |
| Rent: Debt Service | (7,179,600) | (133.63) | (598,300) | (598,300) | (598,300) | (598,300) | (598,300) | (598,300) | (598,300) | (598,300) | (598,300) | (598,300) | (598,300) | (598,300) |
| **EBITDA** | 599,049 | 11.16 | 34,891 | 8,542 | 34,891 | 52,350 | 34,891 | 52,350 | 34,891 | 34,891 | 52,350 | 81,007 | 96,988 | 81,007 |
| Depreciation | (252,000) | (4.69) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) | (21,000) |

| Medicare Rates | |
|---|---|
| 1/1 | 973.64 |
| 10/1 | 1002.85 |

**Epic Nursing and Rehabilitation at White Plains**
**Year 4 Projection by Month**

| | Days | # Beds | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Income/(Loss)** | 347,049 | 6.47 | 13,891 | (12,458) | 13,891 | 31,350 | 13,891 | 31,350 | 13,891 | 13,891 | 31,350 | 60,007 | 75,988 | 60,007 |
| | | | | | | | | | | | | | | |
| Monthly Debt Svc (See Assumptions Tab) | $ | 425,000 | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| 3 Month EBITDAR | | | | | 1,873,224 | | | 1,934,491 | | | 1,917,032 | | | 2,053,902 |
| 3 Month FCCR | | | | | 1.47 | | | 1.52 | | | 1.50 | | | 1.61 |
| | | | | | | | | | | | | | | |
| Rolling 12 Month EBITDAR | | | | | 7,753,439 | | | 7,761,145 | | | 7,767,905 | | | 7,778,649 |
| Rolling 12 Month FCCR | | | | | 1.52 | | | 1.52 | | | 1.52 | | | 1.53 |

| | |
|---|---|
| Revenue Inflation Factor from 2021 $ | 2.50% |
| Expense Inflation Factor from 2021 $ | 2.50% |

**Epic Nursing and Rehabilitation at White Plains**
**Medicaid Rate Analysis**

| | 7/1/2023 As Issued | 2024 Initial | 2024 w/Mortgage |
|---|---|---|---|
| 1 Facility Specific Non-Comp Price | $ 11.84 | $ 11.84 | $ 11.84 |
| 2 Statewide Direct Price | $ 113.68 | $ 113.68 | $ 113.68 |
| 3 WEF Adjustment | 1.0671 | 1.0671 | 1.0671 |
| 4 Facility Case Mix Adjustment | 1.5868 | 1.5868 | 1.5868 |
| 5 WEF and Case Mix Adjusted Price | $ 192.49 | $ 192.49 | $ 192.49 |
| 6 Statewide Indirect Price | $ 57.18 | $ 57.18 | $ 57.18 |
| 7 WEF Adjustment | 1.0356 | 1.0356 | 1.0356 |
| 8 WEF Adjusted Indirect Price | $ 59.22 | $ 59.22 | $ 59.22 |
| 9 Total Operating Component | $ 263.55 | $ 263.55 | $ 263.55 |
| 10 DEM, BMI, TBI Per Diem Add On | - | - | 4.05 |
| 11 Transition Adjustment | - | - | - |
| 12 Quality Adjustment | - | - | - |
| 13 Misc Per Diem Adjustments | $ 24.43 | $ 27.00 | $ 24.43 |
|    1% Retroactive Adj retro to 4/1/23 | | $ - | $ - |
|    Impact of 2024-25 NYS Budget Items | | $ - | $ - |
| 14 PHL Section 2808(215)© Adj | - | - | - |
| 15 Adj to cap case mix | - | - | - |
| 16 Total Price | $ 287.98 | $ 290.55 | $ 292.03 |
| 17 Capital per Diem | $ 49.86 | $ 44.93 | $ 88.94 |
| 18 Total Price + Capital Per Diem | $ 337.84 | $ 335.48 | $ 380.97 |
| 19 Cash Receipts Assessment per Diem | $ 10.43 | $ 10.43 | $ 10.43 |
| 20 Benchmark Rate | $ 348.27 | $ 345.91 | $ 391.40 |
| | | | |
|    MA Only CMI | 1.44 | 1.44 | 1.44 |

# Exhibit D

# **<u>Exhibit G</u>**

**HBL SNF, LLC d/b/a Epic Rehabilitation and Nursing at White Plains**
**Liquidation Analysis**
**Based on Assets as of May 31, 2024**

| Asset Item | Value per Balance Sheet | | Adjustments | | | Liquidation Value |
|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | $ | 163,453 | | | $ | 163,453 |
| Accounts Receivable, Net | $ | 5,320,111 | | | $ | 5,320,111 |
| Third Party Payor Receivables | $ | 1,131,449 | | **G** | $ | 1,131,449 |
| Inventory | $ | 40,206 | $ | (36,185) **A** | $ | 4,021 |
| Security Deposits | $ | 88,871 | $ | (88,871) **B** | $ | - |
| Prepaid Expenses | $ | 936,648 | $ | (936,648) **B** | $ | - |
| Resident Funds | $ | 47,843 | | **C** | $ | 47,843 |
| Property & Equipment, Net | $ | 2,081,089 | | | $ | 2,081,089 |
| | | | | | | |
| Assets Available for Liquidation | | | | | $ | 8,747,966 |
| | | | | | | |
| Security Benefit Corp lien on Accounts Receivable | | | | **D** | $ | (5,320,111) |
| Landlord's claim on title to Property & Equipment | | | | **E** | $ | (2,081,089) |
| | | | | | | |
| | | | | | | |
| DOH Mandated Closure Plan: Professional Fees | | | | **F** | $ | (250,000) |
| DOH Mandated Closure Plan: Operating Costs | | | | **F** | $ | (3,500,000) |
| | | | | | | |
| Net Assets Available for Liquidation | | | | | $ | (2,403,234) |

**NOTES**

**A**  Assumes inventory can be sold at 10% of historical cost

**B**  Prepaid expenses and Secuity Deposits represent monies already expended. Unclear if entity has right to refund

**C**  Resident funds belong to residents of facility and must be refunded and/or transferred at discharge

**D**  Security Benefit Corp holds priority lien on accounts receivable assets

**E**  Landlord has not issued title to Property and Equipment assets being used by the Nursing Home.

**F**  New York State Department of Health mandates Nursing Homes file a closure plan and discharge all residents before liquidation.
      This plan includes professional fees and estimate for 45 days of operating expenses to facilitate discharges and closure.

**G**  Receivables from Third Party Payors represent estimated Medicaid Rate Changes for prior years.
      Unclear when or if the New York State Department of Health will pay these amounts.